RICHARD J. NELSON (State Bar No. 141658)
E-Mail:        *rnelson@sideman.com*
LOUIS P. FEUCHTBAUM (State Bar No. 219826)
E-Mail:        *lfeuchtbaum@sideman.com*
ANGELA M. HE (State Bar No. 319351)
E-Mail:        *ahe@sideman.com*
ARTUR A. MINASYAN (SBN 322248)
E-Mail:        *aminasyan@sideman.com*
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:        (415) 392-1960
Facsimile:        (415) 392-0827

Attorneys for Plaintiffs
Cisco Systems, Inc. and Cisco Technology, Inc.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS, INC., a California corporation, and CISCO TECHNOLOGY, INC., a California corporation, <br><br> Plaintiffs, <br><br> v. <br><br> DEXON COMPUTER, INC., A Minnesota Corporation, <br><br> Defendant. | CASE NO. 3:20-cv-4926 <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** <br><br> 1. **FEDERAL TRADEMARK INFRINGEMENT 15 U.S.C. § 1114;** <br> 2. **USE OF A COUNTERFEIT MARK 15 U.S.C. § 1117(c);** <br> 3. **UNFAIR COMPETITION 15 U.S.C. § 1125(a)(1)(A);** <br> 4. **CALIFORNIA COMMON LAW UNFAIR COMPETITION AND TRADEMARK INFRINGEMENT;** <br> 5. **UNFAIR BUSINESS PRACTICES, CAL. BUS. & PROF. CODE § 17200 et seq.** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ᴺᴰ FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Plaintiffs Cisco Systems, Inc. ("CSI") and Cisco Technology, Inc. ("CTI") (together, "Cisco" or "Plaintiffs"), hereby complain and allege against Defendant Dexon Computer, Inc. ("Dexon") as follows:

## I.   INTRODUCTION

1.      This case seeks to hold Dexon accountable for the mass infringement and counterfeiting, and related unfair competition arising from Dexon's sale of counterfeit, non-authentic "Cisco" products.  Cisco has engaged with Dexon many times in the past years to get Dexon to stop selling counterfeit Cisco products, but to no avail.

2.      As set forth in detail below, Cisco has uncovered a significant and willful infringement scheme by Dexon, which involves the purchase and sale of counterfeit and otherwise non-genuine and infringing "Cisco"-branded products, offered to the public as genuine Cisco products.  Customers purchasing such products are duped into thinking they are buying genuine Cisco-branded products, causing significant harm not only to the duped customer, but also to Cisco, its brand, and its established reputation for producing the highest quality networking communications and information technology products and services.

3.      Consumers rely on Cisco products to run complex, critical and highly secured networks.   But counterfeit Cisco products can cause network downtime, and substantial business interruption.  Cisco brings this action to protect consumers from receiving inferior counterfeit products, to recover for the significant damage Dexon's unlawful and infringing conduct has caused to Cisco, to put a stop to Dexon's unlawful and infringing conduct, and to enjoin further unlawful and infringing conduct.

## II.   THE PARTIES

4.      Plaintiff Cisco Systems, Inc., is, and at all times mentioned herein was, a California corporation, with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.  Plaintiff Cisco Technology, Inc., is, and at all times mentioned herein was, a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

5.      On information and belief, Defendant Dexon Computer, Inc., is and was at all relevant times mentioned herein a business entity incorporated in the State of Minnesota with its principal place of business in Bloomington, Minnesota.

6.      Cisco is informed and believes, and thereon alleges, that Dexon undertook obligations or rights arising out of the subject events and happenings herein referred to, engaged in actions or omissions, either intentional or negligent, regarding the subject events and happenings herein referred to, and/or benefited unjustly from the efforts, work, and goods of Cisco.

### III.     JURISDICTION AND VENUE

7.      This is an action for violations of the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.* (the "Lanham Act").  This Court has original subject matter jurisdiction over this action pursuant to the provision of the Lanham Act, 15 U.S.C. § 1121, as well as under 28 U.S.C. §§ 1331 and 1338(a) and (b).

8.      This Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367, because these claims are so related to Cisco's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

9.      This Court has personal jurisdiction over the defendant Dexon, because Dexon has and appears to continue to transact business within the State of California; because Dexon has caused tortious injury to Plaintiffs' trademarks within the State of California; and because Dexon has systematically directed electronic activity into the State of California with the manifest intent of engaging in business within the State of California, including the purchase for sale of counterfeit Cisco products from resellers within the State of California.  Dexon maintains a website through which it solicits business throughout the United States, including within the State of California.  Cisco alleges on information and belief that at all times relevant to this Complaint, Dexon has continuously operated that website and that Dexon has purposefully maintained contacts within the State of California for the purpose of conducting business there.

10.     Dexon has committed acts, related to the causes of action asserted in this Complaint, which demonstrate that it has purposefully directed its activities towards the State of

1  California.  As described more fully in this Complaint, these activities include selling counterfeit

2  products directly into the State of California.  Dexon also sold counterfeit products that it had

3  shipped from a location within the State of California.  Plaintiffs further allege on information and

4  belief that Dexon regularly conducts business within the State of California, including purchasing

5  Cisco products from resellers in California, and selling products to purchasers within the state.

6       11.  Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(2) because a

7  substantial part of the events or omissions giving rise to Cisco's claims occurred in this judicial

8  district.

