1   Amanda R. Washton (SB# 227541)
      *a.washton@conklelaw.com*
2   **CONKLE, KREMER & ENGEL**
    Professional Law Corporation
3   3130 Wilshire Boulevard, Suite 500
    Santa Monica, California 90403-2351
4   Phone: (310) 998-9100 • Fax: (310) 998-9109

5   Michael M. Lafeber (*pro hac vice*)
      *mlafeber@taftlaw.com*
6   O. Joseph Balthazor Jr. (*pro hac vice*)
      *jbalthazor@taftlaw.com*
7   **TAFT STETTINIUS & HOLLISTER LLP**
    2200 IDS Center
8   80 S. 8th St.
    Minneapolis, MN 55402
9   Tel: 612.977.8400
    Fax: 612.977.8650

10
    Attorneys for Defendant, Counterclaim Plaintiff
11  and Third-Party Plaintiff Dexon Computer, Inc.

12              UNITED STATES DISTRICT COURT

13      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

14

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation, | Case No. 3:20-CV-4926-CRB |
| Plaintiffs, | **DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS** |
| v. | |
| DEXON COMPUTER, INC., a Minnesota corporation, | Hon. Charles R. Breyer Presiding Judge |
| Defendant. | Trial Date:        None |
| DEXON COMPUTER, INC., a Minnesota corporation, | |
| Counterclaim Plaintiff and Defendant, | |
| v. | |
| CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation, | |
| Counterclaim Defendants and Plaintiffs. | |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEXON COMPUTER, INC., a Minnesota corporation,

               Third-Party Plaintiff,

      v.

ATLANTIX GLOBAL SYSTEMS INTERNATIONAL, LLC, BIZCOM ELECTRONICS, INC., DIGI DEVICES ONLINE, ENTERPRISE BUSINESS TECHNOLOGIES, INC., FIBER CABLE CONNECTIONS, MJSI, MULTIMODE TECHNOLOGIES, LLC, NETWORK REPUBLIC, OPTIMUM DATA, INC., PARAGON, PURE FUTURE TECHNOLOGY, INC., SEASTAR IT TRADING LLC, SERVER TECH SUPPLY, SOFTNETWORKS, INC., STRADA NETWORKS, LLC, STRATEGIC TELECOM SUPPLY & SOLUTIONS, TEKSAVERS, UNLIMITED NETWORK SOLUTIONS, and WISECOM TECHNOLOGIES,

               Third-Party Defendants.

Defendant Dexon Computer, Inc. ("Dexon"), by and through its undersigned counsel, for its Answer, denies each and every allegation in Plaintiffs Cisco Systems, Inc. and Cisco Technology Inc.'s ("Plaintiffs") First Amended Complaint ("Complaint") except as expressly admitted, qualified or otherwise responded to herein and denies that Plaintiffs are entitled to any of the relief requested in their Prayer for Relief.  In response to each of the numbered paragraphs of the Complaint, Dexon states as follows. To the extent the headings or any other non-numbered statements in the Complaint contain allegations, Dexon denies each and every such allegation.

## **INTRODUCTION**

1.     Dexon denies the allegations of paragraph 1 of the Complaint.

2.     Dexon denies the allegations of paragraph 2 of the Complaint.

**THE PARTIES**

3.      Dexon lacks sufficient information to admit or deny the allegations of paragraph 3 of the Complaint, and on that basis Dexon denies those allegations.

4.      Dexon admits the allegations of paragraph 4 of the Complaint.

5.      Dexon denies the allegations of paragraph 5 of the Complaint.

**JURISDICTION AND VENUE**

6.      Admits that the Complaint purports to be one "founded upon violations of Federal trademark laws" but denies any such purported claims have legal or factual merit.  The remaining allegations in paragraph 6 of the Complaint are legal conclusions and questions of law regarding jurisdiction to which no response is required. To the extent a response is required, Dexon denies such allegations.

7.      Dexon denies the allegations of paragraph 7 of the Complaint.

8.      Dexon denies the allegations of paragraph 8 of the Complaint.

9.      Dexon denies the allegations of paragraph 9 of the Complaint.

10.      Dexon denies the allegations of paragraph 10 of the Complaint.

11.      Dexon denies the allegations of paragraph 11 of the Complaint.

**FACTUAL ALLEGATIONS**

**Alleged Cisco Business and History**

12.      Dexon lacks sufficient information to admit or deny the allegations of paragraph 12 of the Complaint, and on that basis Dexon denies those allegations.

13.      Dexon lacks sufficient information to admit or deny the allegations of paragraph 13 of the Complaint, and on  that basis Dexon denies those allegations.

14.      Dexon lacks sufficient information to admit or deny the allegations of paragraph 14 of the Complaint, and on that basis Dexon denies those allegations.

**Alleged Cisco Trademarks**

15.      Dexon lacks sufficient information to admit or deny the allegations of paragraph 15 of the Complaint, and on that basis Dexon denies those allegations.

16.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 16 of the Complaint, and on that basis Dexon denies those allegations.

17.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 17 of the Complaint, and on that basis Dexon denies those allegations.

18.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 18 of the Complaint, and on that basis Dexon denies those allegations.

**Alleged Counterfeit "Cisco" Products**

19.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 19 of the Complaint, and on that basis Dexon denies those allegations.

20.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 20 of the Complaint, and on that basis Dexon denies those allegations.

**Alleged Impact on Health, Safety, and National Security Caused by Counterfeit Cisco Products**

21.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 21 of the Complaint, and on that basis Dexon denies those allegations.

22.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 22 of the Complaint, and on that basis Dexon denies those allegations.

**Dexon's Alleged History and Practice of Trafficking in Counterfeit Cisco Products**

23.     Dexon admits selling product bearing the Cisco name and/or mark, but denies the remaining allegations of paragraph 23 of the Complaint, including, without limitation, any allegation such product was counterfeit.

24.     Dexon denies the allegations of paragraph 24 of the Complaint.

25.     Dexon denies the allegations of paragraph 25 of the Complaint.

**Alleged Activity Prior to 2015 Purportedly Demonstrating Dexon's Pattern and Practice of Knowingly Trafficking in Counterfeit Cisco Products**

**Alleged July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco Investigator (Reston, Virginia)**

26.     Dexon denies the allegations in paragraph 26 of the Complaint.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**FBI's Seizure of Alleged Counterfeit Cisco Products from Dexon on February 26, 2008**

27.     Dexon admits the Federal Bureau of Investigation ("FBI") executed a search warrant at Dexon's business location on or about February 26, 2008, but denies the remaining allegations in paragraph 27 of the Complaint including, without limitation, any allegation, suggestion or implication any or "all" of the product taken by the FBI was determined to be counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Cisco's March 2008 Cease and desist Letter to Dexon and its CEO**

28.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 28 of the Complaint, and on that basis Dexon denies those allegations, including, without limitation, Plaintiffs' attempted characterizations of the letters or communications which speak for themselves.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Dexon's June 2010 Sale of Alleged Counterfeit Cisco Products to Wayne State University (Detroit, Michigan) and Cisco's C&D Letter**

29.     Dexon admits selling and shipping Cisco product to Wayne State University on or about February 21, 2010 but denies the remainder of the allegations in paragraph 29 of the Complaint, including, without limitation, any allegation the product involved was counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

30.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 30 of the Complaint, and on that basis Dexon denies those allegations, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

31.     Dexon admits it responded via a letter from counsel to Plaintiff's Wayne State University allegations on or about August 23, 2010, but Dexon denies the reminder of the allegations in paragraph 31 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

32.     Dexon admits Plaintiffs sent a follow-up letter concerning or relating to the Wayne State University allegations on or about August 30, 2010, but Dexon denies the reminder of the allegations in paragraph 32 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Dexon's July 2010 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Los Angeles, California)**

33.     Dexon denies the allegations in paragraph 33 of the Complaint.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**<u>Dexon's Alleged Illegal Conduct Giving Rise to the Present Lawsuit</u>**

34.     Dexon denies the allegations in paragraph 34 of the Complaint.

**Dexon's July 2015 Sale of Alleged Counterfeit Cisco Product to Things Remembered, Inc. (Highland Heights, Ohio) and Cisco's C&D Letter**

35.     Dexon admits selling Cisco product to Things Remembered, Inc. on or about July 2015, but denies the remainder of the allegations in paragraph 35of the Complaint, including any allegation the product was counterfeit.

