Amanda R. Washton (SB# 227541)
*a.washton@conklelaw.com*
**CONKLE, KREMER & ENGEL**
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351
Phone: (310) 998-9100
Fax: (310) 998-9109

Michael M. Lafeber (*pro hac vice*)
*mlafeber@taftlaw.com*
O. Joseph Balthazor Jr. (*pro hac vice*)
*jbalthazor@taftlaw.com*
**TAFT STETTINIUS &**
 **HOLLISTER LLP**
2200 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
Phone: 612.977.8400
Fax: 612.977.8650

David H. Reichenberg (pro hac vice pending)
*DReichenberg@cozen.com*
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 56th Floor
New York, New York 10006
Phone: (212) 883-4900
Fax: (646) 461-2091

Mark A. Jacobson (*pro hac vice pending*)
*mjacobson@cozen.com*
**COZEN O'CONNOR**
33 South 6th Street
Suite 3800
Minneapolis, MN 55402
Phone: (612) 260-9000
Fax: (612) 260-8026

Attorneys for Defendant, Counterclaim
Plaintiff and Third-Party Plaintiff Dexon
Computer, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>DEXON COMPUTER, INC., a Minnesota corporation,<br><br>        Defendant.<br><br>DEXON COMPUTER, INC., a Minnesota corporation,<br><br>        Counterclaim Plaintiff and Defendant,<br><br>    v. | Case No. 3:20-CV-4926-CRB<br><br>**DEFENDANT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Hon. Charles R. Breyer<br>Presiding Judge<br><br>Trial Date:         None |

1 | CISCO SYSTEMS, INC., a Delaware
corporation and CISCO TECHNOLOGY,
2 | INC., a California corporation,

3 | Counterclaim Defendants
and Plaintiffs.

4 |

5 | DEXON COMPUTER, INC., a Minnesota
corporation,

6 |

7 | Third-Party Plaintiff,

v.

8 |

ATLANTIX GLOBAL SYSTEMS
9 | INTERNATIONAL, LLC, BIZCOM
ELECTRONICS, INC., DIGI DEVICES
10 | ONLINE, ENTERPRISE BUSINESS
TECHNOLOGIES, INC., FIBER CABLE
11 | CONNECTIONS, MJSI, MULTIMODE
TECHNOLOGIES, LLC, NETWORK
12 | REPUBLIC, OPTIMUM DATA, INC.,
PARAGON, PURE FUTURE
13 | TECHNOLOGY, INC., SEASTAR IT
TRADING LLC, SERVER TECH
14 | SUPPLY, SOFTNETWORKS, INC.,
STRADA NETWORKS, LLC,
15 | STRATEGIC TELECOM SUPPLY &
SOLUTIONS, TEKSAVERS,
16 | UNLIMITED NETWORK SOLUTIONS,
and  WISECOM TECHNOLOGIES,,

17 |

Third-Party Defendants,

18 |

Defendant Dexon Computer, Inc. ("Dexon"), by and through its undersigned counsel, for its Answer, denies each and every allegation in Plaintiffs Cisco Systems, Inc. and Cisco Technology Inc.'s ("Plaintiffs") First Amended Complaint ("Complaint") except as expressly admitted, qualified or otherwise responded to herein and denies that Plaintiffs are entitled to any of the relief requested in their Prayer for Relief.  In response to each of the numbered paragraphs of the Complaint, Dexon states as follows. To the extent the headings or any other non-numbered statements in the Complaint contain allegations, Dexon denies each and every such allegation.

## INTRODUCTION

1.    Dexon denies the allegations of paragraph 1 of the Complaint.

2.    Dexon denies the allegations of paragraph 2 of the Complaint.

## THE PARTIES

3.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 3 of the Complaint, and on that basis Dexon denies those allegations.

4.    Dexon admits the allegations of paragraph 4 of the Complaint.

5.    Dexon denies the allegations of paragraph 5 of the Complaint.

## JURISDICTION AND VENUE

6.    Admits that the Complaint purports to be one "founded upon violations of Federal trademark laws" but denies any such purported claims have legal or factual merit.  The remaining allegations in paragraph 6 of the Complaint are legal conclusions and questions of law regarding jurisdiction to which no response is required. To the extent a response is required, Dexon denies such allegations.

7.    Dexon denies the allegations of paragraph 7 of the Complaint.

8.    Dexon denies the allegations of paragraph 8 of the Complaint.

9.    Dexon denies the allegations of paragraph 9 of the Complaint.

10.    Dexon denies the allegations of paragraph 10 of the Complaint.

11.    Dexon denies the allegations in paragraph 11 of the Complaint.

# FACTUAL ALLEGATIONS

## Alleged Cisco Business and History

12.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 12 of the Complaint, and on that basis Dexon denies those allegations.

13.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 13 of the Complaint, and on that basis Dexon denies those allegations.

14.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 14 of the Complaint, and on that basis Dexon denies those allegations.

## Alleged Cisco Trademarks

15.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 15 of the Complaint, and on that basis Dexon denies those allegations.

16.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 16 of the Complaint, and on that basis Dexon denies those allegations.

17.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 17 of the Complaint, and on that basis Dexon denies those allegations.

18.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 18 of the Complaint, and on that basis Dexon denies those allegations.

## Alleged Counterfeit "Cisco" Products

19.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 19 of the Complaint, and on that basis Dexon denies those allegations.

20.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 20 of the Complaint, and on that basis Dexon denies those allegations.

## Alleged Impact on Health, Safety, and National Security Caused by Counterfeit Cisco Products

21.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 21 of the Complaint, and on that basis Dexon denies those allegations.

22.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 22 of the Complaint, and on that basis Dexon denies those allegations.

**Dexon's Alleged History and Practice of Trafficking in Counterfeit Cisco Products**

23.     Dexon admits selling product bearing the Cisco name and/or mark, but denies the remaining allegations of paragraph 23 of the Complaint, including, without limitation, any allegation such product was counterfeit.

24.     Dexon denies the allegations of paragraph 24 of the Complaint.

25.     Dexon denies the allegations of paragraph 25 of the Complaint.

**Alleged Activity Prior to 2015 Purportedly Demonstrating Dexon's Pattern and Practice of Knowingly Trafficking in Counterfeit Cisco Products**

**Alleged July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco Investigator (Reston, Virginia)**

26.     Dexon denies the allegations in paragraph 26 of the Complaint.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**FBI's Seizure of Alleged Counterfeit Cisco Products from Dexon on February 26, 2008**

27.     Dexon admits the Federal Bureau of Investigation ("FBI") executed a search warrant at Dexon's business location on or about February 26, 2008, but denies the remaining allegations in paragraph 27 of the Complaint including, without limitation, any allegation, suggestion or implication any or "all" of the product taken by the FBI was determined to be counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Cisco's March 2008 Cease and Desist Letter to Dexon and its CEO**

28.     Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about March 7, 2008, and that Dexon responded via a letter from its counsel on or about March 18, 2008, but Dexon denies the reminder of the allegations in paragraph 28 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

the letters or communications which speak for themselves.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Dexon's June 2010 Sale of Alleged Counterfeit Cisco Products to Wayne State University (Detroit, Michigan) and Cisco's C&D Letter**

29.    Dexon admits selling and shipping Cisco product to Wayne State University on or about February 21, 2010 but denies the remainder of the allegations in paragraph 29 of the Complaint, including, without limitation, any allegation the product involved was counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

30.    Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about August 6, 2010 concerning Dexon's sale of Cisco product to Wayne State University, but Dexon denies the reminder of the allegations in paragraph 30 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

31.    Dexon admits it responded via a letter from counsel to Plaintiff's Wayne State University allegations on or about August 23, 2010, but Dexon denies the reminder of the allegations in paragraph 31 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

32.    Dexon admits Plaintiffs sent a follow-up letter concerning or relating to the Wayne State University allegations on or about August 30, 2010, but Dexon denies the reminder of the allegations in paragraph 32 of the Complaint, including, without limitation, Plaintiffs'

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

attempted characterization of the letter which speaks for itself. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

### Dexon's July 2010 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Los Angeles, California)

33.     Dexon denies the allegations in paragraph 33 of the Complaint. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

### Dexon's Alleged Illegal Conduct Giving Rise to the Present Lawsuit

34.     Dexon denies the allegations in paragraph 34 of the Complaint.

### Dexon's July 2015 Sale of Alleged Counterfeit Cisco Product to Things Remembered, Inc. (Highland Heights, Ohio) and Cisco's C&D Letter

35.     Dexon admits selling Cisco product to Things Remembered, Inc. on or about July 2015, but denies the remainder of the allegations in paragraph 35 of the Complaint, including any allegation the product was counterfeit.

36.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the Things Remembered, Inc. allegations on or about August 27, 2020 and that Dexon responded thereto, but Dexon denies the reminder of the allegations in paragraph 36 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the letters or communications which speak for themselves.

### Dexon's December 2016 Sale of Alleged Counterfeit Cisco Products to Jack Henry & Associates, Inc. (Monett, Missouri) and Cisco's C&D Letter

37.     Dexon admits selling Cisco product to Jack Henry & Associates, Inc. ("Jack Henry") on or about December 2016, but denies the remainder of the allegations in paragraph 37 of the Complaint, including, without limitation, any allegation the product was counterfeit.

38.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the Jack Henry allegations, but Dexon denies the reminder of the allegations in paragraph 38 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

39.     Dexon admits it responded to Plaintiffs' Jack Henry allegations via a letter from Dexon's counsel, but denies the reminder of the allegations in paragraph 39 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the responsive letter which speaks for itself.

**Dexon's October 2017 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Berkeley, California)**

40.     Dexon denies the allegations in paragraph 40 of the Complaint.

**Dexon's January 2018 Sale of Alleged Counterfeit Cisco Product to Community Health Alliance (Reno, Nevada) and Cisco's C&D Letter**

41.     Dexon admits selling Cisco product to Community Health Alliance ("CHA") on or about January 2018, but denies the remainder of the allegations in paragraph 41 of the Complaint, including, without limitation, any allegation the product was counterfeit.

42.     Dexon admits Plaintiffs and Dexon's counsel exchanged a series of letters or communications relating to the CHA allegations, but denies the remainder of the allegations in paragraph 42 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the letters or communications which speak for themselves.

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to Tucson Medical Center (Arizona)**

43.     Dexon admits selling Cisco product to Tucson Medical Center ("TMC") on or about April 2018, but denies the remainder of the allegations in paragraph 43 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to DARCARS (Maryland) and Cisco's C&D Letter**

44.     Dexon admits selling Cisco product to DARCARS on or about April 2018, but denies the remainder of the allegations in paragraph 44 of the Complaint, including, without limitation, any allegation the product was counterfeit.

45.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the DARCARS allegations, but Dexon denies the reminder of the allegations in paragraph 45 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Lockridge, Grindal, Nauen, PLLP (Minneapolis, Minnesota)**

46.     Dexon admits selling Cisco product to Lockridge, Grindal, Nauen, PLLP on or about August 2018, but denies the remainder of the allegations in paragraph 46 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Regional Justice Information Service (St. Louis, MO) and Cisco's C&D Letter**

47.     Dexon admits selling Cisco product to Regional Justice Information Service ("RJIS") on or about August 2018, but denies the remainder of the allegations in paragraph 47 of the Complaint, including, without limitation, any allegation the product was counterfeit.

