Richard J. Nelson (SBN 141658)
Louis P. Feuchtbaum (SBN 219826)
Angela M. He (SBN 319351)
Artur A. Minasyan (SBN 322248)
**SIDEMAN & BANCROFT LLP**
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com
ahe@sideman.com
aminasyan@sideman.com

Aaron M. Panner* (D.C. Bar No. 453608)
Kylie C. Kim* (D.C. Bar No. 230277)
Christopher M. Sarma* (D.C. Bar. No. 1510831)
Alex A. Parkinson* (D.C. Bar. No. 166695)
Ryan M. Folio* (New York Bar No. 5823943)
**KELLOGG, HANSEN, TODD,**
  **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
kkim@kellogghansen.com
csarma@kellogghansen.com
aparkinson@kellogghansen.com
rfolio@kellogghansen.com

*Attorneys for Plaintiffs and Counterclaim Defendants
Cisco Systems, Inc. and Cisco Technology, Inc.*

* Admitted *pro hac vice.*  Mr. Folio
is not admitted in the District of
Columbia; his practice is supervised
by members of the firm.

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a California corporation, and CISCO TECHNOLOGY, INC., a California corporation,<br><br>        Plaintiffs and Counterclaim Defendants,<br><br>    v.<br><br>DEXON COMPUTER, INC., a Minnesota Corporation,<br><br>        Defendant and Counterclaim Plaintiff. | Case No.  3:20-cv-4926-CRB<br><br>**PLAINTIFFS AND COUNTERCLAIM DEFENDANTS CISCO SYSTEMS, INC.'S AND CISCO TECHNOLOGY, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS DEFENDANT DEXON COMPUTER, INC.'S AMENDED COUNTERCLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  December 9, 2021<br>Time:  10:00 a.m.<br>Courtroom:  6<br>Judge:  Honorable Charles R. Breyer |

Case No.  3:20-cv-4926

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on December 9, 2021 at 10:00 a.m., or as soon thereafter as this matter can be heard, in Courtroom 6 on the 17th Floor of the United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, before the Honorable Charles R. Breyer, Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc. (together, "Cisco") will, and hereby do, respectfully move this Court for an order dismissing the amended counterclaims by Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") in their entirety and with prejudice. *See* Dkt. 50.

This Motion is based on this Notice of Motion and Motion; the following Memorandum of Points and Authorities below; the record in this matter; and such other and further papers, evidence, and argument as may be submitted to support this Motion.

DATED:  October 13, 2021                 Respectfully Submitted,

                                        By:  */s/ Aaron M. Panner*
                                              Aaron M. Panner

Richard J. Nelson (SBN 141658)          Aaron M. Panner*
Louis P. Feuchtbaum (SBN 219826)        Kylie C. Kim*
Angela M. He (SBN 319351)               Christopher M. Sarma*
Artur A. Minasyan (SBN 322248)          Alex A. Parkinson*
**SIDEMAN & BANCROFT LLP**              Ryan M. Folio*
One Embarcadero Center                  **KELLOGG, HANSEN, TODD,**
Twenty-Second Floor                       **FIGEL & FREDERICK, P.L.L.C.**
San Francisco, CA 94111-3711            1615 M Street, NW, Suite 400
(415) 392-1960                          Washington, D.C. 20036
rnelson@sideman.com                     (202) 326-7900
lfeuchtbaum@sideman.com                 apanner@kellogghansen.com
ahe@sideman.com                         kkim@kellogghansen.com
aminasyan@sideman.com                   csarma@kellogghansen.com
                                        aparkinson@kellogghansen.com
                                        rfolio@kellogghansen.com

                                        *Attorneys for Plaintiffs and Counterclaim Defendants
                                        Cisco Systems, Inc. and Cisco Technology, Inc.*

                                        * Admitted *pro hac vice.*  Mr. Folio is not admitted in the
                                        District of Columbia; his practice is supervised by members
                                        of the firm.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iv

STATEMENT OF REQUESTED RELIEF ......................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT................................................... 1

BACKGROUND................................................................................................................. 4

    A.    Cisco's World-Class Critical Infrastructure ............................................... 4

    B.    Cisco Protects the Safety of Its Products and Distribution Channels ...................... 5

    C.    Dexon's Counterclaims .............................................................................. 5

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ..................................................................................................................... 7

I.    Dexon Fails To Allege An Actionable Tying Claim (Counts I & IV) ................................. 7

    A.    The Section 1 Claim Fails Because Dexon Does Not Allege Any Foreclosure in the Tied Product Market or Any Tying Between Service and Equipment .................................................................................................. 7

    B.    Dexon's Parallel Cartwright Act Claim Also Fails (Count IV) ............................. 10

II.    Dexon's Section 2 Monopolization Claims Fail (Counts II & III) ..................................... 10

    A.    Dexon Fails To Allege Any Exclusionary Conduct............................................... 10

    B.    Dexon's Opaque Refusal-to-Deal Claim Fails as a Matter of Law......................... 12

III.    Dexon Lacks Antitrust Injury (Counts I-IV)..................................................................... 15

IV.    The California Unfair Competition Law Claim Fails (Count V) ........................................ 16

    A.    Dexon Fails To State a Claim Under the UCL Based On Alleged Misrepresentations ................................................................................... 17

            1.    Dexon lacks statutory standing to maintain its UCL claim based on alleged fraud. ................................................................................. 17

            2.    Dexon fails to plead fraud with the requisite particularity........................ 18

    B.    Dexon Has Not Alleged That Cisco Engaged in Any Unlawful or Unfair Conduct .................................................................................................... 20

C.      Dexon Does Not Seek a Statutorily Authorized Remedy ......................................... 20

V.      The Declaratory-Judgment Claims (Counts VI and VII) Should Be Dismissed For Lack Of Jurisdiction ........................................................................................................... 21

A.      Count VI Fails Because Dexon Fails To Allege That Cisco Has Threatened or Will Threaten Litigation Over Sales of Genuine Cisco Products ...................... 22

B.      Count VII Fails Because Dexon Improperly Seeks Declaratory Relief Based on a Statute That Provides No Private Right of Action .......................................... 22

VI.     The Lanham Act Claim Fails (Count VIII) ........................................................................ 23

A.      The Lanham Act Claim Fails to Meet Rule 9(b)'s Heightened Pleading Standard ................................................................................................................ 23

B.      The Alleged Misrepresentations Are Legal Opinions and Therefore Not Actionable Under the Lanham Act ....................................................................... 23

VII.    The Intentional Interference And Trade Libel Claims Fail (Counts IX-XI) ...................... 24

CONCLUSION ............................................................................................................................. 25

Case No.  3:20-cv-4926

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AccuImage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941 (N.D. Cal. 2003)...........24

*Acer Am. Corp. v. Intellisoft Ltd.*, 2021 WL 1164756 (N.D. Cal. Mar. 26, 2021)...................7, 22

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947 (9th Cir. 1998)...............12

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016)..............................9, 12

*Alfasigma USA, Inc. v. First Databank, Inc.*, 2021 WL 930453 (N.D. Cal. Mar. 11, 2021)....3, 23

*Apple iPod iTunes Antitrust Litig., In re*, 796 F. Supp. 2d 1137 (N.D. Cal. 2011).....................13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................6, 12

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) .................................13

*Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853 (9th Cir. 2017) ..........................................3, 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..............................................................6, 12, 20

*Block v. eBay, Inc.*, 2012 WL 1601471 (N.D. Cal. May 7, 2012),
    *aff'd*, 747 F.3d 1135 (9th Cir. 2014) ...............................................................................3, 18

*Blough v. Holland Realty, Inc.*, 574 F.3d 1084 (9th Cir. 2009) .....................................................8

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012)............................2, 8, 9, 12, 15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977)...........................................16

*Buso v. ACH Food Cos.*, 445 F. Supp. 3d 1033 (S.D. Cal. 2020)................................................17

*Carreno v. 360 Painting, LLC*, 2021 WL 1087106 (S.D. Cal. Mar. 19, 2021) .......................3, 19

*Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) ..........................................10

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ...............3, 20

*Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813 (N.D. Cal. 2019) ..............18, 19, 22

*Cisco Sys. Inc. v. Link US, LLC*, 2019 WL 6682838 (N.D. Cal. Dec. 6, 2019).........18, 19, 20, 21

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001) .................................10

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999)..........23, 24

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) .......................................................11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992).......................................5, 7

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

*eBay Seller Antitrust Litig.*, *In re*, 545 F. Supp. 2d 1027 (N.D. Cal. 2008) ................................... 8

*Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925 (N.D. Cal. Sept. 10, 2021),

     *appeal filed*, No. 21-16506 (9th Cir. Sept. 13, 2021) ....................................................... 20

*Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*,

     2018 WL 659105 (N.D. Cal. Feb. 1, 2018) ................................................................... 3, 17

*Facebook, Inc. v. Brandtotal Ltd.*, 2021 WL 2354751 (N.D. Cal. June 9, 2021) ........................ 12

*First Advantage Background Servs. Corp. v. Private Eyes, Inc.*,

     569 F. Supp. 2d 929 (N.D. Cal. 2008) ............................................................................ 25

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) ........................................... 12, 13, 14

