IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS, INC., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>DEXON COMPUTER, INC., et al.,<br><br>    Defendants. | Case No. 20-cv-04926-CRB<br><br>**ORDER GRANTING MOTION TO DISMISS COUNTERCLAIMS** |

Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc. (collectively "Cisco") sued Defendant Dexon Computer, Inc. ("Dexon") for trademark infringement, trademark counterfeiting, false designation of origin, unfair business practices under California law, and unjust enrichment. In its amended answer, Dexon filed eleven counterclaims against Cisco: antitrust violations of the Sherman Act and the California Cartwright Act; violations of the California Unfair Competition Law and the Lanham Act; declaratory judgments as to the parties' rights; and tortious interference with business and trade libel. Cisco moves to dismiss all counterclaims. The Court GRANTS the motion with leave to amend.

**I.    BACKGROUND**

    **A.    Facts Alleged**

Cisco Systems, Inc. is a Delaware corporation with its principal place of business in San Jose, California. Am. Answer & Countercl. (dkt. 50) ¶ 11. Cisco Technology, Inc. is a California corporation with its principal place of business in San Jose, California. Id. ¶ 12. Cisco manufactures and sells products and services in "routing and switching" as well as "home networking, IP telephony, optical networking, security, storage area networking, and wireless technology." Id. ¶ 14.

1    Dexon is a Minnesota corporation with its principal place of business in Bloomington,

2  Minnesota.  See id. ¶ 10.  Dexon sells "affordable network equipment" to hospitals, emergency

3  service providers, public service organizations, and other small to medium-sized businesses.  Id. ¶

4  6.  Dexon is a "value added reseller" ("VAR") or "independent secondary-market reseller": it

5  purchases and resells new or refurbished equipment by such companies as Cisco, Hewlett Packard,

6  Dell, and Juniper Networks.  Id. ¶¶ 52, 95.

### 1. Alleged Monopoly in Three Markets

Dexon alleges that Cisco has a monopoly in three putative markets: the market for Ethernet switches; the market for routers (collectively, "equipment markets"); and the market for maintenance of its own equipment.

First, Dexon alleges that Cisco has more than a 60% market share of the U.S. and global markets for Ethernet switches.  Id. ¶ 26.  Ethernet switches are "devices that control data flow within a network to enable network components to communicate efficiently."  Id. ¶ 22.

Second, Dexon alleges that Cisco has more than a 60% market share in the U.S. and global markets for routers.  Id. ¶ 30.  Routers "allow for communication between networks."  Id. ¶ 27.  Although some Ethernet switches incorporate routing technologies, customers do not substitute Ethernet switches for routers.  Id. ¶¶ 27, 28.

In the equipment markets, some of Cisco's competitors are "Hewlett Packard, Dell, and Juniper Networks."  Id. ¶ 95.  A new firm may struggle to enter these markets because of the high cost of developing the software and hardware and building a sales network.  Id. ¶ 31.  Also, customers have "long purchase cycles" before they replace or upgrade their network components.  Id. ¶ 32.

Third, Cisco has a 90% share of the U.S. and global "After-Market for Maintenance Services" on its own equipment.  Id. ¶ 20.  Cisco sells the SmartNet package, a maintenance service that may be purchased in one to five year periods.  Id. ¶¶ 2, 3.  SmartNet provides "onsite visits from certified engineers, software updates, technical assistance center [ ] access, online resources, and hardware replacement services."  Id. ¶ 16.  Although third parties provide some of these maintenance services for Cisco equipment, only SmartNet provides "important software bug

fixes, patches, and updates." Id. ¶¶ 18, 17, 20.

Cisco does not require any purchasers of its equipment to purchase SmartNet. Id. And "customers can and do purchase Cisco networking equipment without maintenance services." Id. ¶ 21. Further, those who choose to purchase SmartNet need not do so at the same time they purchase Cisco equipment, or from the same seller. See id. ¶¶ 36, 38. Nonetheless, Dexon alleges that customers who have purchased Cisco products are "effectively compelled" to purchase SmartNet. Id. ¶ 18.

