IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS, INC., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>DEXON COMPUTER, INC., et al.,<br><br>    Defendants. | Case No. 20-cv-04926-CRB<br><br>**ORDER GRANTING MOTION TO DISMISS COUNTERCLAIMS** |

Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc. (collectively "Cisco") sued Defendant Dexon Computer, Inc. ("Dexon") for trademark infringement, trademark counterfeiting, false designation of origin, unfair business practices, and unjust enrichment. The Court previously dismissed Dexon's eleven counterclaims. In its amended pleading, Dexon raises four counterclaims: a Lanham Act violation, intentional interference with contractual relations and prospective economic advantage, and trade libel. Cisco moves to dismiss. The Court finds oral argument unnecessary and GRANTS the motion with leave to amend.

I.  **BACKGROUND**

    **A.**    **Facts**

           **1.**    **Cisco and Dexon**

Cisco Systems and Cisco Technology are corporations that manufacture and sell hardware products in routing, switching, and networking. See Second Am. Answer & Countercl. (dkt. 92) ¶¶ 114-15, Order on MTD (dkt. 87) at 1-2. Cisco has an "Authorized Channel Network" through which it sells products to "Authorized Channel Partners" or "Authorized Resellers." Countercl. ¶ 121. "Within this 'Authorized' network, Cisco

1    exerts strict control over how, and at what prices, its 'Authorized' partners can buy and sell
2    Cisco products." Id. ¶ 121.
3         On the secondary market, Cisco hardware is sold at lower prices. Id. ¶ 117. Dexon
4    is a secondary-market reseller of computer networking products that sells "new,
5    refurbished, and discontinued hardware" by Cisco and others. Id. ¶ 118.

### 2. Alleged Misrepresentations

Dexon alleges that it has been harmed by two misrepresentations Cisco made to Dexon's consumers.

First, Dexon alleges that Cisco falsely represents that the license for the "embedded software"—which is necessary for the hardware to function—may not work in secondary-market products. Id. ¶ 124. Dexon alleges that Cisco makes this representation in the End User License Agreement (EULA) for its hardware. Id. ¶ 128. The EULA provides that:

- "Cisco will grant a[n embedded software] license only to consumers who purchase Cisco hardware with embedded software from a so-called 'Approved Source,'" id.;
- end users are "not licensed to Use the Software on secondhand or refurbished Cisco equipment not authorized by Cisco, or on Cisco equipment not purchased through an Approved Source," id.; and
- the embedded software is "not transferable," so secondary-market purchasers of Cisco equipment "must acquire a new license from Cisco before the software can be used," id. ¶ 129.

Dexon alleges that these representations are false because the EULA is unenforceable: although the EULA is available online and Cisco informs users where it is, Cisco "does not require or mandate that end users acknowledge, read, accept or provide any affirmative assent to" it. Id. ¶ 126; id. ¶ 27 (noting that purchasers are not required to "click through" it either). Dexon alleges that it has "lost sales of products that would have been made but for" Cisco's representation that secondary-market hardware is bound by the EULA and requires a new license. Id. ¶ 131.

Second, Dexon alleges that Cisco misleads customers in defining "used" equipment. Dexon alleges that Cisco defines the term broadly to mean "previously owned equipment that is now owned by a party other than the original customer," which includes both "opened and unopened equipment." Id. ¶ 134. This definition can be viewed on the website www.cisco.com/go/relicensing. Id. The full definition at this link, which the Court may incorporate by reference, see Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir. 2018), reads as follows:

> Q. How does Cisco define "used and secondary-market equipment" that qualifies for this [relicensing] program?
>
> A. Cisco defines used equipment as previously owned equipment that is now owned by a party other than the original customer. Secondary-market equipment is any Cisco equipment—whether it is represented as new, used, or refurbished—that is purchased from a seller that is not an authorized Cisco reseller or distributor. This includes both opened and unopened equipment. Previously owned equipment purchased from an unauthorized reseller cannot be placed under a service contract without being reinspected and possibly relicensed.

See Panner Decl, Ex. 1 (dkt. 96-1) at 3. Dexon alleges that this definition misleads because consumers would not normally understand "used" products to include those in "unopened sealed boxes." Countercl. ¶¶ 135-36.

### 3. Cisco's Brand Protection Team

Dexon alleges that Cisco employs "a team of 'Brand Protection' employees" who "intervene with resellers and end users in cases where they are either contemplating the purchase of product, or have ordered product, from the secondary market." Id. ¶ 137. Because of Cisco's actions, Dexon's customers have "refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from contention for business, and have ceased doing business with Dexon on other products and/or altogether." Id. ¶ 173. Dexon describes four specific instances in which Cisco interacted with Dexon's customers.

