Amanda R. Washton (SB# 227541)
*a.washton@conklelaw.com*
**CONKLE, KREMER & ENGEL**
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351
Phone: (310) 998-9100
Fax: (310) 998-9109

Michael M. Lafeber (*pro hac vice*)
*mlafeber@taftlaw.com*
O. Joseph Balthazor Jr. (*pro hac vice*)
*jbalthazor@taftlaw.com*
**TAFT STETTINIUS &**
   **HOLLISTER LLP**
2200 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Phone: 612.977.8400
Fax: 612.977.8650

Attorneys for Defendant, Counterclaim
Plaintiff and Third-Party Plaintiff Dexon
Computer, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation, | Case No. 3:20-CV-4926-CRB |
| Plaintiffs, | **DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS** |
| v. | |
| DEXON COMPUTER, INC., a Minnesota corporation, | Hon. Charles R. Breyer Presiding Judge |
| Defendant. | |
| DEXON COMPUTER, INC., a Minnesota corporation, | Trial Date:          None |
| Counterclaim Plaintiff and Defendant, | |
| v. | |

1  CISCO SYSTEMS, INC., a Delaware
   corporation and CISCO TECHNOLOGY,
2  INC., a California corporation,

3                    Counterclaim Defendants
                     and Plaintiffs.
4

5  DEXON COMPUTER, INC., a Minnesota
   corporation,
6
                     Third-Party Plaintiff,
7
            v.
8
   ATLANTIX GLOBAL SYSTEMS
9  INTERNATIONAL, LLC, BIZCOM
   ELECTRONICS, INC., DIGI DEVICES
10 ONLINE, ENTERPRISE BUSINESS
   TECHNOLOGIES, INC., FIBER CABLE
11 CONNECTIONS, MJSI, MULTIMODE
   TECHNOLOGIES, LLC,  OPTIMUM
12 DATA, INC., PARAGON, PURE
   FUTURE TECHNOLOGY, INC.,
13 SEASTAR IT TRADING LLC, SERVER
   TECH SUPPLY, SOFTNETWORKS,
14 INC., STRADA NETWORKS, LLC,
   TEKSAVERS, UNLIMITED NETWORK
15 SOLUTIONS, and WISECOM
   TECHNOLOGIES,
16
                     Third-Party Defendants,
17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Defendant Dexon Computer, Inc. ("Dexon"), by and through its undersigned counsel, for its Answer, denies each and every allegation in Plaintiffs Cisco Systems, Inc. and Cisco Technology Inc.'s ("Plaintiffs") First Amended Complaint ("Complaint") except as expressly admitted, qualified or otherwise responded to herein and denies that Plaintiffs are entitled to any of the relief requested in their Prayer for Relief.  In response to each of the numbered paragraphs of the Complaint, Dexon states as follows.  To the extent the headings or any other non-numbered statements in the Complaint contain allegations, Dexon denies each and every such allegation.

## INTRODUCTION

1. Dexon denies the allegations of paragraph 1 of the Complaint.

2. Dexon denies the allegations of paragraph 2 of the Complaint.

## THE PARTIES

3. Dexon lacks sufficient information to admit or deny the allegations of paragraph 3 of the Complaint, and on that basis Dexon denies those allegations.

4. Dexon admits the allegations of paragraph 4 of the Complaint.

5. Dexon denies the allegations of paragraph 5 of the Complaint.

## JURISDICTION AND VENUE

6. Admits that the Complaint purports to be one "founded upon violations of Federal trademark laws" but denies any such purported claims have legal or factual merit. The remaining allegations in paragraph 6 of the Complaint are legal conclusions and questions of law regarding jurisdiction to which no response is required.  To the extent a response is required, Dexon denies such allegations.

7. Dexon denies the allegations of paragraph 7 of the Complaint.

8. Dexon denies the allegations of paragraph 8 of the Complaint.

9. Dexon denies the allegations of paragraph 9 of the Complaint.

10. Dexon denies the allegations of paragraph 10 of the Complaint.

11. Dexon denies the allegations of paragraph 11 of the Complaint.

# FACTUAL ALLEGATIONS

## Alleged Cisco Business and History

12.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 12 of the Complaint, and on that basis Dexon denies those allegations.

13.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 13 of the Complaint, and on that basis Dexon denies those allegations.

14.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 14 of the Complaint, and on that basis Dexon denies those allegations.

## Alleged Cisco Trademarks

15.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 15 of the Complaint, and on that basis Dexon denies those allegations.

16.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 16 of the Complaint, and on that basis Dexon denies those allegations.

17.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 17 of the Complaint, and on that basis Dexon denies those allegations.

18.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 18 of the Complaint, and on that basis Dexon denies those allegations.

## Alleged Counterfeit "Cisco" Products

19.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 19 of the Complaint, and on that basis Dexon denies those allegations.

20.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 20 of the Complaint, and on that basis Dexon denies those allegations.

## Alleged Impact on Health, Safety, and National Security Caused by Counterfeit Cisco Products

21.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 21 of the Complaint, and on that basis Dexon denies those allegations.

22.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 22 of the Complaint, and on that basis Dexon denies those allegations.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**Dexon's Alleged History and Practice of Trafficking in Counterfeit Cisco Products**

23.     Dexon admits selling product bearing the Cisco name and/or mark, but denies the remaining allegations of paragraph 23 of the Complaint, including, without limitation, any allegation such product was counterfeit.

24.     Dexon denies the allegations of paragraph 24 of the Complaint.

25.     Dexon denies the allegations of paragraph 25 of the Complaint.

**Alleged Activity Prior to 2015 Purportedly Demonstrating Dexon's Pattern and Practice of Knowingly Trafficking in Counterfeit Cisco Products**

**Alleged July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco Investigator (Reston, Virginia)**

26.     Dexon denies the allegations in paragraph 26 of the Complaint. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**FBI's Seizure of Alleged Counterfeit Cisco Products from Dexon on February 26, 2008**

27.     Dexon admits the Federal Bureau of Investigation ("FBI") executed a search warrant at Dexon's business location on or about February 26, 2008, but denies the remaining allegations in paragraph 27 of the Complaint including, without limitation, any allegation, suggestion or implication any or "all" of the product taken by the FBI was determined to be counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Cisco's March 2008 Cease and Desist Letter to Dexon and its CEO**

28.     Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about March 7, 2008, and that Dexon responded via a letter from its counsel on or about March 18, 2008, but Dexon denies the reminder of the allegations in paragraph 28 of the Complaint, including, without limitation, Plaintiffs' attempted

1  characterizations of the letters or communications which speak for themselves.  Plaintiffs
2  previously commenced a lawsuit against Dexon in 2011 including claims based directly on
3  such allegations which were resolved via a confidential settlement agreement and dismissed
4  with prejudice.

5  **Dexon's June 2010 Sale of Alleged Counterfeit Cisco Products to Wayne**
6  **State University (Detroit, Michigan) and Cisco's C&D Letter**

7      29.    Dexon admits selling and shipping Cisco product to Wayne State University
8  on or about February 21, 2010 but denies the remainder of the allegations in paragraph 29
9  of the Complaint, including, without limitation, any allegation the product involved was
10 counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including
11 claims based directly on such allegations which were resolved via a confidential settlement
12 agreement and dismissed with prejudice.

13     30.    Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO
14 Steve O'Neil on or about August 6, 2010 concerning Dexon's sale of Cisco product to
15 Wayne State University, but Dexon denies the reminder of the allegations in paragraph 30
16 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the
17 letter which speaks for itself.  Plaintiffs previously commenced a lawsuit against Dexon in
18 2011 including claims based directly on such allegations which were resolved via a
19 confidential settlement agreement and dismissed with prejudice.

20     31.    Dexon admits it responded via a letter from counsel to Plaintiff's Wayne State
21 University allegations on or about August 23, 2010, but Dexon denies the reminder of the
22 allegations in paragraph 31 of the Complaint, including, without limitation, Plaintiffs'
23 attempted characterization of the letter which speaks for itself. Plaintiffs previously
24 commenced a lawsuit against Dexon in 2011 including claims based directly on such
25 allegations which were resolved via a confidential settlement agreement and dismissed with
26 prejudice.

27     32.    Dexon admits Plaintiffs sent a follow-up letter concerning or relating to the
28 Wayne State University allegations on or about August 30, 2010, but Dexon denies the

1 reminder of the allegations in paragraph 32 of the Complaint, including, without limitation,
2 Plaintiffs' attempted characterization of the letter which speaks for itself. Plaintiffs
3 previously commenced a lawsuit against Dexon in 2011 including claims based directly on
4 such allegations which were resolved via a confidential settlement agreement and dismissed
5 with prejudice.

6 **Dexon's July 2010 Sale of Alleged Counterfeit Cisco Products to a Cisco**
7 **Investigator (Los Angeles, California)**

8 33.     Dexon denies the allegations in paragraph 33 of the Complaint. Plaintiffs
9 previously commenced a lawsuit against Dexon in 2011 including claims based directly on
10 such allegations which were resolved via a confidential settlement agreement and dismissed
11 with prejudice.

12 **Dexon's Alleged Illegal Conduct Giving Rise to the Present Lawsuit**

13 34.     Dexon denies the allegations in paragraph 34 of the Complaint.

14 **Dexon's July 2015 Sale of Alleged Counterfeit Cisco Product to Things**
15 **Remembered, Inc. (Highland Heights, Ohio) and Cisco's C&D Letter**

16 35.     Dexon admits selling Cisco product to Things Remembered, Inc. on or about
17 July 2015, but denies the remainder of the allegations in paragraph 35 of the Complaint,
18 including any allegation the product was counterfeit.

19 36.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to
20 the Things Remembered, Inc. allegations on or about August 27, 2020 and that Dexon
21 responded thereto, but Dexon denies the reminder of the allegations in paragraph 36 of the
22 Complaint, including, without limitation, Plaintiffs' attempted characterizations of the
23 letters or communications which speak for themselves.

24 **Dexon's December 2016 Sale of Alleged Counterfeit Cisco Products to**
25 **Jack Henry & Associates, Inc. (Monett, Missouri) and Cisco's C&D**
26 **Letter**

27 37.     Dexon admits selling Cisco product to Jack Henry & Associates, Inc. ("Jack
28 Henry") on or about December 2016, but denies the remainder of the allegations in

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1  paragraph 37 of the Complaint, including, without limitation, any allegation the product
2  was counterfeit.

3      38.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to
4  the Jack Henry allegations, but Dexon denies the reminder of the allegations in paragraph
5  38 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of
6  the letter which speaks for itself.

7      39.    Dexon admits it responded to Plaintiffs' Jack Henry allegations via a letter
8  from Dexon's counsel, but denies the reminder of the allegations in paragraph 39 of the
9  Complaint, including, without limitation, Plaintiffs' attempted characterizations of the
10 responsive letter which speaks for itself.

11         **Dexon's October 2017 Sale of Alleged Counterfeit Cisco Products to a**
           **Cisco Investigator (Berkeley, California)**
12

13     40.    Dexon denies the allegations in paragraph 40 of the Complaint.

14         **Dexon's January 2018 Sale of Alleged Counterfeit Cisco Product to**
           **Community Health Alliance (Reno, Nevada) and Cisco's C&D Letter**
15

16     41.    Dexon admits selling Cisco product to Community Health Alliance ("CHA")
17 on or about January 2018, but denies the remainder of the allegations in paragraph 41 of
18 the Complaint, including, without limitation, any allegation the product was counterfeit.

