Amanda R. Washton (SB# 227541)
*a.washton@conklelaw.com*
**CONKLE, KREMER & ENGEL**
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351
Phone: (310) 998-9100
Fax: (310) 998-9109

Michael M. Lafeber (*pro hac vice*)
*mlafeber@taftlaw.com*
O. Joseph Balthazor Jr. (*pro hac vice*)
*jbalthazor@taftlaw.com*
**TAFT STETTINIUS &
   HOLLISTER LLP**
2200 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Phone: 612.977.8400
Fax: 612.977.8650

David H. Reichenberg (*pro hac vice*)
**MANATT, PHELPS & PHILLIPS, LLP**
7 Times Square
New York, NY 10036
Direct: (212) 790-4626
Office: (212) 790-4500
Fax: (212) 790-4545
Email: DReichenberg@manatt.com

Attorneys for Defendant, Counterclaim Plaintiff
and Third-Party Plaintiff Dexon Computer, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation,<br><br>        Plaintiffs and Counterclaim Defendants,<br><br>        v.<br><br>DEXON COMPUTER, INC., a Minnesota corporation,<br><br>        Defendant, Counterclaim Plaintiff and Third Party Plaintiff.<br><br>        v.<br><br>AND RELATED CROSS-ACTIONS | Case No. 3:20-CV-4926-CRB<br><br>**DECLARATION OF MICHAEL M. LAFEBER IN SUPPORT OF DEFENDANT AND COUNTERCLAIM PLAINTIFF DEXON COMPUTER, INC.'S MOTION FOR LEAVE TO FILE FOURTH AMENDED COUNTERCLAIMS**<br><br>Judge:    Hon. Charles R. Breyer<br>Date:     June 17, 2022<br>Time:     9:00 a.m.<br>Crtrm.:   6<br><br>Hon. Charles R. Breyer<br>Presiding Judge<br><br>Trial Date:          None |

DECLARATION OF MICHAEL M. LAFEBER IN SUPPORT OF DEFENDANT AND COUNTERCLAIM
PLAINTIFF DEXON COMPUTER, INC.'S MOTION FOR LEAVE

1.     My name is Michael M. Lafeber, and I am an attorney at Taft Stettinius & Hollister LLP, in Minneapolis, Minnesota, and counsel of record for Dexon Computer, Inc., ("Dexon") in the above-titled action.  I make this declaration in support of Dexon's Motion for Leave to File Dexon's PROPOSED Fourth Amended Counterclaims.

2.     On or about April 19, 2022, Dexon learned for the first time that Cisco's purported EULA governing products sold by Cisco in 2012 included an "exception" expressly allowing the transfer and use of Cisco's embedded software by secondary market purchasers.  Namely, Dexon's California local counsel was contacted by an attorney adverse to Cisco in another matter who advised she had information relevant to Dexon's counterclaims.  I subsequently spoke directly with such counsel on or about April 20, 2022.  She explained that Cisco's 2012 EULA contained an "exception" which allowed secondary market purchasers to freely transfer and use Cisco products, including the products' embedded software.  She provided the text of the "exception" which provides:

> Exceptions
> 1. Software Bundled with Hardware: In situations where Products combine Hardware and Software and there is no separate Product code or License Fee charged for the Software on the applicable Cisco then-current published price list at the time of transfer (and therefore a separate License Fee for the Software cannot be determined), an exception will be made to allow for the transfer without the transferee being required to pay a new License Fee.

3.     I contacted Cisco's counsel Lou Feuchtbaum via email on April 21, 2022 to advise of the newly discovered information and Dexon's intent to amend its counterclaims, subject to completing its evaluation and investigation.  Due to Cisco's practice of "overwriting" its purported online EULA and applicable policies, Dexon had not yet been able to locate the earlier version of any Cisco purported EULA incorporating the apparent "exception."  In the interest of judicial economy, I advised that I would provide a draft of any contemplate amendments upon completion and proposed a stipulation which would include extending the April 28, 2022 due date for Cisco's anticipated motion to dismiss Dexon's Third Amended  Counterclaims ("TAC").

4.      I followed-up on April 25, 2022 and provided Mr. Feuchtbaum with the promised draft of Dexon's then current PROPOSED Fourth Amended Counterclaims.  I also included a draft or proposed Stipulation allowing the amendments and extending the schedule for Cisco's anticipated motion to dismiss Dexon's TAC.  Mr. Feuchtbaum responded that same day and confirmed that Cisco's earlier documents did in fact include an apparent "exception."   According to Mr. Feuchtbaum,  "[T]he new language that Dexon has cited last appeared in a 2014 document."  Mr. Feuchtbaum further advised that Cisco was "looking for the documents that would apply for the relevant time period and will share those with you, whatever they might say."

5.      I responded to Mr. Feuchtbaum on April 26, 2022.  In the interest of judicial economy, I  proposed stipulating to extend the due date for Cisco's motion to dismiss pending a resolution of Dexon's anticipated amendment.  I explained that the newly discovered "exception" was highly relevant regardless of whether it was last used in 2014.  Namely, I noted that Dexon has sold and will continue to sell Cisco products from as early as 2009 forward – including model years governed by the apparent "exception."   Further, Cisco has published, and continues to publish advertisements and communications advising secondary market consumers that such products are governed by a purported EULA prohibiting the sale and subsequent use of such products on the secondary market.  Cisco's published communications fail to distinguish products governed by the apparent "exception."   My response reasoned that the proposed stipulation would give the parties an opportunity to further investigate the facts, give Cisco more time to decide whether it is amenable to stipulating, and defer Cisco's motion to dismiss Dexon's TAC until the amendment issue is resolved.

6.      By way of response dated April 27, 2022, Cisco confirmed and revealed that the "exception" was in effect for a period which included 2012-2017.  Specifically, Cisco explained that the "exception" was included in Cisco's "Software Transfer and Relicensing Policy" from at least 2012 until some unknown period in 2017. ("No later than 2017, Cisco's Software License Transfer and Re-Use Policy ('Policy') was revised to remove the Fee Exception.")  Cisco also provided full versions of its 2014 "Cisco Software Transfer and Re-Licensing Policy" containing the "exception" and its 2017 "Software License Transfer and Re-Use Policy" with the "exception" removed.  Despite

DECLARATION OF MICHAEL M. LAFEBER IN SUPPORT OF DEFENDANT AND COUNTERCLAIM
PLAINTIFF DEXON COMPUTER, INC.'S MOTION FOR LEAVE

1  confirming that the "exception" was in effect for a significantly longer relevant period of time,
2  Cisco's response rejected the proposed stipulation allowing the parties an opportunity to resolve any
3  proposed amendments prior to Cisco filing its motion to dismiss.

4      7.      By way of response dated May 2, 2022, Dexon sought clarification as to when the
5  2017 policy went into effect.  ("Your email indicates that "No later than 2017, Cisco's Software
6  License Transfer and Re-Use Policy ('Policy') was revised to remove the Fee Exception."  When
7  does Cisco claim the amended 'Policy' removing the 'Fee Exception' went into effect?")  Cisco's
8  May 6, 2022 response explained that it was presently unable to confirm when the 2017 Policy went
9  into effect.  ("The next version of that document I was able to locate is from 2017, and that document
10 does not contain the Fee Exception.  So, the reasonable conclusion is that the Fee Exception had
11 been removed prior to or in 2017.")

12     8.      Attached hereto as **Exhibit A** is a true and correct complete copy of the April 21,
13 2022 to May 6, 2022 email exchange between Cisco's counsel Lou Feuchtbaum and me recounted
14 above.

15     9.      Dexon currently has in inventory Cisco products sold by Cisco or Cisco's authorized
16 resellers to the original consumers and end users in 2012-2017.  Due to the nature of the secondary
17 market, Dexon will continue to receive more such products in inventory.  Dexon has previously sold
18 and will continue to sell Cisco products sold by Cisco and/or Cisco's authorized resellers to the
19 original consumers and end users in 2012-2017.  As detailed in Dexon's PROPOSED Fourth
20 Amended Counterclaims, Dexon's original counterclaims involve Cisco products sold by Cisco
21 and/or Cisco's authorized resellers to the original consumers and end users in 2012-2017, including
22 products subsequently sold on the secondary market by Dexon to Accuray, Inc. and Lockridge
23 Grindal.

24     10.     Attached hereto as **Exhibit B** is a true and correct copy of both a "redline" or
25 "compare view", as well as a "clean" version of Dexon's PROPOSED Fourth Amended
26 Counterclaims.

27     May, 11, 2022

28                                    /s/Michael M. Lafeber
                                     Michael M. Lafeber

DECLARATION OF MICHAEL M. LAFEBER IN SUPPORT OF DEFENDANT AND COUNTERCLAIM
PLAINTIFF DEXON COMPUTER, INC.'S MOTION FOR LEAVE

# EXHIBIT A

**Lagergren, Christopher**

| | |
|---|---|
| **From:** | Feuchtbaum, Louis P. <lfeuchtbaum@sideman.com> |
| **Sent:** | Friday, May 6, 2022 6:12 PM |
| **To:** | Lafeber, Michael |
| **Cc:** | Balthazor, O. Joseph Jr.; Lagergren, Christopher; Amanda R. Washton; Chakraborty, Ria; Nelson, Richard |
| **Subject:** | RE: Cisco v. Dexon / Amendment to Counterclaims |

[EXTERNAL MESSAGE]
**This Message originated outside your organization.**

Hi Mike,

I apologize for my delay in responding.  Dexon provided an excerpt that described a Fee Exception that it claimed was in effect during 2012.  In response, I was able to locate a 2014 document, entitled "Cisco Software Transfer and Relicensing Policy," which had the quoted language in it.  The next version of that document I was able to locate is from 2017, and that document does <u>not</u> contain the Fee Exception.  So, the reasonable conclusion is that the Fee Exception had been removed prior to or in 2017.

-Lou

**From:** Lafeber, Michael <MLafeber@Taftlaw.com>
**Sent:** Monday, May 2, 2022 11:57 AM
**To:** Feuchtbaum, Louis P. <lfeuchtbaum@sideman.com>
**Cc:** Balthazor, O. Joseph Jr. <JBalthazor@Taftlaw.com>; Lagergren, Christopher <CLagergren@Taftlaw.com>; Amanda R. Washton <a.washton@conklelaw.com>; Chakraborty, Ria <RChakraborty@taftlaw.com>
**Subject:** RE: Cisco v. Dexon / Amendment to Counterclaims

Lou,

While Dexon disagrees with Cisco's analysis and position, I appreciate your response and willingness to disclose clarifying facts.  I do have one request for further clarification to assist in Dexon's evaluation.  Your email indicates that "No later than 2017, Cisco's Software License Transfer and Re-Use Policy ("Policy") was revised to remove the Fee Exception."  When does Cisco claim the amended "Policy" removing the "Fee Exception" went into effect?

Your continued cooperation is appreciated.

**From:** Feuchtbaum, Louis P. <lfeuchtbaum@sideman.com>
**Sent:** Wednesday, April 27, 2022 12:58 PM
**To:** Lafeber, Michael <MLafeber@Taftlaw.com>
**Cc:** Balthazor, O. Joseph Jr. <JBalthazor@Taftlaw.com>; Lagergren, Christopher <CLagergren@Taftlaw.com>; Amanda R.

Washton <a.washton@conklelaw.com>
**Subject:** RE: Cisco v. Dexon / Amendment to Counterclaims

[EXTERNAL MESSAGE]
**This Message originated outside your organization.**

Dear Mike,

Dexon's Proposed Fourth Amended Counterclaims ("PFAC") depend upon an allegation, which it states on information and belief, that a 2012 exception to certain licensing fees ("Fee Exception") was applicable during the period from 2019-2021, the period during which all of the relevant conduct in Dexon's PFAC is alleged to have occurred.  Dexon's presumption is wrong.  I cannot find any factual grounds that would support applying the Fee Exception to the events alleged in the PFAC.

First, it is worth noting that the 2012 Fee Exception does not affect Cisco's licensing rights to the embedded software.  It merely waives certain software licensing fees where those fees cannot be easily determined.  But, more to the point, the 2012 Fee Exception is wholly inapplicable to the allegations in Dexon's PFAC for at least two separate and independent reasons:

- First, the 2012 Fee Exception was not in effect during the period relevant to Dexon's counterclaims.  The Fee Exception was last published during 2014, in a document incorporated by reference into the EULA.  That Exception was not part of the EULA in effect during 2019 to 2021.  To the contrary, and as described more fully below, a policy (the same one that originally included the Fee Exception) that was published during 2018 and that was in effect during the relevant period, clearly describes that there is an applicable license fee for all software embedded on products that are resold by Dexon.  Simply put, there is no applicable Fee Exception because it was superseded long before the conduct alleged in Dexon's PFAC would have occurred.

- Second, by its plain language, even if the Fee Exception had not been superseded, it would still not apply to the specific products described in Dexon's PFAC.  The Fee Exception provides that, "[i]n situations where Products combine Hardware and Software and there is no separate Product code or License Fee charged for the Software on the applicable Cisco then-current published price list at the time of transfer (and therefore a separate License Fee for the Software cannot be determined), an exception will be made to allow for the transfer without the transferee being required to pay a new License Fee."  But, the Fee Exception could never apply to the products relevant to the PFAC because the conditions precedent to it being applied were never satisfied.  Cisco did publish license fees for the embedded software on all of the products that Dexon sold to the customers described in its PFAC.

Exhibit A
Page 2 of 7

I have attached a copy of the 2014 Cisco license transfer policy, which contains the language that Dexon is relying upon.  You will find it under "Exceptions", section 1 (at page 2).

**<u>Applicable Policy Requires Payment of Licensing Fees:</u>**

Finally, and in addition to the 2012 Fee Exception not being applicable to the allegations in Dexon's PFAC because it was superseded and because the conditions precedent were never satisfied, the actual policies that were in effect at the relevant time specifically reject any Fee Exception.  No later than 2017, Cisco's Software License Transfer and Re-Use Policy ("Policy") was revised to remove the Fee Exception.  The language quoted by Dexon simply does not appear anywhere within that document, nor does it appear in the 2018 Policy, which is still in effect, governs the conduct occurring during the relevant period from 2019-2021, and is materially identical to the 2017 Policy.  Thus, there is no good faith basis for Dexon's PFAC to allege that the relevant products were subject to the type of licensing Fee Exception, which Cisco last published during 2014.  Even more significantly, the Fee Exception that Dexon's PFAC relies upon is directly contradicted by the Policy applicable to the relevant period.

The relevant Policy directs that a transferee <u>must</u> pay a licensing fee to Cisco, without exception.  "An authorized transfer [of a software license] occurs when the licensee conveys or assigns the Software license to another entity after receipt of Cisco's consent and ***payment of any applicable license fee***. . . ."  *See* attached 2017 Policy, p. 1; *see also* attached 2018 Policy, p. 1 (emphasis added).  The amount of the license fee is explicitly defined as "equal to the fee for a new individual Software license as specified in the then-current [Global Price List] applicable to the Cisco entity in the territory where the transferee is located."  *Id.*  Contrary to the 2012 Fee Exception, the effective Policy directs that where there is no separately published license fee, the license transfer fee is <u>not</u> waived as Dexon's PFAC supposes, but instead the transferee must pay Cisco its "then-current applicable software relicensing fee." *Id.*

Based upon the forgoing, I cannot identify any legitimate grounds for Dexon to file the PFAC, and I do not see any way that it could further amend the PFAC in a manner that would conform with Rule 11.  Given all of this, I hope that Dexon will give serious thought to whether it makes sense to pursue yet another set of amendments.

Feel free to call me if there is anything you would like to discuss.

-Lou

**From:** Lafeber, Michael <MLafeber@Taftlaw.com>
**Sent:** Tuesday, April 26, 2022 8:13 AM
**To:** Feuchtbaum, Louis P. <lfeuchtbaum@sideman.com>
**Cc:** Balthazor, O. Joseph Jr. <JBalthazor@Taftlaw.com>; Lagergren, Christopher <CLagergren@Taftlaw.com>; Amanda R. Washton <a.washton@conklelaw.com>
**Subject:** RE: Cisco v. Dexon / Amendment to Counterclaims

Lou,

Thanks for the response.  One of my main goals is judicial economy.  It seems practical to get this issue resolved – either via a stipulation or a motion to amend - prior to addressing Cisco's forthcoming motion to dismiss.

To clarify – Dexon contends the newly discovered EULA language is highly relevant regardless of whether it was last used in 2014.  As alleged in Dexon's proposed amendments, Dexon has sold *and will continue to sell Cisco products from as early as 2009 forward* – including model years 2012-2014 (both new, unopened, in the box products, as well as used products).  Dexon alleges that Cisco has published, and continues to publish, communications advising secondary market consumers that such products are governed by a purported EULA which prohibits the sale and subsequent use of such products on the secondary market.  Dexon contends the embedded software was not licensed but rather sold, and that any purported EULA is invalid or unenforceable.  Regardless, Cisco's publications/communications fail to distinguish or make an exception for products governed by the apparent 2012-2014 EULA language.  At a minimum, a justiciable controversy exists concerning whether or not Cisco's publications/communications are false and misleading concerning Dexon's current and future sales of products governed by the apparent 2012-2014 EULA language.

One option would be to submit a stipulation seeking an extension of the due date for Cisco's motion to dismiss pending a resolution of the proposed amendment.  This would give the parties an opportunity to further investigate the facts. (It makes sense for any proposed amendment to be based on the actual facts.)  It also gives Cisco more time to decide whether it is amenable to stipulating or whether it will require Dexon to bring a motion to amend.  Lastly, it defers Cisco's motion to dismiss until the amendment issue is resolved.  I'm amenable to preparing the first DRAFT.

Let me know your thoughts.  Thanks.  (Dexon reserves all of its rights.)

---

**From:** Feuchtbaum, Louis P. <lfeuchtbaum@sideman.com>
**Sent:** Monday, April 25, 2022 6:44 PM
**To:** Lafeber, Michael <MLafeber@Taftlaw.com>
**Cc:** Balthazor, O. Joseph Jr. <JBalthazor@Taftlaw.com>; Lagergren, Christopher <CLagergren@Taftlaw.com>; Amanda R. Washton <a.washton@conklelaw.com>
**Subject:** RE: Cisco v. Dexon / Amendment to Counterclaims

[EXTERNAL MESSAGE]
**This Message originated outside your organization.**

Hi Mike,

I appreciate your sending the contemplated amended counterclaims.  I just wanted to write to acknowledge that I've received them and let you know that I believe I can inform you sometime tomorrow whether we can stipulate to Dexon filing these.  The only issue for Cisco is whether the language you've cited is relevant to the products at issue.  My present understanding is that the new language that Dexon has cited last appeared in a 2014

document, which would predate the allegations in Dexon's amended counterclaims.  We are looking for the documents that would apply for the relevant time period and will share those with you, whatever they might say.

Of course, if the exception to license fees Dexon has cited is applicable, I expect that we would stipulate to the amendment.  I will be getting back to you as soon as I have definitive answers.  Feel free to give me a call if you'd like to discuss anything.

-Lou



**Louis P. Feuchtbaum**
Partner

**Sideman & Bancroft LLP**
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111
Main:415.392.1960
Fax:  415.392.0827
lfeuchtbaum@sideman.com
Visit us at www.sideman.com

Please consider the environment before you print this email.

*********************************************************************

CONFIDENTIALITY
This e-mail may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply e-mail [or at (415) 392-1960] and delete all copies of this message. It is the recipient's responsibility to scan this e-mail and any attachments for viruses.

---

**From:** Lafeber, Michael <MLafeber@Taftlaw.com>
**Sent:** Monday, April 25, 2022 12:35 PM
**To:** Feuchtbaum, Louis P. <lfeuchtbaum@sideman.com>
**Cc:** Balthazor, O. Joseph Jr. <JBalthazor@Taftlaw.com>; Lagergren, Christopher <CLagergren@Taftlaw.com>; Amanda R. Washton <a.washton@conklelaw.com>
**Subject:** RE: Cisco v. Dexon / Amendment to Counterclaims

Lou,

In follow-up to my email below, attached please find the following:

1. Dexon's [PROPOSED] Fourth Amended Answer and Counterclaims (Redline Version) incorporating the newly discovered information concerning Cisco's 2012 EULA; and

2. [PROPOSED] Stipulation and Joint Application for Leave to File.

5

Our goal was to get this to you as soon as possible, in part to avoid Cisco having to file its motion to dismiss in advance of any proposed amendments. Accordingly, it's possible the PROPOSED Fourth Amended Counterclaims could still be tweaked/revised slightly to fix typos and style issues. No substantive changes expected. We will provide any revisions before a stip is finalized. If Cisco is willing to stipulate, we will file ASAP and follow-up w/ the court in light of the current 4/27 deadline. Absent a stipulation, Dexon will be filing a motion for leave to amend.

Your anticipated cooperation is appreciated. Give me a call if you have any questions or want to discuss. Thanks.

**Taft /**

**Michael M. Lafeber**
Partner
MLafeber@Taftlaw.com
Dir: 612.977.8472
Tel: 612.977.8400 | Fax: 612.977.8650
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2157

**Taft Bio**
**Download vCard**
**taftlaw.com**

This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

**From:** Lafeber, Michael <MLafeber@Taftlaw.com>
**Sent:** Thursday, April 21, 2022 11:10 AM
**To:** Feuchtbaum, Louis P. <lfeuchtbaum@sideman.com>
**Cc:** Balthazor, O. Joseph Jr. <JBalthazor@Taftlaw.com>; Lagergren, Christopher <CLagergren@Taftlaw.com>
**Subject:** Cisco v. Dexon / Amendment to Counterclaims

Lou,

Dexon just learned new information relevant to its counterclaims. Namely, Dexon has learned that Cisco's 2012 EULA contains language expressly allowing the use/transfer of embedded software on the secondary market. On information and belief, Cisco's 2012 EULA provides:

Exceptions

    1. Software Bundled with Hardware: In situations where Products combine Hardware and Software and there is no separate Product code or License Fee charged for the Software on the applicable Cisco then-current published price list at the time of transfer (and therefore a separate License Fee for the Software cannot be determined), an exception will be made to allow for the transfer without the transferee being required to pay a new License Fee.

6

Exhibit A
Page 6 of 7

Dexon continues to evaluate/investigate, but this 2012 provision/language is relevant to Dexon's counterclaims.  Accordingly, Dexon presently intends to amend its counterclaims to incorporate these facts/allegations.  Having just learned of this information, we do not yet have the PROPOSED Amended version drafted.  However, I wanted to let you know ASAP because I know Cisco is working on a motion to dismiss.  I will provide the PROPOSED Amended Counterclaims for your review ASAP (along with a PROPOSED Stipulation allowing the Amendment.)   The PROPOSED Stipulation will also include a revised due date for Cisco's responsive pleading.  Give me  a call if you have questions or want to discuss.  Cisco's anticipated cooperation is appreciated.

