IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS, INC., et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>DEXON COMPUTER, INC., et al.,<br><br>  Defendants. | Case No. 20-cv-04926-CRB<br><br>**ORDER GRANTING MOTION TO DISMISS COUNTERCLAIMS AND DENYING LEAVE TO FILE FOURTH AMENDED COUNTERCLAIMS** |

Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc. (collectively "Cisco") sued Defendant Dexon Computer, Inc. ("Dexon") for trademark infringement, trademark counterfeiting, false designation of origin, unfair business practices under California law, and unjust enrichment. The Court previously dismissed Dexon's eleven counterclaims with leave to amend. The Court then dismissed Dexon's four amended counterclaims, noting that it would permit only one more chance to amend. Dexon now alleges six counterclaims: declaratory judgment, Lanham Act false advertising, intentional interference with contractual relations, intentional interference with prospective economic advantage, trade libel, and trade libel per se. Dexon also moves for leave to file a fourth amended answer, insisting that it recently uncovered new information that would strengthen its counterclaims. Cisco moves to dismiss. The Court GRANTS the motion to dismiss and DENIES the motion for leave to amend.

I.  **BACKGROUND**

   A.  **Facts**

       1.  **Cisco and Dexon**

Cisco Systems and Cisco Technology are corporations that manufacture and sell

hardware products in routing, switching, and networking.  See December Order (dkt. 87) at 1-2.  Cisco has an "Authorized Channel Network" through which it sells products to "Authorized Channel Partners" or "Authorized Resellers."  Third Am. Countercl. ("TAC") ¶ 122 (dkt. 107).  "Within this 'Authorized' network, Cisco exerts strict control over how, and at what prices, its 'Authorized' partners can buy and sell Cisco products."  Id.  On the secondary market, Cisco hardware is sold at lower prices.  Id. ¶ 118.  Dexon is a secondary-market reseller of computer networking products that sells "new, refurbished, and discontinued hardware" by Cisco and others.  Id. ¶ 119.

### 2. Alleged Misrepresentations

Cisco's hardware contains "embedded software" that is necessary for the hardware to function.  Id. ¶ 125.  Cisco represents that secondary-market hardware is governed by an "End User License Agreement" ("EULA") that restricts transfer and use of the embedded software.  Id. ¶ 126.  Cisco further represents on its "relicensing website" and in its communications with customers that these embedded software licenses are not transferrable and that any Cisco hardware purchased on the secondary market must be relicensed.  Id. ¶¶ 129-130.

Dexon alleges that these representations are false because the initial purchase of the embedded software is a sale and not governed by the EULA.  Id. ¶ 134.  In its second amended counterclaims, Dexon alleged that EULA cannot govern the products Dexon sells because, when Cisco sells the initial hardware, it does not obtain assent to the license.  See Second Am. Countercl. ("SAC") (dkt. 92) ¶ 146; id. ¶ 126 (alleging that Cisco makes the EULA available online and informs users where it is but "does not require or mandate that end users acknowledge, read, accept or provide any affirmative assent to" it); see also TAC ¶ 139 (similar).

In its third amended counterclaims, Dexon adds some additional details in support of its claim that Cisco does not obtain assent to the license.  Dexon alleges that Cisco's notice to customers about the EULA has "varied through the years," from 2009 to today.  TAC ¶ 149.  At first, the license terms were in a "Getting Started Guide" CD and "would

have been routinely ignored as unnecessary or superfluous by experienced IT professionals." Id. ¶¶ 150, 151. At some "unknown time," Cisco stopped providing a copy of the EULA and instead added a paper notice directing the purchaser to a website URL containing the EULA. Id. ¶¶ 152-53. Dexon includes pictures of the exterior packaging for an example Cisco switch. Id. ¶ 145. Because the EULA is only on the inside of the product packaging, it can be accessed only after the product has been purchased and opened. Id. ¶ 146. Dexon alleges that, in the absence of a valid EULA, every initial transaction constitutes a "sale" of both the hardware and software. Id. ¶ 157. Consequently, any subsequent claim by Cisco that the embedded software is governed by the license is "false or misleading." Id. Dexon alleges that it has "lost sales of products that would have been made but for" Cisco's representation that secondary-market hardware is bound by the EULA and requires a new license. Id. ¶ 161.

