John A. Conkle (SB# 117849)
  j.conkle@conklelaw.com
Amanda R. Washton (SB# 227541)
  a.washton@conklelaw.com
CONKLE, KREMER & ENGEL, PLC
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351
Phone: (310) 998-9100 • Fax: (310) 998-9109

Michael M. Lafeber (*pro hac vice*)
  mlafeber@taftlaw.com
David McDaniel (*pro hac vice*)
  dmcdaniel@taftlaw.com
O. Joseph Balthazor Jr. (*pro hac vice*)
  jbalthazor@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
2200 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Phone: (612) 977-8400 • Fax: (612) 977-8650

Attorneys for Defendant, Counterclaim Plaintiff and Third-Party Plaintiff Dexon Computer, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation, and CISCO TECHNOLOGY, INC., a California corporation,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>DEXON COMPUTER, INC., a Minnesota corporation,<br><br>　　　　Defendant.<br><br>AND RELATED CROSS-ACTIONS | Case No. 3:20-cv-04926 CRB<br><br>**DEFENDANT DEXON COMPUTER, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>**PUBLIC REDACTED VERSION**<br><br>Date:　　June 30, 2023<br>Time:　　10:00 AM<br>Crtrm.:　 Zoom<br><br>Hon. Charles R. Breyer, Presiding Judge |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................5

II. BACKGROUND FACTS ....................................................................................................6

    A. DEXON AND THE SECONDARY MARKET ..........................................................6

    B. CISCO'S COUNTERFEIT PROBLEM ....................................................................6

    C. CISCO'S UNDUE DELAY IN SEEKING AN INJUNCTION ................................8

        1. Cisco's Longstanding Knowledge of Dexon's *Alleged* Counterfeit Sales ..........................................................................................................8

        2. Cisco's Longstanding Knowledge of Dexon's SMARTNet Sales................8

    D. ABSENCE OF SUPPORT FOR REQUESTED INJUNCTION ...............................9

        1. Cisco Has Failed to Prove a Single Sale of Counterfeit................................9

III. ARGUMENT ......................................................................................................................12

    A. STANDARDS APPLICABLE TO REQUEST FOR PRELIMINARY INJUNCTION ..............................................................................................................12

    B. CISCO'S DELAY PRECLUDES A FINDING OF IRREPARABLE HARM. .................................................................................................................................13

    C. CISCO HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS. ....................................................................................15

    D. CISCO'S PROPOSED INJUNCTION IS SUBSTANTIALLY OVERBROAD ................................................................................................................16

    E. THE BALANCE OF THE HARMS FAVORS DEXON. .........................................17

IV. CONCLUSION ...................................................................................................................18

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Arc of Cal. v. Douglas*,
  757 F.3d 975 (9th Cir. 2014) ........................................................................................... 15

*Atari Games Corp. v. Nintendo of America, Inc.*,
  897 F.2d 1572 (9th Cir. 1990) ................................................................................... 15, 16

*Caryn Mandabach Prods. Ltd. v. Sadlers Brewhouse Ltd.*,
  2021 WL 2497928 (C.D. Cal. May 19, 2021) ................................................................ 14

*Chalk v. U.S. Dist. Ct. Cent. Dist. of California*,
  840 F.2d 701 (9th Cir. 1988) ........................................................................................... 13

*Doe v. Snyder*,
  28 F.4th 103 (9th Cir. 2022) ........................................................................................... 13

*Feminist Women's Health Ctr. v. Advocates for Life, Inc.*,
  859 F.2d 681 (9th Cir. 1988) ........................................................................................... 16

*Foothill Church v. Watanabe*,
  2023 WL 1767748 (E.D. Cal. Feb. 3, 2023) ................................................................... 16

*In re Excel Innovations, Inc.*,
  502 F.3d 1086 (9th Cir. 2007) ......................................................................................... 15

*Kiva Health Brands LLC v. Kiva Brands Inc.*,
  402 F. Supp. 3d 877 (N.D. Cal. 2019) ............................................................................. 14

*Logic Tech. Dev. LLC v. Levy*,
  2021 WL 3884287 (D.N.J. Aug. 31, 2021) ..................................................................... 14

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ......................................................................................... 12

*Macom Technology Solutions Holdings, Inc. v. Infineon Technologies AG*,
  881 F.3d 1323 (Fed. Cir. 2018) ....................................................................................... 17

