1 | RICHARD J. NELSON (SBN 141658)
E-Mail:     *rnelson@sideman.com*
2 | LOUIS P. FEUCHTBAUM (SBN 219826)
E-Mail:     *lfeuchtbaum@sideman.com*
3 | ZACHARY J. ALINDER (SBN 209009)
E-Mail:     *zalinder@sideman.com*
4 | LYNDSEY C. HEATON (SBN 262883)
E-Mail:     *lheaton@sideman.com*
5 | ALEXANDER J. BUKAC (SBN 305491)
E-Mail:     *abukac@sideman.com*
6 | SIDEMAN & BANCROFT LLP
One Embarcadero Center, 22nd Floor
7 | San Francisco, California 94111
Telephone:     (415) 392-1960
8 | Facsimile:     (415) 392-0827

AARON M. PANNER (Admitted *pro hac vice*)
E-Mail:  apanner@kellogghansen.com
ALEX A. PARKINSON (Admitted *pro hac vice*)
E-Mail:  aparkinson@kellogghansen.com
RYAN M. FOLIO (Admitted *pro hac vice*)
E-Mail:  rfolio@kellogghansen.com
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900

9 | Attorneys for Plaintiffs
CISCO SYSTEMS, INC. and
10 | CISCO TECHNOLOGY, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation, and CISCO TECHNOLOGY, INC., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DEXON COMPUTER, INC., a Minnesota corporation,<br><br>Defendant. | CASE NO. 3:20-cv-4926 CRB-RMI<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>1. **FEDERAL TRADEMARK INFRINGEMENT, 15 U.S.C. § 1114;**<br>2. **FEDERAL TRADEMARK COUNTERFEITING, 15 U.S.C. § 1114;**<br>3. **FALSE DESIGNATION OF ORIGIN, 15 U.S.C. § 1125;**<br>4. **DIRECT AND INDIRECT COPYRIGHT INFRINGEMENT, 17 U.S.C. § 501, et seq.;**<br>5. **VIOLATIONS OF THE DIGITAL MILLENNIUM COPYRIGHT ACT, 17 U.S.C. § 1201, et seq.;**<br>6. **TRAFFICKING IN COUNTERFEIT OR ILLICIT LABELS, 18 U.S.C. § 2318;**<br>7. **COMMON-LAW FRAUD;**<br>8. **INDUCING BREACH OF CONTRACT;**<br>9. **UNFAIR BUSINESS PRACTICES, CAL. BUS. & PROF. CODE § 17200 et seq.; and**<br>10. **UNJUST ENRICHMENT.**<br><br>**JURY TRIAL DEMANDED**<br><br>**PUBLIC REDACTED VERSION** |

1    Plaintiffs Cisco Systems, Inc. ("CSI") and Cisco Technology, Inc. ("CTI") (together,

2  "Cisco" or "Plaintiffs"), hereby complain and allege against Defendant Dexon Computer, Inc.

3  ("Dexon") as follows:

4  **I.      INTRODUCTION**

5    1.      This case seeks to finally put a stop to Dexon's long-running and continuing illegal

6  schemes to counterfeit and otherwise infringe Cisco's federally-registered trademarks and

7  copyrights, duping customers into believing that the illicit "Cisco"-branded products and software

8  licenses it was selling are genuine, when in fact they were not.  Dexon has repeatedly sold

9  counterfeit Cisco products over a period that now well-exceeds 15 years.  In that decade-and-a-

10  half period, Dexon has refused to voluntarily comply with Cisco's requests for its assistance in

11  deterring counterfeit trafficking, it has ignored Cisco's demands that it cease selling counterfeit

12  products, and it has not taken reasonable measures that would allow it to better guard against its

13  continued procurement of counterfeit Cisco products.  Instead, Dexon has chosen to expand its

14  illegal course of conduct by knowingly inducing Cisco partners to violate their agreements with

15  Cisco, so that Dexon can misleadingly offer invalid Cisco service contracts to its customers.

16  Dexon ███████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████

19    2.      Unfortunately, Cisco is not the only victim of Dexon's illegal and infringing

20  schemes.  Customers rely on genuine Cisco products and licenses to run complex, critical and

21  highly secured networks.  Cisco products help form the backbone and infrastructure for global

22  networks, including in mission critical applications for the U.S. government, healthcare, banks,

23  research institutes, and our military.  But counterfeit "Cisco"-branded products and infringing

24  software can, and do, cause network downtime and substantial business interruption.  Cisco

25  therefore brings this action to protect consumers from receiving inferior counterfeit products or

26  invalid and infringing software licenses, to recover for the significant damage Dexon's unlawful

27  and infringing conduct has caused to Cisco, to put a stop to Dexon's unlawful and infringing

28  conduct, and to enjoin any further unlawful and infringing conduct by Dexon.

## II.     THE PARTIES

3.      At all times mentioned in this Second Amended Complaint, Plaintiff Cisco Systems, Inc., has maintained its principal place of business at 170 W. Tasman Drive, San Jose, California 95134, where it remains to this date.  Cisco Systems, Inc. is and has been a Delaware Corporation since January 2021.  Prior to that, and at all times mentioned herein, Cisco Systems, Inc. was a California corporation.  Plaintiff Cisco Technology, Inc., is, and at all times mentioned herein was, a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

4.      On information and belief, Defendant Dexon Computer, Inc., is and was at all relevant times mentioned herein a business entity incorporated in the State of Minnesota with its principal place of business in Bloomington, Minnesota.

5.      Cisco is informed and believes, and thereon alleges, that Dexon undertook obligations or rights arising out of the subject events and happenings herein referred to, engaged in actions or omissions, either intentional or negligent, regarding the subject events and happenings herein referred to, and/or benefited unjustly from the efforts, work, and goods of Cisco.

## III.     JURISDICTION AND VENUE

6.      This is an Action founded upon violations of federal trademark and copyright laws, pursuant to 15 U.S.C. §§ 1051, et seq., 17 U.S.C. §§ 501, et seq., and 17 U.S.C. §§ 1201, et seq., as well as violations of 18 U.S.C. § 2318.  This Court has original subject matter jurisdiction over this Action pursuant to 28 U.S.C. §§ 1331 and 1338(a)-(b), as well as 15 U.S.C. § 1121.

7.      This Court has supplemental subject matter jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367, because these claims are so related to Cisco's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

8.      This Court has personal jurisdiction over Dexon, because Dexon has repeatedly and over a prolonged period of time directed its activities into California, which activities are related to Cisco's claims.  Dexon transacts a significant amount of business in California.  During the period from July 1, 2017 and December 31, 2019, Dexon derived at least 2.9% of its total revenues from

business it conducted in California.  Dexon regularly buys and sells Cisco products in California.  It also actively solicits business in this state.  Dexon maintains a website through which it solicits business throughout the United States, including within the State of California, which website is interactive in that it allows people within California to exchange information with Dexon and to submit payment for products that Dexon advertises on that website.  Cisco alleges on information and belief that at all times relevant to this Complaint, Dexon has continuously operated that website and that Dexon has purposefully maintained contacts within the State of California for the purpose of conducting business here.

9.      California also has personal jurisdiction over Dexon because Dexon has committed tortious acts within California that are at issue in this lawsuit.  Dexon has harmed Cisco through, among other violations set forth herein, willful violations of the Lanham Act, including by procuring counterfeit Cisco products from California for resale by Dexon, by selling counterfeit Cisco products to end users in California, and by having counterfeit products that it sold shipped from a location within California.  Dexon has also committed acts within California that constitute Unfair Business Practices and Unjust Enrichment.  These California directed activities occurred within this Judicial District, among other places in the state.

10.     California also has personal jurisdiction over Dexon as the result of an agreement among the parties.  As described more thoroughly in paragraph 81 below, Dexon sold certain licenses subject to an agreement, which directs that any disputes related to or arising out of the license terms are subject to the exclusive jurisdiction of the Federal Courts for the Northern District of California or of the California Superior Court for Santa Clara County.  Through that agreement, the parties also agreed that venue in those courts is proper.  This action includes disputes that are related to and arise out of Dexon's violation of those license terms.

11.     Venue is also proper in this district, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Cisco's claims occurred in this judicial district.

IV.     **FACTUAL ALLEGATIONS**

     A.     **Cisco's Business and History**

     12.     Founded in 1984, Cisco is the worldwide leader in developing, implementing, and providing the technologies behind networking, communications, and information technology products and services.  Cisco develops and provides a broad range of networking products and services that enable seamless communication among individuals, businesses, public institutions, government agencies, and service providers.  Specifically, the thousands of engineers who work at Cisco develop and provide networking and communications hardware, software, and services that utilize cutting-edge technologies to transport data, voice, and video within buildings, across cities and campuses, and around the world.

     13.     Since its founding, Cisco has pioneered many of the important technologies that created and enabled global interconnectivity.  During the past three decades, Cisco has invested billions of dollars, and the time and dedication of thousands of its engineers, in the research, development, and sale of industry-leading networking and communications products and services.

     14.     Cisco has also built up tremendous goodwill and brand reputation among consumers, including corporate and government consumers, through significant investment in advertising, promoting, and delivering products, software, and services of the highest quality under the CISCO trademark and the family of CISCO-related trademarks (collectively, the "Cisco Marks").  Cisco has used the Cisco Marks to identify goods and services as being genuine and authorized, and therefore, the Cisco Marks are well-recognized signifiers of Cisco's best-in-class products, software, and services.

     B.     **Cisco's Sales Distribution System**

     15.     Cisco is one of the United States' most innovative companies.  The volume of Cisco's yearly sales revenue of hardware, software, and related services is approximately $50 billion dollars world-wide.  In order to support this global demand for Cisco products and services, for the great majority of its sales, Cisco relies upon a system of independent distributors and resellers located throughout the world.  This system is commonly used in the IT hardware and networking industry.  These independent distributors and resellers, referred to as "Authorized

Channel Partners" or "Authorized Resellers," typically represent several other equipment manufacturers, in addition to Cisco.  Among other things, Cisco's distribution system allows it to maintain expertise and a local presence in regions of the world where there would not otherwise be sufficient business to support it.

16.     Authorized Resellers are required to enter into contractual relationships with Cisco that allow them to purchase Cisco products and services at a partner discount from Cisco's authorized distributors.  The most common contractual relationship is called an Indirect Channel Partnership Agreement ("ICPA").  This agreement requires Authorized Resellers to purchase Cisco products and services only from Cisco or authorized distributors, for Authorized Resellers in the United States and to sell those products and services only to end customers for their internal use ("End Users").  Cisco incorporates the ICPA attached as Exhibit A in this Complaint, as if set forth here in full.

17.     Cisco's Authorized Resellers are the direct interface with the customers who use Cisco's products and services.  Cisco's Authorized Resellers identify sales opportunities, provide technical assistance in selecting products, recommend solutions to address their customers' unique needs, conduct pre-sales and sales support, supply the needed products, and provide post-sales support for the products.

C.     **Cisco's Trademarks**

18.     CTI owns all rights, title, and interest in the Cisco Marks, many of which are included on the Principal Register of the U.S. Patent and Trademark Office ("USPTO"), and it has licensed the use of the Cisco Marks to CSI.  The Cisco Marks are well-known.  They are used in connection with Cisco's networking hardware and software products and services.  They include, but are not limited to, the following marks that are used in interstate commerce:

| Mark | Registration Number | Registration Date |
|------|--------------------|--------------------|
| CISCO | 1,542,339 | June 6, 1989 |
| CISCO | 2,498,746 | October 16, 2001 |
| CISCO | 3,709,076 | November 10, 2009 |

| Mark | Registration Number | Registration Date |
|---|---|---|
| ⸱⸱⸱⸱⸱⸱⸱⸱ CISCO | 3,759,451 | March 9, 2010 |
| CISCO | 3,978,294 | June 14, 2011 |
| ⸱⸱⸱⸱⸱⸱⸱⸱ | 3,763,903 | March 23, 2010 |

19.     The Cisco Marks are distinctive, having no meaning outside of their use by Cisco in its course of business operations and in its advertising to distinguish its products and services. Cisco uses the Cisco Marks to advertise through a wide variety of media including television, radio, newspapers, magazines, billboards, direct mail, and web sites.

20.     Cisco has attained one of the highest levels of brand recognition among consumers due to its extensive advertising and promotional efforts and its continuous use of its core Cisco Marks for the past three decades.  As a result of Cisco's longstanding and widespread use and promotion of the Cisco Marks, Cisco customers around the globe have come to rely upon the Cisco Marks to identify Cisco's high-quality hardware, software, and services.  Many of Cisco's products are purchased by the U.S. government, the military, hospitals, and by other industries, and used in critical and life-essential applications.

21.     Cisco's customers associate Cisco's famous and well-known trademarks, including, among others, CISCO and the Cisco logo, exclusively with Cisco and Cisco's products and services. When customers encounter these marks and decide to purchase goods and services identified by these marks, they expect to receive genuine Cisco products that have been produced by Cisco.  Moreover, when customers purchase products that are advertised as "new factory sealed," they reasonably believe that they are purchasing genuine products manufactured or authorized by Cisco that have not been tampered with from the time the product was sealed in its shipping packaging.

### D.     Cisco's Software Copyrights

22.     Cisco has also expended significant resources and effort to research and develop world-class software products that enable, enhance, and interoperate with its high-quality

1  hardware.  CTI registered with the U.S. Copyright Office numerous Cisco software copyrights in

2  connection with a range of telecommunications, computer hardware and software products and

3  services, and CTI owns all rights, title, and interest in these Cisco federal copyrights.  The

4  software copyright registrations relevant here include, but are not limited to:

| Title | Registration Number | Registration Date |
|-------|---------------------|-------------------|
| Cisco IOS 15.0 | TX 7-938-524 | November 28, 2014 |
| Cisco IOS 15.1 | TX 7-938-525 | November 28, 2014 |
| Cisco IOS 15.2 | TX 7-937-159 | November 24, 2014 |
| Cisco IOS 15.4 | TX 7-938-341 | November 26, 2014 |
| Cisco IOS XE 2.1 | TX 7-937-240 | November 24, 2014 |
| Cisco IOS XE 3.5 | TX 7-937-234 | November 24, 2014 |
| Cisco NX-OS 4.0 | TX 7-940-713 | November 13, 2014 |
| Cisco NX-OS 5.0 | TX 7-940-718 | November 13, 2014 |
| Cisco NX-OS 5.2 | TX 7-940-727 | November 13, 2014 |
| Cisco NX-OS 6.2 | TX 7-940-722 | November 13, 2014 |
| Cisco ASA Software Version 7.01 | TX 8-815-414 | December 12, 2019 |
| Cisco ASA Software Version 9.13.1 | TX 8-815-403 | December 12, 2019 |

19      23.    Cisco's software is only licensed by Cisco to a specific End User, and that license

20  is not transferable and cannot be resold.  *See* Cisco's End User License Agreement (available at

21  https://www.cisco.com/c/dam/en_us/about/doing_business/legal/eula/cisco_end_user_license_agr

22  eement-eng.pdf).  The above software copyright registrations include many of the software

23  versions for the Cisco software licenses that ███████████████████████████████████████

24  ██████████████████████████

25      24.    Cisco has also instituted certain technological measures to control access to its

26  copyright-protected software, including the software identified above.  One of those technological

27  measures is the use of software license keys that control access to Cisco's copyright-protected

28  software.  Further, Cisco commonly utilizes Software License Claim Certificates (also referred to

as Product Authorization Key or "PAK" certificates) that constitute a licensing document and label that is designed to accompany properly licensed Cisco software.  Unauthorized resellers of Cisco software licenses, like Dexon, generally distribute pirated and/or otherwise infringing Cisco software by sending their customers counterfeit and/or illicit PAK certificates with stolen or pirated software license keys or with license keys generated through a license key generator program commonly found on the black market or dark web.

**E.       Cisco Service Support Contracts (SMARTNet)**

25.       Cisco supports its products through several means, including: (1) a warranty program that varies based on the product, ranging from 90 days to a limited lifetime warranty, and (2) a more comprehensive suite of service and support offered to customers for a fee, collectively called Smart Net Total Care ("SMARTNet").  The Cisco warranty is non-transferable and is provided solely to the original End User of the equipment.  Furthermore, only Authorized Channel Partners are permitted to sell SMARTNet contracts and, in the United States, only to End Users. As Dexon well knows, Authorized Channel Partners that Cisco authorizes to distribute SMARTNet in the United States violate their contracts with Cisco if they sell a SMARTNet contract to an unauthorized reseller, like Dexon.  Cisco's Authorized Partner network enables Cisco to protect the integrity of its distribution channels, ensuring that End Users are not sold counterfeit or unauthorized equipment that may jeopardize network security.  Buyers of authorized equipment benefit from the safety and peace of mind of knowing that their Cisco-branded equipment is authentic and eligible for SMARTNet support.  Cisco SMARTNet contracts are generally available only to the original End User of a product.  However, if a product has been resold on the secondary market, it too may be eligible for SMARTNet coverage once it is inspected by Cisco to ensure it is genuine and re-licensed by a subsequent End User.  This inspection requirement helps prevent unauthorized or counterfeit Cisco products from reaching End Users.

26.       A SMARTNet contract entitles the holder of the contract to receive supplemental software updates and upgrades for the hardware that is covered by the contract, and access to Cisco's Technical Assistance Center ("TAC") for engineering expertise.  One of the important

1  entitlements that SMARTNet provides is advance replacement – the ability for an End User that

2  has purchased a SMARTNet contract to contact Cisco to report a product that is not functioning

3  and to have Cisco ship a new product even before Cisco receives the original product back.  This

4  is offered in order to allow Cisco's customers to avoid network "downtime" and protect the

5  functioning of critical IT infrastructure.  However, this service exposes Cisco to the risk that third

6  parties may abuse SMARTNet in order to return damaged or counterfeit products and get new

7  products from Cisco.  As described below, ███████████████████████████████

8  ████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████████

11     **F.**     **Counterfeit "Cisco" Products**

12     27.     Counterfeit products that bear markings similar to the Cisco Marks provide

13 customers with a false assurance that the products they have purchased (1) are reliable and

14 conform with Cisco's high standards, (2) come with applicable warranties, (3) can be placed under

15 a Cisco service support contract (i.e., SMARTNet), and (4) come with all of the necessary

16 accessories sold with the product that have been selected and approved by Cisco for use with the

17 product.

18     28.     When Cisco engineers identify a product as "counterfeit," it is based on a

19 determination that the product was not manufactured by Cisco.  ████████████████████

20 ██████ that were determined to be counterfeit are "pure counterfeits," in that their attributes (such

21 as MAC address, motherboard serial number, power supply serial number, or other component

22 attributes) do not match Cisco's manufacturing records.  "Pure counterfeits" were not

23 manufactured by Cisco, and may have been put together as a complete counterfeit in a counterfeit

24 manufacturing operation.  Another variety of counterfeits are what is described as "counterfeit

25 upgrades," which are products that were initially manufactured by Cisco but then were changed by

26 the counterfeiter, usually by adding pirated software or additional components, changing the

27 product's serial number and labels, and then sold to a customer as a new, genuine Cisco product,

28 when in reality it has been modified into something that Cisco did not manufacture.  If, on the

other hand, a product was manufactured by Cisco but was sold outside Cisco's authorized sales channel without any changes, Cisco engineers would determine that the product is genuine, however, it would still not be eligible for SMARTNet if it had not previously been inspected and relicensed.

29.     In addition to harm to customers, the sale of counterfeit Cisco products harms Cisco in many ways.  Counterfeit Cisco products which fail or degrade create the false impression that Cisco products are unreliable, thereby improperly tarnishing Cisco's reputation and causing harm to Cisco's goodwill and suffer lost sales and future business opportunities.  When customers purchase "Cisco"-branded parts that are counterfeit and unreliable, their image of Cisco is diminished and Cisco's opportunity to sell genuine, high-quality products to those customers may be lost forever.  As a result of the manufacture and distribution of such counterfeit products, Cisco suffers substantial and irreparable harm to its brand, image, business, and goodwill with the public.  Cisco also suffers lost sales when customers purchase counterfeit products instead of genuine Cisco products.

### G.    Impact on Health, Safety, and National Security Caused by Counterfeit Cisco Products

30.     Cisco products are part of the backbone of the United States information technology network.  Many of Cisco's products are purchased by U.S. governmental entities, the military, hospitals, and by other industries, and used in important and life-essential applications. Critical governmental and other infrastructure is built on, and relies upon, Cisco products to maintain the security of data storage and transfer.

31.     It would be difficult to overstate the importance that the assured quality of Cisco's products has for customers who need to ensure the reliable functioning of their critical processes. Cisco firewalls, for example, ensure the integrity of government, medical, and business data and communications.  The U.S. government recognizes the importance of installing only genuine Cisco products.  In a criminal trial involving counterfeit Cisco products sold to the U.S. Marine Corps, Staff Seargeant Lee Chieffalo, USMC, testified that he specifically demanded genuine

1    Cisco products because if the networks that the "Cisco" products were in failed due to substandard

2    counterfeit products, "Marines could die."

3    **H.    Dexon's Business**

4    32.    Dexon is not an Authorized Partner.  Instead, Dexon sells unauthorized and

5    counterfeit "Cisco" equipment.  Dexon describes itself as a "middleman" in the sale of

6    networking-related software and hardware.  Dexon often purchases networking products of

7    dubious provenance, marks them up, and resells them to its customers.

8    33.    ████████████████████████████████████████████████████

9    ████████████████████████████ Dexon also purports to sell products and

10   services from Cisco's competitors, including HPE, Juniper, and Dell.

11   34.    ████████████████████████████████████████████

12   ███████████████████████████████████████████████████

13   ██████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ██████

17   35.    ████████████████████████████████████████████

18   ██████████████████████████████████ Sometimes, Dexon induces

19   Authorized Resellers to sell it Cisco equipment, knowingly inducing the resellers to breach their

20   Indirect Channel Partner Agreements with Cisco.  ██████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ██████████████

25   36.    ████████████████████████████████████████████

26   █████████████████ The products they sell to Dexon typically have passed through many

27   hands since being manufactured, often making it virtually impossible to verify their provenance

28   without physical inspection.  ██████████████████████████████████

1    37.    ███████████████████████████████████████████

2    ████████████████████████████████████████████████████

3    ████████████████████████████    Resellers like these do not sell only

4    networking equipment – they resell products of all kinds.  Indeed, it appears that these sellers

5    rarely sell networking equipment.  ██████████████████████████████████

6    ████████████████████████████████████

7    38.    ███████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ███████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ██████████████████████████████████████████████████████

13   ██████████

14   39.    Dexon was a long-time purchaser of "Cisco" hardware from several of the dozens

15   of entities (collectively called the "Pro Network Entities") whose ringleader was criminally

16   indicted in July 2022 by a federal grand jury for trafficking in a huge quantity of counterfeit

17   "Cisco" networking equipment.  According to the indictment, from 2014 to 2022, the Pro Network

18   Entities imported into the U.S. older, lower-model Cisco devices that were modified by Chinese

19   counterfeiters so that they would appear to be genuine versions of new, enhanced, and more-

20   expensive Cisco devices.  Some of the many purchasers of this counterfeit equipment were

21   hospitals, schools, government agencies, and the military.  The counterfeit devices suffered from

22   numerous performance and safety problems and often failed, causing serious damage to users'

23   networks and operations.[2]

24

25   _____

26   [1] *See* ████████████████████████████████████████

27   ████████████████████████████

28   [2] *See* https://www.justice.gov/opa/pr/ceo-dozens-companies-and-entities-charged-scheme-traffic-estimated-1-billion-fraudulent-and

40. ████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████

41. ████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████

**I.** **Dexon's History And Practice Of Trafficking In Counterfeit Cisco Products**

42.     For each of the instances where Dexon trafficked in counterfeit Cisco products described in this Complaint, Cisco alleges that Dexon used a Cisco Mark, which is identical to or nearly indistinguishable from the corresponding Cisco Mark that is registered with the USPTO.  In each of those instances the Cisco Mark was used to deceptively make a product appear Cisco-branded, when, in fact, the product was determined to be counterfeit.  While the product appeared to be a genuine product manufactured by Cisco, in reality, it was not manufactured by Cisco, or

1   under its authority.  For each of those instances, Dexon used the Cisco Mark in commerce without

2   Plaintiffs' permission or authority.

3         43.     From at least July 2006 through the present, Dexon has repeatedly and

4   systematically engaged in schemes to traffic counterfeit Cisco products.  In these schemes, Dexon

5   falsely represented to the public that various Cisco-branded products it was selling are genuine,

6   when in fact they are not.  Throughout that approximately 17-year period, Cisco repeatedly

7   informed Dexon that it was selling counterfeit products, it repeatedly demanded that Dexon cease

8   and desist selling those counterfeits, and it has requested Dexon's assistance in identifying the

9   sources for those counterfeit products so that Cisco could thwart those suppliers from further

10  damaging its brand and from defrauding the public.  In almost every instance, Dexon refused to

11  cooperate with Cisco, and refused to identify the counterfeit traffickers who supply it.

