RICHARD J. NELSON (State Bar No. 141658)
E-Mail:        *rnelson@sideman.com*
LOUIS P. FEUCHTBAUM (State Bar No. 219826)
E-Mail:        *lfeuchtbaum@sideman.com*
ZACHARY J. ALINDER (State Bar No. 209009)
E-Mail:        *zalinder@sideman.com*
LYNDSEY C. HEATON (SBN 262883)
E-Mail:        *lheaton@sideman.com*
ALEXANDER J. BUKAC (State Bar No. 305491)
E-Mail:        *abukac@sideman.com*
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:      (415) 392-1960
Facsimile:      (415) 392-0827

Attorneys for Plaintiffs and Cross-Defendants
CISCO SYSTEMS, INC. and
CISCO TECHNOLOGY, INC.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation, and CISCO TECHNOLOGY, INC., a California corporation, | Case No. 3:20-cv-04926 CRB |
| Plaintiffs, | **PLAINTIFFS CISCO SYSTEMS, INC. AND CISCO TECHNOLOGY, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DEXON COMPUTER, INC., a Minnesota corporation, | Honorable Charles R. Breyer |
| Defendant. | |
| AND RELATED CROSS-ACTIONS | **REDACTED PUBLIC VERSION OF DOCUMENT FILED PROVISIONALLY UNDER SEAL** |

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    Cisco filed the instant action on July 22, 2020 to put an end to Dexon's sales of counterfeit

2  "Cisco"-branded products.  However, instead of stopping its illicit sales, or agreeing to use Cisco's

3  tool to detect counterfeit products, recent discovery has revealed that Dexon has continued to sell

4  counterfeit "Cisco"-branded products through to present.  Cisco filed its Motion for Preliminary

5  Injunction to address this on-going conduct.

6    In support for its Motion for Preliminary Injunction, Cisco presented evidence from Chuck

7  Williams, a Director in Cisco's Brand Protection group, regarding the extent and breadth of

8  Dexon's counterfeit trafficking and included evidence regarding the continued trafficking activity

9  uncovered through Dexon's own production of documents in the related Texas Litigation.  As the

10  Court requested during the July 14 hearing, we hereby submit this supplemental brief and

11  accompanying declarations to further describe the extent of Dexon's prior and continued sales of

12  counterfeit "Cisco"-branded products. The history and magnitude of Dexon's counterfeit

13  trafficking combined with the evidence of its continued counterfeit sales since the date of the

14  Initial Complaint in this matter make it clear that the irreparable harm to Cisco will continue

15  unless an injunction is entered.  Dexon's sales data clearly demonstrates that Dexon continues to

16  sell tens of thousands of "Cisco"-branded products a year and its current anti-counterfeit screening

17  process is, as shown, insufficient.  It is inevitable that, unless stopped, Dexon will only continue to

18  sell more counterfeit "Cisco"-branded products as this case proceeds.  For these reasons, and as

19  described in Cisco's opening and reply papers, the Court should enter a preliminary injunction to

20  stem the tide of Dexon's continued harm to Cisco's brand and goodwill.

21    Since 2017, Cisco has uncovered the sale of more than 250 counterfeit "Cisco"-branded

22  products by Dexon, worth more than $3 million dollars based on Cisco's list price. *See*

23  Declaration of Michael Heidecker In Support of Cisco's Supplemental Brief ("Heidecker Decl.") ¶

24  5.  Michael Heidecker has been with Cisco for 15 years and manages Cisco's global engineering

25  team, supporting evaluations of potentially counterfeit products to determine if they are genuine or

26  counterfeit.  *Id.* at ¶¶ 1-2.  Through Mr. Heidecker's declaration, Cisco submits 75 Executive

27  Summary Reports ("ESRs") detailing the counterfeit determinations for 259 of these products and

28  the basis for those determinations.  *Id.* at ¶ 6 and Exhibit 1.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    Since the filing of the initial Complaint, Cisco has uncovered that Dexon has sold at least 9

2  additional counterfeit "Cisco"-branded units worth $96,063 in total.[1]  Nelson Supplemental Decl.

