RICHARD J. NELSON (State Bar No. 141658)
E-Mail: *rnelson@sideman.com*
LOUIS P. FEUCHTBAUM (State Bar No. 219826)
E-Mail: *lfeuchtbaum@sideman.com*
ZACHARY J. ALINDER (State Bar No. 209009)
E-Mail: *zalinder@sideman.com*
LYNDSEY C. HEATON (SBN 262883)
E-Mail: *lheaton@sideman.com*
ALEXANDER J. BUKAC (State Bar No. 305491)
E-Mail: *abukac@sideman.com*
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone: (415) 392-1960
Facsimile: (415) 392-0827

Attorneys for Plaintiffs and Cross-Defendants
CISCO SYSTEMS, INC. and
CISCO TECHNOLOGY, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation, and CISCO TECHNOLOGY, INC., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>DEXON COMPUTER, INC., a Minnesota corporation,<br><br>Defendant.<br><br>AND RELATED CROSS-ACTIONS | Case No. 3:20-cv-04926 CRB<br><br>**PLAINTIFFS CISCO SYSTEMS, INC. AND CISCO TECHNOLOGY, INC.'S OPPOSITION TO DEFENDANT DEXON COMPUTER, INC.'S MOTION TO DISMISS COUNTS IV-VIII AND COUNT IX (¶¶202-204) OF PLAINTIFFS' SECOND AMENDED COMPLAINT**<br><br>Date: October 20, 2023<br>Time: 10:00 AM<br>Crtrm.: Zoom<br><br>Honorable Charles R. Breyer |

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 1

II. STATEMENT OF FACTS ............................................................................................................ 2

III. LEGAL STANDARD .................................................................................................................. 5

IV. ARGUMENT ................................................................................................................................ 6

    A. CISCO MORE THAN ADEQUATELY STATES A CLAIM FOR COPYRIGHT INFRINGEMENT ....................................................................... 6

        1. Direct Copyright Infringement .......................................................... 6

        2. Indirect Copyright Infringement ....................................................... 9

    B. CISCO HAS PROPERLY PLED DMCA VIOLATIONS ........................................ 10

    C. CISCO HAS ADEQUATELY STATED A CLAIM FOR TRAFFICKING IN COUNTERFEIT/ILLICIT LABELS ............................................................ 12

    D. CISCO ALLEGES INDUCEMENT OF BREACH OF CONTRACT ........................ 13

    E. CISCO HAS ADEQUATELY PLED A FRAUD CLAIM ....................................... 14

    F. CISCO ADEQUATELY STATES A UCL CLAIM ............................................... 15

V. CONCLUSION .......................................................................................................................... 15

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adobe Sys. Inc. v. A&S Elec., Inc.*,
 153 F.Supp.3d 1136 (N.D. Cal. 2015) ............................................................................... 9, 11

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ................................................................................................................. 5

*Avaya Inc. v. Pearce*,
 WL 3238802 (N.D. Cal. July 18, 2019) .......................................................................... 11, 12

*Burroughs Payment Sys., Inc. v. Symco Grp., Inc.*,
 WL 13217738, at *5 (N.D. Ga. Dec. 13, 2011) ..................................................................... 11

*Cisco Sys., Inc. v. Beccela's Etc., LLC*,
 403 F. Supp. 3d 813 (N.D. Cal. 2019) ..................................................................................... 7

*Disney Enterprises, Inc. v. Redbox Automated Retail, LLC*,
 336 F. Supp. 3d 1146 (C.D. Cal. 2018) ................................................................................... 9

*Erickson v. Pardus*,
 551 U.S. 89 (2007) ................................................................................................................... 5

*Fitbit, Inc. v. Laguna 2, LLC*,
 WL 8294288 (N.D. Cal. Sept. 29, 2017) .................................................................................. 7

*Free Speech Sys., LLC v. Menzel*,
 390 F. Supp. 3d 1162 (N.D. Cal. 2019) ................................................................................. 10

*FTC v. Wellness Support Network, Inc.*,
 WL 4026867 (N.D. Cal. Sept. 12, 2011) .................................................................................. 5

*iSpot.tv, Inc. v. Teyfukova*,
 WL 1967958 (C.D. Cal. Jan. 25, 2023) ................................................................................. 12

*Knievel v. ESPN*,
 393 F.3d 1068 (9th Cir. 2005) .................................................................................................. 5

*Microsoft Corp. v. EEE Bus. Inc.*,
 555 F. Supp. 2d 1051 (N.D. Cal. 2008) ............................................................................ 11, 12

*Microsoft Corp. v. Ion Techs. Corp.*,
 484 F. Supp. 2d 955 (D. Minn. 2007) .................................................................................... 12

*Microsoft Corp. v. My Choice Software, LLC*,
 WL 5643210 (C.D. Cal. Oct. 10, 2017) ................................................................................. 12

*Neubronner v. Milken*,
  6 F.3d 666 (9th Cir. 1993) ................................................................................................. 14

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
  167 F. Supp. 2d 1114 (C.D. Cal. 2001) ............................................................................ 6, 9

*Synopsys, Inc. v. InnoGrit, Corp.*,
  WL 4848387 (N.D. Cal. Oct. 1, 2019) ...................................................................... 1, 10, 11

