IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS, INC., et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>DEXON COMPUTER, INC., et al.,<br><br>  Defendants. | Case No. 20-cv-04926-CRB<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiff Cisco Systems, Inc. ("Cisco") brings this motion for a preliminary injunction against Dexon Computer, Inc. ("Dexon"), an unauthorized seller of Cisco product, much of which Cisco alleges to be counterfeit. See Mot. for Prelim. Inj. (dkt. 202). Cisco recently received discovery from Dexon in a different case between the parties—an antitrust suit in Texas—which Cisco claims shows far more (and far more recent) infringing activity than Cisco knew or could have known prior. As a result, Cisco now moves to enjoin Dexon from selling counterfeit Cisco product.

For the reasons set forth below, the Court GRANTS Cisco's motion for a preliminary injunction, subject to the parameters described herein.[1]

## I. BACKGROUND

Cisco manufactures networking and communications hardware, software, and related products and services. Am. Compl. ¶ 12. Cisco has built its brand through

---

[1] The Court initially filed this Order under seal, in light of the parties' many sealing motions related to documents cited herein. On September 19, 2023, the Court ordered the parties to file any proposed redactions to the Order by September 28, 2023. Dkt. 289. Because the parties failed to file any such redactions by the deadline, the Court now files the Order publicly. See Dkt. 289.

significant investment in its CISCO trademark and other related trademarks (Cisco Marks) that Cisco uses in connection with its products and services. Id. ¶¶ 14–17.

In the operative complaint, Cisco alleges that "[f]rom at least July 2006 through the present, Dexon has repeatedly and systematically engaged in schemes to traffic counterfeit Cisco products." Am. Compl. ¶ 24. Cisco alleges that Dexon has told customers that it is selling genuine Cisco products, and then delivered the customers counterfeit products bearing Cisco Marks. Id. And when Cisco repeatedly demanded that Dexon both (i) stop selling counterfeit products, and (ii) help Cisco identify the sources of those products, "[i]n almost every instance, Dexon refused to cooperate with Cisco, and refused to identify the counterfeit traffickers who supply it." Id.

Dexon, for its part, describes itself as a "middleman" reseller of computer networking products, sourcing from thousands of different suppliers, and selling to all types of consumers. Roush Decl. (dkt. 214) ¶ 3. Dexon contends that it has never "intentionally or knowingly sold a counterfeit product," but rather that Cisco itself "has a counterfeit problem due in part to its decision to manufacture its products overseas," and it is passing that problem off on resellers like Dexon, who do their best to try to spot counterfeits, but can only do so much. Id. ¶ 4.

In April 2022, after this Court dismissed Dexon's counterclaims alleging antitrust violations, Dexon brought an antitrust suit against Cisco in the Eastern District of Texas ("The Texas Litigation"). See Dexon Computer, Inc. v. Cisco Sys., Inc., 22-cv-53 (E.D. Tex.). Once the parties began exchanging documents in that case, Cisco contends it was alerted to continued counterfeit sales by Dexon and, in particular, rampant, illegitimate sales of Cisco's SMARTnet service contracts.

SMARTNet are optional enhanced service contracts that Cisco sells for its products. SMARTnet contracts can only be purchased one of two ways: (1) along with Cisco products that are sold through "authorized distribution" channels (of which Dexon is not one); or (2) along with a Cisco product obtained from a non-authorized Cisco source, if the product is inspected by Cisco to ensure it is not counterfeit. First Williams Decl. ¶ 9. As a

result, unauthorized resellers like Dexon are unable to sell SMARTNet contracts directly—rather, they must acquire a SMARTNet contract from an authorized Cisco reseller. If a customer purchases a Cisco product from an unauthorized distributor (like Dexon) and purchases a SMARTNet contract through Dexon (which Dexon acquired through an authorized reseller), and Cisco does not inspect the product, that SMARTnet contract may be voided and terminated by Cisco.

Through its document discovery in the Texas litigation, Cisco learned that Dexon has apparently engaged various "rogue" Cisco partners—i.e., authorized sellers of Cisco products and SMARTnet—to sell SMARTnet contracts to Dexon customers without an inspection, in violation of Cisco's SMARTnet policies and the authorized resellers' contracts with Cisco. Where this goes especially awry is when a Dexon customer's product malfunctions and that customer seeks to have the product fixed or replaced by taking advantage of the SMARTnet contract it purchased. When that occurs, Cisco may have to inform the customer not only that the product is counterfeit, but that the SMARTNet contract is invalid. This can lead to—and has led to—confused and disgruntled customers. Cisco therefore moves to enjoin Dexon from continuing to sell counterfeit Cisco products, which Cisco claims is necessary to stop the harm to its reputation and loss of consumer goodwill.

