1   John A. Conkle (SB# 117849)
      *j.conkle@conklelaw.com*
2   Amanda R. Washton (SB# 227541)
      *a.washton@conklelaw.com*
3   CONKLE, KREMER & ENGEL, PLC
    3130 Wilshire Boulevard, Suite 500
4   Santa Monica, California 90403-2351
    Phone: (310) 998-9100 • Fax: (310) 998-9109
5
    Michael M. Lafeber (*pro hac vice*)
6     *mlafeber@taftlaw.com*
    David McDaniel (*pro hac vice*)
7     *dmcdaniel@taftlaw.com*
    O. Joseph Balthazor Jr. (*pro hac vice*)
8     *jbalthazor@taftlaw.com*
    TAFT STETTINIUS & HOLLISTER LLP
9   2200 IDS Center
    80 S. 8th St.
10  Minneapolis, MN 55402
    Phone: (612) 977-8400 • Fax: (612) 977-8650
11
    Attorneys for Defendant and Third-Party Plaintiff
12  Dexon Computer, Inc.

13

14                 UNITED STATES DISTRICT COURT

15      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

16

17  CISCO SYSTEMS, INC., a Delaware          Case No. 3:20-CV-4926-CRB
    corporation and CISCO TECHNOLOGY,
18  INC., a California corporation,          **DEFENDANT DEXON COMPUTER,
                                             INC.'S MOTION TO STAY INJUNCTION
19              Plaintiffs,                  PENDING APPEAL**

20          v.                              **PUBLIC REDACTED VERSION**

21  DEXON COMPUTER, INC., a Minnesota
    corporation,                             Date:  December 1, 2023
22                                           Time: 10:00 a.m.
                Defendant.                   Crtrm: Zoom
23
                                             Hon. Charles R. Breyer
24  AND RELATED CROSS-ACTIONS                Presiding Judge

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................5

II.   FACTUAL BACKGROUND ...............................................................................................6

III.  ARGUMENT ........................................................................................................................6

    A.    DEXON IS LIKELY TO PREVAIL IN THIS APPEAL ........................................7

        1.    The Court's vague injunction lacks detail and violates Rule 65 ...................7

        2.    The Court failed to apply the heightened standard applicable to
              mandatory injunctions ...................................................................................8

        3.    The Court's irreparable harm analysis in erroneous and unsupported. ........10

            (a)    Purported Ongoing Sales of Alleged Counterfeit Equipment ..........10

            (b)    Dexon's Sales of SMARTNet Service Contracts ............................11

            (c)    The Injunction Fails to Remedy the Alleged Harm ........................12

            (d)    Cisco's 15+ Year Delay Defeats Any Purported Irreparable
                   Harm .............................................................................................12

    B.    DEXON WILL BE IRREPARABLY HARMED IN THE ABSENCE OF A
          STAY PENDING APPEAL ...................................................................................14

    C.    A STAY PENDING THE APPEAL WILL PREVENT HARM TO THIRD
          PARTIES AND WILL NOT HARM CISCO .........................................................16

    D.    THE PUBLIC INTEREST IS SERVED IN STAYING THIS INJUNCTION
          PENDING THE APPEAL .....................................................................................17

IV.   CONCLUSION ...................................................................................................................17

1

## **TABLE OF AUTHORITIES**

2

**Page**

3

## **FEDERAL CASES**

4

*Ajilon Pro. Staffing, LLC v. Griffin*, 2009
5     WL 1507559 (D. Ariz. May 29, 2009) .................................................................. 14

6 *Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ................................................................................. 8
7

*Boardman v. Pac. Seafood Grp.*,
8     822 F.3d 1011 (9th Cir. 2016) ............................................................................... 17

9 *Brocade Commc'ns Svs., Inc. v. A10 Networks, Inc.*,
    2013 WL 890126 (N.D. Cal. Jan. 23, 2013) ........................................................... 8
10

*Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*,
11     2022 WL 1530491 (Fed. Cir. May 16, 2022) ......................................................... 8

12 *Caryn Mandabach Prods. Ltd. v. Sadlers Brewhouse Ltd.*,
    2021 WL 2497928 (C.D. Cal. May 19, 2021) ...................................................... 13
13

*Cf. Master Tax LLC v. Ultimate Software Grp., Inc.*,
14     770 F. App'x 386 (9th Cir. 2019) ........................................................................... 9

15 *Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) ................................................................................. 8
16

*De Maison v. ClairNet, Ltd.*,
17     2013 WL 1855799 (C.D. Cal. Apr. 30, 2013) ...................................................... 12

18 *DealDash Oyj v. ContextLogic Inc.*,
    2018 WL 3820654 (N.D. Cal. Aug. 10, 2018) ..................................................... 10
19

