IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS, INC., et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>DEXON COMPUTER, INC., et al.,<br><br>    Defendants. | Case No. 20-cv-04926-CRB<br><br>**ORDER DENYING MOTION TO STAY** |

  Earlier this year, the Court granted Cisco System, Inc.'s ("Cisco") motion for preliminary injunction, enjoining Dexon Computer, Inc. ("Dexon") from selling counterfeit Cisco products. See Order Gr. Prelim. Inj. (the "Order") (dkt. 293). Dexon has since filed an appeal of the Order, which is currently pending before the Ninth Circuit. See Notice of Appeal (dkt. 309). Before this Court is Dexon's motion to stay the preliminary injunction pending its appeal. See Mot. to Stay (dkt. 313).

  For the reasons described herein, the Court DENIES Dexon's motion to stay. In addition, the Court will issue an amended order to further clarify the injunction.

**I. TEXT OF THE INJUNCTION**

  In the Order, the Court included a section explaining the scope of the injunction, which reads as follows:

  "After the July 14 hearing, Cisco and Dexon met and conferred to discuss the form an injunction would take, specifically with regard to the use of Cisco's packaging verification tool. See Cisco Meet and Confer Decl. (dkt. 258). Cisco then submitted a revised, narrowed proposal. See Cisco Revised Proposal. Cisco's revised injunction addresses the concerns this Court had—namely, it allows Dexon to continue its legitimate

business activities, while protecting Cisco against counterfeit sales. See id. at 6–8 (¶¶1–6). Dexon has raised concerns about the workability of this injunction with regard to drop shippers, see Resp. to Cisco Revised Proposal, but the Court believes the solutions Cisco discussed with Dexon, like Dexon obtaining packaging information from its drop shippers to input into the tool, sufficiently address those concerns.

The Court therefore adopts the scope of the proposed injunction described in the Cisco Revised Proposal at Docket No. 258-1. Subject to the particular language in the proposal, see Cisco Revised Proposal at 6–8 (¶¶1–6), Dexon is enjoined from selling counterfeit Cisco products. Cisco will provide Dexon with a packaging verification tool that will allow Dexon to screen products and determine, within a few seconds, if they are legitimate. So long as Dexon uses that tool before selling a Cisco product, and the tool says the product is legitimate, Dexon will not violate this Order. In addition, the injunction will only apply to Cisco products (1) that can be verified using Cisco's tool, and (2) that Dexon advertises as "new."
See Order at 12.

In addition, on the final page of the Order, the Court ordered that the parties abide by the following terms of the injunction:

(1) Pursuant to the specific terms in Cisco's revised proposed injunction, see Cisco Revised Proposal at 6–8 (¶¶1–6), Dexon is hereby enjoined from selling counterfeit Cisco products.

(2) The preliminary injunction shall only apply to Cisco products which are advertised by Dexon as "new," and for which Cisco has provided Dexon a method to verify the genuine nature of the product packaging.

(3) Dexon will not violate this Order if it sells a Cisco product that turns out to be counterfeit, so long as Dexon used the tool provided by Cisco prior to the sale of such product and the tool reported that the packaging was genuine.

See Order at 14.

## II. JURISDICTION

"While an appeal is pending from an interlocutory order . . . that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). This grant of authority may appear broad, but the Ninth Circuit has limited it, holding that "a district court lacks jurisdiction to modify an injunction once it has been appealed except to maintain the status quo among the parties." See Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc., 204 F.3d 867, 880 (9th Cir. 2000).

Relying on the Circuit's holding in Prudential, Cisco contends that the Court lacks jurisdiction to stay the injunction, because such a stay would modify the status quo: Dexon is presently enjoined from selling counterfeit Cisco products, and a stay would permit the company to resume those sales. Cisco also cites Rocky Mountain Farmers Union v. Goldstene, in which the court explicitly held that it "lack[ed] jurisdiction to grant defendants' motion to stay the injunction and judgments pending appeal." No. CV-F-09-2234 LJO DLB, 2012 WL 217653, at *2 (E.D. Cal. Jan. 23, 2012). The court explained that "Defendants' motion to suspend the preliminary injunction is . . . based on issues that this Court resolved in its orders, and are the issues that are currently pending appeal, . . . [and] this Court lacks jurisdiction to act on the merits of the case or alter the status of the appeal." Id.; see also Overstreet v. Apex Linen Serv., Inc., 2018 WL 2245145, at *1 (D. Nev. Apr. 19, 2018) ("[A] stay of [the] injunction, even in part, would constitute finally adjudicating the parties' rights directly involved in the appeal, would materially change the status of the case on appeal, and would alter the status quo.").