9  **IV.  INTRADISTRICT ASSIGNMENT**

10       12.  In accordance with Civil Local Rule 3-2(c), this action is properly assigned on a

11  District-wide basis because it relates to Intellectual Property Rights.

12  **V.  FACTUAL ALLEGATIONS**

13      **A.  <u>Cisco's Business and History</u>**

14       13.  Founded in 1984, Cisco is the worldwide leader in developing, implementing,

15  and providing the technologies behind networking, communications, and information technology

16  products and services.  Cisco develops and provides a broad range of networking products and

17  services that enable seamless communication among individuals, businesses, public institutions,

18  government agencies, and service providers.  Specifically, the thousands of engineers who work at

19  Cisco develop and provide networking and communications hardware, software, and services that

20  utilize cutting-edge technologies to transport data, voice, and video within buildings, across cities

21  and campuses, and around the world.

22       14.  Since its founding, Cisco has pioneered many of the important technologies that

23  created and enabled global interconnectivity.  During the past three decades, Cisco has invested

24  billions of dollars, and the time and dedication of thousands of its engineers, in the research,

25  development, and sale of industry-leading networking and communications products and services.

26       15.  Cisco has also built up tremendous goodwill and brand reputation among

27  consumers, including corporate and government consumers, through significant investment in

28  advertising, promoting, and delivering products, software, and services of the highest quality

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    under the CISCO trademark and the family of CISCO-related trademarks (collectively, the "Cisco

2    Marks").  Cisco has used the Cisco Marks to identify goods and services as being genuine and

3    authorized, and therefore, the Cisco Marks are well-recognized signifiers of Cisco's best-in-class

4    products, software, and services.

5         **B.    Cisco's Trademarks**

6         16.    CTI owns all rights, title, and interest in the Cisco Marks, many of which are

7    included on the Principal Register of the U.S. Patent and Trademark Office ("USPTO"), and it has

8    licensed the use of the Cisco Marks to CSI.  The Cisco Marks are well-known.  They are used in

9    connection with Cisco's networking hardware and software products and services.  They include,

10   but are not limited to, the following marks that are used in interstate commerce:

| Mark | Registration Number | Registration Date |
|---|---|---|
| CISCO | 1,542,339 | June 6, 1989 |
| CISCO SYSTEMS | 1,996,957 | August 27, 1996 |
| CISCO | 2,498,746 | October 16, 2001 |
| ılıılıı CISCO | 3,759,451 | March 9, 2010 |
| CISCO | 3,978,294 | June 14, 2011 |
| ılıılıı CISCO | 4,263,591 | December 25, 2012 |

20        17.    The Cisco Marks are distinctive, having no meaning outside of their use by Cisco

21   in its course of business operations and in its advertising to distinguish its products and services.

22   Cisco uses the Cisco Marks to advertise through a wide variety of media including television,

23   radio, newspapers, magazines, billboards, direct mail, and web sites.

24        18.    Cisco has attained one of the highest levels of brand recognition among

25   consumers due to its extensive advertising and promotional efforts and its continuous use of its

26   core Cisco Marks for the past three decades.  As a result of Cisco's longstanding and widespread

27   use and promotion of the Cisco Marks, Cisco customers around the globe have come to rely upon

28   the Cisco Marks to identify Cisco's high-quality hardware, software, and services.  Many of

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    Cisco's products are purchased by the U.S. government, the military, hospitals, and by other

2    industries, in critical and life-essential applications.

3         19.    Cisco's customers associate Cisco's famous and well-known trademarks,

4    including, among others, CISCO and the Cisco logo, exclusively with Cisco and Cisco's products

5    and services. When customers encounter these marks and decide to purchase goods and services

6    identified by these marks, they expect to receive genuine Cisco products that have been produced

7    by Cisco.  Moreover, when customers purchase products that are advertised as "new factory

8    sealed," they reasonably believe that they are purchasing genuine products manufactured or

9    authorized by Cisco that have not been tampered with from the time the product was sealed in its

10   shipping packaging.

11        **C.    Counterfeit "Cisco" Products**

12        20.    Counterfeit products that bear markings similar to the Cisco Marks provide

13   customers with a false assurance that the products they have purchased (1) are reliable and

14   conform with Cisco's high standards, (2) come with applicable warranties, (3) can be placed under

15   a Cisco service support contract (i.e., SMARTnet), and (4) come with all of the necessary

16   accessories sold with the product that have been selected and approved by Cisco for use with the

17   product.