36.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the Things Remembered, Inc. allegations on or about August 27, 2020 and that Dexon responded thereto, but Dexon denies the reminder of the allegations in paragraph 36 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the letters or communications which speak for themselves.

**Dexon's December 2016 Sale of Alleged Counterfeit Cisco Products to Jack Henry & Associates, Inc. (Monett, Missouri) and Cisco's C&D Letter**

37.     Dexon admits selling Cisco product to Jack Henry & Associates, Inc. ("Jack Henry") on or about December 2016, but denies the remainder of the allegations in paragraph 37 of the Complaint, including, without limitation, any allegation the product was counterfeit.

38.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the Jack Henry allegations, but Dexon denies the reminder of the allegations in paragraph 38 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

39.     Dexon admits it responded to Plaintiffs' Jack Henry allegations via a letter from Dexon's counsel, but denies the reminder of the allegations in paragraph 39 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the responsive letter which speaks for itself.

**Dexon's October 2017 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Berkeley, California)**

40.     Dexon denies the allegations in paragraph 40 of the Complaint.

**Dexon's January 2018 Sale of Alleged Counterfeit Cisco Product to Community Health Alliance (Reno, Nevada) and Cisco's C&D Letter**

41.     Dexon admits selling Cisco product to Community Health Alliance ("CHA") on or about January 2018, but denies the remainder of the allegations in paragraph 41 of the Complaint, including, without limitation, any allegation the product was counterfeit.

42.     Dexon admits Plaintiffs and Dexon's counsel exchanged a series of letters or communications relating to the CHA allegations, but denies the remainder of the allegations in paragraph 42 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the letters or communications which speak for themselves.

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to Tucson Medical Center (Arizona)**

43.     Dexon admits selling Cisco product to Tucson Medical Center ("TMC") on or about April 2018, but denies the remainder of the allegations in paragraph 43 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to DARCARS (Maryland) and Cisco's C&D Letter**

44.     Dexon admits selling Cisco product to DARCARS on or about April 2018, but denies the remainder of the allegations in paragraph 44 of the Complaint, including, without limitation, any allegation the product was counterfeit.

45.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the DARCARS allegations, but Dexon denies the reminder of the allegations in paragraph 45 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Lockridge, Grindal, Nauen, PLLP (Minneapolis, Minnesota)**

46.     Dexon admits selling Cisco product to Lockridge, Grindal, Nauen, PLLP on or about August 2018, but denies the remainder of the allegations in paragraph 46 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Regional Justice Information Service (St. Louis, MO) and Cisco's C&D Letter**

47.     Dexon admits selling Cisco product to Regional Justice Information Service ("RJIS") on or about August 2018, but denies the remainder of the allegations in paragraph 47 of the Complaint, including, without limitation, any allegation the product was counterfeit.

48.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the RJIS allegations, but Dexon denies the reminder of the allegations in paragraph 48 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Purchases in 2018 of Alleged Counterfeit Switches from PureFutureTech (Fremont, California)**

49.     Dexon admits purchasing Cisco product from PureFutureTech on or about 2018 and that the purported supplier of such product was HongKong Sellsi, a former authorized licensed seller of Cisco products, but lacks sufficient information to admit or deny the remaining allegations of paragraph 49 of the Complaint, and on that basis Dexon denies such allegations.

50.     Dexon admits Plaintiffs served it with a subpoena relating to a lawsuit involving Plaintiffs, PureFutureTech and HongKong Sellsi and that Plaintiffs were ultimately required to file a motion relating to such non-party subpoena.  Dexon denies the remaining allegations of paragraph 50 of the Complaint, including, without limitation, any allegation, suggestion or implication Dexon "refused to cooperate" with, or in any way failed to meet its obligations arising from, the subpoena.

**Dexon's Purchases in 2017 to 2019 of Alleged Counterfeit Transceivers from Pure Future Tech, Inc. (Fremont, California)**

51.     Dexon admits purchasing Cisco product from Pure Future Tech, Inc. in the period 2017-2019 but denies any such product was counterfeit.  Dexon lacks sufficient information to admit or deny the remaining allegations in paragraph 51 of the Complaint and on that basis denies such allegations.

52.     Dexon denies the allegations in paragraph 52 of the Complaint, including, without limitation, any allegation Dexon knew or reasonably should have known any Cisco product was allegedly counterfeit, or that Dexon was willfully blind to such alleged fact.

**Dexon's Sales of Alleged Counterfeit Products to Murray State University (Murray, Kentucky) in 2018 and 2019 and Cisco's C& Letter**

53.     Dexon admits selling Cisco product to Murray State University ("MSU") in or about 2018 and 2019, but denies the remainder of the allegations in paragraph 53 of the Complaint, including, without limitation, any allegation the product was counterfeit.

54.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the MSU allegations, but Dexon denies the reminder of the allegations in paragraph 54 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's July 2019 Sale of Alleged Counterfeit Cisco Products to MedRisk (King of Prussia, Pennsylvania)**

55.     Dexon admits selling Cisco product to MedRisk on or about July 2019, but denies the remainder of the allegations in paragraph 55 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's September 2019 Sale of Alleged Counterfeit Cisco Products to Coppell Independent School District (Coppell, Texas) and Cisco's C&D Letter**

56.     Dexon admits selling Cisco product to Coppell Independent School District ("CISD") on or about September 2019, but denies the remainder of the allegations in paragraph 56 of the Complaint.

57.     Dexon denies any allegation, suggestion or implication in paragraph 57 of the Complaint that Cisco product it sold to CISD was counterfeit.  Dexon lacks sufficient information to admit or deny the remainder of the allegations in paragraph 57 of the Complaint and on that basis denies such allegations.

58.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the CISD allegations, but Dexon denies the reminder of the allegations in paragraph 58 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Alleged California Directed Conduct Identified Through Jurisdictional Discovery**

59.     Dexon admits Plaintiffs conducted jurisdictional discovery herein, but denies the remainder of the allegations in paragraph 59 of the Complaint, including, without limitation, Plaintiffs' characterization of such jurisdictional discovery, as well as any allegation such discovery revealed any "illegal and tortious" conduct by Dexon in California or elsewhere.

**Dexon's Sale of Alleged Counterfeit Cisco Products to California Customers**

60.     Dexon denies the allegations in paragraph 60 of the Complaint.

**Dexon's Sale of Alleged Counterfeit Cisco Licenses to California Customers**

61.     Dexon admits Cisco has transmitted software licenses via Product Activation Key Certificates ("PAK") and that such PAKs have included a code that allows users to utilize the subject software.  Dexon denies the remainder of the allegations in paragraph 61 of the Complaint.

62.     Dexon denies the allegations in paragraph 62 of the Complaint.

63.     Dexon denies the allegations in paragraph 63 of the Complaint.

64.     Dexon denies the allegation in paragraph 64 of the Complaint.

1

**FIRST PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Infringement**

2

(*15 U.S.C. § 1114*)

3    65.    Dexon restates and incorporates by reference its responses to the allegations in

4    paragraphs 1-64 in response to the allegations in paragraph 65 of the Complaint.

5    66.    Dexon denies the allegations of paragraph 66 of the Complaint.

6    67.    Dexon denies the allegations of paragraph 67 of the Complaint.

7    68.    Dexon denies the allegations of paragraph 68 of the Complaint.

8    69.    Dexon denies the allegations of paragraph 69 of the Complaint.

9    70.    Dexon denies the allegations of paragraph 70 of the Complaint.

10    71.    Dexon denies the allegations of paragraph 71 of the Complaint.

11    72.    Dexon denies the allegations of paragraph 72 of the Complaint.