48.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the RJIS allegations, but Dexon denies the reminder of the allegations in paragraph 48 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Purchases in 2018 of Alleged Counterfeit Switches from PureFutureTech (Fremont, California)**

49.     Dexon admits purchasing Cisco product from PureFutureTech on or about 2018 and that the purported supplier of such product was HongKong Sellsi, a former authorized

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1  licensed seller of Cisco products, but lacks sufficient information to admit or deny the

2  remaining allegations of paragraph 49 of the Complaint, and on that basis Dexon denies such

3  allegations.

4  50.    Dexon admits Plaintiffs served it with a subpoena relating to a lawsuit involving

5  Plaintiffs, PureFutureTech and HongKong Sellsi and that Plaintiffs were ultimately required

6  to file a motion relating to such non-party subpoena.  Dexon denies the remaining allegations

7  of paragraph 50 of the Complaint, including, without limitation, any allegation, suggestion

8  or implication Dexon "refused to cooperate" with, or in any way failed to meet its obligations

9  arising from, the subpoena.

10          **Dexon's Purchases in 2017 to 2019 of Alleged Counterfeit Transceivers
           from Pure Future Tech, Inc. (Fremont, California)**

12  51.    Dexon admits purchasing Cisco product from Pure Future Tech, Inc. in the period

13  2017-2019 but denies any such product was counterfeit.  Dexon lacks sufficient information

14  to admit or deny the remaining allegations in paragraph 51 of the Complaint and on that

15  basis denies such allegations.

16  52.    Dexon denies the allegations in paragraph 52 of the Complaint, including, without

17  limitation, any allegation Dexon knew or reasonably should have known any Cisco product

18  was allegedly counterfeit, or that Dexon was willfully blind to such alleged fact.

19          **Dexon's Sales of Alleged Counterfeit Products to Murray State University
           (Murray, Kentucky) in 2018 and 2019 and Cisco's C& Letter**

21  53.    Dexon admits selling Cisco product to Murray State University ("MSU") in or about

22  2018 and 2019, but denies the remainder of the allegations in paragraph 53 of the Complaint,

23  including, without limitation, any allegation the product was counterfeit.

24  54.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the

25  MSU allegations, but Dexon denies the reminder of the allegations in paragraph 54 of the

26  Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter

27  which speaks for itself.

28

**Dexon's July 2019 Sale of Alleged Counterfeit Cisco Products to MedRisk (King of Prussia, Pennsylvania)**

55.     Dexon admits selling Cisco product to MedRisk on or about July 2019, but denies the remainder of the allegations in paragraph 55 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's September 2019 Sale of Alleged Counterfeit Cisco Products to Coppell Independent School District (Coppell, Texas) and Cisco's C&D Letter**

56.     Dexon admits selling Cisco product to Coppell Independent School District ("CISD") on or about September 2019, but denies the remainder of the allegations in paragraph 56 of the Complaint.

57.     Dexon denies any allegation, suggestion or implication in paragraph 57 of the Complaint that Cisco product it sold to CISD was counterfeit.  Dexon lacks sufficient information to admit or deny the remainder of the allegations in paragraph 57 of the Complaint and on that basis denies such allegations.

58.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the CISD allegations, but Dexon denies the reminder of the allegations in paragraph 58 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Alleged California Directed Conduct Identified Through Jurisdictional Discovery**

59.     Dexon admits Plaintiffs conducted jurisdictional discovery herein, but denies the remainder of the allegations in paragraph 59 of the Complaint, including, without limitation, Plaintiffs' characterization of such jurisdictional discovery, as well as any allegation such discovery revealed any "illegal and tortious" conduct by Dexon in California or elsewhere.

**Dexon's Sale of Alleged Counterfeit Cisco Products to California Customers**

60.     Dexon denies the allegations in paragraph 60 of the Complaint.

**Dexon's Sale of Alleged Counterfeit Cisco Licenses to California Customers**

61.     Dexon admits Cisco has transmitted software licenses via Product Activation Key Certificates ("PAK") and that such PAKs have included a code that allows users to utilize the subject software.  Dexon denies the remainder of the allegations in paragraph 61 of the Complaint.

62.     Dexon denies the allegations in paragraph 62 of the Complaint.

63.     Dexon denies the allegations in paragraph 63 of the Complaint.

64.     Dexon denies the allegation in paragraph 64 of the Complaint.

**FIRST PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Infringement**
*(15 U.S.C. § 1114)*

65.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-64 in response to the allegations in paragraph 65 of the Complaint.

66.     Dexon denies the allegations of paragraph 66 of the Complaint.

67.     Dexon denies the allegations of paragraph 67 of the Complaint.

68.     Dexon denies the allegations of paragraph 68 of the Complaint.

69.     Dexon denies the allegations of paragraph 69 of the Complaint.

70.     Dexon denies the allegations of paragraph 70 of the Complaint.

71.     Dexon denies the allegations of paragraph 71 of the Complaint.

72.     Dexon denies the allegations of paragraph 72 of the Complaint.

**SECOND PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Counterfeiting**
*(15 U.S.C. § 1114)*

73.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-72 in response to the allegations in paragraph 73 of the Complaint.

74.     Dexon denies the allegations of paragraph 74 of the Complaint.

75.     Dexon denies the allegations of paragraph 75 of the Complaint.

76.     Dexon denies the allegations of paragraph 76 of the Complaint.

77.     Dexon denies the allegations of paragraph 77 of the Complaint.

78.     Dexon denies the allegations of paragraph 78 of the Complaint.

79.     Dexon denies the allegations of paragraph 79 of the Complaint.

**THIRD PURPORTED CLAIM FOR RELIEF**
**False Designation of Origin**
**(15 U.S.C. *§ 1125*)**

80.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-79 in response to the allegations in paragraph 80 of the Complaint.

81.     Dexon denies the allegations of paragraph 81 of the Complaint

82.     Dexon denies the allegations of paragraph 82 of the Complaint.

83.     Dexon denies the allegations of paragraph 83 of the Complaint.

84.     Dexon denies the allegations of paragraph 84 of the Complaint.

85.     Dexon denies the allegations of paragraph 85 of the Complaint.

**FOURTH PURPORTED CLAIM FOR RELIEF**
**California Unfair Business Practices**
**(Cal. Bus. & Prof. Code *§§ 17200 et seq.*)**

86.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-85 in response to the allegations in paragraph 86 of the Complaint.

87.     The allegations in paragraph 87 of the Complaint are legal conclusions of law regarding California Business and Professions Code §§ 17200 *et seq* to which no response is required. To the extent such allegations imply or suggest Dexon has in any way violated California Business and Professions Code §§ 17200 *et seq* Dexon denies such allegations.

88.     Dexon denies the allegations of paragraph 88 of the Complaint.

89.     Dexon denies the allegations of paragraph 89 of the Complaint.

90.     Dexon denies the allegations of paragraph 90 of the Complaint.

91.     Dexon denies the allegations of paragraph 91 of the Complaint.

92.     Dexon denies the allegations of paragraph 92 of the Complaint.

**FIFTH PURPORTED CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Common Law)**

93.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-92 in response to the allegations in paragraph 93 of the Complaint.

94.     Dexon admits the allegations of paragraph 94 of the Complaint.

95.     Dexon denies the allegations of paragraph 95 of the Complaint.

**AFFIRMATIVE DEFENSES**

Without admitting any wrongful conduct on the part of Dexon, and without admitting that Plaintiffs claims have any merit or that Plaintiffs have suffered any loss, damage, or injury, Dexon alleges the following affirmative defenses to the Complaint.  By designating the following as affirmative defenses, Dexon does not in any way waive or limit any defenses which are or may be raised by their denial, allegations, and averments set forth herein.  These defenses are pled in the alternative, are raised to preserve the rights of Dexon to assert such defenses, and are without prejudice to Dexon's ability to raise other and further defenses. Dexon expressly reserves all rights to reevaluate their defenses and/or assert additional defenses upon discovery and review of additional documents and information, upon the development of other pertinent facts, and during pretrial proceedings in this action.  Dexon expressly incorporate all allegations of its Answer, Counterclaims and Cross-Claims as if fully set forth in each of the following affirmative defenses.

**FIRST AFFIRMATIVE DEFENSE**
**(Res Judicata and Collateral Estoppel)**

96.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel.

**SECOND AFFIRMATIVE DEFENSE**
**(Laches)**

97.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of laches. Plaintiffs' have had longstanding knowledge concerning the legal open or "secondary" market for its products and have proactively engaged in anticompetitive behavior in an effort to selectively manipulate and control such secondary market to their advantage.  Plaintiffs have had longstanding specific knowledge of Dexon's activity in the legal secondary market since well before 2011, yet have failed to take timely action to assert their claims herein, resulting in substantial prejudice to Defendants.

1

2

### THIRD AFFIRMATIVE DEFENSE
### (Estoppel)

3   98.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of

4   estoppel. Plaintiffs' advertises that consumers can purchase their products from their

5   "Authorized Channel Partners" or "Authorized Resellers."  Plaintiffs have known, or should

6   have known such "Authorized Channel Partners" and/or "Authorized Resellers" participate

7   in and sell their products on the secondary market. Plaintiffs have allowed these "Authorized

8   Channel Partners" and/or "Authorized Resellers" to maintain their "authorized" status

9   despite knowledge of their participation in the secondary market, including evidence of their

10  sale of counterfeit Cisco products.  Plaintiffs know, or should have reasonably known, that

11  secondary market resellers such as Dexon rely upon Plaintiffs' endorsement of such

12  "authorized" vendors when sourcing Cisco products, including, without limitation,

13  procuring Cisco product from such "authorized vendors" end customers.  Plaintiffs also

14  claim to have developed "tools" capable of detecting counterfeit goods.  However, unlike

15  their competitors in the market, have intentionally failed or refused to provide or offer such

16  "tools" to secondary market resellers such as Dexon to aid and assist in their efforts to detect

17  and deter counterfeit goods. Plaintiffs have also actively contributed to the presence of

18  counterfeit product in the marketplace by, without limitation, failing to properly police and

19  control their manufacturers and failing to properly manage their product serial numbers.  As

20  one example, Plaintiffs "authorized" vendors intentionally modify or change product serial

21  numbers in order to ensure the subject product(s) qualify for Plaintiffs' SmartNet service

22  packages.  Plaintiffs are therefore estopped from pursuing claims against Dexon or seeking

23  damages related to alleged counterfeit products.

24

### FOURTH AFFIRMATIVE DEFENSE
### (First Sale Doctrine and Exhaustion)

25

26  99.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the first sale

27  doctrine, which protects secondary market resellers such as Dexon from liability for the

28

purchase, importation, and resale of genuine Cisco products and exhausts Plaintiffs' rights in further transactions.

## FIFTH AFFIRMATIVE DEFENSE
### (Statutes of Limitations)

100.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by applicable statutes of limitations, including but not limited to CAL. CIV. PROC. CODE §§ 337–38, CAL. BUS. & PROF. CODE § 17208, and 17 U.S.C. § 507.  Some or all of Plaintiffs' claims involve conduct outside of the applicable statutes of limitations.

## SIXTH AFFIRMATIVE DEFENSE
### (Waiver)

101.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of waiver. Plaintiffs have promoted and advertised its "authorized" sellers despite having full knowledge certain such "authorized" sellers: i) have been caught selling counterfeit product; and ii) actively and regularly deal with secondary market resellers such as Dexon. Secondary market resellers such as Dexon have understandably relied upon Plaintiffs' promotion and endorsement of such "authorized" sellers when sourcing Cisco products for their customers. As noted above, Plaintiffs have also intentionally failed or refused to provide or offer their claimed "tools" for detecting counterfeit product to secondary market resellers such as Dexon, and have actively contributed to the presence of counterfeit product in the marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers.  Accordingly, Plaintiffs have waived any claims related to Dexon's unwitting sale of alleged counterfeit goods, including any such goods sourced directly or indirectly from Plaintiffs' "authorized" vendors.