*Graminex, L.L.C. v. Aktiebolaget Cernelle*, 451 F. Supp. 3d 732 (E.D. Mich. 2020) ................ 22

*hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020) ................................ 13

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) .......................................................... 7

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ................................................... 7, 15

*Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897 (N.D. Cal. 2019) ............................................. 20

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ............................................... 6, 18, 23

*Knutson v. Daily Review, Inc.*, 548 F.2d 795 (9th Cir. 1976) ...................................................... 16

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) ................................................. 7

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) ................................... 3, 20

*Language Line Servs., Inc. v. Language Servs. Assocs., LLC*,

     2011 WL 5024281 (N.D. Cal. Oct. 13, 2011) .............................................................. 3, 24

*Lee v. Luxottica Retail N.A., Inc.*, 65 Cal. App. 5th 793 (2021) .................................................. 21

*Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440 (2005) ......................................................... 21

*Magic Leap, Inc. v. Chi Xu*, 2020 WL 3268659 (N.D. Cal. June 17, 2020) ................................ 25

*McMahon v. Pier 39 Ltd. P'ship*, 2001 WL 1463814 (N.D. Cal. Nov. 8, 2001),

     *aff'd*, 54 F. App'x 644 (9th Cir. 2003) .......................................................................... 15

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ................................................... 21, 22

*MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004) ................................. 13, 14

*Miller v. City & Cnty. of S.F.*, 187 Cal. App. 2d 480 (1960) ...................................................... 19

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

*Monster Cable Prods., Inc. v. Euroflex S.R.L.*, 642 F. Supp. 2d 1001 (N.D. Cal. 2009)..........3, 22

*Mozart Co. v. Mercedes-Benz of N.A., Inc.*, 833 F.2d 1342 (9th Cir. 1987) ................................14

*Muddy Waters, LLC v. Superior Ct.*, 62 Cal. App. 5th 905 (2021)................................................24

*N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149 (9th Cir. 2010)....................23

*Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038 (9th Cir. 2008) ..........................................9

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013)..................................................13

*O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989 (N.D. Cal. 2014)...........................................18

*Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997) ...........................................11

*Oracle Am., Inc. v. CedarCrestone, Inc.*, 2012 WL 12897962 (N.D. Cal. Dec. 7, 2012) ...........12

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009)............................................13

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117 (2d Cir. 2007)............................14

*Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020) .................14

*Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008).........................9, 15

*Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729 (9th Cir. 1987)...............................2, 16

*Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160 (N.D. Cal. 2013) .....................................................10

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780 (9th Cir. 1996) ............14

*Spindler v. Johnson & Johnson Corp.*, 2011 WL 13278876 (N.D. Cal. Jan. 21, 2011) ................8

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) ......................................................................................11

*Top Agent Network, Inc. v. Nat'l Ass'n of Realtors*,
        2021 WL 3616480 (N.D. Cal. Aug. 16, 2021), *appeal filed*, No. 21-16494
        (9th Cir. Sept. 10, 2021)......................................................................................................15

*Underwager v. Channel 9 Australia*, 69 F.3d 361 (9th Cir. 1995) ...............................................24

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U/S. 398 (2004) ....2, 10, 12

*Vernor v. Autodesk, Inc.*, 621 F.3d 1102 (9th Cir. 2010) .............................................................19

*Water, Inc. v. Everpure, Inc.*, 2009 WL 10670419 (C.D. Cal. Oct. 28, 2009) ............................16

*Webkinz Antitrust Litig.*, *In re*, 695 F. Supp. 2d 987 (N.D. Cal. 2010)..........................................8

**STATUTES**

17 U.S.C. 109(a).............................................................................................................................19

28 U.S.C. §§ 2201-2022 .................................................................................................................21

Cal. Bus. & Prof. Code § 17200 ................................................................. 17

N.Y. Gen. Bus. Law § 369-b ..................................................................... 22

**RULES**

Fed. R. Civ. P. 9(b) ........................................................ 6, 17, 18, 23, 24, 25

Fed. R. Civ. P. 12(b)(1) ............................................................................. 1

Fed. R. Civ. P. 12(b)(6) ............................................................................. 1

Fed. R. Civ. P. 12(f) .................................................................................. 1

**OTHER AUTHORITIES**

Am. Answer and Countercls., *Cisco Sys., Inc. v. Beccela's Etc., LLC*,

     No. 5:18-CV-00477-BLF (N.D. Cal. Jan. 2, 2019), Dkt. 81 .......................... 19

X Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2020)  ................ 9

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1

**STATEMENT OF REQUESTED RELIEF**

2

Cisco requests that the Court dismiss Dexon's counterclaims under Federal Rules of Civil

3

Procedure 12(b)(6) and 12(b)(1), and, in the alternative, strike (in part) Count V under Rule 12(f).

4

**MEMORANDUM OF POINTS AND AUTHORITIES**

5

**INTRODUCTION AND SUMMARY OF ARGUMENT**

6

The counterclaims allege that Cisco targeted Dexon – which claims to be a distributor of

7

Cisco equipment – because it is an "efficient, low-cost" seller of Cisco's equipment.  Dexon's Am.

8

Countercls. ("CC") ¶ 71c, Dkt. 50.  This proposition makes no sense.  Cisco is a manufacturer of

9

network equipment, and it competes with other manufacturers that sell to end users through

10

distributing resellers.  Like any manufacturer, Cisco has every incentive to design a distribution

11

system that is low-cost and efficient – if middlemen earn large profits, that raises prices for end

12

users and hurts Cisco's sales; but if Cisco's distribution channel is low-cost and efficient, it makes

13

Cisco's equipment more competitive.  To be sure, it is critical to Cisco's business of creating reliable

14

networking products that its resellers protect end users against counterfeit goods and goods that

15

cybercriminals have compromised.  Cisco depends on reliable and responsible resellers who provide

16

its end users with excellent service.  There is no logic to Dexon's claim that Cisco earns higher

17

margins "for sales made through channels that have higher resale prices." *Id*. ¶ 45.  Why would that

18

be?  Cisco can set the price it charges for the equipment it manufactures.  Why would it charge

19

efficient resellers higher prices than inefficient ones?

20

But even granting this implausible premise, Dexon fails to state any claim under the antitrust

21

laws or any other state or federal law.  The fundamental defect with Dexon's antitrust claims is that

22

none of the conduct that Dexon purports to challenge has anything to do with competition in the

23

relevant markets for network equipment (switches and routers).  Dexon recognizes that Cisco faces

24

competition from (at least) Hewlett Packard Enterprise, Dell, and Juniper Networks. *See id*. ¶ 95.

25

For Dexon's claims to get off the ground, it must therefore allege that Cisco's conduct limited

26

competition from Cisco's rivals in those markets.  But Dexon does not even attempt to allege any

27

such thing.

28

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1  Dexon first attempts a "tying" claim – asserting that Cisco used its supposed power in a
2  claimed market for service to induce customers to purchase Cisco equipment.  That claim fails
3  because Dexon never alleges that the supposed tying arrangement prevented any customer from
4  purchasing equipment sold by a Cisco competitor.  Rather, Dexon complains that the supposed tie
5  led one (unidentified) customer who always intended to buy Cisco equipment to buy that equipment
6  from someone other than Dexon.  *Id*. ¶ 42.  But in the absence of any allegation that the tying
7  arrangement foreclosed any *competitor's* sales – and Dexon makes no such allegation – there is no
8  antitrust claim.  *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199-1202 (9th Cir. 2012).
9  Accordingly, Dexon's claims brought under Section 1 of the Sherman Antitrust Act (Count I) and
10  California's Cartwright Act (Count IV) fail.

11  Dexon next alleges "monopolization" and "attempted monopolization" based on Cisco
12  having supposedly denied Dexon access to a service-related database.  Such refusal-to-deal claims
13  rarely survive motions to dismiss, and Dexon does not come close to pleading one here.  *See Verizon*
14  *Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  Dexon never
15  alleges that Cisco's conduct excluded any competitor from the market.  As noted above, in the
16  supposedly monopolized markets for network equipment, Cisco's competitors are other
17  manufacturers, not Dexon.  And Dexon does not claim that Cisco made it harder for those rivals to
18  distribute their products, only that Cisco made it harder for Dexon to distribute Cisco's products.
19  Nor does Dexon allege facts suggesting that its success or failure has any significance for
20  competition in the relevant markets.  For each reason, Dexon's Section 2 claims (Counts II-III) fail
21  as a matter of law.

22  All of Dexon's antitrust claims (Counts I-IV) independently fail for the additional reason
23  that Dexon lacks antitrust injury.  Dexon has at most alleged that Cisco's conduct undermined
24  Dexon's ability to sell Cisco products; Dexon does not allege, as it must, any injury flowing from
25  reduced competition between Cisco and its competitors in the alleged relevant markets.  *See Rutman*
26  *Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 734-35 (9th Cir. 1987).  As to the alleged tying
27  conduct, Dexon does not allege any injury from reduced competition in the tied product markets for
28  routers and switches (i.e., the competition between Cisco and other manufacturers).  And as to the

1    vague refusal-to-deal theory, Dexon fails to allege reduced competition in any relevant antitrust

2    market, instead asserting mere harm to itself, which is insufficient as a matter of law.