### 2. Cisco's Conduct Toward Consumers

Cisco has an "Authorized Channel Network" under which it sells equipment to entities that are "Authorized Resellers." Id. ¶ 97. Cisco exerts strict control over how, and at what prices, its "Authorized" partners buy and sell Cisco equipment. Id. Dexon, however, is a vendor in the secondary market and often has cheaper prices. Id. ¶ 95. Dexon alleges that Cisco's margins are "far higher" for sales made through channels with higher resale prices." Id. ¶ 45. Dexon alleges that the cheaper prices on the secondary market "run counter to Cisco's profit motives," so Cisco takes steps to suppress it. Id. ¶ 59.

Cisco informs purchasers of secondary-market equipment that the software embedded in the equipment is "not transferable," so their equipment will require a new software license. Id. ¶ 103. After informing these purchasers that their software licenses are invalid, Cisco "extort[s]" license fees from them. Id. ¶ 106. Cisco also informs them that their equipment is "used," "stolen," or "counterfeit." Id. ¶ 110. Cisco defines "used" to mean "previously owned equipment that is now owned by a party other than the original customer," including both "opened and unopened equipment." Id. ¶ 111 (emphasis added). Cisco knows that this definition is misleading and contrary to customers' understanding of the term. Id. ¶¶ 112-13. Finally, Cisco refuses to warranty equipment sold on the secondary market on the stated basis that it cannot determine whether the products are genuine or counterfeit. Id. ¶ 114.

Cisco also allegedly coerces secondary-market equipment purchasers who have purchased SmartNet packages into purchasing more equipment. Id. ¶ 44. Dexon alleges that Cisco "has suddenly claimed at some point after customers purchased a SmartNet service package that the

3

SmartNet service packages were no longer valid in the absence of a new purchase of a [Cisco router and/or Ethernet switch]." Id. ¶ 40.  Cisco has sometimes "force[d]" a customer to pay a "re-certification fee" to reinstate a SmartNet package "associated with previously purchased networking products."  Id.  Customers have "little choice" but to give in because they have already purchased equipment and SmartNet.  Id.

Dexon provides two examples of Cisco's conduct toward secondary-market equipment purchasers.  First, an unidentified hospital that had long purchased Cisco products from Dexon was contemplating another order from Dexon.  Id. ¶ 42.  Cisco "threatened [the hospital] that if it did not cancel the order" from Dexon, Cisco would "not honor the contemplated new SmartNet service package" and "cancel immediately all SmartNet service packages . . . in place for the entire hospital system and clinics."  Id.  The hospital backed out of the deal with Dexon.  Id.  Second, in the middle of an unidentified 911-service center's five-year SmartNet package, Cisco told the center that it had to purchase new routers and Ethernet switches "if it wanted to receive the service it was due under its SmartNet service package."  Id. ¶ 43.  Because the center could not afford it, Dexon, at its own expense, purchased a new SmartNet package for the center's equipment.  Id.

Cisco's tactics "force customers to only be able to access both networking equipment and service through the most expensive avenues."  Id. ¶ 53.  It is "practically difficult" for these customers to defect to a competitor of Cisco's.  Id. ¶ 55.  Further, "customers are not free to make a product choice on the merits but rather need to account for the likely reaction of Cisco" and "what treatment it will face if it draws Cisco's disapproval."  Id. ¶ 57.  Cisco's competitors in the equipment markets therefore "have less revenue than they should."  Id.

### 3. Cisco's Conduct Toward Dexon

Cisco "spends substantial money and effort to attack secondary market participants such as Dexon and to chill reseller and end user participation in the secondary market."  Id. ¶ 119.  It employs a team of "Brand Protection" employees who intervene with resellers and end users to disrupt sales on the secondary market.  Id. ¶ 120(b).  Cisco also "tortiously and erroneously insinuat[es] to resellers and end users that secondary market participants in general are engaging in

4

illegal activity." Id. ¶ 120(c).

In 2015, Cisco deactivated Dexon's access to the online service database used to arrange maintenance for Cisco products. Id. ¶¶ 50, 49. Cisco later reinstated Dexon. Id. But in 2018, Cisco deactivated Dexon's access and refused to reinstate it. Id. ¶ 51. As a result, at least two customers purchased equipment from a Cisco competitor. Id. On another occasion, Cisco allegedly threatened a larger VAR not to do business with Dexon, and when the VAR representative refused to comply, "he was assigned to a different region and account." Id. ¶ 52. Dexon believes that other VARs were "successfully coerced . . . to limit or withdraw their business from Dexon." Id. Cisco has "falsely advis[ed] Dexon's actual and prospective customers" that "Dexon does not sell genuine Cisco product; Dexon does not sell new Cisco product; Dexon 'repackages' used Cisco product as 'new'; Dexon opens new Cisco product and substitutes parts or software" and made other similar statements. Id. ¶ 121.