First, as of July 2019, Fort Bend Independent School District (FBISD) had entered into a written contract with Dexon for the purchase of over $1.3 million in new Cisco

3

equipment. Id. ¶ 146. On or about July 9, Sean O'Brien, a member of Cisco's Brand Protection Team, sent a letter to FBISD stating that "Dexon Computers is not a member of the Cisco authorize reseller program" and "[c]ustomers purchasing most Cisco goods outside of Cisco's authorized sales channels would not automatically have a license to use the software." Id. ¶¶ 146, 147. The letter stated that the Dexon-purchased products "may not come with a valid software license," so "Cisco recommends that you return these goods for a refund, along with any other Cisco products received by the vendor, and replace the items with authorized Cisco products sold via an authorized reseller." Id. ¶¶ 146, 147. The letter also directed FBISD to the Cisco website's definition of "used." Id. ¶ 148. FBISD believed that the equipment was "used" and/or would lack the necessary license, so it cancelled its contract with Dexon. Id. ¶ 149.

Second, on or about March 14, 2019, Tim Casto, a member of Cisco's Brand Protection Team, sent a letter to Dexon customer Lockridge Grindal and Nauen (Lockridge) stating that "six switches" Lockridge had purchased from Dexon were "counterfeit." Id. ¶ 150. The letter stated that "Dexon is NOT a member of the Cisco Authorized Reseller Program," that "[r]egardless of what Dexon claims, and regardless of whether its Cisco product is used or is in new sealed boxes, ANY Cisco product it supplies is consider unauthorized." Id. ¶ 150. It then stated that no product obtained from Dexon comes with a "valid software license," and directed Lockridge to the Cisco website's definition of "used." Id. ¶¶ 151, 152. Lockridge believed that the equipment was counterfeit and/or that the equipment lacked the required license. Id. ¶ 153.

Third, on or about January 27, 2020, Casto sent an email to Accuray Inc. stating that some of the products it had purchased from Dexon on the secondary market "did not have a valid software license." Id. ¶ 154. The email stated that "Cisco . . . determined that the items are genuine" but that the items lacked a valid software license because they "show as sold to end users other than Accuray." Id.

Fourth, on or about July 12, 2021, Shuting Li, a member of Cisco's Brand Protection Team, sent an email to Dexon customer Meadowridge Networks, Inc. stating

4

1  that the product purchased from Dexon was "an unauthorized unit [ ] because this unit is
2  now in possession of end customer which is different from the reported end customer," so
3  "it is an overseas diversion unit." Id. ¶ 155.  Confused, Meadowridge responded: "I am
4  the first end-user to open the box. . . This came to me in an unopened Cisco box and was
5  not a 'used' unit in any sense of the word. . . I had every reason to think that this was a
6  legitimate unit and no reason to believe that it wasn't." Id. ¶ 156.  Cisco directed
7  Meadowridge to a website containing its definition of "used." Id. ¶ 157.

### B. Procedure

On July 22, 2020, Cisco sued Dexon for trademark infringement, trademark counterfeiting, false designation of origin, unfair business practices under California law, and unjust enrichment. See Am. Compl. (dkt. 32).  The Court denied Dexon's motion to dismiss Cisco's amended complaint for lack of personal jurisdiction.  See Am. Order (dkt. 40).  The Court granted Cisco's motion to dismiss the eleven counterclaims Dexon filed along with its amended answer.  See Order on MTD.  Dexon now raises four of the previously-dismissed counterclaims.  Cisco again moves to dismiss.  See Mot. (dkt. 96); Opp. (dkt. 103); Reply (dkt. 104).

## II. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a cause of action which fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  When evaluating a Rule 12(b)(6) motion, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  But conclusory allegations amounting only to "formulaic recitation of the elements" are not entitled to an assumption of truth.  See Iqbal,

556 U.S. at 681 (quoting Twombly, 550 U.S. at 555). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).

A party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Particularity requires "the who, what, when, where, and how of the misconduct charged, including what is false or misleading about a statement, and why it is false." Benavidez v. Cty. of San Diego, 993 F.3d 1134, 1145 (9th Cir. 2021) (quoting United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016)). Allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." United Healthcare, 848 F.3d at 1180 (citation and quotation omitted).