19     42.    Dexon admits Plaintiffs and Dexon's counsel exchanged a series of letters or
20 communications relating to the CHA allegations, but denies the remainder of the allegations
21 in paragraph 42 of the Complaint, including, without limitation, Plaintiffs' attempted
22 characterizations of the letters or communications which speak for themselves.

23         **Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to**
           **Tucson Medical Center (Arizona)**
24

25     43.    Dexon admits selling Cisco product to Tucson Medical Center ("TMC") on
26 or about April 2018, but denies the remainder of the allegations in paragraph 43 of the
27 Complaint, including, without limitation, any allegation the product was counterfeit.

28

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to DARCARS (Maryland) and Cisco's C&D Letter**

44.    Dexon admits selling Cisco product to DARCARS on or about April 2018, but denies the remainder of the allegations in paragraph 44 of the Complaint, including, without limitation, any allegation the product was counterfeit.

45.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the DARCARS allegations, but Dexon denies the reminder of the allegations in paragraph 45 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Lockridge, Grindal, Nauen, PLLP (Minnesota, Minnesota)**

46.    Dexon admits selling Cisco product to Lockridge, Grindal, Nauen, PLLP on or about August 2018, but denies the remainder of the allegations in paragraph 46 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Regional Justice Information Service (St. Louis, MO) and Cisco's C&D Letter**

47.    Dexon admits selling Cisco product to Regional Justice Information Service ("RJIS") on or about August 2018, but denies the remainder of the allegations in paragraph 47 of the Complaint, including, without limitation, any allegation the product was counterfeit.

48.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the RJIS allegations, but Dexon denies the reminder of the allegations in paragraph 48 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Purchases in 2018 of Alleged Counterfeit Switches from PureFutureTech (Fremont, California)**

49.    Dexon admits purchasing Cisco product from PureFutureTech on or about 2018 and that the purported supplier of such product was HongKong Sellsi, a former

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1  authorized licensed seller of Cisco products, but lacks sufficient information to admit or

2  deny the remaining allegations of paragraph 49 of the Complaint, and on that basis Dexon

3  denies such allegations.

4      50.   Dexon admits Plaintiffs served it with a subpoena relating to a lawsuit

5  involving Plaintiffs, PureFutureTech and HongKong Sellsi and that Plaintiffs were

6  ultimately required to file a motion relating to such non-party subpoena.  Dexon denies the

7  remaining allegations of paragraph 50 of the Complaint, including, without limitation, any

8  allegation, suggestion or implication Dexon "refused to cooperate" with, or in any way

9  failed to meet its obligations arising from, the subpoena.

10 **Dexon's Purchases in 2017 to 2019 of Alleged Counterfeit Transceivers**
11 **from Pure Future Tech, Inc. (Fremont, California)**

12     51.   Dexon admits purchasing Cisco product from Pure Future Tech, Inc. in the

13 period 2017-2019 but denies any such product was counterfeit.  Dexon lacks sufficient

14 information to admit or deny the remaining allegations in paragraph 51 of the Complaint

15 and on that basis denies such allegations.

16     52.   Dexon denies the allegations in paragraph 52 of the Complaint, including,

17 without limitation, any allegation Dexon knew or reasonably should have known any Cisco

18 product was allegedly counterfeit, or that Dexon was willfully blind to such alleged fact.

19 **Dexon's Sales of Alleged Counterfeit Products to Murray State**
20 **University (Murray, Kentucky) in 2018 and 2019 and Cisco's C& Letter**

21     53.   Dexon admits selling Cisco product to Murray State University ("MSU") in

22 or about 2018 and 2019, but denies the remainder of the allegations in paragraph 53 of the

23 Complaint, including, without limitation, any allegation the product was counterfeit.

24     54.   Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to

25 the MSU allegations, but Dexon denies the reminder of the allegations in paragraph 54 of

26 the Complaint, including, without limitation, Plaintiffs' attempted characterization of the

27 letter which speaks for itself.

28

**Dexon's July 2019 Sale of Alleged Counterfeit Cisco Products to MedRisk (King of Prussia, Pennsylvania)**

55.    Dexon admits selling Cisco product to MedRisk on or about July 2019, but denies the remainder of the allegations in paragraph 55 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's September 2019 Sale of Alleged Counterfeit Cisco Products to Coppell Independent School District (Coppell, Texas) and Cisco's C&D Letter**

56.    Dexon admits selling Cisco product to Coppell Independent School District ("CISD") on or about September 2019, but denies the remainder of the allegations in paragraph 56 of the Complaint.

57.    Dexon denies any allegation, suggestion or implication in paragraph 57 of the Complaint that Cisco product it sold to CISD was counterfeit.  Dexon lacks sufficient information to admit or deny the remainder of the allegations in paragraph 57 of the Complaint and on that basis denies such allegations.

58.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the CISD allegations, but Dexon denies the reminder of the allegations in paragraph 58 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Alleged California Directed Conduct Identified Through Jurisdictional  Discovery**

59.    Dexon admits Plaintiffs conducted jurisdictional discovery herein, but denies the remainder of the allegations in paragraph 59 of the Complaint, including, without limitation, Plaintiffs' characterization of such jurisdictional discovery, as well as any allegation such discovery revealed any "illegal and tortious" conduct by Dexon in California or elsewhere.

**Dexon's Sale of Alleged Counterfeit Cisco Products to California Customers**

60.    Dexon denies the allegations in paragraph 60 of the Complaint.

**Dexon's Sale of Alleged Counterfeit Cisco Licenses to California Customers**

61.     Dexon admits Cisco has transmitted software licenses via Product Activation Key Certificates ("PAK") and that such PAKs have included a code that allows users to utilize the subject software.  Dexon denies the remainder of the allegations in paragraph 61 of the Complaint.

62.     Dexon denies the allegations in paragraph 62 of the Complaint.

63.     Dexon denies the allegations in paragraph 63 of the Complaint.

64.     Dexon denies the allegation in paragraph 64 of the Complaint.

**FIRST PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Infringement**
*(15 U.S.C. § 1114)*

65.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-64 in response to the allegations in paragraph 65 of the Complaint.

66.     Dexon denies the allegations of paragraph 66 of the Complaint.

67.     Dexon denies the allegations of paragraph 67 of the Complaint.

68.     Dexon denies the allegations of paragraph 68 of the Complaint.

69.     Dexon denies the allegations of paragraph 69 of the Complaint.

70.     Dexon denies the allegations of paragraph 70 of the Complaint.

71.     Dexon denies the allegations of paragraph 71 of the Complaint.

72.     Dexon denies the allegations of paragraph 72 of the Complaint.

**SECOND PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Counterfeiting**
*(15 U.S.C. § 1114)*

73.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-72 in response to the allegations in paragraph 73 of the Complaint.

74.     Dexon denies the allegations of paragraph 74 of the Complaint.

75.     Dexon denies the allegations of paragraph 75 of the Complaint.

76.   Dexon denies the allegations of paragraph 76 of the Complaint.

77.   Dexon denies the allegations of paragraph 77 of the Complaint.

78.   Dexon denies the allegations of paragraph 78 of the Complaint.

79.   Dexon denies the allegations of paragraph 79 of the Complaint.

### THIRD PURPORTED CLAIM FOR RELIEF
**False Designation of Origin**
***(15 U.S.C. § 1125)***

80.   Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-79 in response to the allegations in paragraph 80 of the Complaint.

81.   Dexon denies the allegations of paragraph 81 of the Complaint

82.   Dexon denies the allegations of paragraph 82 of the Complaint.

83.   Dexon denies the allegations of paragraph 83 of the Complaint.

84.   Dexon denies the allegations of paragraph 84 of the Complaint.

85.   Dexon denies the allegations of paragraph 85 of the Complaint.

### FOURTH PURPORTED CLAIM FOR RELIEF
**California Unfair Business Practices**
**(Cal. Bus. & Prof. Code *§§ 17200 et seq.*)**

86.   Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-85 in response to the allegations in paragraph 86 of the Complaint.

87.   The allegations in paragraph 87 of the Complaint are legal conclusions of law regarding California Business and Professions Code §§ 17200 et seq to which no response is required.  To the extent such allegations imply or suggest Dexon has in any way violated California Business and Professions Code §§ 17200 et seq Dexon denies such allegations.

88.   Dexon denies the allegations of paragraph 88 of the Complaint.

89.   Dexon denies the allegations of paragraph 89 of the Complaint.

90.   Dexon denies the allegations of paragraph 90 of the Complaint.

91.   Dexon denies the allegations of paragraph 91 of the Complaint.

92.   Dexon denies the allegations of paragraph 92 of the Complaint.

## FIFTH PURPORTED CLAIM FOR RELIEF
### Unjust Enrichment
### (Common Law)

93.    Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-92 in response to the allegations in paragraph 93 of the Complaint.

94.    Dexon admits the allegations of paragraph 94 of the Complaint.

95.    Dexon denies the allegations of paragraph 95 of the Complaint.

## AFFIRMATIVE DEFENSES

Without admitting any wrongful conduct on the part of Dexon, and without admitting that Plaintiffs claims have any merit or that Plaintiffs have suffered any loss, damage, or injury, Dexon alleges the following affirmative defenses to the Complaint.  By designating the following as affirmative defenses, Dexon does not in any way waive or limit any defenses which are or may be raised by their denial, allegations, and averments set forth herein.  These defenses are pled in the alternative, are raised to preserve the rights of Dexon to assert such defenses, and are without prejudice to Dexon's ability to raise other and further defenses.  Dexon expressly reserves all rights to reevaluate their defenses and/or assert additional defenses upon discovery and review of additional documents and information, upon the development of other pertinent facts, and during pretrial proceedings in this action.  Dexon expressly incorporate all allegations of its Answer, Counterclaims and Cross-Claims as if fully set forth in each of the following affirmative defenses.

## FIRST AFFIRMATIVE DEFENSE
### (Res Judicata and Collateral Estoppel)

96.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SECOND AFFIRMATIVE DEFENSE
### (Laches)

97.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of laches.  Plaintiffs' have had longstanding knowledge concerning the legal open or "secondary" market for its products and have proactively engaged in unfair and tortious behavior in an effort to selectively manipulate and control such secondary market to their advantage.  Plaintiffs have had longstanding specific knowledge of Dexon's activity in the legal secondary market since well before 2011, yet have failed to take timely action to assert their claims herein, resulting in substantial prejudice to Defendants.

## THIRD AFFIRMATIVE DEFENSE
### (Estoppel)

98.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of estoppel.  Plaintiffs' advertises that consumers can purchase their products from their "Authorized Channel Partners" or "Authorized Resellers."  Plaintiffs have known, or should have known such "Authorized Channel Partners" and/or "Authorized Resellers" participate in and sell their products on the secondary market.  Plaintiffs have allowed these "Authorized Channel Partners" and/or "Authorized Resellers" to maintain their "authorized" status despite knowledge of their participation in the secondary market, including evidence of their sale of counterfeit Cisco products.  Plaintiffs know, or should have reasonably known, that secondary market resellers such as Dexon rely upon Plaintiffs' endorsement of such "authorized" vendors when sourcing Cisco products, including, without limitation, procuring Cisco product from such "authorized vendors'" end customers.  Plaintiffs have also actively contributed to the presence of counterfeit product in the marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers.  As one example, Plaintiffs "authorized" vendors intentionally modify or change product serial numbers in order to ensure the subject product(s) qualify for Plaintiffs' SmartNet service

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

packages. Plaintiffs are therefore estopped from pursuing claims against Dexon or seeking damages related to alleged counterfeit products.