**Taft** /  **Michael M. Lafeber,** Partner
Intellectual Property/Patent
Direct: 612.977.8472 | Office Ext: 28472
Taft Office: Minneapolis

# EXHIBIT B

Amanda R. Washton (SB# 227541)
*a.washton@conklelaw.com*
**CONKLE, KREMER & ENGEL**
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351
Phone: (310) 998-9100
Fax: (310) 998-9109

Michael M. Lafeber (*pro hac vice*)
*mlafeber@taftlaw.com*
O. Joseph Balthazor Jr. (*pro hac vice*)
*jbalthazor@taftlaw.com*
**TAFT STETTINIUS &**
   **HOLLISTER LLP**
2200 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Phone: 612.977.8400
Fax: 612.977.8650

David H. Reichenberg (pro hac vice pending)
*dreichenberg@cozen.com*
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 56th Floor
New York, New York 10006
Phone: (212) 883-4900
Fax: (646) 461-2091

Mark A. Jacobson (*pro hac vice pending*)
*mjacobson@cozen.com*
**COZEN O'CONNOR**
33 South 6th Street
Suite 3800
Minneapolis, MN 55402
Phone: (612) 260-9000
Fax: (612) 260-8026

Attorneys for Defendant, Counterclaim Plaintiff and Third-Party Plaintiff Dexon Computer, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation, <br><br> Plaintiffs, <br><br> v. <br><br> DEXON COMPUTER, INC., a Minnesota corporation, <br><br> Defendant. | Case No. 3:20-CV-4926-CRB <br><br> **DEFENDANT'S** ~~**THIRD**~~**[PROPOSED] FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS** <br><br> Hon. Charles R. Breyer <br> Presiding Judge <br><br> Trial Date:        None |
| DEXON COMPUTER, INC., a Minnesota corporation, <br><br> Counterclaim Plaintiff and Defendant, <br><br> v. | |

1

2

3

4

| CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation, | |
| Counterclaim Defendants and Plaintiffs. | |

5

6

7

8

9

10

11

12

13

14

15

16

17

| DEXON COMPUTER, INC., a Minnesota corporation, | |
| Third-Party Plaintiff, | |
| v. | |
| ATLANTIX GLOBAL SYSTEMS INTERNATIONAL, LLC, BIZCOM ELECTRONICS, INC., DIGI DEVICES ONLINE, ENTERPRISE BUSINESS TECHNOLOGIES, INC., FIBER CABLE CONNECTIONS, MJSI, MULTIMODE TECHNOLOGIES, LLC,  OPTIMUM DATA, INC., PARAGON, PURE FUTURE TECHNOLOGY, INC., SEASTAR IT TRADING LLC, SERVER TECH SUPPLY, SOFTNETWORKS, INC., STRADA NETWORKS, LLC, TEKSAVERS, UNLIMITED NETWORK SOLUTIONS, and WISECOM TECHNOLOGIES, | |
| Third-Party Defendants, | |

18

19

20

21

22

23

24

25

26

27

28

1   Defendant Dexon Computer, Inc. ("Dexon"), by and through its undersigned

2   counsel, for its Answer, denies each and every allegation in Plaintiffs Cisco Systems, Inc.

3   and Cisco Technology Inc.'s ("Plaintiffs") First Amended Complaint ("Complaint") except

4   as expressly admitted, qualified or otherwise responded to herein and denies that Plaintiffs

5   are entitled to any of the relief requested in their Prayer for Relief.  In response to each of

6   the numbered paragraphs of the Complaint, Dexon states as follows.  To the extent the

7   headings or any other non-numbered statements in the Complaint contain allegations,

8   Dexon denies each and every such allegation.

9   **INTRODUCTION**

10   1.   Dexon denies the allegations of paragraph 1 of the Complaint.

11   2.   Dexon denies the allegations of paragraph 2 of the Complaint.

12   **THE PARTIES**

13   3.   Dexon lacks sufficient information to admit or deny the allegations of

14   paragraph 3 of the Complaint, and on that basis Dexon denies those allegations.

15   4.   Dexon admits the allegations of paragraph 4 of the Complaint.

16   5.   Dexon denies the allegations of paragraph 5 of the Complaint.

17   **JURISDICTION AND VENUE**

18   6.   ~~Admits~~Dexon admits that the Complaint purports to be one "founded upon

19   violations of Federal trademark laws" but denies any such purported claims have legal or

20   factual merit.   The remaining allegations in paragraph 6 of the Complaint are legal

21   conclusions and questions of law regarding jurisdiction to which no response is required.

22   To the extent a response is required, Dexon denies such allegations.

23   7.   Dexon denies the allegations of paragraph 7 of the Complaint.

24   8.   Dexon denies the allegations of paragraph 8 of the Complaint.

25   9.   Dexon denies the allegations of paragraph 9 of the Complaint.

26   10.   Dexon denies the allegations of paragraph 10 of the Complaint.

27   11.   Dexon denies the allegations of paragraph 11 of the Complaint.

28

## FACTUAL ALLEGATIONS

### Alleged Cisco Business and History

12. Dexon lacks sufficient information to admit or deny the allegations of paragraph 12 of the Complaint, and on that basis Dexon denies those allegations.

13. Dexon lacks sufficient information to admit or deny the allegations of paragraph 13 of the Complaint, and on that basis Dexon denies those allegations.

14. Dexon lacks sufficient information to admit or deny the allegations of paragraph 14 of the Complaint, and on that basis Dexon denies those allegations.

### Alleged Cisco Trademarks

15. Dexon lacks sufficient information to admit or deny the allegations of paragraph 15 of the Complaint, and on that basis Dexon denies those allegations.

16. Dexon lacks sufficient information to admit or deny the allegations of paragraph 16 of the Complaint, and on that basis Dexon denies those allegations.

17. Dexon lacks sufficient information to admit or deny the allegations of paragraph 17 of the Complaint, and on that basis Dexon denies those allegations.

18. Dexon lacks sufficient information to admit or deny the allegations of paragraph 18 of the Complaint, and on that basis Dexon denies those allegations.

### Alleged Counterfeit "Cisco" Products

19. Dexon lacks sufficient information to admit or deny the allegations of paragraph 19 of the Complaint, and on that basis Dexon denies those allegations.

20. Dexon lacks sufficient information to admit or deny the allegations of paragraph 20 of the Complaint, and on that basis Dexon denies those allegations.

### Alleged Impact on Health, Safety, and National Security Caused by Counterfeit Cisco Products

21. Dexon lacks sufficient information to admit or deny the allegations of paragraph 21 of the Complaint, and on that basis Dexon denies those allegations.

22. Dexon lacks sufficient information to admit or deny the allegations of paragraph 22 of the Complaint, and on that basis Dexon denies those allegations.

**Dexon's Alleged History and Practice of Trafficking in Counterfeit Cisco Products**

23.    Dexon admits selling product bearing the Cisco name and/or mark, but denies the remaining allegations of paragraph 23 of the Complaint, including, without limitation, any allegation such product was counterfeit.

24.    Dexon denies the allegations of paragraph 24 of the Complaint.

25.    Dexon denies the allegations of paragraph 25 of the Complaint.

**Alleged Activity Prior to 2015 Purportedly Demonstrating Dexon's Pattern and  Practice of Knowingly Trafficking in Counterfeit Cisco Products**

**Alleged July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco Investigator (Reston, Virginia)**

26.    Dexon denies the allegations in paragraph 26 of the Complaint. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**FBI's Seizure of Alleged Counterfeit Cisco Products from Dexon on February 26, 2008**

27.    Dexon admits the Federal Bureau of Investigation ("FBI") executed a search warrant at Dexon's business location on or about February 26, 2008, but denies the remaining allegations in paragraph 27 of the Complaint including, without limitation, any allegation, suggestion or implication any or "all" of the product taken by the FBI was determined to be counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Cisco's March 2008 Cease and Desist Letter to Dexon and its CEO**

28.    Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about March 7, 2008, and that Dexon responded via a letter from its counsel on or about March 18, 2008, but Dexon denies the reminder of the allegations in paragraph 28 of the Complaint, including, without limitation, Plaintiffs' attempted

characterizations of the letters or communications which speak for themselves.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Dexon's June 2010 Sale of Alleged Counterfeit Cisco Products to ~~WayneState~~Wayne State University (Detroit, Michigan) and Cisco's C&D Letter**

29.     Dexon admits selling and shipping Cisco product to Wayne State University on or about February 21, 2010 but denies the remainder of the allegations in paragraph 29 of the Complaint, including, without limitation, any allegation the product involved was counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

30.     Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about August 6, 2010 concerning Dexon's sale of Cisco product to Wayne State University, but Dexon denies the reminder of the allegations in paragraph 30 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

31.     Dexon admits it responded via a letter from counsel to ~~Plaintiff~~Plaintiffs'~~s~~ Wayne State University allegations on or about August 23, 2010, but Dexon denies the reminder of the allegations in paragraph 31 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

32.     Dexon admits Plaintiffs sent a follow-up letter concerning or relating to the Wayne State University allegations on or about August 30, 2010, but Dexon denies the reminder of the allegations in paragraph 32 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

### Dexon's July 2010 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Los Angeles, California)

33.     Dexon denies the allegations in paragraph 33 of the Complaint. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

### Dexon's Alleged Illegal Conduct Giving Rise to the Present Lawsuit

34.     Dexon denies the allegations in paragraph 34 of the Complaint.

### Dexon's July 2015 Sale of Alleged Counterfeit Cisco Product to Things Remembered, Inc. (Highland Heights, Ohio) and Cisco's C&D Letter

35.     Dexon admits selling Cisco product to Things Remembered, Inc. on or about July 2015, but denies the remainder of the allegations in paragraph 35 of the Complaint, including any allegation the product was counterfeit.

36.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the Things Remembered, Inc. allegations on or about August 27, 2020 and that Dexon responded thereto, but Dexon denies the reminder of the allegations in paragraph 36 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the letters or communications which speak for themselves.

### Dexon's December 2016 Sale of Alleged Counterfeit Cisco Products to Jack Henry & Associates, Inc. (Monett, Missouri) and Cisco's C&D Letter

1    37.    Dexon admits selling Cisco product to Jack Henry & Associates, Inc. ("Jack

2    Henry") on or about December 2016, but denies the remainder of the allegations in

3    paragraph 37 of the Complaint, including, without limitation, any allegation the product

4    was counterfeit.

5    38.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to

6    the Jack Henry allegations, but Dexon denies the reminder of the allegations in paragraph

7    38 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of

8    the letter which speaks for itself.

9    39.    Dexon admits it responded to Plaintiffs' Jack Henry allegations via a letter

10   from Dexon's counsel, but denies the reminder of the allegations in paragraph 39 of the

11   Complaint, including, without limitation, Plaintiffs' attempted characterizations of the

12   responsive letter which speaks for itself.

13   **Dexon's October 2017 Sale of Alleged Counterfeit Cisco Products to a**
     **Cisco Investigator (Berkeley, California)**
14

15   40.    Dexon denies the allegations in paragraph 40 of the Complaint.

16   **Dexon's January 2018 Sale of Alleged Counterfeit Cisco Product to**
     **Community Health Alliance (Reno, Nevada) and Cisco's C&D Letter**
17

18   41.    Dexon admits selling Cisco product to Community Health Alliance ("CHA")

19   on or about January 2018, but denies the remainder of the allegations in paragraph 41 of

20   the Complaint, including, without limitation, any allegation the product was counterfeit.

21   42.    Dexon admits Plaintiffs and Dexon's counsel exchanged a series of letters or

22   communications relating to the CHA allegations, but denies the remainder of the allegations

23   in paragraph 42 of the Complaint, including, without limitation, Plaintiffs' attempted

24   characterizations of the letters or communications which speak for themselves.

25   **Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to**
     **Tucson Medical Center (Arizona)**
26

27

28

43.     Dexon admits selling Cisco product to Tucson Medical Center ("TMC") on or about April 2018, but denies the remainder of the allegations in paragraph 43 of the Complaint, including, without limitation, any allegation the product was counterfeit.

### Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to DARCARS (Maryland) and Cisco's C&D Letter

44.     Dexon admits selling Cisco product to DARCARS on or about April 2018, but denies the remainder of the allegations in paragraph 44 of the Complaint, including, without limitation, any allegation the product was counterfeit.

45.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the DARCARS allegations, but Dexon denies the reminder of the allegations in paragraph 45 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

### Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Lockridge, Grindal, Nauen, PLLP (Minneapolis, Minnesota)

46.     Dexon admits selling Cisco product to Lockridge, Grindal, Nauen, PLLP on or about August 2018, but denies the remainder of the allegations in paragraph 46 of the Complaint, including, without limitation, any allegation the product was counterfeit.

### Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Regional Justice Information Service (St. Louis, MO) and Cisco's C&D Letter

47.     Dexon admits selling Cisco product to Regional Justice Information Service ("RJIS") on or about August 2018, but denies the remainder of the allegations in paragraph 47 of the Complaint, including, without limitation, any allegation the product was counterfeit.

48.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the RJIS allegations, but Dexon denies the reminder of the allegations in paragraph 48 of

DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS

1    the Complaint, including, without limitation, Plaintiffs' attempted characterization of the

2    letter which speaks for itself.

3              **Dexon's Purchases in 2018 of Alleged Counterfeit Switches from
             PureFutureTech (Fremont, California)**

4

5              49.    Dexon admits purchasing Cisco product from PureFutureTech on or about

6    2018 and that the purported supplier of such product was HongKong Sellsi, a former

7    authorized licensed seller of Cisco products, but lacks sufficient information to admit or

8    deny the remaining allegations of paragraph 49 of the Complaint, and on that basis Dexon

9    denies such allegations.

10             50.    Dexon admits Plaintiffs served it with a subpoena relating to a lawsuit

11   involving Plaintiffs, PureFutureTech and HongKong Sellsi and that Plaintiffs were

12   ultimately required to file a motion relating to such non-party subpoena.  Dexon denies the

13   remaining allegations of paragraph 50 of the Complaint, including, without limitation, any

14   allegation, suggestion or implication Dexon "refused to cooperate" with, or in any way

15   failed to meet its obligations arising from, the subpoena.

16             **Dexon's Purchases in 2017 to 2019 of Alleged Counterfeit Transceivers
             from ~~Pure Future Tech~~PureFutureTech, Inc. (Fremont, California)**

17

18             51.    Dexon    admits    purchasing    Cisco    product    from    ~~Pure    Future

19   Tech~~PureFutureTech, Inc. in the period 2017-2019 but denies any such product was

20   counterfeit.  Dexon lacks sufficient information to admit or deny the remaining allegations

21   in paragraph 51 of the Complaint and on that basis denies such allegations.

22             52.    Dexon denies the allegations in paragraph 52 of the Complaint, including,

23   without limitation, any allegation Dexon knew or reasonably should have known any Cisco

24   product was allegedly counterfeit, or that Dexon was willfully blind to such alleged fact.

25             **Dexon's Sales of Alleged Counterfeit Products to Murray State
             University (Murray, Kentucky) in 2018 and 2019 and Cisco's C& Letter**

26

27

28

53.     Dexon admits selling Cisco product to Murray State University ("MSU") in or about 2018 and 2019, but denies the remainder of the allegations in paragraph 53 of the Complaint, including, without limitation, any allegation the product was counterfeit.

54.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the MSU allegations, but Dexon denies the reminder of the allegations in paragraph 54 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

### Dexon's July 2019 Sale of Alleged Counterfeit Cisco Products to MedRisk (King of Prussia, Pennsylvania)

55.     Dexon admits selling Cisco product to MedRisk on or about July 2019, but denies the remainder of the allegations in paragraph 55 of the Complaint, including, without limitation, any allegation the product was counterfeit.

### Dexon's September 2019 Sale of Alleged Counterfeit Cisco Products to Coppell Independent School District (Coppell, Texas) and Cisco's C&D Letter

56.     Dexon admits selling Cisco product to Coppell Independent School District ("CISD") on or about September 2019, but denies the remainder of the allegations in paragraph 56 of the Complaint.

57.     Dexon denies any allegation, suggestion or implication in paragraph 57 of the Complaint that Cisco product it sold to CISD was counterfeit.  Dexon lacks sufficient information to admit or deny the remainder of the allegations in paragraph 57 of the Complaint and on that basis denies such allegations.

58.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the CISD allegations, but Dexon denies the reminder of the allegations in paragraph 58 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

### Dexon's Alleged California Directed Conduct Identified Through Jurisdictional Discovery

59.     Dexon admits Plaintiffs conducted jurisdictional discovery herein, but denies the remainder of the allegations in paragraph 59 of the Complaint, including, without limitation, Plaintiffs' characterization of such jurisdictional discovery, as well as any allegation such discovery revealed any "illegal and tortious" conduct by Dexon in California or elsewhere.

### Dexon's Sale of Alleged Counterfeit Cisco Products to California Customers

60.     Dexon denies the allegations in paragraph 60 of the Complaint.

### Dexon's Sale of Alleged Counterfeit Cisco Licenses to California Customers

61.     Dexon admits Cisco has transmitted software licenses via Product Activation Key Certificates ("PAK") and that such PAKs have included a code that allows users to utilize the subject software.  Dexon denies the remainder of the allegations in paragraph 61 of the Complaint.

62.     Dexon denies the allegations in paragraph 62 of the Complaint.

63.     Dexon denies the allegations in paragraph 63 of the Complaint.

64.     Dexon denies the allegation in paragraph 64 of the Complaint.

### FIRST PURPORTED CLAIM FOR RELIEF
#### Federal Trademark Infringement
##### *(15 U.S.C. § 1114)*

65.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-64 in response to the allegations in paragraph 65 of the Complaint.

66.     Dexon denies the allegations of paragraph 66 of the Complaint.

67.     Dexon denies the allegations of paragraph 67 of the Complaint.

68.     Dexon denies the allegations of paragraph 68 of the Complaint.

69.     Dexon denies the allegations of paragraph 69 of the Complaint.

70.     Dexon denies the allegations of paragraph 70 of the Complaint.

71.     Dexon denies the allegations of paragraph 71 of the Complaint.

72.     Dexon denies the allegations of paragraph 72 of the Complaint.

0640.002\ex                                    -12-                        Case No. 3:20-CV-4926-CRB

DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS
-23-
Exhibit B
Page 12 of 112

**SECOND PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Counterfeiting**
*(15 U.S.C. § 1114)*

73.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-72 in response to the allegations in paragraph 73 of the Complaint.

74.     Dexon denies the allegations of paragraph 74 of the Complaint.

75.     Dexon denies the allegations of paragraph 75 of the Complaint.

76.     Dexon denies the allegations of paragraph 76 of the Complaint.

77.     Dexon denies the allegations of paragraph 77 of the Complaint.

78.     Dexon denies the allegations of paragraph 78 of the Complaint.

79.     Dexon denies the allegations of paragraph 79 of the Complaint.

**THIRD PURPORTED CLAIM FOR RELIEF**
**False Designation of Origin**
*(15 U.S.C. § 1125)*

80.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-79 in response to the allegations in paragraph 80 of the Complaint.

81.     Dexon denies the allegations of paragraph 81 of the Complaint

82.     Dexon denies the allegations of paragraph 82 of the Complaint.

83.     Dexon denies the allegations of paragraph 83 of the Complaint.

84.     Dexon denies the allegations of paragraph 84 of the Complaint.

85.     Dexon denies the allegations of paragraph 85 of the Complaint.

**FOURTH PURPORTED CLAIM FOR RELIEF**
**California Unfair Business Practices**
**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**

86.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-85 in response to the allegations in paragraph 86 of the Complaint.

87.     The allegations in paragraph 87 of the Complaint are legal conclusions of law regarding California Business and Professions Code §§ 17200 et seq to which no response is required.  To the extent such allegations imply or suggest Dexon has in any way violated California Business and Professions Code §§ 17200 et seq Dexon denies such allegations.

88.     Dexon denies the allegations of paragraph 88 of the Complaint.

89.   Dexon denies the allegations of paragraph 89 of the Complaint.

90.   Dexon denies the allegations of paragraph 90 of the Complaint.

91.   Dexon denies the allegations of paragraph 91 of the Complaint.

92.   Dexon denies the allegations of paragraph 92 of the Complaint.

### FIFTH PURPORTED CLAIM FOR RELIEF
#### Unjust Enrichment
#### (Common Law)

93.   Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-92 in response to the allegations in paragraph 93 of the Complaint.

94.   Dexon admits the allegations of paragraph 94 of the Complaint.

95.   Dexon denies the allegations of paragraph 95 of the Complaint.

## AFFIRMATIVE DEFENSES

Without admitting any wrongful conduct on the part of Dexon, and without admitting that Plaintiffs claims have any merit or that Plaintiffs have suffered any loss, damage, or injury, Dexon alleges the following affirmative defenses to the Complaint. By designating the following as affirmative defenses, Dexon does not in any way waive or limit any defenses which are or may be raised by their denial, allegations, and averments set forth herein. These defenses are pled in the alternative, are raised to preserve the rights of Dexon to assert such defenses, and are without prejudice to Dexon's ability to raise other and further defenses. Dexon expressly reserves all rights to reevaluate their defenses and/or assert additional defenses upon discovery and review of additional documents and information, upon the development of other pertinent facts, and during pretrial proceedings in this action. Dexon expressly incorporate all allegations of its Answer, Counterclaims and Cross-Claims as if fully set forth in each of the following affirmative defenses.

### FIRST AFFIRMATIVE DEFENSE
#### (Res Judicata and Collateral Estoppel)

96.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel.

### SECOND AFFIRMATIVE DEFENSE

**(Laches)**

97.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of

laches.  Plaintiffs' have had longstanding knowledge concerning the legal open or

"secondary" market for its products and have proactively engaged in unfair and tortious

behavior in an effort to selectively manipulate and control such secondary market to their

advantage.  Plaintiffs have had longstanding specific knowledge of Dexon's activity in the

legal secondary market since well before 2011, yet have failed to take timely action to

assert their claims herein, resulting in substantial prejudice to Defendants.

## THIRD AFFIRMATIVE DEFENSE
### (Estoppel)

98.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the

doctrine of estoppel.  Plaintiffs' advertises that consumers can purchase their products from

their "Authorized Channel Partners" or "Authorized Resellers."  Plaintiffs have known, or

should have known such "Authorized Channel Partners" and/or "Authorized Resellers"

participate in and sell their products on the secondary market.  Plaintiffs have allowed these

"Authorized Channel Partners" and/or "Authorized Resellers" to maintain their

"authorized" status despite knowledge of their participation in the secondary market,

including evidence of their sale of counterfeit Cisco products.  Plaintiffs know, or should

have reasonably known, that secondary market resellers such as Dexon rely upon Plaintiffs'

endorsement of such "authorized" vendors when sourcing Cisco products, including,

without limitation, procuring Cisco product from such "authorized vendors'" end

customers.  Plaintiffs have also actively contributed to the presence of counterfeit product

in the marketplace by, without limitation, failing to properly police and control their

manufacturers and failing to properly manage their product serial numbers.  As one

example, Plaintiffs "authorized" vendors intentionally modify or change product serial

numbers in order to ensure the subject product(s) qualify for Plaintiffs' SmartNet service

1  packages. Plaintiffs are therefore estopped from pursuing claims against Dexon or seeking

2  damages related to alleged counterfeit products.

3  **FOURTH AFFIRMATIVE DEFENSE**
   **(First Sale Doctrine and Exhaustion)**

4

5  99.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the first

6  sale doctrine, which protects secondary market resellers such as Dexon from liability for

7  the purchase, importation, and resale of genuine Cisco products and exhausts Plaintiffs'

8  rights in further transactions.

9  **FIFTH AFFIRMATIVE DEFENSE**
   **(Statutes of Limitations)**

10

11  100.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by

12  applicable statutes of limitations, including but not limited to CAL. CIV. PROC. CODE §§

13  337–38, CAL. BUS. & PROF. CODE § 17208, and 17 U.S.C. § 507.  Some or all of

14  Plaintiffs' claims involve conduct outside of the applicable statutes of limitations.

15  **SIXTH AFFIRMATIVE DEFENSE**
   **(Waiver)**

16

17  101.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the

18  doctrine of waiver. Plaintiffs have promoted and advertised its "authorized" sellers despite

19  having full knowledge certain such "authorized" sellers: i) have been caught selling

20  counterfeit product; and ii) actively and regularly deal with secondary market resellers such

21  as Dexon. Secondary market resellers such as Dexon have understandably relied upon

22  Plaintiffs' promotion and endorsement of such "authorized" sellers when sourcing Cisco

23  products for their customers.  Plaintiffs have also intentionally failed or refused to provide

24  or offer their claimed "tools" for detecting counterfeit product to secondary market resellers

25  such as Dexon, and have actively contributed to the presence of counterfeit product in the

26  marketplace by, without limitation, failing to properly police and control their

27  manufacturers and failing to properly manage their product serial numbers.  Plaintiffs have

28  also had longstanding specific knowledge of Dexon's activity in the legal secondary market

1  since well before 2011, yet have failed to take timely action to assert their claims herein.

2  Accordingly, Plaintiffs have waived any claims related to Dexon's unwitting sale of alleged

3  counterfeit goods, including any such goods sourced directly or indirectly from Plaintiffs'

4  "authorized" vendors.

### SEVENTH AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

7      102.  Plaintiffs' claims and/or recovery are barred, in whole or in part, by the

8  doctrine of unjust enrichment.  Plaintiffs have engaged in unfair and tortious practices and

9  made misrepresentations to consumers regarding: i) the quality and authenticity of products

10  sold by secondary market resellers such as Dexon; and ii) Plaintiffs' rights to restrict

11  consumers use and transfer of Cisco hardware and software.  Such conduct has improperly

12  steered customers from Dexon to Plaintiffs and unjustly enriched Plaintiffs.