### 3. Cisco's Brand Protection Team

As in the second amended counterclaims, Dexon alleges that Cisco employs "a team of 'Brand Protection' employees" who "intervene with resellers and end users in cases where they are either contemplating the purchase of product, or have ordered product, from the secondary market." Id. ¶ 162. Because of Cisco's actions, Dexon's customers have "refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from contention for business, and have ceased doing business with Dexon on other products and/or altogether." Id. ¶ 216. Dexon alleges that it has suffered damages, including the cancellation of pending orders, loss of opportunity to bid on projects, and the loss of entire relationships with many of its top customers. Id. ¶ 181. Dexon describes, in nearly identical terms as in its previous pleading, the following four interactions between Cisco and Dexon's customers.

First, as of July 2019, Fort Bend Independent School District (FBISD) had entered into a written contract with Dexon for the purchase of over $1.3 million in new Cisco equipment. Id. ¶ 165. On or about July 9, Sean O'Brien, a member of Cisco's Brand Protection Team, sent a letter to FBISD stating that "Dexon Computers is not a member of

3

the Cisco authorize reseller program" and "[c]ustomers purchasing most Cisco goods outside of Cisco's authorized sales channels would not automatically have a license to use the software." Id. ¶¶ 166, 167. The letter stated that the Dexon-purchased products "may not come with a valid software license," so "Cisco recommends that you return these goods for a refund, along with any other Cisco products received by the vendor, and replace the items with authorized Cisco products sold via an authorized reseller." Id. ¶¶ 166, 167. FBISD believed that the equipment "may not be new and that it would not be able to use such products due to the absence of a 'valid software license,'" so it cancelled its contract with Dexon. Id. ¶ 168. Dexon newly alleges that this was "especially egregious" because, "on information and belief," these products were phones that do not require a separate license to operate. Id. ¶ 169.

Second, on or about March 14, 2019, Tim Casto, a member of Cisco's Brand Protection Team, sent a letter to Dexon customer Lockridge Grindal and Nauen (Lockridge) stating that "six switches" Lockridge had purchased from Dexon were "counterfeit." Id. ¶ 170. (According to Dexon, Cisco now alleges that only four of the six switches are counterfeit. Id.) The letter stated that "Dexon is NOT a member of the Cisco Authorized Reseller Program," that "[r]egardless of what Dexon claims, and regardless of whether its Cisco product is used or is in new sealed boxes, ANY Cisco product it supplies is consider unauthorized." Id. ¶ 171. It then stated that no product obtained from Dexon comes with a "valid software license." Id. ¶ 171. Lockridge believed that all six of the switches were counterfeit, that they would not work, and that they lacked the required licenses. Id. ¶ 172. As a result, Lockridge demanded a refund, and Dexon lost all future business opportunities from Lockridge. Id.

Third, on or about January 27, 2020, Casto sent an email to Accuray Inc. stating that some of the products it had purchased from Dexon on the secondary market "did not have a valid software license." Id. ¶ 173. The email stated that "Cisco . . . determined that the items are genuine" but that the items lacked a valid software license because they "show as sold to end users other than Accuray." Id. Dexon newly alleges that due to this

4

correspondence, Accuray believed that the product would not work and that it lacked the required licenses necessary to work. Id. ¶ 174. "As a result," Accuray demanded a refund and Dexon lost all future business opportunities from Accuray. Id.