*Majorica, S.A. v. R.H. Macy & Co.*,
  762 F.2d 7 (2d Cir. 1985) ................................................................................................ 14

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.* .................................................... 13

*Martini v. Dep't of Just.*,
  2008 WL 11509507 (C.D. Cal. May 12, 2008) .............................................................. 17

*McCormack v. Hiedeman*,
  694 F.3d 1004 (9th Cir. 2012) ......................................................................................... 16

*M-I LLC v. FPUSA, LLC*,
  2015 WL 5603901 (Fed. Cir. 2015) ................................................................. 17

*Miracle v. Hobbs*,
  808 Fed. Appx. 470 (9th Cir. 2020) ................................................................ 14

*Nat. Res. Def. Council, Inc. v. Winter*,
  508 F.3d 885 (9th Cir. 2007) ........................................................................... 16

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
  762 F.2d 1374 (9th Cir. 1985) ......................................................................... 13

*Oxford Glob. Res., LLC v. OnPoint Healthcare Sols., Inc.*,
  2018 WL 3207380 (S.D. Cal. June 29, 2018) ................................................. 15

*Pac. Rad. Onc., LLC v. Queen's Med. Ctr.*,
  810 F.3d 631 (9th Cir. 2015) ........................................................................... 15

*Ranck v. Mt. Hood Cable Regul. Comm'n*,
  2017 WL 3016032 (D. Or. July 7, 2017) ........................................................ 17

*Raoul Beauvoir v. Dingle*,
  2013 WL 12114021 (C.D. Cal. Sept. 16, 2013) .............................................. 14

*Stanley v. USC*,
  13 F.3d 1313 (9th Cir. 1994) ........................................................................... 13

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ......................................................................... 13

*Taimani v. Res. Mortgage Loan Trust 2013-TT2*,
  2016 WL 9175877 (N.D. Cal. June 7, 2016) .................................................. 15

*Telebrands Corp. v. Max Sales Grp., Inc.*,
  2009 WL 10702466 (C.D. Cal. Mar. 11, 2009) .............................................. 15

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7, 20 (2008) ............................................................................... 13, 17

**FEDERAL STATUTES**

Fed. R. Civ. P. 65(d)(1) ............................................................................... 16, 17

## I. INTRODUCTION

This matter was commenced almost three years ago in July 2020. Dkt. 1. Cisco only now moves for a preliminary injunction claiming "irreparable" harm based on the same conduct contained in its original complaint—*alleged* sales of counterfeit Cisco product. In an effort to avoid its clear and undue delay, Cisco attempts to suggest it only recently learned of the "extent" of Dexon's sales of SMARTNet service contracts. This is a fiction. Cisco was well aware of Dexon's SMARTNet sales due in part to earlier subpoenas, prior discovery in this case, as well as Dexon's acknowledgement of such sales in its counterclaims. Moreover, every single SMARTNet service contract sold by Dexon was procured directly from a Cisco licensed and authorized seller at Cisco's full reseller price and vetted and approved by Cisco.

Aside from being years late, Cisco's motion lacks any valid or proper support. It is based almost entirely on an attorney declaration lacking in foundation and comprised solely of hearsay. The declaration of Cisco employee Charles Williams is limited to conclusory statements relating to counterfeit allegations contained in Cisco's First Amended Complaint from more than two (2) years ago. The Williams Declaration is devoid of any testimony supporting Cisco's purported "irreparable harm" resulting from Dexon's sales of SMARTNet service contracts.

Moreover, Cisco's requested injunction is grossly overbroad. Cisco seeks an injunction: i) "enjoin[ing] Dexon from continuing to sell counterfeit products"; and ii) "enabling its sale of counterfeit products by claiming that such products are "cleared" for Cisco service contracts and sowing further confusion as to the genuineness and origin of the products it sells." Such non-tailored injunctions are not allowed and clearly overbroad.

Despite now possessing virtually all of Dexon's procurement records, sales records and relevant communications for the past five (5) years, Cisco does not have a shred of evidence of Dexon ever knowingly or intentionally selling a counterfeit product. At worst, Dexon is an innocent middleman reseller, like the numerous other legal secondary market resellers. Cisco's motion is both legally and factually frivolous and should be rejected outright.