12        44.     Cisco asserts that Dexon's long history of counterfeit trafficking, and of repeatedly

13  denying Cisco's requests for assistance in identifying its sources for counterfeit Cisco products,

14  provide evidence that Dexon's illegal conduct was done willfully, or that Dexon has been willfully

15  blind to the fact that it has been selling counterfeit Cisco products for a period that is now

16  approaching almost two decades.  Below are examples of Dexon's sales of counterfeit "Cisco"

17  products.  Discovery in this case will uncover the full scope of counterfeit "Cisco" sales by

18  Dexon.

19       **J.**      **Activity Prior to 2015 Demonstrating Dexon's Pattern and Practice of**
20                 **Knowingly Trafficking in Counterfeit Cisco Products**

21            **(1)**     **Dexon's July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco**
22                     **Investigator (Reston, Virginia)**

23        45.     On or about July 27, 2006, Dexon sold three counterfeit Cisco products (Product

24  identification codes ("PID"): GLC-LH-SM, WIC-1DSU-T1-V2, and NM-4T) to an investigator,

25  who was working for Cisco.  Dexon represented that these were all genuine Cisco products and

26  that they were new.  Dexon sent two of these products (PIDs: GLC-LH-SM and WIC-1DSU-T1-

27  V2) directly from its business location in Minnesota, to the investigator in Reston, Virginia.  One

28

of these parts (PID: NM-4T) was sent by Dexon from 15330 Barranca Parkway, Irvine, California. These parts were inspected by a Cisco engineer who determined that they were all counterfeit.

### (2)   FBI's Seizure of Counterfeit Cisco Products from Dexon on February 26, 2008

46.     On or about February 26, 2008, the Federal Bureau of Investigation ("FBI") executed a search warrant at Dexon's business location in Minnesota.  In the course of that search, the FBI seized 204 Cisco-branded products that appeared suspicious.  Cisco engineers inspected a sampling of these products and determined all those sampled were counterfeit.

### (3)   Cisco's First Cease and Desist Letter to Dexon and its CEO

47.     On or about March 7, 2008, in reaction to the FBI's seizure of Cisco-branded products from Dexon during execution of its search warrant, Cisco sent a letter to Steven O'Neil ("O'Neil"), Dexon's President and CEO, demanding that Dexon cease and desist selling counterfeit Cisco products.  Cisco requested that Dexon assist it in identifying its sources of counterfeit products.  On or about March 18, 2008, Dexon responded to that letter through counsel, denying that Dexon had been involved in any illegal conduct.  Dexon declined to assist Cisco's investigation into its sources of counterfeit Cisco products.

### (4)   Dexon's June 2010 Sale of Counterfeit Cisco Products to Wayne State University (Detroit, Michigan), and Cisco's C&D Letter

48.     On or about January 21, 2010, Dexon provided Wayne State University ("WSU") with a bid to supply it with various new Cisco products.  On or about February 9, 2010, WSU issued a $180,000 purchase order to Dexon for those products.  Dexon shipped those products to WSU during, or about, June 2010.  WSU became concerned that some of those products might not be genuine and sent thirteen of them to Cisco for inspection.  On or about July 6, 2010, engineers examined those products (twelve GLC-SX-MM's and one GLC-LH-SM) and determined that all thirteen were counterfeit.

49.     On or about August 6, 2010, Cisco sent a letter to Dexon's CEO, O'Neil, informing him of Dexon's sale of counterfeit Cisco products to WSU and demanding that Dexon cease and desist its illegal conduct.  In that letter, Cisco demanded that Dexon preserve all evidence

1   regarding its procurement and sale of the counterfeit Cisco products, requested that Dexon

2   quarantine for inspection any Cisco-branded products that it procured in the same batch as the

3   counterfeit products, and requested Dexon's assistance in tracing the counterfeit products to the

4   source.

5          50.     On or about August 23, 2010, Dexon responded to Cisco's Cease and Desist Letter

6   through counsel.  Dexon denied that it knowingly engaged in the sale of counterfeit products or

7   had any liability "for trademark counterfeiting without regard to notice, knowledge, or intent[]."

8   Dexon also demanded that Cisco "substantiate [its claims] with more specific information about

9   the nature of the liability.…" and requested that Cisco provide it with "all information available to

10  substantiate [its]claim that the products listed in [Cisco's] letter are in fact counterfeit."  Dexon

11  conditioned a willingness "to discuss how it might cooperate in Cisco's investigation," upon the

12  "extent that Cisco is willing to provide the [information that Dexon requested]."

13         51.     On or about August 30, 2010, Cisco responded to Dexon by providing it with much

14  of the requested information.  Cisco provided Dexon with general guidelines on how to avoid

15  purchasing counterfeit products, but noted that many indicia of genuine products are maintained as

16  trade secrets because of the need to avoid educating counterfeiters.  Cisco provided Dexon with

17  legal authority to address its contention that it could not be liable for trademark counterfeiting.

18  Cisco noted Dexon's previous refusals to identify its source for counterfeit products, and renewed

19  its request for Dexon's assistance.  Nonetheless, Dexon refused to provide Cisco with any

20  assistance in identifying the sources of these counterfeit products.

21         **(5)     Dexon's July 2010 Sale of Counterfeit Cisco Products to A Cisco
                    Investigator (Los Angeles, California)**

22

23         52.     On or about July 14, 2010, Dexon sold seven Cisco-branded products to an

24  investigator in Los Angeles, CA, who was working for Cisco.  Dexon represented that these were

25  genuine Cisco products and that they were all new.  On or about July 21, 2010, Dexon shipped

26  these products to the investigator at an address in Los Angeles, CA.  On or about August 9, 2010,

27  engineers completed their examination of these parts and determined that all seven were

28  counterfeit (one WS-C2960-24TC-L, four GLC-SX-MM, and two GLC-LH-SM's).

**K.**   **Dexon's Illegal Counterfeit Trafficking Conduct Giving Rise to Its Present Liabilities**

53.    Dexon has continued to sell counterfeit Cisco products, and to protect its suppliers of counterfeit products by concealing their identities.  On every occasion when Cisco requested Dexon's assistance in providing information about people and entities who supplied Dexon with counterfeit or illegally acquired Cisco products, Dexon's response was substantially the same: Dexon denied any wrongdoing, claimed to be committed to maintaining the integrity of the marketplace, and then, paradoxically, refused to assist Cisco's efforts to investigate and deter continued counterfeit trafficking.

**(1)    Dexon's July 2015 Sale of A Counterfeit Cisco Product to Things Remembered, Inc. (Highland Heights, Ohio), and Cisco's C&D Letter**

54.    On or about July 20, 2015, Dexon sold to Things Remembered, Inc. ("Things Remembered") a Cisco-branded WS-C2960X-48FPD-L switch, bearing serial number FOC1820S15Y.  Things Remembered contacted Cisco for assistance during 2020 after that switch failed.  Upon further investigation, Cisco determined that the switch was counterfeit.

55.    On or about August 27, 2020, shortly after determining that this switch was counterfeit, Cisco sent a Cease and Desist Letter to Dexon, through counsel, and requested Dexon's assistance in identifying its procurement source for this counterfeit product.  Dexon responded by raising questions about Cisco's counterfeit determination and related issues.  Cisco responded to Dexon's questions and provided additional information about its counterfeit determinations.  Dexon failed to further respond, or to provide any assistance.

**(2)    Dexon's December 2016 Sale of Counterfeit Cisco Products to Jack Henry & Associates, Inc. (Monett, Missouri), and Cisco's C&D Letter**

56.    On or about December 29, 2016, Dexon sold a large quantity of Cisco transceivers to Jack Henry & Associates, Inc. ("Jack Henry") in Monett, Missouri.  In May 2017, a Cisco engineer examined three of them (a GLC-TE, a SFP-10G-LR, and a SFP-10G-SR) and determined that they were counterfeit.

57.     On or about June 26, 2017, Cisco sent a Cease and Desist Letter to Dexon, through its counsel.  That letter identified the counterfeit Cisco-branded transceivers that Dexon sold to Jack Henry, as well as other activities by Dexon that infringed upon Cisco's trademarks, and misleading statements that Dexon made in advertising regarding the Cisco-branded products it was selling.

58.     On or about July 31, 2017, Dexon responded to Cisco's June letter, largely by objecting to Cisco's claims.  It provided a list of conditions that Cisco would need to satisfy before Dexon would assist Cisco's investigation into the source of counterfeits.

        **(3)     Dexon's October 2017 Sale of Counterfeit Cisco Products to A Cisco Investigator (Berkeley, California)**

59.     On or about October 13, 2017, an investigator working for Cisco conducted a test purchase of the following Cisco-branded products from Dexon: a WS-C3560X-24T-E, a GLC-SX-MMD, a GLC-LH-SMD, a SFP-10G-SR, and a SFP-10G-LR.  Two of these products (the SFP-10G-SR and SFP-10G-LR) were the same model of transceivers that Cisco addressed with Dexon a few months earlier, in June 2017.  Dexon shipped those products from its business location in Minnesota to an address in Berkeley, California.  A Cisco engineer inspected each of these products and determined that they were all counterfeit.

        **(4)     ████████████████████████████**

60.     ████████████████████████████████

████████████████████████████

        **(5)     Dexon's January 2018 Sale of Counterfeit Cisco Product to Community Health Alliance (Reno, Nevada) and Cisco's C&D Letter**

61.     On or about January 29, 2018, Dexon sold to Community Health Alliance ("Community Health") a Cisco-branded WS-C2960X-48FPS-L switch, bearing serial number FOC2011S3JK.  Community Health contacted Cisco for assistance during 2020 after that switch malfunctioned.  Upon further investigation, Cisco determined that this switch was counterfeit.

62.     On or about September 21, 2020, shortly after determining that this switch was counterfeit, Cisco sent a Cease and Desist Letter to Dexon, through counsel, and requested

1   Dexon's assistance in identifying its procurement source for this counterfeit product.  Dexon

2   responded by raising questions about Cisco's counterfeit determination and related issues.  Cisco

3   responded to Dexon's questions and provided additional information about its counterfeit

4   determinations.  Dexon failed to further respond, or to provide any assistance.

5
6   **(6)   Dexon's April 2018 Sale of Counterfeit Cisco Products to Tucson Medical Center (Arizona)**

7       63.     On or about April 16, 2018, Dexon sold 20 Cisco transceivers (SFP-10G-LR) to

8   Tucson Medical Center ("TMC") in Arizona.  These transceivers were identical to one of the

9   models of counterfeit transceivers that Dexon had sold to Jack Henry, and that Cisco had

10  specifically addressed with Dexon's counsel in the June 2017 Cease and Desist Letter.  During

11  June 2018, TMC sought technical assistance from Cisco to correct malfunctions with three of

12  these transceivers.  Cisco inspected each of these three malfunctioning products and determined

13  that they were all counterfeit.

14
15  **(7)   Dexon's April 2018 Sale of Counterfeit Cisco Products to DARCARS (Maryland), and Cisco's C&D Letter**

16      64.     On or about April 16, 2018, Dexon sold two WS-C3650-48PS-E switches, among

17  other products, to DARCARS, a business located in Silver Spring, Maryland.  On or about May

18  12, 2020 DARCARS contacted Cisco for assistance because those switches were malfunctioning.

19  After evaluating these two switches, Cisco determined they are counterfeit.

20      65.     On or about May 13, 2020, counsel for Cisco contacted counsel for Dexon, and

21  requested Dexon's cooperation to disclose the source of the counterfeit switches that Dexon sold

22  to DARCARS, and to quarantine any other Cisco products from the same source.  Once again,

23  Dexon would not provide any information about the source of the counterfeit Cisco products.

24
25  **(8)   Dexon's August 2018 Sale of Counterfeit Cisco Products to Lockridge, Grindal, Nauen, PLLP (Minneapolis, Minnesota)**

26      66.     On or about August 22, 2018, Dexon sold various Cisco-branded products to

27  Lockridge, Grindal, Nauen, PLLP, a law firm in Minneapolis, Minnesota ("LGN").  During or

28  about January 2019, LGN sought technical assistance from Cisco because four of the six Cisco

WS-C2960X-48FPS-L switches that LGN had purchased from Dexon were malfunctioning. Cisco inspected those four switches and determined that they were all counterfeit.

(9)      **Dexon's Purchases in 2018 of Counterfeit Switches from PureFutureTech (Fremont, California)**

67.      In 2018, Dexon purchased "Cisco" switches from PureFutureTech, a company in Fremont, California.  PureFutureTech purchased many "Cisco" products from Chinese sources, including a company called HongKong Sellsi.  Based upon information and belief, Cisco alleges that HongKong Sellsi sold predominately counterfeit Cisco products.  Cisco has analyzed many switches sold by HongKong Sellsi, and they have been predominantly counterfeit.  In 2019, Cisco filed a civil complaint against HongKong Sellsi in the Northern District of California, alleging that HongKong Sellsi sold counterfeit Cisco products.  HongKong Sellsi did not respond, and the Court entered a default judgment against it.

68.      Cisco sought Dexon's cooperation to locate the HongKong Sellsi switches that Dexon had purchased from PureFutureTech, but Dexon refused to cooperate.  Cisco filed a motion in federal court in Minnesota to compel Dexon to comply with a subpoena, and the court ordered Dexon to disclose the customers to which it sold the HongKong Sellsi switches.  Dexon identified two companies—one in Texas and one in Ohio.  Cisco contacted both of those companies and analyzed the switches that Dexon sold to them.  Every one of the five switches that Dexon sold to those companies was counterfeit.

(10)     **Dexon's Purchases in 2017 to 2019 of Counterfeit Transceivers from PureFutureTech (Fremont, California)**

69.      During the period from 2017 through 2019, Dexon purchased a significant number of products from PureFutureTech that are believed and alleged to be counterfeit.  A former employee of the organization that controls PureFutureTech has testified under oath that the organization sold counterfeit Cisco transceivers.  Supporting this former employee's belief that PureFutureTech regularly sold counterfeit Cisco transceivers were her observations that: the products were imported from China to a receiving location in Nevada, and her personally having observed other employees in Fremont place counterfeit Cisco labels on the products before selling

1  them.  The receiving location in Nevada makes no logistical sense, other than an attempt to

2  obfuscate based on the fact that U.S. Customs and Border Patrol had earlier seized a shipment of

3  counterfeit Cisco products going to the Fremont address.  Cisco has analyzed dozens of

4  transceivers sold by the organization that controls PureFutureTech, and determined that they are

5  counterfeit.

6       70.     On information and belief, and as detailed in the following table, Cisco alleges that

7  Dexon purchased at least 1,351 counterfeit Cisco transceivers on 33 separate occasions from

8  PureFutureTech and a related entity, located in Fremont. California, and that Dexon then

9  reintroduced those products into commerce by selling them.  Any reseller, such as Dexon, should

10  have reasonably known that Dexon's procurement price for these Cisco-branded products was so

11  substantially below the Global List Price ("GLP")[3] that they were likely counterfeit.  Thus, Cisco

12  alleges on information and belief that the low price indicates that these products all were

13  counterfeit, and that Dexon knew that the products were counterfeit, or was willfully blind to that

14  fact:

| Date | Quantity Procured By Dexon | Item | GLP | Dexon's Cost | Dexon's Discount Off GLP |
|---|---|---|---|---|---|
| 2/24/2017 | 2 | GLC-BX-D | $1,300 | $74 | 94% |
| 2/24/2017 | 2 | GLC-BX-U | $1,300 | $77 | 94% |
| 6/1/2017 | 2 | GLC-ZX-SM | $3,995 | $92 | 98% |
| 6/12/2017 | 2 | GLC-ZX-SM | $3,995 | $92 | 98% |
| 9/12/2017 | 50 | SFP-10G-LR | $3,995 | $65 | 98% |
| 2/15/2018 | 20 | GLC-LH-SM | $995 | $29 | 97% |
| 2/15/2018 | 35 | SFP-10G-SR | $995 | $47 | 95% |
| 3/8/2018 | 3 | QSFP-H40G-ACU10M | $1,250 | $236 | 81% |
| 3/8/2018 | 8 | QSFP-H40G-AOC10M | $1,000 | $290 | 71% |
| 3/9/2018 | 8 | GLC-LH-SM | $995 | $29 | 97% |
| 3/9/2018 | 8 | SFP-10G-LR | $3,995 | $66 | 98% |
| 3/16/2018 | 8 | SFP-10G-LR | $3,995 | $66 | 98% |
| 3/20/2018 | 4 | GLC-LH-SM | $995 | $29 | 97% |
| 4/10/2018 | 25 | GLC-T | $450 | $42 | 91% |

[3] Global List Price is the full retail price for a given product.

| Date | Quantity Procured By Dexon | Item | GLP | Dexon's Cost | Dexon's Discount Off GLP |
|---|---|---|---|---|---|
| 4/10/2018 | 50 | SFP-10G-LR | $3,995 | $66 | 98% |
| 5/4/2018 | 30 | GLC-T | $450 | $42 | 91% |
| 5/4/2018 | 10 | GLC-TE= | $450 | $56 | 88% |
| 5/7/2018 | 60 | SFP-10G-SR-S | $700 | $60 | 91% |
| 5/15/2018 | 250 | SFP-10G-LR | $3,995 | $65 | 98% |
| 5/31/2018 | 100 | SFP-10G-LR | $3,995 | $65 | 98% |
| 6/18/2018 | 60 | SFP-10G-LR | $3,995 | $66 | 98% |
| 6/20/2018 | 50 | GLC-T | $450 | $43 | 90% |
| 6/26/2018 | 52 | GLC-LX-SM-RGD | $1,095 | $38 | 97% |
| 7/12/2018 | 10 | SFP-10G-LR | $3,995 | $66 | 98% |
| 7/16/2018 | 50 | SFP-10G-LR | $3,995 | $67 | 98% |
| 8/1/2018 | 2 | GLC-TE= | $450 | $47 | 90% |
| 9/14/2018 | 15 | GLC-LH-SMD | $995 | $29 | 97% |
| 9/14/2018 | 50 | SFP-10G-SR | $995 | $47 | 95% |
| 9/19/2018 | 50 | SFP-10G-SR | $995 | $47 | 95% |
| 10/9/2018 | 16 | SFP-10G-LR | $3,995 | $64 | 98% |
| 10/12/2018 | 20 | GLC-LH-SMD | $995 | $31 | 97% |
| 10/16/2018 | 20 | SFP-10G-LR | $3,995 | $63 | 98% |
| 10/17/2018 | 7 | SFP-10G-LR-S | $2,000 | $83 | 96% |
| 10/19/2018 | 50 | SFP-10G-SR | $995 | $47 | 95% |
| 10/22/2018 | 19 | SFP-10G-LR | $3,995 | $64 | 98% |
| 10/31/2018 | 33 | GLC-SX-MM | $500 | $26 | 95% |
| 11/21/2018 | 39 | GLC-SX-MMD | $500 | $33 | 93% |
| 1/14/2019 | 40 | GLC-LH-SMD | $995 | $29 | 97% |
| 1/16/2019 | 50 | SFP-10G-LR | $3,995 | $54 | 99% |
| 1/30/2019 | 6 | GLC-LH-SMD | $995 | $29 | 97% |
| 5/3/2019 | 35 | SFP-10G-SR | $995 | $39 | 96% |

**(11)    Dexon's Sales of Counterfeit Cisco Products to Murray State University (Murray, Kentucky) in 2018 and 2019, and Cisco's C&D Letter**

71.     On or about April 17, 2018, Dexon sold a Cisco WS-C2960X-48FPD-L switch to Murray State University in Murray, Kentucky ("Murray State").  On or about June 6, 2018, Dexon sold Murray State a Cisco WS-C2960X-48LPD-L switch.  On or about September 10, 2019, Dexon sold Murray State another Cisco WS-C2960X-48FPD-L switch.  Each of these Cisco-

1   branded switches began malfunctioning, causing Murray State to seek technical assistance from

2   Cisco.  After evaluating these three switches, Cisco determined that they were all counterfeit.

3        72.     On or about April 7, 2020, Cisco sent a Cease and Desist Letter to Dexon, through

4   its counsel.  That letter identified the counterfeit Cisco switches that Dexon sold to Murray State,

5   demanded that Dexon preserve all evidence related to its purchase of those counterfeit products,

6   and requested Dexon's assistance in identifying others who traffic in counterfeit Cisco products.

7   Once again, Dexon refused to provide any information about the source of the counterfeit Cisco

8   product.

9              (12)     **Dexon's July 2019 Sale of Counterfeit Cisco Products to MedRisk**

10                        **(King of Prussia, Pennsylvania)**

11        73.     In or about July 2019, Dexon sold ten Cisco GLC-TE transceivers to MedRisk Inc,

12   a healthcare organization located in King of Prussia, Pennsylvania ("MedRisk").  Eight of these

13   products began malfunctioning shortly after MedRisk received them from Dexon.  MedRisk

14   sought technical assistance from Cisco.  After evaluating these eight transceivers, Cisco

15   determined that all of them are counterfeit.

16              (13)     **Dexon's September 2019 Sale of Counterfeit Cisco Products to Coppell**

17                        **Independent School District (Coppell, Texas), and Cisco's C&D Letter**

18        74.     On or about September 30, 2019, Dexon sold six "Cisco" QSFP-40G-ER4

19   transceivers to Coppell Independent School District ("Coppell ISD").  These transceivers are

20   extremely sophisticated, with a Global List Price of $37,495 each.  Dexon sold them for a

21   remarkably low price of $2,645 each.

22        75.     On or about October 4, 2019, Coppell ISD contacted Cisco's Technical Assistance

23   Center ("TAC") because the transceivers were not functioning.  The TAC agent obtained

24   information about three of the transceivers, and ultimately a Cisco engineer determined that the

25   transceivers are counterfeit.

26        76.     On or about April 13, 2020, Cisco sent a Cease and Desist Letter to Dexon, through

27   its counsel.  That letter identified the counterfeit Cisco transceivers that Dexon sold to Coppell

28   ISD, demanded that Dexon preserve all evidence related to its purchase of those counterfeit

23

products, and requested Dexon's assistance in identifying others who traffic in counterfeit Cisco products.  Once again, Dexon refused to provide any information.

**L.      Dexon's California Directed Conduct Identified Through Jurisdictional Discovery**

77.      Cisco conducted jurisdictional discovery in accordance with a Court order, which provided a 90-day window during which it could make inquiries relevant to identifying additional conduct that Dexon directed towards California.  This limited discovery period allowed Cisco to seek information for only a small portion of the sales that Dexon disclosed having made in California during the relevant period.  Nonetheless, even the limited inquiries Cisco made led to the discovery of significant additional illegal and tortious conduct by Dexon within California.

**(1)      Dexon's Sale of Counterfeit Cisco Products to California Customers**

78.      Each of the entries in the table, below, identifies Dexon's sale of counterfeit Cisco products into California and/or Dexon's shipment of counterfeit Cisco products into California. Cisco engineers examined photographs of the products and/or electronic information obtained from the products and determined that on at least 18 separate occasions during the period spanning from 2017 to 2020, 40 of the Cisco-branded products that Dexon sold/shipped to California are counterfeit.  Any reseller, such as Dexon, should have reasonably known that Dexon's procurement price[4] for these Cisco-branded products was so substantially below the GLP that they were likely counterfeit.  Thus, Cisco alleges on information and belief that Dexon knew that the products were counterfeit, or was willfully blind to that fact:

---

[4] Given that Dexon is in the business of selling products at a profit, Dexon's procurement price for these products should be less than the sales price that is provided in the table.

| Date of sale by Dexon[5] | Number of Counterfeit Products | Dexon Customer and Location | Relevant Conduct | Sales Price Discount Off Of GLP |
|---|---|---|---|---|
| 2017-2018[6] | 2 | Glenn County Office of Education, Willows, CA | Dexon sold 2 counterfeit Cisco WS-C3850-48P-S switches into California for $4,195 each (GLP of $17,540 each).  Dexon also shipped the counterfeit products into California. | 76% |
| 2/15/2017 | 2 | SAG-AFTRA and Industry Sound Recording Distribution Fund, Valley Village, CA | Dexon sold 2 counterfeit Cisco GLC-T transceivers into California for $115 each (GLP of $450 each).  Dexon also shipped the counterfeit products into California. | 74% |
| 5/9/2017 | 1 | City of Eureka, Eureka, CA | Dexon sold 1 counterfeit Cisco WS-C3560X-48PF-E switch into California for $1,850 (GLP of $16,100 each).  Dexon also shipped the counterfeit product into California. | 89% |
| 12/15/2017 | 1 | Farmersville Unified School District, Farmersville, CA | Dexon sold a counterfeit Cisco WS-C3750X-48PF-S switch into California for $1,695 (GLP of $16,100 each).  Dexon also shipped the counterfeit product into California. | 89% |
| 2/13/2018 | 1 | Financial Partners Credit Union, Downey, CA | Dexon sold 1 counterfeit Cisco WS-C3650-48FD-E switch into California for $4,400 (GLP of $25,510 each).  Dexon also shipped the counterfeit product into California. | 83% |

---

[5] Unless otherwise noted, this is the date from Dexon's invoices.