3  at ¶¶3-4, 6-9.  Dexon also sold SMARTnet coverage after the filing of the Complaint for a product

4  worth $40,689, which Cisco replaced at its own cost once the product started failing (under the

5  advanced-replacement support coverage provided for by the SMARTNet coverage Dexon sold).

6  *Id.* at ¶5.  When Cisco received the unit and examined it, Cisco discovered that the product was

7  counterfeit.  *Id.*  As described in Cisco's opening and reply briefing, Cisco generally discovers

8  Dexon's involvement in the sale of counterfeit products only long after Dexon has sold them and

9  only as a result of either luck, extreme diligence on Cisco's part, or the intervening acts of third

10  parties such as Dexon customers who report failed products to Cisco.  Given this delay, the fact

11  that Dexon continues to sell a large volume of Cisco product, and Dexon's continued

12  unwillingness to adopt more robust methods for screening of potential counterfeit products, it is

13  inevitable that Cisco will continue to uncover more and more-recent sales of counterfeit "Cisco"

14  products.

15    Because of the way counterfeit sales are uncovered, what Cisco has been able to determine

16  since the filing of the Complaint in terms of Dexon's counterfeit sales is likely only the tip of the

17  iceberg.  Some counterfeit products are discovered when End Users experience an issue with

18  purportedly genuine "Cisco"-branded product and must contact Cisco technical support ("TAC")

19  for a failure in the equipment.  *See* Declaration of F. Charles Williams In Support of Reply

20  ("Williams Reply Decl." at ¶ 4.  In those instances, however, Cisco may still not know that Dexon

21  is the source of a particular product determined to be counterfeit because Cisco records would not

22

23

---

24  [1]  Cisco requested that Dexon reduce its confidentiality designation of information relating to
   certain customers and sales data (from "Highly Confidential Attorneys Eyes Only" to
25  "Confidential") in order to allow Mr. Heidecker to attest to the connection between Dexon and
   certain counterfeit analyses occurring after the date of the Initial Complaint in this matter, and
26  Dexon refused.  *See* Declaration of Richard J. Nelson In Support of Cisco's Supplemental Brief
   ("Nelson Supplemental Decl.") at ¶2.  For that reason, the ESRs relating to specific counterfeit
27  sales made after the date of the Initial Complaint and the detail relating thereto are contained in a
   declaration from outside counsel for Cisco.  *Id.*

28

CISCO SYSTEMS, INC. AND CISCO TECHNOLOGY, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1  identify Dexon as even a link in the chain.  *Id.*[2]  As seen in the Dexon documents provided in

2  support of the opening brief, Cisco asks the customer for information about the source of

3  counterfeit products it discovers, but often receives no response.  Nelson Opening Decl. ¶¶ 7, 21-

4  22.  Indeed, Cisco has learned through discovery in the antitrust case Dexon filed against Cisco in

5  Texas that ███████████████████████████████████████  *Id.* at ¶ 22-

6  23.[3]  Further, ████████████████████████████████████

7  ███████████████████████████.  *Id.*  Because of the great lengths that

8  Dexon goes to hide its involvement with sales of counterfeit products, it is likely that Cisco has

9  barely scratched the surface of  Dexon's historical and ongoing counterfeit sales.

10      Dexon claims to be using the same "screening" process it has used for years to weed out

11  counterfeit product, and clearly it is not working.   As Cisco has told Dexon, the use of Cisco's

12  Package Lookup Tool would allow Dexon to confirm within seconds whether a package label is

13  genuine or counterfeit.  Heidecker Decl. at ¶.  Cisco has offered multiple times to Dexon the

14  ability to use the Package Lookup Tool, but Dexon spurned Cisco's offer.  Nelson Reply Decl. at ¶

15  4.  In light of the fact that Dexon's customers of counterfeit "Cisco"-branded products, as reflected

16  in the Second Amended Complaint and in the opening papers for this preliminary injunction



CISCO SYSTEMS, INC. AND CISCO TECHNOLOGY, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    motion, include highly sensitive customers—state and federal government agencies, banks, credit

2    unions, hospitals, universities, and more—Dexon's refusal to use the authentication tool offered to

3    it by Cisco is remarkable.