*Synopsys, Inc. v. Libr. Techs. Inc.*,
  WL 783898 (N.D. Cal. Oct. 1, 2019) .................................................................................. 11

*Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
  WL 5447959 (C.D. Cal. Oct. 4, 2012) ............................................................................. 5, 6

*Tarantinto v. Gawker Media, LLC*,
  WL 2434647 (C.D. Cal. Apr. 22, 2014) ............................................................................. 10

*Vernor v. Autodesk, Inc.*,
  621 F.3d 1102 (9th Cir. 2010) .................................................................................. 1, 7, 8, 9

**Statutes**

17 U.S.C. § 106(3) ................................................................................................................ 6, 8

18 U.S.C. § 2318 ............................................................................................................. 1, 3, 12

Cal. Bus. & Prof. Code § 17200 ............................................................................................. 15

# I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc. (collectively "Cisco" or "Plaintiffs") hereby submit their Opposition to Dexon Computer, Inc.'s ("Dexon's") Motion to Dismiss Cisco's Second Amended Complaint ("SAC").

Cisco's Opposition is based on the fact, *first*, its SAC adequately alleges claims for direct copyright infringement based on Dexon's sales of Cisco's software in violation of Cisco's license agreements and as the First Sale Doctrine provides no safe-harbor for Dexon for same reasons the court in *Vernor v. Autodesk, Inc*., 621 F.3d 1102, 1104–05 (9th Cir. 2010) (and this Court in prior rulings, *see* Dkt. No. 87) held that such legal theory does not apply to licensed software.

*Second,* Cisco adequately states a claim for indirect copyright infringement as it alleges that Dexon both knew of Cisco's license transfer restrictions and distributed infringing copies of Cisco's software to Dexon's customers with that knowledge.  Dexon's arguments otherwise amount to factual disputes not relevant to a motion to dismiss.

*Third*, the SAC adequately states a claim for DMCA violations following the weight of authority in this district that makes it clear that unauthorized use of license keys constitutes circumvention under the statute and as Cisco clearly alleges that Dexon sold improperly attained, fake product activation key claim certificates.  *Synopsys, Inc. v. InnoGrit, Corp.*, 19-CV-02082-LHK, 2019 WL 4848387, at *7-10 (N.D. Cal. Oct. 1, 2019).

*Fourth*, Cisco plainly alleges facts sufficient to state a claim under 18 U.S.C. § 2318, that Dexon "willfully and knowingly traffick[s] in counterfeit and/or illicit labels, documentation, or packaging accompanying or designed to accompany a copy of a computer program" as the allegations are premised on Dexon's distribution of these same counterfeit and/or illicit software license claim certificates.

*Fifth*, Cisco has more than adequately stated a claim for inducing breach of contract as it describes in the SAC how Dexon knowingly, and with the intent to conceal its activity from Cisco via fraud and deception, induced breach by Cisco's partners.

*Sixth*, Cisco's fraud claim more than passes the 9(b) pleading standard as the SAC describes the who, what, where, when, and how of Dexon's multiple instances of providing false

1 information to Cisco in order to induce it to replace counterfeit switches, to Cisco's detriment.

2 *Lastly*, Cisco's unfair competition claims are more than well-pled based on Cisco's allegations of fraud, copyright infringement, and DMCA claims as well as Cisco's Lanham Act claims, which Dexon does not challenge in its current motion.

For these reasons, and as more-fully described below, Cisco respectfully requests that the Court deny Dexon's motion in its entirety.

## II.   STATEMENT OF FACTS

This case seeks to hold Dexon accountable for its large-scale, unabated counterfeiting of Cisco's trademarks - which Dexon leverages to dupe customers into believing that the illicit "Cisco"-branded products and software licenses it sells are genuine - as well as Dexon's large-scale violations of Cisco's copyrights, inducement of breach by Cisco's partners, and its fraud upon Cisco. In order to rectify these wrongs, SAC included additional claims against Dexon for tortious interference with contract, violations of federal copyright law, and related federal statutes. Cisco's allegations in the SAC plead in sufficient detail the facts that demonstrate those additional claims.

Along with its counterfeiting allegations, Cisco's SAC explicitly alleges Dexon's actions which form the basis of copyright infringement claims as well as violations of the DMCA, and also claims of trafficking in counterfeit and illicit labels. Cisco identifies many of its federal copyright registrations relating to its software, including by registration number and date and Cisco makes it clear that all of its software (without any distinction being made for embedded or standalone software) is licensed, not sold, subject to Cisco's End User License Agreement ("EULA"), and is not transferrable. *Id.* at ¶¶ 22- 23. Cisco further alleges that Dexon has unlawfully distributed Cisco's software in violation of Cisco's copyrights and the EULA. *Id.* Cisco makes it clear that it "does not sell its software at all, and does not authorize third parties, like Dexon, to sell its software licenses to anyone. Instead, Cisco only distributes its software licenses through authorized channels . . . . In fact, any Cisco software license sold and distributed by an unauthorized source is invalid and infringing. As detailed in Cisco's End User License Agreement ('EULA'), a license is valid only if the user purchased it from an 'Approved Source,'

which is limited to either Cisco, or a reseller, distributor, or systems integrator that has been authorized by Cisco. By that definition, Dexon is not an Approved Source. Further, the license is for the specific End User that purchased the license from Cisco or an Approved Source and is not allowed to be subsequently transferred." *Id*. at ¶ 98. Thus "**any** licenses [Dexon] sold were invalid and infringing[.]" *Id.* (emphasis added).