The Court held a hearing on Cisco's motion on July 14, 2023.[2] At that hearing, the Court ordered the parties to submit supplemental briefing regarding evidence of ongoing counterfeit sales. The Court also instructed the parties to meet and confer to discuss the form of the proposed injunction. Finally, the Court ordered Dexon to file a declaration with the bond amount that the Court should impose, in the instance that the Court grants an injunction. With that supplemental briefing on file, the Court is now prepared to evaluate and rule on Cisco's motion.

---

[2] Cisco also filed a motion for leave to amend its complaint, which was before the Court at the same hearing. The Court granted that motion, and it is not at issue in this Order. See Dkt. 243, minute entry.

3

## II. OBJECTIONS UNDER LOCAL RULE 7-3(d)

There is one preliminary matter to address before the Court can evaluate the merits of Cisco's motion: competing objections under Civil Local Rule 7-3(d). Local Rule 7-3(d) prohibits a party from filing additional memoranda, papers, or letters once a reply is filed without prior court approval. Civ. L.R. 7-3(d)(1). Cisco and Dexon each claim that the other party filed improper supplemental briefing without prior Court approval. See Cisco's Mot. to Strike (dkt. 263); Dexon's L.R. 7-3 Obj. (dkt. 268).

After the parties met and conferred, in accordance with the Court's July 14 order, Cisco filed a revised proposed injunction. Cisco Revised Proposal (dkt. 258-1). Dexon filed a response to that revised proposal, see Resp. to Cisco Revised Proposal (dkt. 260), to which Cisco filed a motion to strike, claiming that Dexon's response was an improper surreply, see Mot. to Strike. Then, Dexon filed a Rule 7-3(d) objection to that briefing, claiming it included new material and therefore that Cisco submitted an improper supplemental brief "fashioned as a Motion to Strike." Dexon's L.R. 7-3 Obj.

The Court will analyze Cisco's objection first. It is undisputed that the Court did not explicitly order Dexon—or Cisco, for that matter—to submit supplemental briefing regarding the scope of the proposed injunction. But the Court recognizes its order that the parties meet to discuss the form of an injunction may have suggested as much. The Court therefore exercises its discretion to consider both Cisco's revised proposal and—because this was its first opportunity to respond to the proposal—Dexon's response.

Next, Dexon's objection to Cisco's motion to strike. Dexon is right that Cisco's motion contains new material and arguments regarding its packaging verification tool. It would therefore be well within the Court's discretion to disregard that material. See Civ. L.R. 7-3(d) (explaining that a party's objections to new evidence "may not include further argument on the motion"). However, given that the new evidence in Cisco's motion is a "reasonable response" to Dexon's opposition, which contested Cisco's lack of detail regarding its verification tool, see Resp. to Cisco Revised Proposal, and in the interest of a complete record, the Court again exercises its discretion to consider the new material. See

United States ex rel. Doe v. Biotronik, Inc., No. 2:09-CV-3617-KJM-EFB, 2015 WL 6447489, at *3 (E.D. Cal. Oct. 23, 2015).

While the Court uses its discretion to review the parties' unsanctioned supplemental filings this time, the Court may not do so in the future. The Court encourages the parties to ask for permission to file supplemental materials, not forgiveness.

### III. MOTION FOR PRELIMINARY INJUNCTION

#### A. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). The party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. See id. at 20. Alternatively, the moving party must demonstrate that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," and that the other two Winter elements are met. Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

#### B. DISCUSSION

The Court addresses the Winter factors in the following order: (1) likelihood of success on the merits; (2) irreparable harm; (3) balance of the equities; and (4) public interest. Each factor weighs in favor of Cisco.

##### 1. Likelihood of Success on the Merits

First, the Court must address whether the "likelihood of success" standard is appropriate for the proposed injunction at issue. Dexon asserts that Cisco's proposed injunction is actually a "mandatory" injunction because it forces Dexon to "take action"—i.e., to use a tool to verify that its Cisco products are legitimate before selling them—and thus that Cisco has to meet a higher burden on the first Winter factor. Resp. to Cisco Suppl. Br. (dkt. 257) at 3 (citing Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir.