*Del Webb Communities, Inc. v. Partington*,
20     652 F.3d 1145 (9th Cir. 2011) ................................................................................. 8

21 *Del. River Port Auth. v. Transam. Trailer Transp., Inc.*,
    501 F. 2d 917 (3d Cir. 1974) ................................................................................. 16
22

*Doe #1 v. Trump*,
23     957 F.3d 1050 (9th Cir. 2020) ................................................................................. 6

24 *Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022) .................................................................................... 9
25

*Husky Ventures, Inc. v. B55 Invs., Ltd.*,
26     911 F.3d 1000 (10th Cir. 2018) ............................................................................. 14

27 *Iconix, Inc. v. Tokuda*,
    457 F. Supp. 2d 969 (N.D. Cal. 2006) ................................................................. 12

28

*Kiva Health Brands LLC v. Kiva Brands Inc.*,
   402 F. Supp. 3d 877 (N.D. Cal. 2019) ...... 13

*Lair v. Bullock*,
   697 F.3d 1200 (9th Cir. 2012)...... 17

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011)...... 16

*Logic Tech. Dev. LLC v. Levy*,
   2021 WL 3884287 (D.N.J. Aug. 31, 2021) ...... 13

*Majorica, S.A. v. R.H. Macy & Co.*,
   762 F.2d 7 (2d Cir. 1985) ...... 13

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009)...... 8

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ...... 7

*Miracle v. Hobbs*,
   808 Fed. Appx. 470 (9th Cir. 2020) ...... 13

*Nken v. Holder*,
   556 U.S. 418 (2009) ...... 5, 6, 16

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
   762 F.2d 1374 (9th Cir. 1985) ...... 12

*Price v. City of Stockton*,
   390 F.3d 1105 (9th Cir. 2004) ...... 12

*Raoul Beauvoir v. Dingle*,
   2013 WL 12114021 (C.D. Cal. Sept. 16, 2013) ...... 13

*Saucillo v. Peck*,
   25 F.4th 1118 (9th Cir. 2022) ...... 9

*Schmidt v. Lessard*,
   414 U.S. 473 (1974) ...... 7

*Union Pac. R. Co. v. Mower*,
   219 F.3d 1069 (9th Cir. 2000)...... 7

*Y.Y.G.M. SA v. Redbubble, Inc.*,
   75 F.4th 995 (9th Cir. 2023) ...... 16

**FEDERAL STATUTES**

Fed. R. Civ. P. Rule 65...... 5, 7, 8, 9

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

3

Defendant Dexon Computer Inc. ("Dexon") respectfully moves this Court to stay its

4

preliminary injunction order, ECF No. 293, pending resolution of the appeal Dexon has noticed.

5

*See* ECF No. 309.

6

Dexon's request for a brief stay during appellate review is governed by a balancing of four

7

equitable factors—the likelihood of success on the merits, the irreparable harm to Dexon during the

8

stay, the balance of harms between the parties (including injuries to third parties), and the public's

9

interest.  *Nken v. Holder*, 556 U.S. 418, 426 (2009).  All four factors warrant a stay pending the

10

appeal.  First, Dexon is likely to succeed on the merits of its appeal, as: (1) the injunction order

11

violates Rule 65 because it fails to state its terms specifically and in reasonable detail, including

12

violating the express prohibition that it not require reference to additional documents and

13

communications; (2) the Court erroneously determined it was not a "mandatory" injunction and

14

applied the wrong standard; (3) the Court's finding of irreparable harm is not supported by proper

15

evidence, including improperly disregarding Cisco's 15+ year undisputed delay in seeking an

16

injunction; and (4) the injunction fails to address or mitigate Cisco's *alleged* harm.

17

Second, a brief stay to allow the Ninth Circuit to review the preliminary injunction will

18

prevent further irreparable harm to Dexon.  The injunction damages Dexon's relationships with its

19

vendors/suppliers and Dexon's ability to service its customers.  It places discriminatory burdens

20

upon Dexon that other identically-situated secondary market sellers do not have to overcome.  For

21

example, the injunction appears to require Dexon's third party vendors/suppliers to become actively

22

involved in complying with the injunction prior to shipping any products to Dexon's end customers.

23

The erroneous Injunction Order also severely damages Dexon's reputation in the marketplace,

24

including by making repeated, inaccurate claims that Dexon has "concealed" alleged sales of

25

counterfeit equipment.

26

Third, in contrast, Cisco (and others) will not be harmed from a brief stay of the injunction

27

pending the appeal.  Cisco waited over 15+ years to seek this injunction, and more than two years

28

DEFENDANT DEXON COMPUTER, INC.'S MOTION TO STAY INJUNCTION PENDING APPEAL

1  since the filing of this case.  Waiting a few more months pending the appeal would cause virtually

2  no irreparable harm to Cisco or negatively impact the public interest.