Dexon disagrees, arguing that the Court does have jurisdiction to stay the injunction pending appeal because such a stay does not "seek to alter the terms of the injunction" or "vacate" it until the Ninth Circuit resolves the appeal. See Reply to Mot. to Stay (dkt. 319). Dexon cites cases in which district courts in the Ninth Circuit have assumed jurisdiction when considering whether to stay an injunction pending appeal. See, e.g., Wit v. United Behav. Health, 2020 WL 8614181, at *1–3 (N.D. Cal. Dec. 28, 2020); Tri-Dam

v. Frazier, 2022 WL 2067878, at *4 (E.D. Cal. June 8, 2022); Flores v. Bennett, 2023 WL 3751998, at *2 (E.D. Cal. June 1, 2023). The courts in these cases did not consider Prudential or its progeny of cases; rather, the courts simply cite the (seemingly) broad text of Rule 62(d) to satisfy themselves with jurisdiction. And Dexon fails to cite a Ninth Circuit case that suggests district courts are vested with this jurisdiction, despite the holding in Prudential.

Still, it appears to the Court that there is conflicting authority among district courts in the circuit on the issue. Dexon may be correct that Prudential's divestiture of jurisdiction only applies to modifying the terms of the injunction, or vacating it entirely, rather than issuing a stay pending appeal. Yet it is hard to see the distinction between a stay and vacating the injunction in this case. Both involve the Court performing an analysis on the merits of Dexon's position. And both would alter the "status quo" in that Dexon would again be free to sell counterfeit Cisco products—after all, that is exactly the point of Dexon's motion, to get rid of the prohibition on these sales.

There are compelling reasons cutting both ways on the jurisdictional issue. However, because the Court denies the motion on the merits, the Court need not affirmatively decide the jurisdictional question. Following other courts in this circuit, the Court therefore assume jurisdiction for purposes of analyzing the issue on the merits.

### III. LEGAL STANDARD

A request for a stay pending appeal is committed to the exercise of judicial discretion. Doe #1 v. Trump, 957 F.3d 1050, 1058 (9th Cir. 2020). A party requesting a stay pending appeal "bears the burden of showing that the circumstances justify an exercise of that discretion." Nken v. Holder, 556 U.S. 418, 433–34 (2009). Courts analyze four factors to determine whether to exercise that discretion: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. Id. at 434.

## IV. DISCUSSION

Assuming the Court does have jurisdiction to issue a stay, Dexon's arguments on the merits fail. The Court addresses each Nken factor in turn, but only briefly analyzes those factors for which Dexon simply rehashes the arguments that the Court rejected in the Order.

### A. Likelihood of Success on Appeal

Dexon argues that there is a strong likelihood it will prevail in its appeal for three reasons: (1) the Court's "irreparable harm analysis is erroneous and unsupported"; (2) the Court "failed to apply the heightened standard applicable to mandatory injunction"; and (3) the Court's injunction is vague under Federal Rule of Civil Procedure 65. See Mot. to Stay.

#### 1. Irreparable Harm & Mandatory Injunction Analyses

Dexon's first two arguments can be swiftly rejected. That is because Dexon makes the exact same arguments the Court thoroughly considered and denied in the Order. Compare Order at 5–7, 9–11, with Mot. to Stay at 8–12. The Court explained in detail in the Order why Cisco has established irreparable harm and why this is not a mandatory injunction; Dexon presents no new or compelling reason why the Court should find otherwise now.

#### 2. Vagueness of Injunction

Dexon's third argument, however, presents a new and quite technical issue. Dexon argues that the injunction, as stated in the Order, is vague and therefore violates Federal Rule of Civil Procedure 65. Rule 65 requires that an injunction "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1).

Dexon takes issue with three aspects of the Court's injunction: (1) that it refers to an outside document; (2) that it offers "no guidance as to what is a 'counterfeit Cisco product'"; and (3) that it "fails to define what is the acceptable 'method to verify the genuine nature of the product packaging.'" Mot. to Stay at 7–8.

5

Starting with Dexon's first issue. The Court's Order refers to certain paragraphs of Cisco's Proposed Injunction, stating as follows: "Pursuant to the specific terms in Cisco's revised proposed injunction, see Cisco Revised Proposal at 6–8 (¶¶1–6), Dexon is hereby enjoined from selling counterfeit Cisco products." Dexon argues that this violates Rule 65's requirement that the injunction must describe the acts restrained in reasonable detail in the order itself, not by reference to an outside document.