18        21.    In addition to harm to customers, the sale of counterfeit Cisco products harms

19   Cisco in many ways.  Counterfeit Cisco products which fail or degrade create the false impression

20   that Cisco products are unreliable, thereby improperly tarnishing Cisco's reputation and causing

21   Cisco to lose control of its goodwill and suffer lost sales and future business opportunities.  When

22   customers purchase Cisco-branded parts that are counterfeit and unreliable, their image of Cisco is

23   diminished and Cisco's opportunity to sell genuine, high-quality products to those customers may

24   be lost forever.  As a result of the manufacture and distribution of such counterfeit products, Cisco

25   suffers substantial and irreparable harm to its brand, image, business, and goodwill with the

26   public.  Cisco also suffers lost sales when customers purchase counterfeit products instead of

27   genuine Cisco products.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**D.**    **Impact on Health, Safety, and National Security Caused by Counterfeit Cisco Products**

22.    Cisco products are part of the backbone of the United States information technology network.  Many of Cisco's products are purchased by U.S. governmental entities, the military, hospitals, and by other industries, and used in important and life-essential applications. Critical governmental and other infrastructure is built on, and relies upon, Cisco products to maintain the security of data storage and transfer.

23.    It would be difficult to overstate the importance that the assured quality of Cisco's products has for customers who need to ensure the reliable functioning of their critical processes.  Cisco firewalls, for example, ensure the integrity of government, medical, and business data and communications.  The U.S. government recognizes the importance of installing only genuine Cisco products.  In a criminal trial involving counterfeit Cisco products sold to the U.S. Marine Corps, Staff Sargent Lee Chieffalo, USMC, testified that he specifically demanded genuine Cisco products when he ordered them, because if the networks that the "Cisco" products were in failed due to substandard counterfeit products, "Marines could die."

**E.**    **Dexon's History And Practice Of Trafficking In Counterfeit Cisco Products**

24.    For each of the instances where Dexon trafficked in counterfeit Cisco products that is described in this Complaint, Cisco alleges that Dexon used a Cisco Mark, which is identical to or nearly indistinguishable from the corresponding Cisco Mark that is registered with the USPTO.  In each of those instances the Cisco Mark was used on a Cisco-branded product, which was determined to be counterfeit in that the product *appears* to be a genuine product manufactured by Cisco, but in actuality was not manufactured by Cisco, or  under its authority.  For each of those instances, Dexon used the Cisco Mark in commerce without Plaintiffs' permission or authority.

25.    From at least July 2006 through the present, Dexon has repeatedly and systematically engaged in schemes to traffic counterfeit Cisco products.  In these schemes, Dexon falsely represented to the public that various Cisco-branded products it was selling are genuine, when in fact they are not.  In that approximately fifteen year period, Cisco has repeatedly informed

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Dexon that it was selling counterfeit products, it repeatedly demanded that Dexon cease and desist selling those counterfeits, and it has requested Dexon's assistance in identifying the sources for those counterfeit products so that Cisco could thwart those suppliers from further damaging its brand and from defrauding the public.  In almost every instance, Dexon refused to cooperate with Cisco, and refused to identify the counterfeit traffickers who supply it.

26.     As described more fully below, Cisco asserts that Dexon's long history of counterfeit trafficking, and of repeatedly denying Cisco's requests for assistance in identifying its sources for counterfeit Cisco products, provide evidence that Dexon's illegal conduct was done willfully, or that Dexon has been willfully blind to the fact that it has been selling counterfeit Cisco products for a period that is now approaching almost two decades.

F.     **Activity Prior to 2016 Demonstrating Dexon's Pattern and Practice of Knowingly Trafficking in Counterfeit Cisco Products**

(1)     **Dexon's July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco Investigator (Reston, Virginia)**

27.     On or about July 27, 2006, Dexon sold three counterfeit Cisco products (Product identification codes ("PID"): GLC-LH-SM, WIC-1DSU-T1-V2, and NM-4T) to an investigator, who was working for Cisco.  Dexon represented that these were all genuine Cisco products and that they were new.   Dexon sent two of these products (PIDs: GLC-LH-SM and WIC-1DSU-T1-V2) directly from its business location in Minnesota, to the investigator in Reston, Virginia.  One of these parts (PID: NM-4T) was sent by Dexon from 15330 Barranca Parkway, Irvine, California.  These parts were inspected by a Cisco engineer who determined that they were all counterfeit.

(2)     **FBI's Seizure of Counterfeit Cisco Products from Dexon on February 26, 2008**

28.     On February 26, 2008, the Federal Bureau of Investigation ("FBI") executed a search warrant at Dexon's business location in Minnesota.  In the course of that search, the FBI seized 204 Cisco-branded products that appeared suspicious.   Cisco engineers inspected a sampling of these products and determined all those sampled were counterfeit.

1

         **(3)     Cisco's First Cease and Desist Letter to Dexon and its CEO**

2          29.     On March 7, 2008, in reaction to the FBI's seizure of Cisco-branded products from

3 Dexon during execution of its search warrant, Cisco sent a letter to Steven O'Neill ("O'Neill"),

4 Dexon's President and CEO, demanding that Dexon cease and desist selling counterfeit Cisco

5 products.  Cisco requested that Dexon assist it in identifying its sources of counterfeit products.

6 On March 18, 2008, Dexon responded to that letter through counsel, denying that Dexon had been

7 involved in any illegal conduct.  Dexon declined to assist Cisco's investigation into its sources of

8 counterfeit Cisco products.