12

**SECOND PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Counterfeiting**

13

(*15 U.S.C. § 1114*)

14    73.    Dexon restates and incorporates by reference its responses to the allegations in

15    paragraphs 1-72 in response to the allegations in paragraph 73 of the Complaint.

16    74.    Dexon denies the allegations of paragraph 74 of the Complaint.

17    75.    Dexon denies the allegations of paragraph 75 of the Complaint.

18    76.    Dexon denies the allegations of paragraph 76 of the Complaint.

19    77.    Dexon denies the allegations of paragraph 77 of the Complaint.

20    78.    Dexon denies the allegations of paragraph 78 of the Complaint.

21    79.    Dexon denies the allegations of paragraph 79 of the Complaint.

22

**THIRD PURPORTED CLAIM FOR RELIEF**
**False Designation of Origin**

23

(*15 U.S.C. § 1125*)

24    80.    Dexon restates and incorporates by reference its responses to the allegations in

25    paragraphs 1-79 in response to the allegations in paragraph 80 of the Complaint.

26    81.    Dexon denies the allegations of paragraph 81 of the Complaint

27    82.    Dexon denies the allegations of paragraph 82 of the Complaint.

28    83.    Dexon denies the allegations of paragraph 83 of the Complaint.

84.     Dexon denies the allegations of paragraph 84 of the Complaint.

85.     Dexon denies the allegations of paragraph 85 of the Complaint.

## FOURTH PURPORTED CLAIM FOR RELIEF
### California Unfair Business Practices
### (Cal. Bus. & Prof. Code §§ 17200 et seq.)

86.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-85 in response to the allegations in paragraph 86 of the Complaint.

87.     The allegations in paragraph 87 of the Complaint are legal conclusions of law regarding California Business and Professions Code §§ 17200 et seq to which no response is required. To the extent such allegations imply or suggest Dexon has in any way violated California Business and Professions Code §§ 17200 et seq Dexon denies such allegations.

88.     Dexon denies the allegations of paragraph 88 of the Complaint.

89.     Dexon denies the allegations of paragraph 89 of the Complaint.

90.     Dexon denies the allegations of paragraph 90 of the Complaint.

91.     Dexon denies the allegations of paragraph 91 of the Complaint.

92.     Dexon denies the allegations of paragraph 92 of the Complaint.

## FIFTH PURPORTED CLAIM FOR RELIEF
### Unjust Enrichment
### (Common Law)

93.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-92 in response to the allegations in paragraph 93 of the Complaint.

94.     Dexon admits the allegations of paragraph 94 of the Complaint.

95.     Dexon denies the allegations of paragraph 95 of the Complaint.

## AFFIRMATIVE DEFENSES

        Without admitting any wrongful conduct on the part of Dexon, and without admitting that Plaintiffs claims have any merit or that Plaintiffs have suffered any loss, damage, or injury, Dexon alleges the following affirmative defenses to the Complaint. By designating the following as affirmative defenses, Dexon does not in any way waive or limit any defenses which are or may be raised by their denial, allegations, and averments set forth herein. These defenses are pled in the alternative, are raised to preserve the rights of Dexon to assert such

defenses, and are without prejudice to Dexon's ability to raise other and further defenses. Dexon expressly reserves all rights to reevaluate their defenses and/or assert additional defenses upon discovery and review of additional documents and information, upon the development of other pertinent facts, and during pretrial proceedings in this action. Dexon expressly incorporate all allegations of its Answer, Counterclaims and Cross-Claims as if fully set forth in each of the following affirmative defenses.

### FIRST AFFIRMATIVE DEFENSE
### (Res Judicata and Collateral Estoppel)

96.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel.

### SECOND AFFIRMATIVE DEFENSE
### (Laches)

97.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of laches. Plaintiffs' have had longstanding knowledge concerning the legal open or "secondary" market for its products and have proactively engaged in anticompetitive behavior in an effort to selectively manipulate and control such secondary market to their advantage.  Plaintiffs have had longstanding specific knowledge of Dexon's activity in the legal secondary market since well before 2011, yet have failed to take timely action to assert their claims herein, resulting in substantial prejudice to Defendants.

### THIRD AFFIRMATIVE DEFENSE
### (Estoppel)

98.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of estoppel. Plaintiffs' advertises that consumers can purchase their products from their "Authorized Channel Partners" or "Authorized Resellers."  Plaintiffs have known, or should have known such "Authorized Channel Partners" and/or "Authorized Resellers" participate in and sell their products on the secondary market. Plaintiffs have allowed these "Authorized Channel Partners" and/or "Authorized Resellers" to maintain their "authorized" status despite knowledge of their participation in the secondary market, including evidence of their

sale of counterfeit Cisco products.  Plaintiffs know, or should have reasonably known, that secondary market resellers such as Dexon rely upon Plaintiffs' endorsement of such "authorized" vendors when sourcing Cisco products, including, without limitation, procuring Cisco product from such "authorized vendors" end customers.   Plaintiffs also claim to have developed "tools" capable of detecting counterfeit goods.  However, unlike their competitors in the market, have intentionally failed or refused to provide or offer such "tools" to secondary market resellers such as Dexon to aid and assist in their efforts to detect and deter counterfeit goods. Plaintiffs have also actively contributed to the presence of counterfeit product in the marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers.  As one example, Plaintiffs "authorized" vendors intentionally modify or change product serial numbers in order to ensure the subject product(s) qualify for Plaintiffs' SMARTnet service contract.  Plaintiffs are therefore estopped from pursuing claims against Dexon or seeking damages related to alleged counterfeit products.

## FOURTH AFFIRMATIVE DEFENSE
### (First Sale Doctrine and Exhaustion)

99.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the first sale doctrine, which protects secondary market resellers such as Dexon from liability for the purchase, importation, and resale of genuine Cisco products and exhausts Plaintiffs' rights in further transactions.

## FIFTH AFFIRMATIVE DEFENSE
### (Statutes of Limitations)

100.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by applicable statutes of limitations, including but not limited to CAL. CIV. PROC. CODE §§ 337–38, CAL. BUS. & PROF. CODE § 17208, and 17 U.S.C. § 507.  Some or all of Plaintiffs' claims involve conduct outside of the applicable statutes of limitations

## SIXTH AFFIRMATIVE DEFENSE
### (Waiver)

101.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of waiver. Plaintiffs have promoted and advertised its "authorized" sellers despite having full knowledge certain such "authorized" sellers: i) have been caught selling counterfeit product; and ii) actively and regularly deal with secondary market resellers such as Dexon. Secondary market resellers such as Dexon have understandably relied upon Plaintiffs' promotion and endorsement of such "authorized" sellers when sourcing Cisco products for their customers. As noted above, Plaintiffs have also intentionally failed or refused to provide or offer their claimed "tools" for detecting counterfeit product to secondary market resellers such as Dexon, and have actively contributed to the presence of counterfeit product in the marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers.  Accordingly, Plaintiffs have waived any claims related to Dexon's unwitting sale of alleged counterfeit goods, including any such goods sourced directly or indirectly from Plaintiffs' "authorized" vendors.

## SEVENTH AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

102.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of unjust enrichment. Plaintiffs have engaged in anticompetitive practices and made misrepresentations to consumers regarding: i) the quality and authenticity of products sold by secondary market resellers such as Dexon; and ii) Plaintiffs' rights to restrict consumers use and transfer of Cisco hardware and software.  Such anticompetitive and inequitable conduct has improperly steered customers from Dexon to Plaintiffs and unjustly enriched Plaintiffs.

## EIGHTH AFFIRMATIVE DEFENSE
### (Unclean Hands/Inequitable Conduct)

103.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of unclean hands, inequitable conduct, and similar defenses. Without limitation, Plaintiffs

have: i) engaged in anticompetitive practices, (ii) intentionally misled consumers into thinking that genuine products on the secondary market are used, counterfeit, or stolen, (iii) sold products to resellers whom it knew, or should have known, were reselling the products on the secondary market, (iv) held out certain entities as "Authorized Resellers" even though Plaintiffs knew or should have known these entities sold counterfeit goods, and engaged in other inequitable practices that bar recovery on its claims.