## SEVENTH AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

102.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of unjust enrichment. Plaintiffs have engaged in anticompetitive practices and made

1  misrepresentations to consumers regarding: i) the quality and authenticity of products sold

2  by secondary market resellers such as Dexon; and ii) Plaintiffs' rights to restrict consumers

3  use and transfer of Cisco hardware and software.  Such anticompetitive and inequitable

4  conduct has improperly steered customers from Dexon to Plaintiffs and unjustly enriched

5  Plaintiffs.

6  **EIGHTH AFFIRMATIVE DEFENSE**
7  **(Unclean Hands/Inequitable Conduct)**

8  103.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of

9  unclean hands, inequitable conduct, and similar defenses.  Without limitation, Plaintiffs

10  have: i) engaged in anticompetitive practices, (ii) intentionally misled consumers into

11  thinking that genuine products on the secondary market are used, counterfeit, or stolen, (iii)

12  sold products to resellers whom it knew, or should have known, were reselling the products

13  on the secondary market, (iv) held out certain entities as "Authorized Resellers" even though

14  Plaintiffs knew or should have known these entities sold counterfeit goods, and engaged in

15  other inequitable practices that bar recovery on its claims.

16  **NINTH AFFIRMATIVE DEFENSE**
17  **(Redundancy)**

18  104.   Plaintiffs' claims and/or recovery are barred, in whole or in part, because they are

19  redundant and/or duplicative of one another.

20  **TENTH AFFIRMATIVE DEFENSE**
21  **(Abandonment)**

22  105.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by abandonment

23  of any marks at issue. Plaintiffs' have failed to properly police and exercise adequate quality

24  control over its marks and have thereby abandoned their rights therein.

25

26

27

28

**ELEVENTH AFFIRMATIVE DEFENSE**
**(Conduct of Others)**

106.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because the conduct complained of is the conduct of others, including, without limitation, Plaintiff's "authorized" vendors and/or Plaintiffs' licensed manufacturers.

**TWELVE AFFIRMATIVE DEFENSE**
**(Failure to Mitigate)**

107.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because Plaintiffs failed to mitigate, minimize, or attempt to avoid damages.  Without limitation, Plaintiffs could have pursued legal remedies earlier, assisted secondary market resellers like Dexon in detecting and fighting counterfeit products, and/or properly policed and prevented the manufacture and distribution of counterfeit product within their own manufacturing and distribution network.

**THIRTEENTH AFFIRMATIVE DEFENSIVE**
**(Lack of Personal Jurisdiction)**

108.    Plaintiffs are barred from pursuing their claims against Dexon in this Court because the Court lacks personal jurisdiction over Dexon.

**FOURTEENTH AFFIRMATIVE DEFENSIVE**
**(Improper Venue)**

109.    Plaintiffs are barred from pursuing their claims against Dexon in this Court because venue is improper.

**FIFTEENTH AFFIRMATIVE DEFENSIVE**
**(Failure to State a Claim)**

110.    The Complaint, in whole or in part, fails to state any claim upon which relief can be granted.

1

2

### SIXTEENTH AFFIRMATIVE DEFENSIVE
#### (One Satisfaction Rule / Bar on Double Recovery)

3   111.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the one

4   satisfaction rule and/or the bar on double recoveries.

5                              ### COUNTERCLAIMS

6        Counterclaim Plaintiff Dexon Computer, Inc. asserts the following counterclaims

7   against Counterclaim Defendant Cisco Systems, Inc., and Cisco Technology, Inc.

8   (hereinafter referred to jointly as "Cisco") alleges as follows:

9   1.    Cisco is a monopolist that uses whatever means necessary to keep the prices for its

10  networking products as high as possible to the detriment of its customers.

11  2.    While high prices are permissible if lawfully obtained, Cisco engaged and continues

12  to engage in coercion of its customers who purchase its SmartNet service package which is

13  the only way for those customers to receive software and other updates for networking

14  equipment that are often essential for the maintenance of Cisco's networking products such

15  as routers and Ethernet switches.

16  3.    Specifically, customers buy routers and Ethernet switches manufactured by Cisco,

17  and also separately purchase the SmartNet service package for those products for a one to

18  five year period.  At the time a SmartNet service package is purchased, Cisco approves

19  customers' SmartNet service purchase and knows that in many cases the service package is

20  being purchased through a secondary reseller.  SmartNet customers then receive service

21  from Cisco for a portion of the period, but at some point before the end of the service package

22  period, when customers contact Cisco to get the service they paid for, Cisco notifies

23  customers that their SmartNet service has been terminated unless they buy entirely new

24  routers and/or Ethernet switches from a specified Cisco source at a far higher price than the

25  original network equipment purchase.  Alternatively, to preserve customers' SmartNet

26  service, Cisco will demand a "re-certification" fee, charging just as much if not more than

27  the original equipment purchase, and providing no value to the customer other than

28  restoration of SmartNet.  In one case, Cisco even threatened a customer that it would not

1  service <u>any</u> of the customer's Cisco products pursuant to its SmartNet service package,
2  regardless of how or when the customer previously purchased those products, unless the
3  customer made all new equipment purchases.

4  4.      This coercion works.  Customers are forced to either buy new, expensive networking
5  equipment or pay a "re-certification" fee so that they can continue receiving SmartNet
6  service, or are forced to "make the best of" a situation in which they can never be sure that
7  they will receive the service they paid for and had previously been provided.  In the latter
8  situation, Cisco has even kept the money it received for the SmartNet purchase despite not
9  providing the requested services.

10  5.      While any customer subject to this treatment has sustained an injury that should be
11  rectified, Cisco's conduct has impacted at least one local 911-emergency services provider
12  whose network could have been compromised in the midst of these threats.

13  6.      Dexon is a company that has been servicing its customers for decades, providing
14  timely and reliable services as well as selling affordable network equipment to meet the
15  budgets of hospitals, emergency services providers, public service organizations and many
16  other small and medium businesses including those providing essential services including
17  during the COVID-19 pandemic.  Dexon and its customers have been victimized by the
18  above coercion tactics.  Cisco seeks to squash a small provider like Dexon for providing
19  reliable service and products to customers at a price lower than other Cisco dealers, figuring
20  that Dexon would just succumb to Cisco's illegitimate claims of "counterfeit."  Cisco is
21  mistaken, and its anticompetitive conduct must be remedied.

22  7.      Cisco's use of its "service arm," which upon information and belief is entirely
23  separate in terms of personnel, expertise, profitability, process, and corporate structure from
24  its "products arm," to maintain and maximize profitability in its products arm, must stop.

25  8.      Cisco's course of dealing with Dexon confirms its anticompetitive motive and harm
26  to customers.  From at least 2010 to 2015, Dexon was a registered user of Cisco's service
27  database in which it could coordinate repairs and other service calls for its customers.  Both
28  parties benefitted during this time:  Dexon kept its customers happy and Cisco retained the

loyalty of customers who continued to buy Cisco equipment thanks to Dexon's work.  Then in 2016, Cisco terminated Dexon's access to the database, but after a Dexon representative called Cisco and explained how disappointed customers were, Dexon was reinstated. Unfortunately however, in 2018, Cisco again terminated Dexon's access, this time without reinstatement.  At that point, Cisco took a financial loss because frustrated customers went to competitive networking equipment vendors to buy networking equipment manufactured by Cisco's competitors.  The clear intent and effect of this course of conduct is for Cisco to sustain a short term loss for the impermissible long term benefit of eliminating a low cost provider in the market for its products.

9.     The Court must hold Cisco accountable for these anticompetitive acts that are crippling small and medium businesses, including but far from limited to Dexon.

## THE PARTIES

10.     Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

11.     On information and belief, Plaintiff and Counterclaim Defendant Cisco Systems, Inc. ("CSI") is a Delaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

12.     On information and belief, Plaintiff and Counterclaim Defendant Cisco Technology, Inc. ("CTI") is a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

## JURISDICTION

13.     This Court has subject matter jurisdiction over Dexon's counterclaims pursuant to 28 U.S.C. §§ 1367 and 1332.  Dexon's counterclaims arise out of the same controversy as plaintiffs' Federal claims, there is complete diversity of citizenship between Plaintiffs and Dexon, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

1

## FACTS
## Cisco

2

3    14.    Cisco is the worldwide and US leader of networking for the Internet.  Cisco offers

4    products and related services in the core technologies of routing and switching, along with

5    more advanced technologies in areas such as home networking, IP telephony, optical

6    networking, security, storage area networking, and wireless technology.  On information and

7    belief, Cisco contracts for the manufacture of a majority of its products overseas to keep

8    costs of manufacture at a minimum.

9    15.    On information and belief, Cisco has a stranglehold on the supply of networking

10   products in the United States, with a dominant market share that has reached 70% or more,

11   including in routers and Ethernet switches, both markets with high barriers to entry as

12   explained below.

13   **Cisco is Using Its Monopoly In After Market Maintenance Services to Force**

14   **Subsequent Supracompetitive Network Equipment Purchases**

15   **A.    Cisco is a Monopolist For After-Market Maintenance Services On Cisco**

16   **Equipment**

17   16.    Customers of networking equipment may require maintenance and service to ensure

18   the proper functioning of their equipment.  Only Cisco is able to provide full maintenance

19   and support on its router and Ethernet switch products.  These maintenance services include

20   onsite visits from certified engineers, software updates, technical assistance center ("TAC")

21   access, online resources, and hardware replacement services. Without such maintenance

22   services, customers may not be able to address critical performance issues and address

23   service problems that can be catastrophic to their businesses.

24   17.    For customers that may not have the budget to justify maintenance services provided

25   by Cisco, they rely on third party maintenance and service providers that can provide

26   hardware maintenance and support (for instance for a power supply or fan issue), but because

27   of Cisco's policies described herein, cannot provide software maintenance and support.

28   Thus, Cisco is able to maintain a price premium for its maintenance services, including its

SmartNet service packages, because as Cisco highlights in its SmartNet sales materials, "no Third Party Maintenance Provider can provide [customers] with an apples-to-apples match with what Cisco's SmartNet provides," and "a Third Party Maintenance Provider is not authorized to provide [customers] with Cisco bug fixes, patches and updates." These "bug fixes, patches and updates" can be essential to the efficient, effective, and full operation of Cisco's hardware – they cannot be replicated and there are no reasonably interchangeable substitutes for such services.

18. Although end users are not legally required to purchase SmartNet service packages for their Cisco products, they are effectively compelled to do so, because the service packages offered are integral to the products' functionality. Without SmartNet service, end users will not receive important software bug fixes, patches, and updates (collectively, "updates") that permit Cisco products to serve their intended functions. These updates are designed to repair malfunctions or defects in the software or to combat security vulnerabilities. Consumers who do not update the software on their Cisco products are potentially exposed to security and operational risks. In addition, without the software updates, their Cisco products may not function properly.

19. Because Cisco products run on proprietary operating system software that is essential for the products to function, these updates can be obtained only from Cisco. It is routine in the technology industry for manufacturers, such as Apple, Hewlett Packard Enterprise, and Microsoft, to make updates available to their consumers for free. Cisco, in contrast, provides updates only to consumers who have purchased SmartNet service packages. Upon information and belief, Cisco does not routinely inform customers at the time of purchase of these stifling limitations.