3    Dexon bases its remaining claims on vague allegations that Cisco engaged in

4    misrepresentations, but Dexon has no standing to assert such claims under the fraudulent prong of

5    the California Unfair Competition Law ("UCL"), *see Equinox Hotel Mgmt., Inc. v. Equinox*

6    *Holdings, Inc.*, 2018 WL 659105, at *13 (N.D. Cal. Feb. 1, 2018); none of the representations is

7    pleaded with the requisite particularity, *see Block v. eBay, Inc.*, 2012 WL 1601471, at *4 (N.D. Cal.

8    May 7, 2012) (Breyer, J.); and the claim that Cisco's End User Licensing Agreement ("EULA") is

9    misleading (it is not) fails as a matter of law in any event because it states a legal position, not facts,

10   *see Carreno v. 360 Painting, LLC*, 2021 WL 1087106, at *5 (S.D. Cal. Mar. 19, 2021).  Nor does

11   Dexon allege any facts to support the assertion that Cisco's conduct was "anticompetitive" for

12   purposes of the UCL.  *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th

13   163, 187 (1999).  In any event, the UCL does not authorize Dexon to obtain monetary relief for

14   supposedly lost sales.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144

15   (2003).

16   Dexon's two declaratory-judgment claims (Counts VI-VII) should be dismissed for want of

17   jurisdiction.  *See Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 867 (9th Cir. 2017).  Count VI,

18   which seeks a declaration that Dexon's sales of "genuine" Cisco products do not violate the Lanham

19   Act, turns on a hypothetical dispute, not the requisite actual case or controversy.  *See Monster Cable*

20   *Prods., Inc. v. Euroflex S.R.L.*, 642 F. Supp. 2d 1001, 1010-11 (N.D. Cal. 2009).  And Count VII

21   impermissibly seeks a declaration under a state law that provides no private right of action.  Dexon

22   thus fails to establish subject-matter jurisdiction as to either claim.

23   The Lanham Act claim (Count VIII) fails – like the UCL claim – because Dexon does not

24   allege with particularity (as it must) the supposed misrepresentations on which this claim turns.  *See*

25   *Alfasigma USA, Inc. v. First Databank, Inc.*, 2021 WL 930453, at *9-10 & n.6 (N.D. Cal. Mar. 11,

26   2021).   And the vaguely alleged misrepresentations that Dexon does assert relate to legal

27   conclusions in Cisco's EULA, which are not actionable under the Lanham Act.  *See Language Line*

28   *Servs., Inc. v. Language Servs. Assocs., LLC*, 2011 WL 5024281, at *11 (N.D. Cal. Oct. 13, 2011).

1    Finally, Dexon's tort claims (Counts IX-XI) likewise fail to plead the requisite elements of any

2    cause of action.

3        For the foregoing reasons and those that follow, Dexon's counterclaims should be dismissed

4    in their entirety with prejudice.

5                                    **BACKGROUND**

6    **A.    Cisco's World-Class Critical Infrastructure**

7        Dexon alleges (at ¶ 14) that Cisco is a "worldwide" leader of "networking for the Internet."

8    Cisco manufactures "core technologies" – critical infrastructure – across a range of product uses,

9    including for "home networking, IP telephony, optical networking, security, storage area

10   networking, and wireless technology." CC ¶ 14.  These core technologies include Internet

11   switches and routers, which are "network equipment" hardware components that enable Internet

12   access.  *See id.* ¶¶ 22, 27.  Cisco competes for equipment sales against a number of "leading

13   manufacturers," including "Hewlett Packard [Enterprise], Dell, [and] Juniper Networks," *id.* ¶ 95

14   – some of the most successful technology companies in the world.  If consumers are dissatisfied

15   with Cisco, then they will "purchase competitive networking equipment from Cisco's

16   competitors."  *Id.* ¶ 51.  The products these companies manufacture are "the fundamental building

17   blocks" of modern Internet infrastructure, "deployed in virtually every modern business and

18   government office."  *Id.* ¶ 22.

19       Cisco also services the products it manufactures (but not other manufacturers' equipment),

20   including by offering a service package called SmartNet.  *See id.* ¶¶ 17, 20.  SmartNet gives Cisco

21   customers access to proprietary "bug fixes, patches and updates" that enable the "effective" and

22   safe operation of Cisco hardware by protecting purchasers of that critical infrastructure from

23   "security vulnerabilities" and "operational risks."  *Id.* ¶¶ 17, 18.  As Dexon acknowledges, Cisco

24   does not "require[ ]" its equipment customers to purchase SmartNet.  *Id.* ¶ 18.  And as Dexon

25   further alleges, "third-party providers" can offer Cisco's hardware customers alternatives to

26   receive services on Cisco equipment.  *Id.* ¶ 20; *see also id.* ¶ 37.  Cisco's hardware customers may

27   choose to purchase a SmartNet package after purchasing equipment.  *See id.* ¶ 36.  But those

28   customers need not purchase SmartNet from Cisco directly; companies other than Cisco "sell an

1    extremely large volume of SmartNet service packages." *Id.* ¶ 38.

2           **B.      Cisco Protects the Safety of Its Products and Distribution Channels**

3           According to Dexon's counterclaims, Cisco sells a majority of the hardware it

4    manufactures through a "distribution channel," *id.* ¶ 45, comprised of distributors and many value

5    added resellers, *see id.* ¶¶ 48, 52.  Dexon identifies more than a dozen resellers of Cisco equipment

6    (and does not claim that those resellers constitute more than a tiny fraction of the total).  *See id.*

7    ¶¶ 172-190 (listing "dealers and merchants" against whom Dexon brings third-party claims).  A

8    significant "[s]econdary market" for Cisco products also exists; Dexon acknowledges that "rogue

9    actors" have infiltrated this market with "counterfeit goods," i.e., equipment passed off as genuine

10   Cisco product when in fact it is not.  *Id.* ¶ 116.  Unfortunately, Cisco's "[a]uthorized [r]eseller"

11   model "is not foolproof protection against counterfeit products" that have "victimized" Cisco's

12   customers.  *Id.* ¶ 117.  Therefore, as Dexon alleges, Cisco maintains a policy of refusing to

13   warranty or service "products sold on the secondary market" if Cisco cannot determine whether

14   the products are "genuine" or counterfeit.  *Id.* ¶ 114.  Cisco may, however, take steps "to ensure

15   secondary market products qualify" for Cisco's service, *id.* – including the SmartNet service

16   package – upon payment of a "re-certification" fee, *id.* ¶¶ 4, 118.  This "re-certification" process

17   supports the "continu[ation]" of "SmartNet service associated with previously purchased

18   networking products." *Id.* ¶¶ 4, 54.

19          **C.      Dexon's Counterclaims**

20          Dexon's counterclaims fall into four categories:

21          *First*, Counts I (Section 1 of the Sherman Act), II-III (Section 2 of the Sherman Act), and

22   IV (Cartwright Act) depend on the claim that Cisco "tied" the purchase of new Cisco routers and

23   switches to the provision of SmartNet service.  *See id*. ¶¶ 37-43.  Despite the label, the factual

24   allegations are unlike those supporting any tying claim that a court has recognized.  In particular,

25   they should not be confused with "aftermarket" claims in which a manufacturer allegedly requires

26   customers to purchase service as a condition of gaining access to proprietary parts.  *See*, *e.g.*,

27   *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451 (1992).  Here, the "tying" product is

28   the service that Cisco provides to SmartNet purchasers, which Cisco supposedly uses to direct

1   customers to purchase new Cisco equipment from resellers other than Dexon.  But Dexon never

2   alleges that this conduct prevented sales by any other manufacturer.  *See* CC ¶ 42 (alleging a

3   customer wanted to buy Cisco equipment and bought Cisco equipment).

4        *Second*, Counts III-IV (Section 2 of the Sherman Act) depend on allegations that Cisco

5   terminated Dexon's access to a service database that Cisco maintains and makes available to

6   resellers.  *See id.* ¶¶ 50-51, 71d.  Dexon (illogically) asserts that this conduct allows Cisco to

7   maintain (or attempt to acquire) a monopoly in alleged product markets for switches and routers,

8   even though Dexon does not allege that denying Dexon access to the database does anything to

9   interfere with anyone's sales of any competing manufacturer's equipment.

10        *Third*, Counts V (UCL), VIII (Lanham Act), and IX-XI (common-law claims) involve

11   claims that Cisco misrepresents Dexon's products and services to discourage unidentified

12   customers from contracting with Dexon.  Yet Dexon does not allege the "who, what, when, where,

13   or how" of any supposed misrepresentation, providing not one detail about any customer,

14   representation, speaker, specific untrue statement, the reliance any Cisco statement induced, or

15   why that reliance was reasonable.  Dexon does not even allege that it was ever misled.

16        *Fourth*, Count VI seeks a declaratory judgment that Dexon's sale of genuine Cisco

17   equipment does not violate the Lanham Act – even though Cisco has never claimed that it does.

18   And Count VII seeks a declaration that Cisco's refusal to warrant certain resold products is

19   "unenforceable in New York" – though Dexon does not allege that there is (or even could be,

20   since the statute at issue provides no private right of action) any actual controversy between the

21   parties with respect to that legal question.