Dexon has lost customers "due to [Cisco's] anticompetitive and coercive tactics." Id. ¶ 58. And it suffered "losses that directly stem from Cisco's anticompetitive conduct" when it was "forced to provide new equipment under duress from Cisco." Id. Dexon has also sustained "losses to its goodwill and reputation in the marketplace." Id. ¶ 60. Because of its market position, Cisco is "immune" to "customer dissatisfaction" and instead actively "portray[s] Dexon as an unworthy sales partner [that] is the cause of the customers' problems." Id.[1]

### B. Procedural History

On July 22, 2020, Cisco sued Dexon for trademark infringement, trademark counterfeiting, false designation of origin, unfair business practices under California law, and unjust enrichment. See Am. Compl. (dkt. 32). The Court denied Dexon's motion to dismiss Cisco's amended complaint for lack of personal jurisdiction. See Amended Order (dkt. 40). After Dexon filed an amended answer and eleven counterclaims, Cisco moved to dismiss them. See Mot. to Dismiss (dkt. 72).

---

[1] Dexon includes more factual allegations in its opposition brief, but these are not properly before the court on this motion. See, e.g., MTD Opp. (dkt. 81) at 26–27, 30.

## II. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a cause of action which fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When evaluating a Rule 12(b)(6) motion, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). But conclusory allegations amounting only to "formulaic recitation of the elements" are not entitled to an assumption of truth. See Iqbal, 556 U.S. at 681 (quoting Twombly, 550 U.S. at 555). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).

A party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Particularity requires "the who, what, when, where, and how of the misconduct charged, including what is false or misleading about a statement, and why it is false." Benavidez v. Cty. of San Diego, 993 F.3d 1134, 1145 (9th Cir. 2021) (quoting United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016)). Allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." United Healthcare, 848 F.3d at 1180 (citation and quotation omitted).

Courts may adjudicate only actual cases or controversies. U.S. Const. art. III, § 2, cl. 1. "When presented with a claim for a declaratory judgment, therefore, federal courts must take care to ensure the presence of an actual case or controversy." Rhoades v. Avon Prods., Inc., 504 F.3d 1151, 1157 (9th Cir. 2007) (citing Pub. Serv. Comm'n v. Wycoff, Co., 344 U.S. 237, 244 (1952)).

6

1  "Absent a true case or controversy, a complaint solely for declaratory relief under 28 U.S.C. §
2  2201 will fail for lack of jurisdiction under Rule 12(b)(1)." Id. (citation omitted).  To satisfy the
3  actual controversy requirement in a trademark case, the plaintiff must show "real and reasonable
4  apprehension" that it would be liable for infringement if it continued marketing its product.
5  Monster Cable Prod., Inc. v. Euroflex S.R.L., 642 F. Supp. 2d 1001, 1010 (N.D. Cal. 2009)
6  (quoting Chesebrough-Pond's, Inc. v. Faberge, Inc., 666 F.2d 393, 396 (9th Cir. 1982)).

7  When dismissal is appropriate, courts "shall freely" give leave to amend the complaint
8  "when justice so requires." Fed. R. Civ. P. 15(a)(2).  In the Ninth Circuit, district courts may deny
9  leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant,
10 repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the
11 opposing party by virtue of allowance of the amendment, and futility of amendment." Leadsinger,
12 Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (quoting Foman v. Davis, 371 U.S.
13 178, 182 (1962)).

## III. DISCUSSION

The Court dismisses all of Dexon's counterclaims for failure to state a claim.

### A. Antitrust Claims

#### 1. Tying Claims (Counterclaims 1 and 4)

Dexon alleges that Cisco violated Section 1 of the Sherman Act and the California Cartwright Act because competition was harmed when customers who purchased SmartNet (maintenance service) were forced to purchase a "tied" product (equipment). See Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 462 (1992).  To pass a motion to dismiss, a plaintiff "must allege an actual adverse effect on competition caused by the tying arrangement." Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1200 (9th Cir. 2012) (quotation and citation omitted).