When dismissal is appropriate, courts "shall freely" give leave to amend the complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). In the Ninth Circuit, district courts may deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

**III.   DISCUSSION**

Dexon alleges a Lanham Act violation, intentional interference with contractual relations and prospective economic advantage, and trade libel. Although Dexon provides more detail than it did in its prior complaint, Dexon still fails to state these claims.

**A.   Lanham Act**

Dexon alleges that Cisco made two false or misleading statements: (1) that secondary-market hardware likely has an invalid license, and (2) that unopened secondary-

6

market hardware may be considered "used."  However, neither purported misrepresentation plausibly violates the Lanham Act.

Section 43(a) of the Lanham Act forbids the use of false or misleading descriptions in commercial advertising.  See 15 U.S.C. § 1125(a)(1)(B).  A claim requires "injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 140 (2014).  Specifically, a plaintiff must plead:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997).  Most district courts hold that, "where a Lanham Act claim is predicated on the theory that the defendant engaged in a knowing and intentional misrepresentation, then Rule 9(b) is applicable."  Clorox Co. v. Reckitt Benckiser Grp. PLC, 398 F. Supp. 3d 623, 634 (N.D. Cal. 2019) (quoting 23andMe, Inc. v. Ancestry.com DNA, LLC, 356 F. Supp. 3d 889, 908 (N.D. Cal. 2018)).  A plaintiff must therefore allege "the who, what, when, where, and how of the misconduct charged, including what is false or misleading about a statement, and why it is false."  Benavidez, 993 F.3d at 1145.

### 1. Embedded License

The Court previously held that Cisco did not misrepresent when it stated that the embedded software licenses were nontransferable.  See Order at 14, 12.  The Court explained that, as long as the initial owners have valid software licenses, then they may be nontransferable.  See Vernor v. Autodesk, Inc., 621 F.3d 1102, 1007 (9th Cir. 2010).  And the Court found that "Dexon alleges no plausible facts suggesting that initial owners of Cisco equipment own (rather than merely license) the embedded software."  Order at 12; see Cisco Sys. Inc. v. Link US, LLC, 2019 WL 6682838, at *8 (N.D. Cal. Dec. 6, 2019)

(concluding the same).

Dexon now provides some further allegations. It alleges that Cisco "does not require or mandate that end users acknowledge, read, accept or provide any affirmative assent to" the license agreement. Countercl. ¶ 126. And if purchasers do not consent, the EULA binds neither the initial purchasers nor the secondary purchasers, so they (might) own the embedded software outright. See Opp. at 9 (arguing that Dexon has shown "the lack of any reasonable knowledge of or assent to Cisco's purported EULA by the original purchasers"). Thus, in Dexon's view, Cisco incorrectly informed secondary-market purchasers that they are bound by the EULA. Another court in this district accepted a similar argument at this posture. See Cisco Sys., Inc. v. Beccela's Etc., LLC, 403 F. Supp. 3d 813, 829 (N.D. Cal. 2019) ("[T]he question of whether consumers reasonably knew of the EULA such that they could accept it (or return the product if they did not accept) is a question of fact not appropriate for disposition on a motion to dismiss.").

This Court respectfully disagrees with Becella's and concludes that the purported false statement is not actionable under the Lanham Act. Section 43(a) forbids defendants from making "statements of fact" that are materially deceptive to an audience. See Southland Sod, 108 F.3d at 1139. Cisco's "statement" that the EULA applies to its secondary-market products is deceptive (if at all) only because of the disputed legal consequences of the initial sale. Such a statement depends on the resolution of a disputed legal issue and is not the sort of "statement of fact" that may give rise to a false advertising claim. See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 731-32 (9th Cir. 1999) (a statement that a company was "not licensed in California" was not a false statement of fact under the Lanham Act because it was a legal issue—and one that was still disputed). Dexon therefore fails to plausibly allege a misrepresentation as to the embedded software license.

### 2. Definition of "Used"

Dexon has also failed to plead a Lanham Act claim based on the definition of "used" on Cisco's website. Although this Court has previously held in a similar case that

application of Cisco's definition of "used" might plausibly be misleading, see Link, 2019 WL 6682838, at *8–9, Dexon here fails to adequately allege other elements of a Lanham Act claim.  Dexon alleges that Cisco told four Dexon customers that Dexon's products likely lack a valid embedded license, so the purchaser must purchase one.  See Countercl. ¶¶ 146-148 (Cisco's communications to FBISD), id. ¶¶ 150-52 (communications to Lockridge), id. ¶ 154 (communications to Accuray), id. ¶¶ 155-57 (communications to Meadowridge).  In three instances, Cisco pointed customers to the broad definition of "used" on its website.  See id. ¶¶ 149, 152, 157.  One customer then cancelled its order from Dexon.  See id. ¶ 149 (FBISD "cancelled its [$1.3 million] contract").  In the other instances, Dexon (at most) implies reputational injury.  See id. ¶ 153 (Lockridge believed that Dexon sold it "counterfeit" switches); cf. id. ¶ 120 (noting that "an independent reseller's own reputation suffers significantly when it sells a customer counterfeit goods").