### FOURTH AFFIRMATIVE DEFENSE
**(First Sale Doctrine and Exhaustion)**

99.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the first sale doctrine, which protects secondary market resellers such as Dexon from liability for the purchase, importation, and resale of genuine Cisco products and exhausts Plaintiffs' rights in further transactions.

### FIFTH AFFIRMATIVE DEFENSE
**(Statutes of Limitations)**

100.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by applicable statutes of limitations, including but not limited to CAL. CIV. PROC. CODE §§ 337–38, CAL. BUS. & PROF. CODE § 17208, and 17 U.S.C. § 507.  Some or all of Plaintiffs' claims involve conduct outside of the applicable statutes of limitations.

### SIXTH AFFIRMATIVE DEFENSE
**(Waiver)**

101.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of waiver. Plaintiffs have promoted and advertised its "authorized" sellers despite having full knowledge certain such "authorized" sellers: i) have been caught selling counterfeit product; and ii) actively and regularly deal with secondary market resellers such as Dexon. Secondary market resellers such as Dexon have understandably relied upon Plaintiffs' promotion and endorsement of such "authorized" sellers when sourcing Cisco products for their customers.  Plaintiffs have also intentionally failed or refused to provide or offer their claimed "tools" for detecting counterfeit product to secondary market resellers such as Dexon, and have actively contributed to the presence of counterfeit product in the

marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers. Plaintiffs have also had longstanding specific knowledge of Dexon's activity in the legal secondary market since well before 2011, yet have failed to take timely action to assert their claims herein. Accordingly, Plaintiffs have waived any claims related to Dexon's unwitting sale of alleged counterfeit goods, including any such goods sourced directly or indirectly from Plaintiffs' "authorized" vendors.

### SEVENTH AFFIRMATIVE DEFENSE
**(Unjust Enrichment)**

102.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of unjust enrichment. Plaintiffs have engaged in unfair and tortious practices and made misrepresentations to consumers regarding: i) the quality and authenticity of products sold by secondary market resellers such as Dexon; and ii) Plaintiffs' rights to restrict consumers use and transfer of Cisco hardware and software. Such conduct has improperly steered customers from Dexon to Plaintiffs and unjustly enriched Plaintiffs.

### EIGHTH AFFIRMATIVE DEFENSE
**(Unclean Hands/Inequitable Conduct)**

103.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of unclean hands, inequitable conduct, and similar defenses. Without limitation, Plaintiffs have: (i) intentionally misled consumers into thinking that genuine products on the secondary market are used, counterfeit, or stolen, (ii) sold products to resellers whom it knew, or should have known, were reselling the products on the secondary market, (iii) held out certain entities as "Authorized Resellers" even though Plaintiffs knew or should have known these entities sold counterfeit goods, and engaged in other inequitable practices that bar recovery on its claims.

### NINTH AFFIRMATIVE DEFENSE
### (Redundancy)

104.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because they are redundant and/or duplicative of one another.

### TENTH AFFIRMATIVE DEFENSE
### (Abandonment)

105.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by abandonment of any marks at issue. Plaintiffs' have failed to properly police and exercise adequate quality control over its marks and have thereby abandoned their rights therein.

### ELEVENTH AFFIRMATIVE DEFENSE
### (Conduct of Others)

106.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because the conduct complained of is the conduct of others, including, without limitation, Plaintiffs' "authorized" vendors and/or Plaintiffs' licensed manufacturers.

### TWELVE AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

107.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because Plaintiffs failed to mitigate, minimize, or attempt to avoid damages.  Without limitation, Plaintiffs could have pursued legal remedies earlier, assisted secondary market resellers like Dexon in detecting and fighting counterfeit products, and/or properly policed and prevented the manufacture and distribution of counterfeit product within their own manufacturing and distribution network.

### THIRTEENTH AFFIRMATIVE DEFENSIVE
### (Lack of Personal Jurisdiction)

108.     Plaintiffs are barred from pursuing their claims against Dexon in this Court because the Court lacks personal jurisdiction over Dexon.

### FOURTEENTH AFFIRMATIVE DEFENSIVE
### (Improper Venue)

109.     Plaintiffs are barred from pursuing their claims against Dexon in this Court because venue is improper.

### FIFTEENTH AFFIRMATIVE DEFENSIVE
### (Failure to State a Claim)

110.     The Complaint, in whole or in part, fails to state any claim upon which relief can be granted.

### SIXTEENTH AFFIRMATIVE DEFENSIVE
### (One Satisfaction Rule / Bar on Double Recovery)

111.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the one satisfaction rule and/or the bar on double recoveries.

### COUNTERCLAIMS

112.     Counterclaim Plaintiff Dexon Computer, Inc. asserts the following counterclaims against Counterclaim Defendants Cisco Systems, Inc., and Cisco Technology, Inc. (hereinafter referred to jointly as "Cisco") alleges as follows:

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**THE PARTIES**

113.    Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

114.    On information and belief, Plaintiff and Counterclaim Defendant Cisco Systems, Inc. ("CSI") is a Delaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

115.    On information and belief, Plaintiff and Counterclaim Defendant Cisco Technology, Inc. ("CTI") is a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

**JURISDICTION**

116.    This Court has subject matter jurisdiction over Dexon's counterclaims pursuant to 28 U.S.C. §§ 1367 and 1332.  Dexon's counterclaims arise out of the same controversy as plaintiffs' Federal claims, there is complete diversity of citizenship between Plaintiffs and Dexon, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

**FACTS**

**The Secondary Market for Cisco Products**

117.    As with any economic activity where there are significant profits, market forces have operated to create a "secondary" market for Cisco products.  On information and belief, authentic or genuine Cisco products come to the secondary market in the United States in a variety of ways including: (a) Cisco's knowing sale of such products to secondary market suppliers in the context of either specific end user deals or when Cisco needs to move inventory; (b) Cisco's authorized resellers' purchase of product in excess of what they need for a specific end user order and subsequent resale of such product into the secondary market; (c) Cisco end user's resale of new, unused product; and (d) through

1    importation of such product from abroad where it has been sold by distributors, resellers,

2    or end users under similar circumstances.  On information and belief, Cisco resists attempts

3    by end users and resellers to return product, resulting in a natural supply of secondary

4    market Cisco product.

5        118.   Given the substantial profits available from sale of Cisco-branded products,

6    market forces dictate that a secondary market will develop for such products.  These market

7    forces benefit end users in that they reduce prices for such products.

8        119.   Dexon is an independent secondary-market reseller of computer networking

9    products, including routers, Ethernet switches and other computer hardware.  Dexon

10   provides new, refurbished and discontinued hardware products, including authentic or

11   genuine products to its customers from leading manufacturers including, without limitation,

12   Hewlett Packard, Dell, Juniper Networks and Cisco.

13       120.   Dexon obtains Cisco products from reliable suppliers, subjects such products

14   to extensive quality control, and then resells such products to other resellers and to end

15   users, at a profit but frequently at prices lower than those offered by Cisco "Authorized"

16   sellers.

17       121.   Secondary market resellers of Cisco products, including Dexon, are highly

18   incentivized to detect and stamp out the sale of counterfeit goods.  While a manufacturer

19   such as Cisco may blame rogue actors when a dissatisfied customer confronts it with a

20   counterfeit product, an independent reseller's own reputation suffers significantly when it

21   sells a customer a counterfeit goods.  Unsurprisingly, most independent resellers, including

22   Dexon, take proactive steps to detect and prevent the sale of counterfeit product.

23       122.   Cisco has created an "Authorized Channel Network" in which Cisco sells

24   products to entities it refers to as "Authorized Channel Partners" or "Authorized Resellers."

25   Within this "Authorized" network, Cisco exerts strict control over how, and at what prices,

26   its "Authorized" partners can buy and sell Cisco products.

27       123.   "Authorized Reseller" status is not foolproof protection against counterfeit

28   products.  Cisco's "Authorized" sellers are likewise victimized by the presence of

counterfeit product in the marketplace and have been discovered to be selling counterfeit Cisco product.

124.    While manufacturers like Cisco are permitted to control the initial sale of their products, they may not wield trademark or copyright protections to dictate the terms by which their products are resold by other parties.  The well-established "first sale doctrine" protects parties who engage in the subsequent resale of Cisco's products, even if those subsequent resales occur outside the "Authorized" channels. Cisco may not forbid the resale of its products outside the "Authorized" network.

### Cisco's Improper Intereference With Secondary Market: Original Transaction a "Sale" not a "License"

125.    Cisco products, like virtually all modern electronics, contain embedded software.  And just as a car, refrigerator, or cell phone will not function properly without internal software, Cisco's products - including the Cisco products resold by Dexon - cannot function without Cisco's embedded software.  Likewise, such embedded software is not intended to be removed and has no independent value to the end consumer separate and apart from the Cisco product with which it is compatible.

126.    Cisco uses the fact that its products have embedded software as an attempted end-around the first sale doctrine.  It does so by falsely claiming the embedded software is governed by an "End User License Agreement" ("EULA") which restricts subsequent transfer and use of any Cisco product containing such embedded software.

127.    Cisco's false claims concerning purported contractual restrictions on the transfer and use of such embedded software are not merely off the cuff "opinion" statements by lower level Cisco employees or representatives.  Rather, Cisco has employed an intentional, coordinated, formalized and ongoing effort to utilize such false claims to deter consumers from purchasing Cisco products on the secondary market (including from resellers like Dexon).

128.   For example, Cisco's official "relicensing" website found at https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html provides as follows:

| Policies | Using the Program | Product List | Frequently Asked Questions |

Software

Cisco software—whether it is embedded operating system software or standalone application software—is not transferable unless specifically allowed under the Cisco Software License Transfer and Re-Use Policy. You must have Cisco's written consent and pay a license fee. After a transfer, the previous owner's license to the software is terminated, and the transferee's use of the software is governed by the Cisco End User License Agreement and in accordance with the original license entitlement.

129.   The same Cisco "relicensing" website advises consumers that the purported embedded software licenses are not transferrable and that any Cisco product purchased on the secondary market must be relicensed.   The website provides at https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html#q2:

Q: Is a Cisco software license transferable?

A: No, unless it is specifically allowed under the Cisco Software License Transfer and Re-Use Policy. Cisco software licenses are not transferable from user to user unless otherwise stated by Cisco or required by applicable law. Any purchaser of used or secondary-market Cisco equipment is required to relicense the software. For further details read the End User License Agreement.

130.   Cisco's "FAQ" for "Third Party Maintenance Services and purchase of Cisco Products outside the Authorized Channel" found online expressly states that product purchased on the secondary market from a non 'Cisco Channel Partner' does not come with a valid software license:

**Q. If I buy Cisco product from a company who is not a Cisco Channel Partner, willl I have a valid software license?**

**A.** No, unless the Cisco product successfully passes an inspection and any applicable relicensing fees are paid or it meets an exception contained in Cisco's Software License Transfer and Re-Use Policy.