### EIGHTH AFFIRMATIVE DEFENSE
### (Unclean Hands/Inequitable Conduct)

15      103.  Plaintiffs' claims and/or recovery are barred, in whole or in part, by the

16  doctrines of unclean hands, inequitable conduct, and similar defenses.  Without limitation,

17  Plaintiffs have: (i) intentionally misled consumers into thinking that genuine products on

18  the secondary market are used, counterfeit, or stolen, (ii) sold products to resellers whom it

19  knew, or should have known, were reselling the products on the secondary market, (iii) held

20  out certain entities as "Authorized Resellers" even though Plaintiffs knew or should have

21  known these entities sold counterfeit goods, and engaged in other inequitable practices that

22  bar recovery on its claims.

### NINTH AFFIRMATIVE DEFENSE
### (Redundancy)

25      104.  Plaintiffs' claims and/or recovery are barred, in whole or in part, because they

26  are redundant and/or duplicative of one another.

### TENTH AFFIRMATIVE DEFENSE
### (Abandonment)

0640.002\ex           -17-           Case No. 3:20-CV-4926-CRB

DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS        Exhibit B
-28-           Page 17 of 112

105.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by abandonment of any marks at issue. Plaintiffs' have failed to properly police and exercise adequate quality control over its marks and have thereby abandoned their rights therein.

### ELEVENTH AFFIRMATIVE DEFENSE
**(Conduct of Others)**

106.   Plaintiffs' claims and/or recovery are barred, in whole or in part, because the conduct complained of is the conduct of others, including, without limitation, Plaintiffs' "authorized" vendors and/or Plaintiffs' licensed manufacturers.

### TWELVE AFFIRMATIVE DEFENSE
**(Failure to Mitigate)**

107.   Plaintiffs' claims and/or recovery are barred, in whole or in part, because Plaintiffs failed to mitigate, minimize, or attempt to avoid damages.  Without limitation, Plaintiffs could have pursued legal remedies earlier, assisted secondary market resellers like Dexon in detecting and fighting counterfeit products, and/or properly policed and prevented the manufacture and distribution of counterfeit product within their own manufacturing and distribution network.

### THIRTEENTH AFFIRMATIVE DEFENSIVE
**(Lack of Personal Jurisdiction)**

108.   Plaintiffs are barred from pursuing their claims against Dexon in this Court because the Court lacks personal jurisdiction over Dexon.

### FOURTEENTH AFFIRMATIVE DEFENSIVE
**(Improper Venue)**

109.   Plaintiffs are barred from pursuing their claims against Dexon in this Court because venue is improper.

### FIFTEENTH AFFIRMATIVE DEFENSIVE
**(Failure to State a Claim)**

110.   The Complaint, in whole or in part, fails to state any claim upon which relief can be granted.

## SIXTEENTH AFFIRMATIVE DEFENSIVE
### (One Satisfaction Rule / Bar on Double Recovery)

111.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the one satisfaction rule and/or the bar on double recoveries.

## COUNTERCLAIMS

112.   Counterclaim Plaintiff Dexon Computer, Inc. asserts the following counterclaims against Counterclaim Defendants Cisco Systems, Inc., and Cisco Technology, Inc. (hereinafter referred to jointly as "Cisco") alleges as follows:

## THE PARTIES

113.   Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

114.   On information and belief, Plaintiff and Counterclaim Defendant Cisco Systems, Inc. ("CSI") is a Delaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

115.   On information and belief, Plaintiff and Counterclaim Defendant Cisco Technology, Inc. ("CTI") is a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

## JURISDICTION

116.   This Court has subject matter jurisdiction over Dexon's counterclaims pursuant to 28 U.S.C. §§ 1367 and 1332.  Dexon's counterclaims arise out of the same controversy as plaintiffs' Federal claims, there is complete diversity of citizenship between Plaintiffs and Dexon, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

## FACTS

### The Secondary Market for Cisco Products

117.   As with any economic activity where there are significant profits, market forces have operated to create a "secondary" market for Cisco products.  On information

1   and belief, authentic or genuine Cisco products come to the secondary market in the United

2   States in a variety of ways including: (a) Cisco's knowing sale of such products to

3   secondary market suppliers in the context of either specific end user deals or when Cisco

4   needs to move inventory; (b) Cisco's authorized resellers' purchase of product in excess of

5   what they need for a specific end user order and subsequent resale of such product into the

6   secondary market; (c) Cisco end user's resale of new, unused product; and (d) through

7   importation of such product from abroad where it has been sold by distributors, resellers,

8   or end users under similar circumstances.  On information and belief, Cisco resists attempts

9   by end users and resellers to return product, resulting in a natural supply of secondary

10  market Cisco product.

11       118.   Given the substantial profits available from sale of Cisco-branded products,

12  market forces dictate that a secondary market will develop for such products.  These market

13  forces benefit end users in that they reduce prices for such products.

14       119.   Dexon is an independent secondary-market reseller of computer networking

15  products, including routers, Ethernet switches and other computer hardware.  Dexon

16  provides new, refurbished and discontinued hardware products, including authentic or

17  genuine products to its customers from leading manufacturers including, without limitation,

18  Hewlett Packard, Dell, Juniper Networks and Cisco.

19       120.   Dexon obtains Cisco products from reliable suppliers, subjects such products

20  to extensive quality control, and then resells such products to other resellers and to end

21  users, at a profit but frequently at prices lower than those offered by Cisco "Authorized"

22  sellers.

23       121.   Secondary market resellers of Cisco products, including Dexon, are highly

24  incentivized to detect and stamp out the sale of counterfeit goods.  While a manufacturer

25  such as Cisco may blame rogue actors when a dissatisfied customer confronts it with a

26  counterfeit product, an independent reseller's own reputation suffers significantly when it

27  sells a customer a counterfeit goods.  Unsurprisingly, most independent resellers, including

28  Dexon, take proactive steps to detect and prevent the sale of counterfeit product.

DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS

122.   Cisco has created an "Authorized Channel Network" in which Cisco sells products to entities it refers to as "Authorized Channel Partners" or "Authorized Resellers." Within this "Authorized" network, Cisco exerts strict control over how, and at what prices, its "Authorized" partners can buy and sell Cisco products.

123.   "Authorized Reseller" status is not foolproof protection against counterfeit products. Cisco's "Authorized" sellers are likewise victimized by the presence of counterfeit product in the marketplace and have been discovered to be selling counterfeit Cisco product.

124.   While manufacturers like Cisco are permitted to control the initial sale of their products, they may not wield trademark or copyright protections to dictate the terms by which their products are resold by other parties.  The well-established "first sale doctrine" protects parties who engage in the subsequent resale of Cisco's products, even if those subsequent resales occur outside the "Authorized" channels. Cisco may not forbid the resale of its products outside the "Authorized" network.

### Cisco's Improper Intereference With Secondery Market: Original Transaction a "Sale" not a "License"

125.   Cisco products, like virtually all modern electronics, contain embedded software.  And just as a car, refrigerator, or cell phone will not function properly without internal software, Cisco's products - including the Cisco products resold by Dexon - cannot function without Cisco's embedded software.  Likewise, such embedded software is not intended to be removed and has no independent value to the end consumer separate and apart from the Cisco product with which it is compatible.

126.   Cisco uses the fact that its products have embedded software as an attempted end-around the first sale doctrine.  It does so by falsely claiming the embedded software is governed by an "End User License Agreement" ("EULA") which restricts subsequent transfer and use of any Cisco product containing such embedded software.

127.   Cico's   current   purported   EULA   found   at https://www.cisco.com/c/en/us/about/legal/cloud-and-

DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS

1  software/end_user_license_agreement.html defines "Software" broadly to attempt to

2  encompass embedded software.  According to the definition, " 'Software' means the Cisco

3  computer programs including Upgrades, firmware and applicable Documentation."

4        128.   Cisco's current EULA purports to provide a "non-transferable" license to use

5  the "Software" except "as permitted under the Cisco Software Transfer and Re-Use Policy."

6  Cisco's current purported EULA  provides:

7

8        129.   Cisco's current purported "Software License Transfer and Re-Use Policy"

9  found                                                                                    at

10  https://www.cisco.com/c/dam/en_us/about/doing_business/legal/policy/Cisco_Software_

11  Transfer_and_Relicensing_Policy.pdf provides that products containing embedded

12  software acquired on the secondary market cannot be transferred or used without first

13  paying an additional license fee.  Such policy states:

14

15        130.   As explained in detail below, no valid or enforceable EULA exists covering

16  the embedded software.  Rather, the facts and circumstances surrounding the original

17  transactions confirm a sale of such products, including the embedded software, rather than

18  the creation of any alleged or purported license governing the embedded software.

19  Accordingly, Cisco's attempts to notify secondary market purchasers of the purported

20  EULA *after* the original sale, as well as Cisco's repeated and ongoing form publications

21  and advertisements advising secondary market purchasers that they have no right to transfer

22  or use the embedded software, are false and misleading.

23        ~~127.~~131.   Cisco's false claims concerning purported contractual restrictions on

24  the transfer and use of such embedded software are not merely off the cuff "opinion"

25  statements by lower level Cisco employees or representatives.  Rather, Cisco has employed

26  an intentional, coordinated, formalized and ongoing effort to utilize such false claims to

27  deter consumers from purchasing Cisco products on the secondary market (including from

28  resellers like Dexon).

0640.002\ex                                          -22-                        Case No. 3:20-CV-4926-CRB
DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS                                              Exhibit B

1    ~~128.~~132.    ~~For example~~In addition to the EULA and Software License Transfer

2    and Re-Use Policy referred to above, Cisco's current official "relicensing" website found

3    at  https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html  provides  as

4    follows:

5    | Policies | Using the Program | Product List | Frequently Asked Questions |

6    Software

7    Cisco software—whether it is embedded operating system software or standalone application software—is not transferable unless specifically
     allowed under the Cisco Software License Transfer and Re-Use Policy. You must have Cisco's written consent and pay a license fee. After a

8    transfer, the previous owner's license to the software is terminated, and the transferee's use of the software is governed by the Cisco End User
     License Agreement and in accordance with the original license entitlement.

9
     ~~129.~~133.    The  same  Cisco  "relicensing"  website  advises  consumers  that  the
10
     purported  embedded  software  licenses  are  not  transferrable  and  that  any  Cisco  product
11
     purchased on the secondary market must be relicensed.  The current "relicensing" website
12
     found   at   https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html#q2:
13
     provides ~~at  https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html#q2~~:
14
     :
15
     Q: Is a Cisco software license transferable?
16
     A: No, unless it is specifically allowed under the Cisco Software License Transfer and Re-Use Policy. Cisco software licenses are not transferable
17   from user to user unless otherwise stated by Cisco or required by applicable law. Any purchaser of used or secondary-market Cisco equipment is
     required to relicense the software. For further details read the End User License Agreement.
18
     ~~130.~~   Cisco's current "FAQ" for "Third Party Maintenance Services and purchase
19
     of   Cisco   Products   outside   the   Authorized   Channel"   found   online   at
20
     https://www.cisco.com/c/dam/en_us/about/doing_business/legal/service_descriptions/doc
21
     s/Third_Party_Maintenance_Services_FAQ.pdf expressly states that product purchased on
22
     the secondary market from a non 'Cisco Channel Partner' does not come with a valid
23
     software license:
24
     134.
25
     Q. If I buy Cisco product from a company who is not a Cisco Channel Partner, will I have a valid
26   software license?

27   A. No, unless the Cisco product successfully passes an inspection and any applicable relicensing fees
     are paid or it meets an exception contained in Cisco's Software License Transfer and Re-Use Policy.
28

DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS

1    131.

2      132.135.    Cisco also sends vetted and approved form letters from its "Brand

3    Protection Team" to secondary market customers stating that only the "initial purchasers"

4    of Cisco product are entitled to the benefits of the purported EULA.    Such letters are

5    intended to scare consumers into believing that products purchased on the secondary market

6    may not work or that they such consumers are not authorized to utilize the embedded

7    software contained in Cisco products purchased from secondary market sellers like Dexon.

8      133.136.    Specifically, Cisco's "Brand Protection Team" form letters define any

9    Cisco product purchased from secondary market resellers such as Dexon as "unauthorized."

10   Such form letters then falsely claim that "any" such "unauthorized product does not have a

11   valid software license."

12     134.    For example, a March 14, 2019, Cisco Brand Protection Team form letter to

13   Dexon customer Lockridge Grindal Nauen stated in relevant part:

> Please be informed Dexon is NOT a member of the Cisco Authorized Reseller Program. Regardless of what Dexon claims, and regardless of whether its Cisco product is used or is in new sealed boxes, ANY Cisco product it supplies is considered unauthorized.
>
> 1.    Unauthorized product is not eligible for any Cisco OEM warranty
> 2.    Unauthorized product is not automatically eligible for SMARTnet
> 3.    Unauthorized product does not have a valid software license.
>
> For a detailed list of authorized Cisco Channel Partners, please refer to http://www.cisco.com/go/partnerlocator.
>
> The following policy statement applies, whether the product is used or is in new, unopened and sealed boxes.
>
> When products are not sold through Cisco's authorized sales channels, Cisco can offer no assurance as to the provenance, quality, or authenticity of those products. Additionally, when resellers resell Cisco products that have been sourced from outside of Cisco's authorized sales channels, those products do not come with a valid software license or hardware warranty and are not automatically eligible for a Cisco service support contract (such as SMARTnet maintenance).

24     137.

An overview of Cisco's policy on this subject is as follows:

> **Licensing**. When Cisco sells its products, software licenses (such as for Cisco IOS) are granted to the initial purchasers of those products. Cisco's policy is that software may not be transferred to any other purchaser of the product unless specifically authorized by Cisco. To the extent that Cisco believes a customer is not an initial purchaser—or if a customer expresses concern that it is not an initial purchaser—such issues will be promptly addressed and Cisco is committed to resolving all licensing issues that arise. In full, this policy is set forth on Cisco's website: http://www.cisco.com/en/US/prod/cisco_software_transfer_relicensing_policy.html.

~~135.~~138.    Contrary to Cisco's representations, no valid or enforceable license exists covering the embedded software. Rather, the facts and circumstances surrounding the original transactions confirm a *sale* of such products, including the embedded software, rather than the creation of any alleged or purported license governing the embedded software.

## **The Purchasing Process**

~~136.~~139.    Cisco sells new, unopened product to its authorized resellers. Upon information and belief, these sales come in substantial quantities, sometimes in the thousands of individual products.

~~137.~~140.    Upon information and belief, Cisco's authorized resellers accept the risk that the brand-new Cisco products, including the embedded software, may be damaged or lost. Cisco makes it extremely difficult for its authorized resellers to return any products.

~~138.~~141.    Cisco's authorized resellers offer the Cisco products for sale to consumers. Such authorized resellers make it extremely difficult to for consumers to return any products.

0640.002\ex
-25-
Case No. 3:20-CV-4926-CRB
DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS
-36-
Exhibit B
Page 25 of 112

139.142.    As shown and explained below, the original consumer transaction involving the Cisco products is a "sale" of both the hardware and any associated embedded software.  There is no creation of a license covering the embedded software.  Rather, Cisco's authorized resellers state that Cisco switches come with a "Cisco limited lifetime warranty" without mention that the warranty is subject to any restrictions or that the product comes embedded with software subject to a license. CDW and other authorized resellers offer additional "[e]nhance[ments]" for the hardware, like Cisco SmartNet extended service agreements.



140.143.    Cisco's authorized reseller's do not provide original purchasers any notice prior to purchase that there is embedded software in the product or that such embedded software is governed by a license restricting the original purchaser's ability to transfer or sell the subject product.

141.144.    Attached as Exhibit A  is a true and correct copy of an October 15, 2020 invoice from Cisco authorized reseller CDW Direct for a Cisco Catalyst 9200L switch costing $856.47.  The invoice provides a single, flat price for the switch.  The invoice does not provide a separate itemized price for the switch's embedded software.  In fact, the invoice contains absolutely no mention of a separate or independent license agreement governing the switch's embedded software.

1    ~~142.~~145.    The sole reference to "software" is buried in the small print of the

2    attempted "Terms and Conditions" located on the back side of the CDW invoice.

3    ~~143.~~146.    The attempted "Terms and Conditions" include a "Title; Risk of Loss"

4    section which begins by placing the risk of loss or damage during shipment on the

5    purchaser.  It then adds, in small lowercase print, that "title to software will remain with the

6    applicable licensor(s), and Customers rights therein are contained in the license agreement

7    between such licensor(s) and Customer."  Such notice contains no reference to "embedded

8    software."

9    ~~144.~~147.    Cisco does offer several stand alone and independent traditional

10    software licenses, including, without limitation, licenses governing its Digital Network

11    Architecture ("DNA") network management services.  Cisco's authorized resellers provide

12    separate invoices or line items covering such traditional software licenses.  Accordingly, to

13    the extent original purchasers actually read the small print "Terms and Conditions," such

14    purchasers would have no way of knowing the referenced "software" applied to embedded

15    software as opposed to traditional stand-alone software sold and priced separately.

16    ~~145.~~148.    In addition to failing to properly notify original purchasers prior to their

17    purchase that their ability to subsequently transfer or sell the expensive Cisco products is

18    restricted by a purported EULA governing the hardware's embedded software, at no time

19    does Cisco or its Authorized Resellers obtain the purchasers assent to any purported EULA.

20    ~~146.~~149.    At no time has Cisco or its Authorized Resellers placed a notice or

21    warning of a purported EULA on the exterior packaging of any of its hardware.  Moreover,

22    such packaging contains no notice or warning advising purchasers that by opening such

23    packaging they would be assenting or agreeing to Cisco's alleged EULA governing the

24    embedded software.  Below are representative photographs of the exterior packaging for a

25    Cisco WS-C2960L switch:

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





147.150.

0640.002\ex

-28-                                            Case No. 3:20-CV-4926-CRB
DEFENDANT'S THIRD FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS                         Exhibit B
-39-                                           Page 28 of 112

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17
18
19
20



21      ~~148.~~151.   Rather than properly notifying original purchasers of the purported

22  EULA governing the embedded software and obtaining their affirmative assent, Cisco has

23  included various attempted notices on the *inside* of the product packaging. Such notices are

24  accessible only *after* the products have been purchased and opened.

25      ~~149.~~152.   Resellers such as Dexon sell a large volume of new, in the box, never

26  opened Cisco products, meaning at no point were such attempted "notices" ever accessed

27  or viewed by the original purchaser.

28

150.153.    Dexon sells such brand-new, in the box, never opened Cisco product to end users like schools, hospitals, and businesses. The individuals opening or accessing such Cisco products are often lower-level information technology personnel charged with installing such equipment.  In addition to generally being required to install such equipment in short time frames with little or no opportunity for locating, reviewing and studying any purported EULA governing the embedded software, such IT professionals often have no control over or involvement with purchasing or return decisions.

151.154.    The attempted notices Cisco has included inside the product packaging have varied through the years.  For example, an unopened package for a Cisco WS-C2960L switch originally sold on or about 2009 included a separate plastic bag of accessories inside the product packaging.  The plastic bag bears a green sticker providing, "Please read the license terms regarding the use of the product included inside this box.  By using the product, you agree to be bound by these license terms.  If you do not agree with these terms, promptly return the unused product, manual, related equipment and hardware (with proof of payment) to the place of purchase for a full refund":



152.155.

1

2

3

4

5

6          ~~153.~~156.      The referenced licensed terms supposedly to be found "inside this box"

7    are in fact buried in and difficult to access within a "Getting Started Guide" CD included

8    in the plastic bag:

9

10

11

12

13

14

15

16

17

18

19

20

21

22          ~~154.~~157.



23

24

25

26

27

28

155.158.   The "Getting Started Guide" CD is not required to be utilized or accessed by the IT professional as part of the install process. Rather, as the name implies, it is in fact a "Getting Started Guide" containing instructions. The CD does not contain any software required to be loaded or accessed as part of the installation process and would have been routinely ignored as unnecessary or superfluous by experienced IT professionals.

156.159.   At some unknown time, Cisco stopped including the green sticker or the "Getting Started Guide" CD.  In fact, Cisco stopped providing or including *any* copy of the purported EULA governing the embedded software with its products.

157.160.   Rather, Cisco began including a small single page notice directing the user to various websites.  Such "product information" notice contains no warning that use of the product constitutes acceptance of Cisco's purported EULA governing the embedded software or that the consumer's subsequent use of the product will be restricted.  Rather, the notice requires the individual who opened the package, often a lower level IT professional having no responsibility for purchasing or return decisions, to go to a separate URL or website:



158.161.

DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS

159.162.    Subsequent to the introduction of its DNA network management services, Cisco also began including separate notices governing independent and separate licenses for such network management services.

160.163.    In addition to failing to provide any proper notice of a purported EULA governing the embedded software, at no point has Cisco required or obtained any affirmative assent to such purported EULA by the original purchaser.  For example, an original purchaser who actually goes to the referenced website is not required to affirmatively accept the purported EULA governing the embedded software via a "click through" process or otherwise.

161.164.    Moreover, no such affirmative assent to the purported EULA governing the embedded software is required for the original purchaser to actually use the subject Cisco products.  Without limitation, at no point during the "boot up" process is an end user advised of any purported EULA governing the embedded software or asked to provide affirmative assent to any such purported EULA via a "click through" process or otherwise. Upon information and belief, downstream purchasers and end users first become aware of Cisco's contention their use and transfer of the product is restricted by a purported EULA governing the embedded software via communications from Cisco's Brand Protection Team *years after* the original purchase.

162.165.    In light of the absence of any evidence of a valid or enforceable EULA governing the embedded software, the original transaction involving the subject Cisco products constitutes a "sale" of both the hardware and associated embedded software.  As a result, Cisco's form communications and representations thatadvertisements and publications advising secondary market purchasers' ability to use that they are prohibited from using and transfertransferring Cisco products are false and misleading and violate the first sale doctrine codified at 17 U.S.C. § 109. Cisco does not offer or enter into a license for the subject embedded software and does not control the use of such embedded software.

166.    In addition to the fact that any purported EULA is not valid or enforceable, relevant and applicable versions of Cisco's prior purported "Software License Transfer and

DEFENDANT'S THIRDFOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS

1   Re-licensing Policy" expressly allow the use and transfer of Cisco products by secondary

2   market purchasers. Cisco's claimed "Software License Transfer and Relicensing Policy"

3   applicable to products originally sold during 2012-2017 provides that there is no restriction

4   on transfer "[i]n situations where the Products combine Hardware and Software and there

5   is no separate product code or License Fee charged for the Software on the applicable Cisco

6   then-current published price list at the time of transfer (and therefore a separate License Fee

7   for the Software cannot be determined). . ." (On information and belief, such "exception"

8   was included in Cisco's "Software License Transfer and Relicensing Policy" at least from

9   2012 to some unknown date in 2017 when such policy was apparently revised. The full

10  and exact dates such "exception" was included in Cisco's policy is in Cisco's possession

11  and control.) The full relevant provision or "exception" provides:

12

13

14      167.    On information and belief, Cisco's "published price list" contained no

15  separate "Product code or License Fee" for embedded software included with products

16  governed by Cisco's purported 2012-2017 "Software License Transfer and Re-licensing

17  Policy."

18      168.    Cisco's form advertisements and publications falsely advising secondary

19  market purchasers that the embedded software is governed by a purported EULA

20  prohibiting the subsequent transfer and use of Cisco products fails in any way to distinguish

21  or delineate products governed by versions of Cisco's "Software License Transfer and Re-

22  licensing Policy" expressly allowing the transfer and use of such embedded software,

23  including, without limitation, products sold by Cisco or Cisco authorized resellers to the

24  original consumers or end users during 2012-2017.

25      169.    Dexon has regularly sold, and continues to sell, new, unopened, in the box,

26  as well as used, Cisco products for, without limitation, model years 2009 to the present.

27  This has included, and will continue to include, new, unopened, in the box, as well as used,

28  Cisco products originally sold by Cisco or Cisco authorized resellers to the original

0640.002\ex                          -34-                    Case No. 3:20-CV-4926-CRB

DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS

1  consumers or end users during 2012-2017 and covered by Cisco's purported 2012-2017
2  "Software License Transfer and Re-licensing Policy."