Fourth, on or about July 12, 2021, Shuting Li, a member of Cisco's Brand Protection Team, sent an email to Dexon customer Meadowridge Networks, Inc. stating that the product purchased from Dexon was "an unauthorized unit [ ] because this unit is now in possession of end customer which is different from the reported end customer," so "it is an overseas diversion unit." Id. ¶ 175. Confused, Meadowridge responded: "I am the first end-user to open the box. . . This came to me in an unopened Cisco box and was not a 'used' unit in any sense of the word. . . I had every reason to think that this was a legitimate unit and no reason to believe that it wasn't." Id. ¶ 176. Cisco directed Meadowridge to its website, which defined "used" equipment to include all products purchased on the secondary market. Id. ¶ 177. Dexon alleges that Meadowridge believed that the Cisco products it had purchased from Dexon would not work. Id. ¶ 178. Meadowridge demanded a refund and was provided a replacement or substitute product at a reduced price. Id. Dexon lost future business opportunities from Meadowridge. Id.

### 4. Newly Discovered Facts

On May 11, 2022, about five weeks after filing its third amended counterclaims on April 6, Dexon moved for leave to amend again in light of newly-discovered facts concerning an earlier version of Cisco's EULA. Mot. for Leave (dkt. 116). On or about April 19, 2022, Dexon states that its counsel was contacted by an attorney adverse to Cisco in another matter who shared that Cisco's 2012 EULA had an exception that expressly allowed the transfer of the embedded software. Lafeber Decl. (dkt. 116-1) ¶ 2. Dexon communicated this discovery to Cisco, and Cisco confirmed that the exception was in effect from 2012 until some time between 2014 and 2017. Id. ¶¶ 3-6 & Ex A.

In its proposed fourth amended counterclaims, Dexon describes this prior Policy and the language it included. See generally Lafeber Decl. Ex. B, Proposed Fourth Am. Countercl. ("FAC"). Dexon alleges that Cisco products sold from 2012 to 2017 were

5

subject to a "Software License Transfer and Re-licensing Policy" that included an exception "expressly allow[ing] the use and transfer of Cisco products by secondary market purchasers." Id. ¶ 162. That Policy stated that, "[i]n situations where Products combine Hardware and Software and there is no separate Product code or License Fee charged for the Software on the applicable Cisco then-current published price list at the time of transfer[,] . . . an exception will be made to allow for the transfer without the transferee being required to pay a new License Fee." Id. "On information and belief," Cisco's "published price list" contained no separate "Product code or License Fee" for "embedded software included with products governed by Cisco's purported 2012-2017 'Software License Transfer and Re-licensing Policy." Id. ¶ 163. In its communications to secondary market purchasers, Cisco does not distinguish between products governed by the 2012-2017 version of the Software License Transfer and Re-licensing Policy. Id. ¶ 164. A customer purchasing a secondary-market Cisco product from Dexon would, if they go to Cisco's website to view the EULA or "Software License Transfer and Re-use policy," see the current version, with the exception removed. Id. ¶ 170.

Dexon "has regularly sold and continues to sell" Cisco products from model years 2009 to the present. Id. ¶ 165. "[O]n information and belief," Dexon alleges that the products sold to Lockridge were originally sold to the original consumer or end user between 2015 and 2017. Id. ¶ 184. Dexon also alleges on information and belief that 23 out of 26 of the products sold to Accuray were sold to the original consumer or end user between 2014 and 2017. Id. ¶ 187.

### B. Procedural History

On July 22, 2020, Cisco sued Dexon for trademark infringement, trademark counterfeiting, false designation of origin, unfair business practices under California law, and unjust enrichment. See Am. Compl. (dkt. 32). The Court denied Dexon's motion to dismiss Cisco's complaint for lack of personal jurisdiction. See Am. Order (dkt. 40). In December 2021, after Dexon filed an answer and eleven counterclaims, the Court granted Cisco's motion to dismiss. See December Order. Dexon filed an amended answer and

raised four of the previously-dismissed counterclaims. See SAC. In March 2022, the Court granted Cisco's motion to dismiss the four counterclaims. See March Order (dkt. 106). Dexon now raises six counterclaims. See TAC. Cisco again moves to dismiss. See Mot. (dkt. 111); Opp. (dkt. 117); Reply (dkt. 120). On May 11, 2022, Dexon moved for leave to file a fourth amended counterclaims, which Cisco opposes. See Mot. for Leave; Opp. to Mot. for Leave (dkt. 121).