## II. BACKGROUND FACTS

### A. DEXON AND THE SECONDARY MARKET

Dexon has been selling computer networking products for over thirty years. As a reseller, Dexon is in no way involved in the manufacturing of the products it sells. Rather, it acts solely as a "middle-man" reseller. In that role, it strives to provide the highest quality and value products to its customers. To that end, Dexon sources its products from literally thousands of different reputable suppliers. As a result of Dexon's dynamic supply channel—it routinely sells directly to Cisco's licensed and authorized sellers when they are unable to source product for their clients in a timely fashion. (Declaration of Tim Roush, ¶3).

Dexon subjects its products to extensive quality control measures, including taking proactive steps to detect and prevent the sale of counterfeit products. As just one example, Dexon subjects Cisco products to the very inspection recommended by Cisco. This includes confirming the presence of Cisco's anti-counterfeiting labeling and holograms. (Roush Dec., ¶ 5).

### B. CISCO'S COUNTERFEIT PROBLEM

It is undisputed Cisco has a counterfeit problem. Cisco's own documents confirm Cisco's overseas manufacturing contributes to such problem. An October 22, 2019 Executive Summary of Cisco's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Declaration of Joseph Balthazor, Ex. A (emphasis added)). The summary further acknowledges ▮▮▮▮ ▮▮▮▮ The summary questions, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (*Id.*).

The summary further acknowledges Cisco's difficulty in ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*) And the summary questions whether ▮▮▮

███████████████████████████████████████ *(Id.)* Evidencing the problem of counterfeit product originating for Cisco's own authorized manufacturers, Cisco's May 20, 2011 "Global Brand Protection Weekly Report" discusses a "Cisco [Authorized Manufacturer]…diverting a significant amount of product into the unauthorized market." (Balthazor Dec., Ex. B, at Bates No. 534492).

In addition to counterfeit products ███████████████ ██████, Cisco's documents confirm that ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ (Balthazor Dec., Ex. C).

Considering Cisco counterfeit products ████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ it is not surprising Cisco's own licensed and authorized partners are unable to detect counterfeit product. Publicly available sources confirm the sale of counterfeit products to the U.S. government by Cisco Gold and Silver level partners as early as 2008. Published reports reference a whitepaper by KPMG and the Alliance for Gray Market and estimating that approximately ten percent of all IT products sold are counterfeit. Law-enforcement agencies estimated the percentage to be higher. (Balthazor Dec., Ex. D).

Cisco's internal documents ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████. (Balthazor Dec., Ex. E).

---

[1] Dexon has requested all documents: i) evidencing the source/origins/scope of Cisco counterfeit products; ii) evidencing the sale/diversion of valid serial numbers to counterfeiters by Cisco authorized representatives; and iii) evidencing the sale of counterfeit products by Cisco's authorized representatives. Cisco has objected to and refused to produce such documents. The limited documents referenced herein were either publicly available or produced by Cisco in the Texas litigation. Dexon believes such documents are the proverbial "tip of the iceberg."

### C. CISCO'S UNDUE DELAY IN SEEKING AN INJUNCTION

#### 1. Cisco's Longstanding Knowledge of Dexon's *Alleged* Counterfeit Sales

Cisco's original complaint filed on July 22, 2020, attempted to portray Dexon as a bad actor by citing to alleged sales of counterfeit product dating back more than 15 years. Dkt. 1. The complaint failed to clarify that Cisco previously commenced a lawsuit against Dexon in the Northern District of California in 2011 arising out of the very allegations contained at paragraphs 26-34 of its original complaint (Case No. 3:11-CV-1455). The 2011 complaint was dismissed with prejudice without any of the counterfeit allegations having been proven. At no point during the 2011 litigation or in the subsequent 12 years, including the three years following commencement of the present litigation, did Cisco seek an injunction.

#### 2. Cisco's Longstanding Knowledge of Dexon's SMARTNet Sales

Any attempt by Cisco to suggest or imply that Dexon has sold counterfeit SMARTNet service contracts is misleading and false. It is undisputed that: i) every SMARTNet service contract sold by Dexon was procured directly from a Cisco licensed partner; and ii) Dexon paid Cisco's *full reseller price* for every SMARTNet service contract. Moreover, any attempt by Cisco to contend it lacked knowledge of Dexon's SMARTNet service contract activities is a fiction.

Cisco was aware of Dexon's sales of SMARTNet service contracts at the time of the 2011 litigation (Balthazor Dec., ¶ 7). Cisco's motion acknowledges sending Dexon a letter in September 21, 2020 complaining about Dexon's sales of SMARTNet contracts (Dkt. 202, Nelson Dec. ¶ 18, Ex. 17). In response to Cisco's 2020 jurisdictional discovery requests, Dexon provided Cisco with documents evidencing its complete California sales for the period 2016-2020. The documents evidenced significant SMARTNet sales for even that limited territory and temporal period. (Balthazor Dec. ¶ 8, Ex. F).