[6] Cisco is presently unable to determine the exact dates that Dexon sold each of these switches because the records Dexon provided were incomplete.

| Date of sale by Dexon[5] | Number of Counterfeit Products | Dexon Customer and Location | Relevant Conduct | Sales Price Discount Off Of GLP |
|---|---|---|---|---|
| 3/19/2018 | 1 | Farmersville Unified School District, Farmersville, CA | Dexon sold a counterfeit Cisco WS-C3850-24T-E switch into California for $2,295 (GLP of $14,170 each).  Dexon also shipped the counterfeit product into California. | 84% |
| 4/23/2018 | 1 | Financial Partners Credit Union, Downey, CA | Dexon sold 1 counterfeit Cisco WS-C3650-48FD-E switch into California for $4,400 (GLP of $25,510 each).  Dexon also shipped the counterfeit product into California. | 83% |
| 5/28/2020 | 8 | Claremont McKenna College, Claremont, CA | Dexon sold 8 counterfeit Cisco GLC-LH-SM Transceivers into California for $125 each (GLP of $995 each).  Dexon also shipped the counterfeit products into California. | 87% |
| 5/30/18 | 1 | East Bay MUD, Oakland, CA | Dexon sold 1 counterfeit Cisco WS-C3850-24T-E switch into California for $4,200 (GLP of $14,170 each).  Dexon also shipped the counterfeit product into California. | 70% |
| 9/11/2018 | 1 | Financial Partners Credit Union, Downey, CA | Dexon sold 1 counterfeit Cisco WS-C3650-48FD-E switch into California for $4,400 each (GLP of $25,510 each).  Dexon also shipped the counterfeit product into California. | 83% |

| Date of sale by Dexon[5] | Number of Counterfeit Products | Dexon Customer and Location | Relevant Conduct | Sales Price Discount Off Of GLP |
|---|---|---|---|---|
| 6/26/2019 | 2 | Salinas Valley Memorial Healthcare, Salinas, CA | Dexon sold 2 counterfeit Cisco SFP-10G-SR transceivers into California for $80 each (GLP of $995 each).  Dexon also shipped the counterfeit products into California. | 92% |
| 9/25/2019 | 1 | Financial Partners Credit Union, Downey, CA | Dexon sold 1 counterfeit Cisco WS-C3650-48FD-E switch into California for $4,400 (GLP of $25,510 each).  Dexon also shipped the counterfeit product into California. | 83% |
| 10/14/2019 | 1 | Financial Partners Credit Union, Downey, CA | Dexon sold 1 counterfeit Cisco WS-C3650-48FD-E switch into California for $4,400 (GLP of $25,510 each).  Dexon also shipped the counterfeit product into California. | 83% |
| 10/28/2019 | 7 | Salinas Valley Memorial Healthcare, Salinas, CA | Dexon sold 7 counterfeit Cisco SFP-10G-LR transceivers into California for $115 each (GLP of $3,995 each).  Dexon also shipped the counterfeit products into California. | 97% |
| Winter 2020 | 2 | SAFE Credit Union, Folsom, CA | Dexon sold 2 counterfeit Cisco GLC-T transceivers into California for $95 each (GLP of $450 each).  Dexon also shipped the counterfeit products into California. | 79% |
| 4/24/2020 | 5 | SAFE Credit Union, Folsom, CA | Dexon sold 5 counterfeit Cisco GLC-LH-SM transceivers into California for $145 each (GLP $995 each).  Dexon also shipped the counterfeit products into California. | 85% |

| Date of sale by Dexon[5] | Number of Counterfeit Products | Dexon Customer and Location | Relevant Conduct | Sales Price Discount Off Of GLP |
|---|---|---|---|---|
| 5/20/2020 | 2 | Financial Partners Credit Union, Downey, CA | Dexon sold 2 counterfeit Cisco WS-C3650-48FD-E switches into California for $4,485 each (GLP $25,510 each).  Dexon also shipped the counterfeit products into California. | 82% |
| 6/3/2020 | 1 | Financial Partners Credit Union, Downey, CA | Dexon sold 1 counterfeit Cisco WS-C3650-48FD-E switch into California for $4,500 each (GLP of $25,510 each).  Dexon also shipped the counterfeit product into California. | 82% |

**M.    Additional Counterfeit Sales**

79.    In the time since Cisco filed its First Amended Complaint, discovery and investigation have revealed ███████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████  To that end, the counterfeit trafficking by Dexon, █████████████████████████ alleged above and below are mere examples of the vast unlawful and infringing conduct committed by Dexon that have been uncovered thus far.

80.    ████████████████████████████████████ Cisco began inquiring about the ████████ switch during July 2021, when it provided service on a genuine switch with the same serial number, owned by a different customer, and discovered that a switch with the same serial number was also under a service contract for ███████████ Cisco determined that the switch ██████████ ██████████████ is counterfeit based upon analysis of data obtained from that switch.  Cisco sent

1   Dexon a Cease and Desist letter regarding this counterfeit sale on September 13, 2021, and

2   requested assistance in combatting further counterfeit sales by identifying the source for this

3   counterfeit.  Dexon declined to assist.

4          81.   ████████████████████████████████████████████████

5   █████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ██████████████████████████████████████████████ sought Cisco's assistance

8   when one of these switches began to fail.  Cisco analyzed the switches and determined they were

9   all counterfeit.  Cisco sent Dexon a Cease and Desist letter regarding these counterfeit sales on

10  July 20, 2022.  Dexon indicated that it purchased these products from Wisecom Technologies and

11  Digi Devices Online. Cisco sent Dexon another Cease and Desist letter regarding additional

12  counterfeit sales to ██████████ only three-weeks later.

13         82.   ████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ███████████████████████████████████████████████████████████ that

16  customer contacted Cisco for technical assistance when those switches malfunctioned.  Upon

17  further investigation, Cisco determined that both switches were counterfeit.

0

18         83.   On or about August 27, 2020, Dexon sold to Regional Justice Information Service

19  ("Regional Justice") in St. Louis, MO, two Cisco-branded WS-C9300-24T-E switches, bearing

20  serial numbers FCW2307L09M and FOC2307X0AH.  Regional Justice contacted Cisco for

21  assistance after those switches malfunctioned.  Upon further investigation, Cisco determined that

22  both of the switches were counterfeit.  On or about December 15, 2020, shortly after determining

23  that these switches were counterfeit, Cisco sent a Cease and Desist Letter to Dexon, through

24  counsel, and requested Dexon's assistance in identifying its procurement source for these

25  counterfeit products.  Dexon failed to respond, or to provide any assistance.

26         84.   ████████████████████████████████████████████████

27  █████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████



1 ████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████

4 ████████████████████████████████████████

5     85.     ████████████████████████████████████████████████████

6 █████████████████████████████████████████████████████ and

7 sought technical assistance from Cisco.  Cisco examined photographs of these switches and

8 determined that they were counterfeit.[7]

9     86.     On or about December 17, 2021, Dexon sold two Cisco-branded QSFP-40G-LR4

10 modules under the fictitious business name "Optdex."  Dexon sold these products for only $595

11 each, which is a shockingly low price (the list price for these products is $17,737 each).  Cisco

12 analyzed the modules and determined that they were both counterfeit.  Cisco sent Dexon a Cease

13 and Desist letter regarding its sale of these counterfeit products, on February 4, 2022.  In response,

14 Dexon indicated that it purchased the modules from Wisecom Technologies, "its longtime

15 reputable supplier."

16     87.     By August 9, 2022, Cisco discovered that Dexon had sold another eleven

17 counterfeit switches to ███████ and sent it another Cease and Desist letter.  Dexon made

18 many of these sales after Cisco initiated this lawsuit.  In response, Dexon indicated that it had

19 purchased these products from Wisecom and Digi Devices Online.

20     88.     ████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████

22 ██████████████████████████ The company sought technical assistance from Cisco.  In

23

24     ————————————————————

25 [7] ████████████████████████████████████████████████████

26 ██████████████████████████████████████████████████████████

27 ██████████████████████████████████████████████████████████

28 ██████████████████████████████████████████████



1    attempting to analyze the problem, Cisco determined that the switch was counterfeit.[8] ███

2    ████████████████████████████████████████████████████

3    ███████████████████████████████████████████████████████

4    89.   ██████████████████████████████████████

5    ██████████████████████████████████████████████████████████

6    ███████████   Cisco's engineers examined one of the products and determined that it was

7    counterfeit. ████████████████████████████████████

8    ████████████████████████████████████████

9    ██████████████████████████████████████████████

10   ██████████████████████████████████████████

11   ████████████████████████████████████████████

12   ██████████████████████████████████████████████

13   ██████████████████████████████████████████████

14   ███████████████████████████████████████████████

15   ████████████████████████   However, Cisco determined the switches were

16   counterfeit and, thus, ineligible for SMARTNet support.

17   90.   ████████████████████████████████████

18   █████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████████████████

23   █████████████████████████████████████████████

24   ██████████████████████████████████████████████████

25   ████████████████████████████████

26

27   ────────────────────

28   [8]████████████████████████████████████████████
     ███████████████████████████

1    91.    ███████████████████████████████ The switch

2  was non-operational, and after the energy company opened a service request with Cisco, Cisco's

3  engineers determined that it was counterfeit.  ████████████████████

4  █████████████████████████████████████████████████

5  ██████████████████

6    92.    When Dexon sells customers products that bear the Cisco trademark and those

7  products fail, customers blame Cisco, causing Cisco significant reputational harm.  ██████

8  █████████████████████████████████████████████████

9  █████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████

11 ██████████████████

12   93.    Dexon's trafficking in counterfeit and unauthorized "Cisco" equipment irreparably

13 damages Cisco's brand.  Cisco competes with other manufacturers of networking equipment and

14 new, cloud-based entrants in the networking market on the basis of its reputation for reliability,

15 safety, and service.  Dexon's conduct diminishes the value of the Cisco brand, imposing

16 significant costs on Cisco.

17   94.    At the time of each sale noted herein, Cisco had already put Dexon on notice that it

18 was selling counterfeit Cisco products.  Cisco asserts, on information and belief, that had Dexon

19 intended to avoid selling counterfeit Cisco products, it would have voluntarily worked with Cisco

20 to identify counterfeit suppliers, and it also would have changed its procurement practices to avoid

21 using counterfeit suppliers.  Dexon's continued procurement and sale of counterfeit Cisco

22 products resulted from its willful trafficking in counterfeit Cisco products, or it is the result of

23 Dexon's willful blindness – for more than a decade – to the fact that it was trafficking in

24 counterfeit Cisco products.

25   95.    Dexon acted knowingly when it used the Cisco Marks on counterfeit products or in

26 connection with trafficking in counterfeit goods and services.  Dexon had an awareness of a firm

27 belief that the products were counterfeit, or acted with willful blindness, conscious avoidance, or

28 deliberate ignorance, including by the following evidence as discussed above:

a.     Dexon purchased counterfeit Cisco goods and sold them, after notice from Cisco of potential infringement.

b.     Dexon knew that Cisco distributed its goods only through authorized resellers, ████████████████████████████████████████

████████████████████

c.     The counterfeit Cisco products Dexon purchased and sold were of inferior quality.

d.     Dexon purchased counterfeit "Cisco" products for an unusually low price.

e.     ████████████████████████████████████████████████

████████████████████████████████████████

f.     Dexon purchased from known sellers of counterfeit "Cisco" products.

**N.     Dexon's Illegal Copyright Infringement, DMCA Violations, and Trafficking in Counterfeit and Illicit Labels Giving Rise to Its Present Liabilities**

96.     Dexon sold counterfeit software licenses to its customers in California that were uncovered during the jurisdictional discovery in December 2020 to February 2021.  As alleged above, Cisco software licenses are often transmitted in or accompanying a document that is referred to as a Software License Claim Certificate or Product Activation Key Certificate (a "PAK").  A PAK typically includes a license key code that allows a user to unlock or download Cisco software.  The PAK also includes other descriptors by which Cisco can often determine whether the PAK was pirated, stolen, illegally copied, and/or unlawfully transferred.  Each PAK contains Cisco Marks that have been included on the Principal Register of the USPTO.

97.     In every instance described in the table below, Dexon provided its California customers with a counterfeit PAK, which copied a valid code that enabled the customer to access Cisco software without Cisco ever being paid for it.  Further, any reseller, such as Dexon, should have reasonably known that Dexon's procurement price for these counterfeit Cisco licenses was so substantially below the GLP that they were likely counterfeit.  Thus, Cisco alleges on information and belief that the low price indicates that Dexon knew that the products were counterfeit, or was willfully blind to that fact:

| Date of sale by Dexon[9] | Number of Counterfeit Licenses | Dexon Customer and Location | Relevant Conduct | Sales Price Discount Off Of GLP |
|---|---|---|---|---|
| 2017-2018[10] | 1 | East Bay MUD, Oakland, CA | Dexon sold 1 counterfeit PAK (L-LIC-CT5508-25A) into California for $1,495 (GLP $12,495 each).  Dexon also transmitted that counterfeit license into California. | 88% |
| 8/28/2017 | 1 | Farmersville Unified School District, Farmersville, CA | Dexon sold 1 counterfeit PAK (ASA-5555-BOT-1YR) into California for $1,295 (GLP $4,500).  Dexon also transmitted that counterfeit license into California. | 71% |
| 10/30/2017 | 3 | SA Recycling, Orange, CA | Dexon sold 3 counterfeit PAKs (FL-CME-SRST-25=) into California for $1,225 each (GLP $1250 each).  Dexon also transmitted that counterfeit license into California. | 2% |
| 3/21/2018 | 4 | SA Recycling, Orange, CA | Dexon sold 4 counterfeit PAKs (SL-4330-SEC-K9=) into California for $350 each (GLP $1,750 each).  Dexon also transmitted that counterfeit license into California. | 80% |
| 2/28/2018 | 1 | SA Recycling, Orange, CA | Dexon sold 1 counterfeit PAK (SL-4330-SEC-K9=) into California for $350 each (GLP $1,750 each).  Dexon also transmitted that counterfeit license into California. | 80% |

---

[9]  Unless otherwise noted, this is the date from Dexon's invoices.

[10]  Cisco is presently unable to determine the precise date for this sale.

| Date of sale by Dexon[9] | Number of Counterfeit Licenses | Dexon Customer and Location | Relevant Conduct | Sales Price Discount Off Of GLP |
|---|---|---|---|---|
| 10/30/17 | 3 | SA Recycling, Orange, CA | Dexon sold 3 counterfeit PAKs (SL-4330-SEC-K9=) into California for $350 each (GLP $1,750 each).  Dexon also transmitted that counterfeit license into California. | 80% |
| 3/21/2018 | 4 | SA Recycling, Orange, CA | Dexon sold 4 counterfeit PAKs (SL-4330-UC-K9=) into California for $340 each (GLP $1,610 each).  Dexon also transmitted that counterfeit license into California. | 79% |
| 10/30/2017 | 3 | SA Recycling, Orange, CA | Dexon sold 3 counterfeit PAKs (SL-4330-UC-K9=) into California for $340 each (GLP $1,610 each).[11]  Dexon also transmitted that counterfeit license into California. | 79% |

98.     Cisco licenses all of its software to specific End Users pursuant to specific licensing terms and agreements.  Thus, Cisco does not sell its software at all, and does not authorize third parties, like Dexon, to sell its software licenses to anyone.  Instead, Cisco only distributes its software licenses through authorized channels.  As such, Dexon has been distributing "Cisco" branded software in competition with genuine and licensed Cisco software and trading off of Cisco's trademarks to do so, by misrepresenting that Dexon could sell valid Cisco licenses.  In fact, any Cisco software license sold and distributed by an unauthorized source is invalid and infringing.  As detailed in Cisco's End User License Agreement ("EULA"), a license is valid only if the user purchased it from an "Approved Source," which is limited to either

---

[11]  It is presently unclear from the available documentation whether one of the SL-4330-UC-K9= licenses may have been sold on 2/28/2018.

Cisco, or a reseller, distributor, or systems integrator that has been authorized by Cisco.  By that definition, Dexon is not an Approved Source.  Further, the license is for the specific End User that purchased the license from Cisco or an Approved Source and is not allowed to be subsequently transferred.  Dexon was aware of Cisco's EULA and license terms.  As a result, Dexon knew that any Cisco licenses it sold were invalid and infringing.  Indeed, Dexon provided customers with a copy of Cisco's EULA, which describe how any license sold by Dexon, or similar entities, are invalid and infringing.[12]  Nonetheless, Dexon continued to inform its customers that it could sell Cisco licenses, and it did sell those invalid and infringing software licenses to distribute Cisco software to its customers in violation of Cisco's software copyrights.

99.     Dexon's distribution of the counterfeit PAKs described above also constitutes acts of direct and indirect copyright infringement, violations of the Digital Millennium Copyright Act (the "DMCA"), and trafficking in counterfeit and illicit labels in violation of 18 U.S.C. § 2318. While jurisdictional discovery revealed the above instances of infringement, ███████████ ████████████████████████████████████████████████████████████ ████████████

100.     ████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████

_____

[12] Further, Cisco's EULA establishes that any U.S.-based disputes arising out of, or related to, the EULA are subject to the exclusive jurisdiction of, and venue in, the Federal Courts of the Northern District of California or the California Superior Court for Santa Clara County.

101. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This illegal scheme required Cisco to launch a new PAK registration and validation process in mid-2018. ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

102. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

103. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



1 ████████████████████████████████████████████████████████████████

2 ████████████████████████████████████████

3      **O.**      **Dexon Induces Cisco Partners to Breach their Contracts with Cisco**

4      104.    Because Dexon's customers often prefer to purchase Cisco products that are

5 covered by SMARTNet support, which Dexon cannot legitimately procure, ████████████████

6 ████████████████████████████████████████████████████████████████

7 ███████████████████████████████████████████████

8      105.   ████████████████████████████████████████

9 ████████████████████████████████████████████████████████████████████

10 ███████████████████████████████████████████████████████████

11 ██████████████████████████████████████████ Dexon knew since at least

12 2014 that Authorized Partners were at risk of having their agreements terminated by Cisco for

13 selling to Dexon or other unauthorized resellers. ████████████████████████████████

14 ████████████████████████████████████████████████████████████████████

15 ███████████████████████████████████

16      106.    Dexon has also been aware since at least 2012 that all Cisco products that pass

17 through the secondary market must be inspected by Cisco (and confirmed to be genuine), and

18 relicensed before a customer can have an enforceable SMARTNet contract with Cisco.  And yet,

19 offering illegitimate SMARTNet contracts (and inducing breach of partner's contracts with Cisco)

20 remains an essential component of Dexon's business model.

21      107.   ████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████████

28



1

2

3    108.

4

5

6

7

8

9    109.

10

11

12

13

14

15    110.

16                                                                    NGS was a Cisco

17   Authorized Partner until 2018 when Cisco first terminated its agreement for reselling SMARTNet

18   contracts and licenses to unauthorized resellers.  After that termination, NGS circumvented

19   Cisco's controls and created new email accounts to sign up as a Cisco partner and obtain access to

20   SMARTNet contracts in 2020 and again in 2022.

21

22

23

24

25    111.   NGS knowingly acted as a shill            to obtain invalid SMARTNet contracts,

26   repeatedly re-engaging with Cisco after Cisco terminated the ICPA contract with it, using different

27   company names, addresses, and principal names to disguise itself.  NGS initially signed the ICPA

28   on July 31, 2014, as "NGS Infonet Inc.," with an address at 12310 Pinecrest Road, Suite 306,

1   Reston, Virginia.  "Employee A" using an @ngs.com email address agreed to the ICPA.  ███

2   ████████████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████████████

4   ██████████████████████.

5         112.    In March 2018, Cisco discovered that NGS was purchasing SMARTNet contracts

6   improperly—arranging them for unauthorized resellers without having the products inspected or

7   re-licensed—and Cisco terminated the ICPA with NGS.

8         113.    NGS attempted to re-register as a Cisco reseller partner on October 21, 2020, using

9   a new business name (NGS Tech LLC), new business address (1900 Reston Metro Plaza, #603,

10  Reston, Virginia), and purportedly "new" principal contact, whose name was only very slightly

11  changed from the original name used by "Employee A".  Cisco performed onboarding due

12  diligence and determined that NGS Tech was not a valid business, and thus terminated it on

13  November 21, 2020.

14        114.    This second termination did not deter NGS ██████████.  On or about April 15,

15  2022, NGS re-registered with Cisco, with a third business name (NGS SEC Inc.), a third business

16  address (22365 Broderick Drive, Suite 320, Sterling, Virginia), and a third principal contact ("Sara

17  John").  In September 2022, Cisco uncovered the sales of SMARTNet contracts by this final NGS

18  entity and terminated it on September 28, 2022.  ████████████████████████

19  ████████████████████████████████████████████████████████████████████

20        115.    ████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28

40
SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF



116.

117.

118.

119.

SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1 ████████████████████████████████████████████████

2 █████████████████████████████████████████████████

3 ███████████████████████████████

4      120.   ██████████████████████████████████████

5 █████████████████████████████████████████████████

6 █████████████████████████████████████████████████

7 █████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 █████

10      121.   ██████████████████████████████████████

11 █████████████████████████████████████████████████

12 █████████████████████████████████████████████████

13 ███████████████████████████████████████████

14      122.   █████████████████████████████████████

15 █████████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████

18      123.   ████████████████████████████████████

19 ██████████████████████████████████████████████████

20 █████████████████████████████████████████████████

21 ██████████████████████████████

22      124.   Dexon's "Cisco" sales displace authorized sales of Cisco products and services.

23 ██████████████████████████████████████████████████

24 █████████████████████████████████████████████, resulting in

25 significant expense to Cisco.

26      125.   Cisco spends millions of dollars and thousands of its employees' hours

27 investigating and remediating the problems Dexon's unauthorized sales create.  Cisco has invested

28 substantial resources in conducting test purchases of "Cisco" equipment from Dexon, inspecting

the "Cisco" products Dexon has sold to its customers, coordinating with law enforcement agencies to stop Dexon's distribution of counterfeit "Cisco" products, and providing zero-cost product replacements to recipients of Dexon's counterfeit "Cisco" products.

126. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

127. ████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

128. ██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████ contacted Cisco's TAC support seeking a solution

for a failed WS-C2960X-48FPD-L switch █████████████████████

████████████████████████████████ Cisco reviewed the

console readout provided by ██████ for the product, and determined that the switch was not

genuine.  Cisco informed ██████ about this determination, denied the return request, expressed

concern about the existence of counterfeit products in ██████ network, and requested that

██████ identify the source of the product.

129. ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

130. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████





[redacted] contacted Cisco's TAC about switches that were experiencing failure. In its communications with Cisco, [redacted] made it clear that the failure of the switches was seriously affecting [redacted] business, and that it expected Cisco to replace the switches immediately to address the issue, stating: "[i]t is imperative that these switches are shipped today. We have a major, company work stoppage as a result of these down switches. Per our SMARTNet coverage, which these switches are covered under, we should have already received replacement." Although Cisco had not yet analyzed the products to determine their authenticity, Cisco representatives escalated the issue and ultimately replaced the failing products based on the statement of immediate harm to [redacted] business. However, two of the products returned by [redacted] were later analyzed and determined to be counterfeit, as were several other products in [redacted] infrastructure [redacted].

131. [redacted]

132. [redacted] was informed by Cisco that the SMARTNet contract would not be valid unless the product was reinspected. [redacted] expressed its frustration to Cisco stating: "I'm an ISP and this is core hardware. If this hardware were to die

1  while we are having this dispute, and Cisco would fail to honor its contract, I would suffer

2  irreparable harm for which I would hold Cisco responsible for in Court." This is one example

3  ██████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████

6  ████████████

7      133.    In each of the above examples, Dexon has traded off of the goodwill associated

8  with the Cisco Marks for its own financial gain, and has deceived consumers into believing that

9  the counterfeit "Cisco" branded products, ███████████████████████, Dexon

10 sells were manufactured or authorized by Cisco resulting in significant, irreparable harm to Cisco,

11 its brand, and to consumers.

12     134.    In order to attempt to stop this activity, on September 21, 2020, counsel for Cisco

13 provided a detailed letter to Dexon's counsel, describing (again) the fact that Dexon was inducing

14 Cisco partners to breach their contracts by approaching them to sell Dexon SMARTNet coverage

15 for secondary market products, and further highlighting the fact that, in any event, inspection and

16 re-licensing is required for any such product, pursuant to Cisco's long-established and public

17 policy.