4        Further, Dexon's sales of "Cisco"-branded products has not slowed since the filing of the

5    initial Complaint.   In fact, during the period of July 22, 2020, to October 13, 2022 alone (the last

6    date of a sale in the information provided by Dexon), Dexon sold ▮▮▮▮ "Cisco"-branded

7    products, all with its ineffectual procedures to attempt to weed out counterfeit, leading to a

8    dangerously high number of potential counterfeit "Cisco"-branded products out in the market that

9    have yet to be discovered.  Nelson Supplemental Decl. at ¶ 10.

10       Of those products, ▮▮▮▮ are of the very same type and model numbers of counterfeit

11   "Cisco"-branded products Dexon has sold in the past.  *Id.*  Given the fact that Dexon's policies

12   haven't changed, there are likely to be many more counterfeit "Cisco"-branded products within the

13   near ▮▮▮▮ Dexon sold just since the date of the Initial Complaint and which sit as "ticking time

14   bombs" set to further harm Cisco's brand and goodwill in the future.  In addition, Dexon sold ▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮ since the filing of the Initial Complaint without those products being

16   inspected, which also stand to inflict irreparable harm to Cisco when some of them are inevitably

17   linked to counterfeit products.  Nelson Opening Decl. at ¶ 20.

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Nelson Supplemental Decl. at ¶¶ 11-

20   12.  Pro Network's owner, Onur Aksoy, was criminally indicted in July 2022 by a federal grand

21   jury for Pro Network's trafficking in a huge quantity of counterfeit "Cisco"-branded networking

22   equipment.  *Id*. at ¶ 11.  Mr. Aksoy entered his guilty plea to the charges last month, and he is

23   awaiting sentencing.  *Id.* at ¶12 and Exhibit 8.  Pro Network's records reveal that Dexon purchased

24   525 switches, routers, transceivers, and other "Cisco" products from Pro Network and that 163 of

25   those were purchased by Dexon **after** the date of the Initial Complaint, evidencing that Dexon

26   continued to purchase products from vendors of counterfeit products after this case was initiated.

27   *Id.*, Ex. 2.  Dexon's vendor-screening procedures (along with its product screening procedures)

28   have also, clearly, failed to prevent it from continuing to traffic in counterfeit products.

CISCO SYSTEMS, INC. AND CISCO TECHNOLOGY, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1     While Cisco has some information regarding Dexon's sales up to October 2022, Cisco is

2  just beginning to sift through the ▇▇▇▇ "Cisco"-branded products that Dexon sold since the date

3  of the Initial Complaint, yet, every time it looks, it discovers more.

4     Further, Cisco's provision of the Package Lookup Tool, enabling Dexon to prevent further

5  trafficking in counterfeit products, allows the injunction to be narrowly tailored to stop the

6  continued infringement and continued infliction irreparable harm to Cisco with little to no

7  additional steps on Dexon's part, particularly as it would eliminate the need for the other

8  counterfeit "inspections" Dexon claims to currently perform and which have been ineffectual.  It is

9  Dexon's burden to make sure it abides by the Lanham Act and Cisco has offered it a way to ensure

10  it is doing so with respect to Cisco products, yet it is refusing.[4]

11     Thus, the history of Dexon's counterfeit sales, the evidence of its continued counterfeit

12  sales, Dexon's sales of a significant quantity of "Cisco"-branded products, and the likelihood that

13  there are many more instances of sales of counterfeit products by Dexon since the filing of the

14  Initial Complaint that have yet to be uncovered, all warrant the entry of a preliminary injunction in

15  this matter.

16

17  DATED:  July 21, 2023                    SIDEMAN & BANCROFT LLP

18

19                                           By:    /s/ *Lyndsey C. Heaton*

20                                                  Lyndsey C. Heaton
                                                    Attorneys for Plaintiffs and Cross-Defendants
21                                                  CISCO SYSTEMS, INC. and
                                                    CISCO TECHNOLOGY, IN
22

23

24

25

26

27  [4]  That Dexon uses drop-shippers does not mean it gets to escape liability under the law and
    Dexon could work with its suppliers to provide it information for the Package Lookup tool to
28  ensure compliance.

2835-290\7085317                                  6                          Case No. 3:20-cv-04926 CRB

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711