The SAC further alleges that Dexon bought sold and distributed over 8,000 infringing software licenses since 2017 and over 4,000 since 2020. *Id.* at ¶ 100. Cisco details that the customers Dexon sold infringing software to include health care networks, educational institutions, governmental entities, and banks. *Id.* On these allegations alone, it is clear that Cisco has adequately stated a claim for direct copyright infringement as the right to control distribution of copies of a copyrighted work is core to Section 106, and Cisco has easily satisfied its pleading burden. Cisco further alleges that Dexon is distributing copies of Cisco's licensed software, not merely selling random alphanumeric keys. *See* SAC at ¶¶ 23-24, 96-103 & 163-166.

Cisco also clearly alleges that Dexon knew that it was contributing to direct infringement by its customers as it provided a copy of the EULA along with the infringing licenses it sold. *See* SAC at ¶ 98 ("Dexon was aware of Cisco's EULA license and its terms. Indeed, Dexon provided customers with a copy of Cisco's EULA, which describe[s] how any license sold by Dexon, or similar entities are invalid and infringing."). And even Dexon admits that Cisco clearly alleges that Dexon materially contributes to its customer's infringement of Cisco's software by assisting them to use, copy, and/or further distribute Cisco's copyrighted works. Dexon's Motion to Dismiss at p. 12:8-10. Cisco's SAC clearly alleges Dexon knew of the EULA license restrictions, provided the terms of the licenses to its customers, and actively knew of their customer's infringement by way of Dexon's distribution. *See* SAC at ¶¶ 98-103.

As DMCA violations, Cisco plainly alleges facts sufficient to state a claim under 18 U.S.C. § 2318, that Dexon "willfully and knowingly traffick[s] in counterfeit and/or illicit labels, documentation, or packaging accompanying or designed to accompany a copy of a computer program." SAC, ¶¶ 179-181. And Cisco's SAC clearly lays out how Dexon utilized a known scheme to purchase fake PAK claim certificates and resell them. *See* SAC at ¶ 101.

As for inducing breach of contract, Cisco more than sufficiently alleges the terms of its Indirect Channel Partner Agreement ("ICPA") (which is also attached to the SAC), and that Dexon knew of these restrictions. *See* SAC ¶¶ 104-124. "Dexon has developed a network of rogue suppliers that it induces to procure SMARTNet contracts in violation of each supplier's agreement with Cisco, such as the Indirect Channel Partner Agreement. Dexon was intimately familiar with (and held itself out as an expert in) Cisco's Authorized Partnership program, falsely representing to customers both that it exclusively sourced its products from 'authorized resellers' and falsely claiming that it was once an Authorized Partner but 'made the choice to break [its] relationship with Cisco.'" *Id.* at ¶¶ 104-105. Further, Cisco has alleged that "Dexon knew since at least 2014 that Authorized Partners were at risk of having their agreements terminated by Cisco for selling to Dexon or other unauthorized resellers. In the past, when Cisco has terminated a partner due to sales of invalid SMARTNet contracts, Dexon has remained undeterred and simply finds new SMARTNet suppliers for its unauthorized products." *Id.* at ¶ 105. "Indeed, Dexon employees openly admit that the resellers that Dexon purchases SMARTNet contracts from are in blatant violation of the Indirect Channel Partner Agreements the resellers are bound by." *Id.* at ¶ 107. Further, Cisco detail in its SAC specific instances of Dexon, time and time again, approaching Cisco partners, with full knowledge of their obligations, and actively inducing them to breach. *Id.* at ¶¶ 108-124. As on example, on March 29, 2018, one Authorized Partner explained to Dexon that "Cisco restricts us from selling Cisco products to resellers so we try to keep the quotes and orders small and off of their radar." In internal communications on January 5 and 21, 2021, Dexon employees acknowledged that Authorized Partners were "not supposed to sell to resellers" and "not supposed to be selling to an unauthorized reseller . . . us" (ellipses in original). Yet, Dexon willfully and knowingly interfered with Cisco's contracts by inducing Authorized Partners to breach their agreements by selling Cisco products and services to Dexon for purposes of resale." See SAC ¶107.