5

2015)).

The Court disagrees. The injunctive relief that Cisco seeks is for Dexon to stop selling counterfeit Cisco product. To comply with the injunction, Dexon could choose to simply stop selling <u>all</u> Cisco products. In that event, Dexon would not have to take any action—and clearly, the injunction would not qualify as "mandatory." The Court fails to see how giving Dexon a less restrictive option to comply with the injunction (taking seconds to scan a product before a sale, rather than ceasing all sales) results in a heightened burden for Cisco. For the first <u>Winter</u> factor, it is proper to analyze Cisco's proposed injunction using the "likelihood of success on the merits" standard. The Court proceeds to do so.

Cisco currently brings Lanham Act claims for trademark infringement and counterfeiting, and false designation of origin. Am. Compl. (dkt. 32) ¶¶ 65–85.[3] To prevail on a claim of trademark infringement or false designation of origin, Cisco must show that, without Cisco's consent, Dexon "use[d] in commerce any reproduction, counterfeit, copy, or colorable imitation of [Cisco's] mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114.

Cisco's rights in its marks, and the likelihood of confusion resulting from the sale of a counterfeit Cisco product, are not in question. Rather, Dexon maintains that Cisco has failed to show that Dexon has sold any counterfeit Cisco products, pointing to the declarations from Cisco's counsel and its Director of Brand Protection, accompanying Cisco's request for a preliminary injunction. Opp'n at 15–16; First Nelson Decl. (dkt. 202-1); First Williams Decl. (dkt. 202-2). In its reply, Cisco attached additional evidence of Dexon's counterfeit sales. <u>See</u> Reply at 9; Second Williams Decl. (dkt. 230-2). Cisco

---

[3] Cisco also brings claims under the UCL and for unjust enrichment. Cisco does not seek a preliminary injunction tailored to those claims, so the parties' argument on this factor is limited to the likelihood of success on the merits of Cisco's Lanham Act claims.

submitted further evidence of Dexon's counterfeit sales in its supplemental briefing ordered by the Court. Cisco Suppl. Br. (dkt. 248); Heidecker Decl. (dkt. 249); Second Nelson Decl. (dkt. 250).

The evidence of counterfeit sales that Cisco has put forth suffices to demonstrate a likelihood of success of the merits of its Lanham Act claim. While the first Williams declaration only cites to allegations in the complaint for evidence of Dexon's counterfeit sales, see First Williams Decl. ¶ 13, the first Nelson declaration provides a slew of Dexon sales between 2020 and 2022 that Cisco determined were counterfeit. First Nelson Decl. ¶¶ 5–8. And Cisco attached a report to its reply that details the engineering analysis performed on two of those products that Dexon sold in 2020, determining them to be counterfeit. Second Williams Decl. ¶ 5; id. Ex. A. Williams declares that Cisco has produced "more than a dozen similar engineering reports to Dexon, which provide the same detail as to how the products Dexon sold were determined to be counterfeit. Id. ¶ 6.

Dexon filed an objection to Cisco's reply, seeking to strike the second Williams Declaration and accompanying evidence. See Obj. to Reply (dkt. 240). Dexon argues that the second Williams declaration "still lacks foundation" because the "actual supposed testing was conducted by persons other than Williams," and, in any case, the second Williams declaration and the accompanying summary report are "new" evidence presented in a reply that the Court should not consider under Provenz v. Miller, 102 F.3d 1478 (9th Cir. 1996). Neither of these arguments has merit.

First, Williams, as a Director in the Brand Protection group at Cisco and with nearly 20 years of experience in that group, declares that he is tasked with "managing counterfeit investigations." Second Williams Decl. ¶ 1. In this capacity, he is fully qualified to speak to the outcome of an engineering analysis performed on Cisco products sold by Dexon that Cisco engineers determined to be counterfeit—that is, after all, his job. Id. Williams's declaration does not "lack[] foundation" because he did not test the products himself; and in any case, because "the Federal Rules of Evidence do not strictly apply in preliminary injunction proceedings," and evidentiary issues "properly go to weight rather than