3  **II.      FACTUAL BACKGROUND**

4        On September 19, 2023, the Court granted Cisco's motion for a preliminary injunction.  *See*

5  Order, ECF No. 293 ("the Injunction Order").[1]  (*See* Declaration of Amanda R. Washton ("ARW

6  Decl.") at ¶ 2.)  The Injunction Order came after affording Cisco five opportunities to provide critical

7  missing details or "proposals" concerning unclear "tool[s] provided by Cisco," over Dexon's

8  repeated objections.  ( *See* ECF Nos. 214, 260, and 301; ARW Decl. at ¶ 3.)  The entirety of the bare

9  bones terms and details of the injunction contained in the Order (besides Cisco's required bond

10  amount) are as follows:

11      (2)   Pursuant to the specific terms in Cisco's revised proposed injunction, see
            Cisco Revised Proposal at 6–8 (¶¶1–6), Dexon is hereby enjoined from
12            selling counterfeit Cisco products.

13      (3)   The preliminary injunction shall only apply to Cisco products which are
            advertised by Dexon as "new," and for which Cisco has provided Dexon a
14            method to verify the genuine nature of the product packaging.

        (4)   Dexon will not violate this Order if it sells a Cisco product that turns out to
15            be counterfeit, so long as Dexon used the tool provided by Cisco prior to the
            sale of such product and the tool reported that the packaging was genuine.
16

17  (Injunction Order, ECF No. 293 at 13-14; ARW Decl. at ¶ 2.)

18  **III.     ARGUMENT**

19        A request for a stay pending appeal is committed to the exercise of judicial discretion.  *Doe*

20  *#1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020).  In considering whether to exercise its discretion

21  in granting Dexon's motion to stay the preliminary injunction pending the appeal, the applicable

22  factors to consider are: (1) whether Dexon has made a strong showing of the likelihood of success

23  on the merits; (2) whether the appellants will be irreparably injured absent a stay; (3) whether a stay

24  will substantially injure other parties; and (4) where the public interest lies.  *Nken*, 556 U.S. at 426.

25  The first two factors are most critical, and the last two factors are considered if the first two are

26

27

---

28  [1] The initial Injunction Order was filed under seal, and the publicly-available version is referenced
herein.

1  satisfied.  *Id.* at 434. Here, every factor supports a stay of the wrongfully-entered injunction for the

2  brief period during Dexon's pending appeal.

3       A.       **DEXON IS LIKELY TO PREVAIL IN THIS APPEAL**

4       "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be

5  granted unless the movant, by a clear showing, carries the burden of persuasion." *See Mazurek v.*

6  *Armstrong*, 520 U.S. 968, 972 (1997).  The Court abused its discretion by failing to enforce these

7  standards here, and issuing a mandatory injunction.

8            1.       **The Court's vague injunction lacks detail and violates Rule 65**

9       The Court's injunction is ambiguous and fails to demarcate the line between compliance and

10 contempt.  Fed. R. Civ. P. 65(d)(1) expressly requires that every injunction must "state its terms

11 specifically" and "describe in reasonable detail--and not by referring to the complaint or ***other***

12 ***document***--the act or acts restrained or required."  The issued injunction fails to provide the certainty

13 and detail required by Rule 65 to reasonably describe the acts actually restrained or required.  "[O]ne

14 basic principle built into Rule 65 is that those against whom an injunction is issued should receive

15 fair and precisely drawn notice of what the injunction actually prohibits." *Union Pac. R. Co. v.*

16 *Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000).  The specificity provisions of Rule 65(d) are no mere

17 technical requirements as Rule 65 "was designed to prevent uncertainty and confusion on the part

18 of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on

19 a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

20      Rather than provide the required detail, the order violates the express prohibition of Rule 65

21 by merely referencing "Cisco's Revised Proposal."  Injunction Order at 14 ("Pursuant to the specific

22 terms in Cisco's revised proposed injunction, see Cisco Revised Proposal at 6-8 (¶¶1-6), Dexon is

23 hereby enjoined from selling counterfeit Cisco products."  There is no guidance as to what is a

24 "counterfeit Cisco product."

25      The order further violates Rule 65 by attempting to vaguely qualify that it applies solely to

26 "Cisco products which are advertised by Dexon as 'new' and for which Cisco has provided Dexon

27 a method to verify the genuine nature of the product packaging." *Id.* at 14, ¶ 3.  The order fails to

28 define what is the acceptable "method to verify the genuine nature of the product packaging"

provided by Cisco.  Moreover, while referencing external documents such as "Cisco's Revised Proposal" is in and of itself fatal, even "Cisco's Revised Proposal" lacked the requisite details and *requires referencing multiple additional documents/communications to attempt to ascertain the scope and parameters of the injunction.  See, e.g.*, Def.'s Resp. Pls.' Amend. Order, ECF No. 260 at 2-9; Def.'s Resp. Pls.' Supp. Br., ECF No. 301 at 6-7.