The Court does not find that the injunction's reference to an outside document violates Rule 65 in this instance. The inquiry under Rule 65(d)(1) is whether "an ordinary person reading the court's order" can "ascertain from the document itself exactly what conduct is proscribed." Columbia Pictures Industries, Inc. v. Fung, 710 F. 3d 1020, 1047–48 (9th Cir. 2013). Even without the referenced document, the "acts restrained" under the Court's injunction are clear: Dexon cannot sell counterfeit Cisco products that are advertised as "new" and for which Cisco provides a tool for verifying the authenticity.[1] See also Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc., No. 2021-1839, 2022 WL 1530491, at *2 n.1 (Fed. Cir. May 16, 2022) (explaining that the "Ninth Circuit has not taken a rigid approach to Rule 65(d)'s no-incorporation requirement") (internal quotation and citation omitted).

That brings us to Dexon's next complaints. Dexon argues that the terms "counterfeit Cisco product" and the "tool" to verify the product's authenticity are vague. Again, the Court disagrees. While "counterfeit" is clear on its own terms, the Order further clarifies its meaning. First, the injunction contrasts "counterfeit" and "genuine." The injunction provides "reasonable detail" for a reader to understand that "counterfeit Cisco products" are products that are not genuine—which Dexon can confirm by using Cisco's packaging verification tool. The Court's explanation in the Order that "Cisco will provide Dexon with a packaging verification tool that will allow Dexon to screen products

---

[1] There is also a safe harbor if Dexon sells a Cisco product that turns out to be counterfeit, so long as Dexon used the verification tool prior to the sale and the tool confirmed the packaging was genuine.

6

and determine, within a few seconds, if they are legitimate" further provides the same clarity. See Order at 12. And while the injunction does not refer to Cisco's package-verification tool by a particular name, it again describes "in reasonable detail" what the tool is—that is, a tool to "verify the genuine nature of the product packaging." If Cisco does not provide a tool with this capability to Dexon—regardless of the name or form the tool may take—then Dexon is free to sell any and all Cisco products.[2] Neither "counterfeit" nor "method to verify the genuine nature of the product packaging" rise to the level of vagueness such to violate Rule 65. And the cases Dexon's cites only emphasize that point, given the undeniably ambiguous terms in those injunctions. See, e.g., Columbia Pictures, 710 F.3d at 1048 (defining "Infringement-Related Terms" as "terms widely known to be associated with copyright infringement" was impermissibly vague); Del Webb Communities, Inc. v. Partington, 652 F.3d 1145, 1150 (9th Cir. 2011) (concluding that "illegal, unlicensed and false practices" was impermissibly vague).

However, out of an abundance of caution and to "secure the opposing party's rights," see Fed. R. Civ. P. 62(d), the Court will issue an amended order, which (1) removes the reference to the outside document; and (2) clarifies the two terms ("counterfeit" and "tool") which Dexon asserts are vague.

Importantly, the Court has jurisdiction to make these minor clarifications despite Dexon's appeal. The Ninth Circuit has specifically held that minor clarifications of this sort do not run afoul of Prudential's holding that the district court cannot modify an injunction order on appeal. In National Resources Defense Council, Inc. v. Southwest Marine Inc., the district court modified an injunction—which was pending appeal—by substituting two terms: "(1) testing of the surface "microlayer" for testing 'at the surface,' and (2) 18–month deadline for the requirement of 'reasonably expeditious' construction of a facility to capture pier storm water runoff." 242 F.3d 1163, 1165 (9th Cir. 2001). The

---

[2] The Court believes that Dexon feigns uncertainty in this regard. Dexon and Cisco specifically conferred "regarding use of Cisco's packaging verification tool as a method for facilitating compliance with Cisco's proposed preliminary injunction order." See Cisco Supp. Br. (dkt. 258).

7

district court did so because it found that "the phrase 'at the surface' was vague and did not ensure that Southwest Marine's water column testing would accomplish the purpose behind the [injunction]." Id. at 1168. And while "the district court did not find the phrase 'in a reasonably expeditious manner' to be vague," the defendant did. Id. So the district court "obliged by specifying that the pier storm water capture facility must be built within 18 months of the May 7, 2000 order, to comply with the 'reasonably expeditious' standard." Id. The defendant appealed, challenging the district court's jurisdiction to make these two particular modifications.

The Ninth Circuit held that these modifications "effectuated the underlying purposes of the original requirements" and "did not materially alter the status of the consolidated appeal" because "[t]hey left unchanged the core questions before the appellate panel deciding the consolidated appeal." Id. Thus, "having provided no evidence" that these clarifications "increased [defendant's] burdens under the injunction," the Circuit concluded that the "modification was a minor adjustment of the injunction that preserved the status quo." Id.