9         **(4)     Dexon's June 2010 Sale of Counterfeit Cisco Products to Wayne State**

10                  **University (Detroit, Michigan), and Cisco's C&D Letter**

11          30.     On or about January 21, 2010, Dexon provided Wayne State University ("WSU")

12 with a bid to supply it with various new Cisco products.  On or about February 9, 2010, WSU

13 issued a $180,000 purchase order to Dexon for those products.  Dexon shipped those products to

14 WSU during, or about, June 2010.  WSU became concerned that some of those products might not

15 be genuine and sent thirteen of them to Cisco for inspection.  On or about July 6, 2010, engineers

16 examined those products (twelve GLC-SX-MM's and one GLC-LH-SM) and determined that all

17 thirteen were counterfeit.

18          31.     On August 6, 2010, Cisco sent a letter to Dexon's CEO, O'Neill, informing him of

19 Dexon's sale of counterfeit Cisco products to WSU and demanding that Dexon cease and desist its

20 illegal conduct.  In that letter, Cisco demanded that Dexon preserve all evidence regarding its

21 procurement and sale of the counterfeit Cisco products, requested that Dexon quarantine for

22 inspection any Cisco-branded products that it procured in the same batch as the counterfeit

23 products, and requested Dexon's assistance in tracing the counterfeit products to the source.

24          32.     On August 23, 2010, Dexon responded to Cisco's Cease and Desist Letter through

25 counsel.  Dexon denied that it knowingly engaged in the sale of counterfeit products or had any

26 liability "for trademark counterfeiting without regard to notice, knowledge, or intent[]." Dexon

27 also demanded that Cisco "substantiate [its claims] with more specific information about the

28 nature of the liability.…" and requested that Cisco provide it with "all information available to

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   substantiate [its]claim that the products listed in [Cisco's] letter are in fact counterfeit."  Dexon

2   conditioned a willingness "to discuss how it might cooperate in Cisco's investigation," upon the

3   "extent that Cisco is willing to provide the [information that Dexon requested]."

4        33.    On August 30, 2010, Cisco responded to Dexon by providing it with much of the

5   requested information.  Cisco provided Dexon with general guidelines on how to avoid purchasing

6   counterfeit products, but noted that many indicia of genuine products are maintained as trade

7   secrets because of the need to avoid educating counterfeiters.  Cisco provided Dexon with legal

8   authority to address its contention that it could not be liable for trademark counterfeiting.  Cisco

9   noted Dexon's previous refusals to identify its source for counterfeit products, and renewed its

10  request for Dexon's assistance.  Nonetheless, Dexon refused to provide Cisco with any assistance

11  in identifying the sources of these counterfeit products.

12       **(5)    Dexon's July 2010 Sale of Counterfeit Cisco Products To A Cisco**
              **Investigator (Los Angeles, California)**
13

14       34.    On or about July 14, 2010, Dexon sold seven Cisco-branded products to an

15  investigator in Los Angeles, CA, who was working for Cisco.  Dexon represented that these were

16  genuine Cisco products and that they were all new.  On July 21, 2010, Dexon shipped these

17  products to the investigator at an address in Los Angeles, CA.  On August 9, 2010, engineers

18  completed their examination of these parts and determined that all seven were counterfeit (one

19  WS-C2960-24TC-L, four GLC-SX-MM, and two GLC-LH-SM's).

20       **G.    Dexon's Illegal Conduct Giving Rise to Its Present Liabilities**

21       35.    Dexon has continued to engage in a scheme to sell counterfeit Cisco products, and

22  to protect its suppliers of counterfeit products by concealing their identities.  On every occasion

23  when Cisco requested Dexon's assistance in providing information about people and entities who

24  supplied Dexon with counterfeit or illegally acquired Cisco products, Dexon's response would be

25  the same: Dexon would deny any wrong-doing, it would claim to be committed to maintaining the

26  integrity of the marketplace, and then it would paradoxically refuse to assist Cisco's investigations

27  into illegal conduct.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**(1)    Dexon's Sale of Counterfeit Cisco Products to Jack Henry & Associates, Inc. (Monett, Missouri), and Cisco's C&D Letter**

36.    On or about December 29, 2016, Dexon sold a large quantity of Cisco transceivers to Jack Henry & Associates, Inc. ("Jack Henry") in Monett, Missouri.  In May 2017, a Cisco engineer examined three of them (a GLC-TE, a SFP-10G-LR, and a SFP-10G-SR) and determined that they were counterfeit.

37.    On June 26, 2017, Cisco sent a Cease and Desist Letter to Dexon, through its counsel.  That letter identified the counterfeit Cisco-branded transceivers that Dexon sold to Jack Henry, as well as other activities by Dexon that infringed upon Cisco's trademarks, and misleading statements that Dexon made in advertising regarding the Cisco-branded products it was selling.

38.    On July 31, 2017, Dexon responded to Cisco's June letter, largely by objecting to Cisco's claims.  It provided a list of conditions that Cisco would need to satisfy before Dexon would assist Cisco's investigation into the source of counterfeits.