### NINTH AFFIRMATIVE DEFENSE
### (Redundancy)

104.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because they are redundant and/or duplicative of one another.

### TENTH AFFIRMATIVE DEFENSE
### (Abandonment)

105.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by abandonment of any marks at issue. Plaintiffs' have failed to properly policy and exercise adequate quality control over its marks and have thereby abandoned their rights therein.

### ELEVENTH AFFIRMATIVE DEFENSE
### (Conduct of Others)

106.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because the conduct complained of is the conduct of others, including, without limitation, Plaintiff's "authorized" vendors and/or Plaintiffs' licensed manufacturers.

### TWELVE AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

107.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because Plaintiffs failed to mitigate, minimize, or attempt to avoid damages. Without limitation, Plaintiffs could have pursued legal remedies earlier, assisted secondary market resellers like Dexon in detecting and fighting counterfeit products, and/or properly policed and prevented the manufacture and distribution of counterfeit product within their own manufacturing and distribution network.

### THIRTEENTH AFFIRMATIVE DEFENSIVE
#### (Lack of Personal Jurisdiction)

108.    Plaintiffs are barred from pursuing their claims against Dexon in this Court because the Court lacks personal jurisdiction over Dexon.

### FOURTEENTH AFFIRMATIVE DEFENSIVE
#### (Improper Venue)

109.    Plaintiffs are barred from pursuing their claims against Dexon in this Court because venue is improper.

### FIFTEENTH AFFIRMATIVE DEFENSIVE
#### (Failure to State a Claim)

110.    The Complaint, in whole or in part, fails to state any claim upon which relief can be granted.

### SIXTEENTH AFFIRMATIVE DEFENSIVE
#### (One Satisfaction Rule / Bar on Double Recovery)

111.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the one satisfaction rule and/or the bar on double recoveries.

## COUNTERCLAIMS

Counterclaim Plaintiff Dexon Computer, Inc. asserts the following counterclaims against Counterclaim Defendant Cisco Systems, Inc., and Cisco Technology, Inc. alleges as follows:

## THE PARTIES

1.      Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

2.      On information and belief, Plaintiff and Counterclaim Defendant Cisco Systems, Inc. ("CSI") is a Delaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

3.      On information and belief, Plaintiff and Counterclaim Defendant Cisco Technology, Inc. ("CTI") is a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

## JURISDICTION

4.      This Court has subject matter jurisdiction over Dexon's counterclaims pursuant to 28 U.S.C. §§ 1367 and 1332.  Dexon's counterclaims arise out of the same controversy as plaintiffs'' Federal claims, there is complete diversity of citizenship between Plaintiffs and Dexon, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

## FACTS

### Cisco

5.      Counterclaim Defendants (hereinafter referred to jointly as "Cisco") are the worldwide leader of networking for the Internet.  Cisco offers products and related services in the core technologies of routing and switching, along with more advanced technologies in areas such as home networking, IP telephony, optical networking, security, storage area networking, and wireless technology.  On information and belief, Cisco contracts for the

1    manufacture of a majority of its products overseas to keep costs of manufacture at a

2    minimum.

3    6.      On information and belief, Cisco has a stranglehold on the supply of networking

4    products in the United States, with a dominant market share that has reached 70% or more.

5                                        **The Open Market**

6    7.      As with any economic activity where there are significant profits, market forces

7    have operated to create an open or "secondary" market for Cisco products.  On information

8    and belief, authentic or genuine Cisco products come to the open market in the United

9    States in a variety of ways including: (a) Cisco's knowing sale of such products to open

10   market suppliers in the context of either specific end user deals or when Cisco needs to

11   move inventory; (b) Cisco's authorized resellers' purchase of product in excess of what

12   they need for a specific end user order and subsequent resale of such product into the open

13   market; (c) Cisco end user's resale of new, unused product; and (d) through importation of

14   such product from abroad where it has been sold by distributors, resellers, or end users

15   under similar circumstances.  On information and belief, Cisco resists attempts by end

16   users and resellers to return product, resulting in a natural supply of open market Cisco

17   product.

18   8.      Given the substantial profits available from sale of Cisco-branded product, market

19   forces dictate that a secondary market will develop for such products.  These market forces

20   benefit end users in that they reduce prices for such products.

21   9.      Dexon is an independent open-market reseller of computer networking products,

22   including routers, switches and other computer hardware.  Dexon provides new,

23   refurbished and discontinued hardware products, including authentic or genuine products

24   to its customers from leading manufacturers including, without limitation, Hewlett

25   Packard, Dell, Juniper Networks and Cisco.

26   10.     Dexon obtains Cisco products from reliable suppliers, subjects such products to

27   extensive quality control, and then resells such products to other resellers and to end users,

28   at a profit but frequently at prices lower than that offered by Cisco "Authorized" sellers.

11.     Cisco has created an "Authorized Channel Network" in which Cisco sells products to entities it refers to as "Authorized Channel Partners" or "Authorized Resellers."  Within this "Authorized" network, Cisco exerts strict control over how, and at what prices, its "Authorized" partners can buy and sell Cisco products.

12.     While manufacturers like Cisco are permitted to control the initial sale of their products, they may not wield trademark or copyright protections to dictate the terms by which their products are resold by other parties.  The well-established "first sale doctrine" protects parties who engage in the subsequent resale of Cisco's products, even if those subsequent resales occur outside the "Authorized" channels. Accordingly, the "Authorized Channel Network" does not have a monopoly on the legal sale and purchase of Cisco goods in the market, and Cisco may not forbid the resale of its products outside the "Authorized" network.

**Cisco's Anticompetitive Interference with the Secondary Market**

**EULA Misrepresentations and Abuse**

13.     Cisco products, like virtually all modern electronics, contain embedded software. And just as a car, refrigerator, or cell phone will not function properly without internal software, Cisco's products—including the Cisco products resold by Dexon—cannot function without Cisco's embedded software.

14.     Cisco uses the fact that its products have embedded software as an attempted end-around to the first sale doctrine. It does so by informing consumers, after their purchases, that although they have managed to buy Cisco hardware, they are unable to use such hardware unless they license the embedded software from Cisco —software that was packaged and sold with the hardware (and without which the hardware will not function). Cisco does not require end users to acknowledge, read, or accept a license agreement before using the Cisco goods sold by Dexon. Nevertheless, Cisco purports only to license the software pursuant to the terms of its End User License Agreement, or "EULA."

15.     The EULA provides or has provided that Cisco will grant a license only to consumers who purchase Cisco hardware with embedded software from a so-called

1   "Approved Source," defined as "Cisco or . . . [a] Cisco authorized reseller, distributor, or

2   systems integrator[.]" Cisco warns that end users are "not licensed to Use the Software on

3   secondhand or refurbished Cisco equipment not authorized by Cisco, or on Cisco

4   equipment not purchased through an Approved Source."

5   16.     In other words, although Cisco concedes that consumers can freely buy its hardware

6   on the secondary market, Cisco prevents those same consumers from making any use of

7   the hardware they have lawfully purchased on that market by prohibiting use of the

8   embedded software. Cisco does this for anticompetitive ends: to stifle competition by

9   destroying secondary market sales and increasing its own profits at the expense of

10  consumers.

11  17.     In an effort to dissuade consumers from purchasing secondary market goods, Cisco

12  informs consumers that although its hardware can be freely resold, the "embedded Cisco

13  software that runs on the hardware" is "not transferable," and purchasers of secondary

14  market Cisco equipment "must acquire a new license from Cisco before the software can

15  be used." The only way to avoid having to purchase a new license, Cisco says, is to buy

16  refurbished equipment through Cisco's own program.

17  18.     These representations to consumers are false. Even if it were possible for Cisco to

18  sell hardware but license embedded software, the EULA would not be a permissible

19  license of that software because it operates anticompetitively by not applying to products

20  purchased in the secondary market.