20. Thus, the aforementioned services constitute a Relevant After-Market for Maintenance Services on Cisco Equipment (hereinafter the "Relevant Service Market") in which Cisco is a monopolist, and no other competitive service provider has reached a double digit share. Upon information and belief, Cisco consistently has possessed a share of the Relevant Service Market in excess of 90%, and because it dictates that only it can provide

1    certain critical services, Cisco has erected its own high barriers to entry to prevent any

2    meaningful penetration of its dominance by any competitive service vendor.  Cisco has thus

3    admitted that SmartNet pricing is far more expensive than that of third-party providers.  The

4    geographic market for the Relevant Service Market is (i) the United States and (ii) the world,

5    determined by the geographic scope of customers and the extent to which they require

6    maintenance services in the US only or worldwide.  In the case of the former, customers

7    look to service providers located in the US, whereas in the latter case, customers will require

8    vendors with an international team and associated capabilities.

9    21.    The Relevant Service Market is separate and distinct from the Relevant Markets for

10   routers, Ethernet switches and other networking equipment discussed below.  Customers can

11   and do purchase Cisco networking equipment without maintenance services, and the pricing

12   for networking equipment is entirely independent and separate from SmartNet service

13   package pricing.    Moreover, upon information and belief, Cisco's customers in these

14   separate markets (1) deal with different Cisco personnel teams (e.g., TAC support vs. sales

15   managers), (2) purchase the products and services at different times/schedules based on

16   different needs, and (3) work with different engineers because engineers on the service and

17   maintenance team are often different than the engineers on the product manufacturing and

18   sales teams.

19   **B.     Cisco is Also A Monopolist In the Router and Ethernet Switch Relevant Markets**

20   22.    Ethernet switches are a relevant product market.  Ethernet switches are devices that

21   control data flow within a network to enable network components to communicate

22   efficiently.   They are the fundamental building blocks of modern local area networks,

23   deployed in virtually every modern business and government office.   While Ethernet

24   switches are differentiated across vendors and customer types, there is no adequate substitute

25   technology that provides the same function and value within a network infrastructure.

26   23.    Ethernet switches are durable, high fixed cost goods with extended longevity;

27   consumers of these Ethernet switches commonly intend to use them for many years.

28   Transitioning from Cisco Ethernet switches to Ethernet switches made by another

1  manufacturer is an expensive process, requiring the replacement of significant amounts of
2  hardware and the retraining of personnel.

3  24.    Buyers of Ethernet switches would not be able to turn to routers or other alternative
4  technologies in response to a monopolist's price increase above the competitive level.

5  25.    The geographic markets for the sale of Ethernet switches are (i) the United States and
6  (ii) the world. The global market for Ethernet switches includes manufacturers with product
7  portfolios that are worldwide in scope and multinational customers that have a demand for
8  such global capability. There is substantial industry recognition of both a global market for
9  Ethernet switches and narrower U.S.-only market for Ethernet switches. A monopolist of
10  Ethernet switches in the United States would be able to raise prices profitably over
11  competitive levels.  Correspondingly, a monopolist of Ethernet switches globally would be
12  able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to
13  maintain prices above competitive levels both globally and in the United States.

14  26.    Cisco has monopoly power in the U.S. and global markets for Ethernet switches,
15  consistently holding shares above 60% in both markets, and protected by high barriers to
16  entry as discussed below.  Cisco's Ethernet switch market shares are commonly at least five
17  times its closest Ethernet switch competitors in the US, as well as commonly five times its
18  closest Ethernet switch competitors globally. Cisco has managed to maintain its market
19  dominance for at least twenty years, with global and U.S. market shares commonly
20  exceeding 60%, and often above 70%.

21  27.    Routers have been a technology that is complementary to, and not a substitute for,
22  Ethernet switches, and also constitute their own relevant product market.  While Ethernet
23  switches connect components to create a network, routers allow for communication between
24  networks.  The two types of devices generally operate at different logical levels in a network:
25  Ethernet switches transfer information in the data link layer using physical addresses for
26  network components, whereas routers transfer packets in the Network or IP layer using
27  virtual addresses. As technology has evolved, Ethernet switch manufacturers have begun to

28

incorporate certain routing technologies into a single combined product. This confirms that routers are complements for Ethernet switches and not substitutes.

28.     Buyers of routers would not be able to turn to Ethernet switches or other alternative technologies in response to a monopolist's price increase above the competitive level.

29.     The geographic markets for the sale of routers are (i) the United States and (ii) the world.  The global market for routers includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability.  There is substantial industry recognition of both a global market for routers and a narrower U.S.-only market for routers.  A monopolist of routers in the United States would be able to raise prices profitably over competitive levels.  Correspondingly, a monopolist of routers globally would be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices for routers above competitive levels both globally and in the United States.

30.     Cisco has monopoly power in the U.S. and global markets for routers, consistently holding a share in excess of 60% in both markets, and protected by high barriers to entry as discussed below. Cisco's router market shares are roughly at least five times its closest router competitors in the US, as well as five times its closest router competitors globally. Cisco has managed to maintain its market dominance on routers for at least twenty years, with global and U.S. market shares commonly exceeding 60%, and often above 70%.

31.     The Relevant Router and Switch Markets are both characterized by high barriers to entry and expansion.  There are several factors that contribute to these high entry and expansion barriers for potential new entrants and existing competitors.  To begin with, the costs to develop router software and hardware as well as switch software and hardware are substantial.  It requires tens of millions of dollars for initial development, and then hundreds of millions more to tailor the product to specific customer needs and to build an effective sales network.

32.     Another barrier to entry for the Relevant Router and Switch Markets lies in customers' long purchase cycles when replacing or upgrading their network components to

1   the next technology.  For example, it took approximately fifteen years for customers to

2   widely deploy 10+ Gigabit Ethernet switches to replace 1 Gigabit Ethernet switches.  These

3   circumstances mean that competitors have limited opportunities to significantly expand their

4   market share and take market share from competitors.

5   33.     As Cisco publicly promotes, it is the number one vendor for major network

6   components often required by customers for their enterprise infrastructures – such as for

7   wireless LAN and telepresence – in addition to Ethernet switches and routers. Thus, a further

8   barrier to entry is created by the simple fact of Cisco's dominance. Given the relatively high

9   transaction costs for customers, and the presence of bundled offerings, any new Ethernet

10  switch or router entrant may need to offer a full line of network components.

11  34.     Cisco's practice of holding customers hostage through their SmartNet service

12  packages also creates a particularly pernicious barrier to entry.  Any customer wishing to

13  preserve the value of its SmartNet package would not be able to viably consider router or

14  Ethernet switch purchases from competitive vendors to Cisco if the customers are under

15  duress that in the absence of a Cisco purchase their maintenance service may not be

16  provided.  Even if a customer were willing to risk a period without maintenance, purchasing

17  replacement routers or Ethernet switches from a Cisco competitor means risking the value

18  of the SmartNet package for which the customer has already paid during the remaining

19  service period.

20  35.     To summarize, Cisco has monopoly power in the following relevant markets:  the

21  Relevant Service Market (both globally and limited to the U.S.), the Relevant Router Market

22  (both globally and limited to the U.S.), and the Relevant Switch Market (both globally and

23  limited to the U.S.).  Hereinafter the Relevant Router and Switch Markets are referred to

24  collectively as the "Relevant Product Markets."  Upon information and belief, Cisco may be

25  engaging in the same coercive tactics with respect to other Relevant Product Markets, such

26  as optics, access points, and network management software, and should that prove to be the

27  case Dexon will make that apparent in the course of litigation.

28

**C.      Cisco Locks In Customers Who Require Maintenance With SmartNet, and Then Uses SmartNet As A Hammer To Force Supracompetitive Purchases of Routers and Ethernet Switches**

36.      Customers seek to find the best deal for networking equipment regardless of when it is purchased.  Either around the time of such an equipment purchase or at a different time, customers may also consider purchasing a SmartNet service package for several different types of networking equipment.  Upon information and belief, the larger a particular deployment and the more legacy Cisco equipment the customer has in its network, the more likely customers will require a SmartNet package for one or more aspects of their network at any time.

37.      For those customers that require a SmartNet service package, the objective is to secure maintenance services for networking equipment that already is or will be in use for the customers' networks.  To satisfy themselves that this will be the case, SmartNet customers will provide Cisco with the precise serial numbers, part numbers, products, and customer information for which the purchased SmartNet service package will apply.  Cisco specifically approves the service package with this information, including in scenarios where Cisco can see that customer is purchasing the SmartNet service package through a secondary reseller which does not have a direct purchasing relationship with Cisco.

38.      Indeed, Cisco has full knowledge that its standard sellers or partners sell an extremely large volume of SmartNet service packages to secondary market sellers such as Dexon.  In fact, Cisco's Technical Assistance Center has and will alter or change serial numbers in order to approve and thereby receive payment for SmartNet service packages relating to secondary market equipment.  Cisco willfully turns a blind eye to such transactions because they are extremely profitable for Cisco.

39.      Upon information and belief, Cisco receives a payment from customers pursuant to this SmartNet approval process at or around the time of the SmartNet purchases.

40.      As one would expect, customers would receive the service they paid for from Cisco for anywhere from months to years into the purchased SmartNet service package.  As explained below, parties such as Dexon would facilitate such service through Cisco's service

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

team that would keep customers happy with both companies.  But since at least 2015 through the present, Cisco has suddenly claimed at some point after customers purchased a SmartNet service package that the SmartNet service packages were no longer valid in the absence of a new purchase of Cisco equipment, including at least routers and/or Ethernet switches. Alternatively, Cisco has been able to force customers to pay a "re-certification" fee associated with the reinstatement of its SmartNet service associated with previously purchased networking products.  Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process or other associated service, and reactivated the SmartNet service package simply because the customer paid more money for the networking equipment.  Given that customers are locked into the Cisco installed base they already purchased and already invested in the SmartNet service package, they have little choice other than to give in to Cisco's demands.

41.     Given the Cisco approval process associated with customers' SmartNet purchases, customers had no reasonable expectation when they bought the SmartNet service package that Cisco would subsequently claim that entirely new, unwanted networking equipment or a "re-certification" fee would be required to preserve their service package investment.  This is especially true given that Cisco has unique access to customers for the months or years after it purchased the service packages, and customers received the service for which they had paid during that period.  Cisco changed its conduct not because of enforcement of a consistent policy, but rather because it newly disapproved, after approving previously, customers' purchase of networking equipment and SmartNet service.

42.     One scenario involving a hospital provides a poignant example.  For several years, Dexon had provided Cisco routers, Ethernet switches, line cards, access points and modules to the hospital, for which the hospital also purchased a series of SmartNet service packages from Dexon.  Pleased with the products and service Dexon had provided, the hospital decided to make a significant investment in Cisco routers and Ethernet switches with Dexon, and the deal would have been worth a significant amount of business for the hospital (on top of the prior business with Dexon which was already significant).  Upon learning that the

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1    hospital had awarded the order to Dexon, Cisco threatened the customer that if it did not

2    cancel the order for the new purchase of Cisco hardware and associated SmartNet service

3    with Dexon, that not only would Cisco not honor the contemplated new SmartNet service

4    package, but Cisco also would cancel immediately <u>all</u> SmartNet service packages which the

5    customer had in place for the entire hospital system and clinics which the customer had been

6    receiving service and support from Cisco for years.  This tactic worked, and the customer

7    did not go through with the contemplated deal with Dexon, and never made another purchase

8    from Dexon again.  Upon information and belief, the hospital was coerced to deal on terms

9    that met with Cisco's approval, rather than what free market forces would have provided to

10   the hospital and its patients.