22                                      **LEGAL STANDARD**

23        "[A] complaint must contain sufficient factual matter, [if] accepted as true, to state a claim

24   to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted),

25   and that rises "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

26   And, where the counterclaims sound in fraud, Dexon must satisfy Rule 9(b)'s heightened pleading

27   standard by alleging, with particularity, "the who, what, when, where, and how of the misconduct

28   charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks

1    omitted).  Dexon also bears the burden of establishing that the court has subject-matter jurisdiction

2    as to each claim.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Acer*

3    *Am. Corp. v. Intellisoft Ltd.*, 2021 WL 1164756, at *2 (N.D. Cal. Mar. 26, 2021).

4                                      **ARGUMENT**

5    **I.      Dexon Fails To Allege An Actionable Tying Claim (Counts I & IV)**

6            **A.       The Section 1 Claim Fails Because Dexon Does Not Allege Any Foreclosure in**

7                     **the Tied Product Market or Any Tying Between Service and Equipment**

8            **1.**       Dexon's claim that Cisco engages in unlawful tying fails for multiple reasons, most

9    fundamentally because Dexon never alleges that Cisco used its supposed power in any market to

10   foreclose sales of any competitor's equipment.  To plead a tying claim under Section 1 of the

11   Sherman Act, Dexon must allege that the defendant seller "exploit[ed]. . . its control over the tying

12   product to force the buyer into the purchase of a tied product that the buyer either did not want at

13   all, or might have preferred to purchase elsewhere on different terms."  *Jefferson Par. Hosp. Dist.*

14   *No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep.*

15   *Ink, Inc.*, 547 U.S. 28 (2006).  For example, in *Eastman Kodak*, the plaintiff (respondent in the

16   Supreme Court) serviced Kodak copiers; it alleged that Kodak agreed to sell replacement parts to

17   owners of its copiers only if they agreed not to obtain service from independent service providers

18   like the plaintiff.  *See* 504 U.S. at 462-63.  Post-sale service of Kodak copiers was the tied product

19   market, and the tie foreclosed the plaintiff from competing with Kodak to provide that service.

20          Here, the supposed tying product is not equipment or replacement parts, but service

21   provided under SmartNet contracts.  *See* CC ¶¶ 47, 62.  The counterclaims allege that on one

22   occasion, an unidentified customer cancelled an order with Dexon for Cisco equipment because

23   Cisco warned that it would not provide service on the specific Cisco equipment Dexon sold; the

24   customer instead purchased Cisco equipment elsewhere.  *See id.* ¶ 42.

25          Accepting these allegations as true, they do not support any claim that Cisco foreclosed the

26   sale of any *competitor's* equipment.  Dexon defines the Relevant Product Markets as markets for

27   network equipment, *see id.* ¶ 35, in which Cisco allegedly competes with manufacturers such as

28   Hewlett Packard Enterprise, Dell, and Juniper Networks, *see id.* ¶ 95.  But Dexon does not allege

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1    that any customer was induced to forgo purchases of those competitors' routers and switches in

2    order to gain access to SmartNet service.  The anonymous customer whom Cisco allegedly

3    subjected to the "tie" bought Cisco equipment from a different retailer.  Even on the assumption

4    that the alleged conduct posed an obstacle to *Dexon's* sales of *Cisco* equipment, it posed no

5    impediment to *competition* in any of the relevant markets.

6         The failure to allege foreclosure of any competitor's sale of equipment is fatal to Dexon's

7    tying claim.  *See*, *e.g.*, *Brantley*, 675 F.3d at 1199-1202 (tying claim fails absent allegations

8    supporting foreclosure, i.e., that consumers "would" have "purchased [other] services" in the tied

9    market from a competitor but for the tie); *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089

10   (9th Cir. 2009) (no valid Section 1 tying claim where no sales in the tied market are "foreclosed to

11   competitors by the tie") (internal quotation marks omitted); *Spindler v. Johnson & Johnson Corp.*,

12   2011 WL 13278876, at *5 (N.D. Cal. Jan. 21, 2011) (tying claim fails where plaintiffs failed to

13   allege reduction in competition in the relevant market between drugs offered by the defendant and

14   "competitors' drugs"); *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 996-98 (N.D. Cal.

15   2010) (dismissing tying claim where plaintiffs failed to "allege that consumers are unable to

16   purchase the competing manufacturers' products from other retailers" in the allegedly tied

17   market); *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1034 (N.D. Cal. 2008)

18   (dismissing tying claim where plaintiffs had not alleged that the tie "denie[d] competitors free

19   access to the tied product market").

20        **2.**      The tying claim fails for an additional fundamental reason:  Dexon has not

21   plausibly alleged any tie between service and equipment.  To allege a tie, the plaintiff must allege

22   "an agreement by [the seller] to sell one product but only on the condition that the buyer also

23   purchase a different (or tied) product, or at least agrees that he will not purchase that product from

24   any other supplier."  *Webkinz Antitrust Litig.*, 695 F. Supp. 2d at 993.  Dexon alleges (at ¶ 62) that

25   Cisco's SmartNet "service packages" are the "tying product," but, by definition, customers

26   purchase SmartNet to receive services for Cisco equipment.  *See* CC ¶ 20 (defining the tying

27   product market as "Maintenance Services on Cisco Equipment").  As the leading antitrust treatise

28   has explained, it defies logic to complain that Cisco will not agree to provide service on Cisco

---

1    equipment unless a customer buys Cisco equipment.  No consumer wants Cisco service unless it

2    wants Cisco equipment in the first place.  *See* X Phillip E. Areeda & Herbert Hovenkamp,

3    *Antitrust Law* ¶ 1740c4 (4th ed. 2020) ("The only possible tying product is the machine.  Repair

4    parts or service might be tied, but neither can be the tying product, for no customer could prefer

5    the defendant's machine because of an unrequited desire for a part to repair that very machine.").

6           As noted, Dexon suggests that, in one instance, a Cisco customer bought new Cisco

7    equipment from a retailer other than Dexon in order to continue receiving contracted-for service

8    not only on new Cisco equipment but also on Cisco equipment it already owned.  But this claim

9    sounds in contract, not antitrust, law – either any limitation on service was consistent with the

10   contract (and the customer presumably knew about the limitation from the start) or (as Dexon

11   seems to allege) it was not.  *See* CC ¶ 43 (alleging Cisco "will not honor" agreements with third

12   parties).  If it was not, then customers could simply enforce their contracts.  In any event, taking

13   all allegations as true, there is no claim that Cisco used supposed power in any alleged service

14   aftermarket to induce anyone to purchase Cisco equipment when it would have preferred to

15   purchase some other manufacturer's equipment.  Thus, any condition in the service contract had

16   nothing to do with *tying*.  *See Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 973

17   (9th Cir. 2008); *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1047 (9th Cir. 2008).

18          **3.**      In any event, Dexon's factual allegations belie the claim that Cisco required

19   customers to purchase new equipment as a condition of obtaining SmartNet contracts.  On the

20   contrary, Dexon alleges (at ¶ 4) that Cisco's customers can receive SmartNet service for any

21   genuine Cisco equipment by paying a "re-certification fee" – meant to ensure the equipment is not

22   counterfeit or vulnerable to security exploits – without purchasing any new equipment.  That is not

23   a tying claim.  *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179 (9th Cir. 2016)

24   (plaintiff's acknowledgment that defendant "routinely sells [auxiliary power units] parts to airlines

25   without conditioning sales on service contracts" precludes tying claim as a matter of law).  Even if

26   this re-certification fee amounted to a price increase, the Ninth Circuit has instructed that "merely

27   enhancing the price of the tying product" "does not," as a matter of law, "threaten an injury to

28   competition."  *Brantley*, 675 F.3d at 1199.

**B.     Dexon's Parallel Cartwright Act Claim Also Fails (Count IV)**

Because Dexon has failed to plead a tying claim under the Sherman Act, its Cartwright Act claim also fails for the same reasons.  *See Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (explaining that the "analysis under California's antitrust law mirrors the analysis under federal law"); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1181 (N.D. Cal. 2013) (granting motion to dismiss; Cartwright Act claim fails for the same reasons as the Section 1 claim).

**II.     Dexon's Section 2 Monopolization Claims Fail (Counts II & III)**

**A.     Dexon Fails To Allege Any Exclusionary Conduct**

**1.**     Dexon does not allege actionable exclusionary conduct, as it must for a Section 2 monopolization claim.  *See Trinko*, 540 U.S. at 407 ("the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*").  Dexon's allegation (at ¶ 71a) that Cisco unlawfully maintained a monopoly in (or attempted to monopolize) the equipment markets by "withholding service in the Relevant Service Markets" – fails for the same reason that its tying claim fails:  the counterclaims do not allege that Cisco's service-contract conduct prevents Cisco's *competitors* from making any sales.  *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) ("Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way.").

**2.**     Dexon's allegation (at ¶¶ 50-51) that Cisco denied it "access to the service database" provides no support for the claim that Cisco maintained a monopoly in (or attempted monopolization of ) any market for equipment.  Again, on the assumption that the alleged conduct makes it harder for Dexon to sell *Cisco* equipment, there is no allegation that it makes it harder for Dexon (or anyone else) to sell any *competitor's* equipment.  There is thus no connection to the supposed maintenance (or acquisition) of monopoly power in any market for equipment.  On the contrary, Dexon insists that Cisco's purported conduct *encourages* consumers to "purchase competitive networking equipment from Cisco's competitors."  CC ¶ 51.  Whatever the effect on Dexon, there is no allegation that the conduct had any adverse effect on Cisco's competitors in the relevant markets.