These counterclaims fail because Dexon does not allege that the supposed tie had any adverse effect on competition.  Dexon alleges that Cisco's competitors are impacted because "customers are not free to make a product choice on the merits but rather need to account for the likely reaction of Cisco." Countercl. ¶ 57; see id. ¶ 65 ("A substantial amount of commerce has been affected in the [equipment] Markets."); id. ¶ 67 (same).  But the alleged facts do not support

these conclusory assertions. The hospital that cancelled its order from Dexon simply bought Cisco products elsewhere, leaving competitors such as Hewlett Packard, Dell, and Juniper Networks unaffected. See id. ¶ 42. Dexon nowhere alleges that these competitors lost a sale when Cisco asked the 911 service center to purchase more Cisco equipment. And no lost sale is plausible because, at that time, the 911 center was not interested in "mak[ing] a product choice on the merits." It wanted no further equipment from any manufacturer. See id. ¶ 43.

More broadly, the supposed tie makes no logical sense. SmartNet exists to maintain Cisco products. The maintenance service (the supposed tying product) is only desirable to consumers as an add-on to the underlying equipment (the supposed tied product). Because a consumer buys SmartNet for equipment she already has, Cisco cannot exploit control over the SmartNet market to force people to buy the underlying equipment. It's true that, if Cisco improperly withheld SmartNet service from its customers, Cisco may have breached its contract. But that is not an antitrust violation, nor would the claim be Dexon's.[2]

Because Dexon fails to plead a tying claim under the Sherman Act, its Cartwright Act claim fails. See Cnty. Of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1160 (9th Cir. 2001) (noting that the "analysis under California's antitrust law mirrors the analysis under federal law").

### 2. Monopolization Claims (Counterclaims 2 and 3)

The Court also dismisses Dexon's counterclaims that Cisco unlawfully monopolized the equipment markets in violation of Section 2 of the Sherman Act (or that it attempted to do so). The mere fact of having monopoly power is not unlawful "unless it is accompanied by an element of anticompetitive conduct." See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004). Dexon alleges that Cisco engaged in the following exclusionary conduct to maintain its monopoly power: coercing purchases in the equipment markets; bullying its customers to purchase through more expensive channels; pressuring a VAR not to deal with Dexon; hurting Dexon by discontinuing its access to Cisco's service database; reversing a prior

---

[2] It is at least theoretically possible for a firm to harm competitors by locking customers into a costly long-term service plan and then requiring purchases in a tied equipment market that customers en masse (for some set of reasons) cannot refuse. But no court that has yet found such an arrangement, and the conditions necessary are far away from the facts alleged here.

8

course of conduct toward Dexon; and engaging in similar tactics. Countercl. ¶ 71(a)-(f).

Dexon fails to plead that any of this alleged conduct, either singly or in the aggregate, was anticompetitive. As explained above, Dexon fails to allege that Cisco's coercion or "bullying" of its consumers harmed Cisco's competitors in the equipment markets. Nor does Dexon allege that competition was harmed when Cisco pressured another VAR not to deal with Dexon, discontinued Dexon's access to Cisco's database, or reversed its prior course of conduct toward Dexon. Cisco's conduct apparently led some customers to purchase Cisco equipment from suppliers other than Dexon. Countercl. ¶ 42. But this had no effect on Cisco's competitors. In at least one case, Cisco's conduct apparently helped its competitors: shutting off Dexon's access to the service database led frustrated consumers to purchase products made by other manufacturers. See id. ¶ 51. Dexon does not allege that Cisco's conduct made it more difficult for Dexon (or any other distributor) to distribute the products made by Cisco's competitors. And such an allegation would be a difficult one to make. Cf. Omega Env't, Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir. 1997) (restrictions on distribution channels rarely pose an antitrust problem because they rarely foreclose competitors' access to consumers).

Further, Dexon's theory for why Cisco took action against Dexon makes little economic sense. See Adaptive Power Sols., LLC v. Hughes Missile Sys. Co., 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make economic sense." (citing Eastman Kodak, 504 U.S. at 468)). A firm is unlikely to prefer distribution channels with higher resale prices. Dexon alleges that Cisco gets a higher margin out of more expensive distributors, but it pleads no specific facts in support of this assertion. Id. ¶¶ 45, 59. Without more, it is implausible.