Cisco's definition of "used" was not plausibly material to purchaser behavior and/or did not proximately cause Dexon's injury.  Under the Lanham Act, Dexon must plausibly allege that the deception was material to consumers and that it injured Dexon.  See Southland Sod, 108 F.3d at 1139.  But the definition of "used" did not "proximately cause[]" Dexon customers to cancel the contract or get frustrated at Dexon.  See Lexmark, 572 U.S. at 140.  To the extent that Dexon's customers cancelled the contract or otherwise changed their behavior, they did so because they learned key facts: Dexon is not an authorized reseller, Dexon's products may lack valid licenses, and customers need to purchase new licenses.  Dexon alleges that FBISD cancelled the contract because it "believed the Cisco equipment purchased from Dexon was 'used' and/or that it would lack a necessary license to use such equipment."  Id. ¶ 149 (emphasis added)).  But the latter explanation is the only plausible one.  Without more, the Court finds it implausible that FBISD cared about how Cisco conceptualizes "used" equipment on its website.  FBISD simply cared about whether the hardware it bought from Dexon would work.  Indeed, Dexon would have suffered the same injury if Cisco's website never defined the word "used" and described its licensing policy only in terms of "preowned" or "secondary-

1    market equipment." And although Dexon implies that Cisco's use of the words "used" or
2    "counterfeit" caused reputational damage, this implication is too conclusory. The
3    definition of "used" was not plausibly material or did not proximately cause injury. See
4    Southland Sod, 108 F.3d at 1139.[1]

5    The Court therefore dismisses the Lanham Act counterclaim.

### B.  State Claims

7    Dexon also raises counterclaims for intentional interference with contractual
8    relations and prospective economic advantage, and trade libel. These claims fail because
9    Dexon fails to allege injury from three of Cisco's four interactions, and as to the fourth,
10   Dexon fails to allege a wrongful act or falsity.

#### 1.  Harm to Dexon

12   In its previous order, the Court held that Dexon's allegations were "far too
13   unspecific" in light of the Rule 9(b) requirement of pleading fraud with particularity.
14   Order at 15. Although Dexon now more specifically describes four incidents, Dexon has
15   still not alleged harm as to three of them.

16   All of the California counterclaims require Dexon to plead harm. See Pac. Gas &
17   Elec. Co. v. Bear Stearns & Co., 791 P.2d 587, 589–90 (Cal. 1990) (interference with
18   contractual relations requires "actual breach or disruption of the contractual relationship;
19   and [] resulting damage"); id. at 590 (similar as to interference with prospective economic
20   advantage); Robinson v. HSBC Bank USA, 732 F. Supp. 2d 976, 985 (N.D. Cal. 2010)
21   (trade libel requires "direct pecuniary loss" (citing Seeley v. Seymour, 190 Cal. App. 3d
22   844, 858 (1987))).

23   Dexon does not plead any damage or pecuniary loss resulting from Cisco's
24   interactions with Lockridge, Accuray, and Meadowridge. Although Dexon alleges that
25   Cisco communicated that the embedded licenses were likely invalid and Lockridge and
26   Meadowridge "believe[d]" Cisco's representation and/or expressed confusion, see

---

[1] Here, the Court again respectfully parts ways with Becella's, which found that similar allegations plausibly alleged proximate cause under the Lanham Act. See 403 F. Supp. 3d at 830.

10

1    Countercl. ¶ 153 (Lockridge), id. ¶ 156 (Meadowridge), Dexon does not allege that either

2    party cancelled its contract or refused to contract with Dexon in the future. And not only

3    does Dexon fail to allege that Accuray cancelled its contract with Dexon, but Dexon does

4    not even allege that Accuray was confused or concerned by Cisco's statements. See id.

5    ¶ 154. The California counterclaims fail as to these three incidents because Dexon does

6    not allege harm. See, e.g., Robinson, 732 F. Supp. 2d at 986 (dismissing trade-libel claim

7    because the complaint lacked allegations as to damages).[2]

### 2. The FBISD Contract

Although Dexon alleges with particularity that it was harmed by Cisco's interactions with FBISD, see id. ¶ 149, Dexon still fails to state California counterclaims based on this interaction because Dexon does not plead a wrongful act or falsity.