131.   Cisco also sends vetted and approved form letters from its "Brand Protection Team" to secondary market customers stating that only the "initial purchasers" of Cisco product are entitled to the benefits of the purported EULA.   Such letters are intended to scare consumers into believing that products purchased on the secondary may not work or

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1   that they are not authorized to utilize the embedded software contained in Cisco products

2   purchased from secondary market sellers like Dexon.

3        132.    Specifically, Cisco's "Brand Protection Team" form letters define any Cisco

4   product purchased from secondary market resellers such as Dexon as "unauthorized."  Such

5   form letters then falsely claim that "any" such "unauthorized product does not have a valid

6   software license."

7        133.    For example, a March 14, 2019, Cisco Brand Protection Team form letter to

8   Dexon customer Lockridge Grindal Nauen stated in relevant part:

Please be informed Dexon is NOT a member of the Cisco Authorized Reseller Program.
Regardless of what Dexon claims, and regardless of whether its Cisco product is used or is in new
sealed boxes, ANY Cisco product it supplies is considered unauthorized.

1.    Unauthorized product is not eligible for any Cisco OEM warranty
2.    Unauthorized product is not automatically eligible for SMARTnet
3.    Unauthorized product does not have a valid software license.

For a detailed list of authorized Cisco Channel Partners, please refer
to http://www.cisco.com/go/partnerlocator.

The following policy statement applies, whether the product is used or is in new, unopened and
sealed boxes.

When products are not sold through Cisco's authorized sales channels, Cisco can offer no
assurance as to the provenance, quality, or authenticity of those products.  Additionally, when
resellers resell Cisco products that have been sourced from outside of Cisco's authorized sales

channels, those products do not come with a valid software license or hardware warranty and are
not automatically eligible for a Cisco service support contract (such as SMARTnet maintenance).

An overview of Cisco's policy on this subject is as follows:

Licensing.  When Cisco sells its products, software licenses (such as for Cisco IOS) are
granted to the initial purchasers of those products.  Cisco's policy is that software may
not be transferred to any other purchaser of the product unless specifically authorized by
Cisco.  To the extent that Cisco believes a customer is not an initial purchaser—or if a
customer expresses concern that it is not an initial purchaser—such issues will be
promptly addressed and Cisco is committed to resolving all licensing issues that arise. In
full, this policy is set forth on Cisco's
website: http://www.cisco.com/en/US/prod/cisco_software_transfer_relicensing_policy.
html.

26       134.    Contrary to Cisco's representations, no valid or enforceable license exists

27   covering the embedded software.  Rather, the facts and circumstances surrounding the

28   original transactions confirm a *sale* of such products, including the embedded software,

1  rather than the creation of any alleged or purported license governing the embedded

2  software.

3  **The Purchasing Process**

4  135.   Cisco sells new, unopened product to its authorized resellers. Upon

5  information and belief, these sales come in substantial quantities, sometimes in the

6  thousands of individual products.

7  136.   Upon information and belief, Cisco's authorized resellers accept the risk that

8  the brand-new Cisco products, including the embedded software, may be damaged or lost.

9  Cisco makes it extremely difficult for its authorized resellers to return any products.

10  137.   Cisco's authorized resellers offer the Cisco products for sale to consumers.

11  Such authorized resellers make it extremely difficult to for consumers to return any

12  products.

13  138.   As shown and explained below, the original consumer transaction involving

14  the Cisco products is a "sale" of both the hardware and any associated embedded software.

15  There is no creation of a license covering the embedded software. Rather, Cisco's

16  authorized resellers state that Cisco switches come with a "Cisco limited lifetime warranty"

17  without mention that the warranty is subject to any restrictions or that the product comes

18  embedded with software subject to a license. CDW and other authorized resellers offer

19  additional "[e]nhance[ments]" for the hardware, like Cisco SmartNet extended service

20  agreements.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

139.   Cisco's authorized reseller's do not provide original purchasers any notice prior to purchase that there is embedded software in the product or that such embedded software is governed by a license restricting the original purchaser's ability to transfer or sell the subject product.

140.   Attached as Exhibit A  is a true and correct copy of an October 15, 2020 invoice from Cisco authorized reseller CDW Direct for a Cisco Catalyst 9200L switch costing $856.47.  The invoice provides a single, flat price for the switch.  The invoice does not provide a separate itemized price for the switch's embedded software.  In fact, the invoice contains absolutely no mention of a separate or independent license agreement governing the switch's embedded software.

141.   The sole reference to "software" is buried in the small print of the attempted "Terms and Conditions" located on the back side of the CDW invoice.

142.   The attempted "Terms and Conditions" include a "Title; Risk of Loss" section which begins by placing the risk of loss or damage during shipment on the purchaser.  It then adds, in small lowercase print, that "title to software will remain with the applicable licensor(s), and Customers rights therein are contained in the license agreement between such licensor(s) and Customer."   Such notice contains no reference to "embedded software."

143.   Cisco does offer several stand alone and independent traditional software licenses, including, without limitation, licenses governing its Digital Network Architecture ("DNA") network management services.  Cisco's authorized resellers provide separate invoices or line items covering such traditional software licenses.  Accordingly, to the extent original purchasers actually read the small print "Terms and Conditions," such purchasers would have no way of knowing the referenced "software" applied to embedded software as opposed to traditional stand-alone software sold and priced separately.

144.   In addition to failing to properly notify original purchasers prior to their purchase that their ability to subsequently transfer or sell the expensive Cisco products is

restricted by a purported EULA governing the hardware's embedded software, at no time does Cisco or its Authorized Resellers obtain the purchasers assent to any purported EULA.

145.   At no time has Cisco or its Authorized Resellers placed a notice or warning of a purported EULA on the exterior packaging of any of its hardware.  Moreover, such packaging contains no notice or warning advising purchasers that by opening such packaging they would be assenting or agreeing to Cisco's alleged EULA governing the embedded software.  Below are representative photographs of the exterior packaging for a Cisco WS-C2960L switch:





DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

146.   Rather than properly notifying original purchasers of the purported EULA governing the embedded software and obtaining their affirmative assent, Cisco has included various attempted notices on the *inside* of the product packaging. Such notices are accessible only *after* the products have been purchased and opened.

147.   Resellers such as Dexon sell a large volume of new, in the box, never opened Cisco products, meaning at no point were such attempted "notices" ever accessed or viewed by the original purchaser.

148.   Dexon sells such brand-new, in the box, never opened Cisco product to end users like schools, hospitals, and businesses. The individuals opening or accessing such Cisco products are often lower-level information technology personnel charged with installing such equipment.  In addition to generally being required to install such equipment in short time frames with little or no opportunity for locating, reviewing and studying any purported EULA governing the embedded software, such IT professionals often have no control over or involvement with purchasing or return decisions.

149.   The attempted notices Cisco has included inside the product packaging have varied through the years.  For example, an unopened package for a Cisco WS-C2960L switch originally sold on or about 2009 included a separate plastic bag of accessories inside the product packaging.  The plastic bag bears a green sticker providing, "Please read the license terms regarding the use of the product included inside this box.  By using the product, you agree to be bound by these license terms.  If you do not agree with these terms, promptly return the unused product, manual, related equipment and hardware (with proof of payment) to the place of purchase for a full refund":

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1
2
3
4
5
6
7
8
9
10
11



12   150.   The referenced licensed terms supposedly to be found "inside this box" are

13   in fact buried in and difficult to access within a "Getting Started Guide" CD included in the

14   plastic bag:

15
16
17
18
19
20
21
22
23
24
25
26
27



28



151.   The "Getting Started Guide" CD is not required to be utilized or accessed by the IT professional as part of the install process. Rather, as the name implies, it is in fact a "Getting Started Guide" containing instructions. The CD does not contain any software required to be loaded or accessed as part of the installation process and would have been routinely ignored as unnecessary or superfluous by experienced IT professionals.

152.   At some unknown time, Cisco stopped including the green sticker or the "Getting Started Guide" CD.  In fact, Cisco stopped providing or including *any* copy of the purported EULA governing the embedded software with its products.

153.   Rather, Cisco began including a small single page notice directing the user to various websites.  Such "product information" notice contains no warning that use of the product constitutes acceptance of Cisco's purported EULA governing the embedded software or that the consumer's subsequent use of the product will be restricted.  Rather, the notice requires the individual who opened the package, often a lower level IT professional having no responsibility for purchasing or return decisions, to go to a separate URL or website:

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1
2
3
4
5
6
7
8
9
10
11
12
13



14   154.   Subsequent to the introduction of its DNA network management services,

15   Cisco also began including separate notices governing independent and separate licenses

16   for such network management services.

17   155.   In addition to failing to provide any proper notice of a purported EULA

18   governing the embedded software, at no point has Cisco required or obtained any

19   affirmative assent to such purported EULA by the original purchaser.   For example, an

20   original purchaser who actually goes to the referenced website is not required to

21   affirmatively accept the purported EULA governing the embedded software via a "click

22   through" process or otherwise.

23   156.   Moreover, no such affirmative assent to the purported EULA governing the

24   embedded software is required for the original purchaser to actually use the subject Cisco

25   products.   Without limitation, at no point during the "boot up" process is an end user advised

26   of any purported EULA governing the embedded software or asked to provide affirmative

27   assent to any such purported EULA via a "click through" process or otherwise.   Upon

28   information and belief, downstream purchasers and end users first become aware of Cisco's

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

1  contention their use and transfer of the product is restricted by a purported EULA governing
2  the embedded software via communications from Cisco's Brand Protection Team *years*
3  *after* the original purchase.

4      157.   In light of the absence of any evidence of a valid or enforceable EULA
5  governing the embedded software, the original transaction involving the subject Cisco
6  products constitutes a "sale" of both the hardware and associated embedded software.  As
7  a result, Cisco's form communications and representations that secondary market
8  purchasers' ability to use and transfer Cisco products are false and misleading and violate
9  the first sale doctrine codified at 17 U.S.C. § 109. Cisco does not offer or enter into a license
10 for the subject embedded software and does not control the use of such embedded software.

11     158.   Consumers who purchase Cisco products on the secondary market may use
12 the embedded software included therewith because the title of the product and embedded
13 software is transferred to them.  They may also transfer the Cisco products, including the
14 embedded software, freely.  They also accept all risk that the product with embedded
15 software may be lost or damaged.

16     159.   When consumers receive the Cisco Brand Protection Team communications,
17 they falsely believe that they cannot use the product or that the product will not work. There
18 is no license covering the embedded software; rather, any "licenses" apply to add-on
19 "enhanced" software features like DNA. Because there is no license that covers the
20 embedded software, and no assent to any such purported license, Cisco's statements the
21 embedded software is governed by a purported license which restricts the use and
22 disposition of the Cisco product is false. Downstream consumers can use the embedded
23 software without ever buying a separate or independent license from Cisco.

24     160.   When Dexon's customers receive the Brand Protection Team letter, they
25 falsely believe they cannot use the product or that the product will not work because they
26 believe, falsely, that they have to purchase a separate license. They don't.

27     161.   Cisco's past and ongoing misrepresentations regarding the applicability of a
28 purported EULA governing the embedded software and secondary market purchasers'

1  rights to buy, use and transfer secondary-market Cisco products deters consumers from
2  purchasing Cisco products on the secondary market.  Dexon has lost and will continue to
3  lose sales of products that would have been made but for Cisco's false representations to
4  consumers regarding the applicability of a purported EULA and the consumers' ownership
5  rights for Cisco hardware and associated embedded software purchased on the secondary
6  market.  These false representations have unjustly enriched Cisco at Dexon's expense.