3  163.170.    Consumers who purchase Cisco products on the secondary market may
4  use the embedded software included therewith because the title of the product and
5  embedded software is transferred to them.  They may also transfer the Cisco products,
6  including the embedded software, freely.  They also accept all risk that the product with
7  embedded software may be lost or damaged.

8  164.171.    When consumers receive the Cisco Brand Protection Team
9  communicationsform    advertisements and publications, they falsely believe that they
10  cannot use the product or that the product will not work. There is no license covering the
11  embedded software; rather, any "licenses" apply to add-on "enhanced" software features
12  like DNA. Because there is no license that covers the embedded software, and no assent to
13  any such purported license, Cisco's statementsform advertisements and publications stating
14  that the embedded software is governed by a purported license which restricts the use and
15  disposition of the Cisco product is false. Downstream consumers, including secondary
16  market purchasers,  can use the embedded software without ever buying a separate or
17  independent license from Cisco.

18  165.172.    When Dexon's customers receive theCisco's form advertisements and
19  publications, including, without limitation, Cisco's form Brand Protection Team
20  letterletters, they falsely believe they cannot use the subject Cisco product or that the subject
21  Cisco product will not work because they believe, falsely, that they have to purchase a
22  separate license. They don't.

23  173.  Cisco's form advertisements and publications are particularly egregious
24  because they fail to delineate between products governed by Cisco's current purported
25  EULA and "Software License Transfer and Re-Use Policy" and products governed by prior
26  versions which expressly allow secondary market purchasers to transfer and use Cisco's
27  embedded software.

28

174.   Although a customer purchasing a new, never opened, in the box Cisco product from Dexon is unlikely to ever visit the EULA website identified inside the package, if a customer does, it would be viewing Cisco's current EULA or "Software License Transfer and Re-Use Policy" with the applicable "exception" removed.  Customers with product originally sold by Cisco or a Cisco authorized reseller to the original consumers or end users during 2012-2017 are not directed to the applicable earlier versions containing the "exception."  Cisco is misleadingly and improperly attempting to change or modify the terms of the purportedly applicable EULA *after* the original transaction.

175.   Likewise, Cisco's other false and misleading advertisements and publications referenced above, including Cisco's "relicensing" website, Cisco's "FAQ" for "Third Party Maintenance Services and purchase of Cisco Products outside the Authorized Channel," and Cisco's form "Brand Protection Team" letters, all of which falsely claim secondary market purchaser have no right to transfer or use the embedded software, fail to delineate products governed by Cisco's purported 2012-2017 EULA and "Software License Transfer and Re-licensing Policy" expressly allowing such transfer  and use.

176.   Cisco's has and will continue to falsely and intentionally misrepresent that secondary market purchasers' use and transfer of embedded software is prohibited despite the fact that: i) the original transaction was a  sale of the embedded software and no valid or enforceable software license was created; and ii) the correct applicable purported license expressly allows such transfer  and use.

166.177.   Cisco's past and ongoing misrepresentations regarding the terms, applicability, scope and interpretation of a purported EULA governing the embedded software and secondary market purchasers' rights to buy, use and transfer secondary-market Cisco products deters consumers from purchasing Cisco products on the secondary market. Dexon has lost and will continue to lose sales of products that would have been made but for Cisco's false representations to consumers regarding the terms, applicability, scope and interpretation of aCisco's purported EULA and the consumers' ownership rights for Cisco

1  hardware and associated embedded software purchased on the secondary market.  These

2  false representations have unjustly enriched Cisco at Dexon's expense.

3  **Cisco's Tortious Interference with Dexon's Business**

4  167.178.    Because Cisco regards secondary market resellers like Dexon as a

5  threat to its excess profits, Cisco spends substantial money and effort to attack secondary

6  market participants such as Dexon and to chill reseller and end user participation in the

7  secondary market.  These steps include but are not limited to employing a team of "Brand

8  Protection" employees whose primary responsibility is to intervene with resellers and end

9  users in cases where they are either contemplating the purchase of product, or have ordered

10  product, from the secondary market.

11  168.179.    Cisco Brand Protection personnel use a variety of tools to disrupt

12  secondary market sales, including, without limitation, falsely advising Dexon's actual and

13  prospective customers that: i) Dexon does not sell new but rather "used" or "refurbished"

14  Cisco product; ii) Dexon's products are "counterfeit" solely because they were sold on the

15  secondary market despite the fact such products are in fact genuine; iii) Dexon products

16  violate a purported EULA despite the absence of any proper notice of or assent to the

17  purported EULA; and iv) Dexon products violate the purported EULA even though the

18  purported EULA does not even apply to the applicable product; and v) Dexon products

19  violate the purported EULA even though the actual governing purported EULA, including,

20  without limitation, Cisco's 2012-2017 purported EULA and "Software License Transfer

21  and Relicensing Policy" expressly allows the use and transfer of embedded software.

22  169.180.    Cisco has engaged in a pattern and practice of this tortious conduct with

23  the intent to disrupt contracts between Dexon and its customers, pending opportunities with

24  such customers, future business with such customers, and even with the apparent goal of

25  driving Dexon out of business altogether.

26

27

28

**Fort Bend Independent School District**

170.181.   Dexon entered into a contract with Fort Bend Independent School District ("FBISD") for the sale and purchase of over $1,300,000.00 in brand new Cisco equipment.  On or about June 24, 2019, Cisco representative Dan Roberts falsely advised and represented to FBISD representative Cecile Thompson that the equipment FBISD was purchasing from Dexon could not be new but rather had to "refurbished."

171.182.   On or about July 9, 2019, Sean O'Brien, a member of Cisco's Brand Protection Team, sent a letter to FBISD falsely claiming and representing that products sold by Dexon do not come with a "valid software license."  Such letter stated: "According to Cisco Systems' records (www.cisco.com/go/eula), the Cisco goods listed in Exhibit A are not recorded as being sold to Fort Bend Independent School District through one of Cisco's authorized resellers.  It appears you may have purchased the Cisco goods from a company name Dexon Computer.  Unfortunately, Dexon Computer is not a member of the Cisco authorized reseller program.  As such, Cisco recommends that you return these goods for a refund, along with any other Cisco products received by the vendor, and replace the items with authorized Cisco products sold via an authorized reseller."

172.183.   Such letter further warned Dexon's customer that such products "may not come with a valid software license" and that "Customers purchasing most Cisco goods outside of Cisco's authorized sales channels *would not automatically have a license to use the software*."  (italics added.)

173.184.   As a direct and proximate result of such communications, FBISD falsely believed the Dexon products may not be new and that it would not be able to use such products due to the absence of a "valid software license." As a direct and proximate result of Cisco's false and misleading representations, FBISD cancelled its $1.3 million contract with Dexon, and Dexon has received no further business opportunities from FBISD.

174.185.   Cisco's representations to FBISD are especially egregious considering the contracted for products were Cisco phones rather than networking equipment containing

1  embedded software which Cisco contends is governed by a purported EULA.  Upon

2  information and belief, unlike Cisco's subject networking equipment, Cisco's phones

3  utilize "open source" software.  The phones do require a completely separate and

4  independent Cisco service and license to operate (Cisco Unified Communications Manager

5  which is commonly known as "CallManager").  Thus, Cisco's statement that such products

6  would lack a "valid software license" were false and misleading.

7          **Lockridge Grindal and Nauen**

8          ~~175.~~186.     Without limitation, on or about March 14, 2019, Tim Casto, a member

9  of Cisco's Brand Protection Team, sent a letter to Dexon customer Lockridge Grindal and

10  Nauen ("Lockridge").  Such letter falsely advised Dexon customer Lockridge that "six

11  switches" purchased from Dexon were "counterfeit."  On information and belief, only four

12  (4) of the six (6) switches are currently alleged to be counterfeit by Cisco.

13         ~~176.~~187.     The March 14, 2019 letter warned that "Dexon is NOT a member of

14  the Cisco Authorized Reseller Program" and that "[r]egardless of what Dexon claims, and

15  regardless of whether its Cisco product is used or is in new sealed boxes, ANY Cisco

16  product it supplies is consider unauthorized."  Such letter falsely represented that absolutely

17  no product obtained from Dexon comes with a "valid software license."

18         188.   In addition to the fact that the original transaction involving the Lockridge

19  products was a sale and no valid or enforceable license applicable to the embedded software

20  was created, on information and belief, all of the Lockridge products were sold by Cisco or

21  Cisco authorized sellers to the original consumer or end users between 2015-2017.

22  Accordingly, Cisco's alleged or purported EULA applicable to such products expressly

23  allowed the embedded software to be transferred and used by secondary market purchasers.

24         ~~177.~~189.     As a direct and proximate result of the March 14, 2019 correspondence,

25  as well as other similar communications from and representations by Cisco's Brand

26  Protection Team, Lockridge falsely believed all six (6) switches it purchased from Dexon

27  were counterfeit, that the switches would not work, and that it would not have the required

28  licenses necessary to use Cisco product purchased from Dexon. Citing the Brand Protection

1   Team correspondence, Lockridge demanded a refund of all amounts paid to Dexon.  Dexon

2   lost all future business opportunities from Lockridge.

3   **Accuray, Inc.**

4   ~~178.~~190.   Without limitation, on or about , January 27, 2020, Tim Casto, a

5   member of Cisco's Brand Protection Team, sent an email to Dexon customer Accuray Inc.

6   ("Accuray").  Such email acknowledged that products purchased by Accuray from Dexon

7   had been determined to be authentic or "genuine."  However, the email falsely stated that

8   because such genuine products were purchased on the secondary market, they "did not have

9   a valid software license."  The email stated in relevant part, "Cisco reviewed the console

10  readout and determined that the items are genuine. . .The below items, however, show as

11  sold to end users other than Accuray.  This means that the below products do not have a

12  valid software license. . ."

13  191.   In addition to the fact that the original transaction involving the  products was

14  a sale and no valid or enforceable license applicable to the embedded software was created,

15  on information and belief, 23 of the 26 subject Accuray products were originally sold by

16  Cisco or Cisco authorized sellers to the original consumers or end users between 2014-

17  2017.  Accordingly, Cisco's alleged or purported EULA applicable to such products

18  expressly allowed the embedded software to be transferred and used by secondary market

19  purchasers.

20  ~~179.~~192.   As a direct and proximate result of the January 27, 2020

21  correspondence, as well as other similar communications from and representations by

22  Cisco's Brand Protection Team, Accuray falsely believed that the product would not work

23  and that it did not have the required licenses necessary to use the Cisco products purchased

24  from Dexon.  As a result, Accuray demanded a refund of all amounts paid to Dexon.  Dexon

25  lost all future business opportunities from Accuray.

26  **Meadowridge Networks, Inc.**

27  ~~180.~~193.   Without limitation, on or about July 12, 2021, Shuting Li, on

28  information and belief a member of Cisco's Brand Protection Team, sent an email to Dexon

DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS

1   customer Meadowridge Networks, Inc. ("Meadowridge").    Such letter falsely implied

2   product purchased from Dexon was not new or not genuine.    The email stated, "Serial

3   number is verified to be an unauthorized unit. . .because this unit is now in possession of

4   end customer which is different from the reported end customer.    So it is an overseas

5   diversion unit."

6       181.194.    As a direct and proximate result of the July 12, 2021 email, as well as

7   other similar communications from and representations by Cisco, Meadowridge

8   understandably understood Cisco to be claiming the products purchased from Dexon to be

9   "used" and/or counterfeit.  In a responsive email, Meadowridge explained, "I am the first

10  end-user to open the box. . .This came to me in an unopened Cisco box and was not a 'used'

11  unit in any sense of the word. . .I had every reason to think that this was a legitimate unit

12  and no reason to believe that it wasn't."

13      182.195.    Rather    than    clarify    Meadowridge's    interpretation    and

14  misunderstanding of its prior communications, Cisco responded by directing Meadowridge

15  to a domain or website containing a  false and misleading definition of "used."  Namely,

16  such definition defined "used" as all Cisco products purchased on the secondary market.

17  (See  www.cisco.com/go/relicensing    which  misleadingly  defines  "used"  products  as

18  "previously  owned  equipment  that  is  now  owned  by  a  party  other  than  the  original

19  customer" including both "opened and unopened equipment."

20      183.196.    As a direct and proximate result of the Cisco Brand Protection Team

21  communications, Meadowridge falsely believed that its use of Cisco products purchased

22  from Dexon would be impaired or restricted and that the product would not work.  As a

23  direct and proximate result, Meadowridge demanded a refund and was also provided a

24  replacement or substitute product at a reduced priced.  Dexon has lost future business

25  opportunities from Meadowridge.

26      184.197.    The foregoing false and misleading representations of fact were

27  designed to mislead consumers, and have in fact misled consumers, at the expense of

28  Dexon, causing direct and substantial loss and damage to Dexon.

0640.002\ex                                    -41-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S THIRDFOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS

185.198.    Cisco's false and misleading misrepresentations have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

186.199.    As a direct result of Cisco's tortious interference, Dexon has suffered significant damages, including the cancellation of numerous pending orders, loss of opportunity to bid on projects, and the loss of entire relationships with many of its top customers.

**Count I**
**Declaratory Judgment**
**(28 U.S.C. §§ 2201-2202)**

187.200.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

188.201.    Dexon seeks a declaration of its rights, pursuant to 28 U.S.C. §§ 2201 & 2202, that the original transactions involving the subject Cisco products is a "sale" of both the hardware and any associated embedded software and that there exists no valid or enforceable license agreement governing the embedded software which prohibits the use or transfer of such products by subsequent secondary market purchasers.

189.202.    Cisco has made, and continues to make false representations to actual or potential secondary market purchasers, including Dexon's actual or potential customers, that their ability to use and transfer any secondary market Cisco product is prohibited by a purported EULA governing the product's embedded software.

190.203.    No such valid or enforceable EULA exists.

191.204.    Rather, the original transaction involving the subject Cisco products was a "sale" of both the hardware and any included embedded software.

205.    Even if applicable, which it is not, the certain versions of Cisco's EULA, including, without limitation Cisco's purported 2012-17 EULA and "Software License Transfer and Re-licensing Policy" expressly allow the use and transfer of embedded software by secondary market consumers.

192.206.   Accordingly, Cisco's form communications and representations, including, without limitation, Cisco's form advertisements and publications which fail to delineate products governed by Cisco's purported 2012-17 EULA and "Software License Transfer and Re-licensing Policy" which expressly allows the use and transfer of embedded software by secondary market consumers, are and continue to be false and have caused and will continue to cause significant harm and damage to secondary market sellers, including Dexon.

193.  A real legal dispute and actual controversy presently exists between the parties to this action which is concrete and justiciable in character, and as to which each party possesses an interest in resolving.

194.207.   Dexon has sold and intends to continue selling genuine Cisco products, including new, unopened, in the box Cisco products.

208.   Dexon has in inventory Cisco products sold by Cisco or Cisco authorized resellers to the original purchasers or end users from at least as early as 2009 to the present. Because of the nature of the secondary market, Dexon will continue to receive such products in inventory.  Due to the nature of the secondary market, Dexon will continue to receive more such products in inventory.  Dexon has previously sold and will continue to sell Cisco products sold by Cisco and/or Cisco's authorized resellers to the original consumers and end users in 2012-2017.

195.209.   Cisco has continued and will continue its longstanding practice of sending form communicationsadvertisements and publications to Dexon's actual and prospective customers falsely advising such customers that theirthe use and transfer of any Cisco products purchased from Dexon is prohibited by a purported but invalid and unenforceable EULA. Cisco's communications have failed and will continue to fail to distinguish products governed by versions of its purported EULA expressly allowing the use and transfer of embedded software by secondary market purchases, including products sold by Cisco or Cisco's authorized resellers to the original purchasers or end users during

DEFENDANT'S THIRDFOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS                          Exhibit B

1    2012-2017 and governed by Cisco's purported 2012-2017 EULA and "Software License

2    Transfer and Re-licensing Policy."

3    ~~196.~~210.    Unless and until Cisco's form communications and representations are

4    deemed to be false ~~and~~, in violation of the first sale doctrine codified at 17 U.S.C. §109, or

5    contrary to Cisco's own purported 2012-17 EULA and "Software License Transfer and Re-

6    licensing Policy" which expressly allows the use and transfer of embedded software by

7    secondary market consumers, Dexon's ability to sell such products will be wrongfully and

8    unnecessarily impaired and Dexon will continue to be injured and damaged thereby.

9    Accordingly, Dexon seeks declaratory relief from this Court.

10    ~~197.~~211.    The controversy between Dexon and Cisco warrants relief declaring the

11    rights of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that: i) original

12    purchasers of Cisco products obtained the products and any associated embedded software

13    via a "sale"; ii) there is no valid or enforceable EULA governing the embedded software in

14    Cisco products sold by Dexon on the secondary market; ~~and iii~~iii) even if applicable, valid

15    and enforceable, which it is not, Cisco's purported 2012-17 EULA and "Software License

16    Transfer and Relicensing Policy" expressly allows the use and transfer of embedded

17    software by secondary market consumers; and iv) Dexon's customers' are free to use and

18    transfer such products pursuant to the first sale doctrine codified at 17 U.S.C. §109.

19                                          **Count II**
20                           **Lanham Act False Advertising**

21    ~~198.~~212.    Dexon repeats and realleges each of the allegations set forth in the

22    preceding paragraphs as if fully set forth herein.

23    ~~199.~~213.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that it

24    is unlawful for any person to use a "false or misleading description of fact, or false or

25    misleading representation of fact, which . . . in commercial advertising or promotion,

26    misrepresents the nature, characteristics, qualities, or geographic origin of his or her or

27    another person's goods, services, or commercial activities."

28

200.214.    As set forth above, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding the software embedded in Cisco hardware sold on the secondary market.

201.215.    In addition, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding whether products in the secondary market are "used."

202.216.    Cisco knowingly tells end users that they cannot use the products with embedded software because they need to purchase a separate license.

203.217.    Cisco's statements to end users that the embedded software is subject to a software license like the EULA are false. End users cannot be bound by a contract that does not exist in the first place and are free to use and transfer the subject products pursuant to the first sale doctrine.

218.    Cisco knowingly tells end users that they cannot use the products with embedded software despite the fact that versions of Cisco's purported EULA, including, without limitation, Cisco's purported 2012-17 EULA and "Software License Transfer and Re-license Policy" applicable to products Dexon has sold and will continue to sell, expressly allow the use and transfer of such embedded software.

204.219.    The foregoing false and misleading representations of fact were designed to mislead consumers by making them falsely believe they could not use the product or that the product would not work, and have in fact misled consumers, at the expense of Dexon, causing direct and substantial loss and damage to Dexon.

205.220.    The foregoing false and misleading representations of fact are made willfully and entitle Dexon to recover the profits obtained by Cisco thereby, in addition to Dexon's own damages suffered as a result of Cisco's false and misleading representations of fact.

0640.002\ex
-45-
Case No. 3:20-CV-4926-CRB
DEFENDANT'S THIRDFOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS
-56-
Exhibit B
Page 45 of 112

1    ~~206.~~221.    Cisco's misrepresentations have caused, and unless enjoined by this

2  Court, will continue to cause irreparable injury to Dexon.

3    ~~207.~~222.    Dexon will continue to suffer irreparable harm to its goodwill if these

4  actions continue and Dexon is entitled to injunctive relief to preclude such conduct

5  

**Count III**
**Intentional Interference with Contractual Relations**

6

7    ~~208.~~223.    Dexon repeats and realleges each of the allegations set forth in the

8  preceding paragraphs as if fully set forth herein.

9    ~~209.~~224.    Dexon secured contracts with certain customers, including, without

10  limitation, Fort Bend Independent School District, Lockridge, Meadowridge and Accuray

11  for the sale of Cisco products on which Dexon would have earned significant profits.

12    ~~210.~~225.    On information and belief, Cisco knew or should have known of these

13  contractual relationships between Dexon and these third party customers.

14    ~~211.~~226.    ~~On information and belief~~As detailed herein, Cisco intentionally, or

15  with reckless disregard for the truth, made false and misleading statements about Dexon

16  and the products it sells to these customers in order to disrupt the contractual relationship

17  and to cause these customers to purchase product from Cisco authorized resellers at a higher

18  price. Without limitation, Cisco falsely advised such customers they did not possess a valid

19  license to use embedded software included with the subject products. With respect to

20  Lockridge and Accuray, Cisco made such false and misleading statements despite knowing

21  its purported 2012-17 EULA and "Software License Transfer and Re-license Policy"

22  applicable to the subject products expressly allow the use and transfer of such embedded

23  software.

24    ~~212.~~227.    Cisco's statements in fact disrupted these contractual relationships

25  between Dexon and its customers.

26    ~~213.~~228.    Dexon has suffered substantial economic damage as a result of this

27  wrongful conduct in an amount subject to proof at trial.

28

214.229.    Cisco's actions have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

## Count IV
### Intentional Interference with Prospective Economic Advantage

215.230.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

216.231.    An economic relationship existed between Dexon and its actual and prospective customers, including, without limitation, Fort Bend Independent School District, Lockridge, Meadowridge, and Accuray, each of which contained the probability of substantial future economic benefits to Dexon.

217.232.    On information and belief, Cisco knew or should have known of these relationships.

218.233.    On information and beliefAs detailed herein, Cisco intentionally, or with reckless disregard, engaged in tortious conduct designed to disrupt Dexon's potential benefit from these relationships.

234.    Without limitation, Cisco falsely advised such customers they did not or would not possess a valid license for embedded software included with any products purchased from Dexon. Cisco made such false and misleading statements despite knowing: i) Dexon has sold and will continue to sell products governed by Cisco's purported 2012-17 EULA and "Software License Transfer and Re-license Policy": and ii)  Cisco's purported 2012-17 EULA and "Software License Transfer and Re-license Policy" expressly allow the use and transfer of such embedded software.

219.235.    Cisco's statements were made with the intent to disrupt the economic relationship between Dexon and its potential and actual customers in order to damage Dexon and or divert business to "Cisco Authorized Resellers" under Cisco's control.

220.236.    Cisco's knew such statements were false and misleading or had a disregard for whether such statements were true of false and misleading.

1    221.237.    As a result of the efforts detailed above, Dexon's relationships with its

2    potential and actual customers have in fact been permanently disrupted and/or materially

3    damaged in a significant number of instances, including its future relationships. As a result

4    of Cisco's tortious efforts, Dexon's customers have refused to pay for certain Cisco goods,

5    have returned and/or cancelled orders for such goods, have removed Dexon's bids from

6    contention for business, and have ceased doing business with Dexon on other products

7    and/or altogether.

8    222.238.    Dexon has suffered substantial economic damage as a result of this

9    wrongful conduct in an amount subject to proof at trial.

10   223.239.    Cisco's actions have caused, and unless enjoined by this Court, will

11   continue to cause irreparable injury to Dexon.

12                                    **Count V**
                                     **Trade Libel**
13

14   224.240.    Dexon repeats and realleges each of the allegations set forth in the

15   preceding paragraphs as if fully set forth herein.

16   241.    On information and belief, Dexon alleges that Cisco has repeatedly made

17   disparaging and false statements about Dexon's products as detailed herein, including,

18   without limitation, the statements and representations detailed above to Dexon customers

19   Fort Bend Independent School District, Lockridge, Meadowridge and Accuray. As detailed

20   herein, such false and disparaging statements included, without limitation: i) falsely

21   claiming all the products sold by Dexon to Lockridge were counterfeit; ii) falsely claiming

22   the products Dexon had contracted to sell to FBISD were "refurbished" rather than new;

23   and iii) that such Dexon customers did not possess or would not possess a valid license for

24   embedded software included with any products purchased from Dexon.

25   225.242.    Cisco made such disparaging and false statements despite knowing: i)

26   Dexon has sold and will continue to sell products governed by Cisco's purported 2012-17

27   EULA and "Software License Transfer and Re-license Policy"; and ii) Cisco's purported

28

1  2012-17 EULA and "Software License Transfer and Re-license Policy" expressly allow the

2  use and transfer of such embedded software.

3  226.243.   Cisco's statements disparaged Dexon's products.  On information and

4  belief, Dexon alleges that the claims made were false or materially misleading.

5  227.244.   Cisco intentionally made such statement knowing such statements were

6  false and misleading or having a complete disregard for whether such statements were true

7  or false and misleading.