## II.   LEGAL STANDARD

### A.   Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a cause of action which fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When evaluating a Rule 12(b)(6) motion, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). But conclusory allegations amounting only to "formulaic recitation of the elements" are not entitled to an assumption of truth. See Iqbal, 556 U.S. at 681 (quoting Twombly, 550 U.S. at 555). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).

A party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Particularity requires "the who, what, when, where, and how of the misconduct charged, including what is false or misleading about a statement, and why it is false." Benavidez v. Cty. of San Diego, 993 F.3d 1134, 1145 (9th Cir. 2021)

(quoting United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016)). Allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." United Healthcare, 848 F.3d at 1180 (citation and quotation omitted).

### B. Declaratory Judgment

Courts may only adjudicate actual cases or controversies. U.S. Const. art. III, § 2, cl. 1. "When presented with a claim for a declaratory judgment, therefore, federal courts must take care to ensure the presence of an actual case or controversy." Rhoades v. Avon Prods., Inc., 504 F.3d 1151, 1157 (9th Cir. 2007) (citing Pub. Serv. Comm'n v. Wycoff, Co., 344 U.S. 237, 244 (1952)). "Absent a true case or controversy, a complaint solely for declaratory relief under 28 U.S.C. § 2201 will fail for lack of jurisdiction under Rule 12(b)(1)." Id. (citation omitted). To satisfy the actual controversy requirement in a trademark case, the plaintiff must show "real and reasonable apprehension" that it would be liable for infringement if it continued marketing its product. Monster Cable Prod., Inc. v. Euroflex S.R.L., 642 F. Supp. 2d 1001, 1010 (N.D. Cal. 2009) (quoting Chesebrough-Pond's, Inc. v. Faberge, Inc., 666 F.2d 393, 396 (9th Cir. 1982)).

### C. Leave to Amend

When dismissal is appropriate, courts "shall freely" give leave to amend the complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). In the Ninth Circuit, district courts may deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). A court's discretion to deny leave to amend is "particularly broad" where "the plaintiff has previously been granted leave to amended and has subsequently failed to add the requisite particularity to its claims." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1007 (9th Cir. 2009).

## III. DISCUSSION

Dexon alleges six counterclaims in its third amended answer: (1) Lanham Act false advertising, (2) intentional interference with contractual relations, (3) intentional interference with prospective economic advantage, (4) trade libel, (5) trade libel per se, (6) declaratory judgment. Dexon also moves for leave to file a fourth amended counterclaims based on newly-discovered facts. The Court concludes that Dexon fails to state its six counterclaims and that its proposed amendment would be futile and prejudicial.

### A. Counterclaims

#### 1. Lanham Act (Claim III)

Dexon alleges that Cisco violated Section 43(a) of the Lanham Act by telling secondary-market purchasers that they cannot use the embedded software in their hardware unless they purchase a separate license.[1] TAC ¶¶ 194, 197.

Section 43(a) of the Lanham Act forbids the use of false or misleading descriptions in commercial advertising. See 15 U.S.C. § 1125(a)(1)(B). It requires five elements: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997). Although the Ninth Circuit has not yet decided the issue, "the better reasoned [district court] authority is that, where a Lanham Act claim is predicated on the theory that the defendant engaged in a knowing and intentional misrepresentation, then Rule 9(b) is applicable." Clorox Co. v. Reckitt Benckiser Grp. PLC, 398 F. Supp. 3d 623, 634 (N.D. Cal. 2019) (quoting 23andMe, Inc. v. Ancestry.com DNA, LLC, 356 F. Supp. 3d 889, 908 (N.D. Cal. 2018)).