Because Dexon procured all the SMARTNet contracts at full reseller price directly from Cisco's authorized partners, the subject invoices routinely identified Dexon as the customer or purchasing party. Contrary to its current assertions, Cisco could have easily obtained sales records from its own authorized partners documenting Dexon's SMARTNet purchases yet failed to do so. (Balthazor Dec., Ex. G).

Cisco's assertion that it only recently learned of Dexon's SMARTNet activities is further belied by Dexon's counterclaims two (2) years ago. Rather than hiding its SMARTNet sales, Dexon's counterclaims acknowledged its extensive SMARTNet sales. Dexon's original counterclaims filed June 2021 alleged that, "Cisco has full knowledge that its 'Authorized' sellers or partners sell an extremely large volume of SMARTnet contracts to secondary market sellers such as Dexon." (Dkt. 43, ¶ 30). Dexon further alleged that it "routinely and frequently purchased SMARTnet contracts from 'Authorized' sellers to pair with Cisco products sold to its customers." *Id.*, ¶ 32.

Notably, Cisco's supposed "newly discovered" evidence includes Dexon's 2019 sale of a SMARTNet contract to Meadowridge Networks and Dexon's 2017 sale of a SMARTNet contract to Accuray Radiotherapy. (Dkt. 202-1, Nelson Dec. ¶¶ 27-28 ("According to Dexon's purchase and sales spreadsheet, in 2019, Dexon sold encrypted firewalls and corresponding SMARTNet contracts to Meadowridge Networks."); ("According to Dexon's purchase and sales records, it sold the switches and SMARTNet contracts to Accuray.")). Contrary to the suggestion Dexon attempted to hide such sales or that they were only recently discovered, Dexon's counterclaims cited the exact same supposed "new" emails cited by Cisco in support of its motion. (Dexon's Second Amended Counterclaims, Dkt. 92, ¶¶ 154-157).

### D.  ABSENCE OF SUPPORT FOR REQUESTED INJUNCTION

#### 1.  Cisco Has Failed to Prove a Single Sale of Counterfeit

Despite possessing virtually all of Dexon's relevant procurement records, sales records, and communications with its customers for the past five (5) years, Cisco has failed to put forward a shred of evidence Dexon ever knowingly or intentionally sold counterfeit product. In fact, Cisco has yet to prove a single Cisco product sold by Dexon was counterfeit. Rather, Cisco's motion relies almost exclusively on the Declaration of its lead counsel Richard Nelson. Attorney Nelson lacks foundation and his hearsay Declaration should be entitled to no weight.

The Declaration of Cisco employee Charles Williams is similarly lacking. It contains conclusory statements relating exclusively to the *alleged* counterfeit products referenced in Cisco's March 19, 2021 FAC from more than two (2) years ago. In addition to the fact that the Declaration

contains virtually no purported basis or support for Williams's conclusory statements—including failing to provide the evidentiary support or basis for Williams claims—testimony relating solely to Cisco's original counterfeit allegations in no way supports Cisco's motion for a preliminary injunction roughly three years later.  Moreover, noticeably absent from Cisco's motion is any testimony from a percipient witness with foundation supporting Cisco's alleged "irreparable harm" resulting from Dexon's sales of SMARTNet service contracts.

At best, attorney Nelson's Declaration is a bad faith attempt to tarnish Dexon via unfounded, incomplete and misleading statements implying or suggesting Dexon is involved in nefarious conduct.  For example, Nelson's Declaration suggests or implies that Dexon knowingly procured counterfeit product from a now indicted supplier.  (Dkt. 202-1,¶4) ("Dexon has purchased 'Cisco' hardware from Pro Network, whose owner was criminally indicted in July 2022 by a federal grand jury for trafficking in a huge quantity of counterfeit 'Cisco' networking equipment.  Dexon continued to purchase 'Cisco' branded product from Pro Network as late as spring 2022, which was five years after learning in 2017 from a trade association. . .that Pro Network was known to sell counterfeit Cisco products.").