18     135.    ███████████████████████████████████

19 ████████████████████████████████████████████

20 ██████████████████████████████████████████████████

21 ███████████████████████████████████████████

22 ██████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 █████████████████████████

26     136.    To cite a further example, ████████████████████

27 ██████████████████████████████████████████████

28 ██████████████████████████████████████████████

1   █████ opened a TAC request with Cisco due to an issue with the device.  As part of working

2   through the TAC request, Cisco analyzed the product in question and determined that it was

3   counterfeit.  It then informed █████ that the product was counterfeit, denied █████ return request,

4   and asked for the identity of the vendor that supplied the product.  Cisco also informed █████ that

5   its SMARTNet coverage was not valid.  ████████████████████

6   ███████████████████████████████████████████

7   ███████████████████████████████████████████

8   ████████████████████████████████████████████

9   ████████████████████████████████████████████

10  ███████████████████████

11      **P.      The Harmful Effects of Dexon's Conduct**

12      137.   Dexon's sales of unauthorized "Cisco" products and invalid SMARTNet contracts

13  harm Cisco's business and its brand.

14      138.   Dexon's "Cisco" sales displace authorized sales of Cisco products and services that

15  would otherwise be made by resellers that devote time and money to comply with the

16  requirements Cisco mandates its authorized resellers satisfy.  Further, ███████████████

17  ███████████████████████████████████████████

18  ██████████████████████████

19      139.   Cisco spends millions of dollars and thousands of its employees' hours

20  investigating and remediating the problems Dexon's unauthorized sales create.  Cisco has invested

21  substantial resources in conducting test purchases of "Cisco" equipment from Dexon, inspecting

22  the "Cisco" products Dexon has sold to its customers, coordinating with law enforcement agencies

23  to stop Dexon's distribution of counterfeit "Cisco" products, and providing low or zero-cost

24  product replacements to recipients of Dexon's counterfeit "Cisco" products and services.

25      140.   The problems Dexon's unauthorized sales create are significant.  Numerous

26  customers have received unauthorized and counterfeit equipment from Dexon, and they often turn

27  to Cisco for answers and for help.  Victims of Dexon's unauthorized sales include entities that

28

supply critical infrastructure such as hospitals, schools, and the military, and small and large American businesses that rely on Cisco products to provide goods and services to their customers.

**FIRST CLAIM FOR RELIEF**
**Federal Trademark Infringement**
**(15 U.S.C. § 1114)**

141.    Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

142.    The Cisco Marks and the goodwill of the business associated with them are tremendously valuable in the United States and worldwide because they are distinctive and universally associated in the public perception with the highest quality network and communications technology products and services.

143.    Dexon has sold, offered to sell, distributed, and advertised infringing products bearing Cisco Marks ("Infringing Products").

144.    The differences between Dexon's Infringing Products and genuine Cisco goods are material.  Cisco asserts on information and belief that having all original Cisco components and entitlement to warranty services are relevant to customers' decisions about whether, and from whom, to purchase Cisco products.

145.    Dexon's actions have caused confusion, mistake, and deception as to the origin and quality of Dexon's Infringing Products because they are intentionally calculated to mislead the general purchasing public into believing that Dexon's Infringing Products originated from, are associated with, or are otherwise authorized by Cisco, when in fact they are not.

146.    Upon information and belief, Dexon's infringing actions were committed fraudulently, willfully, and in bad faith, with knowledge of Cisco's exclusive rights to, and goodwill in, the Cisco Marks, or with willful blindness to the same, and with the intent to cause confusion, to cause mistake, and/or to deceive.

147.    Dexon's unauthorized use of the Cisco Marks constitutes trademark infringement of the federally registered Cisco Marks and has caused substantial damage to Cisco and to the

1  reputation and goodwill symbolized by the Cisco Marks in violation of Section 32 of the Lanham

2  Act, 15 U.S.C. § 1114, in an amount to be proven at trial.

3      148.    Dexon's conduct described above, including the unauthorized use of the Cisco

4  Marks in interstate commerce, has directly and proximately caused substantial, irreparable injury

5  to Cisco and to the business and goodwill represented by the Cisco Marks, which leaves Cisco

6  without an adequate remedy at law.

7                          **SECOND CLAIM FOR RELIEF**
8                      **Federal Trademark Counterfeiting**
9                            **(15 U.S.C. § 1114)**

10     149.    Cisco incorporates by reference each of the allegations in the preceding paragraphs

11  of this Complaint as though fully set forth here.

12     150.    The Cisco Marks are valid, protectable trademarks that have been registered as

13  marks on the principal register in the USPTO.  Cisco is the owner and registrant of the Cisco

14  Marks.

15     151.    As described in more detail above, Dexon has used and counterfeited the Cisco

16  Marks in connection with the marketing, promotion, and sale of their goods and services without

17  Cisco's consent, in a manner that is likely to cause, and has actually caused, confusion and/or

18  mistake, or that has deceived members of the consuming public and/or the trade.  Indeed, Dexon's

19  counterfeiting and infringing activities are likely to cause and are actually causing confusion,

20  mistake, and deception among members of the trade and the general consuming public as to the

21  origin, sponsorship, and quality of Dexon's infringing products, counterfeit packaging, inferior

22  warranty, and other related commercial activities.  As of the filing of this Complaint, Dexon is

23  continuing to infringe the Cisco Marks unabated as alleged above.

24     152.    Dexon has publicly advertised, sold, offered to sell, and distributed counterfeit

25  Cisco products in interstate commerce in direct competition with Cisco and without authorization

26  or consent to use the Cisco Marks but with full knowledge of Cisco's notorious prior rights in

27  those marks.

28

153.     Dexon's counterfeit Cisco products reproduce, counterfeit, copy, and colorably imitate the Cisco Marks or display a spurious designation that is identical with, or substantially indistinguishable from, the Cisco Marks.  Dexon has applied their reproductions, counterfeits, copies, and colorable imitations of the Cisco Marks to labels, prints, and packages intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of Dexon's counterfeit products, which is likely to cause confusion, to cause mistake, or to deceive.

154.     Dexon's unauthorized use of the Cisco Marks on or in connection with Dexon's counterfeit products was conducted intentionally and with notice and full knowledge that the use was unauthorized by Cisco.  Accordingly, Dexon's actions constitute willful trademark infringement and counterfeiting of the Cisco Marks in violation of 15 U.S.C. §§ 1114 and 1117.

155.     Cisco has been, and continues to be, damaged by Dexon's infringement, including by suffering irreparable harm through the diminution of trust and goodwill among Cisco consumers and members of the general consuming public and the trade.  Cisco is entitled to an injunction against Dexon, and an order of destruction of all infringing products, as well as all monetary relief and other remedies available under the Lanham Act, including but not limited to trebled damages and/or actual profits, reasonable attorneys' fees, costs and prejudgment interest, and/or statutory damages.

**THIRD CLAIM FOR RELIEF**
**False Designation of Origin**
**(15 U.S.C. § 1125)**

156.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

157.     Dexon resells the Infringing Products that are designed to appear identical to genuine Cisco products and thereby employ the same nature, style, look, and color as genuine Cisco products.  Moreover, as alleged above, Dexon sold products that had affixed counterfeit or infringing versions or reproductions of the Cisco Marks to unauthorized products and/or to the packaging, wrapping, etc., in which the Infringing Products are packaged.  This unauthorized use

of the Cisco Marks was likely to cause confusion, to deceive, and to mislead the consuming public into believing that there was some affiliation, connection, or association between Dexon and Cisco and was likely to cause confusion, mistake, or deception as to the origin, source, sponsorship, authorization, approval, or affiliation of Dexon's Infringing Products.

158.     Dexon's actions, including the unauthorized use of the Cisco Marks in commerce, constitute false designation of origin, false or misleading descriptions of fact, and false or misleading representations of fact, which have caused confusion, mistake, and deception, as to Dexon's association or affiliation with Cisco, as well as to the origin, source, and sponsorship of Dexon's Infringing Products, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

159.     Dexon's unauthorized and misleading use of the Cisco Marks constitutes willful infringement of the Cisco Marks in violation of 15 U.S.C. § 1114(1)(b) and entitling Cisco to treble damages and/or enhanced statutory damages under 15 U.S.C. §§ 1117(b) and (c).

160.     Dexon's conduct has directly and proximately caused Cisco to suffer damage in an amount to be proven at trial.

161.     Dexon's actions described above, including its unauthorized and misleading use of the Cisco Marks in commerce have caused substantial and irreparable injury to Cisco and to the business and goodwill represented by the Cisco Marks, thereby leaving Cisco without an adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
### Federal Direct and Indirect Copyright Infringement
### (17 U.S.C. §§ 501, et seq.)

162.     Cisco incorporates each of the foregoing paragraphs of this Complaint as if fully set forth herein.

163.     Cisco's copyrighted software contains a substantial amount of original material (including without limitation code, specifications, documentation and other materials) that is copyrightable subject matter under the Copyright Act, 17 U.S.C. §§ 101, et seq.  Cisco owns valid copyrights in its software, including but not limited to the registered software copyrights, set forth in paragraph 19 above.

164.   Without consent, authorization, approval, or license, Dexon knowingly, willingly, and unlawfully copied, prepared, published, and/or distributed Cisco's copyrighted works, portions thereof, and/or derivative works of the same, constituting direct copyright infringement.

165.   As alleged above, Dexon distributed ███████ copies of Cisco's copyright-registered software, by selling pirated, stolen, previously-sold, and/or otherwise infringing Cisco software licenses to its customers, without authorization and in violation of Cisco's copyrights. Such distribution and use was not licensed and violated Cisco's software licensing terms, including but not limited to Cisco's End User License Agreement.  In addition, Dexon has induced, caused, and materially contributed to the infringing acts of its customers by encouraging, inducing, allowing, and assisting them to use, copy, and/or further distribute Cisco's copyrighted works, and works derived therefrom.  As such, Dexon has engaged in both direct and indirect copyright infringement in violation of Section 501 of the Copyright Act.

166.   Dexon's direct and indirect infringements are, and have been, knowing and willful. By this unlawful copying, use, and/or distribution, Dexon has violated Cisco's exclusive rights under 17 U.S.C. § 106 of the Copyright Act.

167.   Cisco is entitled to an injunction restraining Dexon from engaging in any further such acts in violation of the United States copyright laws.  Unless Dexon is enjoined and prohibited from infringing Cisco's copyrights, or inducing others to infringe Cisco's copyrights, and unless all infringing software, including but not limited to all pirated software licenses, is seized and impounded pursuant to Section 503 of the Copyright Act, Dexon will continue to intentionally infringe and induce infringement of Cisco's registered copyrights.

168.   Dexon's aforesaid conduct is causing immediate and irreparable injury to Cisco and to Cisco's goodwill, and will continue to damage Cisco unless enjoined by this Court.  Cisco has no adequate remedy at law.  As a direct and proximate result of Dexon's infringements, Dexon has realized unjust profits, gains, and advantages at the expense of Cisco, including as set forth above. In addition, Cisco has suffered substantial loss and damages to its property and business, including significant monetary damages as a direct and proximate result of Dexon's infringements, including as set forth above.  The harm caused by Dexon's unlawful conduct entitles Cisco to recovery of all

1    available remedies under the law, including but not limited to actual damages, infringers' profits,

2    statutory damages (if elected), reasonable attorney fees, costs, and prejudgment interest.

**FIFTH CLAIM FOR RELIEF**
**Violations of the Digital Millennium Copyright Act**
**(17 U.S.C. §§ 1201, et seq.)**

6    169.    Cisco incorporates each of the foregoing paragraphs of this Complaint as if fully set

7    forth herein.

8    170.    As alleged above, Cisco has registered numerous copyrights in its software.

9    171.    Cisco employs many technological measures to effectively control access to its

10   copyright-protected software, including but not limited to software license keys.  In order to access

11   and run Cisco's copyright protected software, licensees must validate their copies of Cisco's

12   software with license keys that are generated through Cisco's computer systems.  The license keys

13   are encrypted alphanumeric codes that are encoded with the authorized software features that have

14   been licensed.  In this way, the Cisco software license keys are designed to distribute Cisco

15   software to licensed End Users and to prevent distribution, copying, and infringement by

16   unlicensed users or in excess of a user's license.  Further, because these Cisco software license

17   keys control the access to Cisco's software and because these license entitlements are tracked

18   internally by Cisco, these Cisco software license keys also enable Cisco to verify whether a

19   particular copy of its software installed on a user's system is counterfeit or infringing, or being

20   used without Cisco's authorization or license.

21   172.    As alleged in more detail above, ███████████████████████

22   ██████████████████████████████████████████████████

23   ██████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████

26   ███████████████████████████

27   173.    As alleged further above, ████████████████████████████

28   ██████████████████████████████████████████████████

1  ████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████████

3  ██████████████████████████████████████████████████████████████

4  ████████      Such software license keys have only limited commercially significant purpose or

5  use other than to circumvent a technological protection measure that effectively controls access to

6  copyrighted works, ████████████████████████████████████████████████

7  ████████████████████████████████████

8        174.    Dexon has realized significant profit ████████████████████████████████

9  ████████████████████████████████████████████████████████████

10  Further, Cisco has sustained economic damage ████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  an amount to be proven at trial.

13        175.    Cisco is therefore entitled to an injunction restraining Dexon from engaging in any

14  further such acts in violation of the United States copyright laws.  Dexon's aforesaid conduct is

15  causing immediate and irreparable injury to Cisco and to Cisco's goodwill, and will continue to

16  damage Cisco unless enjoined by this Court.  Cisco has no adequate remedy at law.  Unless Dexon

17  is enjoined and prohibited from infringing Cisco's copyrights, inducing others to infringe Cisco's

18  copyrights, and unless all unlawful software license keys are seized and impounded pursuant to 17

19  U.S.C. Section 1203, Dexon will continue to be able to circumvent technological measures to

20  effectively control access to Cisco's copyright-protected software and to traffic in technology to

21  circumvent Cisco's technological protection measures.

22        176.    Dexon's ████████████████████████████ alleged further above, are

23  and have been knowing and willful.  As a direct and proximate result of its unlawful conduct,

24  Dexon has realized unjust profits, gains and advantages at the expense of Cisco, including as set

25  forth above.  In addition, Cisco has suffered substantial loss and damages to its property and

26  business, including significant monetary damages as a direct and proximate result of Dexon's

27  unlawful conduct, including as set forth above.  The harm caused by Dexon's unlawful conduct

28  entitles Cisco to recovery of all available remedies under the law, including but not limited to

1    actual damages, infringers' profits, statutory damages (if elected), reasonable attorney fees, costs,

2    and prejudgment interest.

3

4                              **SIXTH CLAIM FOR RELIEF**
                        **Trafficking In Counterfeit and/or Illicit Labels**
5                               **(18 U.S.C. § 2318)**

6         177.    Cisco incorporates each of the foregoing paragraphs of this Complaint as if fully set

7    forth herein.

8         178.    18 U.S.C. § 2318 provides in pertinent part that it is a federal crime for persons to

9    knowingly traffic in counterfeit or illicit labels, documentation, or packaging accompanying or

10   designed to accompany a copy of a computer program.  Any copyright owner who is injured, or is

11   threatened with injury, by a violation of 18 U.S.C. § 2318(a) may bring a civil action.

12        179.    Cisco's Software License Claim Certificates, commonly referred to as PAKs, are

13   designed to accompany genuine copies of Cisco software, identifying that the End User has a valid

14   software license authorized by Cisco.  As such, Cisco's PAKs constitute labels and/or

15   documentation within the meaning of 18 U.S.C. § 2318.  As alleged in more detail above, Dexon

16   has trafficked in counterfeit and/or illicit "Cisco" branded PAKs.

17        180.    As further alleged above, Dexon is willfully and knowingly trafficking in

18   counterfeit and/or illicit labels, documentation, or packaging accompanying or designed to

19   accompany a copy of a computer program, including but not limited to because Dexon is aware

20   through Cisco's software licensing terms that all of its software license sales are illicit and

21   unauthorized, that it has procured, and continued to procure, void cut-rate software licenses ███

22   ████████████████████████████████ and because Cisco has previously informed

23   Dexon of the infringing nature of these "Cisco" branded software license sales.

24        181.    Dexon's acts in the commission of the above unlawful conduct used or intended to

25   use interstate and/or foreign commerce.  Further, the Cisco software license keys must accompany

26   the delivery of Cisco software, as without the license key the Cisco software will not operate.

27        182.    Dexon's aforesaid conduct is causing immediate and irreparable injury to Cisco and

28   to Cisco's goodwill, and will continue to damage Cisco unless enjoined by this Court.  Cisco has

no adequate remedy at law.  Cisco is entitled to an injunction restraining Dexon from engaging in any further such acts in violation of 18 U.S.C. § 2318.  Unless Dexon is enjoined and prohibited from such conduct, and unless all illicit and/or counterfeit labels and documentation, including but not limited to all counterfeit software license claim certificates and all pirated/stolen software license keys, are seized and impounded pursuant to 18 U.S.C. § 2318, Dexon will continue to traffic in such illicit and/or counterfeit labels.

183.    As a direct and proximate result of their unlawful conduct in violation of 18 U.S.C. § 2318, Dexon has realized unjust profits, gains and advantages at the expense of Cisco, including as set forth above.  In addition, Cisco has suffered substantial loss and damages to its property and business, including significant monetary damages as a direct and proximate result of Dexon's unlawful conduct, including as set forth above.  The harm caused by Dexon's unlawful conduct entitles Cisco to recovery of all available remedies under the law, including but not limited to actual damages, infringers' profits, statutory damages (if elected), reasonable attorney fees, costs, and prejudgment interest.

### SEVENTH CLAIM FOR RELIEF
### Common Law Fraud

184.    ██████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████

i.    ████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████



1    v.    ██████████████████████████████████

2          ████████████████████████████████████

3          ███████████████████████████████████

4          ███████████████████████████████████

5          ████████████████████

6    vi.   ████████████████████████████████████

7          ████████████████████████████████████

8          ████████████████████████████████████

9          ██████████████████

10   vii.  ██████████████████████████████████

11         ███████████████████████████████████

12         ██████████

13   viii. Later in 2019, Cisco removed Dexon employees' ability to request service from the

14         Technical Assistance Center.  ██████████████████████

15         ██████████████████████████████████████████

16         ██████████████████████████████████████████

17         ████████████████████████████████████████

18         ████████████████████████████████████████

19         ██████████████████████████████████████

20         ████████████████████████████████████████

21         ████████████████

22   185.  Dexon also defrauds Cisco when it sells End Users invalid SMARTNet contracts,

23   and those customers call on Cisco to enforce those invalid contacts.  ██████████████

24   ██████████████████████████████████████████████████

25   ██████████████████████████████████████████  Examples

26   include the following:

27   i.    ████████████████████████████████████

28         ██████████████  When the customer contacted Cisco's Technical Assistance

Center about the failed products, Cisco employees replaced them in reliance on the customer's SMARTNet contract, which the employees unwittingly believed was legitimate.  However, Cisco engineers examined these products and determined that they were counterfeit. ████████████████████n, Cisco replaced costly networking equipment that had no warranty entitlement.

ii.    ████████████████████████████████████████████

████    When the customer contacted Cisco's Technical Assistance Center about the failed switch, Cisco employees replaced it in reliance on the customer's invalid SMARTNet contract, which the employees unwittingly believed was legitimate. However, Cisco engineers subsequently reviewed console readout information from the switch and determined that it was counterfeit. ██████████████ ██████ Cisco shipped costly networking equipment to replace counterfeit networking equipment that was not entitled to be covered under a warranty or a SMARTNet service contract.

186.    Cisco relied ███████████████████████████████████████ ████████████████████████████████ when processing service requests ████████████ customers.

187.    ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████

188.    Cisco is harmed by Dexon's misrepresentations.  Cisco is forced to spend hundreds of hours tracing the provenance of products for which Dexon or its customers seek replacement under a warranty or under a SMARTNet contract.  Cisco is also harmed because it provides low- or no-cost replacements to ████████ customers for products that are counterfeit or are not under a valid service contract or warranty.

58

**EIGHTH CLAIM FOR RELIEF**
**Inducing Breach of Contract**
**(Common Law)**

189.     Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

190.     Cisco has contracts and business relationships with its Authorized Partners, providing these Partners the contractual right to sell genuine, authorized Cisco products and SMARTNet contracts to End Users.

191.     Under the terms of Cisco's ICPA, and other reseller agreements, Cisco's Authorized Resellers are contractually required to sell Cisco products and service contracts only to End Users.  Dexon is aware of these contractual obligations.

192.     At all relevant times, Dexon knew or should have known that its SMARTNet Suppliers and certain of its Cisco hardware suppliers were Cisco Authorized Partners.

193.     At all relevant times, Dexon knew or should have known that its SMARTNet Suppliers and its Authorized Partner suppliers were dealing with Dexon in violation of their contracts with Cisco.

194.     Dexon acted with a wrongful purpose by acquiring Cisco products and services from the Authorized Partners for the purpose of resale, in violation of the Partners' ICPA and other contracts with Cisco.

195.     195.     Dexon's acquisition of Cisco products and services from Authorized Partners for purposes of resale have disrupted Cisco's contractual relationships, because Dexon's unauthorized sales displace legitimate sales by Cisco's Authorized Resellers.

196.     As a direct and proximate result of Dexon's intentional inducements of breaches of the ICPA and other contracts with Cisco, Cisco has suffered and will continue to suffer direct, consequential and other damages, including but not limited to, out-of-pocket expenses related to services provided on unauthorized Cisco products, in an amount to be determined at trial.

**NINTH CLAIM FOR RELIEF**
**California Unfair Business Practices**
**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**

197.    Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

198.    California Business and Professions Code §§ 17200 et seq. prohibits acts of unfair or unlawful business practices, which includes unfair competition.

199.    Dexon has knowingly, willfully, and unlawfully infringed the Cisco Marks, including through the sale of infringing Cisco hardware and software products in violation of the Lanham Act, 15 U.S.C. § 1114.  By this conduct, Dexon also engaged in unfair competition by depriving Cisco of sales through its trafficking in cheaper counterfeit products that were misrepresented by Dexon to be genuine.

200.    As a direct, proximate, and foreseeable result of Dexon's sale of infringing Cisco networking hardware parts, Cisco has further been deprived of lost revenue and payments, and has therefore sustained injury in fact.

201.    Dexon has knowingly, willfully, and unlawfully sold invalid Cisco licenses by misrepresenting that those licenses are valid, when in fact they are not.  Dexon's conduct deprived Cisco of revenues that it would have earned had the licenses been validly purchased from Cisco or from an authorized source.  Thus, as a direct, proximate, and foreseeable result of Dexon's sale of invalid Cisco licenses, Cisco has suffered injury in fact.

202.    Dexon has also knowingly, willfully, and unlawfully induced Cisco's Authorized Resellers to breach their contracts with Cisco by selling Cisco products and support coverage to Dexon.  By this conduct, Dexon engaged in unfair competition by depriving Cisco of sales of underlying products through authorized channels.  Thus, as a direct, proximate, and foreseeable result, Cisco has suffered injury in fact.

203.    Dexon has also knowingly, willfully, and unlawfully ██████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

1   ███████████████  By this conduct, Dexon engaged in unfair competition by depriving

2   Cisco of sales of underlying products through authorized channels and damages Cisco's good will

3   with its customer.  Thus, as a direct, proximate, and foreseeable result, Cisco has suffered injury in

4   fact.

5         204.    Dexon has also knowingly, willfully, and unlawfully ████████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████

8   ████████  By this conduct, Dexon engaged in unfair competition by causing Cisco to lose

9   valuable equipment which is "exchanged" for counterfeit product.  Thus, as a direct, proximate,

10  and foreseeable result, Cisco has suffered injury in fact.

11        205.    Dexon's practices were unlawful, and constitute unfair competition as defined by

12  Cal. Bus. & Prof. C. §§ 17200 et seq.  Dexon's misconduct was unlawful because, as described

13  herein, its misconduct constitutes violations of numerous state and federal statutes, including but

14  not limited to Cal. Civ. Code § 1797.81, state false advertising laws such as Cal. Bus. Prof. Code §

15  17500, as well as the Lanham Act, 15 U.S.C. §§ 1114 and 1125, and the Federal Trade

16  Commission Act, 15 U.S.C. § 45.  Further, their alleged conduct was unfair in that Dexon's

17  actions, as described herein, significantly threatened and/or harmed competition through

18  infringement, counterfeiting, and false advertising.