Cisco's SAC also fully alleges Dexon's fraud and sets out, in detail, the who, what, where, when, and how of those facts. Namely, Cisco alleges that Dexon employees concealed their identities on numerous occasions, each specifically identified, to provide misinformation

1 regarding purportedly genuine "Cisco"-branded products, all to induce Cisco to replace defective
2 counterfeit products with new, genuine products, causing Cisco harm.  *See* SAC ¶¶ 184-185.
3 Cisco specifically alleges that Dexon employees provided misinformation to Cisco regarding the
4 provenance and attributes of Cisco products procured on the secondary market in order to induce
5 Cisco to to replace those products even though they were not subject to valid Cisco warranties or
6 service contracts. *See* SAC at  184-185.  In each of those paragraphs, Cisco lays out the who
7 (Decon employees using personal email addresses and/or opening service requests hiding their
8 identities, the what (providing misinformation and/or concealing from Cisco attributes of the
9 products in question, particularly with respect to whether they were subject to valid service
10 contracts and/or warranties), the how (email communications and electronic service requests), the
11 why (to induce Cisco to replace products at its own cost and to its detriment) and then when (date
12 ranges from 2018 to 2022). *See id.*

### III. LEGAL STANDARD

In considering a motion to dismiss for failure to state a claim, the Court accepts as true all material allegations in the complaint and construes those allegations in the light most favorable to the plaintiff.  *See Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).  "Detailed factual allegations" are not required, but the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  As such, "a plaintiff's burden at the pleading stage is relatively light," requiring just "a short and plain statement of the claim showing that the pleader is entitled to relief."  *FTC v. Wellness Support Network, Inc.*, No. 10-cv-04879-JCS, 2011 WL 4026867, *2 (N.D. Cal. Sept. 12, 2011) (internal citations omitted).

Even under Rule 9(b)'s heightened standard, a complaint need only plead facts establishing fraud is plausible, not probable.  *See Tanedo v. E. Baton Rouge Par. Sch. Bd.,* No. SA CV10-01172 JAK, 2012 WL 5447959, at *8 (C.D. Cal. Oct. 4, 2012). Under either pleading standard, in determining the sufficiency of a pleading, allegations of material fact are taken as true and *construed in the light most favorable to the pleader. See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (emphasis added).

## IV. ARGUMENT

### A. CISCO MORE THAN ADEQUATELY STATES A CLAIM FOR COPYRIGHT INFRINGEMENT

#### 1. Direct Copyright Infringement

Dexon purposefully misconstrues Cisco's claim for direct copyright infringement and ignores the well-pled facts surrounding Cisco's software copyrights and Dexon's rampant infringement.  First, Cisco's SAC explicitly identifies many of its federal copyright registrations relating to its software, including by registration number and date.  *See* SAC at ¶ 22.  That Dexon claims not to be aware of what works are at issue is plainly a farce.  Second, Cisco makes it clear that all of its software (without any distinction being made for embedded or standalone software) is licensed, not sold, subject to Cisco's End User License Agreement ("EULA"), and is not transferrable.  *Id.* at ¶ 23.  Cisco further alleges that Dexon has unlawfully distributed Cisco's software in violation of Cisco's copyrights and the EULA.  *Id.*  Cisco makes clear that it "does not sell its software at all, and does not authorize third parties, like Dexon, to sell its software licenses to anyone."  Instead, Cisco only distributes its software licenses through authorized channels . . . . In fact, any Cisco software license sold and distributed by an unauthorized source is invalid and infringing.  As detailed in Cisco's End User License Agreement ('EULA'), a license is valid only if the user purchased it from an 'Approved Source,' which is limited to either Cisco, or a reseller, distributor, or systems integrator that has been authorized by Cisco.  By that definition, Dexon is not an Approved Source.  Further, the license is for the specific End User that purchased the license from Cisco or an Approved Source and is not allowed to be subsequently transferred."  *Id.* at ¶ 98.  Thus "**any** licenses [Dexon] sold were invalid and infringing[.]" *Id.* (emphasis added).

The SAC further alleges that Dexon bought sold and distributed over 8,000 infringing software licenses since 2017 and over 4,000 since 2020.  *Id.* at ¶ 100.  Cisco details that the customers Dexon sold infringing software to include health care networks, educational institutions, governmental entities, and banks.  *Id.*  On these allegations alone, Cisco has more than sufficiently stated a claim for direct copyright infringement, as the right to control distribution of copies of a copyrighted work is core to Section 106, and Cisco has easily satisfied its pleading burden.  *See* 17 U.S.C. § 106(3); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 167 F.

Supp. 2d 1114, 1120 (C.D. Cal. 2001) (no particularity requirement for copyright claim).

That Dexon may try to assert some defense to portions of Cisco's direct infringement claim, does not make it any less well-pled and viable past the pleading stage, and Dexon's arguments otherwise amount to factual disputes that are inappropriate for a motion to dismiss.

Dexon's reliance on the "First Sale Doctrine" is both premature and incorrect on the law. Even if Dexon could prove the First Sale Doctrine as an affirmative defense (it cannot), Cisco's infringement and licensing allegations are more than sufficient, such that at most what Dexon could hope for would be "questions of fact that cannot be resolved at the 12(b)(6) juncture because there are sufficient allegations in the complaint[.]" *Fitbit, Inc. v. Laguna 2, LLC*, No. 17-CV-00079-EMC, 2017 WL 8294288, at *1 (N.D. Cal. Sept. 29, 2017) (declining to grant 12(b)(6) motion to dismiss on the grounds of the first sale doctrine).