1   admissibility," such issues are not dispositive. Disney Enters., Inc. v. VidAngel, Inc., 224
2   F. Supp. 3d 957, 966 (C.D. Cal. 2016) (internal quotation marks and citations omitted),
3   aff'd, 869 F.3d 848 (9th Cir. 2017).
4       Second, to the extent that Dexon objects to the Williams declaration appended to
5   Cisco's reply as "new" evidence, it was produced to respond to the arguments in Dexon's
6   opposition that Cisco had failed to put forth sufficient evidence of counterfeit sales, and is
7   therefore not a "new" argument on reply. But even if it is, Provenz instructs that courts
8   should not consider new evidence introduced in a reply "without giving the [non-movant]
9   an opportunity to respond." Provenz, 102 F.3d at 1483. Dexon has had the opportunity to
10  respond, in the form of its objection; as a result, the Court may consider the evidence Cisco
11  appended to its reply.[4]
12      Moreover, even putting the second Williams declaration to the side, Cisco's
13  supplemental briefing contains further and significant evidence of counterfeit sales. Cisco
14  submitted a declaration from its global engineering manager, Michael Heidecker, who
15  asserts that Cisco engineers have determined that <u>hundreds</u> of Cisco products sold by
16  Dexon are counterfeit. Cisco Suppl. Br. at 2; Heidecker Decl. ¶ 5–6. Heidecker attached
17  engineering reports detailing the evaluation and analysis for each of these products. Ex. 1
18  (dkt. 249). Cisco also submitted another declaration from its counsel, which details
19  additional, recent counterfeit sales by Dexon. See Second Nelson Decl. In addition, Cisco
20  put forward persuasive evidence that—given Dexon's apparent concealment of its
21  counterfeit sales and the difficulty of uncovering counterfeit sales in general—there is
22  likely many more counterfeit sales that it is unaware of.[5]
23      Dexon's objections to the lack of foundation and personal knowledge in the

---

[4] To the extent that Cisco contends that Dexon's objection is procedurally improper, see Resp. to Obj. (dkt. 240), the Court interprets Dexon's objection as a sur-reply, which the Court allows pursuant to Local Civil Rule 7-3(d).

[5] The Court finds Cisco's evidence in this regard to be much more substantial and convincing than in Vinluan-Jularbal v. Redbubble, Inc., which Dexon cites, but where the plaintiff "offer[ed] no convincing evidence" that the alleged counterfeit products were "not genuine." No. 2:21-cv-00573, 2021 WL 4286539, at *5 (E.D. Cal. Sept. 21, 2021) (emphasis added).

8

Heidecker declaration fail for the same reason as its objections to the Williams declaration: like Williams, it is Heidecker's job to manage Cisco's global engineering team "in support of authentications of products under test to determine if they are genuine or counterfeit." Heidecker Decl. ¶ 1. His declaration is based on his 15 years of experience and his "personal knowledge" of the engineering reports, which he has access to as part of his job duties. Id.

Dexon points out one alleged discrepancy in the Heidecker declaration, asserting that one of the alleged counterfeit products was examined by Cisco on two different dates—one of those dates being before Dexon allegedly sold it. However, Dexon does not put forward any other evidence of discrepancies within the detailed set of engineering reports submitted by Cisco. So, even putting this single sale aside, the Court still finds sufficient evidence of counterfeit sales. Plus, Dexon never claims that it <u>did not</u> sell the product with the purported date discrepancy.

Cisco's evidence, including the First Nelson declaration, the Second Williams declaration, the Second Nelson declaration, and the Heidecker declaration, demonstrates that Dexon has sold counterfeit Cisco products. Cisco has therefore carried its burden to show a likelihood of success on the merits of its Lanham Act claims.

### 2. Irreparable Harm

As a result of a 2020 amendment to the Lanham Act, there is a rebuttable presumption of irreparable harm upon a finding of a likelihood of success on the merits of a Lanham Act claim. See 15 U.S.C. § 1116 ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order."); see also 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:47 (5th ed. 2023).

Dexon's only attempt to rebut the presumption is its argument that Cisco's "extensive" delay "weighs heavily against a finding of irreparable harm" and thus should be "dispositive." Opp'n to Mot. for Prelim. Injunction at 13. Dexon argues that the

operative complaint alleges infringing conduct for fifteen years, and only now moves to enjoin Dexon's conduct. Id. at 14–15. Cisco responds that Dexon has concealed not only its continued sales of counterfeit products after this case was filed, but also its sales of SMARTnet contracts for those products; only because of the discovery received in the related Texas Litigation in December, Cisco contends, did it recognize the scope of the "ongoing, worsening injuries" Dexon was causing. Reply at 8 (quoting Arc of Cal. v. Douglas, 757 F.3d 975, 990–91 (9th Cir. 2013)).