Other courts applying the law of the Ninth Circuit have found similar injunctions do not comport with the standard demanded by Union Pacific.  *See, e.g., Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*, 2022 WL 1530491, at *3 (Fed. Cir. May 16, 2022) (applying Ninth Circuit law and vacating provision of injunction that failed to sufficiently detail what particular acts were prohibited); *Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145, 1150 (9th Cir. 2011) (vacating injunction where examples of prohibited past conduct do not sufficiently define what additional future conduct will be covered); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1048 (9th Cir. 2013) (finding provisions of injunction too vague as "Rule 65(d), overall, prefers certainty to flexibility."); *Brocade Commc'ns Svs., Inc. v. A10 Networks, Inc.*, 2013 WL 890126, at *10 (N.D. Cal. Jan. 23, 2013) (rejecting proposed mandatory injunction lacking in requisite details/clarity and which merely referenced other document).  Dexon is likely to prevail on the merits because the injunction order violates Rule 65 on its face.

## 2. The Court failed to apply the heightened standard applicable to mandatory injunctions

The Court erred in characterizing the requested relief as a prohibitory injunction rather than a mandatory injunction.  The distinction between the two types of injunctions is one of action versus inaction.  *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) ("A mandatory injunction orders a responsible party to take action, while [a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits.").  The difference is legally significant because mandatory injunctions are "particularly disfavored," *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009), and place a higher burden on the plaintiff to show "the facts and law *clearly favor* the moving party." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (emphasis added).

1  Mandatory injunctions are generally not granted "unless extreme or very serious damage will result

2  and are not issued in doubtful cases or where the injury complained of is capable of compensation

3  in damages." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022).

4      In the present case, the injunction requires Dexon to change its standard business practices

5  and take the affirmative action of utilizing a vague set of tools that are within Cisco's control before

6  Dexon can sell certain products.  Worse, the injunction arguably requires Dexon's non-party vendors

7  and suppliers to change their standard business practices and take affirmative action to comply with

8  the order, including furnishing Dexon with certain packaging information before being allowed to

9  drop ship products to Dexon's customers.  Injunction Order at 12.  ("[T]he Court believes the

10  solutions Cisco discussed with Dexon, like Dexon obtaining packaging information from its drop

11  shippers to input into the tool, sufficiently address those concerns.").[2]

12      As a result of improperly concluding the injunction was prohibitory and not a mandatory

13  injunction, the Court's error was compounded by failing to apply the heightened standard applicable

14  to mandatory injunctions.  *See Saucillo v. Peck*, 25 F.4th 1118, 1133 (9th Cir. 2022) ("[A] district

15  court abuse[s] its discretion by employing an erroneous legal standard.").

16      The Court's argument that "[t]o comply with the injunction, Dexon could simply stop selling

17  <u>all</u> Cisco products," Injunction Order at 6, is fallacious and demonstrates the overbroad nature of

18  the injunction.  Even if an injunction against the sale of all Cisco products would be proper, which

19  it is not, the fact the Court ordered an arguably less broad injunction does not render it non-

20  mandatory or proper.  It indisputably requires affirmative action on the part of both Dexon and its

21  non-party suppliers.  Applying the Court's logic, an injunction would never be mandatory if a

22  broader injunction could be fashioned.

23      Alone, the improper choice and application of an erroneous standard justifies staying the

24  injunction pending appeal.  *Cf. Master Tax LLC v. Ultimate Software Grp., Inc.*, 770 F. App'x 386,

25  387 (9th Cir. 2019) (vacating mandatory injunction where "[o]ur holding that the district court

26  applied an erroneous legal standard is sufficient to resolve this appeal").

27

28
---
[2] The mere fact the Court references unstated and unclear "solutions Cisco discussed with Dexon" rather than specifying such rules and parameters violates Rule 65.

1

### 3.     The Court's irreparable harm analysis in erroneous and unsupported.

2          The Court's irreparable harm determinations are erroneous and not supported by the

3    evidence.  Cisco put forth two irreparable harm theories: (a) ongoing sales of alleged counterfeit

4    equipment after the commencement of the present lawsuit; and (b) Dexon's alleged unauthorized

5    sale of SMARTNet service contracts and resulting harm to its reputation when Cisco elects to cancel

6    and refuses to honor such contracts.  Both theories were unsupported and lacked merit.