The same applies here. Further clarification regarding the terms "counterfeit Cisco products" and "method to verify product packaging" in the Order preserves the status quo of the injunction. The injunction itself remains the same. The clarification that the Southwest Marine court blessed after parties found the terms "at the surface" and "in a reasonably expeditious manner" to be vague is the same type of clarification that the Court will provide here. Such clarification helps to "secure [Dexon's] rights"—given its purported uncertainty about the scope of the injunction—but does not interfere with the merits of the Court's decision to grant the preliminary injunction.

While the Court believes the injunction is clear as is and compliant with Rule 65, it also sees no reason not to further clarify it in response to Dexon's uncertainty. Accordingly, the Court will issue an amended preliminary injunction order.

B.   **Irreparable Injury to Dexon Absent a Stay**

Dexon asserts that its business will be "severely harmed" in the absence of a stay

pending the appeal. See Mot. to Stay at 14–15. In particular, Dexon claims that the injunction will result in lost revenue, lost future business, and damage to its reputation.

Dexon says that it will lose revenue and business because "suppliers will simply elect not to do business with Dexon and sell to the hundreds of other identically-situated secondary market sellers rather than have their products randomly scrutinized by Cisco's purported 'tool.'" Id. at 14. However, "monetary injury is not normally considered irreparable." hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 993 (9th Cir. 2019) (citation omitted).[3] The Ninth Circuit has recognized an exception to that rule when there is a "sufficient . . . threat of being driven out of business," id. (citation and internal quotation omitted), but Dexon does not sufficiently allege that the injunction will result in a total destruction of its business. Rather, Dexon says that some suppliers "will be inclined" to stop doing business with it, and that these suppliers are "in part" what differentiates Dexon's business. See Mot. to Stay at 14. It is especially telling that Dexon cites no actual loss of business or actual refusals of suppliers to do business with it, despite the injunction being in place for a month prior to Dexon filing its motion to stay. Id. Because Dexon does not sufficiently claim that the injunction will threaten its business with extinction, any monetary injury from the injunction is not irreparable harm.

As to the purported reputational harm, Dexon claims that "[t]he Court's language [in the Order] implies unidentified nefarious conduct on Dexon's part, which has the potential to be extremely damaging to Dexon's reputation." Id. at 15. However, again, Dexon speaks of this harm in purely speculative terms ("potential to be" "extremely damaging"), even though the injunction was in place for several weeks at the time of its motion. And while Dexon may be right that some customers will find its conduct distasteful, Dexon does not cite any caselaw supporting why this would constitute irreparable harm. Moreover, the Court's conclusions were based on evidence of Dexon's

---

[3] Monetary loss may be irreparable if the money cannot be recouped, see California v. Azar, 911 F.3d 558, 581 (9th Cir. 2018), but that issue does not exist here and Dexon does not claim otherwise. Cisco filed a bond certificate in a sufficient amount to avoid this outcome, in the event that Dexon succeeds on the merits. See Notice of Bond (dkt. 291).

conduct, which the Court accurately quoted and represented in the Order. It belies reason that Dexon should get out of an injunction just because the Court accurately informed the public of its actions.

### C. Irreparable Harm to Cisco & Public Interest

Again, Dexon rehashes arguments from its preliminary injunction briefing on the final two Nken factors. Dexon argues that there is no irreparable harm to Cisco because "Cisco waited over 15 years to move for a preliminary injunction," see Mot. to Stay at 16, and also claims that an injunction is not in the public interest because it prohibits Dexon's lawful sales on the secondary market, see id. at 17. Dexon asserted these same reasons when arguing against Cisco's motion for the preliminary injunction. See Opp'n to Mot. for Prelim. Inj. (dkt. 214) at 13–15, 17. And Dexon provides no new or compelling reason why the Court should change its analysis after thoroughly considering and finding in Cisco's favor on these factors—based on the same arguments—in the Order. See Order at 9–12.[4] The Court (again) rejects Dexon's arguments, and reaffirms its findings of irreparable harm to Cisco as well as that the injunction is in the public interest.

Thus, assuming the Court has jurisdiction on the issue, Dexon has failed to establish that any of the Nken factors favor staying the preliminary injunction pending its appeal.

### V. CONCLUSION

For the foregoing reasons, the Court DENIES Dexon's motion to stay. Out of an abundance of caution, the Court will issue an amended order further clarifying the injunction.

**IT IS SO ORDERED.**

Dated: December 15, 2023

CHARLES R. BREYER
United States District Judge

---

[4] To the extent that Dexon's argument about the public interest is slightly different here, the Court still rejects it. The public's interest in protecting trademarks and in obtaining non-counterfeit goods, see Order at 11, outweighs the additional "competition" Dexon claims it provides in the secondary market.