**(2)    Dexon's October 2017 Sale of Counterfeit Cisco Products To A Cisco Investigator**

39.    On or about October 13, 2017, an investigator working for Cisco conducted a test purchase of the following Cisco-branded products from Dexon: a WS-C3560X-24T-E, a GLC-SX-MMD, a GLC-LH-SMD, a SFP-10G-SR, and a SFP-10G-LR.  Two of these products (the SFP-10G-SR and SFP-10G-LR) were the same model of transceivers that Cisco addressed with Dexon a few months earlier, in June 2017.  Dexon shipped those products from its business location in Minnesota to an address in Berkeley, California.  A Cisco engineer inspected each of these products and determined that they were all counterfeit.

**(3)    Dexon's April 2018 Sale of Counterfeit Cisco Products to Tucson Medical Center (Arizona)**

40.    On or about April 16, 2018, Dexon sold 20 Cisco transceivers (SFP-10G-LR) to Tucson Medical Center ("TMC") in Arizona.  These transceivers were identical to one of the models of counterfeit transceivers that Dexon had sold to Jack Henry, and that Cisco had

specifically addressed with Dexon's counsel in the June 2017 Cease and Desist Letter.  During June 2018, TMC sought technical assistance from Cisco to correct malfunctions with three of these transceivers.  Cisco inspected each of these three malfunctioning products and determined that they were all counterfeit.

### (4)   Dexon's April 2018 Sale of Counterfeit Cisco Products to DARCARS (Maryland), and Cisco's C&D Letter

41.   On or about April 16, 2018, Dexon sold two WS-C3650-48PS-E switches, among other products, to DARCARS, a business located in Silver Spring, Maryland.  On or about May 12, 2020 DARCARS contacted Cisco for assistance because those switches were malfunctioning.  After evaluating these two switches, Cisco determined they are counterfeit.

42.   On May 13, 2020, counsel for Cisco contacted counsel for Dexon, and requested Dexon's cooperation to disclose the source of the counterfeit switches that Dexon sold to DARCARS, and to quarantine any other Cisco products from the same source.  Once again, Dexon would not provide any information about the source of the counterfeit Cisco products.

### (5)   Dexon's August 2018 Sale of Counterfeit Cisco Products to Lockridge, Grindal, Nauen, PLLP (Minneapolis, Minnesota)

43.   On or about August 22, 2018, Dexon sold various Cisco-branded products to Lockridge, Grindal, Nauen, PLLP, a law firm in Minneapolis, Minnesota ("LGN").  During or about January 2019, LGN sought technical assistance from Cisco because four of the six Cisco WS-C2960X-48FPS-L switches that LGN had purchased from Dexon were malfunctioning.  Cisco inspected those four switches and determined that they are all counterfeit.

### (6)   Dexon's Purchases in 2018 of Counterfeit Switches from PureFutureTech (Fremont, California)

44.   In 2018, Dexon purchased "Cisco" switches from PureFutureTech, a company in Fremont, California.  PureFutureTech purchased many "Cisco" products from Chinese sources, including a company called HongKong Sellsi.  Based upon information and belief, Cisco alleges that HongKong Sellsi sold predominately counterfeit Cisco products.  Cisco has analyzed many switches sold by HongKong Sellsi, and they have been predominantly counterfeit.  In 2019, Cisco

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  filed a civil complaint against HongKong Sellsi in the Northern District of California, alleging that

2  HongKong Sellsi sold counterfeit Cisco products.  HongKong Sellsi did not respond, and the

3  Court entered default against it.

4       45.  Cisco sought Dexon's cooperation to locate the HongKong Sellsi switches that

5  Dexon had purchased from PureFutureTech, but Dexon refused to cooperate.  Cisco filed a motion

6  in federal court in Minnesota to compel Dexon to comply with a subpoena, and the court ordered

7  Dexon to disclose the customers to which it sold the HongKong Sellsi switches.  Dexon identified

8  two companies—one in Texas and one in Ohio.  Cisco contacted both of those companies and

9  analyzed the switches that Dexon sold to them.  Every one of the five switches that Dexon sold to

10  those companies was counterfeit.

11       46.  Dexon purchased many more products from PureFutureTech from 2017 to 2019.

12  Most of the products were "Cisco" transceivers.  Dexon placed the orders with PureFutureTech in

13  Fremont, California, and received shipments of these "Cisco" products from Fremont, California.

14  A former employee of the organization that controls PureFutureTech has testified under oath that

15  the organization sold counterfeit Cisco transceivers.  Supporting this former employee's belief that

16  PureFutureTech regularly sold counterfeit Cisco products were the facts that: the products were

17  imported from China to a receiving location in Nevada, and her personally having observed other

18  employees place counterfeit Cisco labels on the products in Fremont before selling them.  The

19  receiving location in Nevada makes no logistical sense, other than an attempt to obfuscate based

20  on the fact that U.S. Customs and Border Patrol had earlier seized shipment of counterfeit Cisco

21  products going to the Fremont address.  Cisco has analyzed dozens of transceivers sold by the

22  organization that controls PureFutureTech, and determined that they are counterfeit.   On

23  information and belief, Cisco alleges that the "Cisco" products purchased by Dexon from

24  PureFutureTech in Fremont are counterfeit.

25

26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Case No. 3:20-cv-4926
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

(7)     **Dexon's Sales of Counterfeit Cisco Products to Murray State University (Murray, Kentucky) in 2018 and 2019, and Cisco's C&D Letter**

47.     On or about April 17, 2018, Dexon sold a Cisco WS-C2960X-48FPD-L switch to Murray State University in Murray, Kentucky ("Murray State").  On or about June 6, 2018, Dexon sold Murray State a Cisco WS-C2960X-48LPD-L switch.  On or about September 10, 2019, Dexon sold Murray State another Cisco WS-C2960X-48FPD-L switch.  Each of these Cisco-branded switches began malfunctioning, causing Murray State to seek technical assistance from Cisco.  After evaluating these three switches, Cisco determined that they were all counterfeit.