21  19.     Accordingly, pursuant to the first sale doctrine, consumers who purchase Cisco

22  hardware may use embedded software. They may also transfer the embedded software,

23  along with the hardware, freely. Cisco may not sidestep the first sale doctrine by refusing

24  to license software that it builds into hardware (to which the first sale doctrine indisputably

25  applies) solely because consumers did not purchase the hardware through Cisco's more

26  lucrative supply chain. And it may not deceive consumers by telling them that although

27  they can buy secondary-market Cisco products, they will not be able to use those products

28  without buying a license from Cisco.

20.     Cisco's misrepresentations regarding consumers' right to buy and use secondary-market Cisco products successfully deter consumers from purchasing Cisco goods on the secondary market. Dexon has lost sales of products that would have been made but for Cisco's false representations to consumers regarding their ownership rights for Cisco hardware and embedded software purchased on the secondary market. These false representations have unjustly enriched Cisco at Dexon's expense.

21.     Cisco has also improperly extorted license fees from consumers who are frightened into believing they will not be able to use the Cisco products they have lawfully purchased. On information and belief, when consumers who purchase Cisco goods on the secondary market attempt to register those goods with Cisco, Cisco falsely informs the consumers that their software licenses are invalid and that they cannot use their lawfully purchased hardware unless they pay additional license fees to Cisco. Cisco would not have obtained these license fees but for misrepresentations it makes to consumers regarding their ability to use Cisco embedded software.

22.     On occasions where secondary market sellers obtain Cisco product directly from an "Authorized" seller, Cisco threatens that the end users rights are restricted because the sale was contrary to the "Authorized" seller's agreement with Cisco.  Cisco's enforcement of this improper policy is selective.  In addition to being contrary to well-established agency principles, on information and belief, such alleged agreements between Cisco and its "Authorized" sellers are often not properly renewed or maintained and are therefore not in force and effect.

### SMARTnet Abuse

23.     In addition to its misrepresentations to consumers regarding whether they have a basic right to turn their products on, Cisco also attempts to leverage its exclusive control of essential software updates and services for Cisco products to functionally incapacitate select secondary market products. Cisco provides services and updates to its products via service agreements known as SMARTnet contracts. End users acquire these contracts in order to obtain those services.

24. Although end users are not legally required to purchase SMARTnet contracts for their Cisco products, they are effectively compelled to do so, because the services the contracts offer are integral to the products' functionality. Without SMARTnet contracts, end users will not receive important software bug fixes, patches, and updates (collectively, "updates") that permit Cisco products to serve their intended functions. These updates are designed to repair malfunctions or defects in the software, or to combat security vulnerabilities. Consumers who do not update the software on their Cisco products are potentially exposed to security and operational risks. In addition, without the software updates, their Cisco products may not function properly.

25. Because Cisco products run on proprietary operating system software that is essential for the products to function, these updates can be obtained only from Cisco. It is routine in the technology industry for manufacturers, such as Apple, Hewlett Packard Enterprise, and Microsoft, to make updates available to their consumers for free. Cisco, in contrast, provides updates only to consumers who have purchased SMARTnet contracts. Upon information and belief, Cisco does not routinely inform customers at the time of purchase of these stifling limitations.

26. Thus, many purchasers of Cisco switches learn after making a significant investment in Cisco products that they have become beholden to Cisco's demands if they wish to continue receiving updates.

27. Purchasers of Cisco products are locked into purchasing SMARTnet contracts for significant periods of time. For example, ethernet switches are durable, high fixed cost goods with extended longevity; consumers of these switches commonly intend to use them for many years. Transitioning from Cisco switches to switches made by another manufacturer is an expensive process, requiring the replacement of significant amounts of hardware and the retraining of personnel.

28. Cisco does not sell SMARTnet contracts directly to end users of Cisco products in the first instance. Instead, Cisco sells SMARTnet contracts through its "Authorized Channel Network." When end users purchase SMARTnet contracts from an Authorized

1  Reseller, the contracts are linked to specific Cisco products. At this time, Cisco is supplied

2  with the relevant product information, including the serial number, part number, and

3  identity of the end user. Cisco then issues a SMARTnet contract in the name of the specific

4  end user and Cisco product. Thus, when Cisco accepts payment for a SMARTnet contract,

5  Cisco already has linked that contract to an identified Cisco product.

6  29.     Despite the fact that Cisco generates the SMARTnet contracts, pairs the contracts to

7  genuine Cisco products identified by serial number and end user, and accepts payment

8  with this information in hand, Cisco routinely selectively, after the fact, and without

9  refunding payment, voids SMARTnet contracts paired with Cisco products because: i) the

10  product was sold at some point on the secondary market; or ii) the SMARTnet contract

11  was sold by an "Authorized" seller to a secondary market seller such as Dexon allegedly in

12  violation of the "Authorized" seller's agreement with Cisco.  Upon information and belief,

13  Cisco does so in order to dissuade potential customers from entering into legal transactions

14  to acquire genuine, lawfully obtained Cisco products from independent resellers like

15  Dexon.

16  30.     Cisco has full knowledge that its "Authorized" sellers or partners sell an extremely

17  large volume of SMARTnet contracts to secondary market sellers such as Dexon.  In fact,

18  Cisco's Technical Assistance Center has and will alter or change serial numbers in order to

19  approve and thereby receive payment for SMARTnet contracts relating to secondary

20  market equipment. Cisco turns a blind eye to such transactions because they are extremely

21  profitable for Cisco.

22  31.     Cisco selectively chooses when to enforce its alleged restrictions on sales of

23  SMARTnet contracts by "Authorized" sellers to secondary market sellers.  In addition to

24  being contrary to well-established agency principles, on information and belief, such

25  alleged agreements between Cisco and its "Authorized" sellers are often not properly

26  renewed or maintained and are therefore not in force and effect.

27  32.     Dexon has routinely and frequently purchased SMARTnet contracts from

28  "Authorized" sellers to pair with Cisco products sold to its customers.

33.     Cisco's practice of selectively voiding SMARTnet contracts for Cisco products traded in the secondary market often results in Cisco voiding SMARTnet contracts – including contracts having the majority of their life remaining – while retaining and refusing to provide a refund for the payment covering such SMARTnet contracts.  In addition to unjustly enriching Cisco at the expense of secondary market sellers like Dexon and end consumers, such practice is contrary to Cisco's agreement with its "Authorized" sellers which calls for a refund under such circumstances. Cisco has and will void or cancel SMARTnet contracts which have been fully paid for without advising the end user. On at least one occasion, Cisco voided the SMARTnet contract governing and protecting a 911 emergency call center's critical network equipment without advising the 911 call center their network equipment was no longer protected/covered.

34.     Due to the robust secondary market, Cisco routinely and intentionally sells multiple SMARTnet contracts on the same product covering the same time period.  For example, it is not uncommon for a consumer to purchase a Cisco product as well as a SMARTnet contract covering such product.  If the consumer ends up not using such product, such product may be sold – unopened in a sealed box - on the secondary market.  The customer receives no refund on the SMARTnet contract and may in fact, due to poor record keeping, mistakenly renew its SMARTnet contract for such product it no longer owns.

35.     It is common for secondary market sellers such as Dexon to purchase a duplicate SMARTnet contract covering the exact same product for its customers.  Despite having records pairing the product's serial number to each SMARTnet contract, Cisco knowingly accepts payment and fails to provide any refund on such redundant SMARTnet contracts.

**Misclassification of Cisco Products**

36.     As part of Cisco's anticompetitive interference in the secondary market, Cisco also selectively classifies genuine, lawfully obtained Cisco products as "used," "stolen," "counterfeit," "black market," "a security risk," "malware," "scrapped," or "inactive" simply because these products were traded on the secondary market. As a result, end users

1   or resellers who communicate with Cisco about the status of certain Cisco products are

2   deliberately provided with misinformation.