11   43.     These terrible tactics were also applied to at least one local 911-service center, for

12   which the center's purchase and maintenance of reliable routers and Ethernet switches can

13   be a matter of life and death.  In the midst of a five-year SmartNet service package the 911-

14   center had purchased from Cisco, when the customer checked on its account for purposes of

15   a service issue, Cisco threatened the customer that it needed to purchase new routers and

16   Ethernet switches if it wanted to receive the service it was due under its SmartNet service

17   package.  The 911-center could not afford new equipment, and Dexon at its own expense

18   purchased a new SmartNet service package for any support issues that may arise on the same

19   networking equipment.  Even at the time of this pleading, upon information and belief, Cisco

20   will not honor the original SmartNet service for which the 911-center had paid and the local

21   community is at risk due to Cisco's coercion tactics that seek to extract improper profits

22   even from the most vulnerable of situations.

23   44.     Upon information and belief, these examples are part of an overall course of conduct

24   by Cisco to hold up its SmartNet customers, at least since 2015.  As explained below through

25   Dexon's experience, upon information and belief, there has been an enterprise-wide effort

26   at Cisco to use SmartNet service packages in this way to be sure that customers purchase

27   networking equipment at supra-competitive prices to pad Cisco's profits as well as the

28   commissions of its sales representatives.  Dexon is aware of at least one of its customers that

1  has threatened legal action against Cisco for these tactics, but Cisco does not care, as Cisco's

2  continued profiteering from this conduct as a monopolist in the Relevant Service Market and

3  Relevant Product Markets far outweighs the costs it would face for defending itself in

4  litigation.  This Court's involvement is desperately needed to make it stop.

5  45.      Cisco draws an economic benefit from these coercion tactics to SmartNet customers

6  because, upon information and belief, its margins are far higher for sales made through

7  channels that have higher resale prices.  For instance, if Cisco can maintain the supra-

8  competitive prices it charges to major VARs by coercing customers to use that distribution

9  channel, Cisco can maintain its overall profitability.  Conversely, if major VARs can

10  negotiate lower pricing from Cisco because customers have a variety of distribution options

11  unimpacted by coercion, then Cisco's overall profitability goes down.  Cisco's sales

12  representatives also earn higher commissions for sales in the Relevant Product Markets

13  made through coercion, on the backs of their customers.

14  46.      There is a substantial amount of commerce involved in the Relevant Product Markets

15  for which Cisco is forcing supracompetitive purchases.  Each year, Cisco sells billions of

16  dollars of Ethernet switches and routers, both in the US and worldwide.

17  47.      Cisco also attempts to leverage its exclusive control of essential software updates and

18  services for Cisco products to functionally incapacitate select secondary market products.

19  Cisco provides services and updates to its products via SmartNet service packages.  End

20  users acquire these packages in order to obtain those services.

21  48.      Cisco selectively chooses when to enforce its alleged restrictions on sales of

22  SmartNet service packages by "Authorized" sellers to secondary market sellers.  In addition

23  to being contrary to well-established agency principles, on information and belief, such

24  alleged restrictions between Cisco and its "Authorized" sellers are often not properly

25  renewed or maintained and are therefore not in force and effect.

26

27

28

1  **Cisco's Conduct Toward Dexon Specifically Shows Its Anticompetitive Intent and**
2  **Results in Anticompetitive Effects With No Valid Business Justification**

3  49.     Cisco was once on amicable terms with Dexon, even sending a Cisco representative

4  to Dexon to aid it in its sales efforts and familiarity with its products.  For at least four years

5  prior to 2015, Dexon had access to Cisco's online database in which it could arrange for

6  maintenance service on behalf of its and Cisco's customers.  This served to both companies'

7  benefit, as Dexon kept its customers happy while Cisco earned customers' loyalty to its

8  product line.

9  50.     That changed in 2015 however, when Cisco deactivated Dexon's access to the service

10  database for a period of several months.  Upon learning this from upset customers, Dexon

11  diligently followed up with Cisco and was able to be reinstated.  The reinstatement was

12  within Cisco's rationale economic interest because it knew it would lose both short term

13  sales and loyalty for its networking equipment if a valuable reseller could not provide the

14  service that customers came to expect.

15  51.     However, in 2018, Cisco decided that it was willing to sustain a short term loss of

16  sales, so that in the long run customers would not have access to more aggressive pricing

17  from Dexon.  Namely, Cisco shut off Dexon's access to the service database, and did not

18  reinstate it despite knowing, upon information and belief, that the customers would purchase

19  competitive networking equipment from Cisco's competitors.  Indeed, Dexon is aware of at

20  least two customers that purchased networking equipment from a Cisco competitor due to

21  the way the customers and Dexon were handled by Cisco.

22  52.     Cisco's more recent efforts to block value added resellers (VARs) like Dexon do not

23  end there.  Major VARs (in terms of volume) will commonly supply networking equipment

24  to smaller VARs such as Dexon because they can reach smaller and more diverse customers.

25  One such major VAR frequently used Dexon for this purpose, and profitably did business

26  with Dexon for several years.  Upon information and belief, Cisco threatened the VAR not

27  to do business with Dexon, and when the VAR representative assigned to Dexon refused to

28  comply with the demand, he was assigned to a different region and account.  Dexon believes

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

that several such instances with larger VARs occurred, but rather than hearing about representatives that were willing to stick up for customers' right to the best deal, Cisco successfully coerced such VARs to limit or withdraw their business from Dexon.

53.     Upon information and belief, the instances described above are not isolated instances of pressure, but rather part of an overall effort to force customers to only be able to access both networking equipment and service through the most expensive avenues.  As explained, Cisco was not always hostile to a channel that sought to give customers the best deals, likely because it aided Cisco's overall effort to be known as the most ubiquitous networking equipment provider regardless of the channel the networking equipment reached the customer.  But that changed sometime around 2015, when Cisco apparently decided that padding its own profit margins and keeping its sales representatives satisfied was more important than servicing all of its customers.

54.     In some cases, Cisco was able to force customers to pay a "re-certification" fee associated with the reinstatement of its SmartNet service associated with previously purchased networking products.  Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process or other associated service, and reactivated the SmartNet service package simply because the customer paid more money. This shows that any purported "business justification" Cisco advances for its practices is pretextual and is merely designed to shift economic welfare from customers to itself.

55.     The inevitable effect of this course of conduct is to drive supra-competitive prices in the Relevant Product Markets and hinder the ability for customers to find alternatives.  While in theory customers could divert purchases in the Relevant Product Markets to Cisco's competitors, because of Cisco's installed base for so many of its customers is a large portion of their networks, it is practically difficult for many customers to make a wholesale change, or to even do so over an extended period of time given the infrequency of new purchases. As the above examples make clear, many customers are left with no practical choice other than to purchase equipment in the Relevant Product Markets on Cisco's terms or face a greater risk of a technical compromise.

56.    Indeed, in the case of a 911-operator, the essential and critical services that everyday Americans rely upon are at risk due to Cisco's bullying tactics.  There is no justification that can be advanced to accept this needless risk to human safety.

57.    Cisco's conduct also has a direct impact on its competitors in the Relevant Product Markets, because in the presence of such pressure, customers are not free to make a product choice on the merits but rather need to account for the likely reaction of Cisco.  Because of the inherently connected and complementary nature of the products in the Relevant Product Markets, customers need to take account of what treatment it will face if it draws Cisco's disapproval.  In this environment, Cisco competitors in the Relevant Product Markets have less revenue than they should to bolster next generation innovation, and potential competitors have less incentive and ability to overcome the barriers Cisco has erected and viably enter the Relevant Product Markets.

### Dexon Has Suffered An Antitrust Injury

58.    As illustrated above, Dexon has lost customers due to the anticompetitive and coercive tactics employed by Cisco.  Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct.  Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

59.    Cisco's conduct is designed to harm VARs just like Dexon precisely because of the benefits to customers that Dexon provides, which run counter to Cisco's profit motives.  Cisco is a quintessential monopolist that knows that it can earn more profit by limiting supply and forcing customers into more expensive channels.  If Cisco can force ultimate customers to purchase from these channels, then there is less need and ability for Cisco's preferred dealers to negotiate for price reductions that would impact Cisco's bottom line.  The coercion and other conduct at issue in this case allows Cisco's monopoly power to not

1  only be maintained, but grown, and Dexon's losses are a direct byproduct of this
2  phenomenon.

3  60.     Dexon has also sustained loses to its goodwill and reputation in the marketplace by
4  virtue of Cisco's conduct.  Because of Cisco's monopoly position in both the Relevant
5  Service Market and the Relevant Product Markets, it has been immune to customer
6  dissatisfaction with its conduct, and has attempted to shift the problem of its own creation
7  to Dexon.  Namely, rather than respond to customer feedback and attempt to win purchases
8  by virtue of better products or terms, Cisco has attempted to portray Dexon as an unworthy
9  sales partner who is the cause of the customers' problems.  But this is not the case, as Dexon
10 has spent decades building trust and goodwill with its customers, even to the benefit of
11 Cisco.  But now that Cisco's priority is to bully and intimidate any company that stands in
12 the way of its maximum profit, Dexon is being painted in a different light.

13
**Claims For Relief**
**Count I**
14
**Violation of Section 1 of the Sherman Act:  Tying**

15 61.     Dexon repeats and realleges each of the allegations set forth in the preceding
16 paragraphs as if fully set forth herein.

17 62.     Cisco is a monopolist in the Relevant Service Market, and has used its SmartNet
18 service packages in that Market as a tying product.  Namely, after approving the terms under
19 which customers would receive a SmartNet service package, Cisco would later use the
20 SmartNet service package as a tying product in order to coerce new purchases in the
21 Relevant Product Markets on terms that are unwanted by customers but favored by Cisco.
22 Cisco conditions its continued service for SmartNet on the purchase of new equipment in
23 the Relevant Product Markets, and upon information and belief, other products that will be
24 confirmed in discovery.

25 63.     The Relevant Service Market is distinct from the Relevant Product Markets because
26 they are fundamentally different offerings that are created, marketed, sold, and accounted
27 for by providers and customers differently.  Driven by budgets and unique customer needs,
28 customers can and have bought products in the Relevant Product Markets without associated

1  service in the Relevant Service Market.  Indeed, Cisco's conduct at issue in this case
2  confirms that Cisco's near-absolute monopoly in the Relevant Service Market can be used
3  as a coercive weapon to maintain and further expand its monopolies in the Relevant Product
4  Markets, because customers often have separate demand for service on the one hand and
5  new networking equipment on the other.

6  64.    Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement
7  between customers and a provider of Cisco branded merchandise in the Relevant Product
8  Markets.  Cisco also effectuates this coercion through its direct relationship with customers
9  through the SmartNet service package, in which customers are forced to interact with Cisco
10 to request the service they were previously promised by Cisco.

11 65.    A substantial amount of commerce has been affected in the Relevant Product Markets
12 (the tied markets) due to Cisco's conduct, as a single forced purchase in the Relevant Product
13 Markets has constituted tens or hundreds of thousands of dollars.  This is unsurprising, as
14 the total amount of commerce in the Relevant Product Markets is billions of dollars.

15 66.    Cisco does not have a legitimate business purpose for its anticompetitive conduct.
16 Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded
17 and received additional compensation for the same services it had already been providing,
18 without providing anything additional to customers. Cisco's conduct does not result in any
19 greater ability to reduce costs in producing or innovating offerings in the Relevant Product
20 Markets that it sells to customers that could result in reduced prices, higher quality, or greater
21 availability to customers. Neither does Cisco's conduct reduce barriers to other vendors'
22 entry, or otherwise result in greater competition in the Relevant Product Markets.  The only
23 "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit
24 inures only to Cisco's advantage, not to that of customers or competition on the merits.