1   Dexon suggests (at ¶ 45) that Cisco restricts distribution of Cisco equipment to certain

2   channels to maintain high prices, but even if accepted as true, these restrictions have nothing to do

3   with maintaining *a monopoly*.  For distribution restrictions to raise antitrust concerns, a

4   monopolist must use its market power to foreclose a substantial share of distribution opportunities

5   that its competitors would otherwise use.  *Cf. Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157,

6   1163 (9th Cir. 1997) ("If competitors can reach the ultimate consumers of the product . . . it is

7   unclear whether such restrictions [on distribution] foreclose from competition *any* part of the

8   relevant market.").  But Dexon has not alleged that Cisco has denied (or even tried to deny)

9   competitors the ability to distribute their products to end users.  Even assuming that Dexon finds it

10  hard to sell Cisco equipment without access to Cisco's database, that says nothing about Dexon's

11  ability to sell other manufacturers' equipment.  And Dexon has made no factual allegations to

12  support any suggestion that *Dexon's* distribution capabilities are of any market-wide significance

13  in any event.  On the contrary, Dexon alleges that the "total amount of commerce in the Relevant

14  Product Markets is billions of dollars," CC ¶ 65, without alleging anything about the volume of its

15  own sales.  Instead, Dexon names more than a dozen Third-Party Defendants who are "reputable

16  dealers and merchants with respect to the Cisco products alleged to be counterfeit" (but which

17  Dexon claims to believe are genuine), *id.* ¶ 191; and Dexon concedes that there are larger value-

18  added resellers ("in terms of volume") distributing Cisco products, *id.* ¶ 52.  Even assuming what

19  is not alleged – that Cisco's conduct somehow made it harder for Dexon to distribute competitors'

20  products – there is no allegation that Dexon's success or failure would affect competition.

21   Nor does Dexon's theory even begin to make economic sense as a monopolization claim.

22  Cisco's economic incentive is to ensure that its distribution chain is competitive to keep

23  distributors' margins low while ensuring that its retail customers receive service that protects

24  Cisco's brand reputation.  *Cf. State Oil Co. v. Khan*, 522 U.S. 3, 17-18 (1997) (rejecting per se

25  liability for vertical maximum price fixing, explaining that "business judgment" and self-

26  interested maintenance of competitive distribution channels limit abusive conduct); *Cont'l T.V.,*

27  *Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52 n.19 (1977) ("when interbrand competition exists . . .  it

28  provides a significant check on the exploitation of intrabrand market power because of the ability

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1    of consumers to substitute a different brand of the same product").  If prices of Cisco equipment

2    rise because of inefficiency in distribution, that can only help Cisco's competitors and hurt Cisco.

3          It is often said that antitrust claims "must make economic sense."  *Adaptive Power Sols.,*

4    *LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998).  Dexon's do not; such facial

5    implausibility warrants dismissal on the pleadings.  *See Iqbal*, 556 U.S. at 679 (claims must be

6    plausible in light of "judicial experience and common sense"); *Twombly*, 550 U.S. at 555-56, 558

7    ("a district court must retain the power to insist upon some specificity in pleading before allowing

8    a potentially massive factual controversy to proceed").

9        **B.**    **Dexon's Opaque Refusal-to-Deal Claim Fails as a Matter of Law**

10       **1.**    Because Dexon's claim depends on the assertion that Cisco had a duty under the

11   antitrust laws to deal with Dexon – by providing access to a service database – its claim fails for

12   the additional reason that it has not come close to clearing the very high bar set for such refusal-to-

13   deal claims.  *See Facebook, Inc. v. Brandtotal Ltd.*, 2021 WL 2354751, at *16 (N.D. Cal. June 9,

14   2021) (stating that, "so long as [the defendant] generally has a right to set rules for accessing [its

15   database] – a principle not reasonably in dispute – its refusal to authorize the access [plaintiff]

16   seeks is a refusal to deal with a potential competitor"); *cf. Oracle Am., Inc. v. CedarCrestone, Inc.*,

17   2012 WL 12897962, at *5-6 (N.D. Cal. Dec. 7, 2012) (explaining that refusal to provide pricing

18   was, "[a]t bottom," a "simple refusal to deal"); *cf. Aerotec Int'l*, 836 F.3d at 1179-80, 1184

19   (rejecting attempt to reframe "refusal to deal claim" as a tying claim where nothing "suggests that

20   arguably manipulative tactics imposed on a third-party competitor are sufficient by themselves to

21   create a tie with respect to a separate buyer simply because they make it less desirable to purchase

22   from the third party").

23         Cisco is under no duty to grant Dexon "access to [Cisco's] service database" – the only

24   conduct Dexon alleges that could plausibly affect its sales.  *See Trinko*, 540 U.S. at 409-11; *FTC*

25   *v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).  Cisco is free to structure its distribution

26   network in the manner it deems most efficient; even a dominant firm has every incentive to

27   promote competitive downstream distribution.  *Cf. Brantley*, 675 F.3d at 1201-02 (merely alleging

28   a "tying arrangement" is insufficient to state a claim because such arrangements in general

1    networks are "consistent with pro-competitive behavior" and firms' freedom to "choose the

2    manner in which they do business absent an injury to competition").  Dexon's claims that Cisco

3    "abused" its "power" in the services market "to prevent rival firms from competing effectively in

4    the retail market" are therefore "not cognizable under the Sherman Act in the absence of an

5    antitrust duty to deal." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009).

6        **2.**        Dexon does not plead any element of any possible narrow exception to this

7    doctrine.  *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

8    Specifically, Dexon does not allege that Cisco terminated a "profitable course of dealing" by

9    refusing to provide Dexon access to a product "already sold in a retail market to other customers,"

10   *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-33 (9th Cir. 2004), nor does it allege

11   that this conduct was "irrational but for its anticompetitive effect," *Novell, Inc. v. Microsoft Corp.*,

12   731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.); *see also In re Apple iPod iTunes Antitrust*

13   *Litig.*, 796 F. Supp. 2d 1137, 1145 (N.D. Cal. 2011) (requiring that "anticompetitive malice"

14   motivated the refusal to deal).  Dexon's failure to satisfy these mandatory elements is fatal to its

15   claims.

16       **a.**        Dexon does not allege that Cisco terminated a profitable course of dealing.  It

17   alleges the opposite:  denying Dexon access to the service database allowed Cisco to boost "its

18   own profit margins," CC ¶ 53, and "force purchases through Cisco's most expensive channels," *id.*

19   ¶¶ 71b, 77b; *see also id.* ¶ 45 (alleging that Cisco's "margins are far higher for sales made through

20   channels that have higher resale prices").  The allegation that Cisco opted for a "more lucrative"

21   distribution channel is fatal to Dexon's claim.  *Qualcomm*, 969 F.3d at 994.  The conclusory

22   assertion (at ¶ 53) that cutting off Dexon harmed Cisco's attempt to be "known as the most

23   ubiquitous networking equipment provider" does not substitute for an allegation that dealing with

24   Dexon specifically was "profitable" to Cisco.  *Cf. hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp.

25   3d 1137, 1151 (N.D. Cal. 2020) (allegation that competitor's use of LinkedIn network "help[ed]

26   prove LinkedIn's value proposition" to customers failed to plead profitable course of dealing

27   under *Aspen Skiing*).

28

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**b.**      There is no allegation that Cisco singled out Dexon, i.e., that Cisco made access to its service database available to "other" resellers similarly situated to Dexon on terms different from those to which Dexon was purportedly subject, or even that Cisco will not sell to Dexon at prices available to similarly situated buyers.  *See MetroNet Servs.*, 383 F.3d at 1132-33.  Indeed, the counterclaims contain no facts at all about access to the service database that would support any plausible refusal-to-deal claim.  *See Qualcomm*, 969 F.3d at 995 (explaining that *Aspen Skiing* claim requires allegations and proof that the defendant "singles out" particular firms "for anticompetitive treatment," and that allegedly exclusionary polices are not applied "equally with respect to all competitors"); *see also Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002 (N.D. Cal. 2020) (explaining that a refusal-to-deal claim fails on the pleadings where policy applied neutrally to similarly situated firms).

**c.**      The restriction that Dexon alleges is a permissible means for Cisco to have used to ensure end-user customers receive high-quality network equipment and service.  *See SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir. 1996) (recognizing "efficiency" as a legitimate business reason for a refusal to deal, and holding that a firm's legitimate business reason for refusing to deal can be decided "as a matter of law"); *Mozart Co. v. Mercedes-Benz of N.A., Inc.*, 833 F.2d 1342, 1348-50 (9th Cir. 1987) (upholding "quality control" as a "legitimate business justification" capable of defeating distributors' tying claim); *see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 125 (2d Cir. 2007) (affirming order granting motion to dismiss where "[t]he facts pleaded" can "sugges[t] . . . the purpose of increasing efficiency" in a distribution channel).  Exerting control over its distribution channel is how Cisco "preserve[s] the integrity of customers' networks" – including both for equipment and service. CC ¶ 58.  That dooms the refusal-to-deal claim, which can survive only if there is no "conceivable rationale" for the conduct other than "the exclusion of competition."  *Qualcomm*, 969 F.3d at 993-94 (citing *MetroNet Servs.*, 383 F.3d at 1132); *see MetroNet Servs.*, 383 F.3d at 1133 (requiring that firm refuse "to provide to [its] competitors products that were already sold in a retail market"); *see also Port Dock & Stone*, 507 F.3d at 124-25 (affirming order granting motion to dismiss refusal-to-deal claim on the pleadings).  Dexon has not come close to making that showing.