Because Dexon has not pleaded that Cisco's alleged conduct harmed competition, its claims under Section 2 of the Sherman Act fail.

### 3. Antitrust Injury

The antitrust claims also fail because Dexon has not pleaded antitrust injury. Although Dexon alleges that it was harmed by Cisco's conduct, it has not pleaded this harm was caused by anticompetitive conduct. Thus, while the conduct may have violated consumers' contracts with Cisco, or it may have been unwarranted or arbitrary, any injury to Dexon was not "of the type the

1  antitrust laws were intended to prevent and that flows from that which makes defendants' acts
2  unlawful." Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990).

3  For the above reasons, counterclaims 1 through 4 are dismissed with leave to amend. See
4  Leadsinger, 512 F.3d at 532.

### B. Other Claims

#### 1. Unfair Competition Law (Counterclaim 5)

Dexon also alleges a claim under the California Unfair Competition Law ("UCL"), founded on the putative antitrust violations, as well as the following conduct: misrepresentations about the software license that users need to operate the equipment; misleading classification of secondary-market Cisco equipment as "used" or "counterfeit"; wrongful denial of warranties to secondary-market equipment; and tortious efforts to interfere with Dexon's business. Countercl. ¶¶ 92-130. These allegations fail because Dexon fails to allege its own reliance on any purported misrepresentation and/or because they are insufficiently pleaded under Federal Rule of Civil Procedure 9(b).

The UCL broadly prohibits "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200; Friedman v. AARP, Inc., 855 F.3d 1047, 1051 (9th Cir. 2017). The "unlawful" prong requires an underlying violation of law. See Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1168 (9th Cir. 2012). Dexon has not plausibly alleged a violation of the antitrust laws, so it does not allege a UCL violation on that basis. See Jones v. Micron Tech. Inc., 400 F. Supp. 3d 897, 923 (N.D. Cal. 2019).

Nor has Dexon pleaded a violation of the "unfair" prong. Dexon fails to sufficiently allege that any of Cisco's conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 973 P.2d 527, 544 (Cal. 1999); see Cisco Sys. Inc. v. Link US, LLC, 2019 WL 6682838 (N.D. Cal. Dec. 6, 2019) (applying this test in the context of a reseller).

To plead a claim under the UCL's fraudulent prong, a "plaintiff must show that members of the public are likely to be deceived by the [challenged] practice." Friedman, 855 F.3d at 1055.

10

"[L]ikelihood of deception is assessed under a 'reasonable consumer standard.'" Id.  A plaintiff must also demonstrate "actual reliance," which may be "inferred from the misrepresentation of a material fact." Id.

### a. Reliance by Third Parties

The UCL claim fails because Dexon did not plead its own reliance on the misrepresentation or facts sufficient to infer that reliance.

Courts are split as to whether reliance by third parties is sufficient to plead UCL fraud claims. See Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc., 2018 WL 659105, at *13–14 (N.D. Cal. Feb. 1, 2018) (discussing the split).  But the majority view is that the plaintiff must plead his own reliance. See, e.g., id.; L.A. Taxi Coop., Inc. v. Uber Techs., Inc., 114 F. Supp. 3d 852, 866 (N.D. Cal. 2015).  On this view, the UCL does not confer statutory standing on a plaintiff when only third parties (and not the plaintiff itself) relied on the misrepresentation.

The Court is persuaded by the majority approach and concludes that Dexon must allege facts sufficient to infer its own reliance on the misrepresentations.  While it is plausible that Dexon is indirectly harmed by its customers' reliance on the misrepresentation, the mere existence of harm does not mean that this harm is cognizable under the UCL.  That's especially true given that restitution is the only monetary remedy for UCL claims, which is a poor fit for the thrust of Dexon's counterclaim as alleged.  See Cal. Bus. & Prof. Code § 17203; Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 947 (Cal. 2003) (restitution under the UCL must "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest").  Dexon has failed to allege facts plausibly suggesting that the harm derived from its own reliance.[3]

### b. Other Grounds

The Court notes several additional flaws with Dexon's UCL claim.  First, Dexon fails to

---

[3] In Cisco Sys. Inc. v. Link US, LLC, 2019 WL 6682838 (N.D. Cal. Dec. 6, 2019), this Court held that a counterclaim plaintiff stated a UCL fraud claim based on Cisco's misleadingly broad definition of "used" equipment. Cf. id. ¶¶ 111-13 (making a similar allegation).  The Court permitted the claim to proceed, explaining that reliance need not be pleaded specifically, and apparently assuming that reliance by third parties could be cognizable.  However, the Court did not consider this question.  The Court does so today and adopts the majority approach.