The California counterclaims require that Cisco make a false statement or otherwise commit a wrongful act. It does not violate California law to tell a party true statements about the world. See Ixchel Pharma, LLC v. Biogen, Inc., 470 P.3d 571, 580 (Cal. 2020) ("[T]o state a claim for interference with an at-will contract by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act."); Della Penna v. Toyota Motor Sales, U.S.A., Inc., 902 P.2d 740, 748, 751 (Cal. 1995) (interference with an economic relationship requires that the interference is "wrongful by some legal measure other than the fact of interference itself"); ComputerXpress, Inc. v. Jackson, 93 Cal. App. 4th 993, 1014 (2001) ("Like the tort of trade libel, interference with prospective economic advantage requires false statements of fact.").

Dexon fails to allege that Cisco made any false statements to, or engaged in any wrongful conduct toward, FBISD. Cisco's letter to FBISD stated:

---

[2] In its opposition, Dexon argues that it does not need to plead damages because its allegations satisfy the requirements for "trade libel per se." Opp. at 14. But it did not plead trade libel per se, and the better reasoned district court authority holds that a plaintiff cannot fail to plead damages for a trade libel claim and then turn around later and insist that it was actually a trade libel per se claim. See Quidel Corp. v. Siemens Med. Sols. USA, Inc., 2020 WL 1820247, at *4 (S.D. Cal. Apr. 9, 2020) (collecting cases on both sides and then concluding: "If [plaintiff] had intended to plead trade libel per se, it could have done so."). So too here.

11

> According to Cisco Systems' records (www.cisco.com/go/eula, the Cisco goods listed in Exhibit A are not recorded as being sold to Fort Bend Independent School District through one of Cisco's authorized resellers. It appears you may have purchased the Cisco goods from a company name Dexon Computer. Unfortunately, Dexon Computers is not a member of the Cisco authorize reseller program. As such, Cisco recommends that you return these goods for a refund, along with any other Cisco products received by the vendor, and replace the items with authorized Cisco products sold via an authorized reseller.

Countercl. ¶ 146. The letter went on to state that Dexon products "may not come with a valid software license" and that "[c]ustomers purchasing most Cisco goods outside of Cisco's authorized sales channels would not automatically have a license to use the software." Id. ¶ 147. It then referred FBISD to www.cisco.com/go/relicensing, the website with the definition of "used." Id. ¶ 148.

The Court explained above that the statements about the applicability of the EULA and the invalidity of the software licenses were not false or misleading statements of fact. See Link, 2019 WL 6682838, at *8 (concluding the same). Dexon does not allege that any of Cisco's other statements were false. And, as explained above, it is implausible that the website definition of "used" proximately caused FBISD to cancel the contract with Dexon. FBISD cancelled the contract because it wanted usable Cisco hardware with valid licenses, not because Cisco articulated a confusingly broad definition of the word "used." Even assuming that a misleading definition can be a "false statement" or "wrongful act" predicate for these counterclaims, it is implausible that it caused Dexon harm. Because the purported interference involved no falsehood or "wrongful act," the claims fail as a matter of law. See Ixchel Pharma, 470 P.3d at 580.[3]

---

[3] The Court notes that Dexon makes assertions like: "Cisco continues to tell Dexon's customers that Dexon sells 'used' equipment as new." Opp. at 14. But that is not quite what Dexon alleges with particularity in its complaint. True, Dexon alleges that Cisco told Lockridge that Dexon's switches were "counterfeit." Id. ¶ 150. If this statement was false and it caused Dexon harm (neither of which is currently alleged), that might well support a counterclaim in tort. But the Court understands almost all of Dexon's allegations to take the form of "I was harmed when Cisco told my customer a true statement" (e.g. that the products I sell likely have invalid licenses) rather than "I was harmed when Cisco told my customer an incorrect statement" (e.g. that the products I sell are "counterfeit" when they are not). If it chooses to amend, Dexon should remedy this problem.

12

## IV. CONCLUSION

For the foregoing reasons, the Court dismisses Dexon's counterclaims. The Court will provide leave to amend one last time. Leadsinger, 512 F.3d at 532. Dexon may file amended counterclaims within 21 days of this order.

**IT IS SO ORDERED.**

Dated: March 16, 2022



CHARLES R. BREYER
United States District Judge