7  **Cisco's Tortious Interference with Dexon's Business**

8      162.   Because Cisco regards secondary market resellers like Dexon as a threat to
9  its excess profits, Cisco spends substantial money and effort to attack secondary market
10  participants such as Dexon and to chill reseller and end user participation in the secondary
11  market.  These steps include but are not limited to employing a team of "Brand Protection"
12  employees whose primary responsibility is to intervene with resellers and end users in cases
13  where they are either contemplating the purchase of product, or have ordered product, from
14  the secondary market.

15      163.   Cisco Brand Protection personnel use a variety of tools to disrupt secondary
16  market sales, including, without limitation, falsely advising Dexon's actual and prospective
17  customers that: i) Dexon does not sell new but rather "used" or "refurbished" Cisco product;
18  ii) Dexon's products are "counterfeit" solely because they were sold on the secondary
19  market despite the fact such products are in fact genuine; iii) Dexon products violate a
20  purported EULA despite the absence of any proper notice of or assent to the purported
21  EULA; and iv) Dexon products violate the purported EULA even though the purported
22  EULA does not even apply to the applicable product.

23      164.   Cisco has engaged in a pattern and practice of this tortious conduct with the
24  intent to disrupt contracts between Dexon and its customers, pending opportunities with
25  such customers, future business with such customers, and even with the apparent goal of
26  driving Dexon out of business altogether.

27
28

1

**Fort Bend Independent School District**

2      165.   Dexon entered into a contract with Fort Bend Independent School District

3  ("FBISD") for the sale and purchase of over $1,300,000.00 in brand new Cisco equipment.

4  On or about June 24, 2019, Cisco representative Dan Roberts falsely advised and

5  represented to FBISD representative Cecile Thompson that the equipment FBISD was

6  purchasing from Dexon could not be new but rather had to "refurbished."

7      166.   On or about July 9, 2019, Sean O'Brien, a member of Cisco's Brand

8  Protection Team, sent a letter to FBISD falsely claiming and representing that products sold

9  by Dexon do not come with a "valid software license."  Such letter stated: "According to

10  Cisco Systems' records (www.cisco.com/go/eula), the Cisco goods listed in Exhibit A are

11  not recorded as being sold to Fort Bend Independent School District through one of Cisco's

12  authorized resellers.  It appears you may have purchased the Cisco goods from a company

13  name Dexon Computer.  Unfortunately, Dexon Computer is not a member of the Cisco

14  authorized reseller program.  As such, Cisco recommends that you return these goods for a

15  refund, along with any other Cisco products received by the vendor, and replace the items

16  with authorized Cisco products sold via an authorized reseller."

17      167.   Such letter further warned Dexon's customer that such products "may not

18  come with a valid software license" and that "Customers purchasing most Cisco goods

19  outside of Cisco's authorized sales channels *would not automatically have a license to use*

20  *the software*."  (italics added.)

21      168.   As a direct and proximate result of such communications, FBISD falsely

22  believed the Dexon products may not be new and that it would not be able to use such

23  products due to the absence of a "valid software license." As a direct and proximate result

24  of Cisco's false and misleading representations, FBISD cancelled its $1.3 million contract

25  with Dexon, and Dexon has received no further business opportunities from FBISD.

26      169.   Cisco's representations to FBISD are especially egregious considering the

27  contracted for products were Cisco phones rather than networking equipment containing

28  embedded software which Cisco contends is governed by a purported EULA.  Upon

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

1    information and belief, unlike Cisco's subject networking equipment, Cisco's phones

2    utilize "open source" software.   The phones do require a completely separate and

3    independent Cisco service and license to operate (Cisco Unified Communications Manager

4    which is commonly known as "CallManager"). Thus, Cisco's statement that such products

5    would lack a "valid software license" were false and misleading.

6        **Lockridge Grindal and Nauen**

7        170.    Without limitation, on or about March 14, 2019, Tim Casto, a member of

8    Cisco's Brand Protection Team, sent a letter to Dexon customer Lockridge Grindal and

9    Nauen ("Lockridge").   Such letter falsely advised Dexon customer Lockridge that "six

10   switches" purchased from Dexon were "counterfeit."  On information and belief, only four

11   (4) of the six (6) switches are currently alleged to be counterfeit by Cisco.

12       171.    The March 14, 2019 letter warned that "Dexon is NOT a member of the Cisco

13   Authorized Reseller Program" and that "[r]egardless of what Dexon claims, and regardless

14   of whether its Cisco product is used or is in new sealed boxes, ANY Cisco product it

15   supplies is consider unauthorized."   Such letter falsely represented that absolutely no

16   product obtained from Dexon comes with a "valid software license."

17       172.    As a direct and proximate result of the March 14, 2019 correspondence, as

18   well as other similar communications from and representations by Cisco's Brand Protection

19   Team, Lockridge falsely believed all six (6) switches it purchased from Dexon were

20   counterfeit, that the switches would not work, and that it would not have the required

21   licenses necessary to use Cisco product purchased from Dexon. Citing the Brand Protection

22   Team correspondence, Lockridge demanded a refund of all amounts paid to Dexon.  Dexon

23   lost all future business opportunities from Lockridge.

24       **Accuray, Inc.**

25       173.    Without limitation, on or about , January 27, 2020, Tim Casto, a member of

26   Cisco's Brand Protection Team, sent an email to Dexon customer Accuray Inc.

27   ("Accuray").  Such email acknowledged that products purchased by Accuray from Dexon

28   had been determined to be authentic or "genuine."  However, the email falsely stated that

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

1   because such genuine products were purchased on the secondary market, they "did not have

2   a valid software license." The email stated in relevant part, "Cisco reviewed the console

3   readout and determined that the items are genuine. . .The below items, however, show as

4   sold to end users other than Accuray. This means that the below products do not have a

5   valid software license. . ."

6       174. As a direct and proximate result of the January 27, 2020 correspondence, as

7   well as other similar communications from and representations by Cisco's Brand Protection

8   Team, Accuray falsely believed that the product would not work and that it did not have

9   the required licenses necessary to use the Cisco products purchased from Dexon. As a

10  result, Accuray demanded a refund of all amounts paid to Dexon. Dexon lost all future

11  business opportunities from Accuray.

12      **Meadowridge Networks, Inc.**

13      175. Without limitation, on or about July 12, 2021, Shuting Li, on information and

14  belief a member of Cisco's Brand Protection Team, sent an email to Dexon customer

15  Meadowridge Networks, Inc. ("Meadowridge"). Such letter falsely implied product

16  purchased from Dexon was not new or not genuine. The email stated, "Serial number is

17  verified to be an unauthorized unit. . .because this unit is now in possession of end customer

18  which is different from the reported end customer. So it is an overseas diversion unit."

19      176. As a direct and proximate result of the July 12, 2021 email, as well as other

20  similar communications from and representations by Cisco, Meadowridge understandably

21  understood Cisco to be claiming the products purchased from Dexon to be "used" and/or

22  counterfeit. In a responsive email, Meadowridge explained, "I am the first end-user to open

23  the box. . .This came to me in an unopened Cisco box and was not a 'used' unit in any sense

24  of the word. . .I had every reason to think that this was a legitimate unit and no reason to

25  believe that it wasn't."

26      177. Rather than clarify Meadowridge's interpretation and misunderstanding of its

27  prior communications, Cisco responded by directing Meadowridge to a domain or website

28  containing a  false and misleading definition of "used." Namely, such definition defined

"used" as all Cisco products purchased on the secondary market. (See www.cisco.com/go/relicensing which misleadingly defines "used" products as "previously owned equipment that is now owned by a party other than the original customer" including both "opened and unopened equipment."

178.   As a direct and proximate result of the Cisco Brand Protection Team communications, Meadowridge falsely believed that its use of Cisco products purchased from Dexon would be impaired or restricted and that the product would not work.  As a direct and proximate result, Meadowridge demanded a refund and was also provided a replacement or substitute product at a reduced priced.  Dexon has lost future business opportunities from Meadowridge.

179.   The foregoing false and misleading representations of fact were designed to mislead consumers, and have in fact misled consumers, at the expense of Dexon, causing direct and substantial loss and damage to Dexon.

180.   Cisco's false and misleading misrepresentations have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

181.   As a direct result of Cisco's tortious interference, Dexon has suffered significant damages, including the cancellation of numerous pending orders, loss of opportunity to bid on projects, and the loss of entire relationships with many of its top customers.

**Count I**
**Declaratory Judgment**
**(28 U.S.C. §§ 2201-2202)**

182.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

183.   Dexon seeks a declaration of its rights, pursuant to 28 U.S.C. §§ 2201 & 2202, that the original transactions involving the subject Cisco products is a "sale" of both the hardware and any associated embedded software and that there exists no valid or

1  enforceable license agreement governing the embedded software which prohibits the use or
2  transfer of such products by subsequent secondary market purchasers.

3      184.   Cisco has made, and continues to make false representations to actual or
4  potential secondary market purchasers, including Dexon's actual or potential customers,
5  that their ability to use and transfer any secondary market Cisco product is prohibited by a
6  purported EULA governing the product's embedded software.

7      185.   No such valid or enforceable EULA exists.

8      186.   Rather, the original transaction involving the subject Cisco products was a
9  "sale" of both the hardware and any included embedded software.

10     187.   Accordingly, Cisco's form communications and representations are and
11 continue to be false and have caused and will continue to cause significant harm and damage
12 to secondary market sellers, including Dexon.

13     188.   A real legal dispute and actual controversy presently exists between the
14 parties to this action which is concrete and justiciable in character, and as to which each
15 party possesses an interest in resolving.

16     189.   Dexon has sold and intends to continue selling genuine Cisco products,
17 including new, unopened, in the box Cisco products.

18     190.   Cisco has continued its longstanding practice of sending form
19 communications to Dexon's actual and prospective customers falsely advising such
20 customers that their use and transfer of any Cisco products purchased from Dexon is
21 prohibited by a purported but invalid and unenforceable EULA.

22     191.   Unless and until Cisco's form communications and representations are
23 deemed to be false and in violation of the first sale doctrine codified at 17 U.S.C. §109,
24 Dexon's ability to sell such products will be wrongfully and unnecessarily impaired and
25 Dexon will continue to be injured and damaged thereby. Accordingly, Dexon seeks
26 declaratory relief from this Court.

27     192.   The controversy between Dexon and Cisco warrants relief declaring the rights
28 of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that: i) original purchasers

of Cisco products obtained the products and any associated embedded software via a "sale"; ii) there is no valid or enforceable EULA governing the embedded software in Cisco products sold by Dexon on the secondary market; and iii) Dexon's customers' are free to use and transfer such products pursuant to the first sale doctrine codified at 17 U.S.C. §109.

## Count II
### Lanham Act False Advertising

193.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

194.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that it is unlawful for any person to use a "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."

195.    As set forth above, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding the software embedded in Cisco hardware sold on the secondary market.

196.    In addition, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding whether products in the secondary market are "used."

197.    Cisco knowingly tells end users that they cannot use the products with embedded software because they need to purchase a separate license.

198.    Cisco's statements to end users that the embedded software is subject to a software license like the EULA are false. End users cannot be bound by a contract that does not exist in the first place and are free to use and transfer the subject products pursuant to the first sale doctrine.