8  228.245.   Dexon has suffered and will continue to suffer irreparable harm should

9  Cisco's trade libel be allowed to continue.

10  229.246.   As a proximate result of Cisco's statements, the identified actual

11  customers have been deterred from buying Dexon's products and from otherwise dealing

12  with Dexon. Specifically, such customers have refused to pay for certain Cisco goods, have

13  returned and/or cancelled orders for such goods, have removed Dexon's bids from

14  contention for business, and have ceased doing business with Dexon on other products

15  altogether.

16  230.247.    Dexon has suffered substantial economic damage as a result of this

17  wrongful conduct in an amount subject to proof at trial.

18  **Count VI**

19  **Trade Libel Per Se**

20  231.248.   Dexon repeats and realleges each of the allegations set forth in the

21  preceding paragraphs as if fully set forth herein.

22  232.249.   As detailed herein, Cisco has repeatedly made disparaging and false

23  statements about Dexon's products to Dexon customers Fort Bend Independent School

24  District, Lockridge, Meadowridge and Accuray.

25  250.  As detailed herein, such false and disparaging statements included, without

26  limitation: i) falsely claiming all the products sold by Dexon to Lockridge were counterfeit;

27  ii) falsely claiming the products Dexon had contracted to sell to FBISD were "refurbished"

28

1  rather than new; and iii) that such Dexon customers did not possess or would not possess a

2  valid license for embedded software included with any products purchased from Dexon.

3       251.   Cisco made such disparaging and false statements despite knowing: i) Dexon

4  has sold and will continue to sell products governed by Cisco's purported 2012-17 EULA

5  and "Software License Transfer and Relicense Policy": and ii)  Cisco's purported 2012-17

6  EULA and "Software License Transfer and Re-license Policy" expressly allow the use and

7  transfer of such embedded software.

8       ~~233.~~252.    Cisco's statements disparaged Dexon's products.

9       ~~234.~~253.    Cisco intentionally made such statements knowing such statements

10  were false and misleading or having a complete disregard for whether such statements were

11  true or false and misleading.

12       ~~235.~~254.    As a proximate result of Cisco's statements, the identified actual

13  customers have been deterred from buying Dexon's products and from otherwise dealing

14  with Dexon. Specifically, such customers have refused to pay for certain Cisco goods, have

15  returned and/or cancelled orders for such goods, have removed Dexon's bids from

16  contention for business, and have ceased doing business with Dexon on other products

17  altogether.

18       ~~236.~~255.     Dexon has suffered substantial economic damage as a result of this

19  wrongful conduct in an amount subject to proof at trial.

20       ~~237.~~256.    Such false and misleading statements by Cisco go to the integrity and

21  character of Dexon's business practices, including, without limitation, implying that Dexon

22  misleads its customers as to the nature or quality of its goods, including that Dexon sells

23  "refurbished" products as "new,", and that Dexon misrepresents that its secondary market

24  customers will be able to use and transfer Cisco products purchased from Dexon.   As a

25  result, damage is presumed for such statements irrespective of any actual damages proven

26  by Dexon at trial.

27                              **THIRD PARTY CLAIMS**

28

1    238.257.    Third Party Plaintiff Dexon Computer, Inc. asserts the following claims

2  against Third Party Defendants Atlantix Global Systems International, LLC, Bizcom

3  Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable

4  Connections, MJSI, Multimode Technologies, LLC, Optimum Data, Inc., Paragon, Pure

5  Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc.,

6  Strada Networks, LLC, Unlimited Network Solutions and Wisecom Technologies alleges

7  as follows:

8                                    **THE PARTIES**

9    239.258.    Third Party Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota

10  corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB,

11  Bloomington, Minnesota 55420.

12    240.259.    On information and belief, Third Party Defendant Atlantix Global

13  Systems International, LLC is a Georgia limited liability corporation with its principal place

14  of business in Georgia.

15    241.260.    On information and belief, Third Party Defendant Bizcom Electronics,

16  Inc., is a California corporation with its principal place of business in California.

17    242.261.    On information and belief, Third Party Defendant Digi Devices Online

18  is a foreign corporation with its principal U.S. place of business in Texas.

19    243.262.    On information and belief, Third Party Defendant Enterprise Business

20  Technologies, Inc. is a New York corporation with its principal place of business in New

21  York.

22    244.263.    On information and belief, Third Party Defendant Fiber Cable

23  Connections is a Washington corporation with its principal place of business in

24  Washington.

25    245.264.    On information and belief, Third Party Defendant MJSI is a California

26  corporation with its principal place of business in California.

27

28

246.265.    On information and belief, Third Party Defendant Multimode Technologies, LLC is a Minnesota limited liability company with its principal place of business in Minnesota.

247.266.    On information and belief, Third Party Defendant Optimum Data, Inc. is a Nebraska corporation with its principal place of business in Nebraska.

248.267.    On information and belief, Third Party Defendant Paragon is a Massachusetts corporation with its principal place of business in Massachusetts.

249.268.    On information and belief, Third Party Defendant Pure Future Technology, Inc. is a California corporation with its principal place of business in California.

250.269.    On information and belief, Third Party Defendant Seastar IT Trading LLC is a Washington limited liability company with its principal place of business in Washington.

251.270.    On information and belief, Third Party Defendant Server Tech Supply is a Virginia corporation with its principal place of business in Pennsylvania.

252.271.    On information and belief, Third Party Defendant Softnetworks, Inc. is a New Jersey limited liability company with its principal place of business in New Jersey.

253.272.    On information and belief, Third Party Defendant Strada Networks, LLC is a foreign limited liability company with its principal place of business in British Columbia, Canada.

254.273.    On information and belief, Third Party Defendant Teksavers is a Texas corporation with its principal place of business in Texas

255.274.    On information and belief, Third Party Defendant Unlimited Network Solutions is a corporation with its principal place of business in California.

256.275.    On information and belief, Wisecom Technologies is a corporation with its principal place of business in Maryland.

**Supply of Alleged Counterfeit and Infringing Product**

1    257.276.    The Third Party Defendants are all reputable dealers and merchants

2  with respect to the Cisco products alleged to be counterfeit and thereby infringing herein

3  ("allegedly infringing Cisco product").

4    258.277.    Dexon obtained such allegedly infringing Cisco product from the Third

5  Party Defendants. While Dexon denies Cisco's allegations and believes the subject products

6  to be genuine, Dexon relied in good faith on the Third Party Defendants in procuring or

7  obtaining such products.

8    259.  Without limitation, the Third Party Defendants warranted that such products

9  sold to Dexon would be "delivered free of the rightful claim of any third person by way of

10  infringement or the like."  *See* U.C.C. §2-312(3).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST THIRD PARTY CLAIM**
**(Indemnification - All Third Party Defendants)**

260.279.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

261.280.    Dexon was named in this litigation as a direct result of product procured from and/or supplied by the Third Party Defendants.

262.281.    Third Party Defendants should be ordered to indemnify Dexon whether based on express agreement, implied agreement or common law.

**SECOND THIRD PARTY CLAIM**
**(Contribution - All Third Party Defendants)**

263.282.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

264.283.    Dexon was named in this litigation as a direct result of product procured from and supplied by the Third Party Defendants.

265.284.    Dexon is entitled to contribution from Third Party Defendants, whether based on express agreement, implied agreement or common law, to pay or defray any judgment entered against Dexon herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Defendant, Counterclaim Plaintiff and Third Party Plaintiff Dexon Computer, Inc. prays for judgment and relief against Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc. ("Cisco") and Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Unlimited Network Solutions and Wisecom Technologies as follows:

1           a.     Dismissing Plaintiffs' Cisco Systems, Inc. and Cisco Technology, Inc.

2    claims with prejudice, together with costs and disbursements;

3           b.     Awarding Dexon actual damages, subject to proof at trial but in an

4    amount in excess of $75,000.;

5           c.     For equitable remedial efforts by Counterclaim Defendants sufficient

6    to rehabilitate Dexon's damaged reputation;

7           d.     Declaring that: i) original purchasers of Cisco products obtained the

8    products and any associated embedded software via a "sale"; ii) there is no valid or

9    enforceable EULA governing the embedded software in Cisco products sold by Dexon on

10   the secondary market; and iii) Dexon's customers' are free to use and transfer such products

11   pursuant to the first sale doctrine codified at 17 U.S.C. §109.

12          e.     For orders restraining or enjoining Cisco from engaging in similar

13   conduct in the future;

14          f.     Awarding Dexon its costs and expenses of litigation, including

15   reasonable attorneys' fees;

16          g.     An award in Dexon's favor against Third Party Defendants sufficient

17   to compensate Dexon for all economic loss, damages, attorney's fees and costs resulting

18   from the claims herein; and

19          h.     Such other and further relief as this Court deems just and equitable.

20

21

22

23

24

25

26

27

28

0640.002\ex                                -55-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S ~~THIRD~~ FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS                   Exhibit B
-66-                     Page 55 of 112

1  Dated: ~~April 6~~May ___, 2022

*/s/ Amanda R. Washton*

Amanda Washton
 *a.washton@conklelaw.com*
**CONKLE, KREMER & ENGEL, PLC**
3130 Wilshire Boulevard, Suite 500
Santa Monica, CA 90403

Michael M. Lafeber
 *mlafeber@taftlaw.com*
O. Joseph Balthazor Jr.
 *jbalthazor@taftlaw.com*
**TAFT STETTINIUS & HOLLISTER LLP**
2200 IDS Center
80 S. 8th St.
Minneapolis, MN 55402

David H. Reichenberg (*pro hac vice pending*)
 *DReichenberg@cozen.com*
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 56th Floor
New York, New York 10006

Mark A. Jacobson (*pro hac vice pending*)
 *mjacobson@cozen.com*
**COZEN O'CONNOR**
33 South 6th Street, Suite 3800
Minneapolis, MN 55402

Attorneys for Defendant, Counterclaim Plaintiff and
Third-Party Plaintiff Dexon Computer, Inc.

0640.002\ex

-56-

Case No. 3:20-CV-4926-CRB
DEFENDANT'S ~~THIRD~~FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS
-67-

Exhibit B
Page 56 of 112

1

## **DEMAND FOR JURY TRIAL**

2

Dexon Computer, Inc. demands a trial by jury on all issues so triable.

3

4   Dated: ~~April 6~~May ___, 2022

/s/ Amanda R. Washton

5
Amanda R. Washton
  *a.washton@conklelaw.com*

6
**CONKLE, KREMER & ENGEL, PLC**
3130 Wilshire Boulevard, Suite 500

7
Santa Monica, CA 90403

8
Michael M. Lafeber
  *mlafeber@taftlaw.com*

9
O. Joseph Balthazor Jr.
  *jbalthazor@taftlaw.com*

10
**TAFT STETTINIUS & HOLLISTER LLP**
2200 IDS Center

11
80 S. 8th Street
Minneapolis, MN 55402

12
David H. Reichenberg (*pro hac vice pending*)

13
  *DReichenberg@cozen.com*
**COZEN O'CONNOR**

14
3 WTC, 175 Greenwich Street, 56th Floor
New York, New York 10006

15
Mark A. Jacobson (*pro hac vice pending*)

16
  *mjacobson@cozen.com*
**COZEN O'CONNOR**

17
33 South 6th Street, Suite 3800
Minneapolis, MN 55402

18
Attorneys for Defendant, Counterclaim Plaintiff and

19
Third-Party Plaintiff Dexon Computer, Inc.

20

21

22

23

24

25

26

27

28

1   Amanda R. Washton (SB# 227541)
     *a.washton@conklelaw.com*
2   **CONKLE, KREMER & ENGEL**
    Professional Law Corporation
3   3130 Wilshire Boulevard, Suite 500
    Santa Monica, California 90403-2351
4   Phone: (310) 998-9100
    Fax: (310) 998-9109
5

6   Michael M. Lafeber (*pro hac vice*)
     *mlafeber@taftlaw.com*
7   O. Joseph Balthazor Jr. (*pro hac vice*)
     *jbalthazor@taftlaw.com*
8   **TAFT STETTINIUS &
       HOLLISTER LLP**
9   2200 IDS Center
    80 S. 8th St.
10  Minneapolis, MN 55402
    Phone: 612.977.8400
11  Fax: 612.977.8650

      David H. Reichenberg (*pro hac vice*)
      **MANATT, PHELPS & PHILLIPS, LLP**
      7 Times Square
      New York, NY 10036
      Direct: (212) 790-4626
      Office: (212) 790-4500
      Fax: (212) 790-4545
      Email: DReichenberg@manatt.com

12
     Attorneys for Defendant, Counterclaim Plaintiff
13   and Third-Party Plaintiff Dexon Computer, Inc.

14

15                        UNITED STATES DISTRICT COURT

16          NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

17

18
     CISCO SYSTEMS, INC., a Delaware
19   corporation and CISCO TECHNOLOGY,
     INC., a California corporation,
20
                     Plaintiffs,
21
            v.
22
     DEXON COMPUTER, INC., a Minnesota
23   corporation,
24                   Defendant.
25
     DEXON COMPUTER, INC., a Minnesota
26   corporation,
27                   Counterclaim Plaintiff and
                     Defendant,
28          v.

|  |  |
|---|---|
| Case No. 3:20-CV-4926-CRB | |
| **DEFENDANT'S [PROPOSED] FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS** | |
| Hon. Charles R. Breyer | |
| Presiding Judge | |
| Trial Date:         None | |

CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation,

Counterclaim Defendants and Plaintiffs.

DEXON COMPUTER, INC., a Minnesota corporation,

Third-Party Plaintiff,

v.

ATLANTIX GLOBAL SYSTEMS INTERNATIONAL, LLC, BIZCOM ELECTRONICS, INC., DIGI DEVICES ONLINE, ENTERPRISE BUSINESS TECHNOLOGIES, INC., FIBER CABLE CONNECTIONS, MJSI, MULTIMODE TECHNOLOGIES, LLC,  OPTIMUM DATA, INC., PARAGON, PURE FUTURE TECHNOLOGY, INC., SEASTAR IT TRADING LLC, SERVER TECH SUPPLY, SOFTNETWORKS, INC., STRADA NETWORKS, LLC, TEKSAVERS, UNLIMITED NETWORK SOLUTIONS, and WISECOM TECHNOLOGIES,

Third-Party Defendants,

0640.002\Ex                                   -2-                       Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-70-
Exhibit B
Page 59 of 112
73575998v1

1   Defendant Dexon Computer, Inc. ("Dexon"), by and through its undersigned

2   counsel, for its Answer, denies each and every allegation in Plaintiffs Cisco Systems, Inc.

3   and Cisco Technology Inc.'s ("Plaintiffs") First Amended Complaint ("Complaint") except

4   as expressly admitted, qualified or otherwise responded to herein and denies that Plaintiffs

5   are entitled to any of the relief requested in their Prayer for Relief.  In response to each of

6   the numbered paragraphs of the Complaint, Dexon states as follows.  To the extent the

7   headings or any other non-numbered statements in the Complaint contain allegations,

8   Dexon denies each and every such allegation.

9   **INTRODUCTION**

10   1.   Dexon denies the allegations of paragraph 1 of the Complaint.

11   2.   Dexon denies the allegations of paragraph 2 of the Complaint.

12   **THE PARTIES**

13   3.   Dexon lacks sufficient information to admit or deny the allegations of

14   paragraph 3 of the Complaint, and on that basis Dexon denies those allegations.

15   4.   Dexon admits the allegations of paragraph 4 of the Complaint.

16   5.   Dexon denies the allegations of paragraph 5 of the Complaint.

17   **JURISDICTION AND VENUE**

18   6.   Dexon admits that the Complaint purports to be one "founded upon violations

19   of Federal trademark laws" but denies any such purported claims have legal or factual merit.

20   The remaining allegations in paragraph 6 of the Complaint are legal conclusions and

21   questions of law regarding jurisdiction to which no response is required.  To the extent a

22   response is required, Dexon denies such allegations.

23   7.   Dexon denies the allegations of paragraph 7 of the Complaint.

24   8.   Dexon denies the allegations of paragraph 8 of the Complaint.

25   9.   Dexon denies the allegations of paragraph 9 of the Complaint.

26   10.   Dexon denies the allegations of paragraph 10 of the Complaint.

27   11.   Dexon denies the allegations of paragraph 11 of the Complaint.

28

# FACTUAL ALLEGATIONS

## Alleged Cisco Business and History

12.	Dexon lacks sufficient information to admit or deny the allegations of paragraph 12 of the Complaint, and on that basis Dexon denies those allegations.

13.	Dexon lacks sufficient information to admit or deny the allegations of paragraph 13 of the Complaint, and on that basis Dexon denies those allegations.

14.	Dexon lacks sufficient information to admit or deny the allegations of paragraph 14 of the Complaint, and on that basis Dexon denies those allegations.

## Alleged Cisco Trademarks

15.	Dexon lacks sufficient information to admit or deny the allegations of paragraph 15 of the Complaint, and on that basis Dexon denies those allegations.

16.	Dexon lacks sufficient information to admit or deny the allegations of paragraph 16 of the Complaint, and on that basis Dexon denies those allegations.

17.	Dexon lacks sufficient information to admit or deny the allegations of paragraph 17 of the Complaint, and on that basis Dexon denies those allegations.

18.	Dexon lacks sufficient information to admit or deny the allegations of paragraph 18 of the Complaint, and on that basis Dexon denies those allegations.

## Alleged Counterfeit "Cisco" Products

19.	Dexon lacks sufficient information to admit or deny the allegations of paragraph 19 of the Complaint, and on that basis Dexon denies those allegations.

20.	Dexon lacks sufficient information to admit or deny the allegations of paragraph 20 of the Complaint, and on that basis Dexon denies those allegations.

## Alleged Impact on Health, Safety, and National Security Caused by Counterfeit Cisco Products

21.	Dexon lacks sufficient information to admit or deny the allegations of paragraph 21 of the Complaint, and on that basis Dexon denies those allegations.

22.	Dexon lacks sufficient information to admit or deny the allegations of paragraph 22 of the Complaint, and on that basis Dexon denies those allegations.

**Dexon's Alleged History and Practice of Trafficking in Counterfeit Cisco Products**

23.     Dexon admits selling product bearing the Cisco name and/or mark, but denies the remaining allegations of paragraph 23 of the Complaint, including, without limitation, any allegation such product was counterfeit.

24.     Dexon denies the allegations of paragraph 24 of the Complaint.

25.     Dexon denies the allegations of paragraph 25 of the Complaint.

**Alleged Activity Prior to 2015 Purportedly Demonstrating Dexon's Pattern and  Practice of Knowingly Trafficking in Counterfeit Cisco Products**

**Alleged July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco Investigator (Reston, Virginia)**

26.     Dexon denies the allegations in paragraph 26 of the Complaint. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**FBI's Seizure of Alleged Counterfeit Cisco Products from Dexon on February 26, 2008**

27.     Dexon admits the Federal Bureau of Investigation ("FBI") executed a search warrant at Dexon's business location on or about February 26, 2008, but denies the remaining allegations in paragraph 27 of the Complaint including, without limitation, any allegation, suggestion or implication any or "all" of the product taken by the FBI was determined to be counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Cisco's March 2008 Cease and Desist Letter to Dexon and its CEO**

28.     Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about March 7, 2008, and that Dexon responded via a letter from its counsel on or about March 18, 2008, but Dexon denies the reminder of the allegations in paragraph 28 of the Complaint, including, without limitation, Plaintiffs' attempted

1   characterizations of the letters or communications which speak for themselves.  Plaintiffs

2   previously commenced a lawsuit against Dexon in 2011 including claims based directly on

3   such allegations which were resolved via a confidential settlement agreement and dismissed

4   with prejudice.

5          **Dexon's June 2010 Sale of Alleged Counterfeit Cisco Products to Wayne**
           **State University (Detroit, Michigan) and Cisco's C&D Letter**
6

7          29.    Dexon admits selling and shipping Cisco product to Wayne State University

8   on or about February 21, 2010 but denies the remainder of the allegations in paragraph 29

9   of the Complaint, including, without limitation, any allegation the product involved was

10  counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including

11  claims based directly on such allegations which were resolved via a confidential settlement

12  agreement and dismissed with prejudice.

13         30.    Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO

14  Steve O'Neil on or about August 6, 2010 concerning Dexon's sale of Cisco product to

15  Wayne State University, but Dexon denies the reminder of the allegations in paragraph 30

16  of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the

17  letter which speaks for itself.  Plaintiffs previously commenced a lawsuit against Dexon in

18  2011 including claims based directly on such allegations which were resolved via a

19  confidential settlement agreement and dismissed with prejudice.

20         31.    Dexon admits it responded via a letter from counsel to Plaintiffs' Wayne State

21  University allegations on or about August 23, 2010, but Dexon denies the reminder of the

22  allegations in paragraph 31 of the Complaint, including, without limitation, Plaintiffs'

23  attempted characterization of the letter which speaks for itself. Plaintiffs previously

24  commenced a lawsuit against Dexon in 2011 including claims based directly on such

25  allegations which were resolved via a confidential settlement agreement and dismissed with

26  prejudice.

27         32.    Dexon admits Plaintiffs sent a follow-up letter concerning or relating to the

28  Wayne State University allegations on or about August 30, 2010, but Dexon denies the

DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

1  reminder of the allegations in paragraph 32 of the Complaint, including, without limitation,

2  Plaintiffs' attempted characterization of the letter which speaks for itself. Plaintiffs

3  previously commenced a lawsuit against Dexon in 2011 including claims based directly on

4  such allegations which were resolved via a confidential settlement agreement and dismissed

5  with prejudice.

6
7  **Dexon's July 2010 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Los Angeles, California)**

8      33.    Dexon denies the allegations in paragraph 33 of the Complaint. Plaintiffs

9  previously commenced a lawsuit against Dexon in 2011 including claims based directly on

10  such allegations which were resolved via a confidential settlement agreement and dismissed

11  with prejudice.

12  **Dexon's Alleged Illegal Conduct Giving Rise to the Present Lawsuit**

13      34.    Dexon denies the allegations in paragraph 34 of the Complaint.

14
15  **Dexon's July 2015 Sale of Alleged Counterfeit Cisco Product to Things Remembered, Inc. (Highland Heights, Ohio) and Cisco's C&D Letter**

16      35.    Dexon admits selling Cisco product to Things Remembered, Inc. on or about

17  July 2015, but denies the remainder of the allegations in paragraph 35 of the Complaint,

18  including any allegation the product was counterfeit.

19      36.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to

20  the Things Remembered, Inc. allegations on or about August 27, 2020 and that Dexon

21  responded thereto, but Dexon denies the reminder of the allegations in paragraph 36 of the

22  Complaint, including, without limitation, Plaintiffs' attempted characterizations of the

23  letters or communications which speak for themselves.

24
25  **Dexon's December 2016 Sale of Alleged Counterfeit Cisco Products to Jack Henry & Associates, Inc. (Monett, Missouri) and Cisco's C&D Letter**

26
27      37.    Dexon admits selling Cisco product to Jack Henry & Associates, Inc. ("Jack

28  Henry") on or about December 2016, but denies the remainder of the allegations in

0640.002\Ex                                    -7-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-75-
73575998v1
Exhibit B
Page 64 of 112

1   paragraph 37 of the Complaint, including, without limitation, any allegation the product

2   was counterfeit.

3       38.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to

4   the Jack Henry allegations, but Dexon denies the reminder of the allegations in paragraph

5   38 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of

6   the letter which speaks for itself.

7       39.    Dexon admits it responded to Plaintiffs' Jack Henry allegations via a letter

8   from Dexon's counsel, but denies the reminder of the allegations in paragraph 39 of the

9   Complaint, including, without limitation, Plaintiffs' attempted characterizations of the

10  responsive letter which speaks for itself.

11            **Dexon's October 2017 Sale of Alleged Counterfeit Cisco Products to a**
              **Cisco Investigator (Berkeley, California)**

12

13      40.    Dexon denies the allegations in paragraph 40 of the Complaint.

14            **Dexon's January 2018 Sale of Alleged Counterfeit Cisco Product to**
              **Community Health Alliance (Reno, Nevada) and Cisco's C&D Letter**

15

16      41.    Dexon admits selling Cisco product to Community Health Alliance ("CHA")

17  on or about January 2018, but denies the remainder of the allegations in paragraph 41 of

18  the Complaint, including, without limitation, any allegation the product was counterfeit.

19      42.    Dexon admits Plaintiffs and Dexon's counsel exchanged a series of letters or

20  communications relating to the CHA allegations, but denies the remainder of the allegations

21  in paragraph 42 of the Complaint, including, without limitation, Plaintiffs' attempted

22  characterizations of the letters or communications which speak for themselves.