---

[1] In prior counterclaims, Dexon alleged an additional misrepresentation concerning Cisco's capacious definition of "used," but it no longer bases any of its claims on that allegation. See Opp. at 6 n.2, 16-17.

9

1    No allegations in its newest pleading change the Court's view (expressed twice) that
2    Cisco did not make an actionable false statement in communicating that secondary-market
3    purchasers require a software license. See December Order at 14, 12; see also March
4    Order at 7, 8. As before, Dexon alleges that Cisco neither provides notice to the original
5    purchaser that the embedded software is governed by a licensing agreement nor requires
6    affirmative assent to that agreement. Countercl. ¶ 139, 155. As such, in Dexon's view, the
7    EULA does not apply to the embedded software, the software is not subject to any license
8    at all, and any later statement that secondary market purchasers cannot transfer Cisco
9    products is false and misleading. Id. ¶ 157.

10   The Court has twice held that the allegations do not plausibly demonstrate that
11   Cisco's statement is false or misleading. Dexon acknowledges that there are significant
12   differences over how the EULA was communicated to original purchasers between 2009
13   and now. See TAC ¶¶ 145-153. So, too, were the circumstances of each sale by an
14   Authorized Reseller different. Cisco's statement would be false only if the circumstances
15   surrounding each original purchase demonstrate that that purchaser lacked objective
16   understanding from the seller that the embedded software was subject to a license, and if
17   the circumstances surrounding Dexon's purchase indicate that it too gained title to the
18   embedded software. But Dexon has not sufficiently alleged that the Authorized Resellers
19   provide no notice. See e.g., id. ¶ 139 (stating generally that "Cisco's authorized reseller[s]
20   do not provide original purchasers any notice prior to purchase that there is embedded
21   software in the product or that such embedded software is governed by a license"). Dexon
22   also has not alleged anything about when or how it gained title to the embedded software
23   as to the products that it sold to FBISD, Lockridge, Accuray, or Meadowridge.
24   Consequently, Dexon fails to allege that it held title to the embedded software in the
25   specific equipment at issue here. See Clorox Co., 398 F. Supp. 3d at 634. Cisco therefore
26   did not make a false statement in communicating that these secondary purchasers had to
27   acquire licenses.
28   Moreover, a Lanham Act claim requires a misleading "statement of fact," and the

1  Cisco's statement does not qualify because its truth depends on the resolution of a disputed
2  legal issue.  March Order at 8.  Whether the transactions are sales or licenses is not the sort
3  of "statement of fact" that may give rise to a false advertising claim.  See Coastal Abstract
4  Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 731-32 (9th Cir. 1999) (a statement
5  that a company was "not licensed in California" was not a false statement of fact under the
6  Lanham Act because it was a legal issue—and one that was still disputed).  Dexon
7  attempts to distinguish Coastal Abstract by contrasting the one-time statement there with
8  Cisco's "intentional, coordinated [and] formalized" statements.  Opp. at 17.  But even if
9  true, the fact that Cisco's statements were approved by the company does not transform it
10 from a disputed legal issue into a "statement of fact" that would give rise to a Lanham Act
11 claim.  Dexon therefore fails to plausibly allege a misrepresentation as to the embedded
12 software license.

### 2. Intentional Interference and Trade Libel (Claims III, IV, and V)

Dexon also pleads intentional interference with contractual relations, intentional interference with prospective economic advantage, and trade libel claims, all of which are subject to the heightened requirement of Rule 9(b).  See Benavidez, 993 F.3d at 1145. These claims are based on the general allegations that Cisco "made false and misleading statements about Dexon and the products it sells to these customers in order to disrupt the contractual relationship and to cause these customers to purchase product from Cisco authorized resellers at a higher price."  TAC ¶ 206; see also id. ¶¶ 214, 215.