First, the 2017 trade association "list serv" email cited and relied on by Cisco—one of countless "list serv" emails received from the trade association on a daily basis—identifies a specific issue (an "add on" circuit) in a product alleged to have originated from PRO Network LLC.  The "list serv" email fails to quantify the scope of the issue, including whether it was an ongoing problem.  The "list serve" email also in no way suggests PRO Network LLC was in any way responsible for the issue.  To the extent the "add on" circuit issue evidenced counterfeit product, a plausible conclusion would be that PRO Network LLC had been victimized just like Cisco's "Gold" and "Silver" level partners.

According to attorney Nelson, Dexon "continued to purchase. . .product from Pro Network as late as spring 2022." Nelson fails to identify or provide any documentation supporting the alleged subsequent purchases. Cisco's PROPOSED Amended Complaint does reference—with no supporting testimony or documentation—subsequent purchases from "Pro Network LLC" located in Florida (not New Jersey) roughly two years later.  Cisco has not even alleged that the subject

product was counterfeit.  Cisco also alleges a purchase from a company called "smartnetworks" in April 2022.  First, the product ordered by Dexon from "smartnetworks" was not the Cisco WS-2960X switch at issue in the 2017 "list serv" email.  Rather, Dexon's order was for a completely different model switch.  Second, Dexon cancelled the order and the product was never acquired. (Roush Declaration, ¶10, Ex B.).

Cisco further fails to inform the Court that "between 2014 and 2019" it "sent seven letters to [Pro Network's Principal] asking him to cease and desist his trafficking of counterfeit goods" and that Pro Networks' Principal fooled and evaded Cisco "provid[ing] Cisco with forged documents." (Balthazor Dec., Ex. H). Despite being aware of the issue and sending multiple cease and desist letters, there is no evidence Cisco ever notified the market of any risks associated with Pro Network. Cisco apparently expects secondary market resellers like Dexon to take extraordinary measures to detect and avoid counterfeit sales despite Cisco's own failure and or inability to do so.  Again contradicting Cisco's attempted insinuations, Dexon voluntarily imposed a "DO NOT BUY" order on Pro Network even before the federal investigation and indictment first became public in July 2022. (Roush Dec., ¶10, Ex. B).

Accepting Cisco's premise as true—that Dexon's limited purchase of non-suspect product from what appeared to be a completely different entity years later supports an injunction—all resellers who subsequently purchased product from Cisco partners found selling counterfeit products would likewise be subject to an injunction. That is absurd.

Nelson's Declaration also misleadingly relies on Dexon sales representatives' isolated references to "clean serial numbers."  (Dkt. 202-1, ¶ 14-15, Exs. 13-15).  Although unclear, Cisco is apparently implying, without any explanation or support, that the reference to "clean" serial numbers means non-genuine or counterfeit serial numbers.  This is false. Rather, the reference to "clean" serial numbers merely means product for which no existing SMARTNet contract is currently attached.  As explained in Dexon's counterclaims, when an end user purchases a SMARTNet contract "Cisco is supplied with the relevant product information, including the serial number. . and identity of the end user."  Accordingly, the SMARTNet contract is "linked" to a specific end user and product. (Dkt. 43, ¶ 28). Cisco will sometimes refuse SMARTNet contracts if the subject serial

number remains associated with an existing SMARTNet contract.[2]  Accordingly, the reference to "clean serial numbers" merely means a secondary market product not already associated with an existing or ongoing SMARTNet contract (For example, a genuine secondary market product for which the original end user did not obtain a SMARTNet contract.)

Absent evidence Dexon ever knowingly or intentionally sold counterfeit products, Nelson's Declaration relies on several frivolous contentions.  For example, Nelson suggests Dexon's legal purchase of product on eBay warrants an injunction because he believes the sellers' online titles are suspect. (Dkt. 202-1, ¶ 3).  Absent from Nelson's Declaration is any claim or evidence the identified eBay sellers ever sold counterfeit product. Moreover, Cisco's own partners routinely sell on eBay utilizing an alternative title.  (Roush Dec., ¶ 18, Ex. C).  Nelson's Declaration also suggests an injunction is warranted because a Dexon Sales Representatives utilized a personal email address. (Dkt. 202-1, ¶ 23).  Dexon employees do in fact occasionally utilize a non-Dexon email address when working remotely. (Roush Dec., ¶19).