19        206.    As a direct and proximate result of Dexon's unlawful and unfair business practices,

20  Cisco has lost money and property, and has suffered irreparable injury to its brand, business

21  reputation, and goodwill.  As such, Cisco's remedy at law is not adequate to compensate for the

22  injuries inflicted by Dexon.  Accordingly, Cisco is entitled to temporary, preliminary, and

23  permanent injunctive relief against Dexon, in addition to restitution in an amount to be proven at

24  trial.

25

26

27

28

**TENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Common Law)**

207.    Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

208.    Dexon unjustly received benefits at the expense of Cisco through its wrongful conduct, as alleged further above. Dexon continues to unjustly retain these benefits at the expense of Cisco.  The unjust receipt of the benefits obtained by Dexon lacks any adequate legal basis and thus cannot conscientiously be retained by Dexon.  Therefore, the circumstances of the receipt and retention of such benefits are such that, as between Cisco and Dexon, it is unjust for Dexon to retain any such benefits.

209.    Cisco is therefore entitled to full restitution of all amounts and/or other benefits in which Dexon has been unjustly enriched at Cisco's expense, in an amount to be proven at trial.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## PRAYER FOR RELIEF

WHEREFORE Cisco respectfully prays for the following relief:

A.      For entry of judgment in favor of Cisco and against Dexon on each of Cisco's claims for relief alleged in this Complaint;

B.      For a preliminary and permanent injunction restraining Dexon; their officers, agents, servants, employees, attorneys, and affiliated companies; assigns and successors in interest; and those persons in active concert or participation with them, from:

(i) importing, exporting, assisting in the importation or exportation, manufacturing, procuring, distributing, shipping, retailing, selling, offering for sale, marketing, advertising, or trafficking in any products not authorized by Cisco and bearing unauthorized simulations, reproductions, counterfeits, copies, or colorable imitations of the Cisco Marks which are likely to cause confusion, or bearing a design that is of a substantially similar appearance to the Cisco Marks listed in this Complaint;

(ii) From passing off, inducing, or enabling others to sell or pass off as authentic products produced by Cisco or otherwise authorized by Cisco, any product not manufactured by Cisco or produced under the control or supervision of Cisco and approved by Cisco, which uses any of the Cisco Marks listed in this Complaint; and

(iii) From committing any act calculated to cause purchasers to believe that products from Dexon are those sold under the control and supervision of Cisco, or are sponsored, approved, or guaranteed by Cisco, or are connected with and produced under the control or supervision of Cisco;

C.      For a determination that Dexon's acts of trademark infringement constitute cases of willful and exceptional infringement;

D.      For actual damages as a result of Dexon's unlawful conduct, alleged above, as well as any profits that are attributable to the alleged conduct and are not taken into account in computing Cisco's actual damages;

E.      For maximum statutory damages available under the law to the extent Cisco elects statutory damages for any claim for relief;

1     F.      For punitive damages to the fullest extent available under the law;

2     G.     For reasonable attorneys' fees to the fullest extent available under the law;

3     H.     For treble and/or enhanced damages to the fullest extent available under the law;

4     I.      For full restitution, including restoration of all property unlawfully taken from

5 Cisco, as well as any ill-gotten gains from the unauthorized resale of Cisco's property;

6     J.      For prejudgment interest and the costs of prosecuting these claims to the fullest

7 extent available under the law;

8     K.     For any additional injunctive, specific performance, and/or other provisional

9 remedies, as appropriate; and,

10     L.     For such other and further relief as the Court deems just and proper.

11

12 DATED:  April 14, 2023         Respectfully submitted,

13                   SIDEMAN & BANCROFT LLP

14

15               By:   _/s/ Richard J. Nelson_

16                   Richard J. Nelson

                       Attorneys for Plaintiffs

17                   Cisco Systems, Inc. and Cisco Technology, Inc.

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Pursuant to Civ. L.R. 3-6 and Fed. R. Civ. Proc. 38, Plaintiffs Cisco Systems, Inc. and
Cisco Technology, Inc.  hereby demand a trial by a jury on all issues herein so triable.

DATED:  April 14, 2023                    SIDEMAN & BANCROFT LLP


By:   /s/ *Richard J. Nelson*
        Richard J. Nelson
        Attorneys for Plaintiffs
        Cisco Systems, Inc. and Cisco Technology, Inc.

# EXHIBIT A
# TO THE SECOND AMENDED COMPLAINT



### INDIRECT CHANNEL PARTNER AGREEMENT

**To register as an Indirect Channel Partner with Cisco, your company must accept the terms and conditions of this Indirect Channel Partner Agreement (the "Agreement"). This Agreement applies to all "Registered Partners", as defined in Part A below.**

This Agreement is entered into by and between the company you identified in the applicable Partner Registration Application ("**Registered Partner**") and Cisco. For purposes of this Agreement, Cisco is defined as follows:

- If Registered Partner's principal place of business is located in Canada, "**Cisco**" is defined as Cisco Systems Canada Co., a Canadian corporation having its principal place of business at 88 Queens Quay West, Suite 2900, Toronto, Ontario, M5J 0B8, Canada.

- If Registered Partner's principal place of business is located in China (excluding Hong Kong, Macau and Taiwan), for innovative businesses categories offered by Cisco (China) Innovation Technology co., Ltd., "**Cisco**" is defined as Cisco (China) Innovation Technology Co., Ltd., a company organized and existing under the laws of China having its registered address at Room 303, No. 79, Wan Bo Er Road, Nan Cun town, Panyu District, Guangzhou, Guangdong Province, China. If Registered Partner's principal place of business is located in China (excluding Hong Kong, Macau and Taiwan), for Products and Services offered by Cisco China Company, Limited, "**Cisco**" is defined as Cisco China Company, Limited, having its principal place of Building No.3, 19 and 20 Floor, Wangjiang International Center, Shangcheng District, Hangzhou City, China.

- If Registered Partner's principal place of business is located in Japan, "**Cisco**" is defined as Cisco Systems G.K., a Japanese corporation having its principal place of business at 9-7-1, Akasaka, Minato-ku, Tokyo 107-6227, Japan.

- If Registered Partner's principal place of business is located in Latin America (excluding Brazil) or the Caribbean or the United States of America (the "**United States**"), "**Cisco**" is defined as Cisco Systems, Inc., a California corporation having its principal place of business at 170 West Tasman Drive, San Jose, California 95134, United States.

- If Registered Partner's principal place of business is located in Brazil, for Products and Services offered by Cisco Systems, Inc. in the Territory, "**Cisco**" is defined as Cisco Systems, Inc., a California corporation having its principal place of business at 170 West Tasman Drive, San Jose, California 95134, United States. If Registered Partner's principal place of business is located in Brazil, for Products and Services offered by Cisco Comércio e Serviços de Hardware e Software do Brasil Ltda. in the Territory, "**Cisco**" is defined as Cisco Comércio e Serviços de Hardware e Software do Brasil Ltda., a limited liability company organized under the laws of Brazil having its principal place of business at CENU – West Tower, 2nd Floor, Suite 1, Av. das Nações Unidas 12901, Brooklin Novo, São Paulo – SP, Brazil, 04578-000.

- If Registered Partner's principal place of business is located in India, "**Cisco**" is defined as Cisco Commerce India Private Limited., a company incorporated under the provisions of the companies Act, 1956 and having its registered office at Prestige Solitaire, Level-II, No. 6, Brunton Road, Bangalore, 560001, Karnataka, India.

- If Registered Partner's principal place of business is located in the Netherlands, "**Cisco**" is defined as Cisco Systems International B.V., a corporation organized under the laws of the Netherlands having its principal place of business at Haarlerbergpark, Haarlerbergweg 13-19, 1101 CH, Amsterdam, the Netherlands.

- If Registered Partner's principal place of business is located in Israel, the Asia Pacific region

(excluding Australia, China, India, Republic of Korea, and Japan), or the Middle East, Africa, Central and Eastern Europe (excluding Switzerland, the Netherlands, the Russian Federation and the member states of the European Economic Area), "**Cisco**" is defined as Cisco International Limited, a company organized under the laws of the United Kingdom, having its principal place of business at 9-11 New Square Park, Bedfont Lakes, Feltham, England TW14 8HA, United Kingdom.

•    If Registered Partner's principal place of business is located in Korea, "Cisco" is defined as Cisco Systems (Korea) Ltd., a corporation organized under the laws of Korea and having its principal place of business located at 5th Floor, 517 Yeongdong-daero (Samsung-dong), Gangnam-gu, Seoul, Republic of Korea.

This Agreement shall become effective as of the date that Cisco accepts the registration via email to the Registered Partner (the "**Effective Date**").

If Cisco and Registered Partner (together, the "**Parties**") have a Direct Resale Agreement (as defined below) that is in effect as of the day Registered Partner submits this Agreement, or if the Parties subsequently execute a Direct Resale Agreement, to the extent that such Direct Resale Agreement conflicts with this Agreement, the conflicting terms and conditions of the Direct Resale Agreement shall take precedence for the term of the Direct Resale Agreement. If no Direct Resale Agreement exists, this Agreement comprises the complete agreement between the Parties concerning the subject matter herein and replaces any prior oral or written communications between the Parties, all of which are excluded. There are no other conditions, understandings, agreements, representations, or warranties, expressed or implied, which are not specified herein. This Agreement may only be modified by a written document executed by Cisco and Registered Partner, subject to Part B22.5 (Enforceability) below.

***Part A. Definitions.***

1.    **Added Value** is the non-Cisco component or portion of the total solution which Registered Partner provides to End Users. Examples of Added Value are pre- and post-sales network design, configuration, trouble-shooting, managed services, cloud services, and support and the sale of complementary products and services that comprise a significant portion of the total revenues received by Registered Partner from an End User of Cisco Products. Registered Partner acknowledges that providing financing options and/or network services (unless such network services comprise managed and/or cloud services) to End Users does not constitute Added Value.

2.    **Authorized Source** means a distributor that is authorized by Cisco to redistribute Products and Services within the Territory (or within another country of Cisco's choice, in the event that no Cisco authorized distributor exists within the Territory) to Registered Partner, as they are from time to time identified at https://www.disticompass.com/user/Distributor/Locator or as otherwise provided by Cisco from time to time. If Registered Partner is a Cisco Learning Partner, **Authorized Source** means a Cisco authorized Learning Partner source, such as Gilmore Global Logistic Services. If Registered Partner enters into this Agreement as a Learning Partner, it is for the sole purpose of purchasing and distributing Cisco's Collaborative Knowledge Product.

3.    **Cisco-Branded** means Products or Services bearing a valid Cisco trademark or service mark.

4.    **Country Group** means then-current list of single countries and groups of countries as defined at https://www.cisco.com/go/countrygroups/.

5.    **Direct Resale Agreement** means Cisco's System Integrator Agreement, Two-Tier Distributor Agreement or any substantially similar Cisco contract with a different title that authorizes Registered Partner to purchase Products and Services directly from Cisco and Resell them to End Users either directly or indirectly. "Direct Resale Agreement" does not include the Internet Commerce Agreement.

6. **End User** is the final purchaser or licensee that: (i) has acquired Product, managed services, and/or Services for its own Internal Use and not for Resale, remarketing or distribution, and (ii) is identified as such purchaser or licensee by Registered Partner pursuant to Part B.3.1 below.

7. **End User Obligations** means the compliance obligations of End Users when purchasing Services in addition to End User responsibilities set out in the applicable Services Descriptions. The End User Obligations are posted at http://www.cisco.com/go/servicedescriptions.

8. **Internal Use** is any business use of a Product for an End User's or Registered Partner's own internal use; it is to be distinguished from the definition of Resale provided below. For clarification purposes, "internal use" does *not* mean the use of a Product or Service by Registered Partner for the purpose of providing managed or cloud services to an End User.

9. **Marks** means the Cisco Registered Partner logo, the Cisco Certified Partner marks for which Registered Partner qualifies and has been approved by Cisco, and any other Cisco program or certification mark for which Registered Partner qualifies and has been approved by Cisco. "Marks" expressly excludes any other Cisco trademark, service mark, name, or logo. The Marks and the applicable qualification requirements are delineated at Cisco's web site: http://www.cisco.com/go/partnerlogos.

10. **Non-Genuine Products** are any and all products: (i) to which a Mark or other Cisco trademark or service mark has been affixed without Cisco's express written consent; (ii) that have not been manufactured by Cisco or Cisco Technologies, Inc. ("**CTI**") or by a licensed manufacturer of either Cisco or CTI in accordance with the applicable license; (iii) are produced with the intent to counterfeit or imitate a genuine Cisco Product, or (iv) Products where any form of copyright notice, trademark, logo, confidentiality notice, serial number or other product identifier have been removed, altered, or destroyed.

11. **Products** means the Cisco hardware products, Software, and related documentation which Cisco makes available to Registered Partner through an Authorized Source for Resale (or, in the case of Software, license grant to use such Software).

12. **Professional Services** means any pre- or post-sale services performed by Registered Partner for an End User, excluding training on Cisco Products, which provides Added Value for Cisco Products. Such services include without limitation pre- and post-sales network design, configuration, troubleshooting, management (remote/virtual or on premise), and support on Cisco Products.

13. **Professional Service Providers** are Registered Partners that wish to provide their own pre- and/or post-sales Professional Services to End Users.

14. **Registered Partner** means Professional Service Providers and/or Resellers (including managed services / cloud providers) that have registered using the Cisco Partner Registration Tool and accepted the terms and conditions of this Indirect Channel Partner Agreement.

15. **Resale** includes any of the following sales or dispositions of a Product or Service:

    (a) transfer of title (or, for Software, a license conferring the right to use the Software, and, for Services, the entitlement to receive such Services) to the End User of such Product or Service;

    (b) transfer of title (or, for Software, a license conferring the right to use the Software, and, for Services, the entitlement to receive such Services) to a financial intermediary such as a leasing company, even if such leasing company is affiliated with Registered Partner, where the Product or Service is used by an unaffiliated End User; or

    (c) retention of title (or, for Software, a license conferring the right to use the Software, and, for Services, the entitlement to receive such Services) by the Registered Partner, but only where the Product or Service is deployed to facilitate the provision by the Registered Partner of hosting, outsourcing, managed services, cloud services, or any other provisioned services for the use of

End Users who are not affiliated with the Registered Partner and who contract with the Registered Partner for the provision of such services.

In no event shall the term Resale include use of a Product or Service for the provision of network services to the general public. The verb "**Resell**" means to engage in Resale. For clarification purposes, use of a Product or Service by Registered Partner for the purpose of providing managed or cloud services to an End User does not constitute network services.

16. **Reseller** is a Registered Partner that purchases and/or licenses Services and Products from an Authorized Source and Resells them directly to End Users.

17. **Services** means one or more of the Cisco Branded Services and Collaborative Services made available under the Cisco Services Partner Program ("Program"), further described in Attachment A to this Agreement.

18. **Service Description** means the description of Services, as of the purchase date of such Services, to be made available by Cisco, and the terms and conditions under which those Services are provided. Each available Service has its own Service Description, which can be found at http://www.cisco.com/go/cspp/.

19. **Software** is the machine-readable (object code) version of computer programs developed or marketed by Cisco, including firmware and any related documentation.

20. **Territory** means the country identified by Registered Partner in the applicable Partner Registration Application accepted by Cisco. If that country resides within a Country Group, the Registered Partner's Territory shall include all countries within the associated Country Group.

21. **Unauthorized Cisco Product** means any genuine Cisco Product or Cisco Service that has been purchased or acquired, either directly or indirectly, from any party other than Cisco and/or an Authorized Source or sold to any party other than an End User. Unauthorized Cisco Products do not include Non-Genuine Products.

***Part B. Registered Partner Terms and Conditions.***

1. **Cisco Authorization and Resale Rules.**

   1.1   <u>Cisco Authorization.</u> Subject to the terms and conditions set forth in this Agreement, and during this Agreement's term, as set forth below, Cisco authorizes Registered Partner to purchase and/or license Services and Products only from an Authorized Source, and to Resell and/or redistribute such Services and Products directly to End Users within the Territory. "Within the Territory" means that End Users must deploy the Products and/or receive the Services within the Territory.To assist Registered Partner in its sales and marketing efforts, Registered Partner may also purchase and/or license Services and Products for its purchases of demonstration, evaluation, and lab equipment. Registered Partner may only use such Services and Products for demonstration, evaluation, or lab purposes. Except to the extent permitted by Applicable Law, any Software received with or for such Products may not be distributed further, and, notwithstanding any other provision of this Agreement, all Software for such Products is licensed to Registered Partner solely for its use for demonstration, evaluation, or lab purposes.

   1.2   <u>No Resale Outside the Territory.</u> Registered Partner agrees not to solicit Product or Service orders, engage salespersons, Resell, or establish warehouses or other distribution centers outside of the Territory. For purposes of clarification, Cisco considers the following to be soliciting Product or Service orders outside of the Territory in violation of the Agreement, except as expressly authorized by Cisco in writing in advance: where Registered Partner solicits for Resale or Resells Cisco Product or Services to an End User that is located outside the Territory and otherwise has no meaningful operations in the Territory, even if delivery of the Cisco Product or Service occurs in the Territory.

1.3     Sales to End Users. Registered Partner certifies that it is acquiring the Products and
        Services solely for Resale to End Users, in accordance with this Agreement. Registered
        Partner will not Resell, license, sublicense or distribute Products or Services to other
        Registered Partners of Cisco Products or Services, whether or not such other Registered
        Partners are authorized by Cisco or by any other source to Resell or license Products or
        Services. Notwithstanding the above provisions of this Part B.1.3, Registered Partner may
        Resell Products or Services to any other Cisco-authorized Registered Partner of Cisco
        Products or Services in the Territory, provided that such other Registered Partner is
        purchasing and using such Products or Services strictly as an End User and strictly for its
        Internal Use in the Territory.

        Registered Partner certifies that it will not misrepresent service coverage to End Users by
        selling Services to End Users without purchasing service contract coverage for those specified
        items from an Authorized Source.

        Registered Partner further acknowledges that destroyed, stolen, altered or damaged Products
        are not entitled to Services, as more fully set forth in Cisco's published non- entitlement
        policies at http://www.cisco.com/go/warranty, which are expressly incorporated into this
        Agreement.
        Altered products include any modification to the product serial number, MAC address, or
        components.

1.4   Non-Genuine Products or Unauthorized Cisco Products. Registered Partner may not purchase
        or Resell Non-Genuine Products or Unauthorized Cisco Products or Resell Services
        associated with any Non-Genuine Products or Unauthorized Cisco Products.

        If Cisco determines that Registered Partner has Resold and/or redistributed Unauthorized
        Cisco Products, then Cisco may, at Cisco's sole discretion: (a) audit Registered Partner's
        purchase and Resale records of Cisco Product and relevant records pursuant to Part B.22.6
        and/or (b) invoice Registered Partner for all reasonable costs incurred by Cisco in its
        performance of the Audit and/or (c) suspend shipments to Registered Partner.

        For all Unauthorized or altered Cisco Products, Cisco reserves the right to deny or withhold
        any Services on such Products, per the non-entitlement policies referenced above.

1.5     Renewal of Services.

        (a)   Sixty (60) Days Prior to Service Contract Expiration Date:   At least sixty (60) days
              prior to the expiration date of a Service contract, Cisco, or its authorized agents,
              may send Service contract renewal reminder notices to Registered Partner and/or
              the identified End User, and Registered Partner will either: (i) initiate the Service
              contract renewal process with the End User and forward to Cisco the completed
              service contract renewal with a valid purchase order; or (ii) notify Cisco in writing
              of Registered Partner's intent to not renew the Services.

        (b)   At the Service Contract Expiration Date: If, upon the expiration date of the Service
              contract, Registered Partner has not renewed the Services, Cisco or its authorized
              agents, may contact the End User to arrange for the renewal of such Services with
              Cisco directly or via another Cisco-authorized Registered Partner.

1.6   Unsupported Products. If Registered Partner elects not to Resell Services at the time of Product
        purchase or if Product becomes unsupported due for whatever reason at some point
        subsequent to initial deployment, Registered Partner shall refer End User information,
        including but not limited to End User name, address and phone number to Cisco within
        ninety (90) days of Product becoming unsupported and authorizes Cisco to contact the End
        User for the express purpose of contracting directly for support services for the unsupported
        Product identified by Registered Partner.

2.   **Added Value Requirement.** Each time a Registered Partner Resells Services or Products to an End User, Registered Partner will include its Added Value. Registered Partner must be able to demonstrate Products to prospective End Users at the End User's location and make Professional Services available for each Product Resold by Registered Partner.

3.   **Registered Partner Obligations.**

3.1   <u>Point of Sale Reports.</u>   Registered Partner shall identify the complete name and address of each End User in the applicable Product purchase order issued to the Authorized Source. Additionally, Registered Partner shall identify the complete name and address of each End User in writing within five (5) days of receiving any request from Cisco or the Authorized Source. Registered Partner acknowledges that its provisioning to Cisco of adequate End User information is critical in order for Cisco to provide any applicable warranty and/or other service support, and to verify End User's entitlement to same. Registered Partner's material and unexcused failure to timely provide such End User information may be grounds for Cisco's termination of this Agreement prior to its expiration. Additionally, Registered Partner must comply with any other point of sale reporting requirements published by Cisco from time to time, and/or the Authorized Source(s) from which such Registered Partner purchases and/or licenses Services and Products.

3.2   <u>Agreements with an Authorized Source.</u> Registered Partner acknowledges that each Authorized Source may require Registered Partner to enter into other agreement/s with an Authorized Source. Registered Partner acknowledges and accepts that each Authorized Source is an independent party who is not empowered to act on behalf of Cisco or bind or represent Cisco in any manner. Therefore, such agreement/s will be considered executed only between Registered Partner and each Authorized Source with which Registered Partner has entered into such agreements, except to the extent that such agreements specifically identify Cisco as a third party beneficiary of such agreements. For the avoidance of doubt, this Agreement shall not constitute a sale, purchase or distribution agreement with Cisco. Any arrangements between the Registered Partner and an Authorized Source with respect to the sale, purchase or distribution of Cisco Products and/or Services will need to be defined in separate, specific agreements between Registered Partner and each Authorized Source selected by Registered Partner.

3.3   <u>Additional Requirements.</u> Registered Partner acknowledges that Cisco may require Registered Partner to achieve particular requirements, for example particular specializations, certifications, or training requirements, before permitting any Authorized Source to make available particular Products or Services to Registered Partner. Cisco may require on-going fulfillment of some or all of the requirements to retain the right to purchase, license, Resell or support such Products and Services. Information is available regarding such requirements on the Cisco Channel Partner Program website, located at http://www.cisco.com/go/channelprograms.

Cisco reserves the right, during the term of this Agreement, to license and distribute additional items of Software. Such items of Software may be licensed under additional or different policies and license terms, which will be made available to Registered Partner at the time such items of Software are provided to Registered Partner. Also, Registered Partner acknowledges that Resale of Products and Services to particular End Users with which Cisco has contracted directly (for example, state governments) may require Registered Partner to satisfy additional requirements and to enter into supplemental agreements with Cisco.

3.4   <u>No Stocking of Product</u>. Registered Partner may not stock Products, and may not order Products without a valid End User purchase order. This Part B.3.4 does not apply to Registered Partners in Japan.

3.5   <u>Due Diligence</u>. Registered Partner must complete any due diligence or other questionnaire provided by Cisco and must comply with such other due diligence or other compliance requirements requested by Cisco in writing.

3.6     <u>Maintenance of Minimum Eligibility Requirements</u>. Registered Partner must meet and continue at all times to meet the following eligibility requirements:

3.6.1   <u>Existing Cisco User ID</u>:  Registered Partner must have at least one existing Cisco User ID, which will be used to initiate Registered Partner's application for this Agreement. The individual associated to this Cisco User ID must be authorized to sign a legally binding document on behalf of Registered Partner's legal entity. A Cisco User ID can be obtained by going to https://id.cisco.com/signin/register

3.6.2   <u>Existing Cisco Authorized Distributor Account and Viability</u>: Registered Partner must have at least one existing and active customer account relationship with a Cisco Authorized Distributor. This Distributor must be physically located or authorized to sell in the country or sales territory where Registered Partner is registering with Cisco. Registered Partner must provide Cisco with all Authorized Distributor(s) and customer account number(s) to validate its intent and ability to purchase and resell though Cisco's Authorized Distribution channel.

3.6.2.1   At time of new Partner registration, Registered Partner must choose and designate a Cisco Authorized Distributor, who will be responsible for engaging with Registered Partner for on-boarding and training purposes. Registered Partner may purchase Products and Services from any Cisco Authorized Source (or Authorized Channel), but must designate an initial distributor for these training purposes.

3.6.2.2   If Registered Partner is approved as a Cisco Registered Partner, Registered Partner must update and maintain its Distributor account information within its Partner profile account at Cisco by using the Cisco Partner Self Service (PSS) or other Cisco-provided Partner Account management tool. Registered Partner may be restricted from purchasing through a Distributor if the information is not provided at the time of registration or is not updated and maintained in the Partner Account profile information at Cisco.