Further, Ninth Circuit law is settled that the First Sale Doctrine does not apply to software, like here, that is licensed, rather than sold. *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1104–05 (9th Cir. 2010). In *Vernor*, the Ninth Circuit found that held that the First Sale Doctrine did not apply to Autodesk's software copyright infringement claims because the infringer was merely a licensee of the software (subject to transfer restrictions) and not an owner. *Id.* The Ninth Circuit established a three-part test, all elements of which Cisco alleges in its SAC: "a software user is a licensee rather than an owner of a copy where the copyright owner (1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions." *Id.* at 1111. Every one of those conditions is met by the SAC's copyright allegations, making the First Sale Doctrine not a bar to Cisco's claims at all, let alone at the pleading stage.

The same holds true whether software is standalone or is embedded in hardware. *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 828–29 (N.D. Cal. 2019) ("The Court has not located (and Defendants do not cite, []) any case law that would suggest that application of this well-established law to software embedded in hardware would run afoul of the first sale doctrine. Indeed, if the Court were to apply the first sale doctrine to embedded software as a matter of law, such a holding would render the above case law a nullity in a huge swath of software licensing

1  cases.") (internal citation omitted).  Further, this Court has already previously ruled that Dexon's

2  First Sale Doctrine arguments regarding embedded software are ineffectual: "Dexon alleges that

3  Cisco informs customers that 'although its hardware can be freely resold, the 'embedded Cisco

4  software that runs on the hardware' is 'not transferable,' and purchasers of secondary market

5  Cisco equipment 'must acquire a new license from Cisco before the software can be used.'

6  Countercl. ¶ 102.  Dexon contends that this statement is false because it violates the first sale

7  doctrine.  But that doctrine applies to purchased software, not to purchased software licenses.

8  Dexon alleges no plausible facts suggesting that initial owners of Cisco equipment own (rather

9  than merely license) the embedded software. Cisco makes no misrepresentation when it informs

10 secondary-market equipment purchasers that they need a software license. *See Link US*, 2019 WL

11 6682838, at *7–8 (*citing Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1007 (9th Cir. 2010))." Dkt.

12 No. 87, Order on Motion to Dismiss Counterclaims at 12:6-11.  That Dexon disputes Cisco's

13 allegations regarding licensing software is irrelevant to a motion under Rule 12(b)(6).

14      Dexon also misreads and mis-states Cisco's allegations with respect to infringing sales of

15 software product activation keys ("PAKs").  Dexon argues that Cisco's sale of the PAKS amounts

16 only to the selling of alphanumeric key codes, which are not independently copyrightable, yet

17 Dexon's argument fails because Cisco alleges that Dexon is distributing copies of Cisco's licensed

18 software, not merely selling random alphanumeric keys.  *See* SAC at ¶¶ 23-24, 96-103 & 163-166.

19 *Vernor*, again, is directly on point.  *Vernor*, at 1112.  In that case, Vernor bought copies of

20 Autodesk software at an office sale, with the specific authorization codes written on the outside of

21 the software package.  *Id*. at 1105.  Vernor did not open the package or otherwise assent to

22 Autodesk's license agreement before attempting to resell the software, with the activation codes,

23 on eBay.  *Id*.  The Ninth Circuit held that Vernor was at most a licensee who violated Autodesk's

24 Section 106 distribution right by selling the software package on eBay, and that his customers

25 received no rights to the software they purchased.  *Id*. at 1112 ("Both CTA's and Vernor's sales

26 infringed Autodesk's exclusive right to distribute copies of its work. *Id.* § 106(3)."). This is no

27 different from what Cisco alleges here.  *See* SAC at ¶¶ 23-24, 96-103 & 163-166.

28      Even if Dexon were only distributing bare software license keys (and, as described above,

that is not what Cisco alleges), such activity still constitutes copyright infringement. *See, e.g., Adobe Sys. Inc. v. A&S Elec., Inc.*, 153 F.Supp.3d 1136, 1144 (N.D. Cal. 2015) (rejecting the argument that resale of license keys excuses Defendant from copyright liability for distribution of the underlying software). In *Adobe v. A&S*, the court explicitly found that "even if the serial license key is not separately subject to copyright protection, Defendants' alleged distribution of the code to facilitate the sale and use of software it had no right to distribute is sufficient to state a claim for copyright infringement." *Id.*

Dexon's reliance on the *Pearson*, and *Perfect 10* cases in its motion is misplaced. In those cases, the copyright infringement defendant merely provided a customer with HTML instructions directing a user to a website where there was infringing content (*Perfect 10*), or emailing a link to website where there was infringing content (*Pearson*) which is wholly different from actively purchasing, marketing, selling, and distributing fake software license keys to unlawfully distribute Cisco's software to its customers.

As *Vernor* made clear, the First Sale Doctrine simply "does not apply to a person who possesses a copy of the copyrighted work without owning it, such as a licensee." *Vernor*, 621 F.3d at 1107 (citing 17 U.S.C. § 109(d)). As alleged in Cisco's Complaint, Cisco only licenses its software, and therefore, Dexon's direct copyright infringement argument holds no water.