Dexon has not established that Cisco unduly delayed in bringing this motion. While Cisco may have known about Dexon's prior sales of counterfeit products, Cisco has persuasively argued that it did not know—nor could it have known—about the extent of Dexon's continued sales of counterfeit products or its sales of SMARTnet contracts for those products, because Dexon was actively working to conceal where those products and contracts originated. See, e.g., Nelson Decl. ¶¶ 7, 16, 21–24, 28; id. Exs. 4, 19, 21–25, 31–32.

Even if Cisco did delay in bringing the instant motion, Dexon cites no Ninth Circuit case holding that delay, standing alone, rebuts the presumption of irreparable harm under the Lanham Act—particularly where the movant marshals evidence of loss of reputation and consumer goodwill and the non-movant makes no attempt to rebut that evidence. See Arc of Cal., 757 F.3d at 990 ("Usually, delay is but a single factor to consider in evaluating irreparable injury; courts are 'loath to withhold relief solely on that ground.'" (quoting Lydo Enters., Inc. v. City of Las Vegas, 745 F.2d 1211, 1214 (9th Cir. 1984)).

The cases Dexon does cite found that delay, in combination with a host of other factors, warranted denying injunctive relief. See Oakland Trib., Inc. v. Chron. Pub. Co., 762 F.2d 1374 (9th Cir. 1985) (finding that the movant failed to sustain its burden to demonstrate irreparable harm and that finding was "supported" by other arguments, including "Plaintiff's long delay in seeking a preliminary injunction"); Miracle v. Hobbs, 808 F. App'x 470 (9th Cir. 2020) (affirming a denial of a preliminary injunction where the only "speculative injury" was established and the balance of the equities did not tip in the

movant's favor, and "[t]he likelihood of imminent and irreparable harm is further undermined" by the five year delay in filing suit); Kiva Health Brands LLC v. Kiva Brands Inc., 402 F. Supp. 3d 877 (N.D. Cal. 2019) (denying preliminary injunction because the movant had failed to demonstrate likelihood of success on the merits, had failed to demonstrate irreparable harm, and the movant's delay was "substantial"); Caryn Mandabach Prods. Ltd. v. Sadlers Brewhouse Ltd., No. CV2010220CBMJEMX, 2021 WL 2497928, at *7 (C.D. Cal. May 19, 2021) (denying preliminary injunction because the movant was not likely to succeed on the merits and waited over two years to file the action even though the movant had actual knowledge of defendants' infringement).

In this case, even assuming that Cisco did, in fact, delay in bringing this motion, it is the only factor on Dexon's side of the ledger. The Court therefore declines to find that such delay, standing alone, rebuts the presumption of irreparable harm under the Lanham Act.

### 3. Balance of the Equities

The balance of the equities clearly favors Cisco. Courts regularly acknowledge that a business has no legitimate interest in selling counterfeit product. See, e.g., Kinsley Tech. Co. v. Ya Ya Creations, Inc., No. 220CV04310ODWKSX, 2021 WL 2227394, at *4 (C.D. Cal. May 3, 2021). And while the broad injunction originally proposed by Cisco may have chilled Dexon's legitimate sales, see Opp'n to Prelim. Injunction at 17, Cisco's revised proposal permits Dexon to continue those sales, so long as it uses a verification tool (which takes just a few seconds) to ensure the products are legitimate. The balance of the equities therefore favors Cisco.

### 4. Public Interest

The public interest, too, weighs in favor of Cisco. Of course, the public has an "interest in protecting trademarks." Brookfield, 174 F.3d at 1066. But there is also ample evidence in the record of customer confusion and consternation related to Dexon's sales of counterfeit Cisco product. See, e.g., Nelson Decl. ¶¶ 9, 12, 21, 22, 25–27. This interest is particularly acute in relation to Dexon's sales of SMARTnet contracts for counterfeit

11

products, because, when those products break, Dexon's purchasers are doubly injured: First, because they did not know that the product they purchased is counterfeit; and second, because Cisco will not honor the SMARTnet contracts they purchased for those products. See id. ¶¶ 25–27, Exs. 27–29. This confusion and consternation would be avoided were Dexon enjoined from selling counterfeit product in the first place.