7                    ### (a)     Purported Ongoing Sales of Alleged Counterfeit Equipment

8          In an attempt to avoid or justify its 15+ year delay in seeking an injunction, Cisco relied on

9    purported ongoing sales of alleged counterfeit equipment after the commencement of the present

10   lawsuit.  Cisco's evidence of such ongoing sales consisted solely and exclusively of nine (9) alleged

11   sales during the three (3) year period from the filing of the lawsuit to the present.  Nine (9) alleged

12   counterfeit sales over a three (3) year time period is easily remedied via monetary damages and does

13   not constitute the level of "extreme or serious damage" required to meet the heightened mandatory

14   injunction standard, let alone excuse Cisco's delay in seeking relief for any purported "irreparable"

15   harm.[3]

16         This is especially true considering such nine (9) sales represent just 6/1000th of 1% of

17   Dexon's sales of Cisco product during that same time period, a fact the Court ignored and failed to

18   address in its order.  *See DealDash Oyj v. ContextLogic Inc.*, 2018 WL 3820654, at *6 (N.D. Cal.

19   Aug. 10, 2018) (12 alleged "consumer complaints" representing a small percentage of the

20   defendant's subject transactions insufficient to meet the heightened standard required for a

21   mandatory injunction).

22

23

24

25   [3] As explained by Dexon, Cisco's evidence supporting its assertion that the nine (9) post-
     commencement sales were counterfeit was also suspect.  Def.'s Resp. to Pl. Supp. Br., ECF No.
26   301, at 4-5.  For example, Dexon noted that Cisco submitted two conflicting ESRs for the same
     product, including one report that predated Dexon's sale by nine (9) months.  *Id.*  The Court failed
27   to address or resolve the suspect nature of such evidence.  Rather, the Court appears to have missed
     the point altogether and remarked that "Dexon never claims that it <u>did not</u> sell the product with the
28   purported date discrepancy."  Injunction Order at 9.

There is no evidence of any material change in circumstances, let alone a change of such magnitude as might excuse Cisco's years-long delay in seeking injunctive relief.  It is undisputed Cisco has a counterfeit problem.  Def.'s Memo. Opp. Pls.' Mot. Prelim. Inj., ECF No. 214, at 6-8.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████    *Id.*  Accordingly, any claim Cisco is somehow irreparably harmed if 6/1000th of 1% of Dexon's sales going forward unknowingly turn out to be counterfeit, a number significantly below the percentage of counterfeit product in the stream of commerce, lacks merit.

### (b)    Dexon's Sales of SMARTNet Service Contracts

Cisco's argument it is irreparably harmed by Dexon's SMARTNet sales is unavailing.  It is undisputed that: i) every SMARTNet service contract sold by Dexon was genuine and procured directly from a Cisco licensed partner; ii) approved by Cisco; and iii) Dexon paid Cisco's full retail price for every SMARTNet service contract.  Cisco's practice of cancelling and refusing to honor such SMARTNet contracts because of Dexon's involvement was the subject of Dexon's attempted counterclaims herein and is directly implicated in Dexon's current antitrust lawsuit pending in Texas.[4]  It is undisputed Cisco has been fully aware of Dexon's sales of SMARTNet contracts for over 15+ years.  Moreover, contrary to Cisco's claims it only recently became aware of the extent of Dexon's SMARTNet sales, Dexon's counterclaims filed June 2021 alleged that, "Cisco has full knowledge that its 'Authorized' sellers or partners sell an extremely large volume of SMARTNet contracts to secondary market sellers such as Dexon."  ECF No. 43, ¶ 30.  Dexon further alleged that it "routinely and frequently purchased SMARTNet contracts from 'Authorized' sellers to pair with Cisco products sold to its customers."  *Id.*  ¶ 32.  If Cisco truly believed it was in any way harmed by such sales, it could have easily learned the full details and extent of such SMARTNet sales to Dexon from its own partners.  The Court's order and analysis simply ignored these facts.

[4] Further belying Cisco's claim of "irreparable harm," Cisco wrongfully retains the customers full prepayment amount for the SMARTNet contract, refusing to refund even a pro rata share covering the remaining contract term.

1

### (c)       The Injunction Fails to Remedy the Alleged Harm

2       The injunction order in no way impacts, effects or remedies Cisco's alleged harm resulting

3 from its own unilateral decision to cancel genuine SMARTNet contracts procured and sold by

4 Dexon going forward.  Nor does the granted injunction address or remedy the actual alleged harm

5 that Cisco complained of that gave rise to the injunction.  Injunctions are a "precise tool to fix a

6 precise injury" and must be narrowly tailored to remedy only the specific harms shown by the

7 movant, rather than to "enjoin all possible breaches of the law."  *Price v. City of Stockton*, 390 F.3d

8 1105, 1117 (9th Cir. 2004); *see also De Maison v. ClairNet, Ltd.*, 2013 WL 1855799, at *2 (C.D.