48.     On April 7, 2020, Cisco sent a Cease and Desist Letter to Dexon, through its counsel.  That letter identified the counterfeit Cisco switches that Dexon sold to Murray State, demanded that Dexon preserve all evidence related to its purchase of those counterfeit products, and requested Dexon's assistance in identifying others who traffic in counterfeit Cisco products.  Once again, Dexon refused to provide any information about the source of the counterfeit Cisco product.

(8)     **Dexon's July 2019 Sale of Counterfeit Cisco Products to MedRisk (King of Prussia, Pennsylvania)**

49.     In or about July 2019, Dexon sold ten Cisco GLC-TE transceivers to MedRisk Inc, a healthcare organization located in King of Prussia, Pennsylvania ("MedRisk").  Eight of these products began malfunctioning, shortly after MedRisk received them from Dexon.  MedRisk sought technical assistance from Cisco.  After evaluating these eight transceivers, Cisco determined that all of them are counterfeit.

(9)     **Dexon's September 2019 Sale of Counterfeit Cisco Products to Coppell Independent School District (Coppell, Texas), and Cisco's C&D Letter**

50.     On or about September 30, 2019, Dexon sold six QSFP-40G-ER4 transceivers to Coppell Independent School District ("Coppell ISD").  These transceivers are extremely sophisticated, with a Global List Price of $37,495 each.  Dexon sold them for a remarkably low price of $2,645 each.

51.     On October 4, 2019, Coppell ISD contacted Cisco's Technical Assistance Center ("TAC") because the transceivers were not functioning.  The TAC agent obtained information about three of the transceivers, and ultimately a Cisco engineer determined that the transceivers are counterfeit.

52.     On April 13, 2020, Cisco sent a Cease and Desist Letter to Dexon, through its counsel.  That letter identified the counterfeit Cisco transceivers that Dexon sold to Coppell ISD, demanded that Dexon preserve all evidence related to its purchase of those counterfeit products, and requested Dexon's assistance in identifying others who traffic in counterfeit Cisco products. Once again, Dexon refused to provide any information.

### (10)     Dexon's June 2020 Sale of Counterfeit Cisco Products to a Cisco Investigator

53.     On or about June 4, 2020, an investigator working for Cisco conducted a test purchase of Cisco-branded products from Dexon, which were offered by Dexon as "new" products.  A Cisco engineer inspected these products and determined that three of them, one C3850-NM-4-10G switch and two SFP-10G-SR transceivers, were counterfeit.

### DEXON'S WILLFULNESS

54.     Cisco asserts on information and belief that at the time of each sale noted herein, Dexon was on notice that it was selling counterfeit Cisco products.  Cisco asserts on information and belief that Dexon's continued sales of counterfeit Cisco products resulted from its willful selling of counterfeit Cisco products, or that it is the result of Dexon's willful blindness to the fact that it was selling counterfeit Cisco products.

### FIRST CLAIM FOR RELIEF
### Federal Trademark Infringement
### (15 U.S.C. § 1114)

55.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

56.     The Cisco Marks and the goodwill of the business associated with them are tremendously valuable in the United States and worldwide because they are distinctive and

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  universally associated in the public perception with the highest quality network and

2  communications technology products and services.

3     57.    Dexon has sold, offered to sell, distributed, and advertised infringing products

4  bearing Cisco Marks ("Infringing Products").

5     58.    The differences between Dexon's Infringing Products and genuine Cisco goods are

6  material.  Cisco asserts on information and belief that having all original Cisco components and

7  entitlement to warranty services are relevant to customers' decisions about whether, and from

8  whom, to purchase Cisco products.

9     59.    Dexon's actions have caused confusion, mistake, and deception as to the origin and

10  quality of Dexon's Infringing Products because they are intentionally calculated to mislead the

11  general purchasing public into believing that Dexon's Infringing Products originated from, are

12  associated with, or are otherwise authorized by Cisco, when in fact they are not.

13     60.    Upon information and belief, Dexon's infringing actions were committed

14  fraudulently, willfully, and in bad faith, with knowledge of Cisco's exclusive rights to, and

15  goodwill in, the Cisco Marks, or with willful blindness to the same, and with the intent to cause

16  confusion, to cause mistake, and/or to deceive.