3   37.     Cisco's contortion of the term "used" is particularly egregious. Rather than give the

4   term its ordinary meaning, Cisco has unilaterally decided that "used equipment" means

5   "previously owned equipment that is now owned by a party other than the original

6   customer," including both "opened and unopened equipment." Cisco even instructs its

7   employees to tell consumers that "unopened boxes do[] not necessarily mean [that

8   equipment is] 'new.'"

9   38.     Accordingly, Cisco routinely publicly criticizes and labels secondary market

10  product which has never been used – including product contained in unopened sealed

11  boxes – as "used" contrary to consumers well understood meaning of such term.

12  39.     Cisco knows that its unilateral definition of the term "used" is contrary to the

13  common consumer understanding, and that consumers are misled by its use of the term.

14  Indeed, Cisco deploys its false definition of the term "used" in order to deceive consumers

15  as to the nature of products they purchase on the secondary market. Cisco does so in an

16  effort to stifle competition and extract additional profits from consumers who would, but

17  for Cisco's misrepresentations and misuse of the term "used," purchase products on the

18  secondary market.

19                    **Wrongful Denial of Warranty Coverage**

20  40.     Cisco has also wrongfully denied warranty coverage of genuine Cisco products

21  solely as a result of the fact that those products were sold in the secondary market. Cisco

22  states as a general policy that products sold on the secondary market are ineligible for

23  Cisco warranties.  Cisco's ostensible justification for this refusal is that Cisco is unsure

24  whether products sold on the secondary market are genuine. But this is a farce: Cisco is

25  well-aware that genuine Cisco products are commonly sold on the secondary market.

26  41.     Cisco has at various times asserted that these anticompetitive strictures are

27  necessary in order to mitigate the risk of counterfeit goods being sold to unwitting

28  customers or receiving Cisco services. These justifications are pretextual and designed to

1    obscure the fact Cisco seeks to minimize competition and exact more control over the

2    market for Cisco products, to the detriment of the consuming public.

3    42.    Secondary market resellers of Cisco products, including Dexon, are highly

4    incentivized to detect and stamp out the sale of counterfeit goods. While a manufacturer

5    such as Cisco may blame rogue actors when a dissatisfied customer confronts it with a

6    counterfeit product, an independent reseller's own reputation suffers significantly when it

7    sells a customer a counterfeit goods.  Unsurprisingly, most independent resellers, including

8    Dexon, take proactive steps to detect and prevent the sale of counterfeit product.

9    43.    "Authorized Reseller" status is not foolproof protection against counterfeit

10   products. Cisco's "Authorized" sellers are likewise victimized by the presence of

11   counterfeit product in the marketplace and have been caught selling counterfeit Cisco

12   product.

13   44.    Cisco has contributed to and caused the presence of counterfeit product in the

14   stream of commerce by: i) claiming to have developed "tools" capable of detecting

15   counterfeit goods yet, unlike their competitors in the market, intentionally failing or

16   refusing to provide or offer such "tools" to secondary market resellers such as Dexon to

17   aid and assist their efforts to detect and deter counterfeit products; ii) failing to properly

18   police and control their manufacturers; and iii) failing to properly manage their product

19   serial numbers.  As one example, Plaintiffs' Technical Assistance Center will intentionally

20   modify or change product serial numbers in order to ensure secondary market products

21   qualify for, and Plaintiffs' receive compensation for,  SMARTnet.

22   45.    Cisco's anticompetitive behavior as alleged herein has attracted the attention of

23   government regulators and interested parties worldwide. Upon information and belief,

24   Cisco has sought to avoid a wholesale dismantling of its anticompetitive practices by

25   incrementally providing relief when compelled to do so. For example, in 2014, when Cisco

26   was under investigation by the Swiss Competition Commission related to Cisco's failure to

27   provide updates and other anticompetitive behavior, Cisco was compelled to make a

28   commitment that updates could be obtained within Switzerland and the European Union

1   without having to purchase SMARTnet contracts. Cisco also had to implement a series of

2   remedial measures to inform consumers of these policies. In the United States, however,

3   Cisco continues to pursue the anticompetitive practices alleged herein.

4   **Cisco's Tortious Efforts to Interfere with Dexon's Business**

5   46.   Because Cisco regards open market resellers like Dexon as a threat to its excess

6   profits, Cisco spends substantial money and effort to attack open market participants such

7   as Dexon and to chill reseller and end user participation in the open market.  These steps

8   include but are not limited to:

9       a.   Prompting federal investigation of the open market on specious grounds

10        that the open market presents a threat to the national security of the

11        United States.

12      b.   Employing a team of "Brand Protection" employees whose primary

13        responsibility is to intervene with resellers and end users in cases where

14        they are either contemplating the purchase of product, or have ordered

15        product, from the open market.  Brand Protection personnel use a variety

16        of tools to disrupt open market sales, including: (i) advising resellers and

17        end users that product from the open market is suspect, may damage or

18        jeopardize their network operations, may void Cisco warranties, may be

19        counterfeit, and is otherwise unreliable; and (ii) spreading false rumors

20        about open market resellers and their owners.

21      c.   Instructing its account managers, assigned to specific end users: (i) to

22        convince end users to specify in RFPs the acquisition of Cisco equipment

23        through "authorized" resellers only (even if the result is materially higher

24        pricing); (ii) to advise resellers and end users of the same issues raised by

25        Brand Protection and, if necessary, invite Brand Protection into the

26        discussion.

1          d.   Tortiously and erroneously insinuating to resellers and end users that

2               open market participants in general are engaging in illegal activity when

3               this is not the case.

4   47.     Such tortious conduct includes, without limitation, falsely advising Dexon's actual

5  and prospective customers that: i) Dexon does not sell genuine Cisco product; ii) Dexon

6  does not sell new Cisco product; iii) Dexon "repackages" used Cisco product as "new"; iii)

7  Dexon opens new Cisco product and substitutes parts or software; iv) Dexon's products

8  are "counterfeit" solely because they were sold on the secondary market despite the fact

9  such products are in fact genuine; v) threatens license violations for products such as

10  phone which are sold separate and distinct from Cisco's typical

11  48.     Cisco has presented, published, and/or caused to be published the false and

12  misleading message that alleged "genuine" and/or "new" Cisco gear only comes from

13  Cisco and its "Authorized" sellers.

14  49.     Cisco has engaged in a pattern and practice of this tortious conduct with the intent

15  to disrupt contracts between Dexon and its customers, pending opportunities with such

16  customers, future business with such customers, and even with the apparent goal of driving

17  Dexon out of business altogether.

18  50.     As a direct result of Cisco's tortious interference, Dexon has suffered significant

19  damages, including the cancellation of numerous pending orders, loss of opportunity to bid

20  on projects, and the loss of entire relationships with many of its top customers.

21
22
**FIRST COUNTERCLAIM**
**Declaratory Judgment**
**(28 U.S.C. §§ 2201-2202)**

23  51.     Dexon repeats and realleges each of the allegations set forth in the preceding

24  paragraphs as if fully set forth herein.

25  52.     Counterclaimants seeks a declaration of its rights, pursuant to 28 U.S.C. §§ 2201 &

26  2202, that the sale of genuine Cisco product which Cisco has unilaterally deemed to be

27  "unauthorized" or "unapproved" because sold outside of Cisco's authorized channels, sold

28

1  to a secondary market reseller such as Dexon, or ineligible for warranty services as a result

2  thereof, do not violate the Lanham Act, 15 U.S.C. §§ 1114, 1125.

3  53.    Contrary to Cisco's assertions, the first sale doctrine does not permit a trademark

4  holder to transform non-infringing goods into infringing goods simply by fiat. The sale of

5  genuine goods whose warranty eligibility has been unilaterally revoked by Cisco does not

6  violate the Lanham Act.

7  54.    A real and actual controversy presently exists between the parties to this action

8  which is concrete and justiciable in character, and as to which each party possesses an

9  interest in resolving.