25 67.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed
26 Dexon's sales in those markets and the products of other competitors, diminished Dexon's
27 and future sales opportunities, and increased Dexon's operating costs.

28

68.     Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

## Count II
### Violation of Section 2 of the Sherman Act:  Unlawful Monopolization

69.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

70.     Cisco's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Product Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

71.     For the purpose of maintaining its monopoly power, Cisco committed numerous acts, including:

a.     Coercing purchases in the Relevant Product Markets by withholding service in the Relevant Service Markets;

b.     Engaging in associated pressure and bullying tactics pursuant to its overall goal to force purchases through Cisco's most expensive channels;

c.     Pressuring at least one large volume VAR not to deal with Dexon or other efficient, low-cost providers in the Relevant Product Markets;

d.     Intentionally sustaining short term losses by discontinuing Dexon's access to Cisco's service database for the purpose of eliminating a low cost provider from the Relevant Product Markets in the long term;

e.     Reversing its previous course of conduct toward VARs like Dexon in which both parties benefitted, and changing to a position and associated conduct in which customers are penalized for using such lower-priced and efficient VARs; and

f.    Upon information and belief, engaging in related tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall competition in the Relevant Product Markets and other Markets.

72.    Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers.  Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets.  The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

73.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

74.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

### Count III
### Violation of Section 2 of the Sherman Act:  Attempted Monopolization

75.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

76.    Cisco acted with a specific intent to monopolize and destroy competition in the Relevant Product Markets.  Cisco devised and implemented an overall plan to force customers to pay supra-competitive prices in the Relevant Product Markets, with the associated destruction of competition in the Relevant Product Markets.

77.     Cisco willfully engaged in a course of anticompetitive conduct to obtain a monopoly in the Relevant Product Markets, including:

      a.      Coercing purchases in the Relevant Product Markets by withholding service in the Relevant Service Markets;

      b.      Engaging in associated pressure and bullying tactics pursuant to its overall goal to force purchases through Cisco's most expensive channels;

      c.      Pressuring at least one large volume VAR not to deal with Dexon or other efficient, low-cost providers in the Relevant Product Markets;

      d.      Intentionally sustaining short term losses by discontinuing Dexon's access to Cisco's service database for the purpose of eliminating a low cost provider from the Relevant Product Markets in the long term;

      e.      Reversing its previous course of conduct toward VARs like Dexon in which both parties benefitted, and changing to a position and associated conduct in which customers are penalized for using such lower-priced and efficient VARs; and

      f.      Upon information and belief, engaging in related tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall competition in the Relevant Product Markets and other Markets.

78.     Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers.  Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets.  The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

79.     Throughout the time Cisco engaged in this anticompetitive conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling each of the Relevant Product Markets and continuing to maintain supra-competitive prices and exclude its competitors.

80.     Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

81.     Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

## Count IV
## Violation of the California Cartwright Act

82.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

83.     Upon information and belief, Cisco's overall anticompetitive scheme was directed and executed within California, and has a direct impact upon California-based small and medium businesses.

84.     Cisco is a monopolist in the Relevant Service Market, and has used its SmartNet service packages in that Market as a tying product.  Namely, after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted by customers but favored by Cisco. Cisco conditions its continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery.

85.     The Relevant Service Market is distinct from the Relevant Product Markets because they are fundamentally different offerings that are created, marketed, sold, and accounted

for by providers and customers differently.  Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Markets.  Indeed, Cisco's conduct at issue in this case confirms that Cisco's near-absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking equipment on the other.

86.     Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement between customers and a provider of Cisco branded merchandise in the Relevant Product Markets.  Cisco also effectuates this coercion through its direct relationship with customers through the SmartNet service package, in which customers are forced to interact with Cisco to request the service they were previously promised by Cisco.

87.     A substantial amount of commerce has been affected in the Relevant Product Markets due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has constituted tens or hundreds of thousands of dollars.  This is unsurprising, as the total amount of commerce in the Relevant Product Markets is billions of dollars.

88.     Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets.  The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

89.     Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

90.     Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

91.     The above phenomenon has harmed competition and resulted in loses to Dexon in California.

### Count V
### Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

92.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

### The Secondary Market

93.     As with any economic activity where there are significant profits, market forces have operated to create a "secondary" market for Cisco products.  On information and belief, authentic or genuine Cisco products come to the secondary market in the United States in a variety of ways including: (a) Cisco's knowing sale of such products to secondary market suppliers in the context of either specific end user deals or when Cisco needs to move inventory; (b) Cisco's authorized resellers' purchase of product in excess of what they need for a specific end user order and subsequent resale of such product into the secondary market; (c) Cisco end user's resale of new, unused product; and (d) through importation of such product from abroad where it has been sold by distributors, resellers, or end users under similar circumstances.  On information and belief, Cisco resists attempts by end users and resellers to return product, resulting in a natural supply of secondary market Cisco product.

94.     Given the substantial profits available from sale of Cisco-branded products, market forces dictate that a secondary market will develop for such products.  These market forces benefit end users in that they reduce prices for such products.

95.    Dexon is an independent secondary-market reseller of computer networking products, including routers, Ethernet switches and other computer hardware.   Dexon provides new, refurbished and discontinued hardware products, including authentic or genuine products to its customers from leading manufacturers including, without limitation, Hewlett Packard, Dell, Juniper Networks and Cisco.

96.    Dexon obtains Cisco products from reliable suppliers, subjects such products to extensive quality control, and then resells such products to other resellers and to end users, at a profit but frequently at prices lower than those offered by Cisco "Authorized" sellers.

97.    Cisco has created an "Authorized Channel Network" in which Cisco sells products to entities it refers to as "Authorized Channel Partners" or "Authorized Resellers."  Within this "Authorized" network, Cisco exerts strict control over how, and at what prices, its "Authorized" partners can buy and sell Cisco products.

98.    While manufacturers like Cisco are permitted to control the initial sale of their products, they may not wield trademark or copyright protections to dictate the terms by which their products are resold by other parties.  The well-established "first sale doctrine" protects parties who engage in the subsequent resale of Cisco's products, even if those subsequent resales occur outside the "Authorized" channels. Accordingly, the "Authorized Channel Network" does not have a monopoly on the legal sale and purchase of Cisco goods in the market (unlike Cisco's monopolies in the Relevant Service and Relevant Product Markets), and Cisco may not forbid the resale of its products outside the "Authorized" network.

### Cisco's Anticompetitive Interference with the Secondary Market
**EULA Misrepresentations and Abuse**

99.    Cisco products, like virtually all modern electronics, contain embedded software. And just as a car, refrigerator, or cell phone will not function properly without internal software, Cisco's products—including the Cisco products resold by Dexon—cannot function without Cisco's embedded software.

100.   Cisco uses the fact that its products have embedded software as an attempted end-around to the first sale doctrine.  It does so by informing consumers, after their purchases, that although they have bought Cisco hardware, they are unable to use such hardware unless they license the embedded software from Cisco —software that was packaged and sold with the hardware (and without which the hardware will not function). Cisco does not require end users to acknowledge, read, or accept a license agreement before using the Cisco goods sold by Dexon.  Nevertheless, Cisco purports only to license the software pursuant to the terms of its End User License Agreement, or "EULA."

101.   The EULA provides or has provided that Cisco will grant a license only to consumers who purchase Cisco hardware with embedded software from a so-called "Approved Source," defined as "Cisco or . . . [a] Cisco authorized reseller, distributor, or systems integrator[.]"  Cisco warns that end users are "not licensed to Use the Software on secondhand or refurbished Cisco equipment not authorized by Cisco, or on Cisco equipment not purchased through an Approved Source."

102.   In an effort to dissuade consumers from purchasing secondary market goods, Cisco informs consumers that although its hardware can be freely resold, the "embedded Cisco software that runs on the hardware" is "not transferable," and purchasers of secondary market Cisco equipment "must acquire a new license from Cisco before the software can be used." The only way to avoid having to purchase a new license, Cisco says, is to buy refurbished equipment through Cisco's own program.

103.   These representations to consumers are false.  Even if it were possible for Cisco to sell hardware but license embedded software, the EULA would not be a permissible license of that software because it operates anticompetitively by not applying to products purchased in the secondary market.

104.   Accordingly, pursuant to the first sale doctrine, consumers who purchase Cisco hardware may use embedded software.  They may also transfer the embedded software, along with the hardware, freely.  Cisco may not sidestep the first sale doctrine by refusing to license software that it builds into hardware (to which the first sale doctrine indisputably

1  applies) solely because consumers did not purchase the hardware through Cisco's more
2  lucrative supply chain.  And it may not deceive consumers by telling them that although they
3  can buy secondary-market Cisco products, they will not be able to use those products without
4  buying a license from Cisco.

5  105.   Cisco's misrepresentations regarding consumers' right to buy and use secondary-
6  market Cisco products successfully deter consumers from purchasing Cisco goods on the
7  secondary market.  Dexon has lost sales of products that would have been made but for
8  Cisco's false representations to consumers regarding their ownership rights for Cisco
9  hardware and embedded software purchased on the secondary market.  These false
10 representations have unjustly enriched Cisco at Dexon's expense.

11 106.   Cisco has also improperly extorted license fees from consumers who are frightened
12 into believing they will not be able to use the Cisco products they have lawfully purchased.
13 On information and belief, when consumers who purchase Cisco goods on the secondary
14 market attempt to register those goods with Cisco, Cisco falsely informs the consumers that
15 their software licenses are invalid and that they cannot use their lawfully purchased hardware
16 unless they pay additional license fees to Cisco.  Cisco would not have obtained these license
17 fees but for misrepresentations it makes to consumers regarding their ability to use Cisco
18 embedded software.

19 107.   On occasions where secondary market sellers obtain Cisco product directly from an
20 "Authorized" seller, Cisco threatens that the end users rights are restricted because the sale
21 was contrary to the "Authorized" seller's agreement with Cisco.  Cisco's enforcement of
22 this improper policy is selective.  In addition to being contrary to well-established agency
23 principles, on information and belief, such alleged agreements between Cisco and its
24 "Authorized" sellers are often not properly renewed or maintained and are therefore not in
25 force and effect.

26 108.   Relatedly, due to the robust secondary market, Cisco routinely and intentionally sells
27 multiple SmartNet service packages on the same product covering the same time period.  For
28 example, it is not uncommon for a consumer to purchase a Cisco product as well as a

SmartNet service package covering such product.  If the consumer ends up not using such product, such product may be sold – unopened in a sealed box – on the secondary market. The customer receives no refund on the SmartNet service package and may in fact mistakenly renew its SmartNet service package for such product it no longer owns.  In addition, the new customer who bought the unopened product may purchase its own SmartNet service package for such product.

109.   It is common for secondary market sellers such as Dexon to purchase a duplicate SmartNet service package covering the exact same product for its customers.  Despite having records pairing the product's serial number to each SmartNet servce package, Cisco knowingly accepts payment and fails to provide any refund on such redundant SmartNet service packages.

**Misclassification of Cisco Products**

110.   As part of Cisco's anticompetitive interference in the secondary market, Cisco also selectively classifies genuine, lawfully obtained Cisco products as "used," "stolen," "counterfeit," "black market," "a security risk," "malware," "scrapped," "out of compliance" or "inactive" simply because these products were traded on the secondary market.  As a result, end users or resellers who communicate with Cisco about the status of certain Cisco products are deliberately provided with misinformation.

111.   Cisco's contortion of the term "used" is particularly egregious.  Rather than give the term its ordinary meaning, Cisco has unilaterally decided that "used equipment" means "previously owned equipment that is now owned by a party other than the original customer," including both "opened and unopened equipment."  Cisco even instructs its employees to tell consumers that "unopened boxes do[] not necessarily mean [that equipment is] 'new.'"