1   **III.    Dexon Lacks Antitrust Injury (Counts I-IV)**

2        Dexon also cannot maintain its federal or California antitrust counterclaims because it fails

3   to allege antitrust injury from any supposed tying or refusal to deal.  *See Brantley*, 675 F.3d

4   at 1200 ("[I]n order to state a claim successfully, plaintiffs must allege both that the defendant's

5   behavior is anticompetitive and that plaintiff has been injured by an [anticompetitive] aspect of the

6   practice under scrutiny.") (citation and internal quotation marks omitted); *Top Agent Network, Inc.*

7   *v. Nat'l Ass'n of Realtors*, 2021 WL 3616480, at *8 (N.D. Cal. Aug. 16, 2021) ("A plaintiff

8   bringing claims under the Cartwright Act must meet the same antitrust injury requirement as under

9   the Sherman Act."), *appeal filed*, No. 21-16494 (9th Cir. Sept. 10, 2021).  To plead actionable

10  injury, a "plaintiff[ ] must allege facts that if taken as true would allow them to recover for an

11  injury of the type the antitrust laws were intended to prevent and that flows from that which makes

12  defendants' acts unlawful."  *Brantley*, 675 F.3d at 1200 (citations and internal quotation marks

13  omitted).  Dexon fails to do so for either its tying claim or its refusal-to-deal claim.

14       *First*, Dexon cannot plead antitrust injury from the alleged tying conduct because it does

15  not plead any injury resulting from reduced competition in the claimed Relevant Product Markets.

16  Tying is subject to antitrust scrutiny because it may threaten "reduced competition in the market

17  for the tied product."  *Rick-Mik Enters.*, 532 F.3d at 971 (citing *Jefferson Parish*, 466 U.S. at 12).

18  Accordingly, to establish antitrust injury, Dexon must plausibly allege that its injuries flow from

19  reduced competition in the markets for routers and switches.  But Dexon does not allege any

20  injury from reduced competition in those markets.  Rather, Dexon alleges (at ¶¶ 67, 73, 80, 89)

21  that the purported tying decreased its sales of *Cisco equipment*.  Dexon also claims (at ¶¶ 43, 58)

22  that it had to coax customers to continue using Cisco's equipment by purchasing the equipment

23  itself and supplying it to the customers.  None of these injuries arises from the foreclosure of sales

24  by Cisco competitors like Hewlett Packard Enterprise, Dell, and Juniper Networks.  *See* CC ¶ 95.

25       *Second*, Dexon's refusal-to-deal allegations likewise fail to support any claim of antitrust

26  injury.  The injury caused by an unlawful refusal to deal is reduced competition in a relevant

27  antitrust market, not mere harm to a competitor.  *See, e.g.*, *McMahon v. Pier 39 Ltd. P'ship*, 2001

28  WL 1463814, at *3 (N.D. Cal. Nov. 8, 2001) (Breyer, J.) ("Antitrust injury requires proof that

1  defendant's conduct injured competition, not merely that the conduct injured a competitor."),

2  *aff'd*, 54 F. App'x 644 (9th Cir. 2003); *see also Rutman Wine*, 829 F.2d at 735 ("A termination is

3  not unlawful because of some adverse effect on the distributor's business, even if the effect is the

4  elimination of the distributor from the market.  The complaining distributor must show that the

5  refusal to deal was intended to or did bring about some restraint of trade beyond the loss of

6  business suffered by the distributor or the market's loss of a distributor-competitor.") (quoting

7  *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 803 (9th Cir. 1976)).

8          Dexon does not allege that its injuries flow from reduced competition in markets for

9  switches and routers that Cisco supposedly monopolized or attempted to monopolize by denying

10  Dexon access to Cisco's service database.  Instead, it alleges (at ¶ 8) that, in 2018, Cisco

11  terminated Dexon's access to a service database, leading Dexon to lose business because

12  customers bought non-Cisco equipment from Dexon's competitors – the opposite of what Dexon

13  must allege to have antitrust standing.  It further alleges (at ¶¶ 42, 52) that Cisco convinced a

14  hospital (i.e., a Dexon customer) and a major value-added reseller (i.e., a Cisco supplier) not to

15  deal with Dexon.  But none of these alleged lost sales has anything to do with reduced competition

16  in the relevant markets for switches and routers; if anything, Dexon claims that its losses spring

17  from the *gains* of Cisco's competitors.  *Cf. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S.

18  477, 488 (1977) (awarding damages for competition is "inimical to the purposes of" the antitrust

19  laws).  On the assumption that Dexon "pleads injury to itself, its conclusion that competition has

20  been harmed thereby does not follow." *Rutman Wine*, 829 F.2d at 734; *see also Water, Inc. v.*

21  *Everpure, Inc.*, 2009 WL 10670419, at *5 (C.D. Cal. Oct. 28, 2009) (granting judgment on federal

22  and California antitrust claims because the antitrust plaintiff – a dealer terminated by the

23  manufacturer because of alleged counterfeiting – had not adequately alleged restraint of trade

24  beyond its own loss of business).  Each of its state and federal antitrust claims therefore fails.

25  **IV.     The California Unfair Competition Law Claim Fails (Count V)**

26          Dexon's UCL claim is based on allegations that Cisco interfered with "secondary market"

27  sales by (1) stating in its EULA that Cisco software licenses are not transferable, *see* CC ¶¶ 99-

28  109; (2) misinforming customers about the status of Cisco products sold in the secondary market,

1   *see id.* ¶¶ 110-113, 120b-d,[1] 122; (3) making false statements about Dexon in particular, *see id.*

2   ¶ 121; and (4) declining to provide warranty coverage to products sold on the secondary market,

3   *see id.* ¶¶ 114-119.  The UCL prohibits "unlawful, unfair or fraudulent" business practices.  Cal.

4   Bus. & Prof. Code § 17200.  Most of Dexon's allegations supporting its UCL claim are based on

5   supposed misrepresentations that sound in fraud; Dexon also refers to "anticompetitive actions,"

6   CC ¶ 126, apparently intending to implicate the "unlawful" or "unfair" prongs of the UCL.

7        The Court should dismiss this claim.  *First*, Dexon lacks statutory standing to bring a UCL

8   action based on alleged fraud because it never alleges that it relied on any of the alleged

9   misrepresentations.  *Second*, Dexon has not satisfied the heightened pleading requirements that

10   apply to its fraud-based claims under Rule 9(b).  *Third*, any claim under the "unlawful" and

11   "unfair" prongs of the UCL fails because Dexon has not alleged any violation of the antitrust laws

12   or any conduct that would constitute an "incipient" violation of those laws.  Furthermore, and

13   independently, Dexon has no valid claim for monetary relief, because the UCL does not provide

14   for recovery of lost profits from expected sales.

15   **A.    Dexon Fails To State a Claim Under the UCL Based On Alleged**

16   **Misrepresentations**

17   **1.    Dexon lacks statutory standing to maintain its UCL claim based on**

18   **alleged fraud.**

19        Dexon lacks statutory standing to bring its fraud-based UCL claim because it did not

20   allege, as is required, that it relied on any of Cisco's alleged misrepresentations.  *See Equinox*

21   *Hotel Mgmt.*, 2018 WL 659105, at *13 ("The Court finds that plaintiff's claim under the

22   fraudulent prong of UCL fails because plaintiff has not alleged actual reliance . . . ."); *see also*

23   *Buso v. ACH Food Cos.*, 445 F. Supp. 3d 1033, 1037 (S.D. Cal. 2020) (stating that UCL claims

24   based on consumer deception go to the "fraudulent prong").  Instead, Dexon alleges (at ¶¶ 103-

25   106) that unidentified customers relied on Cisco's misrepresentations.  *See also* CC ¶ 105

26

27

28   ---
[1] Dexon refers in passing to Cisco's having prompted "federal investigation of the secondary market on specious grounds," CC ¶ 120a, but says no more about it.

("Cisco's misrepresentations regarding consumers' right to buy and use secondary-market Cisco products successfully deter consumers from purchasing Cisco goods on the secondary market."). But "UCL fraud plaintiffs must allege their *own* reliance – not the reliance of third parties – to have standing under the UCL." *O'Connor v. Uber Techs., Inc*., 58 F. Supp. 3d 989, 1002 (N.D. Cal. 2014). Dexon fails to do so.[2]

## 2. Dexon fails to plead fraud with the requisite particularity.

Dexon's fraud-based claims also fail because it has not pleaded with particularity that Cisco engaged in any fraudulent conduct. UCL claims brought in federal court and sounding in fraud must satisfy the pleading requirements of Rule 9(b). *See Block*, 2012 WL 1601471, at *4 (dismissing UCL claim for failure to plead fraud with particularity), *aff'd*, 747 F.3d 1135 (9th Cir. 2014). Rule 9(b) requires Dexon to allege "the who, what, when, where, and how of the misconduct charged." *Kearns*, 567 F.3d at 1124 (internal quotation marks omitted). Yet Dexon does not identify any specific customers to whom Cisco made false statements. *See*, *e.g.*, CC ¶ 105 ("Cisco's misrepresentations . . . successfully deter consumers."); *id.* ¶ 110 ("[E]nd users or resellers who communicate with Cisco . . . are . . . provided with misinformation."); *id.* ¶ 121 ("falsely advising Dexon's actual and prospective customers"). Nor does Dexon specify who at Cisco made any specific statements. And Dexon does not allege when, where, or how the unnamed individuals made the vague statements that Dexon identifies.