11

allege that Cisco made any misrepresentation about the software license that users need to operate the equipment. See Link US, 2019 WL 6682838, at *7-8 (rejecting this argument). Dexon alleges that Cisco informs customers that "although its hardware can be freely resold, the 'embedded Cisco software that runs on the hardware' is 'not transferable,' and purchasers of secondary market Cisco equipment 'must acquire a new license from Cisco before the software can be used.'" Countercl. ¶ 102. Dexon contends that this statement is false because it violates the first sale doctrine. But that doctrine applies to purchased software, not to purchased software licenses. Dexon alleges no plausible facts suggesting that initial owners of Cisco equipment own (rather than merely license) the embedded software. Cisco makes no misrepresentation when it informs secondary-market equipment purchasers that they need a software license. See Link US, 2019 WL 6682838, at *7–8 (citing Vernor v. Autodesk, Inc., 621 F.3d 1102, 1007 (9th Cir. 2010)).

Dexon's claim of wrongful denial of warranties to secondary-market equipment also fails. The Court can discern no misrepresentations here. Countercl. ¶¶ 114-19. Dexon criticizes Cisco's policy of refusing to warranty secondary-market equipment, asserts that Cisco's tools to detect counterfeits are lacking, and alleges that Cisco fails to properly police its manufacturers and process serial numbers. Id. ¶¶ 116-18. Dexon has alleged not fraud, but frustration.

The allegations also fail because Dexon does not "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); see Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009) (applying Rule 9(b) to UCL fraud claims). Particularity requires "the who, what, when, where, and how of the misconduct charged, including what is false or misleading about a statement, and why it is false." Benavidez, 993 F.3d at 1145 (quotation and citation omitted). Dexon does not state who at Cisco classified genuine products as "used" or "counterfeit," or when, and to whom. See Countercl. ¶ 110. And although it provides at least some further details in its opposition, see Opp. at 25, its pleading does not allege the "who, when, or where" of Cisco's allegedly misleading definition of the word "used." See id. ¶ 111-13. Dexon fails to allege the "who, when, or where" to back up its conclusory claim that Cisco's Technical Assistance Center "intentionally modif[ies] or change[s] product serial numbers" in order to sell SmartNet. Id. ¶ 118. Nor does it allege "who, when, where, or what" as to Cisco's alleged "tortious[] and

12

1    erroneous[] insinuati[ons] to resellers and end users" that actors such as Dexon are engaging in

2    illegal activity.  See id. ¶ 120(d).  It also does not allege "when or where" Cisco told Dexon's

3    actual and prospective customers that "Dexon does not sell genuine [or new] product," or who

4    made this claim, or to whom.  Id. ¶ 121.  Although Dexon alleges that Cisco made this threat to a

5    hospital system, that hospital is unidentified and insufficient specific facts are pleaded.  Id. ¶ 42.

6    For these reasons, Dexon has failed to state a claim under the UCL.

**2.     Declaratory Judgment (Counterclaims 6 and 7)**

Dexon seeks a declaratory judgment that "the sale of genuine Cisco product which Cisco has unilaterally deemed to be 'unauthorized' or 'unapproved' because sold outside of Cisco's authorized channels, sold to a secondary market reseller such as Dexon, or ineligible for warranty services as a result thereof, do not violate the Lanham Act."  Countercl. ¶ 132.

This sentence is difficult to parse, but Dexon appears to want a declaration that its sale of genuine Cisco products does not violate the Lanham Act.  But Cisco does not contend that the sale of genuine Cisco products violates the Lanham Act.  Dexon does not allege that Cisco has sued Dexon or anyone else on this theory.  In this suit, Cisco has sued Dexon on the theory that it does not sell genuine products.  See Amended Compl. (dkt. 32).  The Court lacks subject matter jurisdiction to issue a declaratory judgment as Dexon's proposed contention because Dexon has no "real and reasonable apprehension" of liability under the Lanham Act for selling genuine products.  See MTD at 22 (citing Monster Cable Prod., Inc. v. Euroflex S.R.L., 642 F. Supp. 2d 1001, 1010 (N.D. Cal. 2009)).  The Court dismisses with leave to amend.