199.   The foregoing false and misleading representations of fact were designed to mislead consumers by making them falsely believe they could not use the product or that the product would not work, and have in fact misled consumers, at the expense of Dexon, causing direct and substantial loss and damage to Dexon.

200.   The foregoing false and misleading representations of fact are made willfully and entitle Dexon to recover the profits obtained by Cisco thereby, in addition to Dexon's own damages suffered as a result of Cisco's false and misleading representations of fact.

201.   Cisco's misrepresentations have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

202.   Dexon will continue to suffer irreparable harm to its goodwill if these actions continue and Dexon is entitled to injunctive relief to preclude such conduct.

## **Count III**
### **Intentional Interference with Contractual Relations**

203.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

204.   Dexon secured contracts with certain customers, including, without limitation, Fort Bend Independent School District, Lockridge, Meadowridge and Accuray for the sale of Cisco products on which Dexon would have earned significant profits.

205.   On information and belief, Cisco knew or should have known of these contractual relationships between Dexon and these third party customers.

206.   On information and belief, Cisco intentionally, or with reckless disregard for the truth, made false and misleading statements about Dexon and the products it sells to these customers in order to disrupt the contractual relationship and to cause these customers to purchase product from Cisco authorized resellers at a higher price.

207.   Cisco's statements in fact disrupted these contractual relationships between Dexon and its customers.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

208.    Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

209.    Cisco's actions have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

### Count IV
### Intentional Interference with Prospective Economic Advantage

210.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

211.    An economic relationship existed between Dexon and its actual and prospective customers, including, without limitation, Fort Bend Independent School District, Lockridge, Meadowridge, and Accuray, each of which contained the probability of substantial future economic benefits to Dexon.

212.    On information and belief, Cisco knew or should have known of these relationships.

213.    On information and belief, Cisco intentionally, or with reckless disregard, engaged in tortious conduct designed to disrupt Dexon's potential benefit from these relationships.

214.    Cisco's statements were made with the intent to disrupt the economic relationship between Dexon and its potential and actual customers in order to damage Dexon and or divert business to "Cisco Authorized Resellers" under Cisco's control.

215.    Cisco's knew such statements were false and misleading or had a disregard for whether such statements were true of false and misleading.

216.    As a result of the efforts detailed above, Dexon's relationships with its potential and actual customers have in fact been permanently disrupted and/or materially damaged in a significant number of instances, including its future relationships. As a result of Cisco's tortious efforts, Dexon's customers have refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from

1   contention for business, and have ceased doing business with Dexon on other products
2   and/or altogether.

3       217.   Dexon has suffered substantial economic damage as a result of this wrongful
4   conduct in an amount subject to proof at trial.

5       218.   Cisco's actions have caused, and unless enjoined by this Court, will continue
6   to cause irreparable injury to Dexon.

7

8   **Count V**
    **Trade Libel**
9

10      219.   Dexon repeats and realleges each of the allegations set forth in the preceding
11  paragraphs as if fully set forth herein.

12      220.   On information and belief, Dexon alleges that Cisco has repeatedly made
13  disparaging statements about Dexon's products as detailed herein, including, without
14  limitation, the statements and representations detailed above to Dexon customers Fort Bend
15  Independent School District, Lockridge, Meadowridge and Accuray.

16      221.   Cisco's statements disparaged Dexon's products.  On information and belief,
17  Dexon alleges that the claims made were false or materially misleading.

18      222.   Cisco intentionally made such statement knowing such statements were false
19  and misleading or having a complete disregard for whether such statements were true or
20  false and misleading.

21      223.   Dexon has suffered and will continue to suffer irreparable harm should
22  Cisco's trade libel be allowed to continue.

23      224.   As a proximate result of Cisco's statements, the identified actual customers
24  have been deterred from buying Dexon's products and from otherwise dealing with Dexon.
25  Specifically, such customers have refused to pay for certain Cisco goods, have returned
26  and/or cancelled orders for such goods, have removed Dexon's bids from contention for
27  business, and have ceased doing business with Dexon on other products altogether.

28

225.    Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

**Count VI**
**Trade Libel Per Se**

226.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

227.   As detailed herein, Cisco has repeatedly made disparaging statements about Dexon's products to Dexon customers Fort Bend Independent School District, Lockridge, Meadowridge and Accuray.

228.   Cisco's statements disparaged Dexon's products.

229.   Cisco intentionally made such statements knowing such statements were false and misleading or having a complete disregard for whether such statements were true or false and misleading.

230.   As a proximate result of Cisco's statements, the identified actual customers have been deterred from buying Dexon's products and from otherwise dealing with Dexon. Specifically, such customers have refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from contention for business, and have ceased doing business with Dexon on other products altogether.

231.    Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

232.    Such false and misleading statements by Cisco go to the integrity and character of Dexon's business practices, including, without limitation, implying that Dexon misleads its customers as to the nature or quality of its goods, including that Dexon sells "refurbished" products as "new,", and that Dexon misrepresents that its secondary market customers will be able to use and transfer Cisco products purchased from Dexon.   As a result, damage is presumed for such statements irrespective of any actual damages proven by Dexon at trial.

**THIRD PARTY CLAIMS**

233.    Third Party Plaintiff Dexon Computer, Inc. asserts the following claims against Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Unlimited Network Solutions and Wisecom Technologies alleges as follows:

**THE PARTIES**

234.    Third Party Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

235.    On information and belief, Third Party Defendant Atlantix Global Systems International, LLC is a Georgia limited liability corporation with its principal place of business in Georgia.

236.    On information and belief, Third Party Defendant Bizcom Electronics, Inc., is a California corporation with its principal place of business in California.

237.    On information and belief, Third Party Defendant Digi Devices Online is a foreign corporation with its principal U.S. place of business in Texas.

238.    On information and belief, Third Party Defendant Enterprise Business Technologies, Inc. is a New York corporation with its principal place of business in New York.

239.    On information and belief, Third Party Defendant Fiber Cable Connections is a Washington corporation with its principal place of business in Washington.

240.    On information and belief, Third Party Defendant MJSI is a California corporation with its principal place of business in California.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

241.   On information and belief, Third Party Defendant Multimode Technologies, LLC is a Minnesota limited liability company with its principal place of business in Minnesota.

242.   On information and belief, Third Party Defendant Optimum Data, Inc. is a Nebraska corporation with its principal place of business in Nebraska.

243.   On information and belief, Third Party Defendant Paragon is a Massachusetts corporation with its principal place of business in Massachusetts.

244.   On information and belief, Third Party Defendant Pure Future Technology, Inc. is a California corporation with its principal place of business in California.

245.   On information and belief, Third Party Defendant Seastar IT Trading LLC is a Washington limited liability company with its principal place of business in Washington.

246.   On information and belief, Third Party Defendant Server Tech Supply is a Virginia corporation with its principal place of business in Pennsylvania.

247.   On information and belief, Third Party Defendant Softnetworks, Inc. is a New Jersey limited liability company with its principal place of business in New Jersey.

248.   On information and belief, Third Party Defendant Strada Networks, LLC is a foreign limited liability company with its principal place of business in British Columbia, Canada.

249.   On information and belief, Third Party Defendant Teksavers is a Texas corporation with its principal place of business in Texas

250.   On information and belief, Third Party Defendant Unlimited Network Solutions is a corporation with its principal place of business in California.

251.   On information and belief, Wisecom Technologies is a corporation with its principal place of business in Maryland.

### Supply of Alleged Counterfeit and Infringing Product

252.   The Third Party Defendants are all reputable dealers and merchants with respect to the Cisco products alleged to be counterfeit and thereby infringing herein ("allegedly infringing Cisco product").

253.     Dexon obtained such allegedly infringing Cisco product from the Third Party Defendants. While Dexon denies Cisco's allegations and believes the subject products to be genuine, Dexon relied in good faith on the Third Party Defendants in procuring or obtaining such products.

254.     Without limitation, the Third Party Defendants warranted that such products sold to Dexon would be "delivered free of the rightful claim of any third person by way of infringement or the like." *See* U.C.C. §2-312(3).

## FIRST THIRD PARTY CLAIM
### (Indemnification - All Third Party Defendants)

255.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

256.     Dexon was named in this litigation as a direct result of product procured from and/or supplied by the Third Party Defendants.

257.     Third Party Defendants should be ordered to indemnify Dexon whether based on express agreement, implied agreement or common law.

## SECOND THIRD PARTY CLAIM
### (Contribution - All Third Party Defendants)

258.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

259.     Dexon was named in this litigation as a direct result of product procured from and supplied by the Third Party Defendants.

260.     Dexon is entitled to contribution from Third Party Defendants, whether based on express agreement, implied agreement or common law, to pay or defray any judgment entered against Dexon herein.

1

**PRAYER FOR RELIEF**

2   **WHEREFORE**, Defendant, Counterclaim Plaintiff and Third Party Plaintiff Dexon

3   Computer, Inc. prays for judgment and relief against Plaintiffs and Counterclaim

4   Defendants Cisco Systems, Inc. and Cisco Technology, Inc. ("Cisco") and Third Party

5   Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi

6   Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI,

7   Multimode Technologies, LLC, Optimum Data, Inc., Paragon, Pure Future Technology,

8   Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks,

9   LLC, Unlimited Network Solutions and Wisecom Technologies as follows:

10          a.      Dismissing Plaintiffs' Cisco Systems, Inc. and Cisco Technology, Inc.

11   claims with prejudice, together with costs and disbursements;

12          b.      Awarding Dexon actual damages, subject to proof at trial but in an

13   amount in excess of $75,000.;

14          c.      For equitable remedial efforts by Counterclaim Defendants sufficient

15   to rehabilitate Dexon's damaged reputation;

16          d.      Declaring that: i) original purchasers of Cisco products obtained the

17   products and any associated embedded software via a "sale"; ii) there is no valid or

18   enforceable EULA governing the embedded software in Cisco products sold by Dexon on

19   the secondary market; and iii) Dexon's customers' are free to use and transfer such products

20   pursuant to the first sale doctrine codified at 17 U.S.C. §109.

21          e.      For orders restraining or enjoining Cisco from engaging in similar

22   conduct in the future;

23          f.      Awarding Dexon its costs and expenses of litigation, including

24   reasonable attorneys' fees;

25          g.      An award in Dexon's favor against Third Party Defendants sufficient

26   to compensate Dexon for all economic loss, damages, attorney's fees and costs resulting

27   from the claims herein; and

28

1          h.      Such other and further relief as this Court deems just and equitable.

2

3    Dated:  April 6, 2022                    /s/ Amanda R. Washton

4                                             Amanda Washton
                                                a.washton@conklelaw.com
5                                             **CONKLE, KREMER & ENGEL, PLC**
                                              3130 Wilshire Boulevard, Suite 500
6                                             Santa Monica, CA 90403

7                                             Michael M. Lafeber
                                                mlafeber@taftlaw.com
8                                             O. Joseph Balthazor Jr.
                                                jbalthazor@taftlaw.com
9                                             **TAFT STETTINIUS & HOLLISTER LLP**
                                              2200 IDS Center
10                                            80 S. 8th Street
                                              Minneapolis, MN 55402
11
                                              Attorneys for Defendant, Counterclaim Plaintiff and
12                                            Third-Party Plaintiff Dexon Computer, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2

Dexon Computer, Inc. demands a trial by jury on all issues so triable.