23            **Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to**
              **Tucson Medical Center (Arizona)**

24

25      43.    Dexon admits selling Cisco product to Tucson Medical Center ("TMC") on

26  or about April 2018, but denies the remainder of the allegations in paragraph 43 of the

27  Complaint, including, without limitation, any allegation the product was counterfeit.

28

0640.002\Ex         -8-         Case No. 3:20-CV-4926-CRB

DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-76-

73575998v1

Exhibit B
Page 65 of 112

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to DARCARS (Maryland) and Cisco's C&D Letter**

44.     Dexon admits selling Cisco product to DARCARS on or about April 2018, but denies the remainder of the allegations in paragraph 44 of the Complaint, including, without limitation, any allegation the product was counterfeit.

45.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the DARCARS allegations, but Dexon denies the reminder of the allegations in paragraph 45 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Lockridge, Grindal, Nauen, PLLP (Minneapolis, Minnesota)**

46.     Dexon admits selling Cisco product to Lockridge, Grindal, Nauen, PLLP on or about August 2018, but denies the remainder of the allegations in paragraph 46 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Regional Justice Information Service (St. Louis, MO) and Cisco's C&D Letter**

47.     Dexon admits selling Cisco product to Regional Justice Information Service ("RJIS") on or about August 2018, but denies the remainder of the allegations in paragraph 47 of the Complaint, including, without limitation, any allegation the product was counterfeit.

48.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the RJIS allegations, but Dexon denies the reminder of the allegations in paragraph 48 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Purchases in 2018 of Alleged Counterfeit Switches from PureFutureTech (Fremont, California)**

49.     Dexon admits purchasing Cisco product from PureFutureTech on or about 2018 and that the purported supplier of such product was HongKong Sellsi, a former

0640.002\Ex                                                      -9-                              Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-77-
73575998v1

Exhibit B
Page 66 of 112

1  authorized licensed seller of Cisco products, but lacks sufficient information to admit or

2  deny the remaining allegations of paragraph 49 of the Complaint, and on that basis Dexon

3  denies such allegations.

4       50.    Dexon admits Plaintiffs served it with a subpoena relating to a lawsuit

5  involving Plaintiffs, PureFutureTech and HongKong Sellsi and that Plaintiffs were

6  ultimately required to file a motion relating to such non-party subpoena.  Dexon denies the

7  remaining allegations of paragraph 50 of the Complaint, including, without limitation, any

8  allegation, suggestion or implication Dexon "refused to cooperate" with, or in any way

9  failed to meet its obligations arising from, the subpoena.

10
11
**Dexon's Purchases in 2017 to 2019 of Alleged Counterfeit Transceivers from PureFutureTech, Inc. (Fremont, California)**

12       51.    Dexon admits purchasing Cisco product from PureFutureTech, Inc. in the

13  period 2017-2019 but denies any such product was counterfeit.  Dexon lacks sufficient

14  information to admit or deny the remaining allegations in paragraph 51 of the Complaint

15  and on that basis denies such allegations.

16       52.    Dexon denies the allegations in paragraph 52 of the Complaint, including,

17  without limitation, any allegation Dexon knew or reasonably should have known any Cisco

18  product was allegedly counterfeit, or that Dexon was willfully blind to such alleged fact.

19
20
**Dexon's Sales of Alleged Counterfeit Products to Murray State University (Murray, Kentucky) in 2018 and 2019 and Cisco's C& Letter**

21       53.    Dexon admits selling Cisco product to Murray State University ("MSU") in

22  or about 2018 and 2019, but denies the remainder of the allegations in paragraph 53 of the

23  Complaint, including, without limitation, any allegation the product was counterfeit.

24       54.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to

25  the MSU allegations, but Dexon denies the reminder of the allegations in paragraph 54 of

26  the Complaint, including, without limitation, Plaintiffs' attempted characterization of the

27  letter which speaks for itself.

28

DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**Dexon's July 2019 Sale of Alleged Counterfeit Cisco Products to MedRisk (King of Prussia, Pennsylvania)**

55.      Dexon admits selling Cisco product to MedRisk on or about July 2019, but denies the remainder of the allegations in paragraph 55 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's September 2019 Sale of Alleged Counterfeit Cisco Products to Coppell Independent School District (Coppell, Texas) and Cisco's C&D Letter**

56.      Dexon admits selling Cisco product to Coppell Independent School District ("CISD") on or about September 2019, but denies the remainder of the allegations in paragraph 56 of the Complaint.

57.      Dexon denies any allegation, suggestion or implication in paragraph 57 of the Complaint that Cisco product it sold to CISD was counterfeit.  Dexon lacks sufficient information to admit or deny the remainder of the allegations in paragraph 57 of the Complaint and on that basis denies such allegations.

58.      Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the CISD allegations, but Dexon denies the reminder of the allegations in paragraph 58 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Alleged California Directed Conduct Identified Through Jurisdictional  Discovery**

59.      Dexon admits Plaintiffs conducted jurisdictional discovery herein, but denies the remainder of the allegations in paragraph 59 of the Complaint, including, without limitation, Plaintiffs' characterization of such jurisdictional discovery, as well as any allegation such discovery revealed any "illegal and tortious" conduct by Dexon in California or elsewhere.

**Dexon's Sale of Alleged Counterfeit Cisco Products to California Customers**

60.      Dexon denies the allegations in paragraph 60 of the Complaint.

1

### Dexon's Sale of Alleged Counterfeit Cisco Licenses to California Customers

2

3    61.    Dexon admits Cisco has transmitted software licenses via Product Activation

4 Key Certificates ("PAK") and that such PAKs have included a code that allows users to

5 utilize the subject software.  Dexon denies the remainder of the allegations in paragraph 61

6 of the Complaint.

7    62.    Dexon denies the allegations in paragraph 62 of the Complaint.

8    63.    Dexon denies the allegations in paragraph 63 of the Complaint.

9    64.    Dexon denies the allegation in paragraph 64 of the Complaint.

10    **FIRST PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Infringement**
11    *(15 U.S.C. § 1114)*

12    65.    Dexon restates and incorporates by reference its responses to the allegations

13 in paragraphs 1-64 in response to the allegations in paragraph 65 of the Complaint.

14    66.    Dexon denies the allegations of paragraph 66 of the Complaint.

15    67.    Dexon denies the allegations of paragraph 67 of the Complaint.

16    68.    Dexon denies the allegations of paragraph 68 of the Complaint.

17    69.    Dexon denies the allegations of paragraph 69 of the Complaint.

18    70.    Dexon denies the allegations of paragraph 70 of the Complaint.

19    71.    Dexon denies the allegations of paragraph 71 of the Complaint.

20    72.    Dexon denies the allegations of paragraph 72 of the Complaint.

21    **SECOND PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Counterfeiting**
22    *(15 U.S.C. § 1114)*

23    73.    Dexon restates and incorporates by reference its responses to the allegations

24 in paragraphs 1-72 in response to the allegations in paragraph 73 of the Complaint.

25    74.    Dexon denies the allegations of paragraph 74 of the Complaint.

26    75.    Dexon denies the allegations of paragraph 75 of the Complaint.

27    76.    Dexon denies the allegations of paragraph 76 of the Complaint.

28    77.    Dexon denies the allegations of paragraph 77 of the Complaint.

0640.002\Ex                           -12-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-80-
73575998v1

Exhibit B
Page 69 of 112

1     78.    Dexon denies the allegations of paragraph 78 of the Complaint.

2     79.    Dexon denies the allegations of paragraph 79 of the Complaint.

**THIRD PURPORTED CLAIM FOR RELIEF**
**False Designation of Origin**
*(15 U.S.C. § 1125)*

80.    Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-79 in response to the allegations in paragraph 80 of the Complaint.

81.    Dexon denies the allegations of paragraph 81 of the Complaint

82.    Dexon denies the allegations of paragraph 82 of the Complaint.

83.    Dexon denies the allegations of paragraph 83 of the Complaint.

84.    Dexon denies the allegations of paragraph 84 of the Complaint.

85.    Dexon denies the allegations of paragraph 85 of the Complaint.

**FOURTH PURPORTED CLAIM FOR RELIEF**
**California Unfair Business Practices**
**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**

86.    Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-85 in response to the allegations in paragraph 86 of the Complaint.

87.    The allegations in paragraph 87 of the Complaint are legal conclusions of law regarding California Business and Professions Code §§ 17200 et seq to which no response is required.  To the extent such allegations imply or suggest Dexon has in any way violated California Business and Professions Code §§ 17200 et seq Dexon denies such allegations.

88.    Dexon denies the allegations of paragraph 88 of the Complaint.

89.    Dexon denies the allegations of paragraph 89 of the Complaint.

90.    Dexon denies the allegations of paragraph 90 of the Complaint.

91.    Dexon denies the allegations of paragraph 91 of the Complaint.

92.    Dexon denies the allegations of paragraph 92 of the Complaint.

**FIFTH PURPORTED CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Common Law)**

93.    Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-92 in response to the allegations in paragraph 93 of the Complaint.

0640.002\Ex             -13-            Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-81-             Exhibit B
73575998v1             Page 70 of 112

94.     Dexon admits the allegations of paragraph 94 of the Complaint.

95.     Dexon denies the allegations of paragraph 95 of the Complaint.

## AFFIRMATIVE DEFENSES

Without admitting any wrongful conduct on the part of Dexon, and without admitting that Plaintiffs claims have any merit or that Plaintiffs have suffered any loss, damage, or injury, Dexon alleges the following affirmative defenses to the Complaint.  By designating the following as affirmative defenses, Dexon does not in any way waive or limit any defenses which are or may be raised by their denial, allegations, and averments set forth herein.  These defenses are pled in the alternative, are raised to preserve the rights of Dexon to assert such defenses, and are without prejudice to Dexon's ability to raise other and further defenses.  Dexon expressly reserves all rights to reevaluate their defenses and/or assert additional defenses upon discovery and review of additional documents and information, upon the development of other pertinent facts, and during pretrial proceedings in this action.  Dexon expressly incorporate all allegations of its Answer, Counterclaims and Cross-Claims as if fully set forth in each of the following affirmative defenses.

## FIRST AFFIRMATIVE DEFENSE
### (Res Judicata and Collateral Estoppel)

96.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel.

## SECOND AFFIRMATIVE DEFENSE
### (Laches)

97.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of laches.  Plaintiffs' have had longstanding knowledge concerning the legal open or "secondary" market for its products and have proactively engaged in unfair and tortious behavior in an effort to selectively manipulate and control such secondary market to their advantage.  Plaintiffs have had longstanding specific knowledge of Dexon's activity in the legal secondary market since well before 2011, yet have failed to take timely action to assert their claims herein, resulting in substantial prejudice to Defendants.

### THIRD AFFIRMATIVE DEFENSE
### (Estoppel)

98.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of estoppel.  Plaintiffs' advertises that consumers can purchase their products from their "Authorized Channel Partners" or "Authorized Resellers."  Plaintiffs have known, or should have known such "Authorized Channel Partners" and/or "Authorized Resellers" participate in and sell their products on the secondary market.  Plaintiffs have allowed these "Authorized Channel Partners" and/or "Authorized Resellers" to maintain their "authorized" status despite knowledge of their participation in the secondary market, including evidence of their sale of counterfeit Cisco products.  Plaintiffs know, or should have reasonably known, that secondary market resellers such as Dexon rely upon Plaintiffs' endorsement of such "authorized" vendors when sourcing Cisco products, including, without limitation, procuring Cisco product from such "authorized vendors'" end customers.  Plaintiffs have also actively contributed to the presence of counterfeit product in the marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers.  As one example, Plaintiffs "authorized" vendors intentionally modify or change product serial numbers in order to ensure the subject product(s) qualify for Plaintiffs' SmartNet service packages. Plaintiffs are therefore estopped from pursuing claims against Dexon or seeking damages related to alleged counterfeit products.

### FOURTH AFFIRMATIVE DEFENSE
### (First Sale Doctrine and Exhaustion)

99.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the first sale doctrine, which protects secondary market resellers such as Dexon from liability for the purchase, importation, and resale of genuine Cisco products and exhausts Plaintiffs' rights in further transactions.

### FIFTH AFFIRMATIVE DEFENSE
### (Statutes of Limitations)

DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

100.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by applicable statutes of limitations, including but not limited to CAL. CIV. PROC. CODE §§ 337–38, CAL. BUS. & PROF. CODE § 17208, and 17 U.S.C. § 507.   Some or all of Plaintiffs' claims involve conduct outside of the applicable statutes of limitations.

## SIXTH AFFIRMATIVE DEFENSE
### (Waiver)

101.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of waiver. Plaintiffs have promoted and advertised its "authorized" sellers despite having full knowledge certain such "authorized" sellers: i) have been caught selling counterfeit product; and ii) actively and regularly deal with secondary market resellers such as Dexon. Secondary market resellers such as Dexon have understandably relied upon Plaintiffs' promotion and endorsement of such "authorized" sellers when sourcing Cisco products for their customers.  Plaintiffs have also intentionally failed or refused to provide or offer their claimed "tools" for detecting counterfeit product to secondary market resellers such as Dexon, and have actively contributed to the presence of counterfeit product in the marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers.  Plaintiffs have also had longstanding specific knowledge of Dexon's activity in the legal secondary market since well before 2011, yet have failed to take timely action to assert their claims herein. Accordingly, Plaintiffs have waived any claims related to Dexon's unwitting sale of alleged counterfeit goods, including any such goods sourced directly or indirectly from Plaintiffs' "authorized" vendors.

## SEVENTH AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

102.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of unjust enrichment.  Plaintiffs have engaged in unfair and tortious practices and made misrepresentations to consumers regarding: i) the quality and authenticity of products sold by secondary market resellers such as Dexon; and ii) Plaintiffs' rights to restrict

1  consumers use and transfer of Cisco hardware and software.  Such conduct has improperly
2  steered customers from Dexon to Plaintiffs and unjustly enriched Plaintiffs.

## EIGHTH AFFIRMATIVE DEFENSE
### (Unclean Hands/Inequitable Conduct)

103.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the
doctrines of unclean hands, inequitable conduct, and similar defenses.  Without limitation,
Plaintiffs have: (i) intentionally misled consumers into thinking that genuine products on
the secondary market are used, counterfeit, or stolen, (ii) sold products to resellers whom it
knew, or should have known, were reselling the products on the secondary market, (iii) held
out certain entities as "Authorized Resellers" even though Plaintiffs knew or should have
known these entities sold counterfeit goods, and engaged in other inequitable practices that
bar recovery on its claims.

## NINTH AFFIRMATIVE DEFENSE
### (Redundancy)

104.   Plaintiffs' claims and/or recovery are barred, in whole or in part, because they
are redundant and/or duplicative of one another.

## TENTH AFFIRMATIVE DEFENSE
### (Abandonment)

105.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by
abandonment of any marks at issue. Plaintiffs' have failed to properly police and exercise
adequate quality control over its marks and have thereby abandoned their rights therein.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Conduct of Others)

106.   Plaintiffs' claims and/or recovery are barred, in whole or in part, because the
conduct complained of is the conduct of others, including, without limitation, Plaintiffs'
"authorized" vendors and/or Plaintiffs' licensed manufacturers.

## TWELVE AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

107.   Plaintiffs' claims and/or recovery are barred, in whole or in part, because Plaintiffs failed to mitigate, minimize, or attempt to avoid damages.  Without limitation, Plaintiffs could have pursued legal remedies earlier, assisted secondary market resellers like Dexon in detecting and fighting counterfeit products, and/or properly policed and prevented the manufacture and distribution of counterfeit product within their own manufacturing and distribution network.

## THIRTEENTH AFFIRMATIVE DEFENSIVE
### (Lack of Personal Jurisdiction)

108.   Plaintiffs are barred from pursuing their claims against Dexon in this Court because the Court lacks personal jurisdiction over Dexon.

## FOURTEENTH AFFIRMATIVE DEFENSIVE
### (Improper Venue)

109.   Plaintiffs are barred from pursuing their claims against Dexon in this Court because venue is improper.

## FIFTEENTH AFFIRMATIVE DEFENSIVE
### (Failure to State a Claim)

110.   The Complaint, in whole or in part, fails to state any claim upon which relief can be granted.

## SIXTEENTH AFFIRMATIVE DEFENSIVE
### (One Satisfaction Rule / Bar on Double Recovery)

111.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the one satisfaction rule and/or the bar on double recoveries.

## COUNTERCLAIMS

112.   Counterclaim Plaintiff Dexon Computer, Inc. asserts the following counterclaims against Counterclaim Defendants Cisco Systems, Inc., and Cisco Technology, Inc. (hereinafter referred to jointly as "Cisco") alleges as follows:

## THE PARTIES

113.   Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

114.   On information and belief, Plaintiff and Counterclaim Defendant Cisco Systems, Inc. ("CSI") is a Delaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

115.   On information and belief, Plaintiff and Counterclaim Defendant Cisco Technology, Inc. ("CTI") is a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

## JURISDICTION

116.   This Court has subject matter jurisdiction over Dexon's counterclaims pursuant to 28 U.S.C. §§ 1367 and 1332.  Dexon's counterclaims arise out of the same controversy as plaintiffs' Federal claims, there is complete diversity of citizenship between Plaintiffs and Dexon, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

## FACTS

### The Secondary Market for Cisco Products

117.   As with any economic activity where there are significant profits, market forces have operated to create a "secondary" market for Cisco products.  On information and belief, authentic or genuine Cisco products come to the secondary market in the United States in a variety of ways including: (a) Cisco's knowing sale of such products to secondary market suppliers in the context of either specific end user deals or when Cisco needs to move inventory; (b) Cisco's authorized resellers' purchase of product in excess of what they need for a specific end user order and subsequent resale of such product into the secondary market; (c) Cisco end user's resale of new, unused product; and (d) through importation of such product from abroad where it has been sold by distributors, resellers, or end users under similar circumstances.  On information and belief, Cisco resists attempts

1   by end users and resellers to return product, resulting in a natural supply of secondary

2   market Cisco product.

3       118.    Given the substantial profits available from sale of Cisco-branded products,

4   market forces dictate that a secondary market will develop for such products.  These market

5   forces benefit end users in that they reduce prices for such products.

6       119.    Dexon is an independent secondary-market reseller of computer networking

7   products, including routers, Ethernet switches and other computer hardware.  Dexon

8   provides new, refurbished and discontinued hardware products, including authentic or

9   genuine products to its customers from leading manufacturers including, without limitation,

10  Hewlett Packard, Dell, Juniper Networks and Cisco.

11      120.    Dexon obtains Cisco products from reliable suppliers, subjects such products

12  to extensive quality control, and then resells such products to other resellers and to end

13  users, at a profit but frequently at prices lower than those offered by Cisco "Authorized"

14  sellers.

15      121.    Secondary market resellers of Cisco products, including Dexon, are highly

16  incentivized to detect and stamp out the sale of counterfeit goods.  While a manufacturer

17  such as Cisco may blame rogue actors when a dissatisfied customer confronts it with a

18  counterfeit product, an independent reseller's own reputation suffers significantly when it

19  sells a customer a counterfeit goods.  Unsurprisingly, most independent resellers, including

20  Dexon, take proactive steps to detect and prevent the sale of counterfeit product.

21      122.    Cisco has created an "Authorized Channel Network" in which Cisco sells

22  products to entities it refers to as "Authorized Channel Partners" or "Authorized Resellers."

23  Within this "Authorized" network, Cisco exerts strict control over how, and at what prices,

24  its "Authorized" partners can buy and sell Cisco products.

25      123.    "Authorized Reseller" status is not foolproof protection against counterfeit

26  products.  Cisco's "Authorized" sellers are likewise victimized by the presence of

27  counterfeit product in the marketplace and have been discovered to be selling counterfeit

28  Cisco product.

0640.002\Ex                                        -20-                              Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-88-
73575998v1

Exhibit B
Page 77 of 112

124.    While manufacturers like Cisco are permitted to control the initial sale of their products, they may not wield trademark or copyright protections to dictate the terms by which their products are resold by other parties.  The well-established "first sale doctrine" protects parties who engage in the subsequent resale of Cisco's products, even if those subsequent resales occur outside the "Authorized" channels. Cisco may not forbid the resale of its products outside the "Authorized" network.

### Cisco's Improper Intereference With Secondery Market: Original Transaction a "Sale" not a "License"

125.    Cisco products, like virtually all modern electronics, contain embedded software.  And just as a car, refrigerator, or cell phone will not function properly without internal software, Cisco's products - including the Cisco products resold by Dexon - cannot function without Cisco's embedded software.  Likewise, such embedded software is not intended to be removed and has no independent value to the end consumer separate and apart from the Cisco product with which it is compatible.

126.    Cisco uses the fact that its products have embedded software as an attempted end-around the first sale doctrine.  It does so by falsely claiming the embedded software is governed by an "End User License Agreement" ("EULA") which restricts subsequent transfer and use of any Cisco product containing such embedded software.

127.    Cico's    current    purported    EULA    found    at https://www.cisco.com/c/en/us/about/legal/cloud-and-software/end_user_license_agreement.html defines "Software" broadly to attempt to encompass embedded software.  According to the definition, " 'Software' means the Cisco computer programs including Upgrades, firmware and applicable Documentation."

128.    Cisco's current EULA purports to provide a "non-transferable" license to use the "Software" except "as permitted under the Cisco Software Transfer and Re-Use Policy." Cisco's current purported EULA  provides:

DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

2.1. **License and Right to Use.** Cisco grants You a non-exclusive, non-transferable (except with respect to Software as permitted under the Cisco Software Transfer and Re-Use Policy) (a) license to use the Software; and (b) right to use the Cloud Services, both as acquired from an Approved Source, for Your direct benefit during the Usage Term and as set out in Your Entitlement and this EULA (collectively, the "Usage Rights").

129.   Cisco's current purported "Software License Transfer and Re-Use Policy" found                                                                                                    at https://www.cisco.com/c/dam/en_us/about/doing_business/legal/policy/Cisco_Software_Transfer_and_Relicensing_Policy.pdf provides that products containing embedded software acquired on the secondary market cannot be transferred or used without first paying an additional license fee.  Such policy states:

## Transfer Policy

Unless prohibited by applicable law or expressly allowed by Cisco in the applicable license terms or otherwise provided below, Software is not transferable until and unless: (1) Cisco approves the Software Transfer Request Form referenced herein *and* (2) you pay any applicable license fees, including payment of all outstanding license fees invoiced and paid periodically. The transferee also may be required to pay service inspection or reinstatement fees in accordance with Cisco policies before any transfer is permitted.

130.   As explained in detail below, no valid or enforceable EULA exists covering the embedded software.  Rather, the facts and circumstances surrounding the original transactions confirm a sale of such products, including the embedded software, rather than the creation of any alleged or purported license governing the embedded software. Accordingly, Cisco's attempts to notify secondary market purchasers of the purported EULA *after* the original sale, as well as Cisco's repeated and ongoing form publications and advertisements advising secondary market purchasers that they have no right to transfer or use the embedded software, are false and misleading.

131.   Cisco's false claims concerning purported contractual restrictions on the transfer and use of such embedded software are not merely off the cuff "opinion" statements by lower level Cisco employees or representatives.  Rather, Cisco has employed an intentional, coordinated, formalized and ongoing effort to utilize such false claims to deter

1  consumers from purchasing Cisco products on the secondary market (including from

2  resellers like Dexon).

3      132.    In addition to the EULA and Software License Transfer and Re-Use Policy

4  referred    to    above,    Cisco's    current    official    "relicensing"    website    found    at

5  https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html    provides    as

6  follows:

7

| Policies | Using the Program | Product List | Frequently Asked Questions |

**Software**

Cisco software—whether it is embedded operating system software or standalone application software—is not transferable unless specifically allowed under the Cisco Software License Transfer and Re-Use Policy. You must have Cisco's written consent and pay a license fee. After a transfer, the previous owner's license to the software is terminated, and the transferee's use of the software is governed by the Cisco End User License Agreement and in accordance with the original license entitlement.