A claim for interference requires proof that the defendant engaged in conduct that was wrongful by some legal measure other than the fact of interference itself.  Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014).  The California counterclaims require that Cisco make a false statement or otherwise commit a wrongful act.  It does not violate California law to tell a party true statements about the world.  See Ixchel Pharma, LLC v. Biogen, Inc., 470 P.3d 571, 580 (Cal. 2020) ("[T]o state a claim for interference with an at-will contract by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act."); Della Penna v.

11

Toyota Motor Sales, U.S.A., Inc., 902 P.2d 740, 748, 751 (Cal. 1995) (interference with an economic relationship requires that the interference is "wrongful by some legal measure other than the fact of interference itself"); ComputerXpress, Inc. v. Jackson, 93 Cal. App. 4th 993, 1014 (2001) ("Like the tort of trade libel, interference with prospective economic advantage requires false statements of fact.").

Dexon still has not properly pleaded that Cisco's conduct was wrongful. Dexon alleges that Cisco, through its Brand Protection Team, informed FBISD, Lockridge, Accuray, and Meadowridge that the Cisco products lacked a valid software license and/or were counterfeit or refurbished. TAC ¶¶ 166, 167, 170, 173, 175. As noted above, Dexon has not sufficiently alleged that the statements to these customers that their hardware required new licenses were misleading or false statements of fact. Nor does Dexon plausibly allege that calling Dexon's secondary equipment "refurbished" was false or wrongful, especially given that Dexon does in fact sell "refurbished" hardware. TAC ¶ 119; see Ixchel Pharma, 470 P.3d at 580. Although Dexon alleges that Cisco labeled the six switches it sold to Lockridge as "counterfeit," Dexon never alleges that this statement was false and that they were in fact not counterfeit. Id. ¶ 170. (Although Dexon alleges that "[o]n information and belief" Cisco currently believes only four of the switches are counterfeit, this is not the same as an allegation that they were not counterfeit. Id.)

Even if it could be construed as wrongful that Cisco called some of these products "counterfeit" or "refurbished," these actions were not plausibly material to purchaser behavior and/or did not proximately cause Dexon's injury. To the extent that Dexon's customers cancelled their contracts or otherwise changed their behavior, they did so because they learned key facts that Dexon still has not plausibly alleged are false: Dexon is not an authorized reseller, the products Dexon sold to them likely lack valid licenses, and they must purchase new ones.

For these reasons, the intentional interference with contractual relations, intentional interference with prospective economic advantage, and trade libel claims should be dismissed.

12

### 3. Trade Libel Per Se (Claim VI)

Dexon also argues that Cisco's statements to Dexon's customers about Dexon and its business practices amount to trade libel per se. TAC ¶ 227. But Cisco's communications were not plausibly defamatory on their face.

Libel per se is "defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact. . . ." Barnes-Hind, Inc. v. Superior Ct., 181 Cal. App. 3d 377, 382 (Ct. App. 1986) (quoting Slaughter v. Friedman, 32 Cal. 3d 149, 649 P.2d 886 (1982)). Libel per se requires statements that disparage the integrity or honesty of a business, for example by alleging "fraud and deception and unfair dealing with their customers." Johnstech Int'l Corp. v. JF Microtechnology SDN BHD, No. 14-CV-02864-JD, 2016 WL 4182402, at *3 (N.D. Cal. Aug. 8, 2016), aff'd, 773 F. App'x 623 (Fed. Cir. 2019). It is intended to redress false statements that "seriously impugn morals, character or reputation in a way that jumps off the page without the need for further explanation." Id.