Despite this case being pending for approximately three (3) years, Cisco elected to file for a preliminary injunction within three weeks after the Texas District Court Judge rejected Cisco's appeal of the Magistrate Judge's denial of Cisco's motion to dismiss the Texas litigation. (Balthazor Dec., Ex. I).  The timing suggests a strategy to harass Dexon and force it to spend money litigating rather than any legitimate basis or need for an injunction.

## III. ARGUMENT

### A. STANDARDS APPLICABLE TO REQUEST FOR PRELIMINARY INJUNCTION

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, **by a clear showing**, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted) (emphasis added).  To obtain a preliminary injunction, the moving party must show "'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

---

[2] Dexon's counterclaims explained that Cisco also: i) routinely "sells multiple SMARTnet contracts on the same product covering the same time period"; and ii) "alter[s] or change[s] serial numbers in order to approve and thereby receive payment for SMARTnet contracts relating to secondary market equipment. (Dkt. 43, ¶¶ 30, 34).

1  favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109,
2  1127 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

3  "The basic function of a preliminary injunction is to preserve the status quo pending a
4  determination of the action on the merits." *Chalk v. U.S. Dist. Ct. Cent. Dist. of California*, 840
5  F.2d 701, 704 (9th Cir. 1988). "[Where] a party seeks mandatory preliminary relief that goes well
6  beyond maintaining the status quo pendente lite, courts should be extremely cautious about issuing
7  a preliminary injunction." *Stanley v. USC*, 13 F.3d 1313, 1319 (9th Cir. 1994). These types of
8  injunctions are "'particularly disfavored.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH &
9  Co.*, 571 F.3d 873, 879 (2009) (citation omitted).  They should not be granted in "'doubtful cases'"
10 or in the absence of "extreme or very serious damage." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir.
11 2022) (citation omitted).

12 Here, Cisco requests sweeping relief that would far exceed the status quo, including relief
13 requiring affirmative action by Dexon. For example, Cisco seeks to enjoin Dexon from selling
14 "counterfeit" products despite: i) lack of evidence Dexon has ever knowingly sold a counterfeit
15 product; and ii) Cisco's own partners struggling to detect counterfeit.

16 While Cisco cannot meet the standard for even a prohibitory injunction due to its delay and
17 lack of evidence, this is more appropriately a case for application of the stringent mandatory
18 injunction standard, which Cisco comes nowhere close to meeting. Dexon already subjects Cisco
19 products to Cisco's recommended inspection protocol. It is unclear what, if any, further steps Dexon
20 could take to comply with Cisco's patently overbroad requested injunction.

21 **B.  CISCO'S DELAY PRECLUDES A FINDING OF IRREPARABLE HARM.**

22 Case law in the Ninth Circuit establishes that a party's extensive delay in seeking a
23 preliminary injunction weighs heavily against a finding of irreparable harm and, if long enough, can
24 be dispositive.  In *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985), for
25 example, the court affirmed the denial of the plaintiff's motion to enjoin conduct the defendant had
26 been engaged in for "several years," finding that "[the] Plaintiff's long delay before seeking a
27 preliminary injunction implie[d] a lack of urgency and irreparable harm." Similarly, in *Miracle v.*
28

*Hobbs*, 808 Fed. Appx. 470, 473 (9th Cir. 2020) (citation omitted), the court, in affirming the denial of the plaintiffs' request for a preliminary injunction cited its lengthy delay:

> The likelihood of imminent and irreparable harm is further undermined by the length of time between the enactment of the Strikeout Law in 2014 to filing suit in July 2019, thus allowing the law to remain in place for multiple election cycles. This delay "implies a lack of urgency and irreparable harm."

See also *Kiva Health Brands LLC v. Kiva Brands Inc*., 402 F. Supp. 3d 877, 898-99 (N.D. Cal. 2019) (delay of more than 1.5 years "was certainly substantial," and citing delay in finding no irreparable harm); *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985) ("Lack of diligence, standing alone, may…preclude the granting of preliminary injunctive relief[.]")

Courts are overwhelmingly likely to deny a preliminary injunction where, as here, the moving party's delay is measured in years. Such was the case in *Raoul Beauvoir v. Dingle*, 2013 WL 12114021, at *3 (C.D. Cal. Sept. 16, 2013), a trademark infringement matter in which the district court concluded that "Plaintiffs' three-year delay in seeking preliminary injunctive relief negate[d] any presumption of irreparable harm." Injunctive relief was denied on similar grounds in *Caryn Mandabach Prods. Ltd. v. Sadlers Brewhouse Ltd.,* 2021 WL 2497928, at *7 (C.D. Cal. May 19, 2021) (citations omitted), also a trademark case:

> Plaintiff had actual knowledge of Defendants' use of the mark as of April 4, 2018, but waited over two years to file this action and nearly three years to file the instant Motion for Preliminary Injunction, which demonstrates Plaintiff would not be irreparably harmed absent an injunction…. Such delay rebuts any presumption of irreparable harm.