3.6.2.3   If Registered Partner does not have a current account relationship with a Cisco Authorized Distributor, Registered Partner may use the Cisco Authorized Distributor Locator, located at https://www.disticompass.com/user/Distributor/Locator, to contact a Cisco Distributor  that will best  service its business needs.

3.6.3   <u>Release of Information</u>: By submitting the Partner registration application and accepting the terms of this Agreement, Registered Partner authorizes the release of its information, including its customer Account Number(s) at the Distributor, Reseller name, and contact information to Cisco and Cisco- authorized third parties, including Cisco Authorized Distributors, to validate Registered Partner's intent and ability to resell and to initiate new partner onboarding, training, and sales engagement. Registered Partner also indemnifies and holds Cisco and its authorized third parties and Cisco Authorized Distributors harmless for any claim or judicial action whatsoever resulting from the use of such information.

3.6.4   <u>Physical Address in Country</u>: Registered Partner must have at least one physical location within the Country Group in which it is applying for Cisco Partner Registration. The physical location must be Registered Partner's actual business location and not a rented mailbox, a private residence, virtual office, third party location or a commercial logistics supplier. If approved as a Registered Partner, Registered Partner must list at least one physical location in Cisco's Partner Locator tool.

3.6.5   <u>Business Email Address</u>: Registered Partner must provide a business email address as its primary email address during registration. A business email address does not mean a public domain email address, such as yahoo.com or gmail.com.

3.6.6    Phone Number: Registered Partner must provide and maintain with Cisco, a valid phone number where Registered Partner can be contacted by Cisco.

3.6.7    Company Web Address: Registered Partner must provide and maintain a valid web address for itself.

4.    **Government Sales.**

4.1    For Government Sales in which Registered Partner's Territory does not include the United States:

4.1.1    Schedule Contracts. Registered Partner shall not, without the express prior written consent of Cisco, distribute or sell, either directly or indirectly, any Products to any agencies, departments or entities (whether or not within the Territory) which either form part of, or are subject to the procurement requirements of, the federal government or any state or municipal government of any of the United States of America (including, for example, but without limitation, embassies, military bases, etc.).

4.1.2    Government Terms. Cisco does not accept any government flow-down provisions, whether for Resale or Internal Use. Further, Cisco will not provide any governmentrequired representations or certifications to Registered Partner or any of Registered Partner's End Users.

Notwithstanding the foregoing, Registered Partner may Resell Products and Services to federal, state, provincial and local governments within the Territory, subject to this Agreement and the applicable Cisco qualification and eligibility requirements, including Cisco's aforementioned disclaimers of supply representations or government flow-downs.

4.2    For Government Sales in which Registered Partner's Territory does include the United States:

4.2.1    Schedule Contracts. With respect to US General Services Administration ("**GSA**"), California Multiple Award Schedule ("**CMAS**"), and other schedule contracts, Registered Partner is prohibited from placing Cisco Products and Services on Registered Partner's GSA, CMAS, or any other schedule contract(s) without the express written approval from an authorized representative of Cisco's Federal Channels organization.

4.2.2    Government Terms. Cisco does not accept any government flow-down provisions, including but not limited to, the United States Government Federal Acquisition Regulations ("**FARs**") and its supplements, Defense FARs, or NASA FARs, whether for Resale or Internal Use. Further, Cisco will not provide any governmentrequired representations or certifications to Registered Partner or any of Registered Partner's End Users.

4.2.3    Registered Partner acknowledges that the Trade Agreements Act, 19 U.S.C. §2511 et seq., and its implementing regulations (collectively, the "**TAA**") limit the ability of the federal government to purchase items produced outside the United States and certain designated countries. Registered Partner acknowledges that not all Cisco items are produced in the United States or designated countries and that only certain items specifically identified by Cisco ("**Designated Country Items**") are certified as being produced in the United States or designated countries. If Registered Partner undertakes to sell items other than Designated Country Items to the federal government, Registered Partner accepts sole responsibility for ensuring that such sales may be made to the federal government.

    4.2.4    Notwithstanding the foregoing, Registered Partner may Resell Products and Services to the U.S. Federal Government within the Territory, subject to this Agreement and enrollment in and meeting the eligibility requirements of the Cisco U.S. Federal Authorization process managed by Cisco's authorized distributors. Registered Partner may contact one of Cisco's authorized distributors for more information on the process.

5.   **Pricing.**

    5.1    <u>Registered Partner Prices.</u> The prices Registered Partner pays for Services and Products will be set unilaterally by the Authorized Source from which Registered Partner purchases such Services and Products. Registered Partner is free to unilaterally determine its Resale prices.

    5.2    <u>Special Pricing.</u> Any commitment from Cisco to provide special pricing will only occur through the provision of an approved Deal ID. Unless you are notified in writing, including by email, of the Deal ID in relation to special pricing, then any other notification of pricing is indicative only, and is not binding upon Cisco.

6.   **Proprietary Rights and Software Licensing.**

    6.1    <u>Grant of Rights.</u> Subject to the terms and conditions set forth in this Agreement, Registered Partner's or End User's use or access to Software or SaaS is subject to Cisco's EULA and applicable End User terms (http://www.cisco.com/go/terms). In order to ensure that End User understands that use of the Product is subject to the applicable End User terms (http://www.cisco.com/go/terms), Registered Partner shall provide the applicable End User terms (http://www.cisco.com/go/terms) to each End User as part of the commercial transaction between Registered Partner and End User for the applicable Product, or otherwise prior to End User's access to or use of the Product.

    6.2    <u>Rights Reserved by Cisco.</u>  Except for the limited license provided to Registered Partner in the preceding Part B.6.1, Cisco reserves all right, title, and interest in and to each proprietary right embedded in or contained in any Product. Registered Partner acknowledges that it shall not sublicense (except as expressly authorized by Cisco in writing), copy Software or Documentation for the benefit of, or distribute any Software or Documentation to, any other person or entity, including, without limitation, other Registered Partners. No 'sale' of any Software is conveyed.

    6.3    <u>License Restrictions and Conditions.</u> Registered Partner will not remove, alter, or destroy any form of copyright notice, trademark, logo, or confidentiality notice provided with any Product. Registered Partner will not affix any other mark or name to any Product without Cisco's express written permission. Registered Partner agrees that it will not redistribute Software (including Software received as part of a Product) received from any source other than Cisco or an Authorized Source. Registered Partner will not translate, reverse compile or disassemble the Software, and will transfer to each End User to which Registered Partner Resells Products all applicable and then-in-effect EULA and end-user documentation provided by Cisco and accompanying such Products. Registered Partner shall notify Cisco promptly of any breach or suspected breach of the Cisco license terms or third party license and further agrees that it will, at Cisco's request, assist Cisco in efforts to preserve Cisco's or its supplier's intellectual property rights including pursuing an action against any breaching third parties.

    6.4    <u>Non-Cisco Products.</u> If Registered Partner chooses to order from Cisco non-Cisco branded products and/or services that are on the GPL and to be delivered in connection with this Agreement, then such third-party software and/or services along with related documentation shall be governed by the applicable third party's applicable license and

services/support terms. Registered Partner agrees that it shall enter with the third party into such appropriate agreements whose terms shall solely govern the purchase and delivery of these.

7. **Registered Partner Benefits.** Subject to Registered Partner's compliance with its obligations under this Agreement, Registered Partner shall be entitled to the following benefits:

7.1 <u>Cisco.com Access.</u> Registered Partner shall have partner-level access to the information and tools on the Cisco.com web site (previously referred to as "CCO"), provided Registered Partner's use of such information is subject to the terms and conditions of Cisco.com (including, without limitation, Cisco's software license terms associated with Registered Partner's downloading of any software from Cisco.com) and the Confidentiality obligations of this Agreement set forth in Part B.10 below;

7.2 <u>Partner Locator Listing.</u> Unless Registered Partner tells Cisco in writing that it may not do so, Cisco may include Registered Partner in the Cisco Partner Locator tool within the Cisco.com web site;

7.3 <u>Registered Partner Logo.</u> Subject to Part B.9 below, Registered Partner may use the Marks to promote the sale of Products, Services and Professional Services to End Users within the Territory; and

7.4 <u>Partner E-Learning Access.</u> Registered Partner shall have the right to register on Partner ELearning Connection, to the extent Cisco makes such service available to Registered Partner within the Territory.

8. **Term and Termination.**

8.1 <u>Term.</u> This Agreement will expire one (1) year after the date it is accepted by Cisco, unless extended by written agreement of both parties or sooner terminated pursuant to this Agreement.

8.2 <u>Termination.</u> Within the first thirty (30) days following the Effective Date of this Agreement, either party may terminate this Agreement for convenience with no notice.
After the first thirty (30) days following the Effective Date of this Agreement, this Agreement may be terminated for convenience, for any reason or no reason, by either party upon no less than thirty (30) days prior written notice to the other. This Agreement may be terminated by Cisco for cause at any time upon Registered Partner's material breach of the Agreement, on ten (10) days' notice, except that this Agreement may be terminated by Cisco immediately upon Registered Partner's breach of any provision of Parts B.1.2 (No Resale Outside the Territory), B.1.3 (Sales to End Users), B.1.4 (Non-
Genuine Products or Unauthorized Cisco Products), B.2 (Added Value Requirement), B.6 (Proprietary Rights and Software Licensing), B.9 (Use of the Marks), B.10 (Confidentiality and Publicity), B.11 (End User License Agreement), B.16 (Export Restrictions and Controls and Import Customs Compliance), B.19 (Compliance with Laws, including AntiCorruption Laws), B.22.1 (Assignment), B.22.6 (Audit), and where Registered Partner fails to complete any due diligence questionnaire or other questionnaire provided by Cisco and/or to comply with such other due diligence or other compliance requirements requested by Cisco in writing and/or to meet Cisco's general due diligence requirements.

8.3 <u>Effect of Termination.</u> Upon the termination or expiration of this Agreement, Registered Partner's rights to purchase Services and Products from any Authorized Source shall immediately terminate, Cisco shall discontinue all Registered Partner benefits listed in Part B.7 above, and Registered Partner shall immediately (a) cease to represent itself as a Cisco Registered Partner, and (b) cease its use of any of the Marks.

9. **Use of the Marks.**

9.1 During the term of this Agreement, and subject to all other terms and conditions of this Agreement, Cisco grants to Registered Partner a nonexclusive, nontransferable, royalty- free, personal license to use the Marks in the exact form provided by Cisco in the Territory, solely to promote the Resale of Cisco Products and Services to End Users. Registered

Partner agrees and acknowledges that Cisco is the sole owner of the Marks, and that all goodwill arising from use of the Marks shall inure to Cisco's sole benefit. Registered Partner will not register or seek to register the Marks, or use or adopt any mark, name, domain name or designation that is confusingly similar to the Marks or otherwise violates Cisco's rights in the Marks. Registered Partner also agrees that it will not take any action to challenge or interfere with, directly or indirectly, the validity of the Marks or Cisco's use, ownership, or registration of the Marks.

9.2     Registered Partner shall not affix the Marks or any other Cisco trademark or name to any product. Registered Partner agrees that it will not use the Marks or any other Cisco marks or names in anyway not expressly authorized by Cisco in writing. Registered Partner's use of the Marks shall conform to the Program Guidelines and Qualifications located at http://www.cisco.com/go/partnerlogos and Cisco's Trademark, Copyright, and other usage Policies provided at: http://www.cisco.com/go/logo (jointly referred to as the "**Guidelines**"), which are incorporated into this Agreement by this reference. Cisco reserves the right to modify the Guidelines from time to time, and will provide notice of such updates by posting on the above referenced web pages. Registered Partner shall cooperate with Cisco's requests to confirm Registered Partner's compliance with the current Guidelines and the terms of this Agreement. Registered Partner shall comply promptly with any request by Cisco that Registered Partner modify, correct or cease any non-complying use of the Marks.

9.3     Upon termination or expiration of this Agreement, Registered Partner agrees to cease immediately all use of the Marks. Registered Partner also shall cease immediately holding itself out as a Registered Partner of Cisco products or implying an association or affiliation with Cisco.

9.4     <u>Non-Genuine Products</u>

9.4.1   Registered Partner shall not acquire, use, promote or Resell Non Genuine Products. Registered Partner will not remove, alter, or destroy any form of copyright notice, trademark, logo, confidentiality notice, serial number or other product identifier provided with any Product.

9.4.2   If Registered Partner acquires, uses, promotes or Resells Non-Genuine Products (other than from an Authorized Source), Cisco may take one or more of the following actions, at Cisco's discretion: (i) require Registered Partner, within ten days of Cisco's request, to recall and destroy all Non-Genuine Products that Registered Partner has sold to End Users or used in the provision of a managed/cloud service and replace such products with legitimate, equivalent Products, at Registered Partner's expense (or reimburse Cisco for the cost of such replacement, if Cisco makes the replacement), (ii) require Registered Partner, within five days of receiving Cisco's written request, to provide Cisco with all details related to Registered Partner's acquisition of all Non-Genuine Products, including without limitation, its suppliers, shipping details and all buyers to whom Registered Partner resold Non-Genuine Products; (iii) decline the provisioning of any kind of service support for such Non-Genuine Products; and/or (iv) immediately terminate this Agreement pursuant to Part B.8 (Term and Termination).

10.   **Confidentiality and Publicity.** In the event that either Party receives from the other Party information that is marked as confidential, the receiving Party shall protect that information using the same degree of care as it uses to protect its own sensitive business information, but not less than a reasonable degree of care, and shall not disclose such information to any third party without the disclosing Party's prior written consent. Registered Partner shall only use Cisco's confidential information in connection with the promotion and Resale of Products and Services. Upon the termination or expiration of this Agreement, each Party will promptly return or destroy any confidential information provided by the other Party. Except as expressly provided in this Agreement, neither Cisco nor Registered Partner will issue press releases or make other public announcements that identify Registered Partner as an authorized or registered Cisco Channel Partner without the express written consent of the other party. In addition, Registered Partner shall at no time (nor cause any third party to) take any action, publish or otherwise communicate anything which is or may be detrimental to the business reputation of Cisco.

11. **End User License Agreement. ALL SOFTWARE MADE AVAILABLE TO REGISTERED PARTNER, INCLUDING BUT NOT LIMITED TO THE SOFTWARE DOWNLOADED VIA CISCO.COM AND ANY SOFTWARE ACQUIRED THROUGH AN AUTHORIZED SOURCE, EITHER WITH HARDWARE OR SEPARATELY, IS SUBJECT TO THE CISCO END USER LICENSE AGREEMENT <u>UNLESS THE SOFTWARE IS BRANDED BY A THIRD-PARTY AND A THIRD-PARTY LICENSE ACCOMPANIES THE SOFTWARE (EITHER IN HARDCOPY OR ELECTRONIC FORMAT)</u>. REGISTERED PARTNER'S RIGHTS AND RESPONSIBILITIES WITH RESPECT TO ANY THIRD-PARTY BRANDED SOFTWARE SHALL BE GOVERNED BY THE LICENSOR'S APPLICABLE SOFTWARE LICENSE.** The Cisco End User License Agreement may be found at: http://www.cisco.com/go/terms.

Information made available to Registered Partner through Cisco.com is made available subject to the terms contained in the Cisco.com Terms and Conditions and any additional terms as Cisco may notify Registered Partner of through Cisco.com. Information provided through Cisco.com may be used only in connection with Registered Partner's promotion and Resale of Products and Services.

12. **Limited Warranty / Warranty Disclaimer.**

12.1   <u>Warranty.</u> The warranty for Cisco-Branded Products will be provided by Cisco with the Product, or, if no written warranty statement is provided, the Limited Warranty Statement for Cisco-Branded Products is available at the following URL: http://www.cisco.com/go/warranty.

**PRODUCTS THAT ARE NOT BRANDED BY CISCO WITH THE CISCO TRADEMARK OR SERVICE MARK ARE NOT COVERED BY THE CISCO WARRANTY REFERENCED ABOVE. INSTEAD, SUCH THIRD-PARTY PRODUCTS MADE AVAILABLE WITH CISCO PRODUCTS AND SOLUTIONS, INCLUDING BUT NOT LIMITED TO THE UNIFIED COMPUTING SYSTEMS ("UCS") SOLUTION, SHALL BE COVERED BY THEIR OWN MANUFACTURER'S WARRANTY.**

12.2   **<u>Disclaimer</u>. EXCEPT AS SPECIFIED IN THE LIMITED WARRANTY STATEMENT SPECIFIED IN PART B.12.1 ABOVE, ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS OR WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OR CONDITION OF MERCHANTIBILITY, FITNESS FOR A PARTICULAR PURPOSE (EVEN IF KNOWN TO CISCO), NONINFRINGEMENT, SATISFACTORY QUALITY OR ARISING FROM A COURSE OF DEALING, LAW, USAGE, OR TRADE PRACTICE ARE HEREBY EXCLUDED TO THE GREATEST EXTENT ALLOWED BY APPLICABLE LAW. TO THE EXTENT AN IMPLIED WARRANTY CANNOT BE EXCLUDED, SUCH WARRANTY IS LIMITED TO THE 90DAY PERIOD PROVIDED IN THE LIMITED WARRANTY STATEMENT SPECIFIED IN PART B.12.1 ABOVE. THIS DISCLAIMER AND EXCLUSION SHALL APPLY EVEN IF THE EXPRESS WARRANTY SET FORTH ABOVE FAILS OF ITS ESSENTIAL PURPOSE. REGISTERED PARTNER SHALL NOT MAKE ANY WARRANTY COMMITMENT BEYOND THE LIMITED WARRANTY REFERENCED IN PART B.12.1 ON CISCO'S BEHALF. REGISTERED PARTNER AGREES TO INDEMNIFY CISCO AND HOLD CISCO HARMLESS FROM ANY WARRANTY MADE BY REGISTERED PARTNER BEYOND THE LIMITED WARRANTY REFERENCED IN PART B.12.1.**

13. **Patent, Copyright, and Trademark Infringement Indemnification**

13.1   Claims. Cisco will defend any claim against Registered Partner that a Cisco-Branded Product provided under this Agreement infringes third party patents, copyrights, or registered trademarks (the "Claim") and will indemnify Registered Partner against the final judgment entered by a court of competent jurisdiction or any settlements arising out of a Claim.

13.2   Registered Partner will:

13.2.1   Promptly notify Cisco in writing of the Claim (or threat thereof), and any subsequent litigation updates; and

13.2.2   Cooperate with Cisco in the defense of the Claim (including any statements to third parties regarding the Claim), and grant Cisco full and exclusive control of the defense and settlement of the Claim and any subsequent appeal.

If Registered Partner fails to notify Cisco promptly of the Claim, and that failure prejudices Cisco's ability to defend, settle or respond to the Claim, then Cisco's obligation to defend or indemnify Registered Partner with respect to that Claim will be reduced to the extent Cisco has been prejudiced. In addition, such failure to provide prompt notification shall relieve Cisco of any obligation to reimburse for Registered Partner's attorneys' fees incurred prior to notification.

13.3   Additional Remedies. If a Claim is made or appears likely, Registered Partner agrees to permit Cisco to procure for Registered Partner the right to continue using the Cisco- Branded Product, or to replace or modify the Cisco-Branded Product with one that is at least functionally equivalent. If Cisco determines that none of those alternatives is reasonably available, then Registered Partner will return the Cisco-Branded Product and Cisco will refund Registered Partner's remaining net book value of the Cisco-Branded Product calculated according to generally accepted accounting principles.

13.4   Exclusions. Cisco has no obligation for any Claim based on:

13.4.1   Compliance with any designs, specifications, requirements, or instructions provided by Customer or a third party on Registered Partner's behalf;

13.4.2   Modification of a Cisco-Branded Product by Registered Partner or a third party;

13.4.3   The amount or duration of use made of the Cisco-Branded Product, revenue earned by Registered Partner, or services offered by Registered Partner to external or internal customers; or

13.4.4   Combination, operation, or use of a Cisco-Branded Product with non-Cisco products, software, or business processes.

13.5   Sole and Exclusive Remedy. This Part B.13 states Cisco's entire obligation and Registered Partner's exclusive remedy regarding any claims for intellectual property infringement.

14.   **Limitation of Liability and Consequential Damages Waiver.** The limits of liability for this Agreement are set forth as follows:

14.1   If this Agreement is governed by California, Japanese, Brazilian, Korean, or Canadian law, as set forth in Part B.21, below, the following Sections B.14.1.1 and B.14.1.2 will apply:

14.1.1   <u>**Limitation of Liability**</u>**. NOTWITHSTANDING ANYTHING ELSE HEREIN, AND EXCEPT FOR LIABILITY ARISING OUT OF 1) REGISTERED PARTNER'S BREACH OF PART B, SECTION 6 (PROPRIETARY RIGHTS AND SOFTWARE LICENSING) OR PART B, SECTION 11 (END USER LICENSE AGREEMENT) OF THIS AGREEMENT, 2) AMOUNTS DUE FOR PRODUCTS AND SERVICES PURCHASED OR SOFTWARE USED OR TRANSFERRED WITH RESPECT TO THE PAYMENT OF WHICH NO BONA FIDE DISPUTE EXISTS, OR 3) CLAIMS OF FRAUD, ALL LIABILITY OF EACH PARTY AND ITS SUPPLIERS UNDER THIS AGREEMENT OR OTHERWISE SHALL BE LIMITED TO THE MONEY PAID BY REGISTERED PARTNER TO ANAUTHORIZED SOURCE UNDER THIS AGREEMENT DURING THE SIX (6) MONTH PERIOD PRECEDING THE EVENT OR CIRCUMSTANCES GIVING RISE TO SUCH LIABILITY. THIS LIMIT SHALL NOT APPLY TO LIABILITY FOR DEATH OR BODILY INJURY RESULTING DIRECTLY FROM THE NEGLIGENCE OR WILLFUL MISCONDUCT OF CISCO, OR FROM DAMAGE TO TANGIBLE PERSONAL PROPERTY (EXCLUDING LIABILITY FOR LOST DATA) RESULTING DIRECTLY FROM THE RECKLESSNESS OR WILLFUL MISCONDUCT OF CISCO. ALL LIABILITY UNDER THIS AGREEMENT IS CUMULATIVE AND NOT PER INCIDENT.**

14.1.2        **Waiver of Consequential Damages**. EXCEPT FOR LIABILITY ARISING OUT OF OR IN CONNECTION WITH BREACH OF PART B, SECTION 6 (PROPRIETARY RIGHTS AND SOFTWARE LICENSING) ORPART B, SECTION 11 (END USER LICENSE AGREEMENT) OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY OR THEIR RESPECTIVE SUPPLIERS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, OR LOST REVENUE, LOST PROFITS, OR LOST OR DAMAGED DATA, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN INFORMED OF THE POSSIBILITY THEREOF.

14.2 If this Agreement is governed by English or Indian law, as set forth in Section B.21 below, the following Sections B.14.2.1 and B.14.2.2 will apply:

14.2.1   Limitation of Liability.

14.2.1.1 Nothing in this Agreement shall limit Cisco's or its suppliers' liability to Registered Partner for (1) bodily injury or death caused by its negligence or (2) Cisco's liability in the tort of deceit.

14.2.1.2 The aggregate total liability of Cisco and its suppliers shall be limited to the higher of (i) Ten Thousand United States Dollars ($10,000 USD), or (ii) money paid by Registered Partner to the Authorized Source under this Agreement in the twelve (12) month period prior to the event or circumstances giving rise to the liability. All liability under this Agreement is cumulative and not per incident.

14.2.1.3 Nothing in this Agreement shall limit Registered Partner's liability to Cisco for (1) bodily injury or death caused by its negligence or (2) Registered Partner's liability to Cisco in the tort of deceit.

14.2.1.4 Except for liability arising out of 1) Registered Partner's breach of obligations set forth in Part B, Section 6 (Proprietary Rights and Software Licensing) or Part B, Section 11 (End User License Agreement) of this Agreement, 2) amounts due for products and services purchased with respect to the payment of which no bona fide dispute exists, or 3) claims of fraud, the aggregate total liability of Registered Partner shall be limited to the greater of (a) money paid by Registered Partner to the Authorized Source under this Agreement in the twelve (12) month period prior to the event or circumstances giving rise to the liability or (b) amounts due for products and services purchases with respect to the payment of which no bona fide dispute exists. All liability under this Agreement is cumulative and not per incident.