### 2. Indirect Copyright Infringement

Dexon's indirect infringement arguments fail for the same reasons, including that it makes factual arguments which are improper at the pleading stage. Cisco clearly alleges that Dexon knew that it was contributing to direct infringement by its customers as it provided a copy of the EULA along with the infringing licenses it sold. *See* SAC at ¶ 98 ("Dexon was aware of Cisco's EULA license and its terms. Indeed, Dexon provided customers with a copy of Cisco's EULA, which describe[s] how any license sold by Dexon, or similar entities are invalid and infringing."). Dexon admits that Cisco clearly alleges that Dexon materially contributes to its customer's infringement of Cisco's software by assisting them to use, copy, and/or further distribute Cisco's copyrighted works. Dexon's Motion to Dismiss at p. 12:8-10. *See Disney Enterprises, Inc. v. Redbox Automated Retail, LLC*, 336 F. Supp. 3d 1146, 1156 (C.D. Cal. 2018) ("Because Redbox

1  did not obtain an ownership right to any digital content when it purchased Combo Packs, Disney
2  has adequately shown that it is likely to succeed on its claim that Redbox encouraged Redbox
3  customers to infringe Disney's copyrights by redeeming Codes in violation of the license terms set
4  forth on the redemption sites.").

5        Dexon's reliance on *Tarantinto v. Gawker Media, LLC*, 2014 WL 2434647 (C.D. Cal. Apr.
6  22, 2014) is also misplaced as, in that case, the defendant merely posted hyperlinks to copyrighted
7  material on its website and did not engage in the type of active marketing, sale, and direct
8  distribution of infringing software licenses that Cisco alleges here.  The same is true with respect
9  to *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1173 (N.D. Cal. 2019), where the
10 Court found no indirect infringement because there were no facts alleged "that could plausibly
11 suggest [the purported infringer] knew of the action of that third-party[.]"  Here, Cisco clearly
12 alleges Dexon knew of the EULA license restrictions, provided the terms of the licenses to its
13 customers, and actively knew of their customer's infringement by way of Dexon's distribution.
14 Indeed, the whole point of Dexon distributing the Cisco software licenses to its customers is for
15 those same customers to receive, copy, and otherwise use the underlying Cisco software
16 associated with that software license.  Dexon's arguments make no sense and certainly provide no
17 basis for a challenge at the pleading stage.

18       **B.    CISCO HAS PROPERLY PLED DMCA VIOLATIONS**

19       Dexon's arguments regarding failure to allege DMCA violations are similarly meritless.
20 The overwhelming weight of authority in this District holds that DMCA claims based on license
21 keys are valid and well pled.  *Synopsys, Inc. v. InnoGrit, Corp.*, 19-CV-02082-LHK, 2019 WL
22 4848387, at *7-10 (N.D. Cal. Oct. 1, 2019) (holding that unauthorized use of license keys
23 constitutes circumvention).  The *InnoGrit* court collected cases and held the following:

> 24-28 The majority of the courts in this district have found that a defendant's unauthorized use of license keys or passwords, as Synopsys has alleged, constitutes circumvention under Section 1201(a)(1). *See Actuate Corp. v. Int'l Bus. Machines Corp.*, 2010 WL 1340519 (N.D. Cal. Apr. 5, 2010) (Spero, M.J.) ("[U]nauthorized distribution of passwords and usernames avoids and bypasses a technological measure in violation of sections 1201(a)(2) and (b)(1)."); *Microsoft Corp. v. EEE Bus. Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2008) (White, J.) ("By distributing a VLK without authorization, [defendant] effectively

1  circumvented [plaintiff's] technological measure to control access to a copyrighted work in violation of the DCMA."); *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1098 (N.D. Cal. 2004) (N.D. Cal. 2004) (Illston, J.) ("However, while [defendant's] software does use the authorized key to access the DVD, it does not have authority to use this key, as licensed DVD players do, and it therefore avoids and bypasses [the technological measure]."); *see also Burroughs Payment Sys., Inc. v. Symco Grp., Inc.*, 2012 WL 1670163, at *4 (N.D. Cal. May 14, 2012) (Spero, M.J.) (explaining that the Northern District of California has taken the "view that unauthorized use of a valid password 'circumvents' technology measures") (*quoting Burroughs Payment Sys., Inc. v. Symco Grp., Inc.*, 2011 WL 13217738, at *5 (N.D. Ga. Dec. 13, 2011)). Under the holdings of these cases, InnoGrit's conduct clearly constitutes circumvention under Section 1201(a)(1) of the DMCA because the SAC specifically alleges that InnoGrit lacked authorization to use the license key on the 15 InnoGrit computers in San Jose, California. SAC ¶ 27.

*Id.* at *8.

Dexon's attempt to cast doubt on this authority ring hollow.  While Dexon is correct that the *Microsoft Corp. v. EEE Business Inc.*, 555 F.Supp.2d 1051, 1059 (N.D. Cal. 2008) was decided at the summary judgment phase, it does not disturb the fact that the court found that unauthorized distribution of product keys qualified as contributory infringement.  Further, despite what Dexon argues, the court in *Avaya Inc. v. Pearce*, No. 19-CV-00565-SI, 2019 WL 3238802, at *3 (N.D. Cal. July 18, 2019), did not base its refusal to dismiss DMCA claims on allegations relating to phones with hacked internal components, but found that plaintiff Avaya had sufficiently stated a claim for DMCA violations against defendant Telephone Man of America for his sale of "encrypted alphanumeric codes," unrelated to any hardware phone sales, and which provided access to copyrighted software.  Further, here, Cisco has alleged that Dexon sold fake and counterfeit PAKs that were generated by tools specifically made to circumvent Cisco's controls, aligning Dexon's nefarious acts with the defendants in *Synopsys, Inc. v. Libr. Techs. Inc.*, 2022 WL 783898, at *2 (N.D. Cal. Oct. 1, 2019) and *InnoGrit, Corp.*, at *7-10.