Accordingly, because each factor undoubtedly favors Cisco, the Court concludes that Cisco has met its burden of showing that it is entitled to a preliminary injunction. The Court must now determine the proper scope and limitations of this injunction.

### C. Scope of the Injunction

After the July 14 hearing, Cisco and Dexon met and conferred to discuss the form an injunction would take, specifically with regard to the use of Cisco's packaging verification tool. See Cisco Meet and Confer Decl. (dkt. 258). Cisco then submitted a revised, narrowed proposal. See Cisco Revised Proposal. Cisco's revised injunction addresses the concerns this Court had—namely, it allows Dexon to continue its legitimate business activities, while protecting Cisco against counterfeit sales. See id. at 6–8 (¶¶1–6). Dexon has raised concerns about the workability of this injunction with regard to drop shippers, see Resp. to Cisco Revised Proposal, but the Court believes the solutions Cisco discussed with Dexon, like Dexon obtaining packaging information from its drop shippers to input into the tool, sufficiently address those concerns.

The Court therefore adopts the scope of the proposed injunction described in the Cisco Revised Proposal at Docket No. 258-1. Subject to the particular language in the proposal, see Cisco Revised Proposal at 6–8 (¶¶1–6), Dexon is enjoined from selling counterfeit Cisco products. Cisco will provide Dexon with a packaging verification tool that will allow Dexon to screen products and determine, within a few seconds, if they are legitimate. So long as Dexon uses that tool before selling a Cisco product, and the tool says the product is legitimate, Dexon will not violate this Order. In addition, the injunction will only apply to Cisco products (1) that can be verified using Cisco's tool, and (2) that Dexon advertises as "new."

**D.      Appropriate Bond**

Because there are costs to Dexon associated with this injunction, the Court finds it appropriate to order Cisco to furnish a bond. See Fed. R. Civ. P. 65(c). The amount of this bond shall be what the Court considers "proper" to pay Dexon's costs and damages sustained during the injunction if Dexon ultimately prevails at trial. See id.; see also Civ. L.R. 65.1-1(a).

Unsurprisingly, the parties have (very) different proposals for how much the bond should be. Dexon asks for $8 million, see Resp. to Cisco Revised Proposal, while Cisco argues the bond amount should be no more than $10,000, see Mot. to Strike. Neither party provides a clear explanation for why its proposed number reflects the amount of harm Dexon will sustain during the injunction. For example, Dexon bases its proposal on Dexon's annual gross revenue for Cisco products—without factoring in its costs or expenses. On top of that, it asks for more than double that amount of revenue without explaining why the additional harms it points to will cost an extra $4 million. Cisco, for its part, points out the flaws with Dexon's proposal but does not substantiate its own proposed amount with any explanation. See Mot. to Strike.

The Court recognizes that Dexon sells a significant number of Cisco products each year, with substantial price tags. The Court also notes that the injunction may result in strained relationships with its customers if Dexon is unable to fulfill orders due to available product being identified as counterfeit. With these facts in mind, the Court orders Cisco to furnish a $500,000 bond. The Court considers this amount appropriate to pay Dexon's costs and damages associated with the injunction, should it be found to have been wrongfully enjoined at trial—which, though yet to be scheduled, appears could happen as early as 2024. See Order Granting Extension of Disc. (dkt. 281).

**IV.   CONCLUSION**

For the foregoing reasons, the Court concludes that Cisco has met its burden and is entitled to a preliminary injunction during the pendency of this proceeding. The Court thus orders as follows:

13

(1) Cisco's motion for a preliminary injunction is GRANTED.

(2) Pursuant to the specific terms in Cisco's revised proposed injunction, see Cisco Revised Proposal at 6–8 (¶¶1–6), Dexon is hereby enjoined from selling counterfeit Cisco products.

(3) The preliminary injunction shall only apply to Cisco products which are advertised by Dexon as "new," and for which Cisco has provided Dexon a method to verify the genuine nature of the product packaging.

(4) Dexon will not violate this Order if it sells a Cisco product that turns out to be counterfeit, so long as Dexon used the tool provided by Cisco prior to the sale of such product and the tool reported that the packaging was genuine.

(5) Cisco shall furnish a bond in the amount of $500,000 within 10 days of this Order.

**IT IS SO ORDERED.**

Dated: October 3, 2023



CHARLES R. BREYER
United States District Judge