9 Cal. Apr. 30, 2013) (denying preliminary injunction that was not narrowly tailored to prevent the

10 alleged "irreparable harm"); *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 1001 (N.D. Cal. 2006)

11 (rejecting portions of proposed preliminary injunction not narrowly tailored to the alleged

12 irreparable harm arising from infringement).

13       Specifically, Cisco's election to cancel and refuse to honor such contracts is in no way based

14 or predicated on a determination the subject product was allegedly counterfeit.  Rather, it is based

15 solely on the fact that the SMARTNet contract and/or the subject product were procured on the

16 secondary market.  Accordingly, the injunction in no way remedies or mitigates Cisco's alleged

17 harm.  Moreover, as noted by Dexon, it is undisputed Cisco's partners routinely sell SMARTNet

18 contracts to other secondary market sellers like Dexon.  Accordingly, even if the injunction

19 somehow addressed any alleged harm caused by Dexon's sale of genuine SMARTNet contracts—

20 which it does not—the alleged harm would remain ongoing.

21

### (d)       Cisco's 15+ Year Delay Defeats Any Purported Irreparable

22

### Harm

23       The Court erred by finding irreparable harm despite Cisco's undisputed 15+ year delay in

24 seeking injunctive relief. Ninth Circuit precedent is clear that a party's extensive delay in seeking a

25 preliminary injunction weighs heavily against a finding of irreparable harm and, if long enough, can

26 be dispositive.  In *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985), for

27 example, the court affirmed the denial of the plaintiff's motion to enjoin conduct the defendant had

28 been engaged in for "several years," finding that "[the] Plaintiff's long delay before seeking a

1   preliminary injunction implie[d] a lack of urgency and irreparable harm." Similarly, in *Miracle v.*

2   *Hobbs*, 808 Fed. Appx. 470, 473 (9th Cir. 2020) (citation omitted), the court, in affirming the denial

3   of the plaintiffs' request for a preliminary injunction cited its lengthy delay:

4       The likelihood of imminent and irreparable harm is further undermined by the length
of time between the enactment of the Strikeout Law in 2014 to filing suit in July

5       2019, thus allowing the law to remain in place for multiple election cycles. This delay
"implies a lack of urgency and irreparable harm."

6

7   S*ee also Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 898-99 (N.D. Cal.

8   2019) (delay of more than 1.5 years "was certainly substantial," and citing delay in finding no

9   irreparable harm); *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985) ("Lack of

10  diligence, standing alone, may…preclude the granting of preliminary injunctive relief[.]") Courts

11  overwhelmingly deny injunctive relief where, as here, the moving party's delay is measured in years.

12  Such was the case in *Raoul Beauvoir v. Dingle*, 2013 WL 12114021, at *3 (C.D. Cal. Sept. 16,

13  2013), a trademark infringement matter in which the district court concluded that "Plaintiffs' three-

14  year delay in seeking preliminary injunctive relief negate[d] any presumption of irreparable harm."

15  Injunctive relief was denied on similar grounds in *Caryn Mandabach Prods. Ltd. v. Sadlers*

16  *Brewhouse Ltd.*, 2021 WL 2497928, at *7 (C.D. Cal. May 19, 2021) (citations omitted), also a

17  trademark case:

18      Plaintiff had actual knowledge of Defendants' use of the mark as of April 4, 2018,
but waited over two years to file this action and nearly three years to file the instant

19      Motion for Preliminary Injunction, which demonstrates Plaintiff would not be
irreparably harmed absent an injunction…. Such delay rebuts any presumption of

20      irreparable harm.

21  There are many like examples. *See, e.g., Logic Tech. Dev. LLC v. Levy*, 2021 WL 3884287, at *2

22  (D.N.J. Aug. 31, 2021) ("The Court is aware of no analogous case—and Plaintiff has cited none—

23  where a litigant successfully established irreparable harm after a delay of more than three years.").

24      Cisco's delay here far exceeds that of the parties in the above-cited cases, as Cisco contends

25  that Dexon has been infringing its marks for more than 15 years. ECF No. 32, ¶ 1 ("Dexon has

26  repeatedly sold counterfeit Cisco products over a period that now well-exceeds 15 years."). Cisco

27  was aware of Dexon's sales of SMARTNet service contracts at the time of the 2011 litigation. As

28  noted above, Cisco's assertion that it only recently learned of the extent of Dexon's sales of genuine

DEFENDANT DEXON COMPUTER, INC.'S MOTION TO STAY INJUNCTION PENDING APPEAL

1   SMARTNet service contracts likewise lacks merit.  Moreover, the injunction fails to address or

2   remedy any alleged harm from such sales.  Accordingly, the Court's finding of irreparable harm in

3   the face of such 15+ year delay is error.