17     61.    Dexon's unauthorized use of the Cisco Marks constitutes trademark infringement

18  of the federally registered Cisco Marks and has caused substantial damage to Cisco and to the

19  reputation and goodwill symbolized by the Cisco Marks in violation of Section 32 of the Lanham

20  Act, 15 U.S.C. § 1114, in an amount to be proven at trial.

21     62.    Dexon's conduct described above, including the unauthorized use of the Cisco

22  Marks in interstate commerce, has directly and proximately caused substantial, irreparable injury

23  to Cisco and to the business and goodwill represented by the Cisco Marks, which leaves Cisco

24  without an adequate remedy at law.

25  / / /

26  / / /

27  / / /

28  / / /

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**SECOND CLAIM FOR RELIEF**
**Federal Trademark Counterfeiting**
**(15 U.S.C. § 1114)**

63.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

64.     The Cisco Marks are valid, protectable trademarks that have been registered as marks on the principal register in the USPTO.  Cisco is the owner and registrant of the Cisco Marks.

65.     As described in more detail above, Dexon has used and counterfeited the Cisco Marks in connection with the marketing, promotion, and sale of their goods and services without Cisco's consent, in a manner that is likely to cause, and has actually caused, confusion and/or mistake, or that has deceived members of the consuming public and/or the trade.  Indeed, Dexon's counterfeiting and infringing activities are likely to cause and are actually causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin, sponsorship, and quality of Dexon's infringing products, counterfeit packaging, inferior warranty, and other related commercial activities.  As of the filing of this Complaint, Dexon is continuing to infringe the Cisco Marks unabated as alleged above.

66.     Dexon has publicly advertised, sold, offered to sell, and distributed counterfeit Cisco products in interstate commerce in direct competition with Cisco and without authorization or consent to use the Cisco Marks but with full knowledge of Cisco's notorious prior rights in those marks.

67.     Dexon's counterfeit Cisco products reproduce, counterfeit, copy, and colorably imitate the Cisco Marks or display a spurious designation that is identical with, or substantially indistinguishable from, the Cisco Marks.  Dexon has applied their reproductions, counterfeits, copies, and colorable imitations of the Cisco Marks to labels, prints, and packages intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or

advertising of Dexon's counterfeit products, which is likely to cause confusion, to cause mistake, or to deceive.

68.     Dexon's unauthorized use of the Cisco Marks on or in connection with Dexon's counterfeit products was conducted intentionally and with notice and full knowledge that the use was unauthorized by Cisco.    Accordingly, Dexon's actions constitute willful trademark infringement and counterfeiting of the Cisco Marks in violation of 15 U.S.C. §§ 1114 and 1117.

69.     Cisco has been, and continues to be, damaged by Dexon's infringement, including by suffering irreparable harm through the diminution of trust and goodwill among Cisco consumers and members of the general consuming public and the trade.    Cisco is entitled to an injunction against Dexon, and an order of destruction of all infringing products, as well as all monetary relief and other remedies available under the Lanham Act, including but not limited to trebled damages and/or actual profits, reasonable attorneys' fees, costs and prejudgment interest, and/or statutory damages.

### THIRD CLAIM FOR RELIEF
### False Designation of Origin
### (15 U.S.C. § 1125)

70.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

71.     Dexon resells the Infringing Products that are designed to appear identical to genuine Cisco products and thereby employ the same nature, style, look, and color as genuine Cisco products.    Moreover, as alleged above, Dexon sold products that had affixed counterfeit or infringing versions or reproductions of the Cisco Marks to unauthorized products and/or to the packaging, wrapping, etc., in which the Infringing Products are packaged.    This unauthorized use of the Cisco Marks was likely to cause confusion, to deceive, and to mislead the consuming public into believing that there was some affiliation, connection, or association between Dexon and Cisco and was likely to cause confusion, mistake, or deception as to the origin, source, sponsorship, authorization, approval, or affiliation of Dexon's Infringing Products.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

72.     Dexon's actions, including the unauthorized use of the Cisco Marks in commerce, constitute false designation of origin, false or misleading descriptions of fact, and false or misleading representations of fact, which have caused confusion, mistake, and deception, as to Dexon's association or affiliation with Cisco, as well as to the origin, source, and sponsorship of Dexon's Infringing Products, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

73.     Dexon's unauthorized and misleading use of the Cisco Marks constitutes willful infringement of the Cisco Marks in violation of 15 U.S.C. § 1114(1)(b) and entitling Cisco to treble damages and/or enhanced statutory damages under 15 U.S.C. §§ 1117(b) and (c).

74.     Dexon's conduct has directly and proximately caused Cisco to suffer damage in an amount to be proven at trial.

75.     Dexon's actions described above, including its unauthorized and misleading use of the Cisco Marks in commerce have caused substantial and irreparable injury to Cisco and to the business and goodwill represented by the Cisco Marks, thereby leaving Cisco without an adequate remedy at law.

### FOURTH CLAIM FOR RELIEF
### California Unfair Competition
### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

76.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

77.     California Business and Professions Code §§ 17200 *et seq.* prohibits acts of unfair competition, which includes any unlawful business act or practice.

78.     Dexon has knowingly, willfully, and unlawfully infringed the Cisco Marks, including through the sale of infringing Cisco networking hardware products in violation of the Lanham Act, 15 U.S.C. § 1114.