10  55.    Counterclaimant sells, and intends to continue selling, genuine Cisco products

11  which Cisco asserts are ineligible for warranty services once they come into

12  Counterclaimant's possession in the ordinary course of commerce. Unless and until

13  Counterclaimant's sales of genuine Cisco products are deemed to be permissible under

14  United States law, Counterclaimant's ability to sell such products will be wrongfully and

15  unnecessarily impaired, and Counterclaimant will continue to be injured and damaged by

16  this threat. Accordingly, Counterclaimant seeks declaratory relief from this Court.

17  56.    The controversy between Counterclaimant and Cisco warrants relief declaring the

18  rights of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that the sale of

19  genuine Cisco products whose warranty eligibility has been unilaterally revoked by Cisco

20  after entering the stream of commerce does not violate the Lanham Act.

21
22  **SECOND COUNTERCLAIM**
**Declaratory Judgment**
**(28 U.S.C. §§ 2201-2202)**

23  57.    Dexon repeats and realleges each of the allegations set forth in the preceding

24  paragraphs as if fully set forth herein.

25  58.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq.,

26  Counterclaimant is entitled to judgment from this Court that Counterclaimants' refusal to

27  warrant genuine Cisco products acquired outside of Cisco's "Authorized Reseller

28

1  Network" violates New York General Business Law § 369-b and is unenforceable in New

2  York.

3  59.     A real and actual controversy presently exists between the parties to this action

4  which is concrete and justiciable in character, and as to which each party possesses an

5  interest in resolving.

6  60.     Counterclaimant sells, and intends to continue selling, genuine Cisco products in

7  New York which Cisco asserts are ineligible for warranty services once they come into

8  Counterclaimant's possession in the ordinary course of commerce. Cisco's claims harm

9  Counterclaimant's ability to sell these products in New York due to wrongfully

10  representing to customers that products sold by Counterclaimant are not eligible for

11  warranties. Accordingly, Counterclaimant seeks declaratory relief from this Court.

12  61.     The controversy between Counterclaimant and Cisco warrants relief declaring the

13  rights of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that Cisco's refusal

14  to warrant genuine products sold in New York based on their purchase or sale in the

15  secondary market violates New York General Business Law § 369-b.

16  
### THIRD COUNTERCLAIM
**Unfair Competition Law**
17  **(CAL. BUS. & PROF. CODE §§ 17200 et seq.)**

18  62.     Dexon repeats and realleges each of the allegations set forth in the preceding

19  paragraphs as if fully set forth herein.

20  63.     California Business and Professions Code §§ 17200 et seq. prohibit acts of unfair

21  competition, which includes any unlawful, unfair, or fraudulent business act or practice.

22  64.     As detailed above, Cisco has taken numerous anticompetitive steps designed to

23  afford it a greater level of control over the purchase and sale of Cisco-branded products

24  than the law permits. These anticompetitive actions are tantamount to violations of the

25  antitrust laws.

26  65.     Cisco has engaged in these unfair and wrongful actions in order to hinder the ability

27  of those in the secondary market to compete with Cisco. These practices harm both

28  independent resellers like Dexon, whose ability to compete is impeded, and customers,

1  who are forced to pay increased costs for genuine Cisco products as a result of this

2  artificially deflated competition. Cisco's acts, which destroy competition for its products at

3  the expense of consumers, are tantamount to violations of the antitrust laws. As a result of

4  Cisco's unfair, fraudulent, and unlawful conduct, Dexon has lost sales of Cisco products

5  they otherwise would have made, and have accordingly lost money or property as a result

6  of Cisco's practices.

7  66.    Cisco's actions have caused, and unless restrained by this Court, will continue to

8  cause irreparable injury to Dexon.

9  67.    Dexon seeks the full restitution by Cisco that is necessary and according to proof to

10  restore any and all property and monies, including interest, acquired by Cisco, and all costs

11  caused to Dexon as a result of Cisco's unlawful and unfair business practices.

12  68.    Dexon's claims, including their claims under California Business & Professions

13  Code § 17200, are brought to enforce an important right affecting the public interest.

14  Accordingly, Dexon is entitled to recover its attorneys' fees from Cisco. CAL. CIV.

15  PROC. CODE § 1021.5.

16
17
**FOURTH COUNTERCLAIM**
**Lanham Act False Advertising**
**(15 U.S.C. § 1125(a)(1)(B))**

18  69.    Dexon repeats and realleges each of the allegations set forth in the preceding

19  paragraphs as if fully set forth herein.

20  70.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that it is unlawful

21  for any person to use a "false or misleading description of fact, or false or misleading

22  representation of fact, which . . . in commercial advertising or promotion, misrepresents

23  the nature, characteristics, qualities, or geographic origin of his or her or another person's

24  goods, services, or commercial activities."

25  71.    As set forth above, Cisco has published in commercial advertising and promotion,

26  and continues to publish in commercial advertising and promotion, false or misleading

27  representations of fact regarding the software embedded in Cisco hardware sold on the

28  secondary market.

72.    In addition, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding whether products in the secondary market are "used."

73.    The foregoing false and misleading representations of fact are designed to mislead consumers, and do in fact mislead consumers, at the expense of Dexon, causing direct and substantial loss to Dexon of money and market share.

74.    The foregoing false and misleading representations of fact are made willfully and entitle Dexon to recover the profits obtained by Cisco thereby, in addition to Dexon's own damages suffered as a result of Cisco's false and misleading representations of fact.

75.    Cisco's misrepresentations have caused, and unless restrained by this Court, will continue to cause irreparable injury to Dexon.

**FIFTH COUNTERCLAIM**
**Intentional Interference with Contractual Relations**

76.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

77.    Dexon secured contracts with certain customers for the sale of Cisco products on which Dexon would have earned significant profits.

78.    On information and belief, Cisco knew or should have known of these contractual relationships between Dexon and these third party customers.

79.    On information and belief, Cisco intentionally, or with reckless disregard for the truth, made false and misleading statements about Dexon and the products it sells to these customers in order to disrupt the contractual relationship and to cause these customers to purchase product from Cisco authorized resellers at a higher price.

80.    Cisco's statements in fact disrupted these contractual relationships between Dexon and its customers.

81.    Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

82.     Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

## SIXTH COUNTERCLAIM
### Intentional Interference with Prospective Economic Advantage

83.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

84.     An economic relationship existed between Dexon and its actual and prospective customers, each of which contained the probability of substantial future economic benefits to Dexon.

85.     On information and belief, Cisco knew or should have known of these relationships.

86.     On information and belief, Cisco intentionally, or with reckless disregard, engaged in tortious conduct designed to disrupt Dexon's potential benefit from these relationships, including:

a.      By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that the Cisco products Dexon sold were not new, used, counterfeit, suspect, non-genuine, and/or unauthorized; and

b.      By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that if they purchased product from open market resellers such as Dexon, they would jeopardize the security of their data networks.

c.      By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that Dexon somehow improperly modified Cisco product, including, without limitation, by "repackaging" such products and/or substituting or replacing parts/software on such product.

DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD- PARTY CLAIMS

87.     Cisco's statements were made with the intent to disrupt the economic relationship between Dexon and its potential and actual customers in order to put Dexon out of business and to ensure that these customers would purchase Cisco product at higher prices from "Cisco Authorized Resellers" under Cisco's control.

88.     As a result of the efforts detailed above, Dexon's relationships with its potential and actual customers have in fact been permanently disrupted and/or materially damaged in a significant number of instances, including its future relationships.   As a result of Cisco's tortious efforts, Dexon's customers have refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from contention for business, and have ceased doing business with Dexon on other products and/or all together.

89.     Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

90.     Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

### SEVENTH COUNTERCLAIM
**Trade Libel**

91.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

92.     On information and belief, Dexon alleges that Cisco has repeatedly made disparaging statements about Dexon's products as detailed herein.

93.     Cisco's statements disparaged Dexon's products.  On information and belief, Dexon alleges that the claims made were false or materially misleading.

94.     Dexon has suffered and will continue to suffer irreparable harm should Cisco's trade libel be allowed to continue.

95.     As a proximate result of Cisco's statements, prospective and actual customers have been deterred from buying Dexon's products and from otherwise dealing with Dexon. Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

96.     Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

97.     Dexon will suffer irreparable harm to its goodwill if this trade libel continues. Dexon is entitled to injunctive relief to preclude Cisco's trade libel.