112.   Accordingly, Cisco routinely publicly criticizes and labels secondary market product which has never been used – including product contained in unopened sealed boxes – as "used" contrary to consumers' well understood meaning of such term.

113.    Cisco knows that its unilateral definition of the term "used" is contrary to the common consumer understanding, and that consumers are misled by its use of the term.  Indeed, Cisco deploys its false definition of the term "used" in order to deceive consumers as to the nature of products they purchase on the secondary market.  Cisco does so in an effort to stifle competition and extract additional profits from consumers who would, but for Cisco's misrepresentations and misuse of the term "used," purchase products on the secondary market.

## Wrongful Denial of Warranty Coverage

114.    Cisco has also wrongfully denied warranty coverage of genuine Cisco products solely as a result of the fact that those products were sold in the secondary market.  Cisco states as a general policy that products sold on the secondary market are ineligible for Cisco warranties.  Cisco's ostensible justification for this refusal is that Cisco is unsure whether products sold on the secondary market are genuine. But this is a farce: Cisco is well-aware that genuine Cisco products are commonly sold on the secondary market.

115.    Cisco has at various times asserted that these anticompetitive strictures are necessary in order to mitigate the risk of counterfeit goods being sold to unwitting customers or receiving Cisco services.  These justifications are pretextual and designed to obscure the fact Cisco seeks to minimize competition and exact more control over the market for Cisco products, to the detriment of the consuming public.

116.    Secondary market resellers of Cisco products, including Dexon, are highly incentivized to detect and stamp out the sale of counterfeit goods.  While a manufacturer such as Cisco may blame rogue actors when a dissatisfied customer confronts it with a counterfeit product, an independent reseller's own reputation suffers significantly when it sells a customer a counterfeit goods.  Unsurprisingly, most independent resellers, including Dexon, take proactive steps to detect and prevent the sale of counterfeit product.

117.    "Authorized Reseller" status is not foolproof protection against counterfeit products.  Cisco's "Authorized" sellers are likewise victimized by the presence of counterfeit product in the marketplace and have been caught selling counterfeit Cisco product.

118.   Cisco has contributed to and caused the presence of counterfeit product in the stream of commerce by: i) claiming to have developed "tools" capable of detecting counterfeit goods yet, unlike their competitors in the market, intentionally failing or refusing to provide or offer such "tools" to secondary market resellers such as Dexon to aid and assist their efforts to detect and deter counterfeit products; ii) failing to properly police and control their manufacturers; and iii) failing to properly manage their product serial numbers.  As one example, Plaintiffs' Technical Assistance Center will intentionally modify or change product serial numbers in order to ensure secondary market products qualify for, and Plaintiffs' receive compensation for, SmartNet.

119.   Cisco's anticompetitive behavior as alleged herein has attracted the attention of government regulators and interested parties worldwide.  Upon information and belief, Cisco has sought to avoid a wholesale dismantling of its anticompetitive practices by incrementally providing relief when compelled to do so.  For example, in 2014, when Cisco was under investigation by the Swiss Competition Commission related to Cisco's failure to provide updates and other anticompetitive behavior, Cisco was compelled to make a commitment that updates could be obtained within Switzerland and the European Union without having to purchase SmartNet service packages.  Cisco also had to implement a series of remedial measures to inform consumers of these policies.  In the United States, however, Cisco continues to pursue the anticompetitive practices alleged herein.

**Cisco's Tortious Efforts to Interfere with Dexon's Business**

120.   Because Cisco regards secondary market resellers like Dexon as a threat to its excess profits, Cisco spends substantial money and effort to attack secondary market participants such as Dexon and to chill reseller and end user participation in the secondary market.  These steps include but are not limited to:

        a.   Prompting federal investigation of the secondary market on specious grounds that the secondary market presents a threat to the national security of the United States.

b.  Employing a team of "Brand Protection" employees whose primary responsibility is to intervene with resellers and end users in cases where they are either contemplating the purchase of product, or have ordered product, from the secondary market.  Brand Protection personnel use a variety of tools to disrupt secondary market sales, including: (i) advising resellers and end users that product from the secondary market is suspect, may damage or jeopardize their network operations, may void Cisco warranties, may be counterfeit, and is otherwise unreliable; and (ii) spreading false rumors about secondary market resellers and their owners.

c.  Instructing its account managers, assigned to specific end users: (i) to convince end users to specify in RFPs the acquisition of Cisco equipment through "authorized" resellers only (even if the result is materially higher pricing); (ii) to advise resellers and end users of the same issues raised by Brand Protection and, if necessary, invite Brand Protection into the discussion.

d.  Tortiously and erroneously insinuating to resellers and end users that secondary market participants in general are engaging in illegal activity when this is not the case.

121.    Such tortious conduct includes, without limitation, falsely advising Dexon's actual and prospective customers that: i) Dexon does not sell genuine Cisco product; ii) Dexon does not sell new Cisco product; iii) Dexon "repackages" used Cisco product as "new"; iii) Dexon opens new Cisco product and substitutes parts or software; iv) Dexon's products are "counterfeit" solely because they were sold on the secondary market despite the fact such products are in fact genuine; v) Dexon products violate purported Cisco licenses even though such products (such as phones) are not governed by any purported applicable Cisco licenses.

122.    Cisco has presented, published, and/or caused to be published the false and misleading message that alleged "genuine" and/or "new" Cisco gear only comes from Cisco and its "Authorized" sellers.

123.     Cisco has engaged in a pattern and practice of this tortious conduct with the intent to disrupt contracts between Dexon and its customers, pending opportunities with such customers, future business with such customers, and even with the apparent goal of driving Dexon out of business altogether.

124.     As a direct result of Cisco's tortious interference, Dexon has suffered significant damages, including the cancellation of numerous pending orders, loss of opportunity to bid on projects, and the loss of entire relationships with many of its top customers.

125.     California Business and Professions Code §§ 17200 et seq. prohibit acts of unfair competition, which includes any unlawful, unfair, or fraudulent business act or practice. Cisco's conduct, as set forth herein, is unlawful, unfair, and fraudulent as well as untrue and deceptive within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq*.

126.     As detailed above, Cisco has taken numerous anticompetitive steps designed to afford it a greater level of control over the purchase and sale of Cisco-branded products than the law permits. These anticompetitive actions are tantamount to violations of the antitrust laws.

127.     Cisco has engaged in these unfair and wrongful actions in order to hinder the ability of those in the secondary market to compete with Cisco.   These practices harm both independent resellers like Dexon, whose ability to compete is impeded, and customers, who are forced to pay increased costs for genuine Cisco products as a result of this artificially deflated competition.  Cisco's acts, which destroy competition for its products at the expense of consumers, are tantamount to violations of the antitrust laws.  As a result of Cisco's unfair, fraudulent, and unlawful conduct, Dexon has lost sales of Cisco products they otherwise would have made, and have accordingly lost money or property as a result of Cisco's practices.

128.     Cisco's actions have caused, and unless restrained by this Court, will continue to cause irreparable injury to Dexon.  Dexon is entitled to injunctive relief to preclude Cisco's unfair competition.

129.   Dexon seeks the full restitution by Cisco that is necessary and according to proof to restore any and all property and monies, including interest, acquired by Cisco, and all costs caused to Dexon as a result of Cisco's unlawful and unfair business practices.

130.   Dexon's claims, including their claims under California Business & Professions Code § 17200, are brought to enforce an important right affecting the public interest. Accordingly, Dexon is entitled to recover its attorneys' fees from Cisco. CAL. CIV. PROC. CODE § 1021.5.

### Count VI
### Declaratory Judgment
### (28 U.S.C. §§ 2201-2202)

131.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

132.   Counterclaimants seeks a declaration of its rights, pursuant to 28 U.S.C. §§ 2201 & 2202, that the sale of genuine Cisco product which Cisco has unilaterally deemed to be "unauthorized" or "unapproved" because sold outside of Cisco's authorized channels, sold to a secondary market reseller such as Dexon, or ineligible for warranty services as a result thereof, do not violate the Lanham Act, 15 U.S.C. §§ 1114, 1125.

133.   Contrary to Cisco's assertions, the first sale doctrine does not permit a trademark holder to transform non-infringing goods into infringing goods simply by fiat. The sale of genuine goods whose warranty eligibility has been unilaterally revoked by Cisco does not violate the Lanham Act.

134.   A real and actual controversy presently exists between the parties to this action which is concrete and justiciable in character, and as to which each party possesses an interest in resolving.

135.   Counterclaimant sells, and intends to continue selling, genuine Cisco products which Cisco asserts are ineligible for warranty services once they come into Counterclaimant's possession in the ordinary course of commerce. Unless and until Counterclaimant's sales of genuine Cisco products are deemed to be permissible under United States law, Counterclaimant's ability to sell such products will be wrongfully and unnecessarily

1 impaired, and Counterclaimant will continue to be injured and damaged by this threat.

2 Accordingly, Counterclaimant seeks declaratory relief from this Court.

3 136.   The controversy between Counterclaimant and Cisco warrants relief declaring the

4 rights of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that the sale of

5 genuine Cisco products whose warranty eligibility has been unilaterally revoked by Cisco

6 after entering the stream of commerce does not violate the Lanham Act.

7
**Count VII**
**Declaratory Judgment**
8 **(28 U.S.C. §§ 2201-2202)**

9 137.   Dexon repeats and realleges each of the allegations set forth in the preceding

10 paragraphs as if fully set forth herein.

11 138.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq.,

12 Counterclaimant is entitled to judgment from this Court that Counterclaimants' refusal to

13 warrant genuine Cisco products acquired outside of Cisco's "Authorized Reseller Network"

14 violates New York General Business Law § 369-b and is unenforceable in New York.

15 139.   A real and actual controversy presently exists between the parties to this action which

16 is concrete and justiciable in character, and as to which each party possesses an interest in

17 resolving.

18 140.   Counterclaimant sells, and intends to continue selling, genuine Cisco products in New

19 York which Cisco asserts are ineligible for warranty services once they come into

20 Counterclaimant's possession in the ordinary course of commerce. Cisco's claims harm

21 Counterclaimant's ability to sell these products in New York due to wrongfully representing

22 to customers that products sold by Counterclaimant are not eligible for warranties.

23 Accordingly, Counterclaimant seeks declaratory relief from this Court.

24 141.   The controversy between Counterclaimant and Cisco warrants relief declaring the

25 rights of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that Cisco's refusal

26 to warrant genuine products sold in New York based on their purchase or sale in the

27 secondary market violates New York General Business Law § 369-b.

28

**Count VIII**
**Lanham Act False Advertising**
**(15 U.S.C. § 1125(a)(1)(B))**

142.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

143.   Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that it is unlawful for any person to use a "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."

144.   As set forth above, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding the software embedded in Cisco hardware sold on the secondary market.

145.   In addition, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding whether products in the secondary market are "used."

146.   The foregoing false and misleading representations of fact are designed to mislead consumers, and do in fact mislead consumers, at the expense of Dexon, causing direct and substantial loss to Dexon of money and market share.

147.   The foregoing false and misleading representations of fact are made willfully and entitle Dexon to recover the profits obtained by Cisco thereby, in addition to Dexon's own damages suffered as a result of Cisco's false and misleading representations of fact.

148.   Cisco's misrepresentations have caused, and unless restrained by this Court, will continue to cause irreparable injury to Dexon.