Dexon's claim that Cisco misrepresented the "used" status of resold equipment is not alleged with the requisite particularity either. Though this Court in *Cisco Systems Inc. v. Link US, LLC*, found that a similar allegation was to survive a motion to dismiss, Dexon's counterclaim does not identify where any supposed representation appeared, who was exposed to it, or what impact it had on any specific consumer. *Cf.* 2019 WL 6682838, at *8 (N.D. Cal. Dec. 6, 2019) (quoting specific language); *see also* Am. Answer and Countercls. ¶ 186 & n.7, *Cisco Sys., Inc. v.*

---

[2] While this Court and another court of this district allowed certain claims under the UCL to proceed in a similar posture, *see Cisco Sys. Inc. v. Link US, LLC*, 2019 WL 6682838, at *9 (N.D. Cal. Dec. 6, 2019) (Breyer, J.); *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 830 (N.D. Cal. 2019), neither decision addresses this threshold statutory standing issue.

1   *Beccela's Etc., LLC*, No. 5:18-CV-00477-BLF (N.D. Cal. Jan. 2, 2019), Dkt. 81 (citing specific

2   representations).  Though Dexon copies language from the counterclaims in those cases, Dexon's

3   allegations are limited only to high-level generalities.

4          Dexon's allegation (at ¶ 102) that Cisco misrepresented in its EULA that Cisco customers

5   receive a non-transferable software license is, moreover, legally insufficient to support Dexon's

6   misrepresentation claim.  According to Dexon, this statement is false because copyright's first-sale

7   doctrine permits customers to transfer their software licenses.  CC ¶ 104; *cf.* 17 U.S.C. 109(a).  To

8   start, Dexon is wrong on the law:  Cisco sells equipment, but it *licenses* software; thus, the first-

9   sale doctrine does not apply.  *See Link US*, 2019 WL 6682838, at *8 (citing *Vernor v. Autodesk,*

10  *Inc.*, 621 F.3d 1102, 1107 (9th Cir. 2010)); *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp.

11  3d 813, 828 (N.D. Cal. 2019) (same).[3]  A purchaser of Cisco equipment does not acquire any right

12  to transfer ownership of software, because the purchaser does not own the software in the first

13  place.

14         But even if the state of the law were in legitimate dispute, Cisco's representation that

15  purchasers of secondary market Cisco equipment must acquire a new software license is a

16  statement of legal opinion and therefore cannot form the basis of a valid UCL claim.  *See Carreno*,

17  2021 WL 1087106, at *5 (dismissing UCL claim because "there's no fraud in statements of legal

18  opinion"); *see also Miller v. City & Cnty. of S.F.*, 187 Cal. App. 2d 480, 483 (1960) ("a

19  misrepresentation of law is not an actionable fraud . . . , at least where, as here, no confidential

20  relationship exists between the parties").

21

22

23

24

_____

25  [3] The court in *Beccela's Etc.* noted that a software license is binding only if a consumer agrees to
    it and credited counterclaimants' allegation that Cisco had made "representations about the
26  EULA's binding effect" that could support a Lanham Act claim.  *See* 403 F. Supp. 3d at 829.  By
    contrast, Dexon makes no allegation that Cisco misrepresented the binding effect of its software
27  license.

28

**B.**     **Dexon Has Not Alleged That Cisco Engaged in Any Unlawful or Unfair Conduct**

Dexon vaguely asserts that the conduct alleged under the rubric of its UCL claim is "tantamount to violations of the antitrust laws." *See*, *e.g.*, CC ¶ 126.[4]  But Dexon alleges no facts to support the claim that Cisco's EULA- and warranty-related conduct "threaten[ed] an incipient violation of an antitrust law, or violate[d] the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187; *see also Link US*, 2019 WL 6682838, at *6 (applying *Cel-Tech* test where plaintiff was a reseller).  Dexon does not allege any facts to suggest that Cisco violated any duty under the antitrust laws; it defines no markets for purposes of its UCL claim; it alleges nothing about the market impact of Cisco's conduct; and it does not explain how "hinder[ing]" secondary market sellers, CC ¶ 127, could possibly violate the antitrust laws.  *See supra* Parts I-II; *see also Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925, at *116 (N.D. Cal. Sept. 10, 2021) (rejecting most of Epic's UCL claims because Apple had proffered "mostly valid and non-pretextual procompetitive justifications" for its policies, but finding that one specific policy violated the UCL because Epic had presented evidence showing the anticompetitive effects of that specific policy), *appeal filed*, No. 21-16506 (9th Cir. Sept. 13, 2021).  All Dexon offers is the purely conclusory assertion that Cisco's conduct is "anticompetitive"; that fails to plead a claim.  *See Twombly*, 550 U.S. at 555 ("a formulaic recitation of the elements of a cause of action will not do").

**C.**     **Dexon Does Not Seek a Statutorily Authorized Remedy**

The UCL also does not permit Dexon to obtain monetary relief for "lost sales of Cisco products [Dexon] otherwise would have made," CC ¶ 127, because monetary relief based on lost profits is not an available remedy under the UCL.  *See Korea Supply*, 29 Cal. 4th at 1144.  Any

---

[4] To the extent Dexon intended to refer to the conduct alleged in support of its antitrust claims to support a claim under the "unlawful" prong of the UCL, that claim fails for the reasons explained above.  *See supra* Parts I-II; *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 923 (N.D. Cal. 2019) (ruling that because "the Sherman Act and Cartwright Act violations are insufficiently pled, it follows that Plaintiffs have failed to sufficiently plead a violation of the UCL").

1   restitution award under the UCL must "restore the status quo by returning to the plaintiff funds *in*

2   *which he or she has an ownership interest*." *Id.* at 1149 (emphasis added); *see also id.* at 1148

3   ("Under the UCL, an individual may recover profits unfairly obtained to the extent that these

4   profits represent monies given to the defendant or benefits in which the plaintiff has an ownership

5   interest.").  Future expected sales are not a form of restitution because they are "merely a

6   contingent interest." *Id.* at 1149; *see also Lee v. Luxottica Retail N.A.*, *Inc.*, 65 Cal. App. 5th 793,

7   807 (2021) ("Simply put, regardless of label ('lost market share,' 'lost business opportunity' or

8   'lost profits'), a plaintiff cannot recover anticipated but unearned, future income under the UCL in

9   the guise of restitution because, absent a legally enforceable right to that stream of future income,

10  the plaintiff lacks an ownership interest in it and thus there is nothing to 'restore.' ").

11      For the same reason, Dexon also cannot obtain unjust enrichment based on the theory (*see*

12  CC ¶ 105) that it lost potential sales.  *See Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 455

13  (2005) (unjust enrichment damages not available because the "object [of the UCL] is to return to

14  the plaintiff funds in which he or she has an ownership interest").  To the extent that the Court

15  does not dismiss all of Count V, it should strike Dexon's requests for monetary relief for

16  supposedly lost sales.  *See Link US*, 2019 WL 6682838, at *9 (striking Link's request for

17  compensation for lost sales).

18  **V.      The Declaratory-Judgment Claims (Counts VI and VII) Should Be Dismissed For**

19  **         Lack Of Jurisdiction**

20      The Court should dismiss both of Dexon's claims under the Declaratory Judgment Act, 28

21  U.S.C. §§ 2201-2022, because Dexon fails to establish the existence of any actual controversy

22  with respect to its purported claims.  The Declaratory Judgment Act does not expand the

23  jurisdiction of the federal courts; rather, it provides a mechanism for resolving actual cases or

24  controversies when, for example, a party threatens, but does not bring, an affirmative lawsuit.  *See*,

25  *e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 130 (2007).  To establish the requisite

26  case or controversy for a declaratory-judgment claim, "the facts alleged, under all the

27  circumstances, [must] show that there is a substantial controversy, between parties having adverse

28  legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

1   judgment." *Bayer*, 861 F.3d at 867 (quoting *MedImmune*, 549 U.S. at 127).  The burden is on

2   Dexon to establish that the Court has jurisdiction.  *See Acer Am.*, 2021 WL 1164756, at *2.  It fails

3   to do so here.