The Court also dismisses Dexon's claim for a declaratory judgment that, in limiting its warranty to products sold by Authorized Sellers, Cisco violates N.Y. General Business Law § 369-b.  Section 369-b does not provide a private right of action.  Cisco Sys., Inc. v. Beccela's Etc., LLC, 403 F. Supp. 3d 813, 826 (N.D. Cal. 2019) (citing Worldhomecenter.com, Inc. v. KWC America, Inc., 2011 WL 4352390, at *8 (S.D.N.Y. Sept. 15, 2011)).  A party cannot bring a declaratory judgment claim based on a statute for which there is no private right of action.  N. Cty. Commc'ns Corp. v. Cal. Catalog & Tech., 594 F.3d 1149, 1162 (9th Cir. 2010).

13

### 3. Lanham Act (Counterclaim 8)

Dexon also alleges that Cisco violated the Lanham Act because it made "misleading representations of fact regarding the software embedded in Cisco hardware sold on the secondary market" and "misleading representations of fact regarding whether products in the secondary market are 'used.'" Countercl. ¶ 144-45.

Section 43(a) of the Lanham Act forbids the use of false or misleading descriptions in commercial advertising. See 15 U.S.C. § 1125(a)(1)(B); see Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (stating the five required elements). Although the Ninth Circuit has not yet decided the issue, "the better reasoned [district court] authority is that, where a Lanham Act claim is predicated on the theory that the defendant engaged in a knowing and intentional misrepresentation, then Rule 9(b) is applicable." Clorox Co. v. Reckitt Benckiser Grp. PLC, 398 F. Supp. 3d 623, 634 (N.D. Cal. 2019) (quoting 23andMe, Inc. v. Ancestry.com DNA, LLC, 356 F. Supp. 3d 889, 908 (N.D. Cal. 2018)).

The Lanham Act claim fails for two reasons discussed in the previous section. First, Cisco's statement that secondary-market equipment purchasers require a software license is not a misrepresentation. Second, Dexon has not pleaded with particularity the "who, what, or when" regarding Cisco's allegedly misleading definition of "used," who was misled, and how specifically the misrepresentation caused Dexon harm. See Kearns, 567 F.3d at 1126.

### 4. Intentional Interference and Trade Libel (Counterclaims 9, 10, and 11)

Dexon also insufficiently pleads its intentional interference with contractual relations, intentional interference with prospective economic advantage, and trade libel claims, all of which are subject to Rule 9(b). These claims are based on the general allegations that Cisco "made false and misleading statements about Dexon and the products it sells to these customers in order to disrupt the contractual relationship and to cause these customers to purchase product from Cisco authorized resellers." Countercl. ¶ 152; see also id. ¶¶ 159(a)-(c), 165 (similar).

All three claims require specificity not present here. Intentional interference with contractual relations requires pleading the existence of a valid then-existing contract between plaintiff and a third party. Quelimane Co. v. Stewart Title Guar. Co., 960 P.2d 513, 530 (Cal.

14

1998). Intentional interference with prospective economic advantage requires pleading an existing "economic relationship . . . with a probability of future economic benefit" and that the defendant's interference "was wrongful by some legal measure other than the fact of interference itself." Della Penna v. Toyota Motor Sales, U.S.A., Inc., 902 P.2d 740, 748, 751 (Cal. 1995). Similarly, trade libel requires a plaintiff to "identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived." Muddy Waters, LLC v. Superior Ct., 62 Cal. App. 5th 905, 925 (2021).

The Court dismisses these three counterclaims with leave to amend. Especially in light of Rule 9(b), Dexon's allegations are far too unspecific. See AccuImage Diagnostics Corp v. Terarecon, Inc., 260 F. Supp. 2d 941, 956–57 (N.D. Cal. 2003) (dismissing these claims where plaintiff pleaded only "conclusory allegations").

## IV.   CONCLUSION

For the foregoing reasons, the Court dismisses Dexon's eleven counterclaims with leave to amend. Dexon may file an amended answer and counterclaims within 30 days of the date of this order.

**IT IS SO ORDERED.**

Dated: December 9, 2021

CHARLES R. BREYER
United States District Judge