3

4     Dated:  April 6, 2022

5                                              */s/ Amanda R. Washton*

Amanda R. Washton

6      *a.washton@conklelaw.com*
**CONKLE, KREMER & ENGEL, PLC**

7      3130 Wilshire Boulevard, Suite 500
Santa Monica, CA 90403

8
Michael M. Lafeber

9      *mlafeber@taftlaw.com*
O. Joseph Balthazor Jr.

10     *jbalthazor@taftlaw.com*
**TAFT STETTINIUS & HOLLISTER LLP**

11     2200 IDS Center
80 S. 8th Street

12     Minneapolis, MN 55402

13     Attorneys for Defendant, Counterclaim Plaintiff and
Third-Party Plaintiff Dexon Computer, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

0640.002\9965

-50-

Case No. 3:20-CV-4926-CRB

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

# EXHIBIT A



| REMIT PAYMENT TO: | | **INVOICE** | ACH INFORMATION: | E-mail Remittance To: achremittance@cdw.com |
|---|---|---|---|---|

**CDW Direct**
PO Box 75723
Chicago, IL 60675-5723

RETURN SERVICE REQUESTED

ACH INFORMATION:
THE NORTHERN TRUST
50 SOUTH LASALLE STREET
CHICAGO, IL  60675

E-mail Remittance To: achremittance@cdw.com
ROUTING NO.: 071000152
ACCOUNT NAME: CDW DIRECT
ACCOUNT NO.: 47910

| INVOICE NUMBER | INVOICE DATE | CUSTOMER NUMBER |
|---|---|---|
| 1416352 | 09/15/20 | 2988126 |
| SUBTOTAL | SHIPPING | SALES TAX |
| $856.47 | $0.00 | $0.00 |
| DUE DATE | AMOUNT DUE | |
| 10/15/20 | **$856.47** | |

DEXON COMPUTER INC
JODI NORGAARDEN
9201 E BLOOMINGTON FWY STE BB
MINNEAPOLIS MN 55420-3472
USA

CDW Direct
P.O. Box 75723
Chicago, IL  60675-5723

**PLEASE RETURN THIS PORTION WITH YOUR PAYMENT**

| INVOICE DATE | INVOICE NUMBER | | PAYMENT TERMS | | | | | DUE DATE |
|---|---|---|---|---|---|---|---|---|
| 09/15/20 | 1416352 | | Net 30 Days | | | | | 10/15/20 |
| ORDER DATE | SHIP VIA | | PURCHASE ORDER NUMBER | | | | | CUSTOMER NUMBER |
| 09/14/20 | Drop Ship -FedEx Ground, Cust Acct | | MM180132 | | | | | 2988126 |

| ITEM NUMBER | DESCRIPTION | QTY ORD | QTY SHIP | QTY B/O | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|---|
| 5396427 | CISCO CATALYST 9200L 24PORT POE+ 4X1<br>Manufacturer Part Number: C9200L-24P-4G-E<br>Serial No: SJAE24260GYG | 1 | 1 | 0 | 856.47 | 856.47 |

**GO GREEN!**
CDW is happy to announce that paperless billing is now available!  If you would like to start receiving your invoices as an emailed PDF, please email CDW at paperlessbilling@cdw.com.  Please include your Customer number or an Invoice number in your email for faster processing.

**REDUCE PROCESSING COSTS AND ELIMINATE THE HASSLE OF PAPER CHECKS!**
Begin transmitting your payments electronically via ACH using CDW's bank and remittance information located at the top of the attached payment coupon.  Email credit@cdw.com with any questions.

| ACCOUNT MANAGER | SHIPPING ADDRESS: | | |
|---|---|---|---|
| FRANK SZYMANSKI<br>480-270-7341<br>fransz@cdw.com | DEXON COMPUTER INC<br>MICHELLE MALASKA; PO#MM180132<br>9201 E BLOOMINGTON FWY STE BB<br>MINNEAPOLIS MN 55420-3472 | SUBTOTAL | $856.47 |
| | | SHIPPING | $0.00 |
| SALES ORDER NUMBER | | SALES TAX | $0.00 |
| LQLL115 | | AMOUNT DUE | $856.47 |



**HAVE QUESTIONS ABOUT YOUR ACCOUNT?**
PLEASE EMAIL US AT credit@cdw.com
VISIT US ON THE INTERNET AT www.cdw.com

ISO 9001 and ISO 14001 Certified
CDW DIRECT FEIN 36-4530079

Page 1 of 1

Exhibit A
Page 1 of 2

THE TERMS AND CONDITIONS ARE LIMITED TO THOSE CONTAINED HEREIN AND THE ADDITIONAL TERMS AND CONDITIONS CONTAINED IN THE "TERMS AND CONDITIONS" LINK AT WWW.CDW.COM INCORPORATED HEREIN BY REFERENCE. ANY TERMS NOT DEFINED HEREIN ARE DEFINED IN THE "TERMS AND CONDITIONS" LINK AT WWW.CDW.COM. ANY DIFFERENT TERMS OR CONDITIONS IN ANY FORM DELIVERED BY YOU ("CUSTOMER") ARE HEREBY DEEMED TO BE MATERIAL ALTERATIONS AND NOTICE OF OBJECTION TO THEM AND REJECTION OF THEM IS HEREBY GIVEN.

BY ACCEPTING DELIVERY OF THE PRODUCTS OR BY ENGAGING THE CDW AFFILIATE IDENTIFIED ON THE INVOICE, STATEMENT OF WORK OR OTHER CDW DOCUMENTATION ("SELLER") TO PROVIDE PRODUCT OR PERFORM OR PROCURE ANY SERVICES, CUSTOMER AGREES TO BE BOUND BY AND ACCEPTS THESE TERMS AND CONDITIONS UNLESS CUSTOMER AND SELLER HAVE SIGNED A SEPARATE AGREEMENT FOR THE PROVISION OF PRODUCT OR PERFORMANCE OF SERVICES, IN WHICH CASE THE SEPARATE AGREEMENT WILL GOVERN.

Important Information About These Terms and Conditions
These Terms and Conditions constitute a binding contract between Customer and Seller and are referred to herein as either "Terms and Conditions" or this "Agreement". Customer accepts these Terms and Conditions by making a purchase from or placing an order with Seller or shopping on Seller's Website (the "Site") or otherwise requesting products (the "Products") or engaging Seller to perform or procure any Services (as this and all capitalized terms are defined herein).

Customer may issue a purchase order for administrative purposes only. Additional or different terms and conditions contained in any such purchase order will be null and void. This Agreement including the terms contained in the "Terms and Conditions" link at www.cdw.com which Customer acknowledges and agrees are incorporated herein by reference contains the entire understanding of the parties with respect to the matters contained herein and supersedes and replaces in its entirety any and all prior communications and contemporaneous agreements and understandings, whether oral, written, electronic or implied, if any, between the parties with respect to the subject matter hereof.

Governing Law
THESE TERMS AND CONDITIONS, ANY STATEMENTS OF WORK, THE SERVICES HEREUNDER AND ANY SALE OF PRODUCTS HEREUNDER WILL BE GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO CONFLICTS OF LAWS RULES. ANY ARBITRATION, ENFORCEMENT OF AN ARBITRATION OR LITIGATION WILL BE BROUGHT EXCLUSIVELY IN COOK COUNTY, ILLINOIS, AND CUSTOMER CONSENTS TO THE JURISDICTION OF THE COURTS LOCATED THEREIN. CUSTOMER SUBMITS TO THE JURISDICTION THEREOF AND WAIVES THE RIGHT TO CHANGE VENUE. CUSTOMER FURTHER CONSENTS TO THE EXERCISE OF PERSONAL JURISDICTION BY ANY SUCH COURT WITH RESPECT TO ANY SUCH PROCEEDING. Except in the case of nonpayment, neither party may institute any action in any form arising out of these Terms and Conditions more than one (1) year after the cause of action has arisen. The rights and remedies provided Seller under these Terms and Conditions are cumulative, are in addition to, and do not limit or prejudice any other right or remedy available at law or in equity.

Title; Risk of Loss
If Customer provides Seller with Customer's carrier account number or selects a carrier other than a carrier that regularly ships for Seller, title to Products and risk of loss or damage during shipment pass from Seller to Customer upon delivery to the carrier (F.O.B. Origin, freight collect). For all other shipments, title to Products and risk of loss or damage during shipment pass from Seller to Customer upon delivery to the specified destination (F.O.B. Destination, freight prepaid and added). Notwithstanding the foregoing, title to software will remain with the applicable licensor(s), and Customer's rights therein are contained in the license agreement between such licensor(s) and Customer. A purchase money security interest is retained in the Products to secure payment in full. Customer authorizes Seller to file a financing statement reflecting such security interest and, if requested, Customer will record such purchase money security interest on its books.

Payment
Orders are not binding upon Seller until accepted by Seller. Customer agrees to pay the total purchase price for the Products plus shipping (to the extent shipping is not prepaid by Customer), including shipping charges that are billed to Seller as a result of using Customer's carrier account number. Terms of payment are within Seller's sole discretion. In connection with Services being performed pursuant to a Statement of Work, Customer will pay for the Services in the amounts and in accordance with any payment schedule set forth in the applicable Statement of Work. If no payment schedule is provided, Customer will pay for the Services as invoiced by Seller. Invoices are due and payable within the time period specified on the invoice, measured from the date of invoice, subject to continuing credit approval by Seller. Seller, or any of its Affiliates on behalf of Seller may issue an invoice to Customer. Seller may invoice Customer separately for partial shipments, and Seller may invoice Customer for all of the Services described in a Statement of Work or any portion thereof. Customer agrees to pay interest on all past-due sums at the lower of one and one-half percent (1.5%) per month or the highest rate allowed by law. In the event of a payment default, Customer will be responsible for all of Seller's costs of collection, including, but not limited to, court costs, filing fees and attorneys' fees. In addition, if payments are not received as described above, Seller reserves the right to suspend Services until payment is received.

Export Sales
If this transaction involves an export of items (including, but not limited to commodities, software or technology), subject to the Export Administration Regulations, such items were exported from the United States by Seller in accordance with the Export Administration Regulations. Diversion contrary to United States laws is prohibited.

Warranties
Customer understands that Seller is not the manufacturer of the Products purchased by Customer hereunder and the only warranties offered are those of the manufacturer, not Seller or its Affiliates. In purchasing the Products, Customer is relying on the manufacturer's specifications only and is not relying on any statements, specifications, photographs or other illustrations representing the Products that may be provided by Seller or its Affiliates. SELLER AND ITS AFFILIATES HEREBY EXPRESSLY DISCLAIM ALL WARRANTIES EITHER EXPRESS OR IMPLIED, RELATED TO PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF TITLE, ACCURACY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WARRANTY OF NONINFRINGEMENT, OR ANY WARRANTY RELATING TO THIRD PARTY SERVICES. THE DISCLAIMER CONTAINED IN THIS PARAGRAPH DOES NOT AFFECT THE TERMS OF ANY MANUFACTURER'S WARRANTY. Customer expressly waives any claim that it may have against Seller or its Affiliates based on any product liability or infringement or alleged infringement of any patent, copyright, trade secret or other intellectual property rights (each a "Claim") with respect to any Product and also waives any right to indemnification from Seller or its Affiliates against any such Claim made against Customer by a third party. Customer acknowledges that no employee of Seller or its Affiliates is authorized to make any representation or warranty on behalf of Seller or any of its Affiliates that is not in this Agreement.

Seller warrants that the Services will be performed in a good and workmanlike manner. Customer's sole and exclusive remedy and Seller's entire liability with respect to this warranty will be, at the sole option of Seller, to either (a) use its reasonable commercial efforts to reperform or cause to be reperformed any Services not in substantial compliance with this warranty or (b) refund amounts paid by Customer related to the portion of the Services not in substantial compliance; provided, in each case, Customer notifies Seller in writing within five (5) business days after performance of the applicable Services EXCEPT AS SET FORTH HEREIN OR IN ANY STATEMENT OF WORK THAT EXPRESSLY AMENDS SELLER'S WARRANTY, AND SUBJECT TO APPLICABLE LAW, SELLER MAKES NO OTHER, AND EXPRESSLY DISCLAIMS ALL, OTHER REPRESENTATIONS, WARRANTIES, CONDITIONS OR COVENANTS, EITHER EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTIES OR CONDITIONS OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, DURABILITY, TITLE, ACCURACY OR NON-INFRINGEMENT) ARISING OUT OF OR RELATED TO THE PERFORMANCE OR NON-PERFORMANCE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY WARRANTY RELATING TO THIRD PARTY SERVICES. ANY WARRANTY WITH RESPECT TO THE PERFORMANCE OF ANY HARDWARE OR SOFTWARE USED IN PERFORMING SERVICES AND ANY WARRANTY CONCERNING THE RESULTS TO BE OBTAINED FROM THE SERVICES. THIS DISCLAIMER AND EXCLUSION SHALL APPLY EVEN IF THE EXPRESS WARRANTY AND LIMITED REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE. CUSTOMER ACKNOWLEDGES THAT NO REPRESENTATIVE OF SELLER OR OF ITS AFFILIATES IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY ON BEHALF OF SELLER OR ANY OF ITS AFFILIATES THAT IS NOT IN THIS AGREEMENT OR IN A STATEMENT OF WORK EXPRESSLY AMENDING SELLER'S WARRANTY.

Customer shall be solely responsible for daily back-up and other protection of its data and software against loss, damage or corruption. Customer shall be solely responsible for reconstructing data (including but not limited to data located on disk files and memories) and software that may be lost, damaged or corrupted during the performance of Services. SELLER, ITS AFFILIATES, AND ITS AND THEIR SUPPLIERS, SUBCONTRACTORS AND AGENTS ARE HEREBY RELEASED AND SHALL CONTINUE TO BE RELEASED FROM ALL LIABILITY IN CONNECTION WITH THE LOSS, DAMAGE OR CORRUPTION OF DATA AND SOFTWARE, AND CUSTOMER ASSUMES ALL RISK OF LOSS, DAMAGE OR CORRUPTION OF DATA AND SOFTWARE IN ANY WAY RELATED TO OR RESULTING FROM THE SERVICES.

Seller will not be responsible for and no liability shall result to Seller or any of its Affiliates for any delays in delivery or in performance which result from any circumstances beyond Seller's reasonable control, including, but not limited to, Product unavailability, carrier delays, delays due to fire, severe weather conditions, failure of power, labor problems, acts of war, terrorism, embargo, acts of God or acts or laws of any government or agency. Any shipping dates or completion dates provided by Seller or any purported deadlines contained in a Statement of Work or any other document are estimates only.

Pricing Information; Availability Disclaimer
Seller reserves the right to make adjustments to pricing, Products and Service offerings for reasons including, but not limited to, changing market conditions, Product discontinuation, Product unavailability, manufacturer price changes, supplier price changes and errors in advertisements. All orders are subject to Product availability and the availability of Personnel to perform the Services. Therefore, Seller cannot guarantee that it will be able to fulfill Customer's orders. If Services are being performed on a time and materials basis, any estimates provided by Seller are for planning purposes only.

Credits
Any credit issued by Seller to Customer for any reason must be used within two (2) years from the date that the credit was issued and may only be used for future purchases of Products and/or Services. Any credit or portion thereof not used within the two (2) year period will automatically expire.

Limitation of Liability
UNDER NO CIRCUMSTANCES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY SET FORTH HEREIN, WILL SELLER, ITS AFFILIATES OR ITS OR THEIR SUPPLIERS, SUBCONTRACTORS OR AGENTS BE LIABLE FOR: (A) ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS, BUSINESS, REVENUE OR SAVINGS, EVEN IF SELLER HAS BEEN ADVISED OF THE POSSIBILITIES OF SUCH DAMAGES OR IF SUCH DAMAGES ARE OTHERWISE FORESEEABLE, IN EACH CASE, WHETHER A CLAIM FOR ANY SUCH LIABILITY IS PREMISED UPON BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY OF LIABILITY; (B) ANY CLAIMS, DEMANDS OR ACTIONS AGAINST CUSTOMER BY ANY THIRD PARTY; (C) ANY LOSS OR CLAIM ARISING OUT OF OR IN CONNECTION WITH CUSTOMER'S IMPLEMENTATION OF ANY CONCLUSIONS OR RECOMMENDATIONS BY SELLER OR ITS AFFILIATES BASED ON, RESULTING FROM, ARISING OUT OF OR OTHERWISE RELATED TO THE PRODUCTS OR SERVICES; OR (D) ANY UNAVAILABILITY OF THE PRODUCT FOR USE OR ANY LOST, DAMAGED OR CORRUPTED DATA OR SOFTWARE. IN THE EVENT OF ANY LIABILITY INCURRED BY SELLER OR ANY OF ITS AFFILIATES, THE ENTIRE LIABILITY OF SELLER AND ITS AFFILIATES FOR DAMAGES FROM ANY CAUSE WHATSOEVER WILL NOT EXCEED THE LESSER OF: (A) THE DOLLAR AMOUNT PAID BY CUSTOMER FOR THE PRODUCT(S) GIVING RISE TO THE CLAIM OR THE SPECIFIC SERVICES GIVING RISE TO THE CLAIM; OR (B) $50,000.00.

Confidential Information
Each party anticipates that it may be necessary to provide access to information of a confidential nature of such party, the Affiliates or a third party (hereinafter referred to as "Confidential Information") to the other party in the performance of this Agreement and any Statement of Work. "Confidential Information" means any information or data in oral, electronic or written form which the receiving party knows or has reason to know is proprietary or confidential and which is disclosed by a party in connection with this Agreement or Statement of Work, including but not limited to the terms and conditions of such Statement of Work. Confidential Information will not include information which: (a) becomes known to the public through no act of the receiving party; (b) was known to the receiving party, or becomes known to the receiving party from a third party having the right to disclose it and having no obligation of confidentiality to the disclosing party with respect to the applicable information; or (c) is independently developed by agents, employees or subcontractors of the receiving party who have not had access to such information. To the extent practicable, Confidential Information should be clearly identified or labeled as such by the disclosing party at the time of disclosure or as promptly thereafter as possible, however, failure to so identify or label such Confidential Information does not evidence that such information is not confidential or protectable.

Each party agrees to hold the other party's Confidential Information confidential for a period of three (3) years following the date of disclosure and to do so in a manner at least as protective as it holds its own Confidential Information if that is no less than a reasonable degree of care. Disclosures of the other party's Confidential Information will be restricted (i) to those individuals who are participating in the performance of this Agreement or the applicable Statement of Work and need to know such Confidential Information for purposes of providing or receiving the Products or Services or otherwise in connection with this Agreement or the applicable Statement of Work, or (ii) to its business, legal and financial advisors, each on a confidential basis. Each party agrees not to use any Confidential Information of the other party for any purpose other than the business purposes contemplated by this Agreement and the applicable Statement of Work. Upon the written request of a party, the other party will either return or certify the destruction of the Confidential Information of the other party.

If a receiving party is required by law, rule or regulation, or requested in any judicial or administrative proceeding or by any governmental or regulatory authority, to disclose Confidential Information of the other party, the receiving party will give the disclosing party prompt notice of such request so that the disclosing party may seek an appropriate protective order or similar protective measure and will use reasonable efforts to obtain confidential treatment of the Confidential Information so disclosed.

Return Privileges
To obtain Seller's return policy, Customer should contact CDW Customer Relations at 866.SVC.4CDW or email at CustomerRelations@cdw.com. Customer must notify CDW Customer Relations of any damaged Products within ten (10) days of receipt.

Arbitration
Any claim, dispute, or controversy (whether in contract, tort or otherwise, whether preexisting, present or future, and including, but not limited to, statutory, common law, intentional tort and equitable claims) arising from or relating to the Products, the Services, the interpretation or application of these Terms and Conditions or any Statement of Work or the breach, termination or validity thereof, the relationships which result from these Terms and Conditions or any Statement of Work (including, to the full extent permitted by applicable law, relationships with third parties who are not signatories hereto), or Seller's or any of its Affiliates' advertising or marketing (collectively, a "Claim") WILL BE RESOLVED, UPON THE ELECTION OF ANY OF SELLER, CUSTOMER OR THE THIRD PARTIES INVOLVED, EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION. If arbitration is chosen, it will be conducted pursuant to the Rules of the American Arbitration Association. If arbitration is chosen by any party with respect to a Claim, neither Seller nor Customer will have the right to litigate that Claim in court or to have a jury trial on that Claim or to engage in pre-arbitration discovery, except as provided for in the applicable arbitration rules or by agreement of the parties involved. Further, Customer will not have the right to participate as a representative or member of any class of claimants pertaining to any Claim. Notwithstanding any choice of law provision included in these Terms and Conditions, this arbitration agreement is subject to the Federal Arbitration Act (9 U.S.C. §§ 1-16). The arbitration will take place exclusively in Chicago, Illinois. Any court having jurisdiction may enter judgment on the award rendered by the arbitrator(s). Each party involved will bear its own cost of any legal representation, discovery or research required to support arbitration. The expense or results of any arbitration will be treated as confidential. Notwithstanding anything to the contrary contained herein, all matters pertaining to the collection of amounts due to Seller arising out of the Products or Services will be exclusively litigated in court rather than through arbitration.

Miscellaneous
Seller may assign or subcontract all or any portion of its rights or obligations with respect to the sale of Products or the performance of Services or assign the right to receive payments, without Customer's consent. Customer may not assign these Terms and Conditions, or any of its rights or obligations herein without the prior written consent of Seller. Subject to the restrictions on assignment contained herein, these Terms and Conditions will be binding on and inure to the benefit of the parties hereto and their successors and assigns. No provision of this Agreement or any Statement of Work will be deemed waived, amended or modified by either party unless such waiver, amendment or modification is in writing and signed by both parties. The relationship between Seller and Customer is that of independent contractors and not that of employer/employee, partnership or joint venture. If any term or condition of this Agreement or a Statement of Work is found by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, the same shall not affect the other terms or conditions hereof or thereof or the whole of this Agreement or the applicable Statement of Work. Notices provided under this Agreement will be given in writing and deemed received upon the earlier of actual receipt or three (3) days after mailing if mailed postage prepaid by regular mail or airmail or one (1) day after such notice is sent by courier or facsimile transmission. Any delay or failure by either party to exercise any right or remedy will not constitute a waiver of that party to thereafter enforce such rights.

Version Date: 02/23/2010

Exhibit A

Page 2 of 2