12      133.    The same Cisco "relicensing" website advises consumers that the purported

13  embedded software licenses are not transferrable and that any Cisco product purchased on

14  the secondary market must be relicensed.  The current "relicensing" website found at

15  https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html#q2: provides:

16

17      134.    Cisco's current "FAQ" for "Third Party Maintenance Services and purchase

18  of    Cisco    Products    outside    the    Authorized    Channel"    found    online    at

19  https://www.cisco.com/c/dam/en_us/about/doing_business/legal/service_descriptions/doc

20  s/Third_Party_Maintenance_Services_FAQ.pdf expressly states that product purchased on

21  the secondary market from a non 'Cisco Channel Partner" does not come with a valid

22  software license:

23      **Q. If I buy Cisco product from a company who is not a Cisco Channel Partner, will I have a valid software license?**

24

25      **A**. No, unless the Cisco product successfully passes an inspection and any applicable relicensing fees are paid or it meets an exception contained in Cisco's Software License Transfer and Re-Use Policy.

26

27      135.    Cisco also sends vetted and approved form letters from its "Brand Protection

28  Team" to secondary market customers stating that only the "initial purchasers" of Cisco

0640.002\Ex                              -23-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-91-
73575998v1

Exhibit B
Page 80 of 112

product are entitled to the benefits of the purported EULA.   Such letters are intended to scare consumers into believing that products purchased on the secondary market may not work or that such consumers are not authorized to utilize embedded software contained in Cisco products purchased from secondary market sellers like Dexon.

136.   Specifically, Cisco's "Brand Protection Team" form letters define any Cisco product purchased from secondary market resellers such as Dexon as "unauthorized." Such form letters then falsely claim that "any" such "unauthorized product does not have a valid software license."

137.   For example, a March 14, 2019, Cisco Brand Protection Team form letter to Dexon customer Lockridge Grindal Nauen stated in relevant part:

Please be informed Dexon is NOT a member of the Cisco Authorized Reseller Program. Regardless of what Dexon claims, and regardless of whether its Cisco product is used or is in new sealed boxes, ANY Cisco product it supplies is considered unauthorized.

1.     Unauthorized product is not eligible for any Cisco OEM warranty
2.     Unauthorized product is not automatically eligible for SMARTnet
3.     Unauthorized product does not have a valid software license.

For a detailed list of authorized Cisco Channel Partners, please refer to http://www.cisco.com/go/partnerlocator.

The following policy statement applies, whether the product is used or is in new, unopened and sealed boxes.

When products are not sold through Cisco's authorized sales channels, Cisco can offer no assurance as to the provenance, quality, or authenticity of those products.  Additionally, when resellers resell Cisco products that have been sourced from outside of Cisco's authorized sales channels, those products do not come with a valid software license or hardware warranty and are not automatically eligible for a Cisco service support contract (such as SMARTnet maintenance).

An overview of Cisco's policy on this subject is as follows:

> **Licensing**. When Cisco sells its products, software licenses (such as for Cisco IOS) are granted to the initial purchasers of those products. Cisco's policy is that software may not be transferred to any other purchaser of the product unless specifically authorized by Cisco. To the extent that Cisco believes a customer is not an initial purchaser—or if a customer expresses concern that it is not an initial purchaser—such issues will be promptly addressed and Cisco is committed to resolving all licensing issues that arise. In full, this policy is set forth on Cisco's website: http://www.cisco.com/en/US/prod/cisco_software_transfer_relicensing_policy.html.

138.   Contrary to Cisco's representations, no valid or enforceable license exists covering the embedded software.  Rather, the facts and circumstances surrounding the original transactions confirm a *sale* of such products, including the embedded software, rather than the creation of any alleged or purported license governing the embedded software.

### **The Purchasing Process**

139.   Cisco sells new, unopened product to its authorized resellers. Upon information and belief, these sales come in substantial quantities, sometimes in the thousands of individual products.

140.   Upon information and belief, Cisco's authorized resellers accept the risk that the brand-new Cisco products, including the embedded software, may be damaged or lost. Cisco makes it extremely difficult for its authorized resellers to return any products.

141.   Cisco's authorized resellers offer the Cisco products for sale to consumers. Such authorized resellers make it extremely difficult to for consumers to return any products.

142.   As shown and explained below, the original consumer transaction involving the Cisco products is a "sale" of both the hardware and any associated embedded software. There is no creation of a license covering the embedded software. Rather, Cisco's authorized resellers state that Cisco switches come with a "Cisco limited lifetime warranty" without mention that the warranty is subject to any restrictions or that the product comes embedded with software subject to a license. CDW and other authorized resellers offer

1  additional "[e]nhance[ments]" for the hardware, like Cisco SmartNet extended service

2  agreements.



12  143.   Cisco's authorized reseller's do not provide original purchasers any notice

13  prior to purchase that there is embedded software in the product or that such embedded

14  software is governed by a license restricting the original purchaser's ability to transfer or

15  sell the subject product.

16  144.   Attached as Exhibit A  is a true and correct copy of an October 15, 2020

17  invoice from Cisco authorized reseller CDW Direct for a Cisco Catalyst 9200L switch

18  costing $856.47.  The invoice provides a single, flat price for the switch.  The invoice does

19  not provide a separate itemized price for the switch's embedded software.  In fact, the

20  invoice contains absolutely no mention of a separate or independent license agreement

21  governing the switch's embedded software.

22  145.   The sole reference to "software" is buried in the small print of the attempted

23  "Terms and Conditions" located on the back side of the CDW invoice.

24  146.   The attempted "Terms and Conditions" include a "Title; Risk of Loss" section

25  which begins by placing the risk of loss or damage during shipment on the purchaser.  It

26  then adds, in small lowercase print, that "title to software will remain with the applicable

27  licensor(s), and Customers rights therein are contained in the license agreement between

28

DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

1 such licensor(s) and Customer."   Such notice contains no reference to "embedded

2 software."

3     147.   Cisco does offer several stand alone and independent traditional software

4 licenses, including, without limitation, licenses governing its Digital Network Architecture

5 ("DNA") network management services.   Cisco's authorized resellers provide separate

6 invoices or line items covering such traditional software licenses.   Accordingly, to the

7 extent original purchasers actually read the small print "Terms and Conditions," such

8 purchasers would have no way of knowing the referenced "software" applied to embedded

9 software as opposed to traditional stand-alone software sold and priced separately.

10     148.   In addition to failing to properly notify original purchasers prior to their

11 purchase that their ability to subsequently transfer or sell the expensive Cisco products is

12 restricted by a purported EULA governing the hardware's embedded software, at no time

13 does Cisco or its Authorized Resellers obtain the purchasers assent to any purported EULA.

14     149.   At no time has Cisco or its Authorized Resellers placed a notice or warning

15 of a purported EULA on the exterior packaging of any of its hardware.   Moreover, such

16 packaging contains no notice or warning advising purchasers that by opening such

17 packaging they would be assenting or agreeing to Cisco's alleged EULA governing the

18 embedded software.   Below are representative photographs of the exterior packaging for a

19 Cisco WS-C2960L switch:

20

21

22

23

24

25

26

27

28



0640.002\Ex                            -27-                          Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-95-
73575998v1                                                          Exhibit B
Page 84 of 112

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
Exhibit B
Page 85 of 112
73575998v1



150.    Rather than properly notifying original purchasers of the purported EULA governing the embedded software and obtaining their affirmative assent, Cisco has included various attempted notices on the *inside* of the product packaging. Such notices are accessible only *after* the products have been purchased and opened.

151.    Resellers such as Dexon sell a large volume of new, in the box, never opened Cisco products, meaning at no point were such attempted "notices" ever accessed or viewed by the original purchaser.

152.    Dexon sells such brand-new, in the box, never opened Cisco product to end users like schools, hospitals, and businesses. The individuals opening or accessing such Cisco products are often lower-level information technology personnel charged with installing such equipment.  In addition to generally being required to install such equipment in short time frames with little or no opportunity for locating, reviewing and studying any purported EULA governing the embedded software, such IT professionals often have no control over or involvement with purchasing or return decisions.

153.    The attempted notices Cisco has included inside the product packaging have varied through the years.  For example, an unopened package for a Cisco WS-C2960L switch originally sold on or about 2009 included a separate plastic bag of accessories inside

the product packaging.  The plastic bag bears a green sticker providing, "Please read the license terms regarding the use of the product included inside this box.  By using the product, you agree to be bound by these license terms.  If you do not agree with these terms, promptly return the unused product, manual, related equipment and hardware (with proof of payment) to the place of purchase for a full refund":



154.   The referenced licensed terms supposedly to be found "inside this box" are in fact buried in and difficult to access within a "Getting Started Guide" CD included in the plastic bag:

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17
18
19



20      155.    The "Getting Started Guide" CD is not required to be utilized or accessed by

21  the IT professional as part of the install process. Rather, as the name implies, it is in fact a

22  "Getting Started Guide" containing instructions. The CD does not contain any software

23  required to be loaded or accessed as part of the installation process and would have been

24  routinely ignored as unnecessary or superfluous by experienced IT professionals.

25      156.    At some unknown time, Cisco stopped including the green sticker or the

26  "Getting Started Guide" CD.  In fact, Cisco stopped providing or including *any* copy of the

27  purported EULA governing the embedded software with its products.

28

0640.002\Ex                                    -31-                          Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-99-
73575998v1

Exhibit B
Page 88 of 112

157.   Rather, Cisco began including a small single page notice directing the user to various websites.  Such "product information" notice contains no warning that use of the product constitutes acceptance of Cisco's purported EULA governing the embedded software or that the consumer's subsequent use of the product will be restricted.  Rather, the notice requires the individual who opened the package, often a lower level IT professional having no responsibility for purchasing or return decisions, to go to a separate URL or website:



158.   Subsequent to the introduction of its DNA network management services, Cisco also began including separate notices governing independent and separate licenses for such network management services.

159.   In addition to failing to provide any proper notice of a purported EULA governing the embedded software, at no point has Cisco required or obtained any affirmative assent to such purported EULA by the original purchaser.  For example, an original purchaser who actually goes to the referenced website is not required to

0640.002\Ex                                                     -32-                         Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-100-
73575998v1

Exhibit B
Page 89 of 112

1   affirmatively accept the purported EULA governing the embedded software via a "click

2   through" process or otherwise.

3       160.   Moreover, no such affirmative assent to the purported EULA governing the

4   embedded software is required for the original purchaser to actually use the subject Cisco

5   products.  Without limitation, at no point during the "boot up" process is an end user advised

6   of any purported EULA governing the embedded software or asked to provide affirmative

7   assent to any such purported EULA via a "click through" process or otherwise. Upon

8   information and belief, downstream purchasers and end users first become aware of Cisco's

9   contention their use and transfer of the product is restricted by a purported EULA governing

10   the embedded software via communications from Cisco's Brand Protection Team *years*

11   *after* the original purchase.

12       161.   In light of the absence of any evidence of a valid or enforceable EULA

13   governing the embedded software, the original transaction involving the subject Cisco

14   products constitutes a "sale" of both the hardware and associated embedded software.  As

15   a result, Cisco's form advertisements and publications advising secondary market

16   purchasers that they are prohibited from using and transferring Cisco products are false and

17   misleading and violate the first sale doctrine codified at 17 U.S.C. § 109. Cisco does not

18   offer or enter into a license for the subject embedded software and does not control the use

19   of such embedded software.

20       162.   In addition to the fact that any purported EULA is not valid or enforceable,

21   relevant and applicable versions of Cisco's prior purported "Software License Transfer and

22   Re-licensing Policy"  expressly allow the use and transfer of Cisco products by secondary

23   market purchasers.  Cisco's claimed "Software License Transfer and Relicensing Policy"

24   applicable to products originally sold during  2012-2017 provides that there is no restriction

25   on transfer "[i]n situations where the Products combine Hardware and Software and there

26   is no separate product code or License Fee charged for the Software on the applicable Cisco

27   then-current published price list at the time of transfer (and therefore a separate License Fee

28   for the Software cannot be determined). . ."  (On information and belief, such "exception"

0640.002\Ex   -33-   Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-101-
73575998v1
Exhibit B
Page 90 of 112

1   was included in Cisco's "Software License Transfer and Relicensing Policy" at least from

2   2012 to some unknown date in 2017 when such policy was apparently revised.  The full

3   and exact dates such "exception" was included in Cisco's policy is in Cisco's possession

4   and control.) The full relevant provision or "exception" provides:

5

6   Exceptions

7       1. Software Bundled with Hardware: In situations where Products
        combine Hardware and Software and there is no separate Product code or

8       License Fee charged for the Software on the applicable Cisco then-current
        published price list at the time of transfer (and therefore a separate License

9       Fee for the Software cannot be determined), an exception will be made to

10      allow for the transfer without the transferee being required to pay a new
        License Fee.

11

12

13      163.   On information and belief, Cisco's "published price list" contained no

14  separate "Product code or License Fee" for embedded software included with products

15  governed by Cisco's purported 2012-2017 "Software License Transfer and Re-licensing

16  Policy."

17      164.   Cisco's form advertisements and publications falsely advising secondary

18  market purchasers that the embedded software is governed by a purported EULA

19  prohibiting the subsequent transfer and use of Cisco products fails in any way to distinguish

20  or delineate products governed by versions of Cisco's "Software License Transfer and Re-

21  licensing Policy" expressly allowing the transfer and use of such embedded software,

22  including, without limitation, products sold by Cisco or Cisco authorized resellers to the

23  original consumers or end users during 2012-2017.

24      165.   Dexon has regularly sold, and continues to sell, new, unopened, in the box,

25  as well as used, Cisco products for, without limitation, model years 2009 to the present.

26  This has included, and will continue to include, new, unopened, in the box, as well as used,

27  Cisco products originally sold by Cisco or Cisco authorized resellers to the original

28

1  consumers or end users during 2012-2017 and covered by Cisco's purported 2012-2017

2  "Software License Transfer and Re-licensing Policy."

3      166.   Consumers who purchase Cisco products on the secondary market may use

4  the embedded software included therewith because the title of the product and embedded

5  software is transferred to them.  They may also transfer the Cisco products, including the

6  embedded software, freely.  They also accept all risk that the product with embedded

7  software may be lost or damaged.

8      167.   When consumers receive the Cisco Brand Protection Team form

9  advertisements and publications, they falsely believe that they cannot use the product or

10  that the product will not work. There is no license covering the embedded software; rather,

11  any "licenses" apply to add-on "enhanced" software features like DNA. Because there is

12  no license that covers the embedded software, and no assent to any such purported license,

13  Cisco's form advertisements and publications stating that the embedded software is

14  governed by a purported license which restricts the use and disposition of the Cisco product

15  is false. Downstream consumers, including secondary market purchasers,  can use the

16  embedded software without ever buying a separate or independent license from Cisco.

17      168.   When Dexon's customers receive Cisco's form advertisements and

18  publications, including, without limitation, Cisco's form Brand Protection Team letters,

19  they falsely believe they cannot use the subject Cisco product or that the subject Cisco

20  product will not work because they believe, falsely, that they have to purchase a separate

21  license. They don't.

22      169.   Cisco's form advertisements and publications are particularly egregious

23  because they fail to delineate between products governed by Cisco's current purported

24  EULA and "Software License Transfer and Re-Use Policy" and products governed by prior

25  versions which expressly allow secondary market purchasers to transfer and use Cisco's

26  embedded software.

27      170.   Although a customer purchasing a new, never opened, in the box Cisco

28  product from Dexon is unlikely to ever visit the EULA website identified inside the

DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

1   package, if a customer does, it would be viewing Cisco's current EULA or "Software

2   License Transfer and Re-Use Policy" with the applicable "exception" removed.  Customers

3   with product originally sold by Cisco or a Cisco authorized reseller to the original

4   consumers or end users during 2012-2017 are not directed to the applicable earlier versions

5   containing the "exception."  Cisco is misleadingly and improperly attempting to change or

6   modify the terms of the purportedly applicable EULA *after* the original transaction.

7       171.    Likewise, Cisco's other false and misleading advertisements and publications

8   referenced above, including Cisco's "relicensing" website, Cisco's "FAQ" for "Third Party

9   Maintenance Services and purchase of Cisco Products outside the Authorized Channel,"

10  and Cisco's form "Brand Protection Team" letters, all of which falsely claim secondary

11  market purchaser have no right to transfer or use the embedded software, fail to delineate

12  products governed by Cisco's purported 2012-2017 EULA and "Software License Transfer

13  and Re-licensing Policy" expressly allowing such transfer  and use.

14      172.    Cisco's has and will continue to falsely and intentionally misrepresent that

15  secondary market purchasers' use and transfer of embedded software is prohibited despite

16  the fact that: i) the original transaction was a  sale of the embedded software and no valid

17  or enforceable software license was created; and ii) the correct applicable purported license

18  expressly allows such transfer  and use.

19      173.    Cisco's past  and ongoing misrepresentations regarding the terms,

20  applicability, scope and interpretation of a purported EULA governing the embedded

21  software and secondary market purchasers' rights to buy, use and transfer secondary-market

22  Cisco products deters consumers from purchasing Cisco products on the secondary market.

23  Dexon has lost and will continue to lose sales of products that would have been made but

24  for Cisco's false representations to consumers regarding the terms, applicability, scope and

25  interpretation of Cisco's purported EULA and the consumers' ownership rights for Cisco

26  hardware and associated embedded software purchased on the secondary market.  These

27  false representations have unjustly enriched Cisco at Dexon's expense.

28

**Cisco's Tortious Interference with Dexon's Business**

174.   Because Cisco regards secondary market resellers like Dexon as a threat to its excess profits, Cisco spends substantial money and effort to attack secondary market participants such as Dexon and to chill reseller and end user participation in the secondary market.  These steps include but are not limited to employing a team of "Brand Protection" employees whose primary responsibility is to intervene with resellers and end users in cases where they are either contemplating the purchase of product, or have ordered product, from the secondary market.

175.   Cisco Brand Protection personnel use a variety of tools to disrupt secondary market sales, including, without limitation, falsely advising Dexon's actual and prospective customers that: i) Dexon does not sell new but rather "used" or "refurbished" Cisco product; ii) Dexon's products are "counterfeit" solely because they were sold on the secondary market despite the fact such products are in fact genuine; iii) Dexon products violate a purported EULA despite the absence of any proper notice of or assent to the purported EULA; iv) Dexon products violate the purported EULA even though the purported EULA does not even apply to the applicable product; and v) Dexon products violate the purported EULA even though the actual governing purported EULA, including, without limitation, Cisco's 2012-2017 purported EULA and "Software License Transfer and Relicensing Policy" expressly allows the use and transfer of embedded software.

176.   Cisco has engaged in a pattern and practice of this tortious conduct with the intent to disrupt contracts between Dexon and its customers, pending opportunities with such customers, future business with such customers, and even with the apparent goal of driving Dexon out of business altogether.

**Fort Bend Independent School District**

177.   Dexon entered into a contract with Fort Bend Independent School District ("FBISD") for the sale and purchase of over $1,300,000.00 in brand new Cisco equipment. On or about June 24, 2019, Cisco representative Dan Roberts falsely advised and

0640.002\Ex                                    -37-                        Case No. 3:20-CV-4926-CRB

DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS
-105-
73575998v1                                                                                              Exhibit B
Page 94 of 112

1  represented to FBISD representative Cecile Thompson that the equipment FBISD was

2  purchasing from Dexon could not be new but rather had to "refurbished."

3      178.   On or about July 9, 2019, Sean O'Brien, a member of Cisco's Brand

4  Protection Team, sent a letter to FBISD falsely claiming and representing that products sold

5  by Dexon do not come with a "valid software license."  Such letter stated: "According to

6  Cisco Systems' records (www.cisco.com/go/eula), the Cisco goods listed in Exhibit A are

7  not recorded as being sold to Fort Bend Independent School District through one of Cisco's

8  authorized resellers.  It appears you may have purchased the Cisco goods from a company

9  name Dexon Computer.  Unfortunately, Dexon Computer is not a member of the Cisco

10  authorized reseller program.  As such, Cisco recommends that you return these goods for a

11  refund, along with any other Cisco products received by the vendor, and replace the items

12  with authorized Cisco products sold via an authorized reseller."

13      179.   Such letter further warned Dexon's customer that such products "may not

14  come with a valid software license" and that "Customers purchasing most Cisco goods

15  outside of Cisco's authorized sales channels *would not automatically have a license to use*

16  *the software*."  (italics added.)

17      180.   As a direct and proximate result of such communications, FBISD falsely

18  believed the Dexon products may not be new and that it would not be able to use such

19  products due to the absence of a "valid software license." As a direct and proximate result

20  of Cisco's false and misleading representations, FBISD cancelled its $1.3 million contract

21  with Dexon, and Dexon has received no further business opportunities from FBISD.

22      181.   Cisco's representations to FBISD are especially egregious considering the

23  contracted for products were Cisco phones rather than networking equipment containing

24  embedded software which Cisco contends is governed by a purported EULA.  Upon

25  information and belief, unlike Cisco's subject networking equipment, Cisco's phones

26  utilize "open source" software.  The phones do require a completely separate and

27  independent Cisco service and license to operate (Cisco Unified Communications Manager

28

0640.002\Ex                                    -38-                         Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-106-
73575998v1                                                                              Exhibit B
                                                                                Page 95 of 112

1  which is commonly known as "CallManager"). Thus, Cisco's statement that such products

2  would lack a "valid software license" were false and misleading.

3      **Lockridge Grindal and Nauen**

4      182.    Without limitation, on or about March 14, 2019, Tim Casto, a member of

5  Cisco's Brand Protection Team, sent a letter to Dexon customer Lockridge Grindal and

6  Nauen ("Lockridge").  Such letter falsely advised Dexon customer Lockridge that "six

7  switches" purchased from Dexon were "counterfeit."  On information and belief, only four

8  (4) of the six (6) switches are currently alleged to be counterfeit by Cisco.

9      183.    The March 14, 2019 letter warned that "Dexon is NOT a member of the Cisco

10 Authorized Reseller Program" and that "[r]egardless of what Dexon claims, and regardless

11 of whether its Cisco product is used or is in new sealed boxes, ANY Cisco product it

12 supplies is consider unauthorized."  Such letter falsely represented that absolutely no

13 product obtained from Dexon comes with a "valid software license."

14     184.    In addition to the fact that the original transaction involving the Lockridge

15 products was a sale and no valid or enforceable license applicable to the embedded software

16 was created, on information and belief, all of the Lockridge products were sold by Cisco or

17 Cisco authorized sellers to the original consumer or end users between 2015-2017.

18 Accordingly, Cisco's alleged or purported EULA applicable to such products expressly

19 allowed the embedded software to be transferred and used by secondary market purchasers.

20     185.    As a direct and proximate result of the March 14, 2019 correspondence, as

21 well as other similar communications from and representations by Cisco's Brand Protection

22 Team, Lockridge falsely believed all six (6) switches it purchased from Dexon were

23 counterfeit, that the switches would not work, and that it would not have the required

24 licenses necessary to use Cisco product purchased from Dexon. Citing the Brand Protection

25 Team correspondence, Lockridge demanded a refund of all amounts paid to Dexon.  Dexon

26 lost all future business opportunities from Lockridge.

27

28

DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

73575998v1

**Accuray, Inc.**

186.    Without limitation, on or about , January 27, 2020, Tim Casto, a member of Cisco's Brand Protection Team, sent an email to Dexon customer Accuray Inc. ("Accuray").  Such email acknowledged that products purchased by Accuray from Dexon had been determined to be authentic or "genuine."  However, the email falsely stated that because such genuine products were purchased on the secondary market, they "did not have a valid software license."  The email stated in relevant part, "Cisco reviewed the console readout and determined that the items are genuine. . .The below items, however, show as sold to end users other than Accuray.  This means that the below products do not have a valid software license. . ."

187.    In addition to the fact that the original transaction involving the  products was a sale and no valid or enforceable license applicable to the embedded software was created, on information and belief, 23 of the 26 subject Accuray products were originally sold by Cisco or Cisco authorized sellers to the original consumers or end users between 2014-2017.  Accordingly, Cisco's alleged or purported EULA applicable to such products expressly allowed the embedded software to be transferred and used by secondary market purchasers.

188.    As a direct and proximate result of the January 27, 2020 correspondence, as well as other similar communications from and representations by Cisco's Brand Protection Team, Accuray falsely believed that the product would not work and that it did not have the required licenses necessary to use the Cisco products purchased from Dexon.  As a result, Accuray demanded a refund of all amounts paid to Dexon.  Dexon lost all future business opportunities from Accuray.

**Meadowridge Networks, Inc.**

189.    Without limitation, on or about July 12, 2021, Shuting Li, on information and belief a member of Cisco's Brand Protection Team, sent an email to Dexon customer Meadowridge Networks, Inc. ("Meadowridge").  Such letter falsely implied product purchased from Dexon was not new or not genuine.  The email stated, "Serial number is

1   verified to be an unauthorized unit. . .because this unit is now in possession of end customer

2   which is different from the reported end customer.  So it is an overseas diversion unit."

3   190.   As a direct and proximate result of the July 12, 2021 email, as well as other

4   similar communications from and representations by Cisco, Meadowridge understandably

5   understood Cisco to be claiming the products purchased from Dexon to be "used" and/or

6   counterfeit.  In a responsive email, Meadowridge explained, "I am the first end-user to open

7   the box. . .This came to me in an unopened Cisco box and was not a 'used' unit in any sense

8   of the word. . .I had every reason to think that this was a legitimate unit and no reason to

9   believe that it wasn't."

10   191.   Rather than clarify Meadowridge's interpretation and misunderstanding of its

11   prior communications, Cisco responded by directing Meadowridge to a domain or website

12   containing a  false and misleading definition of "used."  Namely, such definition defined

13   "used"   as   all   Cisco   products   purchased   on   the   secondary   market.   (See

14   www.cisco.com/go/relicensing  which misleadingly defines "used" products as "previously

15   owned equipment that is now owned by a party other than the original customer" including

16   both "opened and unopened equipment."

17   192.   As a direct and proximate result of the Cisco Brand Protection Team

18   communications, Meadowridge falsely believed that its use of Cisco products purchased

19   from Dexon would be impaired or restricted and that the product would not work.  As a

20   direct and proximate result, Meadowridge demanded a refund and was also provided a

21   replacement or substitute product at a reduced priced.  Dexon has lost future business

22   opportunities from Meadowridge.

23   193.   The foregoing false and misleading representations of fact were designed to

24   mislead consumers, and have in fact misled consumers, at the expense of Dexon, causing

25   direct and substantial loss and damage to Dexon.

26   194.   Cisco's false and misleading misrepresentations have caused, and unless

27   enjoined by this Court, will continue to cause irreparable injury to Dexon.

28

0640.002\Ex                                     -41-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-109-
73575998v1                                                                     Exhibit B
                                                                   Page 98 of 112

195.   As a direct result of Cisco's tortious interference, Dexon has suffered significant damages, including the cancellation of numerous pending orders, loss of opportunity to bid on projects, and the loss of entire relationships with many of its top customers.

### Count I
### Declaratory Judgment
### (28 U.S.C. §§ 2201-2202)

196.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

197.   Dexon seeks a declaration of its rights, pursuant to 28 U.S.C. §§ 2201 & 2202, that the original transactions involving the subject Cisco products is a "sale" of both the hardware and any associated embedded software and that there exists no valid or enforceable license agreement governing the embedded software which prohibits the use or transfer of such products by subsequent secondary market purchasers.

198.   Cisco has made, and continues to make false representations to actual or potential secondary market purchasers, including Dexon's actual or potential customers, that their ability to use and transfer any secondary market Cisco product is prohibited by a purported EULA governing the product's embedded software.

199.   No such valid or enforceable EULA exists.

200.   Rather, the original transaction involving the subject Cisco products was a "sale" of both the hardware and any included embedded software.

201.   Even if applicable, which it is not, the certain versions of Cisco's EULA, including, without limitation Cisco's purported 2012-17 EULA and "Software License Transfer and Re-licensing Policy" expressly allow the use and transfer of embedded software by secondary market consumers.

202.   Accordingly, Cisco's form communications and representations, including, without limitation, Cisco's form advertisements and publications which fail to delineate products governed by Cisco's purported 2012-17 EULA and "Software License Transfer

0640.002\Ex     -42-     Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-110-
73575998v1     Exhibit B
Page 99 of 112

1   and Re-licensing Policy" which expressly allows the use and transfer of embedded software

2   by secondary market consumers, are and continue to be false and have caused and will

3   continue to cause significant harm and damage to secondary market sellers, including

4   Dexon.

5       203.   A real legal dispute and actual controversy presently exists between the

6   parties to this action which is concrete and justiciable in character, and as to which each

7   party possesses an interest in resolving.

8       204.   Dexon has in inventory Cisco products sold by Cisco or Cisco authorized

9   resellers to the original purchasers or end users from at least as early as 2009 to the present.

10  Because of the nature of the secondary market, Dexon will continue to receive such

11  products in inventory.  Due to the nature of the secondary market, Dexon will continue to

12  receive more such products in inventory.  Dexon has previously sold and will continue to

13  sell Cisco products sold by Cisco and/or Cisco's authorized resellers to the original

14  consumers and end users in 2012-2017.

15      205.   Cisco has continued and will continue its longstanding practice of sending

16  form advertisements and publications to Dexon's actual and prospective customers falsely

17  advising such customers that the use and transfer of any Cisco products purchased from

18  Dexon is prohibited by a purported but invalid and unenforceable EULA. Cisco's

19  communications have failed and will continue to fail to distinguish products governed by

20  versions of its purported EULA expressly allowing the use and transfer of embedded

21  software by secondary market purchases, including products sold by Cisco or Cisco's

22  authorized resellers to the original purchasers or end users during 2012-2017 and governed

23  by Cisco's purported 2012-2017 EULA and "Software License Transfer and Re-licensing

24  Policy."

25      206.   Unless and until Cisco's form communications and representations are

26  deemed to be false, in violation of the first sale doctrine codified at 17 U.S.C. §109, or

27  contrary to Cisco's own purported 2012-17 EULA and "Software License Transfer and Re-

28  licensing Policy" which expressly allows the use and transfer of embedded software by

0640.002\Ex                                    -43-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-111-
73575998v1

Exhibit B
Page 100 of 112

1  secondary market consumers, Dexon's ability to sell such products will be wrongfully and

2  unnecessarily impaired and Dexon will continue to be injured and damaged thereby.

3  Accordingly, Dexon seeks declaratory relief from this Court.

4  207.  The controversy between Dexon and Cisco warrants relief declaring the rights

5  of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that: i) original purchasers

6  of Cisco products obtained the products and any associated embedded software via a "sale";

7  ii) there is no valid or enforceable EULA governing the embedded software in Cisco

8  products sold by Dexon on the secondary market; iii) even if applicable, valid and

9  enforceable, which it is not, Cisco's purported 2012-17 EULA and "Software License

10  Transfer and Relicensing Policy" expressly allows the use and transfer of embedded

11  software by secondary market consumers; and iv) Dexon's customers' are free to use and

12  transfer such products pursuant to the first sale doctrine codified at 17 U.S.C. §109.

### Count II
### Lanham Act False Advertising

15  208.  Dexon repeats and realleges each of the allegations set forth in the preceding

16  paragraphs as if fully set forth herein.

17  209.  Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that it is

18  unlawful for any person to use a "false or misleading description of fact, or false or

19  misleading representation of fact, which . . . in commercial advertising or promotion,

20  misrepresents the nature, characteristics, qualities, or geographic origin of his or her or

21  another person's goods, services, or commercial activities."

22  210.  As set forth above, Cisco has published in commercial advertising and

23  promotion, and continues to publish in commercial advertising and promotion, false or

24  misleading representations of fact regarding the software embedded in Cisco hardware sold

25  on the secondary market.

26  211.  In addition, Cisco has published in commercial advertising and promotion,

27  and continues to publish in commercial advertising and promotion, false or misleading

28  representations of fact regarding whether products in the secondary market are "used."

0640.002\Ex                                   -44-                    Case No. 3:20-CV-4926-CRB

DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-112-

73575998v1                                                            Exhibit B
                                                                      Page 101 of 112

212.   Cisco knowingly tells end users that they cannot use the products with embedded software because they need to purchase a separate license.

213.   Cisco's statements to end users that the embedded software is subject to a software license like the EULA are false. End users cannot be bound by a contract that does not exist in the first place and are free to use and transfer the subject products pursuant to the first sale doctrine.

214.   Cisco knowingly tells end users that they cannot use the products with embedded software despite the fact that versions of Cisco's purported EULA, including, without limitation, Cisco's purported 2012-17 EULA and "Software License Transfer and Re-license Policy" applicable to products Dexon has sold and will continue to sell, expressly allow the use and transfer of such embedded software.

215.   The foregoing false and misleading representations of fact were designed to mislead consumers by making them falsely believe they could not use the product or that the product would not work, and have in fact misled consumers, at the expense of Dexon, causing direct and substantial loss and damage to Dexon.

216.   The foregoing false and misleading representations of fact are made willfully and entitle Dexon to recover the profits obtained by Cisco thereby, in addition to Dexon's own damages suffered as a result of Cisco's false and misleading representations of fact.

217.   Cisco's misrepresentations have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

218.   Dexon will continue to suffer irreparable harm to its goodwill if these actions continue and Dexon is entitled to injunctive relief to preclude such conduct

## Count III
### Intentional Interference with Contractual Relations

219.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

0640.002\Ex                                      -45-                              Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-113-
73575998v1

Exhibit B
Page 102 of 112

220.   Dexon secured contracts with certain customers, including, without limitation, Fort Bend Independent School District, Lockridge, Meadowridge and Accuray for the sale of Cisco products on which Dexon would have earned significant profits.

221.   On information and belief, Cisco knew or should have known of these contractual relationships between Dexon and these third party customers.

222.   As detailed herein, Cisco intentionally, or with reckless disregard for the truth, made false and misleading statements about Dexon and the products it sells to these customers in order to disrupt the contractual relationship and to cause these customers to purchase product from Cisco authorized resellers at a higher price.  Without limitation, Cisco falsely advised such customers they did not possess a valid license to use embedded software included with the subject products.  With respect to Lockridge and Accuray, Cisco made such false and misleading statements despite knowing its purported 2012-17 EULA and "Software License Transfer and Re-license Policy" applicable to the subject products expressly allow the use and transfer of such embedded software.

223.   Cisco's statements in fact disrupted these contractual relationships between Dexon and its customers.

224.   Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

225.   Cisco's actions have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

## Count IV
### Intentional Interference with Prospective Economic Advantage

226.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

227.   An economic relationship existed between Dexon and its actual and prospective customers, including, without limitation, Fort Bend Independent School District, Lockridge, Meadowridge, and Accuray, each of which contained the probability of substantial future economic benefits to Dexon.

0640.002\Ex   -46-   Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-114-
Exhibit B
Page 103 of 112
73575998v1

228.   On information and belief, Cisco knew or should have known of these relationships.

229.   As detailed herein, Cisco intentionally, or with reckless disregard, engaged in tortious conduct designed to disrupt Dexon's potential benefit from these relationships.

230.   Without limitation, Cisco falsely advised such customers they did not or would not possess a valid license for embedded software included with any products purchased from Dexon.  Cisco made such false and misleading statements despite knowing: i) Dexon has sold and will continue to sell products governed by Cisco's purported 2012-17 EULA and "Software License Transfer and Re-license Policy": and ii)   Cisco's purported 2012-17 EULA and "Software License Transfer and Re-license Policy" expressly allow the use and transfer of such embedded software.

231.   Cisco's statements were made with the intent to disrupt the economic relationship between Dexon and its potential and actual customers in order to damage Dexon and or divert business to "Cisco Authorized Resellers" under Cisco's control.

232.   Cisco's knew such statements were false and misleading or had a disregard for whether such statements were true of false and misleading.

233.   As a result of the efforts detailed above, Dexon's relationships with its potential and actual customers have in fact been permanently disrupted and/or materially damaged in a significant number of instances, including its future relationships. As a result of Cisco's tortious efforts, Dexon's customers have refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from contention for business, and have ceased doing business with Dexon on other products and/or altogether.

234.   Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

235.   Cisco's actions have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

0640.002\Ex                                                                    -47-                                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-115-
73575998v1

Exhibit B
Page 104 of 112

## <u>Count V</u>
## Trade Libel

236.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

237.   On information and belief, Dexon alleges that Cisco has repeatedly made disparaging and false statements about Dexon's products as detailed herein, including, without limitation, the statements and representations detailed above to Dexon customers Fort Bend Independent School District, Lockridge, Meadowridge and Accuray.  As detailed herein, such false and disparaging statements included, without limitation: i) falsely claiming all the products sold by Dexon to Lockridge were counterfeit; ii) falsely claiming the products Dexon had contracted to sell to FBISD were "refurbished" rather than new; and iii) that such Dexon customers did not possess or would not possess a valid license for embedded software included with any products purchased from Dexon.

238.   Cisco made such disparaging and false statements despite knowing: i) Dexon has sold and will continue to sell products governed by Cisco's purported 2012-17 EULA and "Software License Transfer and Re-license Policy": and ii)  Cisco's purported 2012-17 EULA and "Software License Transfer and Re-license Policy" expressly allow the use and transfer of such embedded software.

239.   Cisco's statements disparaged Dexon's products.  On information and belief, Dexon alleges that the claims made were false or materially misleading.

240.   Cisco intentionally made such statement knowing such statements were false and misleading or having a complete disregard for whether such statements were true or false and misleading.

241.   Dexon has suffered and will continue to suffer irreparable harm should Cisco's trade libel be allowed to continue.

242.   As a proximate result of Cisco's statements, the identified actual customers have been deterred from buying Dexon's products and from otherwise dealing with Dexon. Specifically, such customers have refused to pay for certain Cisco goods, have returned

0640.002\Ex
-48-
Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS
-116-
Exhibit B
Page 105 of 112
73575998v1

1   and/or cancelled orders for such goods, have removed Dexon's bids from contention for

2   business, and have ceased doing business with Dexon on other products altogether.

3       243.    Dexon has suffered substantial economic damage as a result of this wrongful

4   conduct in an amount subject to proof at trial.

5                                    **Count VI**
                                **Trade Libel Per Se**
6

7       244.    Dexon repeats and realleges each of the allegations set forth in the preceding

8   paragraphs as if fully set forth herein.

9       245.    As detailed herein, Cisco has repeatedly made disparaging and false

10  statements about Dexon's products to Dexon customers Fort Bend Independent School

11  District, Lockridge, Meadowridge and Accuray.

12      246.    As detailed herein, such false and disparaging statements included, without

13  limitation: i) falsely claiming all the products sold by Dexon to Lockridge were counterfeit;

14  ii) falsely claiming the products Dexon had contracted to sell to FBISD were "refurbished"

15  rather than new; and iii) that such Dexon customers did not possess or would not possess a

16  valid license for embedded software included with any products purchased from Dexon.

17      247.    Cisco made such disparaging and false statements despite knowing: i) Dexon

18  has sold and will continue to sell products governed by Cisco's purported 2012-17 EULA

19  and "Software License Transfer and Relicense Policy": and ii)  Cisco's purported 2012-17

20  EULA and "Software License Transfer and Re-license Policy" expressly allow the use and

21  transfer of such embedded software.

22      248.    Cisco's statements disparaged Dexon's products.

23      249.  Cisco intentionally made such statements knowing such statements were false

24  and misleading or having a complete disregard for whether such statements were true or

25  false and misleading.

26      250.  As a proximate result of Cisco's statements, the identified actual customers

27  have been deterred from buying Dexon's products and from otherwise dealing with Dexon.

28  Specifically, such customers have refused to pay for certain Cisco goods, have returned

0640.002\Ex                              -49-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-117-
73575998v1

Exhibit B
Page 106 of 112

1  and/or cancelled orders for such goods, have removed Dexon's bids from contention for

2  business, and have ceased doing business with Dexon on other products altogether.

3      251.    Dexon has suffered substantial economic damage as a result of this wrongful

4  conduct in an amount subject to proof at trial.

5      252.    Such false and misleading statements by Cisco go to the integrity and character

6  of Dexon's business practices, including, without limitation, implying that Dexon misleads

7  its customers as to the nature or quality of its goods, including that Dexon sells "refurbished"

8  products as "new,", and that Dexon misrepresents that its secondary market customers will

9  be able to use and transfer Cisco products purchased from Dexon.   As a result, damage is

10 presumed for such statements irrespective of any actual damages proven by Dexon at trial.

11                          **THIRD PARTY CLAIMS**

12      253.    Third Party Plaintiff Dexon Computer, Inc. asserts the following claims

13 against Third Party Defendants Atlantix Global Systems International, LLC, Bizcom

14 Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable

15 Connections, MJSI, Multimode Technologies, LLC, Optimum Data, Inc., Paragon, Pure

16 Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc.,

17 Strada Networks, LLC, Unlimited Network Solutions and Wisecom Technologies alleges

18 as follows:

19                              **THE PARTIES**

20      254.    Third Party Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota

21 corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB,

22 Bloomington, Minnesota 55420.

23      255.    On information and belief, Third Party Defendant Atlantix Global Systems

24 International, LLC is a Georgia limited liability corporation with its principal place of

25 business in Georgia.

26      256.    On information and belief, Third Party Defendant Bizcom Electronics, Inc.,

27 is a California corporation with its principal place of business in California.

28

DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
73575998v1                                                                   Exhibit B

257.   On information and belief, Third Party Defendant Digi Devices Online is a foreign corporation with its principal U.S. place of business in Texas.

258.   On information and belief, Third Party Defendant Enterprise Business Technologies, Inc. is a New York corporation with its principal place of business in New York.

259.   On information and belief, Third Party Defendant Fiber Cable Connections is a Washington corporation with its principal place of business in Washington.

260.   On information and belief, Third Party Defendant MJSI is a California corporation with its principal place of business in California.

261.   On information and belief, Third Party Defendant Multimode Technologies, LLC is a Minnesota limited liability company with its principal place of business in Minnesota.

262.   On information and belief, Third Party Defendant Optimum Data, Inc. is a Nebraska corporation with its principal place of business in Nebraska.

263.   On information and belief, Third Party Defendant Paragon is a Massachusetts corporation with its principal place of business in Massachusetts.

264.   On information and belief, Third Party Defendant Pure Future Technology, Inc. is a California corporation with its principal place of business in California.

265.   On information and belief, Third Party Defendant Seastar IT Trading LLC is a Washington limited liability company with its principal place of business in Washington.

266.   On information and belief, Third Party Defendant Server Tech Supply is a Virginia corporation with its principal place of business in Pennsylvania.

267.   On information and belief, Third Party Defendant Softnetworks, Inc. is a New Jersey limited liability company with its principal place of business in New Jersey.

268.   On information and belief, Third Party Defendant Strada Networks, LLC is a foreign limited liability company with its principal place of business in British Columbia, Canada.

0640.002\Ex
-51-
Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS
-119-
73575998v1
Exhibit B
Page 108 of 112

269.   On information and belief, Third Party Defendant Teksavers is a Texas corporation with its principal place of business in Texas

270.   On information and belief, Third Party Defendant Unlimited Network Solutions is a corporation with its principal place of business in California.

271.   On information and belief, Wisecom Technologies is a corporation with its principal place of business in Maryland.

**Supply of Alleged Counterfeit and Infringing Product**

272.   The Third Party Defendants are all reputable dealers and merchants with respect to the Cisco products alleged to be counterfeit and thereby infringing herein ("allegedly infringing Cisco product").

273.   Dexon obtained such allegedly infringing Cisco product from the Third Party Defendants. While Dexon denies Cisco's allegations and believes the subject products to be genuine, Dexon relied in good faith on the Third Party Defendants in procuring or obtaining such products.

274.   Without limitation, the Third Party Defendants warranted that such products sold to Dexon would be "delivered free of the rightful claim of any third person by way of infringement or the like."  *See* U.C.C. §2-312(3).

**FIRST THIRD PARTY CLAIM**
**(Indemnification - All Third Party Defendants)**

275.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

276.   Dexon was named in this litigation as a direct result of product procured from and/or supplied by the Third Party Defendants.

277.   Third Party Defendants should be ordered to indemnify Dexon whether based on express agreement, implied agreement or common law.

0640.002\Ex
73575998v1
-52-
-120-
Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS
Exhibit B
Page 109 of 112

### SECOND THIRD PARTY CLAIM
### (Contribution - All Third Party Defendants)

278.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

279.    Dexon was named in this litigation as a direct result of product procured from and supplied by the Third Party Defendants.

280.    Dexon is entitled to contribution from Third Party Defendants, whether based on express agreement, implied agreement or common law, to pay or defray any judgment entered against Dexon herein.

### PRAYER FOR RELIEF

**WHEREFORE**, Defendant, Counterclaim Plaintiff and Third Party Plaintiff Dexon Computer, Inc. prays for judgment and relief against Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc. ("Cisco") and Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Unlimited Network Solutions and Wisecom Technologies as follows:

a.    Dismissing Plaintiffs' Cisco Systems, Inc. and Cisco Technology, Inc. claims with prejudice, together with costs and disbursements;

b.    Awarding Dexon actual damages, subject to proof at trial but in an amount in excess of $75,000.;

c.    For equitable remedial efforts by Counterclaim Defendants sufficient to rehabilitate Dexon's damaged reputation;

d.    Declaring that: i) original purchasers of Cisco products obtained the products and any associated embedded software via a "sale"; ii) there is no valid or enforceable EULA governing the embedded software in Cisco products sold by Dexon on

1  the secondary market; and iii) Dexon's customers' are free to use and transfer such products

2  pursuant to the first sale doctrine codified at 17 U.S.C. §109.

3        e.    For orders restraining or enjoining Cisco from engaging in similar

4  conduct in the future;

5        f.    Awarding Dexon its costs and expenses of litigation, including

6  reasonable attorneys' fees;

7        g.    An award in Dexon's favor against Third Party Defendants sufficient

8  to compensate Dexon for all economic loss, damages, attorney's fees and costs resulting

9  from the claims herein; and

10       h.    Such other and further relief as this Court deems just and equitable.

11 Dated:  May  11, 2022                    /s/Amanda Washton
                                    _____
12                                  Amanda Washton
                                      a.washton@conklelaw.com
13                                  **CONKLE, KREMER & ENGEL, PLC**
                                    3130 Wilshire Boulevard, Suite 500
14                                  Santa Monica, CA 90403

15                                  Michael M. Lafeber
                                      mlafeber@taftlaw.com
16                                  O. Joseph Balthazor Jr.
                                      jbalthazor@taftlaw.com
17                                  **TAFT STETTINIUS & HOLLISTER LLP**
                                    2200 IDS Center
18                                  80 S. 8th St.
                                    Minneapolis, MN 55402

19                                  David H. Reichenberg (*pro hac vice pending*)
                                      DReichenberg@cozen.com
20                                  **COZEN O'CONNOR**
                                    3 WTC, 175 Greenwich Street, 56th Floor
21                                  New York, New York 10006

22                                  Mark A. Jacobson (*pro hac vice pending*)
                                      mjacobson@cozen.com
23                                  **COZEN O'CONNOR**
                                    33 South 6th Street, Suite 3800
24                                  Minneapolis, MN 55402

25                                  Attorneys for Defendant, Counterclaim Plaintiff and
26                                  Third-Party Plaintiff Dexon Computer, Inc.

27

28

0640.002\Ex                    -54-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S FOURTH AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS
-122-
73575998v1                                                    Exhibit B
                                                              Page 111 of 112

1

## DEMAND FOR JURY TRIAL

2    Dexon Computer, Inc. demands a trial by jury on all issues so triable.

3

4    Dated: May 11, 2022          */s/Amanda R. Washton*

5                                  Amanda R. Washton
                                   *a.washton@conklelaw.com*
6                                  **CONKLE, KREMER & ENGEL, PLC**
                                   3130 Wilshire Boulevard, Suite 500
7                                  Santa Monica, CA 90403

8                                  Michael M. Lafeber
                                   *mlafeber@taftlaw.com*
9                                  O. Joseph Balthazor Jr.
                                   *jbalthazor@taftlaw.com*
10                                 **TAFT STETTINIUS & HOLLISTER LLP**
                                   2200 IDS Center
11                                 80 S. 8th Street
                                   Minneapolis, MN 55402

12                                 David H. Reichenberg (*pro hac vice pending*)
                                   *DReichenberg@manatt.com*
13                                 **MANATT, PHELPS & PHILLIPS, LLP**
                                   7 Times Square
14                                 New York, NY 10036

15

16                                 Attorneys for Defendant, Counterclaim Plaintiff and
                                   Third-Party Plaintiff Dexon Computer, Inc.

17

18

19

20

21

22

23

24

25

26

27

28