Dexon fails to plausibly allege that any statement by Cisco amounts to trade libel per se. Dexon alleges that Cisco damaged Dexon's integrity and character by implying Dexon misleads its customers and that Dexon misrepresents that its customers can use and transfer the products it sells. TAC ¶ 232. The Court has already stated that Cisco's claim about the licenses is not a false statement. Even if it were, the implicit claim that some of Dexon's products do not work as advertised does not rise to the level of "seriously impugn[ing Dexon's] morals, character or reputation." See Johnstech, 2016 WL 4182402, at *3. Dexon does not allege that Cisco made any claims about what Dexon told its customers before it sold them the products or that it knowingly sold products without a valid license. And Cisco's statement to one of Dexon's customers that it sold them a refurbished product is not the sort of claim that "disparages the integrity or honesty of a business" because Dexon does in fact sell refurbished Cisco products. See Johnstech, 2016 WL 4182402, at *3; TAC ¶ 119 (stating that "Dexon provides new, refurbished and discontinued hardware products").

13

### 4. Declaratory Judgment (Claim I)

Dexon seeks a declaratory judgment that "the original transactions involving the subject Cisco products is a 'sale' of both the hardware and any associated embedded software and that there exists no valid or enforceable license agreement governing the embedded software which prohibits the use of such products by subsequent secondary market purchasers." TAC ¶ 183.

To satisfy the "actual controversy" requirement of the Declaratory Judgment Act, the dispute must be definite and concrete as to the legal relations of parties having adverse legal interests. MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007). Declaratory judgment claims must satisfy Article III's requirements, including standing and ripeness, by pleading actual or imminent injury caused by the defendant that can be redressed by judicial relief and that is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Monster Cable Prod., Inc. v. Euroflex S.R.L., 642 F. Supp. 2d 1001, 1011 (N.D. Cal. 2009). A plaintiff must show "real and reasonable apprehension" of liability. Id.

Dexon fails to plausibly allege facts showing an actual controversy that a declaratory judgment can resolve. As described above, Dexon has not alleged specific facts around the original conveyance of these specific hardware products to plausibly suggest that it held title to the embedded software in those transactions. See Adobe Sys. Inc. v. Kornrumpf, 780 F. Supp. 2d 988, 994 (N.D. Cal. 2011) (dismissing a declaratory judgment claim based on the first-sale doctrine because the plaintiff did not plead sufficient "facts to suggest that it owned any of the particular copies of [] software that it resold"). Dexon cites International Equipment Trading, Ltd. v. Illumina, Inc., 312 F. Supp. 3d 725, 736 (N.D. Ill. 2018), Levita Magnetics International Corp. v. Attractive Surgical, LLC, 2020 WL 4580504 (N.D. Cal. Apr. 1, 2020), and Shoom, Inc. v. Electronic Imaging Systems of America, Inc., 2008 WL 11515251 (N.D. Cal. Apr. 10, 2008), but in each of those cases, the court found that the litigant had plausibly alleged a dispute over the transactions at issue there. Here, having concluded that Dexon has not plausibly alleged

14

1  that the initial transactions involved sales of the embedded software, the Court finds that
2  there is no concrete controversy.
3     Nor is there "real and reasonable apprehension" of liability on the basis of the
4  allegation that Cisco "continues to make false representations to actual or potential
5  secondary market purchasers, including Dexon's actual or potential customers." TAC
6  ¶ 184. The Court lacks power to issue a declaration on the basis that Dexon might be
7  subject to some future liability from some other transactions. See MedImmune, 549 U.S.
8  at 127 (a controversy must be real and substantial rather than an advisory opinion based
9  upon a hypothetical state of facts).[2]

### B.   Leave to Amend

Dexon seeks leave to file fourth amended counterclaims, even though the Court already permitted multiple rounds of amendments and previously said its third counterclaims would be its last. See March Order at 13. The Court denies this motion because Dexon's amendments would be futile. See Leadsinger, Inc., 512 F.3d at 532.

Cisco first argues that the Court should deny leave because of undue delay—that is, because Dexon should have better investigated this theory at the outset of this litigation. Cisco cites to Jordan v. County of Los Angeles, in which the Ninth Circuit affirmed denial of leave to amend because the plaintiff gave no satisfactory reasons for failing to include the new causes of action in the original complaint. See Jordan v. Cty. of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982). But it is less clear that Dexon could easily have included these allegations in the original complaint. Arguably, Dexon should have known about the Re-licensing Policy because it sold Cisco products prior to 2017. Yet although Cisco's current EULA and Policies are easily accessible on Cisco's website, the older versions are not—and were not on Cisco's website when Dexon was drafting these counterclaims.[3] For

---

[2] Dexon also argues that its declaratory judgment counterclaim is supported by the "zone of interests" standard from Lexmark International, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014). Opp. at 14. But Lexmark decided nothing about the Declaratory Judgment Act or Article III standing. Dexon's other cases are inapposite for similar reasons. See Opp. at 14-15.

[3] It is unclear from the pleading when Cisco switched over from a CD in the box

this reason, the Court is unpersuaded by the undue delay argument,

Dexon's proposed amendments would be futile because Dexon does not allege with particularity that the 2012-2017 Software License Transfer and Re-licensing Policy applied to the products it sold, so its counterclaims sounding in fraud would not stand. In its proposed fourth amended counterclaims, Dexon alleges "on information and belief" that the exception would apply to the products it sold to Lockridge and Accuray, but it does not identify which products were sold to these customers, let alone what year they were manufactured or when the original sale took place. See FAC ¶¶ 184, 187. Dexon does not allege at all whether the Policy could apply to the products it sold to FBISD or Meadowridge. Although Dexon alleges that it has inventory of Cisco products from that period and will continue to receive and sell products from that time period, see id. ¶ 165, Rule 9(b) requires more. Indeed, denial of leave is especially appropriate here because Dexon has repeatedly "been granted leave to amend and has subsequently failed to add the requisite particularity to its claims." See Zucco Partners, 552 F.3d at 1007; see, e.g., In re Tesla Motors, Inc. Sec. Litig., 75 F. Supp. 3d 1034, 1048 (N.D. Cal. 2014), aff'd, 671 F. App'x 670 (9th Cir. 2016) (denying leave to amend because plaintiff failed to comply with Rule 9(b) despite previous warnings).[4]

---

containing the EULA to putting it online and including the URL in the box. (The only date Dexon provides is that Cisco used a CD as of 2009.)

[4] The Court does not reach Cisco's third argument, which is that Dexon's proposed amendments would cause Cisco undue prejudice. Prejudice to the opposing party is the most important factor in analyzing leave to amend. See Jackson v. Bank of Hawaii, 902 F.2d 1385, 1387 (9th Cir. 1990). A party can suffer prejudice even if discovery has not started. See Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1161 (9th Cir. 1989). Cisco has incurred substantial legal costs from defending itself against Dexon's three sets of counterclaims over the past year. Opp. to Mot. for Leave at 10. Moreover, Dexon filed a new suit in the Eastern District of Texas asserting claims duplicative of those in this case—including some of the counterclaims that this Court has already dismissed—further inflating Cisco's costs. Id. at 6; see Dexon Computer, Inc. v. Cisco Systems, Inc. and CDW Corporation, No. 5:22-CV-53 (E.D. Tex.). Dexon's apparent attempts to seek repeated bites at the apple would weigh in support of denying leave. Cf. Hernandez v. DMSI Staffing, LLC, 79 F. Supp. 3d 1054, 1059 (N.D. Cal. 2015) (denying motion for leave in part because "the facts suggest that Plaintiff has engaged in forum-shopping"), aff'd, 677 F. App'x 359 (9th Cir. 2017). It is a close question whether further amendment would cause Cisco undue prejudice, but the Court need not reach it because it concludes that amendment would be futile.

16

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Cisco's motion to dismiss Dexon's counterclaims without leave to amend and DENIES Dexon leave to file fourth amended counterclaims.

**IT IS SO ORDERED.**

Dated: June 21, 2022



CHARLES R. BREYER
United States District Judge