There are many like examples. See, e.g*., Logic Tech. Dev. LLC v. Levy*, 2021 WL 3884287, at *2 (D.N.J. Aug. 31, 2021) ("The Court is aware of no analogous case—and Plaintiff has cited none—where a litigant successfully established irreparable harm after a delay of more than three years.")

Cisco's delay here far exceeds that of the parties in the above-cited cases, as Cisco contends that Dexon has been infringing its marks for more than ***15 years***. Dkt. 32 ¶ 1 ("Dexon has repeatedly sold counterfeit Cisco products over a period that now well-exceeds 15 years."). Numerous allegations in Cisco's own FAC confirm its years-long delay in seeking a preliminary injunction. See FAC, ¶¶ 24, 25, 28-32, 37-40, 51-52. There is also Cisco's 2011 Complaint. Similar to its allegations here, Cisco alleged infringing acts by Dexon dating back to 2006. See 2011 Complaint,

¶¶ 17-33.  This 12-year-old complaint further demonstrates Cisco's lengthy delay in seeking injunctive relief, and further undermines any claim of irreparable harm.  Finally, while Cisco presently has no SMARTnet claim in the case, its proposed allegations of wrongdoing relating to SMARTnet are nothing new either, as explained above.  *See Pac. Rad. Onc., LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction.").

Cisco, acknowledging its lengthy delay, cites *Arc of Cal. v. Douglas*, 757 F.3d 975, 990-991 (9th Cir. 2014), for the proposition that "ongoing, worsening injuries" can justify delay in seeking a preliminary injunction.  But *Arc* does not help Cisco.  There, the delay, which was less than two years, was of limited significance because "the magnitude of the potential harm" only became "apparent gradually, undermining any inference that the plaintiff was 'sleeping on its rights.'"  *Arc*, 757 F.3d at 990-991 (citation omitted).  *Arc* does not furnish Cisco with any excuse for its extreme lack of diligence.[3]  There is no evidence of any material change in circumstances, let alone a change of such magnitude as might excuse Cisco's years-long delay in seeking injunctive relief. Cisco's extraordinary delay defeats any claim of irreparable injury.

### C. CISCO HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.

"As a general rule, a preliminary injunction should not issue on the basis of affidavits alone." *Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572, 1575 (9th Cir. 1990).  "Moreover, a district court should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff." *Id.*; see also *Taimani v. Res. Mortgage Loan Trust 2013-TT2*, 2016 WL 9175877, *1 (N.D. Cal. June 7, 2016).  Courts are similarly wary of attorney declarations based on "information and belief." *Oxford Glob. Res., LLC v. OnPoint Healthcare Sols., Inc.*, 2018 WL 3207380, at *5 (S.D. Cal. June 29, 2018); *see also Telebrands Corp. v. Max Sales Grp., Inc.*, 2009 WL 10702466, at *9 (C.D. Cal. Mar. 11, 2009).

---

[3] Cisco's assertion it only recently became aware of the magnitude of Dexon's alleged actions rests on the bare words of its counsel.  *See, e.g., In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098-99 (9th Cir. 2007) (counsel's "conclusory allegations" "insufficient to establish irreparable harm.").

1    Cisco's "evidence" consists almost exclusively of the Nelson Declaration and exhibits. Mr.
2  Nelson candidly acknowledges that much of his declaration is based on "information and belief."
3  Nelson Decl., ¶ 1.  The Nelson Declaration is materially deficient in many other respects as well, as
4  is detailed above.  It does not present an adequate evidentiary basis for granting the drastic remedy
5  of a preliminary injunction.  As is also detailed above, the Williams Declaration is similarly lacking.
6  Mr. Williams talks in generalities about Dexon's alleged unlawful sales of "counterfeit" goods, but
7  he does not specifically identify any instance of such a sale.  He merely cites "[e]xamples of sales
8  by Dexon of counterfeit Cisco products…set forth in the [FAC], ¶¶ 26-63 (Doc. 32)."  Williams
9  Decl., ¶ 12.  But these are only allegations, not evidence, and there is no indication that Mr. Williams
10 has any first-hand knowledge regarding those sales.  *Atari*, 897 F.2d at 1575 ("[A] district court
11 should be wary of issuing an injunction based solely upon allegations and conclusory affidavits.").

12   Cisco has failed to submit evidence sufficient to justify a finding that it is likely to succeed
13 on the merits of its Lanham Act Claims.

14   **D.   CISCO'S PROPOSED INJUNCTION IS SUBSTANTIALLY OVERBROAD**

15   "Injunctive relief must be tailored to remedy the specific harm alleged, and an overbroad
16 preliminary injunction is an abuse of discretion."  *Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d
17 885, 886 (9th Cir. 2007); *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012)
18 ("[I]njunctive relief should be no more burdensome to the defendant than necessary…" (citations
19 omitted)). This is reflected in Fed. R. Civ. P. 65(d)(1), which provides:

> Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.

23   Consistent with Rule 65(d)(1), a court ordering a preliminary injunction is "obligated to craft
24 an understandable and thus enforceable injunction, i.e., it cannot be "'impermissibly vague.'"
25 *Foothill Church v. Watanabe*, 2023 WL 1767748, at *2 (E.D. Cal. Feb. 3, 2023) (quoting Portland
26 *Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 859 F.2d 681, 685 (9th Cir. 1988)).
27 Accordingly, injunctions broadly prohibiting "infringement" are improper and routinely rejected.
28 *Macom Technology Solutions Holdings, Inc. v. Infineon Technologies AG*, 881 F.3d 1323, 1331-32

(Fed. Cir. 2018) (preliminary injunction improper because it "essentially prohibited infringement but failed to identify a specific accused product."); *M-I LLC v. FPUSA, LLC*, 2015 WL 5603901, *3 (Fed. Cir. 2015) ("[B]road injunctions that merely instruct the enjoined party not to infringe are improper. . .").

Cisco's proposed preliminary injunction is vague, wildly overbroad, would potentially encompass legal conduct, and, for reasons previously discussed, presents substantial compliance issues. For example, Cisco seeks to enjoin Dexon from distributing "any products not authorized by Cisco…." Cisco fails to provide any clarity on what products it contends would be covered. Williams declaration states that Dexon "is not authorized to resell Cisco products," suggesting Dexon's lawful re-sales of genuine Cisco products are encompassed by the requested injunction. This is prohibited. *Martini v. Dep't of Just.*, 2008 WL 11509507, at *3 (C.D. Cal. May 12, 2008) ("[L]awful conduct, of course, cannot be enjoined."); *Ranck v. Mt. Hood Cable Regul. Comm'n,* 2017 WL 3016032, at *3 (D. Or. July 7, 2017) ("Courts lack jurisdiction to enjoin lawful conduct.").

Cisco also wants Dexon enjoined from "[i]nfringing any of the CISCO Marks," but fails to provide any detail about what obligations it believes should be imposed on Dexon under this language. This language is not "tailored to remedy the specific harm alleged," Winter, 508 F.3d at 886, and would not satisfy the specificity requirements of Fed. R. Civ. P. 65(d)(1).

### E.    THE BALANCE OF THE HARMS FAVORS DEXON.

Because Cisco cannot establish irreparable harm or likelihood of success, the Court need not consider the balance of the harms. But if it does, this balance tips decidedly in Dexon's favor. If an injunction is denied, Cisco will simply be operating under the same market conditions that have existed for 15 or more years, with a known counterfeiting problem that Cisco and its own authorized channel partners have contributed to and been victimized by.

Conversely, the broad requested injunction would in essence prohibit Dexon from the lawful practice of selling secondary market Cisco products. *Martini,* 2008 WL 11509507, at *3; Ranck, 2017 WL 3016032, at *3.

## IV. CONCLUSION

For the reasons stated, Cisco's motion for a preliminary injunction should be denied in its entirety.

Dated: May 12, 2023

CONKLE, KREMER & ENGEL, PLC

By: /s/ Amanda R. Washton
John A. Conkle
Amanda R. Washton

Michael M. Lafeber *(pro hac vice)*
David McDaniel *(pro hac vice)*
O. Joseph Balthazor Jr. *(pro hac vice)*
TAFT STETTINIUS & HOLLISTER LLP

Attorneys for Defendant, Counterclaim Plaintiff and Third-Party Plaintiff Dexon Computer, Inc.