14.2.2        **Waiver of Consequential Damages**. EXCEPT FOR LIABILITY ARISING OUT OF OR IN CONNECTION WITH BREACH OF PART B, SECTION 6 (PROPRIETARY RIGHTS AND SOFTWARE LICENSING) ORPART B, SECTION 11 (END USER LICENSE AGREEMENT) OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY OR THEIR RESPECTIVE SUPPLIERS BE LIABLE FOR ANY OF THE FOLLOWING LOSSES OR DAMAGE (WHETHER SUCH LOSSES WERE FORESEEN, FORESEEABLE, KNOWN, OR OTHERWISE): LOSS OF USE, INTERRUPTION OF BUSINESS, LOSS OF ACTUAL OR ANTICIPATED PROFITS (INCLUDING LOSS OF PROFIT ON CONTRACTS), LOSS OF REVENUE, LOSS OF THE USE OF MONEY, LOSS OF ANTICIPATED SAVINGS, LOSS OF OPPORTUNITY, LOSS OF GOODWILL, LOSS OF REPUTATION, LOSS OF, DAMAGE TO OR CORRUPTION OF DATA, OR SPECIAL, INCIDENTAL, INDIRECT, OR

CONSEQUENTIAL DAMAGES, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN INFORMED OF THE POSSIBILITY THEREOF. SUCH LIABILITIES WILL BE EXCLUSIVELY GOVERNED BY THE SPECIFIC AGREEMENTS BETWEEN REGISTERED PARTNER AND THE AUTHORIZED SOURCE, UNDER WHICH SPECIFIC CISCO PRODUCTS AND/OR SERVICES ARE PURCHASED.

15. **Third Party Rights. To the extent permitted by law, no person or entity who is not a party to this Agreement shall be entitled to enforce or benefit from any of this Agreement's terms, including but not limited to doing so under the Contracts (Rights of Third Parties) Act of 1999.**

16. **Export Restrictions and Controls and Import Customs Compliance.**

   16.1 **Export Restrictions and Controls.**

   16.1.1 <u>Applicability.</u> Cisco Products, technology, and Services are subject to U.S. and local export control laws and regulations. The Parties shall comply with such laws and regulations governing use, export, re-export, and transfer of Products and technology and will obtain all required U.S. and local authorizations, permits, or licenses.

   Registered Partner agrees not to use any export and/or re-export licenses or authorizations that Cisco or its affiliates hold for securing its own activities unless specifically authorized by Cisco's Global Export Trade and where legally compliant. Registered Partner agrees to institute and maintain an effective internal export compliance program to ensure compliance with its export and re-export activities.

   16.1.2 <u>Government/Military Sales.</u> Registered Partner hereby certifies that none of the Products, Services, or technical data supplied by Cisco under this Agreement will be knowingly sold or otherwise transferred to, or made available for use by or for, any government or military end-users or in any government or military end-use located in or operating under the authority of any country not identified in Supplement No. 1, Country Group A:1 to Part 740 of the EAR without US or other country's export authorizations.

   16.1.3 Registered Partner also certifies that none of the Products, Services or technical data supplied by Cisco under this Agreement will be knowingly sold or otherwise transferred to, or made available for use by or for, any entity that is engaged in the design, development, production or use of nuclear, biological or chemical weapons or missiles or is otherwise restricted from receiving Cisco Products without US or other country's export authorizations.

   16.1.4 <u>Trade Data.</u> Registered Partner may locate ECCN (Export Control Classification Number), HTS (Harmonized Tariff Schedule), French DCSSI Authorization, Encryption Strength, Encryption Status and CCATS (Commodity Classification Automated Tracking System) number at the following URL: http://tools.cisco.com/legal/export/pepd/Search.do

   16.1.5 <u>Record Keeping.</u> Registered Partner agrees to maintain a record of sales, imports, exports and re-export of Cisco Products, technology, and Services in accordance with the Registered Partner's records retention programs in the appropriate geographies but at least for five years.

   16.2 **Import Customs Compliance.**

   16.2.1 Registered Partner agrees to comply with Customs import and other trade and tax related laws and regulations ("**Trade laws**") of the United States and other national governments.

   16.2.2 Registered Partner agrees to comply with the Trade Agreement Act (TAA),

(unless subject to a valid waiver) any time Cisco Products will be sold to an End User that is identified as a US government entity. For all such orders, Registered Partner agrees to request, via Cisco's ordering tools, that any Product included in the order has a TAA eligible country of origin. Registered Partner also agrees to comply with any similar rules or regulations promulgated by a non-US government that would similarly apply to sales to an entity of that government.

16.2.3 <u>Country of Origin</u>. Country of Origin (CO) shown on Cisco's commercial invoices is determined according to the Worldwide Customs Organization (WCO) nonpreferential rules of origin. For purposes of clarification, the CO shown on any Cisco commercial invoice is based on a non-preferential CO treatment and should not be relied upon as a preferential CO treatment, unless and until written authorization has been provided by Cisco's Custom's organization. Registered Partner may seek information related to a request to obtain preferential treatment from Cisco's Custom's organization, however, Registered Partner acknowledges that Cisco's Custom's organization has no processes in place to respond or process such requests.

16.2.4 In instances where Cisco is not the importer of record, the provision of Trade Data, in particular the HTS Classifications, is undertaken without liability for errors and omissions contained therein. It remains the responsibility of the Registered Partner to ensure that the correct HTS is applied at the time of importation into the Territory.

16.3 **Obligation.** Registered Partner's obligation under this Article shall survive the expiration or termination of this Agreement.

17. **Obligation to Maintain Contacts.**

17.1 **Requirement to Maintain.** Registered Partners are required to have at least one valid contact associated to their company at all times in the Cisco Channel Partner Database.

17.2 **Valid Contact Information.** For Registered Partner's contacts to be "valid," its contact profiles in Cisco's Channel Partner Database ("CPD"), as maintained via the Partner Self Service ("PSS") data management tool, must include a First Name, Last Name, Site Address, and Email Address. Cisco will remove the Registered Partner from the CPD if the last valid contact associated with the company is removed from the CPD using the PSS tool. To regain Cisco Channel Partner status, a user from the company must complete registration as a new prospective Cisco Channel Partner.

17.3 **Reservation of Rights.** Cisco reserves the right to remove any Registered Partner without sufficient valid contacts at such time, and using such means, as Cisco may determine in its sole discretion. Whereas Cisco may choose, at its option, to provide certain forms of notification regarding the removal of a Registered Partner's status as a result of insufficient or invalid contacts in the PSS, Cisco is not under any obligation to provide notification of any kind regarding any such removal.

17.4 **Effect of Partner Removal.** If Cisco removes the Registered Partner from the CPD in accordance with the foregoing, or Registered Partner's status as a Registered Partner is otherwise removed from the CPD, this Agreement shall terminate concurrently.

18. **Entitlement.** Registered Partner acknowledges that Cisco has the right to verify an End User's entitlement to receipt of Services, and that End User is entitled to receive support services only on Product for which Cisco has been paid the applicable software license and support fees.

18.1 **Services for Unauthorized Cisco Products and Non-Genuine Products.** Non-Genuine Products are not eligible for Cisco service and support. Unauthorized Cisco Products are only eligible for Cisco service and support following an inspection. If it is determined that a Cisco Product has Unauthorized Cisco Products incorporated into it, Cisco reserves the right to withhold support services for that Product until such time as the Product is inspected by Cisco or its designated representative, with any applicable inspection and software licensing fees paid in full.

18.2 **Inspection and Software Relicensing.** Information on Cisco's Inspections and Software Relicensing program and policies can be viewed at the following link: http://www.cisco.com/en/US/prod/hw_sw_relicensing_program.html#~policy.

18.3 **Suspension and Termination of Support Contracts.** If Cisco determines that 1) Registered Partner or Customer does not have a valid license for the Product, 2) the Product was purchased from a source other than an Authorized Source without appropriate inspection and relicensing, or 3) a valid software license for the Product does not exist, Cisco reserves the right to either suspend any support service contract associated with such Products until such time as any applicable inspection is conducted and any applicable relicensing fees are paid for such Products, or to terminate the support service contract (in which event Cisco will provide a pro-rata refund of any paid support service fees for the remaining period of the support service contract). If Cisco determines that the Product is a Non-Genuine Product, then any associated support service contract will be terminated with immediate effect, and Registered Partner or Customer must immediately return to Cisco any replacement parts or other materials made available in connection with that NonGenuine Product.

18.4 **Initiation of Product Support.** Technical support is effective immediately upon opening a Cisco service contract. However, Products not under a valid Cisco Warranty at the time a new service contract is initiated will not be eligible for advance replacement service requests until 30 days after the initiation of the service contract.

Registered Partner certifies that it will not initiate or facilitate a service request on a Product (a) in furtherance of or with intent to commit any fraudulent or other illegal activities, or otherwise in violation of any applicable law, regulation, legal agreement, or Cisco's published policies; (b) in a manner that is abusive of Cisco programs or other information in this Agreement or in the Service Description; or (c) for Products that are not on the Registered Partner's valid support contract.

19. **Compliance with Laws, including Anti-Corruption Laws.**

19.1 Cisco requires that all of its suppliers, subcontractors, channel partners, consultants, agents and other parties with whom Cisco does business act at all times in a professional and ethical manner in carrying out their services and contractual obligations to Cisco, or on Cisco's behalf to a Cisco customer or other third party. To that end, Registered Partner must undertake to strictly comply with any and all country, federal, state and local laws, ordinances, codes, regulations, rules, policies and procedures, including, but not limited to, anti-corruption laws, such as the U.S. Foreign Corrupt Practices Act, U.K. Bribery Act, other anti-bribery laws ("**Applicable Laws**"). Registered Partner can find more information about the FCPA at the following URL: http://www.usdoj.gov/criminal/fraud/fcpa/, or by contacting publicsectorcompliance@cisco.com. Any violation of Applicable Laws in a country and regulations shall represent breach of this Agreement and could results in immediate termination of the business and contractual relationship between the Parties.

19.2 Upon request, Registered Partner may be required to have its own subcontractors, consultants, agents or representatives execute a similar written anti-corruption compliance statement, and to confirm to Cisco that such action has been taken.

19.3 **Registered Partner shall immediately report to Cisco any concerns it may have regarding any business practices by any Cisco employee or other Cisco Registered Partner by emailing ethics@cisco.com, or by calling Cisco's Helpline toll free number in North America 1-877-571-1700 or worldwide number (reverse calling charges to Cisco) 001-770-776-5611.**

19.4 Vendor Due Diligence and Compliance. Registered Partner will conduct appropriate, riskbased due diligence on Partner Vendors and ensure that they adhere to anti-bribery and anti-corruption policies no less comprehensive than Cisco's Global Anti-Corruption Policy for Partners published at http://www.cisco.com/web/about/doing_business/legal/anti_corruption.html.

"**Partner Vendor**" means vendors, suppliers, subcontractors, consultants, or agents engaged or used by Registered Partner in connection with a Cisco Offering.

"**Cisco Offerings**" means Products and Services collectively.

19.5    **Government Officials.** Registered Partner is prohibited from paying expenses for travel, lodging, gifts, hospitality, entertainment, or charitable contributions for Government Officials on Cisco's behalf.

"**Governmental Entity**" means any national, provincial, or local government, department, agency, instrumentality, state-owned or state-controlled (in whole or in part) company, public international organization, political party, or entity that is financed in large measure through public appropriations, is widely perceived to be performing government functions, or has its key officers and directors appointed by a government.

"**Government Official**" means (i) any public or elected official or officer, employee (regardless of rank), or person acting on behalf of a Governmental Entity; and (ii) any party official or candidate for political office or any person acting on behalf of such party official or candidate for political office**.**

20. **Dispute Resolution.**

20.1    **Dispute Resolution.** Cisco and Registered Partner, (together, the "**Parties**", or individually, each a "**Party**") agree that any conflict, dispute, controversy, or claim arising out of or relating to this Agreement or the relationship created by this Agreement, including questions of arbitrability, whether sounding in tort or contract (together or individually a **"Dispute"**), shall be finally resolved in accordance with the following process:

20.2    **Escalation of Disputes**. Subject to Section 20.5 below, the Parties agree to attempt to resolve each Dispute by first escalating the Dispute to their respective business managers. Within fourteen (14) calendar days of written notice of a Dispute, or such other period the Parties may agree in writing, the business managers will meet in person or by phone and work in good faith to resolve the Dispute.

20.3    **Mandatory, Non-Binding Mediation**. Subject to Section 20.5 below, if the Parties are unable to resolve the Dispute in accordance with Section 20.2 above, either Party may initiate a mandatory, non-binding mediation. If Registered Partner is located in the United States, such mediation shall be in accordance with the JAMS mediation procedures then in effect. The JAMS mediation procedures are hereby incorporated by reference into this clause. If Registered Partner is located outside the United States, such mediation shall be in accordance with the London Court of International Arbitration ("**LCIA**") Mediation Procedure then in effect, unless stated otherwise in this Agreement. The LCIA Mediation Procedure is hereby incorporated by reference into this clause.

The Parties shall share all fees and costs of the mediation proceedings.

All communications made during the course of the mediation by either of the Parties or the mediator are intended to be confidential and privileged to the extent permitted by law.

If Registered Partner is located in India, then the Parties may mutually decide to attempt resolution of the Dispute by conciliation under the Arbitration and Conciliation Act, 1996 **("Act")** and associated rules under the Act.

20.4    Arbitration. SUBJECT TO SECTION 20.5 BELOW, IF THE PARTIES ARE UNABLE TO RESOLVE THE DISPUTE THROUGH THE MEDIATION PROCESS WITHIN SIXTY (60) CALENDAR DAYS OF THE APPOINTMENT OF THE MEDIATOR, OR SUCH FURTHER PERIOD AS THE PARTIES SHALL AGREE TO IN WRITING, THE DISPUTE SHALL BE REFERRED TO AND FINALLY RESOLVED BY BINDING ARBITRATION. IF REGISTERED PARTNER IS LOCATED IN THE UNITED STATES, SUCH ARBITRATION SHALL BE IN ACCORDANCE WITH THE JAMS ARBITRATION RULES THEN IN EFFECT, WHICH ARE HEREBY INCORPORATED BY REFERENCE INTO THIS CLAUSE. IF REGISTERED PARTNER IS LOCATED OUTSIDE THE UNITED STATES, SUCH ARBITRATION SHALL BE IN ACCORDANCE WITH THE LCIA ARBITRATION

RULES THEN IN EFFECT, WHICH ARE HEREBY INCORPORATED BY REFERENCE INTO THIS CLAUSE. THIS CLAUSE SHALL NOT APPLY IF THE REGISTERED PARTNER IS LOCATED IN INDIA.

The arbitration tribunal shall consist of a sole arbitrator, selected in accordance with the LCIA arbitration rules if Registered Partner is located outside the United States, or in accordance with the JAMS arbitration rules if Registered Partner is located in the United States. The arbitrator shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the Parties an adequate opportunity to discover relevant information regarding the subject matter of the Dispute.

Cisco shall pay all fees and costs of the arbitration proceedings. After the arbitrator issues the written award, however, the prevailing Party may apply to the arbitrator for recovery of all reasonable costs and expenses associated with the arbitration, including, but not limited to, the fees of the arbitrator, administrative fees, and reasonable attorneys' fees. Such costs and expenses will be awarded at the arbitrator's discretion.

Notwithstanding anything to the contrary, the arbitrator shall exceed his or her powers if the arbitrator awards damages inconsistent with the Limitation of Liability and Consequential Damages Waiver provisions set forth in Section B.14.1 (Limitation of Liability), and Section B.14.2 (Consequential Damages Waiver). The Parties irrevocably waive the award of any such damages.

The language to be used in the arbitration shall be English.

20.5. **Preliminary Relief.** At any point after a Dispute has arisen, in the event interim or provisional relief is necessary to protect the rights or property of a Party under Sections B.1.4 and B.10 of this Agreement or otherwise prior to the resolution of the Dispute, either Party may, without waiving any process or remedy under this Agreement, seek such relief from any court of competent jurisdiction.

21. **Choice of Law and Venue.** Except as otherwise provided, the venue for the dispute resolution processes set forth above, and the validity, interpretation, and enforcement of this Agreement shall be governed as follows:

21.1 If Registered Partner's principal place of business is located in Canada, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of the Province of Ontario and the laws of Canada applicable as if performed wholly within the province and without giving effect to principles of conflicts of laws. The Parties specifically disclaim the application of the UN Convention on Contracts for the International Sale of Goods to the interpretation or enforcement of this Agreement. The seat of mediation and arbitration shall be in the Province of Ontario unless otherwise agreed by the Parties.

21.2 If Registered Partner's principal place of business is located in China, the validity, interpretation, and performance of this Agreement shall be controlled by and construed under the laws of the People's Republic of China. Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration at China International Economic and Trade Arbitration Commission in Beijing, the People's Republic of China ("CIETAC"), in accordance with the Arbitration Rules of CIETAC for the time being in force, which rules are deemed to be incorporated by reference in this section. The arbitration tribunal shall be made up of three (3) arbitrators. Cisco and Distributor shall each appoint one (1) arbitrator and the third arbitrator shall be appointed by agreement between the Parties. In the event that the Parties cannot agree on the nomination of the third arbitrator within fourteen (14) days of the CIETAC accepting the case, the third arbitrator, who shall serve as the presiding arbitrator, shall be appointed by the president of CIETAC, provided that such appointee shall not be a United States or Chinese national (including Hong Kong, Macau or Taiwan permanent residents). The language of the arbitration shall be in English. The arbitral award shall be final and binding upon both parties. Notwithstanding the foregoing, either party may seek injunction in any court of appropriate jurisdiction with respect to any alleged breach of such party's intellectual property, proprietary rights or the confidentiality obligations stated herein.

21.3    If Registered Partner's principal place of business is located in Japan, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of Japan, without giving effect to principles of conflicts of laws. The seat of mediation and arbitration shall be in Tokyo, unless otherwise agreed by the Parties.

21.4    If Registered Partner's principal place of business is located in Latin America, the Caribbean, or the United States, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of the State of California, United States of America, as if performed wholly within the State and without giving effect to principles of conflicts of laws. The Parties specifically disclaim the application of the UN Convention on Contracts for the International Sale of Goods to the interpretation or enforcement of this Agreement. The seat of mediation and arbitration shall be in San Francisco, California, unless otherwise agreed by the Parties.

21.5    If Registered Partner's principal place of business is located in the Asia Pacific region (excluding Australia, China, Republic of Korea and Japan), the Middle East (excluding Israel), Africa, Central and Eastern Europe (excluding member states of the European Economic Area), Russia and the Commonwealth of Independent States (CIS), or Israel, the validity, interpretation, and enforcement of this Agreement shall be governed by the laws of England, without giving effect to principles of conflicts of laws. The Parties specifically disclaim the UN Convention on Contracts for the International Sale of Goods. The seat of mediation and arbitration shall be in London, England, unless otherwise agreed by the Parties.

21.6    If Registered Partner's principal place of business is located in Brazil, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of Brazil, without giving effect to principles of conflicts of laws. The Parties specifically disclaim the application of the UN Convention on Contracts for the International Sale of Goods to the interpretation or enforcement of this Agreement. The seat of mediation and arbitration shall be in San Francisco, California, unless otherwise agreed by the Parties.

21.7    If Registered Partner's principal place of business is located in India, the validity, interpretation, and enforcement of this Agreement shall be controlled by and construed under the laws of India, as if performed wholly within India and without giving effect to the principles of conflicts of law. The Parties specifically disclaim the application of the UN Convention on Contracts for the International Sale of Goods to the interpretation or enforcement of this Agreement. The courts at Bengaluru, Karnataka shall have exclusive jurisdiction over any Dispute under this Agreement.

21.8    If Registered Partner's principal place of business is located in Republic of Korea, the validity, interpretation, and enforcement of this Agreement shall be governed by the domestic laws of Republic of Korea, without giving effect to principles of conflicts of laws. The seat of mediation and arbitration shall be in Seoul, unless otherwise agreed by the Parties.

22.  **Miscellaneous.**

22.1    <u>Assignment.</u> Neither this Agreement, nor any rights under this Agreement, may be assigned or delegated by Registered Partner without the express prior written consent of Cisco. Any attempted assignment in violation of the preceding sentence shall immediately terminate the Agreement and be without legal effect. Cisco shall have the right to assign all or part of this Agreement to another Cisco or Cisco-affiliated entity without Registered Partner's approval.

22.2    <u>Relationship of the Parties; No Partnership.</u> Each Party to this Agreement is an independent contractor. This Agreement does not create any agency, partnership, joint venture, employment or franchise relationship. Furthermore, no labor relationship between Cisco and Registered Partner employees is created hereby. Registered Partner shall indemnify and hold Cisco harmless of any claim or judicial action whatsoever from any Registered Partner employee. Neither Party has the right or authority to, and shall not, assume or create any obligation of any nature whatsoever on behalf of the other party or bind the other party in any respect whatsoever. Notwithstanding the use of the term "Partner" in this Agreement, the Parties do not intend to create any legal relationship of partnership between them, and neither will assert to any third party or otherwise claim that such a legal relationship exists between them.

22.3  Survival. Part A and Sections B.3, B.4, B.6.2, B.6.3, B.8, B.9.3 and B.10 through B.22 shall survive the expiration or termination of this Agreement.

22.4  Notices. All notices required to be provided under this Agreement shall be provided (a) by Registered Partner, to contract-notice@cisco.com, and (b) by Cisco, to the electronic mail address provided by Registered Partner with its Partner Registration application. Notices shall be deemed received one business day after being sent by e-mail.

22.5  Enforceability.

22.5.1  Registered Partner agrees that the electronic mail address it has provided corresponds to a person that has the capacity and authority to execute this Agreement and any amendments on behalf of Registered Partner.

22.5.2  Registered Partner and Cisco each waive any defense to the validity or enforceability of this Agreement arising from the electronic submission and electronic acceptance of this Agreement by Registered Partner.

22.5.3  If Registered Partner needs a physical document evidencing the Agreement, Registered Partner may (i) print the accepted Agreement or (ii) request from Cisco a signed version, in which case Registered Partner shall print and return to Cisco two (2) printed, executed originals of the Agreement. Such printed originals shall not be deemed accepted by Cisco unless Cisco returns one (1) counter-signed original to Registered Partner.

22.5.4  Registered Partner agrees that any contact associated with its online profile with Cisco, as identified by electronic mail address and CCO ID, corresponds to a current employee or person working under a valid contract on behalf of Registered Partner to perform specific ongoing job functions which require access to Cisco Channel resources.

22.5.5  Registered Partner will maintain a current list of approved contact associations. Furthermore, Registered Partner will disassociate employees and contractors from its online profile as soon as their employment is abandoned or terminated.

22.5.6  Registered Partner's employees and contractors will not share CCO IDs, which enables Cisco.com users to view and access personalized information online. If employees do share CCO IDs, Registered Partner will not be in compliance with Cisco's privacy policy statement and EU regulations, which stipulate that Cisco will not share personal information with another individual without express approval.

22.6  Audit. Registered Partner will keep full, true, and accurate records and accounts ("**Records**"), including but not limited to details of the purchase order issued by Registered Partner, the purchase order received by Registered Partner from the End User, documentary proof of delivery to the End User, including signatures and stamps, End User sales invoices, relevant serial numbers, proof of payment, supply contracts, any applicable Cisco special pricing codes (such as Deal IDs), and documentation related to the Records, in accordance with generally accepted accounting principles, of each Cisco Service and Product purchased and resold, including information regarding compliance with Cisco marketing and sales programs, Software usage and transfer, and export. Records may be kept in electronic or hardcopy form. Registered Partner shall keep such Records for no less than three (3) years after the termination of this Agreement. Registered Partner shall make these Records available for audit by Cisco upon fifteen (15) days prior written notice, during regular business hours, at those locations where Partner may maintain relevant records. Additionally, Registered Partner shall make such Records available via email if requested by Cisco. Registered Partner additionally acknowledges that from time to time Cisco or its independent auditors may request data extracts from the electronic Records (including supervised access to the functioning data processing system from which the data was extracted in order to review records related to Cisco Products and Services to verify payment, suppliers, and related details) and may

conduct additional specific audits with the purpose of monitoring and ensuring compliance by Registered Partner and its Authorized Source with Cisco's policies and applicable laws. Such audits may include, without limitation, investigations in order to prevent the acquisition, use, promotion or Resale of Non-Genuine Products and/or Unauthorized Cisco Products. Audits may include the requirement for access to any Cisco Products stored or used onsite, and verification of the proper use, tracking, and location of any Not For Resale Products. When requested, Registered Partner shall collaborate with Cisco's auditors and provide accurate and truthful information. In all cases, Registered Partner agrees to bear, and/or promptly repay to Cisco, all costs, fees, and expenses, incurred by Cisco in the performance of any such audit and/or investigation that discloses any material breach of this Agreement by Registered Partner. Registered Partner acknowledges and accepts that, in addition to the above audit rights, Cisco may directly contact any End User at any time in order to verify and/or inform End Users about Registered Partner's compliance or non-compliance with this Agreement. Registered

Partner acknowledges and accepts that Cisco shall be entitled to recover its costs incurred as a result of Registered Partner's failure to maintain, and provide access to, the Records in compliance with the provisions of this Audit section, and Cisco shall be entitled to recover any revenue lost due to misuse by Registered Partner of any program or promotion, and, if Registered Partner does not reimburse Cisco within 60 days for all amounts improperly claimed, paid, or due, Cisco may, in addition to any other remedy, withhold Registered Partner's access to programs, promotions, and special pricing or discounts.

22.7    Data Protection. Registered Partner agrees to the following in regard to data protection:

22.7.1    Registered Partner will use any data related to sales leads solely for the purpose of contacting the prospective End Users identified (the "Lead") in connection with the promotion and resale of Cisco Products and Services, and for no other purpose.

22.7.2    Registered Partner will not disclose or transfer any Lead data to any other party, without the prior permission of Cisco or the applicable End User (except as otherwise required by applicable law, in which case Registered Partner must first notify Cisco and the End User, if allowable by law).

22.7.3    Lead data is Confidential Information of Cisco and the prospective End User. Registered Partner agrees to protect Lead data with safeguards reasonably designed to protect the information against unauthorized access, use, and disclosure. These safeguards are in addition to any other confidentiality and security obligations contained in agreements between Registered Partner and Cisco.

22.7.4    Registered Partner will use Lead data in compliance with applicable laws and regulations, including, without limitation, those governing unsolicited marketing communications.

22.7.5    Registered Partner will indemnify and hold Cisco harmless from and against any damage, injury, loss, claim, or liability incurred as a result of Registered Partner's failure to abide by this Section 22.7.

22.8    URLs. Registered Partner hereby confirms that it has the ability to access, has accessed, has read and agrees to, the information made available by Cisco at all of the world wide web sites/URLs/addresses/pages referred to anywhere throughout this Agreement. Registered Partner acknowledges that Cisco may modify any URL address or terminate the availability of any information at any address without notice to Registered Partner.

22.9    Other Remedies. All Cisco remedies specified in this Agreement shall be in addition to, and shall in no way limit, any other rights and remedies that might be available to Cisco, all of which Cisco hereby expressly reserves.

22.10   Translations. This Indirect Channel Partner Agreement is prepared in the English language. Other languages are translations for convenience purpose only. If there is any conflict between the original English language and other languages, to the extent permitted by law, the English language shall prevail.

22.11   <u>Communications</u>. By entering into this Agreement, Registered Partner agrees to receive communications and emails from Cisco and Cisco Authorized Distributors regarding onboarding, certifications, programs, incentive accounts, conduct, and requirements.

22.12   <u>Marketing</u>. By entering into this Agreement, Registered Partner agrees to allow Cisco to share aggregated information collected from Registered Partner's sales (such as results from statistical models as to propensity to buy and customer wallet share) with other Cisco Channel Partners to market to End Users.

22.13   <u>Severability</u>. In the event that any of the terms of this Agreement become or are declared to be illegal or otherwise unenforceable by any regulatory body or court of competent jurisdiction, such term(s) shall be null and void and shall be deemed deleted from this Agreement. All remaining terms of this Agreement shall remain in full force and effect. Notwithstanding the foregoing, if this paragraph becomes applicable and, as a result, the value of this Agreement is materially impaired for either Party, as determined by such Party in its sole discretion, then the affected Party may terminate this Agreement by written notice to the other.

*-End-*

**Attachment A to the Indirect Channel Partner Agreement**
**Cisco Services Partner Program**

The Cisco Services Partner Program ("CSPP") is an attachment ("Attachment") that supplements the Agreement and all the terms and conditions of the Agreement apply to this Attachment, provided that, to the extent that there is a conflict between the Agreement and this Attachment, the terms of this Attachment shall take precedence over the terms and conditions of the Agreement with regard to the subject matter described herein._This Attachment shall come in to effect upon execution of the Agreement. However, in the event Reseller has renewed the Agreement after the expiration of the prior agreement, then Reseller must re- register to become authorized under CSPP for the subsequent Term.

1      **DEFINITIONS.**

1.1      **Additional Program Documentation** means the Cisco Services Partner Program Operations Guide, Build Your Services Portfolio and Cisco Services Partner Program Eligible Bookings Guide incorporated by reference within the Program Guide.

1.2      **Cisco Branded Services** means those service offerings identified as Technical Services and Advanced Services made available for purchase and resale by Reseller under the Program, which can be found at www.cisco.com/go/cspp.

1.3      **Collaborative Services** means those service offerings identified as Collaborative Technical Support and Collaborative Professional Services made available for purchase by Reseller under the Program, which can be found at http://www.cisco.com/go/cspp.

1.4      **Deliverable(s)** means, with respect to each Service Description or SOW, the Reports to be delivered by Cisco to Reseller as specified in the Service Description or SOW, if any.

1.5      **End User Network Information** means the information about End User's network that is collected, stored, and analyzed in connection with the Data Collector Tool, and may include, without limitation, the following information: configurations (including running configurations and startup configurations), product identification numbers, serial numbers, host names, equipment locations, IP addresses, system contacts, equipment models, feature sets, software versions, hardware versions, installed memory, installed flash, boot versions, chassis series, exceptions to such information (e.g., duplicate host name, duplicate IP address, device running interim release image), slot IDs, card types, card families, firmware versions, and other network and inventory information as deemed appropriate by Cisco.

1.6      **Excluded Service Programs** means those services not available under the Program but made available under Cisco's Solution Technology Integrator program, Cisco's Partner Essential Operate Support program, and Cisco's Smart Care Service program, and any other services that Cisco elects to exclude from this Program, subject to providing sufficient Notice.

1.7      **Intellectual Property** means any and all tangible and intangible: (i) rights associated with works of authorship throughout the world, including but not limited to copyrights, neighboring rights, moral rights, and mask works, and all derivative works thereof, (ii) trademark and trade name rights and similar rights, (iii) trade secret rights, (iv) patents, designs, algorithms and other industrial property rights, (v) all other intellectual and industrial property rights (of every kind and nature throughout the world and however designated) whether arising by operation of law, contract, license, or otherwise, and (vi) all registrations, initial applications, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force (including any rights in any of the foregoing).

1.8      **Other Product** means Product an End User acquired from sources other than Reseller.

1.9      **Previous Service Program** means the support program(s) including, but not limited to, Cisco Brand Resale ("CBR"), Cisco Shared Support Program ("CSSP"), and Cisco's Partner-

Core Bridge Service program, and Co-Brand Foundation Program, under which Reseller was or may have been previously participating and receiving services from Cisco prior to the Program becoming available.

1.10 **Program** means the Cisco Services Partner Program.

1.11 **Program Guide** means the governing document for Cisco Services Partner Program, defining program elements, including, but not limited to, eligibility, performance management, and any applicable rebates. The Program Guide (including the Additional Program Documentation incorporated therein) applicable for transactions through Cisco China
Company, Limited and Cisco (China) Innovation Technology Co., Ltd. is the country-specific Program Guide for the People's Republic of China made available by Cisco on http://www.cisco.com/go/cspp.

1.12 **Program Start Date** means the date when Reseller is authorized to participate in the Program and shall be the i) Effective Date of this Agreement for Territory in which Cisco has made the Program available or ii) the date provided in a notice by Cisco on the Program website and/or via email that the Program is being made available in an applicable Territory.

1.13 **Report(s)** means a report or reports generated by Cisco based on End User Network Information.  The information contained in Reports may include part or all of the collected End User Network Information, product alert information, and such other information as Cisco deems appropriate.

1.14 **Statement of Work or SOW** means the documents agreed upon by the parties that define the services and deliverables, if any, to be provided there under.

1.15 **TAC** means Cisco's Technical Assistance Center.

1.16 **Territory** means the country or countries in which Cisco has made the Program available to Reseller.

1.17 **Tool(s)** means the software or hardware appliance, commonly referred to as "Data Collector Tools" or "Collectors", which enables Reseller to run, on one or more computers connected to an End User's network, data collection devices in order to collect, analyze and provide reports regarding End User Network Information.

## 2   SCOPE OF THE PROGRAM.

2.1 This Attachment sets forth the governing terms and conditions for the Program under which Reseller is authorized to purchase and license Services from Authorized Source as of the Program Start Date. Except for Excluded Service Programs, any other attachment(s), exhibit(s) and/or appendices to the Agreement addressing services supported under a Previous Service Program within a Territory in which Program has been available is hereby deleted in its entirety as of the Program Start Date.

2.2 Reseller is eligible to participate in Previous Service Program in Territory for which CSPP has not yet become generally available. When the Program becomes available in a Territory (and Reseller is notified by Cisco of that availability), Previous Service Program will automatically terminate within such Territory and Reseller will gain entry in to Program in the applicable Territory and be entitled to participate in any service offerings for which eligibility requirements have been met.

## 3   ELIGIBILITY. Reseller acknowledges that it is authorized to provide Services under this Program for Products only on those technologies where Reseller has achieved such Cisco designated specializations or certifications as specified in the eligibility portion of the Program Guide and/or Additional Program Documentation. Additionally, Reseller understands and acknowledges that Cisco may from time to time require Cisco's Advanced Technology Provider certification or other specializations as a pre-requisite to the Reseller being certificated as meeting the requirements to support certain technologies or Products.

**4   CHANGE OF SCOPE.** Cisco reserves the right to make changes to the Program, or parts thereof, at any time, including, but not limited to, the eligibility criteria, performance metrics, service offerings, and rebates. Any Program changes shall become effective thirty (30) days from the date of Notice provided by Cisco.

**5   CISCO RIGHTS AND OBLIGATIONS.**

5.1   Cisco will make available the Services listed at http://www.cisco.com/go/cspp for purchase and resale, as applicable, by Reseller under the Program. Services are subject to availability limitations specified in the applicable Service Description. For any Services provided by Cisco directly to End User, Cisco shall perform the Services on behalf of Reseller, acting as Reseller's subcontractor.

5.2   Inspection Fee. In order to be eligible to receive support services as set out herein for Product that has not been previously supported, for Product where support has lapsed and/or for Other Product, the following shall apply:

5.2.1   Cisco may charge an inspection fee for Product and/or Other Product in accordance with Cisco's standard fee schedule on the Price List in effect at the time of inspection (any related upgrades, replacements, repairs, or troubleshooting are excluded); and

5.2.2   Cisco will validate a Software license exists for Software to be supported. Where a valid Software license does not exist, a Software license fee shall be payable by Reseller to Cisco.

5.3   Support under Previous Support Program. Product for which support was paid under Previous Support Program shall continue to be supported at the same level previously purchased until expiration of the support term after which time any further support shall be subject to the terms of the Program.

**6   RESELLER RIGHTS AND OBLIGATIONS.**

6.1   Reseller has read, understood, and agrees to comply with Program Guide, and Additional Program Documentation contained therein, located at http://www.cisco.com/go/cspp, which is incorporated herein by reference and may be updated from time to time by Cisco in its sole discretion under Section 4.0 (Change of Scope). Reseller must comply at all times with requirements of particular Services, Program Guide, and Additional Program Documentation in order to achieve and retain the benefits of the Program, including any associated rebates.

6.2   Prior to accepting a purchase order from an End User for Services provided by Cisco directly to End User, Reseller shall refer the End User to http://www.cisco.com/go/servicedescriptions, where the relevant Service Description and End User Obligations are posted, or provide a current copy of such documents to End User and ensure that End User understands (i) Cisco's obligations, (ii) End User's responsibilities under the applicable Service Description, and (iii) End User Obligations.

6.3   For transactions through Cisco China Company, Limited and Cisco (China) Innovation Technology Co., Ltd., Reseller acknowledges and agrees that no rebates are available and any additional or different compensation for such transactions is set forth in the Program Guide for the People's Republic of China.

**7   REPRESENTATION OF CISCO BRAND.** Reseller agrees to comply with the guidelines located at http://www.cisco.com/web/partners/market/partner-marks.html, which is incorporated herein by reference.

**8   RESERVED.**

**9   LICENSE.** Subject to the terms and conditions herein, Cisco grants to Reseller a limited, revocable, non-exclusive, non-transferable license to (a) use, display, reproduce, modify, and distribute Deliverables; (b) create, use, reproduce, and distribute derivative works of the Deliverables; and c) distribute Software that Reseller may receive as a result of Services provided under the Program, only on Product covered under the Program. The license herein is granted solely for Reseller's

support of End Users during its participation in the Program and solely for use with Cisco products. Reseller may not sublicense to any persons or entity any rights to reproduce or distribute the Deliverables. Cisco also may terminate this license upon written or oral notice to Reseller, with or without prior notice.

Access to and use of Tool(s) by Reseller is subject to acceptance of the Cisco End User License Agreement located at www.cisco.com/go/warranty, incorporated by reference and made a part hereof. Reseller agrees to return Tool(s) upon termination of the license or upon Cisco's request that the Tool(s) be returned to Cisco.

10  **OWNERSHIP.** As between Reseller and Cisco, Cisco shall at all times retain all right, title, and interest in and to all pre-existing Intellectual Property owned by Cisco as of the Effective Date and all Intellectual Property in and to the Services and Deliverables or other Intellectual Property provided or developed by Cisco or a third party on Cisco's behalf thereafter. As between Reseller and Cisco, Reseller shall at all times retain all right, title, and interest in and to all pre-existing Intellectual Property owned by Reseller as of the Effective Date and all Intellectual Property that is developed by Reseller or by a third party on Reseller's behalf thereafter without the benefit of any of Cisco's Intellectual Property. Third party hardware and software shall at all times be owned by the applicable third party.

11  **WARRANTY.** ALL SERVICES PROVIDED HEREUNDER SHALL BE PERFORMED IN A WORKMANLIKE MANNER. EXCEPT AS SPECIFIED IN THIS SECTION, CISCO HEREBY DISCLAIMS AND RESELLER WAIVES ALL REPRESENTATIONS, CONDITIONS, AND WARRANTIES (WHETHER EXPRESS, IMPLIED, OR STATUTORY), INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OR CONDITION (A) OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, TITLE, SATISFACTORY QUALITY, QUIET ENJOYMENT, ACCURACY, (B) ARISING FROM ANY COURSE OF DEALING, COURSE OF PERFORMANCE, OR USAGE IN THE INDUSTRY. TO THE EXTENT AN IMPLIED WARRANTY CANNOT BE DISCLAIMED, SUCH WARRANTY IS LIMITED IN DURATION TO THE APPLICABLE EXPRESS WARRANTY PERIOD. RESELLER'S SOLE AND EXCLUSIVE REMEDY FOR BREACH OF WARRANTY SHALL BE, AT CISCO'S OPTION, RE-PERFORMANCE OF THE SERVICES; OR CANCELLATION OF THE APPLICABLE SERVICE ORDERED AND RETURN OF THE PORTION OF THE SERVICE FEES PAID TO CISCO BY AUTHORIZED SOURCE FOR SUCH NONCONFORMING SERVICES.

12  **LIMITATION OF LIABILITY AND CONSEQUENTIAL DAMAGES WAIVER.**

12.1  ALL LIABILITY OF CISCO, ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND SUPPLIERS (COLLECTIVELY) FOR CLAIMS ARISING UNDER THIS ATTACHMENT OR OTHERWISE HOWSOEVER ARISING SHALL BE LIMITED TO THE AMOUNT PAID BY AUTHORIZED SOURCE TO CISCO PURSUANT TO THE RELEVANT SERVICE DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE EVENT OR CIRCUMSTANCES FIRST GIVING RISE TO SUCH LIABILITY. THIS LIMITATION OF LIABILITY IS CUMULATIVE AND NOT PER-INCIDENT (I.E., THE EXISTENCE OF TWO OR MORE CLAIMS WILL NOT ENLARGE THIS LIMIT).

12.2  EXCEPT FORRESELLER'S BREACH OF SECTION 9 (LICENSE), IN NO EVENT SHALL EITHER PARTY, ITS RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR SUPPLIERS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, OR LOST REVENUE, LOST PROFITS, OR LOST OR DAMAGED DATA, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN INFORMED OF THE POSSIBILITY THEREOF.

12.3  RESELLER EXPRESSLY ACKNOWLEDGES AND AGREES THAT IT IS SOLELY RESPONSIBLE FOR THE DETERMINATION AND IMPLEMENTATION OF THEIR END USER'S NETWORK, DESIGN, BUSINESS, OR OTHER REQUIREMENTS AND THAT CISCO SHALL NOT BE RESPONSIBLE FOR THE FAILURE OF DELIVERABLES AND/OR RELATED SOFTWARE TO MEET END USER'S NETWORK, DESIGN, BUSINESS, OR OTHER REQUIREMENTS.

12.4 If this Agreement is governed by the laws of England, the following will apply.

12.4.1 Nothing in this Agreement shall limit (i) the liability of Cisco, its Affiliates, officers, directors, employees, agents and suppliers to Reseller for personal injury or death caused by their negligence, (ii) Cisco's liability for fraudulent misrepresentation, or (iii) Cisco's liability in connection with any terms which cannot be excluded under applicable law.

## 13   DATA USAGE AND PROTECTION.

13.1     Each party has implemented and shall maintain appropriate technical and organizational security measures designed to protect Confidential Information against accidental or unauthorized loss, access, alteration, corruption, disclosure, unavailability, or destruction.

13.2     Each party shall restrict access to Confidential Information at all times solely to those personnel whose access is necessary in performing obligations under this Agreement.

13.3     Each party shall maintain written policies describing its technical and organizational security measures and the relevant procedures and responsibilities of its personnel who have access to Confidential Information and to its systems and networks where such Confidential Information is processed. Each party shall communicate its policies and requirements to all persons having access to Confidential Information.

13.4     Each party shall, without undue delay, notify the other party if any information security incident occurs that compromises or is likely to compromise the security of Confidential Information.

13.5     Each party shall respond promptly to reasonable requests from the other party for information, cooperation, and assistance related to its handling of Confidential Information.

13.6     Cisco shall use all Personal Data in accordance with this Agreement and Cisco's Privacy Statement located at https://www.cisco.com/c/en/us/about/legal/privacy-full.html.

13.7     "Personal Data" or "Personal Information" means any information that is about, or can be related to, an identifiable individual. It includes any information that can be linked to an individual or used to directly or indirectly identify an individual, natural person. Personal Data shall be considered Confidential Information. "personal data" and "personal information" shall be construed accordingly.

13.8     Each party shall, during the term of this Agreement, comply with all applicable mandatory laws in connection with any processing of Personal Data which it undertakes in the performance of or in connection with this Agreement, or which may otherwise apply, including without limitation, privacy or data protection laws applicable in the country or countries where Personal Data is collected, held, or otherwise processed including, but not limited to Regulation (EU) 2016/679 (General Data Protection Regulation or "GDPR").

13.9     Each party shall not transfer End User Personal data outside of a particular jurisdiction unless it is permitted under applicable mandatory law and the transferring party meets the security, privacy, and other legal requirements to allow such transfer.

13.10   Where either party processes Personal Data from the EEA or Switzerland, that party shall perform such processing in a manner consistent with the Privacy Shield Principles (see www.commerce.gov/privacyshield) or its successor framework(s) to the extent the Principles are applicable to the party's processing of such data. "EEA" means the European Economic Area and includes countries that are members of the European Free Trade Association and the then-current, post-accession member states of the European Union.

13.11   Where either party processes Personal Data from an APEC Member Economy, Cisco shall perform such processing in a manner consistent with the APEC Cross Border Privacy Rules Systems requirements (see www.cbprs.org) to the extent the requirements are applicable to Cisco's processing of such data. "APEC" means the Asia Pacific Economic Cooperation (see www.apec.org for more information).

## 14   ASSIGNMENT AND SUBCONTRACTING.

14.1 Without prejudice to the Assignment provision of the Agreement, Reseller may not delegate, assign, or subcontract any obligation which it has to an End User to provide support services for Products under the Program incorporating any of the Services, except where; (i) otherwise permitted in writing by Cisco or with its prior written consent; or

   (ii) Reseller subcontracts to a company that meets the qualification criteria for participation under the Program but is acting as a subcontractor to Reseller ("Services Only Partner"); or

   (iii) Reseller subcontracts to a service provider in respect of which Reseller demonstrates to Cisco's reasonable satisfaction, such approval not to be unreasonably withheld or delayed, that the service provider provides support services of an equivalent level of quality to a Reseller qualified under the Program.

14.2 In the event that the Territory includes a country within the European Economic Area ("EEA"), Reseller is authorized to provide support services incorporating the Services under the Program in an EEA country ("Destination Country") where it is not qualified to participate in the Program, provided it has either: (i) subcontracted the Services to a Services Only Partner qualified in the Destination Country as set forth above; or (ii) made other arrangements to Cisco's reasonable satisfaction, such approval not to be unreasonably withheld or delayed, to provide support services in the Destination Country of a quality equivalent to a Services Only Partner qualified in that country.

14.3 In all permitted exceptions identified above, the Reseller subcontracting the Services shall remain entirely responsible and any actions taken by the Reseller or the Services Only Partner will count in the measurement of Reseller's performance metrics under the Program.

## 15   TERM AND TERMINATION.

15.1 In addition to all rights and remedies which it may have under the Agreement, Cisco may terminate or suspend its performance in respect of some or all Products covered under this Program, whether or not Products were purchased prior to or subsequent to the Effective Date, immediately upon Notice if (i) Cisco receives notice from its Authorized Distributor of Reseller's failure to pay for the Services when due and fails to make such payment within fifteen (15) days after Cisco's receipt of such notice from its Authorized Distributor; (ii) if Reseller breaches the provisions of Section 9 (License), sub-Section 17.2 (Disclosure of Contract Information), sub-Section 17.3 (Service Marks), and/or any of the material provisions of this Attachment and fails to remedy such breach within thirty (30) days after written notification by Cisco to Reseller of such breach; (iii) in the event that Cisco discontinues Service for one or more Product for whatever reason, or (v) the Agreement terminates.

15.2 Cisco may at any time terminate the Program for convenience, for any reason or no reason, by providing Reseller with ninety (90) days prior written notice of termination.

15.3 This Attachment shall terminate when the Agreement terminates.

15.4 In the event that Cisco's obligations to Reseller under this Program with respect to support of Product for which payment was made prior to the expiration of the term as set forth in this Section extend beyond the term as applicable, and provided that Reseller complies with the terms of the Agreement and its obligations in this Attachment, Cisco will provide support to Reseller for the term of support specified in the purchase order issue to Cisco by Authorized Source provided that the maximum period of support shall not exceed three (3) years from the date of such purchase order.

## 16   INDEMNIFICATION.
Reseller hereby indemnifies and holds Cisco harmless from any claim, loss, damage, or expense, including, but not limited to, reasonable court costs and attorneys' fees, resulting from any claim made by End User against Cisco that: (a) Reseller has failed to provide End User with support services in accordance with an agreement between Reseller and End User; or (b) Reseller has failed to comply with or perform its obligations set forth in this Agreement, whether under a claim of a third party beneficiary or otherwise. This shall not limit Cisco's obligations, subject to the terms of this Agreement, to provide the support services described herein.

## 17   GENERAL.

17.1   <u>Third Party Services</u>.   Cisco reserves the right to subcontract the provision of all or part of the Services to a third party.

17.2   <u>Disclosure of Contract Information</u>. Reseller acknowledges and agrees that in no event shall any of the information contained in this Agreement or Reseller's service contract number(s) or Cisco.com access information be disclosed to any third party. Such information shall be considered Confidential Information under the Agreement.

17.3   <u>Service Marks</u>. Reseller will not use Cisco's service marks in any manner except as set out in this Agreement or as mutually agreed upon in writing.

17.4   <u>Entitlement</u>. Reseller acknowledges that Cisco has the right to verify an End User's entitlement to receipt of Services, and that End User is entitled to receive support services only on Product for which Reseller has paid the applicable license and support fees to Cisco. Reseller agrees to assist Cisco with enforcement of End User entitlement as necessary, including, without limitation, providing serial number(s) to Cisco and enabling Cisco to undertake inventory review(s).

17.5   <u>Notices</u>. All notices required or permitted under this Attachment will be in writing and will be deemed given one (1) day after deposit with a commercial express courier specifying next day delivery (or two (2) days for international courier packages specifying 2-day delivery), with written verification of receipt. All communications will be sent to the addresses set forth on the cover sheet of this Agreement or such other address as may be designated by a party by giving written notice to the other party pursuant to this paragraph. Notwithstanding the above, notices regarding changes to the Program may also be by posting on Cisco.com or by e-mail or fax.

17.6   <u>Survival.</u> Sections 9 (License), 10 (Ownership), 11 (Warranty), 12 (Limitation of Liability and Consequential Damages Waiver), 13 (Data Usage and Protection), 15 (Term and Termination), 16 (Indemnification), and 17 (General) shall survive the termination or expiration of this Attachment.

## Signature Block:

Company: _____

By: _____

Name: _____

Title: _____

Date: _____