Dexon's citation to *Adobe Sys. Inc. v. A & S Elecs., Inc.,* No. C 15-2288 SBA, 2015 WL 13022288, at *2 (N.D. Cal. Aug. 19, 2015), is also inapposite. *Adobe* is not consistent with the great weight of authority in this District interpreting the DMCA (as set forth in *Innogrit* above) and is easily distinguishable in any event.  In that case, the allegations concerned the mere use or distribution of unauthorized passwords and license keys, without any additional actions taken on

the part of the defendants, which is wholly distinguishable from the additional actions Dexon took here.  *See id.*  Further, Dexon's *iSpot.tv* case is similarly unhelpful to its position and, if anything, supports Cisco.  *See iSpot.tv, Inc. v. Teyfukova*, No. 2:21-cv-06815-MEMF-MARx, 2023 WL 1967958, at *13 (C.D. Cal. Jan. 25, 2023).  *iSpot.tv* did not concern license keys at all, but rather whether an employee's use of her own username and password to access a database was a DMCA violation.  *See id*. at *10-13 (allowing leave to amend DMCA claim to add unauthorized use of the username and password).

In short, Cisco has properly alleged DMCA claims here.

### C.  CISCO HAS ADEQUATELY STATED A CLAIM FOR TRAFFICKING IN COUNTERFEIT/ILLICIT LABELS

Dexon similarly fails to identify any pleading defect in Cisco's counterfeit and illicit label claim.  Cisco plainly alleges facts sufficient to state a claim under 18 U.S.C. § 2318, that Dexon "willfully and knowingly traffick[s] in counterfeit and/or illicit labels, documentation, or packaging accompanying or designed to accompany a copy of a computer program."  SAC, ¶¶ 179-181.  Claims, like these, that are premised on Dexon's distribution of counterfeit and/or illicit software license claim certificates are well pled and legally sufficient.  The *Avaya v. Pearce* case is, in fact, on point as the court found *Avaya* had sufficiently stated a claim for trafficking in counterfeit and/or illicit labels against down-stream resellers who sold pirated software activation keys, just as Dexon here sold thousands of counterfeit PAKs.  *Avaya*, 2019 WL 3238802 at *3.  And the fact that the court in *EEE Business Inc.*, found a claim to be not only sufficiently stated but sufficiently proved for summary judgment purposes on facts similar to those here weights in Cisco's favor, not Dexon's.  *Microsoft v. EEE Business Inc.*, 555 F.Supp. at 1059 (granting summary judgment as to trafficking in counterfeit labels with license keys).

Dexon's reliance on the *MyChoice Software* case is similarly misplaced.  *Microsoft Corp. v. My Choice Software, LLC*, No. SA-cv-162187-DOC-KESx, 2017 WL 5643210, at *5 (C.D. Cal. Oct. 10, 2017).  The court in that case found that Microsoft had not sufficiently pled the elements of the claim and granted leave to amend.  *Id.*; *cf. Microsoft Corp. v. Ion Techs. Corp.*, 484 F. Supp. 2d 955, 961 (D. Minn. 2007) (granting summary judgment under § 2318 based on shipment of

standalone certificates). Further, this case is distinguishable from *Synopsys, Inc. v. Ubiquiti Networks*, Inc., No. 17-CV-00561-WHO, 2017 WL 3485881, at *12 (N.D. Cal. Aug. 15, 2017), where the court held that there were no allegations that the defendant "made unauthorized copies of Synopsys' software and then improperly used *someone else's* legitimate temporary key to access those unauthorized copies" where, here, Cisco has alleged, among other things, that Dexon trafficked in counterfeit and fake PAK certificates, including at a minimum where the software license keys to put on the certificate were obtained through a known illegal scheme. *See* SAC at ¶ 101.

### D. CISCO ALLEGES INDUCEMENT OF BREACH OF CONTRACT

On inducing of breach of contract, Dexon again ignores allegations in the SAC which lay out Cisco's partners obligations to Cisco, Dexon's knowledge of those obligations, and Dexon's active inducement of breach of Cisco's partner's contracts with Cisco. Dexon, for some reason, ignores the fact that Cisco more than sufficiently alleges the terms of its Indirect Channel Partner Agreement ("ICPA") (which is also attached to the SAC), and that Dexon knew of these restrictions. *See* SAC ¶¶ 104-124. "Dexon has developed a network of rogue suppliers that it induces to procure SMARTNet contracts in violation of each supplier's agreement with Cisco, such as the Indirect Channel Partner Agreement. Dexon was intimately familiar with (and held itself out as an expert in) Cisco's Authorized Partnership program, falsely representing to customers both that it exclusively sourced its products from 'authorized resellers' and falsely claiming that it was once an Authorized Partner but 'made the choice to break [its] relationship with Cisco.'" *Id.* at ¶¶ 104-105. Further, Cisco has alleged that "Dexon knew since at least 2014 that Authorized Partners were at risk of having their agreements terminated by Cisco for selling to Dexon or other unauthorized resellers. In the past, when Cisco has terminated a partner due to sales of invalid SMARTNet contracts, Dexon has remained undeterred and simply finds new SMARTNet suppliers for its unauthorized products." *Id.* at ¶ 105. "Indeed, Dexon employees openly admit that the resellers that Dexon purchases SMARTNet contracts from are in blatant violation of the Indirect Channel Partner Agreements the resellers are bound by." *Id.* at ¶ 107.

Further, Cisco details in its SAC specific instances of Dexon, time and time again,

1  approaching Cisco partners, with full knowledge of their obligations, and actively inducing them

2  to breach. *Id.* at ¶¶ 108-124.  As on example, on March 29, 2018, one Authorized Partner

3  explained to Dexon that "Cisco restricts us from selling Cisco products to resellers so we try to

4  keep the quotes and orders small and off of their radar." In internal communications on January 5

5  and 21, 2021, Dexon employees acknowledged that Authorized Partners were "not supposed to

6  sell to resellers" and "not supposed to be selling to an unauthorized reseller . . . us" (ellipses in

7  original). Yet, Dexon willfully and knowingly interfered with Cisco's contracts by inducing

8  Authorized Partners to breach their agreements by selling Cisco products and services to Dexon

9  for purposes of resale." See SAC ¶107.  Dexon may seek to disprove these allegations, but, at this

10 stage, the Court must accept Cisco's allegations as true.  Further, Cisco's fraud claims, along with

11 Cisco's general allegations of concealment and deception, make it apparent that any addition

12 factor requiring allegations of an additional "wrongful act" are more than clearly stated.

13     As to Dexon's statute of limitations argument, while Cisco alleges some facts regarding

14 the historical nature of Dexon's actions, none of them excuse or inoculate from Dexon's continued

15 intentional inducements of breach within the statutory time frame, which continue up until this

16 dat.  *See* SAC at ¶¶ 107-136.

17     **E.     CISCO HAS ADEQUATELY PLED A FRAUD CLAIM**

18     As to common law fraud, Dexon ignores the extensive sections of the SAC which set out,

19 in detail, the who, what, where, when, and how of the fraud alleged and more than satisfy the 9(b)

20 pleading standard. Namely, Cisco alleges that Dexon employees concealed their identities on

21 numerous occasions, each specifically identified, to provide misinformation regarding purportedly

22 genuine "Cisco"-branded products, all to induce Cisco to replace defective counterfeit products

23 with new, genuine products, causing Cisco harm.  *See* SAC ¶¶ 184-185.  Those facts establish a

24 well-pled fraud claim.  The fact that the allegations are made on "information and belief" cannot

25 help Dexon, because the "information and belief" supporting the allegations are derived from

26 documents Dexon produced in the Texas Litigation and such allegations are sufficient where facts

27 constituting fraud are uniquely held with the defendant. *Neubronner v. Milken*, 6 F.3d 666, 672

28 (9th Cir. 1993) ("[T]he general rule that allegations of fraud based on information and belief do

1  not satisfy Rule 9(b) may be relaxed with respect to matters within the opposing party's
2  knowledge.").
3    Cisco specifically alleges that Dexon employees provided misinformation to Cisco
4  regarding the provenance and attributes of Cisco products procured on the secondary market in
5  order to induce Cisco to replace those products, even though they were not subject to valid Cisco
6  warranties or service contracts. *See* SAC at ¶¶ 184-185.  In each of those paragraphs, Cisco lays
7  out the who (Dexon employees using personal email addresses and/or opening service requests
8  hiding their identities), the what (providing misinformation and/or concealing from Cisco
9  attributes of the products in question, particularly with respect to whether they were subject to
10 valid service contracts and/or warranties), the how (email communications and electronic service
11 requests), the why (to induce Cisco to replace products at its own cost and to its detriment) and the
12 when (date ranges from 2018 to 2022). *See id.*  Again, while Dexon disputes these facts, its
13 arguments are not appropriate for ruling on a 12(b)(6) motion.
14   **F.**  **CISCO ADEQUATELY STATES A UCL CLAIM**
15   Lastly, as to unfair competition, Dexon ignores the fact that this cause of action is based
16 not just on the inducement of breach and fraud allegations, but also on the basis of Dexon's
17 counterfeiting, copyright infringement, and DMCA violations.  Each of those support liability
18 under California's Unfair Competition Law's unfair, fraudulent and/or illegal conduct prongs
19 sufficient to state such a claim, such that Cisco's allegations more than survive a motion to
20 dismiss.  Cal. Bus. & Prof. Code § 17200.
21   **V.**  **CONCLUSION**
22   For these reasons, Cisco respectfully requests the Court deny Dexon's motion.
23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

DATED:  September 19, 2023          SIDEMAN & BANCROFT LLP


                                    By:      */s/Lyndsey C. Heaton*
                                        Lyndsey C. Heaton
                                        Attorneys for Plaintiffs and Cross-Defendants
                                        CISCO SYSTEMS, INC. and
                                        CISCO TECHNOLOGY, INC.