4           **B.      DEXON WILL BE IRREPARABLY HARMED IN THE ABSENCE OF A**

5                   **STAY PENDING APPEAL**

6           Dexon's business will be severely harmed by the injunction.  Because the injunction applies

7   only to Dexon, suppliers will simply elect not to do business with Dexon and sell to the hundreds of

8   other identically-situated secondary market sellers rather than have their products randomly

9   scrutinized by Cisco's purported "tool" and unilateral proclamations of counterfeit.

10          This is especially true for Dexon's longstanding suppliers who drop-ship products to

11  Dexon's end-customers.   Like other similarly-situated secondary market sellers, Dexon

12  differentiates itself from and competes with Cisco's direct channel partners based in part on its

13  ability to quickly locate and furnish its customers with product.  Although unclear, the Court's Order

14  appears to apply to such drop shipments.  As non-parties, such suppliers will be inclined to stop

15  doing business with Dexon and elect to do business with the hundreds of other identically situated

16  resellers rather than comply with the burdens imposed by the Court's Order.  "It is well-settled that

17  injury to or destruction of a business constitutes irreparable harm."  *Ajilon Pro. Staffing, LLC v.*

18  *Griffin*, 2009 WL 1507559, at *4 (D. Ariz. May 29, 2009); *see also Husky Ventures, Inc. v. B55*

19  *Invs., Ltd.*, 911 F.3d 1000, 1013-14 (10th Cir. 2018).

20          In addition to direct lost revenue, addressing any preliminary and unsubstantiated "non-

21  genuine" determinations from Cisco's unspecified "tools" would prevent Dexon from completing a

22  previously promised and contracted for order with its customer.  As noted earlier, one of the ways

23  Dexon differentiates itself from Cisco's authorized sellers is its ability to locate, procure and ship

24  product required by its customers quickly (often due to a network issue).  Having already quoted,

25  procured and promised to provide a product needed by its customer by a given date, Dexon would

26

27

28

1   be unable to honor such promise, likely resulting in lost future business.  Kaas Decl., ECF No. 260-

2   1, ¶7. [5]

3          Lastly, the Court's ruling contains repeated, unsupported, and extremely damaging

4   references to Dexon "concealing" the alleged counterfeit sales.  Injunction Order, ECF No. 293, at

5   8 ("Cisco put forward persuasive evidence that—given Dexon's apparent concealment of its

6   counterfeit sales and the difficulty of uncovering counterfeit sales in general—there is likely many

7   more counterfeit sales that it is unaware of."); *id.* at 10 ("Cisco has persuasively argued that it did

8   not know—nor could it have known—about the extent of Dexon's continued sales of counterfeit

9   products or its sales of SMARTnet contracts for those products, because Dexon was actively

10  working to conceal where those products and contracts originated.").  The Court's language implies

11  unidentified nefarious conduct on Dexon's part, which has the potential to be extremely damaging

12  to Dexon's reputation.   In fact, the extent of such "persuasive evidence" consisted of emails

13  categorized by Cisco as Dexon instructing its customers not to disclose Dexon's identity to Cisco.

14  First, the majority of the emails cited and relied on by Cisco do not contain such statements by

15  Dexon.  Second, for the extremely limited emails where Dexon recommended customers to withhold

16  its identity, it had nothing to do with "concealing" counterfeit equipment.   Rather, Dexon's

17  recommendation was based on Cisco's repeated pattern of refusing to service products procured on

18  the secondary market, including wrongfully cancelling and failing to honor genuine and fully paid

19  for SMARTNet contracts because they were procured by a secondary market seller like Dexon.

20         By staying the injunction until such time as the Ninth Circuit has had a chance to review the

21  Injunction and correct any errors, the irreparable harm to Dexon's relationships with its customers

22  and suppliers would be delayed, and altogether thwarted if the injunction is vacated.

23

24

25

26

27  [5] The Injunction Order, albeit in considering the bond amount, acknowledged that "Dexon sells a
    significant number of Cisco products each year, with substantial price tags," and "that the injunction
28  may result in strained relationships with its customers."  Injunction Order at 13.

1

2

### C.   A STAY PENDING THE APPEAL WILL PREVENT HARM TO THIRD PARTIES AND WILL NOT HARM CISCO

3       If the Court does not stay the injunction, third parties—Dexon's customers, partners, and

4   clients—will be severely injured.  *See Del. River Port Auth. v. Transam. Trailer Transp., Inc.*, 501

5   F. 2d 917, 924 (3d Cir. 1974).  The Ninth Circuit has observed, "[i]f anything, a flexible approach

6   is even more appropriate in the stay context," as a stay operates only "upon the judicial proceeding

7   itself.... either by halting or postponing some portion of the proceeding, or by temporarily divesting

8   an order of enforceability." *Nken* at 428. In other words, although "'[a] stay pending appeal certainly

9   has some functional overlap with an injunction,' *id.* at 428, stays are typically less coercive and less

10   disruptive than are injunction." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per

11   curiam).

12       Cisco waited over 15 years to move for a preliminary injunction.  Cisco had notice of Dexon,

13   and other secondary market resellers selling SMARTnet contracts for over 15 years and did nothing

14   to seek injunctive relief.  Cisco is fully aware its authorized resellers sell SMARTnet to secondary

15   market resellers like Dexon—and Cisco approved the contracts and accepts the money—but Cisco

16   did nothing about these contracts for well over a decade.  Moreover, the more recent transactions

17   that Cisco relied upon for seeking the injunction under the appeal occurred more than two years ago.

18   None of these events are recent-in-time, let alone warrant the enforcement of an injunction while

19   this appeal is pending.

20       The Ninth Circuit has noted that "delay can be dispositive when its length substantially

21   outweighs any upsides from the injunction," and "[f]or instance, in the context of a preliminary

22   injunction, a three-year delay between when the trademark holder learned of the infringement and

23   when it filed suit revealed that "[a]ny injury that [the trademark holder] would suffer before trial on

24   the merits would be a relatively short extension of the injury that [the trademark holder] knowingly

25   suffered for three years before it filed suit." *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006

26   (9th Cir. 2023).  Here, Dexon believes that the stay pending appeal of the preliminary injunction

27   will be of very limited duration, especially when a matter of weeks or months is but a small fraction

28   of the time in which Cisco has irrefutably known of Dexon's sales and SMARTNet contracts.  In

1   contrast, there will be no "[s]ubstantial [i]njury" to Cisco from staying the injunction during the

2   appeal.  *Lair v. Bullock*, 697 F.3d 1200, 1215 (9th Cir. 2012).  If an injunction is stayed, Cisco will

3   simply be operating under the same market conditions that have existed for 15 or more years.  Cisco

4   has never presented any evidence of actual harm throughout this case, and instead relies almost

5   entirely upon a purported rebuttable presumption of irreparable harm flowing from its Lanham Act

6   claims, as opposed to any actual evidence of irreparable harm.  Cisco has failed to present even a

7   single instance in which a client left Cisco because of any alleged infringement or other alleged

8   misconduct by Dexon.  A brief stay maintaining the status quo will not harm Cisco.

9        **D.**      **THE PUBLIC INTEREST IS SERVED IN STAYING THIS INJUNCTION**

10               **PENDING THE APPEAL**

11        Vigorous "competition . . . [is] vital to the public interest."  B*oardman v. Pac. Seafood Grp.*,

12   822 F.3d 1011, 1024 (9th Cir. 2016).  Dexon is a secondary market seller.  The injunction erects

13   significant barriers to Dexon's ability to compete with Cisco (and other secondary market sellers)

14   in providing the general public and Dexon's clients with a competing secondary market for its

15   products.  Therefore, the injunction will drastically reduce competition (and therefore affordability)

16   in the marketplace, such that the public interest is served in a brief stay—especially where Cisco

17   merely alleges only less than 6/1000th of 1% of Dexon's sales of Cisco product during that time

18   frame.  The public interest is served by ensuring continued vigorous competition.

19   **IV.**    **CONCLUSION**

20        Dexon seeks only a brief stay of the injunction to allow the Ninth Circuit to vacate, correct

21   the errors in the preliminary injunction, or to otherwise affirm the Court's order.  Given the

22   miniscule amount of sales that purportedly support Cisco's request for an injunction, and the wide

23   and disruptive impact the injunction will have upon Dexon's business, Dexon respectfully requests

24   the Court halt implementation of its injunction until such time as the Ninth Circuit has reviewed

25   Dexon's appeal.

26

27

28

1  Dated:  October 23, 2023                    CONKLE, KREMER & ENGEL, PLC

2

3                                              By:  /s/ Amanda R. Washton

4                                                   John A. Conkle
                                                    Amanda R. Washton
5
                                                    Michael M. Lafeber (pro hac vice)
6                                                   David McDaniel (pro hac vice)
                                                    O. Joseph Balthazor Jr. (pro hac vice)
7                                                   TAFT STETTINIUS & HOLLISTER LLP

8                                                   Attorneys for Defendant and Third-Party Plaintiff
                                                    Dexon Computer, Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28