79.     As a direct, proximate, and foreseeable result of Dexon's sale of infringing Cisco networking hardware parts, Cisco has further been deprived of lost revenue and payments, and has therefore sustained injury in fact.

80.     Dexon's practices were unlawful, and constitute unfair competition as defined by Cal. Bus. & Prof. C. §§ 17200 *et seq.*  Dexon's misconduct was unlawful because, as described herein, its misconduct constitutes violations of numerous state and federal statutes, including but not limited to Cal. Civ. Code § 1797.81, conversion, state false advertising laws such as Cal. Bus. Prof. Code § 17500, as well as the Lanham Act, 15 U.S.C. §§ 1114 and 1125, and the Federal Trade Commission Act, 15 U.S.C. § 45.  Further, their alleged conduct was unfair in that Dexon's actions, as described herein, significantly threatened and/or harmed competition through infringement, counterfeiting, and false advertising.

81.     As a direct and proximate result of Dexon's unlawful and unfair business practices, Cisco has lost money and property, and has suffered irreparable injury to its brand, business reputation, and goodwill.  As such, Cisco's remedy at law is not adequate to compensate for the injuries inflicted by Dexon.  Accordingly, Cisco is entitled to temporary, preliminary, and permanent injunctive relief against Dexon, in addition to restitution in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Common Law)**

82.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

83.     Dexon unjustly received benefits at the expense of Cisco through its wrongful conduct, as alleged further above. Dexon continues to unjustly retain these benefits at the expense of Cisco.  The unjust receipt of the benefits obtained by Dexon lacks any adequate legal basis and thus cannot conscientiously be retained by Dexon.  Therefore, the circumstances of the receipt and retention of such benefits are such that, as between Cisco and Dexon, it is unjust for Dexon to retain any such benefits.

84.     Cisco is therefore entitled to full restitution of all amounts and/or other benefits in which Dexon has been unjustly enriched at Cisco's expense, in an amount to be proven at trial.

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**PRAYER FOR RELIEF**

WHEREFORE Cisco respectfully prays for the following relief:

A.      For entry of judgment in favor of Cisco and against Dexon on each of Cisco's claims for relief alleged in this Complaint;

B.      For a preliminary and permanent injunction restraining Dexon; their officers, agents, servants, employees, attorneys, and affiliated companies; assigns and successors in interest; and those persons in active concert or participation with them, from:

(i) importing, exporting, assisting in the importation or exportation, manufacturing, procuring, distributing, shipping, retailing, selling, offering for sale, marketing, advertising, or trafficking in any products not authorized by Cisco and bearing unauthorized simulations, reproductions, counterfeits, copies, or colorable imitations of the Cisco Marks which are likely to cause confusion, or bearing a design that is of a substantially similar appearance to the Cisco Marks listed in this Complaint;

(ii) From passing off, inducing, or enabling others to sell or pass off as authentic products produced by Cisco or otherwise authorized by Cisco, any product not manufactured by Cisco or produced under the control or supervision of Cisco and approved by Cisco, which uses any of the Cisco Marks listed in this Complaint; and

(iii) From committing any act calculated to cause purchasers to believe that products from Dexon are those sold under the control and supervision of Cisco, or are sponsored, approved, or guaranteed by Cisco, or are connected with and produced under the control or supervision of Cisco;

C.      For a determination that Dexon's acts of trademark infringement constitute cases of willful and exceptional infringement;

D.      For actual damages as a result of Dexon's unlawful conduct, alleged above, as well as any profits that are attributable to the alleged conduct and are not taken into account in computing Cisco's actual damages;

E.      For maximum statutory damages available under the law to the extent Cisco elects statutory damages for any claim for relief;

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    F.    For punitive damages to the fullest extent available under the law;

2    G.    For reasonable attorneys' fees to the fullest extent available under the law;

3    H.    For treble and/or enhanced damages to the fullest extent available under the law;

4    I.    For full restitution, including restoration of all property unlawfully taken from

5    Cisco, as well as any ill-gotten gains from the unauthorized resale of Cisco's property;

6    J.    For prejudgment interest and the costs of prosecuting these claims to the fullest

7    extent available under the law;

8    K.    For any additional injunctive, specific performance, and/or other provisional

9    remedies, as appropriate; and,

10    L.    For such other and further relief as the Court deems just and proper.

11

12    DATED: July 22, 2020                   Respectfully submitted,

13                                            SIDEMAN & BANCROFT LLP

14                                     By:    /s/ Richard J. Nelson
15                                            Richard J. Nelson
                                              Attorneys for Plaintiffs
16                                            Cisco Systems, Inc. and Cisco Technology, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

## JURY DEMAND

Pursuant to Civ. L.R. 3-6 and Fed. R. Civ. Proc. 38, Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc.  hereby demand a trial by a jury on all issues herein so triable.

DATED: July 22, 2020                          SIDEMAN & BANCROFT LLP


By:   /s/ *Richard J. Nelson*
Richard J. Nelson
Attorneys for Plaintiffs
Cisco Systems, Inc. and Cisco Technology, Inc.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

2835-75\4390521