**EIGHTH COUNTERCLAIM**
**Unfair Competition Under Cal. Bus. & Prof. Code § 17200 *et seq*.**

98.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

99.     Cisco's conduct, as set forth above, is unlawful, unfair, and fraudulent as well as untrue and deceptive within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq*.

100.    Dexon will continue to suffer irreparable harm to its goodwill if this unfair competition continues.  Dexon is entitled to injunctive relief to preclude Cisco's unfair competition.

1

2

### THIRD PARTY CLAIMS

Third Party Plaintiff Dexon Computer, Inc. asserts the following claims against Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Network Republic, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Strategic Telecom Supply & Solutions, Unlimited Network Solutions and Wisecom Technologies alleges as follows:

### THE PARTIES

101.    Third Party Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

102.    On information and belief, Third Party Defendant Atlantix Global Systems International, LLC is a Georgia limited liability corporation with its principal place of business in Georgia.

103.    On information and belief, Third Party Defendant Bizcom Electronics, Inc., is a California corporation with its principal place of business in California.

104.    On information and belief, Third Party Defendant Digi Devices Online is a foreign corporation with its principal U.S. place of business in Texas.

105.    On information and belief, Third Party Defendant Enterprise Business Technologies, Inc. is a New York corporation with its principal place of business in New York.

106.    On information and belief, Third Party Defendant Fiber Cable Connections is a Washington corporation with its principal place of business in Washington.

107.    On information and belief, Third Party Defendant MJSI is a California corporation with its principal place of business in California.

DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD- PARTY CLAIMS

108.    On information and belief, Third Party Defendant Multimode Technologies, LLC is a Minnesota limited liability company with its principal place of business in Minnesota.

109.    On information and belief, Third Party Defendant Network Republic is a Texas corporation with its principal place of business in Texas.

110.    On information and belief, Third Party Defendant Opitmum Data, Inc. is a Nebraska corporation with its principal place of business in Nebraska.

111.    On information and belief, Third Party Defendant Paragon is a Massachusetts corporation with its principal place of business in Massachusetts.

112.    On information and belief, Third Party Defendant Pure Future Technology, Inc. is a California corporation with its principal place of business in California.

113.    On information and belief, Third Party Defendant Seastar IT Trading LLC is a Washington limited liability company with its principal place of business in Washington.

114.    On information and belief, Third Party Defendant Server Tech Supply is a Virginia corporation with its principal place of business in Pennsylvania.

115.    On information and belief, Third Party Defendant Softnetworks, Inc. is a New Jersey limited liability company with its principal place of business in New Jersey.

116.    On information and belief, Third Party Defendant Strada Networks, LLC is a foreign limited liability company with its principal place of business in British Columbia, Canada.

117.    On information and belief, Third Party Defendant Strategic Telecom Supply & Solutions is a Virginia limited liability company with its principal place of business in Virginia.

118.    On information and belief, Third Party Defendant Teksavers is a Texas corporation with its principal place of business in Texas

119.    On information and belief, Third Party Defendant Unlimited Network Solutions is a corporation with its principal place of business in California.

120.    On information and belief, Wisecom Technologies is a corporation with its principal place of business in Maryland.

**Supply of Alleged Counterfeit and Infringing Product**

121.    The Third Party Defendants are all reputable dealers and merchants with respect to the Cisco products alleged to be counterfeit and thereby infringing herein ("allegedly infringing Cisco product").

122.    Dexon obtained such allegedly infringing Cisco product from the Third Party Defendants.  While Dexon denies Cisco's allegations and believes the subject products to be genuine, Dexon relied in good faith on the Third Party Defendants in procuring or obtaining such products.

123.    Without limitation, the Third Party Defendants warranted that such products sold to Dexon would be "delivered free of the rightful claim of any third person by way of infringement or the like."  See U.C.C. §2-312(3).

**FIRST THIRD PARTY CLAIM**
**(Indemnification - All Third Party Defendants)**

124.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

125.    Dexon was named in this litigation as a direct result of product procured from and/or supplied by the Third Party Defendants.

126.    Third Party Defendants should be ordered to indemnify Dexon whether based on express agreement, implied agreement or common law.

**SECOND THIRD PARTY CLAIM**
**(Contribution - All Third Party Defendants)**

127.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

128.    Dexon was named in this litigation as a direct result of product procured from and supplied by the Third Party Defendants.

129.    Dexon is entitled to contribution from Third Party Defendants, whether based on express agreement, implied agreement or common law, to pay or defray any judgment entered against Dexon herein.

1

2                              **PRAYER FOR RELIEF**

3          **WHEREFORE,** Defendant, Counterclaim Plaintiff and Third Party Plaintiff Dexon

4   Computer, Inc. prays for judgment and relief against Plaintiffs and Counterclaim Defendants

5   Cisco Systems, Inc. and Cisco Technology, Inc. ("Cisco") and Third Party Defendants

6   Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online,

7   Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode

8   Technologies, LLC, Network Republic, Optimum Data, Inc., Paragon, Pure Future

9   Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada

10  Networks, LLC, Strategic Telecom Supply & Solutions, Unlimited Network Solutions and

11  Wisecom Technologies as follows:

12      a.  Dismissing Plaintiffs' Cisco Systems, Inc. and Cisco Technology, Inc. claims with
13          prejudice, together with costs and disbursements;

14      b.  Awarding Defendant Dexon Computer, Inc. its attorneys' fees incurred in defending
15          against such claims;

16      c.  Declaring that Dexon's sale of genuine Cisco goods which Cisco has unilaterally
17          deemed to be "unauthorized" or "unapproved" because sold outside of Cisco's
18          authorized channels, sold to a secondary market reseller such as Dexon, or ineligible
19          for warranty services as a result thereof, does not violate the Lanham Act, 15 U.S.C.
20          §§ 1114, 1125(a);

21      d.  Declaring that Cisco's refusal to warrant genuine products sold in New York violates
22          New York General Business Law § 369-b;

23      e.  Awarding Dexon restitutionary disgorgement;

24      f.  Awarding Dexon actual damages, subject to proof at trial but in an amount in excess
25          of $75,000.;

26      g.  An award of punitive damages in an amount sufficient to punish Counterclaim
27          Defendants, to make an example of them to the community, and to deter them from
28          such conduct as to Dexon or others in the future;

h.  For equitable remedial efforts by Counterclaim Defendants sufficient to rehabilitate Dexon's damaged reputation;

i.  For orders restraining Cisco Systems, Inc. from engaging in similar conduct in the future;

j.  Awarding Dexon damages, lost profits, and treble damages pursuant to the Lanham Act;

k.  Awarding Dexon its costs and expenses of litigation, including reasonable attorneys' fees;

l.  Enjoining Cisco from further violations of the laws enumerated herein;

m.  An award in Dexon's favor against Third Party Defendants sufficient to compensate Dexon for all economic loss, damages, attorney's fees and costs resulting from the claims herein; and

n.  Such other and further relief as this Court deems just and equitable.


Dated:  June 17, 2021                    Amanda R. Washton, member of
                                         CONKLE, KREMER & ENGEL
                                         Professional Law Corporation


                                   By:   /s/ Amanda R. Washton
                                         Amanda R. Washton
                                         Attorneys for Defendant, Counterclaimant,
                                         Plaintiff and Third Party Plaintiff Dexon
                                         Computer, Inc.

1

## DEMAND FOR JURY TRIAL

2

Dexon Computer, Inc. demands a trial by jury on all issues so triable.

3

4    Dated:  June 17, 2021                    Amanda R. Washton, member of
5                                             CONKLE, KREMER & ENGEL
                                              Professional Law Corporation
6

7

8                                     By:  _/s/ Amanda R. Washton_
9                                          Amanda R. Washton
                                           Attorneys for Defendant, Counterclaimant,
10                                         Plaintiff and Third Party Plaintiff Dexon
                                           Computer, Inc.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28