**Count IX**
**Intentional Interference with Contractual Relations**

149.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

150.    Dexon secured contracts with certain customers for the sale of Cisco products on which Dexon would have earned significant profits.

151.    On information and belief, Cisco knew or should have known of these contractual relationships between Dexon and these third party customers.

152.    On information and belief, Cisco intentionally, or with reckless disregard for the truth, made false and misleading statements about Dexon and the products it sells to these customers in order to disrupt the contractual relationship and to cause these customers to purchase product from Cisco authorized resellers at a higher price.

153.    Cisco's statements in fact disrupted these contractual relationships between Dexon and its customers.

154.    Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

155.    Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

### Count X
**Intentional Interference with Prospective Economic Advantage**

156.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

157.    An economic relationship existed between Dexon and its actual and prospective customers, each of which contained the probability of substantial future economic benefits to Dexon.

158.    On information and belief, Cisco knew or should have known of these relationships.

159.    On information and belief, Cisco intentionally, or with reckless disregard, engaged in tortious conduct designed to disrupt Dexon's potential benefit from these relationships, including:

a.     By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that the Cisco products Dexon sold were not new, used, counterfeit, suspect, non-genuine, and/or unauthorized; and

b.     By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that if they purchased product from secondary market resellers such as Dexon, they would jeopardize the security of their data networks.

c.     By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that Dexon somehow improperly modified Cisco product, including, without limitation, by "repackaging" such products and/or substituting or replacing parts/software on such product.

160.   Cisco's statements were made with the intent to disrupt the economic relationship between Dexon and its potential and actual customers in order to put Dexon out of business and to ensure that these customers would purchase Cisco product at higher prices from "Cisco Authorized Resellers" under Cisco's control.

161.   As a result of the efforts detailed above, Dexon's relationships with its potential and actual customers have in fact been permanently disrupted and/or materially damaged in a significant number of instances, including its future relationships.   As a result of Cisco's tortious efforts, Dexon's customers have refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from contention for business, and have ceased doing business with Dexon on other products and/or altogether.

162.   Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

163.   Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

**Count XI**
**Trade Libel**

164.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

165.    On information and belief, Dexon alleges that Cisco has repeatedly made disparaging statements about Dexon's products as detailed herein.

166.    Cisco's statements disparaged Dexon's products.  On information and belief, Dexon alleges that the claims made were false or materially misleading.

167.    Dexon has suffered and will continue to suffer irreparable harm should Cisco's trade libel be allowed to continue.

168.    As a proximate result of Cisco's statements, prospective and actual customers have been deterred from buying Dexon's products and from otherwise dealing with Dexon. Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

169.    Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

170.    Dexon will suffer irreparable harm to its goodwill if this trade libel continues.  Dexon is entitled to injunctive relief to preclude Cisco's trade libel.

## THIRD PARTY CLAIMS

Third Party Plaintiff Dexon Computer, Inc. asserts the following claims against Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Network Republic, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Strategic Telecom Supply & Solutions, Unlimited Network Solutions and Wisecom Technologies alleges as follows:

**THE PARTIES**

171.    Third Party Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

172.    On information and belief, Third Party Defendant Atlantix Global Systems International, LLC is a Georgia limited liability corporation with its principal place of business in Georgia.

173.    On information and belief, Third Party Defendant Bizcom Electronics, Inc., is a California corporation with its principal place of business in California.

174.    On information and belief, Third Party Defendant Digi Devices Online is a foreign corporation with its principal U.S. place of business in Texas.

175.    On information and belief, Third Party Defendant Enterprise Business Technologies, Inc. is a New York corporation with its principal place of business in New York.

176.    On information and belief, Third Party Defendant Fiber Cable Connections is a Washington corporation with its principal place of business in Washington.

177.    On information and belief, Third Party Defendant MJSI is a California corporation with its principal place of business in California.

178.    On information and belief, Third Party Defendant Multimode Technologies, LLC is a Minnesota limited liability company with its principal place of business in Minnesota.

179.    On information and belief, Third Party Defendant Network Republic is a Texas corporation with its principal place of business in Texas.

180.    On information and belief, Third Party Defendant Opitmum Data, Inc. is a Nebraska corporation with its principal place of business in Nebraska.

181.    On information and belief, Third Party Defendant Paragon is a Massachusetts corporation with its principal place of business in Massachusetts.

182.    On information and belief, Third Party Defendant Pure Future Technology, Inc. is a California corporation with its principal place of business in California.

183.    On information and belief, Third Party Defendant Seastar IT Trading LLC is a Washington limited liability company with its principal place of business in Washington.

184.    On information and belief, Third Party Defendant Server Tech Supply is a Virginia corporation with its principal place of business in Pennsylvania.

185.    On information and belief, Third Party Defendant Softnetworks, Inc. is a New Jersey limited liability company with its principal place of business in New Jersey.

186.    On information and belief, Third Party Defendant Strada Networks, LLC is a foreign limited liability company with its principal place of business in British Columbia, Canada.

187.    On information and belief, Third Party Defendant Strategic Telecom Supply & Solutions is a Virginia limited liability company with its principal place of business in Virginia.

188.    On information and belief, Third Party Defendant Teksavers is a Texas corporation with its principal place of business in Texas

189.    On information and belief, Third Party Defendant Unlimited Network Solutions is a corporation with its principal place of business in California.

190.    On information and belief, Wisecom Technologies is a corporation with its principal place of business in Maryland.

**Supply of Alleged Counterfeit and Infringing Product**

191.    The Third Party Defendants are all reputable dealers and merchants with respect to the Cisco products alleged to be counterfeit and thereby infringing herein ("allegedly infringing Cisco product").

192.    Dexon obtained such allegedly infringing Cisco product from the Third Party Defendants.  While Dexon denies Cisco's allegations and believes the subject products to be genuine, Dexon relied in good faith on the Third Party Defendants in procuring or obtaining such products.

193.    Without limitation, the Third Party Defendants warranted that such products sold to Dexon would be "delivered free of the rightful claim of any third person by way of infringement or the like."  See U.C.C. §2-312(3).

**FIRST THIRD PARTY CLAIM**
**(Indemnification - All Third Party Defendants)**

194.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

195.   Dexon was named in this litigation as a direct result of product procured from and/or supplied by the Third Party Defendants.

196.   Third Party Defendants should be ordered to indemnify Dexon whether based on express agreement, implied agreement or common law.

**SECOND THIRD PARTY CLAIM**
**(Contribution - All Third Party Defendants)**

197.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

198.   Dexon was named in this litigation as a direct result of product procured from and supplied by the Third Party Defendants.

199.   Dexon is entitled to contribution from Third Party Defendants, whether based on express agreement, implied agreement or common law, to pay or defray any judgment entered against Dexon herein.

**PRAYER FOR RELIEF**

**WHEREFORE,** Defendant, Counterclaim Plaintiff and Third Party Plaintiff Dexon Computer, Inc. prays for judgment and relief against Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc. ("Cisco") and Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Network Republic, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Strategic Telecom Supply & Solutions, Unlimited Network Solutions and Wisecom Technologies as follows:

a. An Order directing the termination of the anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. § 1-2), the California Cartwright Act, and Section 17200 of the California Business and Professional Code;

b. Treble damages (including lost profits), in an amount to be determined at trial and that cannot now be adequately quantified before relevant discovery;

c. Dismissing Plaintiffs' Cisco Systems, Inc. and Cisco Technology, Inc. claims with prejudice, together with costs and disbursements;

d. Awarding Dexon's costs of suit herein, including its attorneys fees incurred in defending against Cisco's claims and asserting antitrust claims;

e. Declaring that Dexon's sale of genuine Cisco goods which Cisco has unilaterally deemed to be "unauthorized" or "unapproved" because sold outside of Cisco's authorized channels, sold to a secondary market reseller such as Dexon, or ineligible for warranty services as a result thereof, does not violate the Lanham Act, 15 U.S.C. §§ 1114, 1125(a);

f. Declaring that Cisco's refusal to warrant genuine products sold in New York violates New York General Business Law § 369-b;

g. Awarding Dexon restitutionary disgorgement;

h. Awarding Dexon actual damages, subject to proof at trial but in an amount in excess of $75,000.;

i. An award of punitive damages in an amount sufficient to punish Counterclaim Defendants, to make an example of them to the community, and to deter them from such conduct as to Dexon or others in the future;

j. For equitable remedial efforts by Counterclaim Defendants sufficient to rehabilitate Dexon's damaged reputation;

k. For orders restraining Cisco Systems, Inc. from engaging in similar conduct in the future;

l. Awarding Dexon damages, lost profits, and treble damages pursuant to the Lanham Act;

1      m. Awarding Dexon its costs and expenses of litigation, including reasonable attorneys'

2         fees;

3      n. Enjoining Cisco from further violations of the laws enumerated herein;

4      o. An award in Dexon's favor against Third Party Defendants sufficient to compensate

5         Dexon for all economic loss, damages, attorney's fees and costs resulting from the

6         claims herein; and

7      p. Such other and further relief as this Court deems just and equitable.

8

9 Dated:  July 29, 2021               */s/ Amanda R. Washton*

10                           Amanda Washton
                            *a.washton@conklelaw.com*

11                           **CONKLE, KREMER & ENGEL, PLC**
                            3130 Wilshire Boulevard, Suite 500

12                           Santa Monica, CA 90403

13                           Michael M. Lafeber
                            *mlafeber@taftlaw.com*

14                           O. Joseph Balthazor Jr.
                            *jbalthazor@taftlaw.com*

15                           **TAFT STETTINIUS & HOLLISTER LLP**
                          2200 IDS Center

16                           80 S. 8th St.
                          Minneapolis, MN 55402

17                           David H. Reichenberg (*pro hac vice pending*)

18                           *DReichenberg@cozen.com*
                          **COZEN O'CONNOR**

19                           3 WTC, 175 Greenwich Street, 56th Floor
                          New York, New York 10006

20                           Mark A. Jacobson (*pro hac vice pending*)

21                           *mjacobson@cozen.com*
                          **COZEN O'CONNOR**

22                           33 South 6th Street, Suite 3800
                          Minneapolis, MN 55402

23                           Attorneys for Defendant, Counterclaim Plaintiff and

24                           Third-Party Plaintiff Dexon Computer, Inc.

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2
    Dexon Computer, Inc. demands a trial by jury on all issues so triable.

3

4  Dated:  July 29, 2021                        /s/ Amanda R. Washton

5                                              Amanda R. Washton
                                                *a.washton@conklelaw.com*
6                                              **CONKLE, KREMER & ENGEL, PLC**
                                                3130 Wilshire Boulevard, Suite 500
7                                              Santa Monica, CA 90403

8                                              Michael M. Lafeber
                                                *mlafeber@taftlaw.com*
9                                              O. Joseph Balthazor Jr.
                                                *jbalthazor@taftlaw.com*
10                                             **TAFT STETTINIUS & HOLLISTER LLP**
                                                2200 IDS Center
11                                             80 S. 8th Street
                                                Minneapolis, MN 55402
12
                                                David H. Reichenberg (*pro hac vice pending*)
13                                              *DReichenberg@cozen.com*
                                                **COZEN O'CONNOR**
14                                             3 WTC, 175 Greenwich Street, 56th Floor
                                                New York, New York 10006
15
                                                Mark A. Jacobson (*pro hac vice pending*)
16                                              *mjacobson@cozen.com*
                                                **COZEN O'CONNOR**
17                                             33 South 6th Street, Suite 3800
                                                Minneapolis, MN 55402
18
                                                Attorneys for Defendant, Counterclaim Plaintiff and
19                                             Third-Party Plaintiff Dexon Computer, Inc.

20

21

22

23

24

25

26

27

28