A.   **Count VI Fails Because Dexon Fails To Allege That Cisco Has Threatened or Will Threaten Litigation Over Sales of Genuine Cisco Products**

6   In Count VI, Dexon seeks a declaration that its sales of "genuine Cisco product" do not

7   violate the Lanham Act.  CC ¶ 132.  But Dexon does not allege any facts to show "a real and

8   reasonable apprehension" of suit for Lanham Act violations relating to its sale of *genuine* Cisco

9   products.  *See Monster Cable Prods.*, 642 F. Supp. 2d at 1010-11 ("Under Ninth Circuit trademark

10  law, to satisfy the actual controversy requirement [for a declaratory-judgment claim], the plaintiff

11  must show 'real and reasonable apprehension' that it would be liable for infringement.") (citation

12  omitted).  To be sure, Cisco *has* sued Dexon over its sale of counterfeit goods, defined as goods

13  "not manufactured by Cisco, or under its authority."  First Am. Compl. ¶ 23, Dkt. 32.  But Cisco

14  has not sued, and Dexon makes no allegation that Cisco has threatened to sue, Dexon for selling

15  authentic Cisco products.  *See* CC ¶ 93 (alleging that "authentic or genuine Cisco products" are

16  available in the "secondary market"); *see also*, *e.g.*, *Graminex, L.L.C. v. Aktiebolaget Cernelle*,

17  451 F. Supp. 3d 732, 741 (E.D. Mich. 2020) ("no threatened litigation" where defendant sent

18  protests letters that did not mention the specific trademarks at issue); *cf. Beccela's Etc.*, 403 F.

19  Supp. 3d at 823-24 (holding that "substantial controversy" existed with respect to declaratory-

20  judgment counterclaim against Cisco, based on finding that Cisco had sued counterclaimant under

21  the Lanham Act over sale of "genuine" Cisco products).  Accordingly, Dexon fails to establish

22  that there is any actual controversy with respect to Count VI.

B.   **Count VII Fails Because Dexon Improperly Seeks Declaratory Relief Based on a Statute That Provides No Private Right of Action**

25  Count VII – which seeks a declaratory judgment under New York General Business Law

26  § 369-b – likewise fails because "there is no private right of action under [§] 369-b." *Beccela's*

27  *Etc.*, 403 F. Supp. 3d at 826.  Dexon seeks a declaration with respect to Cisco's alleged

28  obligations to provide warranties for certain goods sold in New York.  But a plaintiff "cannot

1 bring a declaratory judgment claim based on a statute for which there is no private right of action."

2 *Id.* (citing *N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149, 1162 (9th Cir. 2010)

3 (dismissing declaratory-judgment claim)).  The Court should therefore dismiss Count VII as well.

4 **VI.     The Lanham Act Claim Fails (Count VIII)**

5   **A.     The Lanham Act Claim Fails to Meet Rule 9(b)'s Heightened Pleading**

6     **Standard**

7   Dexon's false advertising claim under the Lanham Act fails to meet the heightened Rule

8 9(b) pleading standard.  *See Alfasigma USA*, 2021 WL 930453, at *9-10 & n.6 (applying Rule 9(b)

9 to Lanham Act claims).  Dexon alleges two misrepresentations:  (1) "false or misleading

10 representations of fact regarding the software embedded in Cisco hardware sold on the secondary

11 market," CC ¶ 144; and (2) "false or misleading representations of fact regarding whether products

12 in the secondary market are 'used,'" *id.* ¶ 145.

13   But Dexon fails to identify "the particular circumstances surrounding such

14 representations."  *Kearns*, 567 F.3d at 1126.  For example, Dexon fails to allege when and to

15 whom specifically Cisco supposedly made false representations regarding whether all products in

16 the secondary market are "used," let alone what effect – if any – this had on those specific

17 customers' purchasing decisions and thereby Dexon's business.  *See* CC ¶¶ 110-113; *see also*

18 *supra* Part IV.A.2.  Accordingly, those allegations fall far short of meeting the heightened

19 pleading standard.  *See Kearns*, 567 F.3d at 1126 (plaintiff alleged that statements were made but

20 failed to "specify *who* made this statement or *when* this statement was made," and alleged the

21 existence of marketing materials containing misrepresentations but failed to identify *what* the

22 materials "specifically stated," "*when* he was exposed to them," "which ones he found material,"

23 or which he "relied upon" when making his purchasing decision) (emphases added).

24   **B.     The Alleged Misrepresentations Are Legal Opinions and Therefore Not**

25     **Actionable Under the Lanham Act**

26   Dexon's EULA-related allegations fail to state a claim under the Lanham Act for the

27 additional reason that, as under the UCL, legal opinions are not "actionable under the Lanham

28 Act."  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999);

23

Case No.  3:20-cv-4926

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1   *see also Language Line Servs.*, 2011 WL 5024281, at *11 (explaining that the court should inquire

2   whether "the statement itself is sufficiently factual to be susceptible of being proved true or false")

3   (quoting *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995)).  Because Cisco's

4   alleged representations in the EULA that customers are receiving a "non-transferable" software

5   license are a legal opinion, Dexon cannot state a Lanham Act violation based on those

6   representations.  *See* CC ¶¶ 102-104; *see also Coastal Abstract Serv.*, 173 F.3d at 732 (holding

7   that a legal opinion "could not give rise to a Lanham Act claim" "even if a California court

8   ultimately concludes" that the legal opinion is incorrect).

9   **VII.   The Intentional Interference And Trade Libel Claims Fail (Counts IX-XI)**

10          The Court should dismiss Counts IX-XI because Dexon fails to identify actual or potential

11  customers who refused to contract with Dexon because of Cisco's conduct – a necessary allegation

12  for all three common-law claims to survive a motion to dismiss.  *See AccuImage Diagnostics*

13  *Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 956 (N.D. Cal. 2003) (dismissing intentional

14  interference with contractual relations claims because plaintiff made only "conclusory allegations

15  that valid 'contracts' exist between itself and an unspecified third party"); *id.* at 956-57

16  (dismissing intentional interference with economic advantage claim because the "complaint

17  alleges no specific existing or prospective relationships"); *Muddy Waters, LLC v. Superior Ct.*, 62

18  Cal. App. 5th 905, 926 (2021) (ordering dismissal of trade libel claim because plaintiff did not

19  identify any specific customers "let alone any specific contract or sale that it claims was lost").

20  Instead, Dexon alleges that an unspecified number of customers – including an unidentified

21  hospital (CC ¶¶ 42-43) – refused to contract with Dexon because of Cisco's conduct.  *Cf. id.*

22  ¶¶ 150-154 (Cisco's conduct "disrupted . . . contractual relationships between Dexon and its

23  customers"); *id.* ¶ 161 (Cisco's conduct has disrupted "Dexon's relationships with its potential and

24  actual customers"); *id.* ¶ 168 (Cisco's statements deterred "prospective and actual

25  customers . . . from buying Dexon's products").  This is insufficient:  Dexon has not named any

26  specific customer or a specific contract that it lost.

27          These counterclaims must also satisfy Rule 9(b) because Dexon alleged (at ¶¶ 152, 159,

28  166) that Cisco made false and misleading statements to customers.  *See Magic Leap, Inc. v. Chi*

1    *Xu*, 2020 WL 3268659, at *6 (N.D. Cal. June 17, 2020) (ruling that 9(b) applied to the interference

2    with contract claim because the complaint alleged that defendant's conduct was based on fraud);

3    *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 937 (N.D.

4    Cal. 2008) (trade libel claim was "deficient" because the complaint did not give "any indication of

5    who from First Advantage made the allegedly libelous statements, to whom they made those

6    statements, when they made the statements, or what exactly they said").  Once again, however,

7    Dexon does not allege who at Cisco made these allegedly libelous statements, to whom they were

8    made, when they were made, or what was said.  *See supra* Parts IV.A.2, VI.A.

9                                                      **CONCLUSION**

10            For the foregoing reasons, the Court should dismiss Dexon's counterclaims in their entirety

11    and with prejudice.

12    DATED:  October 13, 2021                 Respectfully Submitted,

13                                                       By:    */s/ Aaron M. Panner*

14                                                              Aaron M. Panner

15    Richard J. Nelson (SBN 141658)           Aaron M. Panner*
      Louis P. Feuchtbaum (SBN 219826)         Kylie C. Kim*
16    Angela M. He (SBN 319351)                Christopher M. Sarma*
      Artur A. Minasyan (SBN 322248)           Alex A. Parkinson*
17    **SIDEMAN & BANCROFT LLP**               Ryan M. Folio*
18    One Embarcadero Center                   **KELLOGG, HANSEN, TODD,**
      Twenty-Second Floor                        **FIGEL & FREDERICK, P.L.L.C.**
19    San Francisco, CA 94111-3711             1615 M Street, NW, Suite 400
      (415) 392-1960                           Washington, D.C. 20036
20    rnelson@sideman.com                      (202) 326-7900
      lfeuchtbaum@sideman.com                  apanner@kellogghansen.com
21    ahe@sideman.com                          kkim@kellogghansen.com
      aminasyan@sideman.com                    csarma@kellogghansen.com
22                                             aparkinson@kellogghansen.com
                                               rfolio@kellogghansen.com
23

24                                             *Attorneys for Plaintiffs and Counterclaim Defendants*
                                               *Cisco Systems, Inc. and Cisco Technology, Inc.*
25

26                                             * Admitted *pro hac vice.*  Mr. Folio is not admitted in
                                               the District of Columbia; his practice is supervised by
27                                             members of the firm.

28

25                                                      Case No.  3:20-cv-4926

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION